## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., *and* | ) ) ) |
| ROBERT NASH, *and* | ) ) |
| BRANDON KOCH, | ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| | )   Civil Action No. <u>1:22-cv-00907</u> (GTS/CFH) |
| KEVIN P. BRUEN, in his official capacity as Superintendent of the New York State Police, *and* | ) ) ) |
| RICHARD J. MCNALLY, JR., in his official capacity as Justice of the New York Supreme Court, Third Judicial District, and Licensing Officer for Rensselaer County, | ) ) ) ) ) |
| *Defendants.* | ) |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs New York State Rifle & Pistol Association, Inc., Robert Nash, and Brandon Koch (collectively "Plaintiffs"), by and through the undersigned attorneys, file this Complaint against the above-captioned Defendants, in their official capacities as state and local officials responsible under New York law for administering and enforcing the State's laws and regulations governing the carrying of firearms outside the home. Plaintiffs seek a declaration that New York's limitations of and burdens on the right to carry firearms as enacted in Senate Bill 51001 ("SB51001") and as otherwise detailed below are unconstitutional under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution. Plaintiffs also seek an injunction compelling Defendants to refrain from enforcing those invalid limitations. In support of their Complaint against Defendants, Plaintiffs hereby make the following allegations.

## INTRODUCTION

1.     The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. The Supreme Court, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), made clear that the text of the Second Amendment protects equally the right to keep arms in the home and the right to bear them in public. "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. at 2134; *see also id*. at 2135 (The Second Amendment "guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home.") (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). This guarantee protects the right of "ordinary, law-abiding, adult citizens" to "carry[] handguns publicly for self-defense." *Id*. at 2134.

2.     At issue in *Bruen* was a New York law that granted licenses to carry concealed without regard to employment or place of possession pursuant to Section 400.00(2)(f) of the New York Penal Law (a "Handgun Carry License") to only those who could demonstrate to a licensing officer that they had "proper cause" for obtaining a Handgun Carry License. The licensing officer's determination was discretionary. *Bruen* struck down that requirement, holding that the Second Amendment precludes "licensing laws[] under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id*. at 2123–24.

3.     In response to *Bruen*, New York enacted the Concealed Carry Improvement Act (Senate Bill 51001) (the "CCIA"). The CCIA replaces one unconstitutional, discretionary law with another unconstitutional, discretionary law. The CCIA contains a slew of burdensome and discriminatory requirements for obtaining a Handgun Carry License—violating the First, Second,

Fourth, and Fourteenth Amendments—and an additional slew of restrictions on where and how Handgun Carry License holders may exercise their right to carry arms outside the home—in violation of the First, Second, and Fourteenth Amendments.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over Plaintiffs' claim under 28 U.S.C. §§ 1331 and 1343.

5.      Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) & (b)(2).

## PARTIES

7.      Plaintiff Robert Nash is a citizen of the United States and a resident and citizen of the State of New York. He resides in Averill Park, NY 12018.

8.      Plaintiff Brandon Koch is a citizen of the United States and a resident and citizen of the State of New York. He resides in Troy, NY 12180.

9.      Plaintiff New York State Rifle & Pistol Association, Inc. ("NYSRPA") is a group organized to support and defend the right of New York residents to keep and bear arms. The New York restrictions on the public carrying of firearms at issue in this case are a direct affront to NYSRPA's central mission. NYSRPA has thousands of members who reside in New York. Its official address is 713 Columbia Turnpike East Greenbush, NY 12061. Plaintiffs Nash and Koch are members of NYSRPA. They are two among many NYSRPA members who will be deterred by the CCIA's requirements from exercising the right to carry a firearm outside of the home. Many of NYSRPA's members own or lease private property and wish to allow individuals to possess firearms on their private property without posting clear and conspicuous signage indicating (or

otherwise providing express consent) that the carrying of firearms, rifles, or shotguns on their property is permitted on their property.

10.     Defendant Kevin P. Bruen is the Superintendent of the New York State Police. As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including prescribing the form for Handgun Carry License applications. His official address is New York State Police, 1220 Washington Avenue, Building 22, Albany, NY 12226. He is being sued in his official capacity.

11.     Defendant Richard J. McNally, Jr., is a Justice of the New York Supreme Court, Third Judicial District, and a Licensing Officer for Rensselaer County under N.Y. PENAL LAW § 400.00. Pursuant to N.Y. PENAL LAW § 265.00(10), he is responsible for receiving applications from residents of Rensselaer County for a license to carry a handgun, investigating the applicant, and either approving or denying the application. His official address is Rensselaer County Courthouse, 80 Second Street, Troy, NY 12180. He is being sued in his official capacity as a State Licensing Officer.

## FACTUAL ALLEGATIONS

### New York's Burdensome Handgun Carry License Application Process

12.     New York law generally forbids any person from "possess[ing] any firearm," N.Y. PENAL LAW § 265.01(1), without first obtaining "a license therefor," *id.* § 265.20(a)(3). Violating this ban is a class A misdemeanor, punishable by a fine of $1,000 or less or up to a year in prison. *Id.* §§ 70.15(1), 80.05(1), 265.01. Possessing a loaded firearm without a license is a class C felony, punishable by a fine of up to $5,000 or between one- and fifteen-years imprisonment. *Id.* §§ 70.00(2)(c) & (3)(b), 80.00(1), 265.03.

13.     New York's ban is subject to minor exceptions for active duty members of the military, police officers, and peace officers. *Id. § 265.20.* An ordinary member of the general public who wishes to carry a handgun outside the home for purposes of self-protection, however, can only do so if he obtains a Handgun Carry License under Section 400.00(2)(f) of New York's Penal Law.

14.     A person seeking a Handgun Carry License must submit an application—on a form approved by Defendant Bruen—to the Licensing Officer for the city or county where he resides. *Id. § 400.00(3)(a).* No license is available to authorize the carrying of handguns within the State openly.

15.     To be eligible for a Handgun Carry License, an applicant must satisfy numerous objective criteria. For example, he must be at least 21 years old, must not have been convicted of any felony or serious offense (including certain misdemeanors), must not be an unlawful user of a controlled substance, and must not have any history of mental illness. *Id. § 400.00(1).*

16.     Additionally, the applicant must complete a minimum of 16 hours of in-person live firearms safety and training curriculum on the following topics: (i) general firearm safety, including an overview of firearm and ammunition functions and operation, firearm cleaning and maintenance, safe handling practices, range safety rules, and proper holster considerations and retention strategies for safe concealed carry (two hours minimum); (ii) firearm safe storage requirements, as defined in N.Y. PENAL LAW §§ 265.45 and 265.50, and general firearm secure storage and transportation best practices (one hour minimum); (iii) state and federal gun laws, including the possession disqualifiers under 18 U.S.C. § 922(g) and New York State law, restrictions on the private sale or transfer of firearms under New York General Business Law § 898, and requirements for keeping firearm license information up to date, properly registering

pistols and revolvers, and license recertification and, if applicable, renewal requirements, including but not limited to the provision set forth in Articles 265 and 400 of the Penal Law (two hours minimum); (iv) concealed carry situational awareness of surroundings, including firearm display and concealment; (v) conflict de-escalation tactics that include verbal and non-verbal strategies, including retreating, that are intended to reduce the intensity of a conflict or crises encountered; (vi) adverse effects of alcohol and drug use as it pertains to firearm safety; (vii) best practices when encountering law enforcement (e.g., a traffic stop), including how to communicate throughout the encounter, considerations for disclosing concealed carry status and displaying a valid firearm license, obeying all commands given by the officer(s), and best practices for handling a firearm and self-identification as a lawful concealed carry licensee if the firearm is visible when an officer responds to an incident; (viii) the statutorily defined sensitive places listed below in paragraph 31; (ix) conflict management; (x) use of deadly physical force, including the circumstances in which deadly physical force may be considered justified, and when there is the duty to retreat pursuant to N.Y. PENAL LAW § 35.15(2); (xi) suicide prevention including recognizing signs of suicide risk and resources to obtain assistance, including a suicide hotline (e.g., 988 Suicide and Crisis Lifeline); and (xii) basic principles of marksmanship, including stance, grip, sight alignment, sight picture, breathing, and trigger control (one hour minimum). The applicant must also then score 80% or higher on a written test that covers this curriculum. New York does not cover the fees associated with attending the firearms safety training course or the associated exam.

17.     The applicant must also complete minimum of two hours of a live-fire range training course that covers (i) range safety; (ii) safe drawing, target acquisition, and re-holstering; (iii) dry firing; (iv) safe loading and unloading of ammunition; (v) performing a firearm condition check, and how to achieve and verify a safe and empty firearm condition; and (vi) safely

discharging the firearm. He must not just complete a range training course but must demonstrate a certain level of proficiency, requiring each applicant to: (i) perform a firearm condition check and demonstrate that the firearm is in a safe and empty condition; (ii) without any ammunition loaded, safely draw the firearm from concealment, acquire a target, and safely re-holster; (iii) safely load the firearm with five rounds of ammunition; not holster the loaded firearm; maintain a ready position with the firearm safely pointed downrange; (iv) on the instructor's command to fire, aim at a paper target that is 25 ½ by 11 inches and fire all five rounds from a standing position, from a distance of 4 yards, hitting at least four out of the five rounds on the target; and (v) perform a firearm condition check and verify that the firearm is in a safe and empty condition. New York does not cover the fees associated with completing at least two hours of live-fire range training— which may include renting a firearm and purchasing ammunition—or the associated exam. Upon information and belief, the expenses associated with the firearms safety training course and live-fire range training course will be hundreds of dollars.

18.     The applicant must also ensure that after demonstrating his proficiencies in firearms safety training and live-fire that he obtains a certification of completion endorsed and affirmed under the penalties of perjury by his authorized instructor.

19.     The applicant must also satisfy a subjective criterium: a licensing officer (always a government official; usually a judge or law enforcement officer) deems him "of good moral character." The CCIA defines good moral character to mean that the licensing officer, in his discretion, deems the applicant to have "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."

20.     To determine whether an applicant is of good moral character, a licensing offer must meet with and interview the applicant. At this interview, the applicant shall provide to the licensing offer and the licensing officer shall review:

  a.  The names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home.

  b.  The names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others.

  c.  The certification of completion of the training required by the CCIA.

  d.  A list of the applicant's former and current social media accounts from the past three years.

  e.  Such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application.

21.     The term "social media accounts" is not a defined term. Social media accounts may include Facebook, Instagram, and Twitter accounts. It may also include WhatsApp, Venmo, Yelp, Snapchat, online dating accounts, or myriad other online accounts that are arguably a "social media account"—all of which allow for expressive communications and many of which allow for users to communicate through text, audio, or photographs, doing so privately and/or anonymously. Nor is there any guidance for how in-depth the licensing officer's review may or must be and for what the licensing officer may or must review. The licensing officer may, for instance, require the

applicant to grant access to the applicant's private social media accounts so the licensing officer may search for and review the applicant's most personal and sensitive information and communications, like private messages and photographs sent and received on the applicant's social media accounts. The CCIA authorizes a licensing officer to make copies of and store whatever he finds when digging through the applicant's social media accounts. *See* N.Y. PENAL LAW § 400.02(1).

22.    Requiring Handgun Carry License applicants to provide a list of their social media accounts and character references to a licensing officer will chill the protected speech of New Yorkers, including Plaintiffs Nash and Koch and NYSRPA's members, because they will not know what they can and cannot say in their private lives and in their private social media, and whether their exercise of protected speech may one day give a licensing officer pause in issuing a license to exercise an entirely different constitutionally protected right.

23.    The provision allowing a licensing officer to review "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application" on its face grants the licensing officer access to any and all other information he so desires.

24.    The government must then take the applicant's fingerprints and physical descriptive data.

25.    A Handgun Carry License must be renewed every three years.

26.    Before issuing or renewing a license, the licensing officer must conduct a rigorous investigation and background check to verify that each of the statutory requirements is satisfied. New York requires an investigation of all statements required in the application by the duly constituted police authorities of the locality where the application is made, including but not

limited to such records as may be accessible to the division of state police or division of criminal justice services pursuant to section 400.02 of the New York Penal Law. For that purpose, the records of the appropriate office of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority.

27.    The CCIA allows licensing officers up to six months—unless the licensing officer provides written notice that the approval process will take longer—to approve or deny an application for a Handgun Carry License. That indefinite wait for Handgun Carry License applicants is in addition to however long it took the applicant to complete the required training courses and obtain a certification of completion, find four individuals willing to be a character reference, compile his social media (whatever that term means), schedule an interview and meet with a licensing officer, and provide that licensing officer whatever additional information that licensing officer wishes to review.

28.    Completing a Handgun Carry License application and waiting for a licensing officer's subjective approval is a lengthy and exorbitantly expensive process that will have the effect of denying ordinary citizens their right to public carry.

### New York's Restrictions on Handgun Carry License Holders

29.    The CCIA greatly restricts where Handgun Carry License holders, including Plaintiffs Nash and Koch, may exercise their fundamental right to carry arms in public for self-defense.

30.    The CCIA forbids New Yorkers from possessing or carrying a firearm in "sensitive locations," which are defined to include:

a.  Any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts.

b.  Any location providing health, behavioral health, or chemical dependance care or services.

c.  Any place of worship or religious observation.

d.  Libraries, public playgrounds, public parks, and zoos.

e.  The location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York.

f.  Nursery schools, preschools, and summer camps.

g.  The location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities.

h.  The location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports.

i.  The location of any program licensed, regulated, certified, operated, or funded by the office of mental health.

j.  The location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance.

k.  Homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence.

l.  Residential settings licensed, certified, regulated, funded, or operated by the department of health.

m.  In or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools.

n.  Any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals.

o.  Any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption.

p.  Any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks,

performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission.

q. Any location being used as a polling place.

r. Any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage.

s. Any gathering of individuals to collectively express their constitutional rights to protest or assemble.

t. The area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

31.     It is unclear where, if anywhere, an ordinary Handgun Carry License holder may lawfully carry a handgun for self-defense. Not only are the sensitive locations impermissibly vague, making it impossible for a Handgun Carry License holder to know if he is in a "sensitive location" and thus in violation of the law, they are so broad that they swallow the right such that there is no realistic ability to exercise the right to carry a handgun in public. A Handgun Carry License holder may not, without disarming himself: enter a place owned or even controlled by the State; seek medical care; attend church; go to a public park; walk through a college campus; ride public transit; go out to eat; vote; use a sidewalk if there is a special event happening; or go

13

anywhere two or more people are assembled and engaged in First Amendment activities. These problems are not unique to New York City. New Yorkers throughout the state are subject to onerous and vague restrictions pertaining to so-called sensitive locations. The CCIA is intentionally vague, overbroad, and in contradiction of *Bruen*. Governor Hochul does not even know where Handgun Carry License holders may carry a firearm, stating that although New York "can't shut [carrying] off [in] all places," the CCIA limits carrying to "probably [in] some streets." *See* Marcia Kramer & Dick Brennan, *Fresh off primary win, Gov. Kathy Hochul dives right into guns -- who can get them and where they can take them*, CBS NEWS NEW YORK, available at [https://www.cbsnews.com/newyork/news/fresh-off-primary-win-gov-kathy-hochul-dives-right-into-guns-who-can-get-them-and-where-they-can-take-them/](https://www.cbsnews.com/newyork/news/fresh-off-primary-win-gov-kathy-hochul-dives-right-into-guns-who-can-get-them-and-where-they-can-take-them/). She also labeled *Bruen* a mere "temporary setback because we are going to marshal the resources to make sure that we do not surrender my right as governor and our rights as New Yorkers to protect ourselves from gun violence." *Id*.

32.     Former police officers who no longer possess any police powers but who possess a Handgun Carry License may possess a firearm in the aforementioned sensitive locations.

33.     The CCIA also forbids, with minor exceptions, New Yorkers from possessing or carrying a firearm in a "restricted location," which includes all "private property [without] clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on the[] property is permitted or [the property owner] has otherwise given express consent." The CCIA mandates a presumption that all private property be a gun free zone. Unless a property owner or lessee takes specific action in the form of compelled speech to restore his fellow citizen's Second Amendment rights, law-abiding and responsible New Yorkers may not possess or carry a firearm on that property owner or lessee's property.

14

34.     Former police officers who possess a Handgun Carry License may possess a firearm in the aforementioned restricted locations.

35.     Criminal possession of a weapon in a sensitive or restricted location is a class E felony. But for a credible threat of prosecution, Plaintiffs Nash and Koch would possess a firearm in each of the aforementioned prohibited sensitive and restricted locations.

36.     The CCIA also restricts how Handgun Carry License holders may keep their firearms in their automobiles. The CCIA prohibits Handgun Carry License holders from storing or otherwise leaving a rifle, shotgun, or firearm out of his or her immediate possession or control inside a vehicle without first removing the ammunition from and securely locking the rifle, shotgun, or firearm in an appropriate safe storage depository out of sight from outside of the vehicle. Safe storage depository does not include a glove compartment or glove box but only a safe or other secure container which, when locked, is incapable of being opened without the key, keypad, combination or other unlocking mechanism and is capable of preventing an unauthorized person from obtaining access to and possession of the weapon contained therein and is fire, impact, and tamper resistant.

37.     Failure to safely store rifles, shotguns, and firearms in the first degree is a class A misdemeanor. But for the credible threat of prosecution, Plaintiffs Nash and Koch would safely and responsibly secure their firearms in their unattended automobiles without first removing ammunition from their firearms and without utilizing a safe storage depository.

**The CCIA Will Deter Plaintiffs From Obtaining or Renewing Handgun Carry Licenses**

38.     Plaintiff Robert Nash is an adult citizen and resident of New York. He is not a law enforcement official or a member of the armed forces, and he does not fall within any of the other

15

exceptions enumerated in N.Y. PENAL LAW § 265.20 to New York's ban on carrying firearms in public.

39.     Mr. Nash possesses all of the qualifications necessary to obtain a Handgun Carry License that are enumerated in N.Y. PENAL LAW § 400.00(1). For example, he is over 21 years of age, he has not been convicted of any felony or other serious offense, and he is not addicted to controlled substances or mentally infirm.

40.     Mr. Nash desires to carry a handgun in public for self-defense. Mr. Nash lawfully owns several handguns which he keeps in his home to defend himself and his family, and he would carry a handgun for self-defense when he is in public were it not for Defendants' enforcement of New York's ban on the public carrying of firearms. Mr. Nash is not entitled to a Handgun Carry License by virtue of his occupation.

41.     In or around September 2014, Mr. Nash applied to the Licensing Officer for the county where he resides, Rensselaer County, for a license to carry a handgun in public. After investigation, Mr. Nash's application was granted on March 12, 2015, but he was issued a license marked "Hunting, Target only" that allowed him to carry a firearm outside the home only while hunting and target shooting.

42.     Because of these restrictions, Mr. Nash is not able to carry a firearm outside of his home for self-defense.

43.     On September 5, 2016, Mr. Nash requested the Licensing Officer, Defendant Richard N. McNally, Jr., to remove the "hunting and target" restrictions from his license and issue him a license allowing him to carry a firearm for self-defense.

44.     On November 1, 2016, after an informal hearing, Defendant McNally denied Mr. Nash's request and "determined that the `Hunting, Target only' restrictions [shall] remain on your

carry concealed permit." Letter from Richard McNally, Jr., to Robert Nash (Nov. 1, 2016) (attached as Exhibit 1). Defendant McNally "emphasize[d] that the restrictions are intended to prohibit you from carrying concealed in ANY LOCATION typically open to and frequented by the general public." *Id.*

45.    Defendant McNally did not determine that Mr. Nash was ineligible for any of the reasons enumerated in N.Y. PENAL LAW § 400.00(1); indeed, his eligibility is confirmed by the fact that he continues to hold a "restricted" license. Instead, Defendant McNally concluded that Mr. Nash had failed to show "proper cause" to carry a firearm in public for self-defense because he did not demonstrate a special need for self-defense that distinguished him from the general public.

46.    Mr. Nash will be deterred from renewing his Handgun Carry License under the newly-enacted CCIA because of the expense, inconvenience, and other impermissible burdens of the CCIA's application process and its constituent parts.

47.    Plaintiff Brandon Koch is an adult citizen and resident of New York. He is not a law enforcement official or a member of the armed forces, and he does not fall within any of the other exceptions enumerated in N.Y. PENAL LAW § 265.20 to New York's ban on carrying firearms in public.

48.    Mr. Koch possesses all of the qualifications necessary to obtain a Handgun Carry License that are enumerated in N.Y. PENAL LAW § 400.00(1). For example, he is over 21 years of age, he has not been convicted of any felony or other serious offense, and he is not addicted to controlled substances or mentally infirm.

49.    Mr. Koch desires to carry a handgun in public for self-defense. Mr. Koch lawfully owns at least one handgun which he keeps in his home to defend himself and his family, and he

would carry a handgun for self-defense when he is in public were it not for Defendants' enforcement of New York's ban on the public carrying of firearms. Mr. Koch is not entitled to a Handgun Carry License by virtue of his occupation.

50.     In 2008, Mr. Koch was granted a license to carry a handgun in public by the Licensing Officer for the county where he resides, Rensselaer County. However, he was issued a license marked "Hunting & Target" that allowed him to carry a firearm outside the home only while hunting and target shooting.

51.     Because of these restrictions, Mr. Koch is not able to carry a firearm outside of his home for self-defense.

52.     In November of 2017, Mr. Koch requested the Licensing Officer, Defendant Richard N. McNally, Jr., to remove the "hunting and target" restrictions from his license and issue him a license allowing him to carry a firearm for self-defense.

53.     On January 16, 2018, after an informal hearing, Defendant McNally denied Mr. Koch's request and "determined that the `Hunting, Target only' restrictions [shall] remain on your carry concealed permit." Letter from Richard McNally, Jr., to Brandon Koch (Jan. 16, 2018) (attached as Exhibit 2).

54.     Defendant McNally did not determine that Mr. Koch was ineligible for any of the reasons enumerated in N.Y. PENAL LAW § 400.00(1); indeed, his eligibility is confirmed by the fact that he continues to hold a "restricted" license. Instead, Defendant McNally concluded that Mr. Koch had failed to show "proper cause" to carry a firearm in public for self-defense, because he did not demonstrate a special need for self-defense that distinguished him from the general public.

18

55.     Mr. Koch will be deterred from renewing his Handgun Carry License under the newly-enacted CCIA because of the expense, inconvenience, and other impermissible burdens of the CCIA's application process and its constituent parts.

56.     Plaintiff NYSRPA has at least one member who will be deterred from completing an application for a Handgun Carry License under the newly-enacted CCIA because of the expense, inconvenience, and other impermissible burdens of the CCIA's application process and its constituent parts, as well as the restrictions on Handgun Carry License holders. But for Defendants' continued enforcement of the New York laws and regulations set forth above, that member would forthwith carry a firearm outside the home for self-defense.

## COUNT ONE

### 42 U.S.C. § 1983 Action for Deprivation of
### Plaintiffs' Rights under U.S. CONST. amends. II and XIV

57.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

58.     Plaintiffs Nash and Koch and Plaintiff NYSRPA's law-abiding, responsible members are included in the "the people" protected by the Second Amendment.

59.     New York's objective and subjective requirements to obtain Handgun Carry License, detailed above in paragraphs 12–28 and including their attendant burdens, expenses, and delays and the requirement that a licensing officer use his discretion to determine whether a Handgun Carry Applicant is of good moral character, burden conduct protected by the Second Amendment.

60.     New York's objective and subjective requirements to obtain Handgun Carry License, detailed above in paragraphs 12–28 and including their attendant burdens, expenses, and delays and the requirement that a licensing officer use his discretion to determine whether a

Handgun Carry Applicant is of good moral character, are not consistent with this Nation's historical tradition of firearm regulation.

61.     The sensitive and restricted locations prohibitions imposed on where and how Handgun Carry License holders may exercise their constitutional right to bear arms in public for self-defense, as well as the restrictions on how Handgun Carry License holders must store their firearms in their cars, detailed above in paragraphs 29–37, burdens conduct protected by the Second Amendment—the constitutional right to bear arms in public for self-defense.

62.     The sensitive and restricted location prohibitions limiting where and how Handgun Carry License holders may exercise their constitutional right to bear arms in public for self-defense, as well as the restrictions on how Handgun Carry License holders must store their firearms in their cars, detailed above in paragraphs 29–37, are not consistent with this Nation's historical tradition of firearm regulation.

63.     To determine whether a Handgun Carry License applicant is of good moral character, a licensing officer shall meet with and interview the applicant. At this interview, the applicant shall provide to the licensing offer and the licensing officer shall review, among other things, the names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home and the names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others.

64.     The CCIA requires a Handgun Carry License applicant to obtain permission to exercise their Second Amendment right to carry a firearm in public from their spouse, household members, and character references, which impermissibly provides a third-party veto power over Handgun Carry License applicants' exercise of their right to bear arms. *Cf. Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 74 (1976) ("Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent.").

65.     By infringing the right to bear arms in public in these ways, the New York laws and regulations discussed in the foregoing allegations violate the Second Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs Nash, Koch, and members of NYSRPA, and they are therefore invalid.

## COUNT TWO

### 42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under U.S. CONST. amends. I and XIV

66.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

67.     To determine whether a Handgun Carry License applicant is of good moral character, a licensing officer shall meet with and interview the applicant. At this interview, the applicant shall provide to the licensing offer and the licensing officer shall review, among other things, the contents of an applicant's protected speech, including the names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home; the names and contact information of no less than four character references who can attest to the applicant's good moral character and that

such applicant has not engaged in any acts or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others; and the applicant's former and current social media accounts from the past three years.

68.     The CCIA's requirement that Handgun Carry License applicants provide to a licensing officer their former and current social media accounts from the past three years applies specifically to speakers engaged in online communication, chilling their ability and willingness to speak on the internet, and preventing a Handgun Carry License applicant from speaking privately and/or anonymously.

69.     The CCIA will chill the protected speech of Plaintiffs Nash, Koch, and NYSRPA's members because they will not know what they can and cannot say in their private lives and in their private social media, and whether their exercise of protected speech may one day give a licensing officer pause in issuing a license to exercise an entirely different constitutionally protected right.

70.     The CCIA allows a licensing officer to reject a Handgun Carry License application because of who the applicant associates with at home or online. The CCIA's requirement that Handgun Carry License applicants provide to a licensing officer their social media as well the names and contact information of at least four character references, and of the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home are an unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Thus, the CCIA conditions the right to carry a firearm upon a person engaging in only government-approved speech and association.

71.     The CCIA will interfere with Plaintiffs Nash, Koch, and NYSRPA's members' choices to enter into and maintain certain intimate or private relationships because they will not know whether their associations may give a licensing officer pause in issuing a license to exercise an entirely different constitutionally protected right.

72.     The exercise of one constitutional right cannot be conditioned on the forfeiture or violation of another. *See, e.g.*, *Simmons v. United States*, 390 U.S. 377, 393–94 (1968) (It is "intolerable that one constitutional right should have to be surrendered in order to assert another.").

73.     The CCIA impermissibly compels the speech of property owners and lessees. It requires property owners and lessees to espouse a belief one way or the other on the public carriage of firearms by requiring them to post (or not post) on their property a "clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on the[] property is permitted" (or "otherwise giv[ing] express consent" to each individual person who desires to carry a firearm on their property). *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("[F]reedom of speech prohibits the government from telling people what they must say.") (citation omitted).

74.     By infringing the rights to free speech and association, the New York laws and regulations discussed in the foregoing allegations violate the First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs Nash, Koch, and members of NYSRPA, and they are therefore invalid.

## COUNT THREE

### 42 U.S.C. § 1983 Action for Deprivation of
### Plaintiffs' Rights under U.S. CONST. amends. IV and XIV

75.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

76.     To determine whether a Handgun Carry License applicant is of good moral character, a licensing offer shall meet with and interview the applicant. At this interview, the applicant shall provide to the licensing offer and the licensing officer shall review, among other things, the applicant's former and current social media accounts from the past three years.

77.     Handgun Carry License applicants have an expectation of privacy in their social media activity that is not publicly available. Social media activity that is not publicly available is protected from unreasonable search and seizure from government officials, including licensing officers.

78.     Licensing officers may, without a warrant, require credentials or other access from applicants to view private material, which, in any other circumstance, would require a warrant. *See Carpenter v. United States*, 138 S. Ct. 2206, 2222 (2018) ("If the third-party doctrine does not apply to the 'modern-day equivalents of an individual's own 'papers' or 'effects,' ' then the clear implication is that the documents should receive full Fourth Amendment protection. We simply think that such protection should extend as well to a detailed log of a person's movements over several years.").

79.     The exercise of one constitutional right cannot be conditioned on the forfeiture or violation of another. *See, e.g.*, *Simmons*, 390 U.S. at 393–94 (It is "intolerable that one constitutional right should have to be surrendered in order to assert another.").

80.     By infringing the right to be free from unreasonable searches and seizures in these ways, the New York laws and regulations discussed in the foregoing allegations violate the Fourth Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs Nash, Koch, and members of NYSRPA, and they are therefore invalid.

## COUNT FOUR

### 42 U.S.C. § 1983 Action for Deprivation of
### Plaintiffs' Rights under U.S. CONST. amend XIV (Due Process Clause)

81.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

82.     To be eligible for a Handgun Carry License, a Handgun Carry License applicant must satisfy a subjective criterium: that a licensing officer deems him "of good moral character." The CCIA unhelpfully defines good moral character to mean that the licensing officer, in his discretion, deems the applicant to have "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."

83.     To determine whether a Handgun Carry License applicant is of good moral character, a licensing offer shall meet with and interview the applicant. At this interview, the applicant shall provide to the licensing offer and the licensing officer shall review, among other things, the applicant's former and current social media accounts from the past three years and such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application.

84.     The CCIA does not define or limit the term "social media accounts."

85.     The CCIA also does not define or limit the term "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application." The licensing officer seemingly has authority to require from an applicant any and all information when meeting with and interviewing that applicant. Further, under the CCIA, the licensing officer may require different information from different applicants.

86.     In these respects, the CCIA does not contain minimal guidelines as to who is of "good moral character." It does not provide explicit standards for those who apply these terms to

avoid resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Licensing officers have unfettered discretion to demand more and more information and to disbelieve an applicant who states they have no social media accounts. The CCIA authorizes and/or encourages arbitrary and discriminatory enforcement of what constitutes a social media account that a licensing officer may review and how these social media accounts may be reviewed.

87.     The terms "good moral character, "social media account," and "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application" are therefore void for vagueness—both as applied to Plaintiffs Nash, Koch, and members of NYSRPA and on its face.

88.     The CCIA forbids Handgun Carry License holders from possessing a firearm in sensitive and restricted locations, which are detailed above in paragraphs 30–34. Possessing a firearm in a sensitive or restricted location is a class E felony.

89.     The categories of sensitive and restricted location restrictions are so broad and all-encompassing that the CCIA fails to provide an ordinary person with fair notice of the conduct the CCIA proscribes—or, conversely, where a Handgun Carry License holder may lawfully carry a firearm. The CCIA's sensitive and restricted location restrictions are therefore void for vagueness. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) ("Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.").

## COUNT FIVE

**42 U.S.C. § 1983 Action for Deprivation of
Plaintiffs' Rights under U.S. CONST. amend XIV (Equal Protection Clause)**

90.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

91.     The CCIA exempts former police officers who possess a Handgun Carry License from its sensitive and restricted locations prohibitions.

92.     Former police officer Handgun Carry License holders and other Handgun Carry License holders are similarly situated insofar as they are both civilians and classes of State residents who, absent the CCIA, would generally have the right to carry firearms in public for self-defense. There is no constitutionally sufficient rationale that would justify this distinction.

93.     The former police officer exception is a classification affecting Second Amendment rights, and Second Amendment rights are fundamental rights.

94.     Furthermore, by not defining what "other information" a licensing officer may require, the CCIA permits licensing officers to treat similarly situated Handgun Carry License differently by requiring them to provide—and thus reviewing—different information. There is no constitutionally sufficient rationale that would justify this distinction.

95.     Because the CCIA draws distinctions that fail any applicable level of scrutiny, it violates the Equal Protection Clause of the Fourteenth Amendment both facially and as-applied. *See Plyler v. Doe*, 457 U.S. 202, 216–17 (1982) ("Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.").

96.     The CCIA violates the equal protection rights of Plaintiffs Nash, Koch, and members of NYSRPA, and it is therefore facially unconstitutional, void, and invalid.

## COUNT SIX

**42 U.S.C. § 1983 Action for Deprivation of
Plaintiffs' Rights under U.S. CONST. amend XIV (Right to Privacy)**

97.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

98.     To determine whether a Handgun Carry License applicant is of good moral character, a licensing offer shall meet with and interview the applicant. At this interview, the applicant shall provide to the licensing offer and the licensing officer shall review, among other things, the names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others.

99.     The CCIA in effect requires a Handgun Carry License applicant to find at least four individuals and disclose to them that (1) he does not have a Handgun Carry License (or a Handgun Carry License without restrictions) and (2) he desires to obtain one (or one without any restrictions).

100.    Plaintiffs Nash and Koch, as well as those NYSRPA members described above, have a privacy interest in their confidential status as a Handgun Carry License holder. *See* N.Y. PENAL LAW § 400.02(1); *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 762 (1989) (right of personal privacy includes "avoiding disclosure of personal matters") (citation omitted).

101.    The CCIA's requirement that Plaintiffs disclose confidential information to at least four individuals to find the statutorily-required character references is arbitrary in the

constitutional sense and shocks the conscience. It therefore violates the right to privacy of Plaintiffs Nash, Koch, and members of NYSRPA.

**PRAYER FOR RELIEF**

102.   WHEREFORE, Plaintiffs pray for an order and judgment:

103.   An order declaring that the challenged sections of the Handgun Carry License requirements, as set forth above, both on their face and as applied through foregoing implementing regulations and practices adopted by Defendants, violates the First, Second, Fourth, and Fourteenth Amendments of United States Constitution in violation of 42 U.S.C. § 1983;

104.   Enjoining Defendants and their employees and agents from enforcing the challenged sections of the Handgun Carry License requirements, as set forth above;

105.   Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action, pursuant to 42 U.S.C. § 1988; and

106.   Granting such other and further relief as this Court deems just and proper.


Dated: August 31, 2022                    Respectfully submitted,

                                          /s/ *John Parker Sweeney*
                                          John Parker Sweeney
                                          James W. Porter, III
                                          Marc A. Nardone
                                          Connor M. Blair
                                          Bradley Arant Boult Cummings LLP
                                          1615 L Street N.W., Suite 1350
                                          Washington, D.C. 20036
                                          Phone: 202-393-7150
                                          Facsimile: 202-347-1684
                                          jsweeney@bradley.com

                                          Counsel for Plaintiffs