**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

NEW YORK STATE RIFLE & PISTOL  )
ASSOCIATION, INC.,  )
  )
ROBERT NASH,  )
  )
BRANDON KOCH,  )
  )
THOMAS STIRNWEIS,  )
  )
WAYNE FRANCIS,  )
  )
KHOURY PORTER, *and*  )
  )
SCOTT NOREN  )
  )
   *Plaintiffs,*  )
  )
v.  ) Civ. Action No. 1:22-cv-00907-MAD-CFH
  )
STEVEN G. JAMES, in his official capacity )
as Acting Superintendent of the New York )
State Police,  )
  )
RODNEY K. HARRISON, in his official )
capacity as Commissioner of the Suffolk )
County Police Department, and Licensing )
Officer for Suffolk County, *and* )
  )
PATRICK J. RYDER, in his official )
capacity as Police Commissioner of the Nassau )
County Police Department, and Licensing )
Officer for Nassau County )
  )
   *Defendants.*  )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF MATERIAL FACTS ........................................................................... 2

PROCEDURAL HISTORY ............................................................................................... 5

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT ..................................................................................................................... 6

    I.     The CCIA's location prohibitions and licensing requirements violate the
            Second Amendment. ............................................................................................... 6

          A.    The plain text of the Second Amendment protects Plaintiffs' right to
                carry firearms in public. ............................................................................. 6

          B.    Defendants cannot overcome Plaintiffs' presumptive right to public
                carry because no Founding Era precedents justify the CCIA's
                challenged provisions ................................................................................. 7

          C.    The CCIA's location prohibitions are not consistent with the Nation's
                historical tradition of firearm regulation. .................................................. 10

                1.    Prohibitions not addressed by the Second Circuit in *Antonyuk* .... 12

                        a.    Public transportation, transit, and airports ........................ 12

                        b.    Places of worship ................................................................ 13

                          c.    Government administration buildings ................................. 14

                2.    Prohibitions touched on, but not directly addressed in
                   *Antonyuk* ...................................................................................... 16

                        a.    Any location providing health care or services and
                                places licensed or otherwise overseen by the
                                Department of Health ......................................................... 16

                        b.    Sporting venues .................................................................. 17

                            c.    Times Square ...................................................................... 18

                            d.    Public playgrounds and special events ............................. 19

i

3.      Prohibitions *Antonyuk* upheld, but misapplied *Bruen*—public parks and places serving alcohol for on-premises consumption... 20

4.      Prohibitions that *Antonyuk* correctly held unconstitutional—privately owned places open to the public ................................. 21

D.      The CCIA's licensing, renewal, and automobile storage requirements are not consistent with the Nation's historical tradition of firearm regulation. ........................................................................... 22

II.     The CCIA also violates the First and Fourteenth Amendments. .......................... 24

A.      The CCIA's restricted locations provision impermissibly compels speech. ........................................................................................ 24

B.      The CCIA is vague, intrusive on Plaintiffs' privacy, and discriminatory. ........................................................................... 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Hochul*,
   639 F. Supp. 3d 232 (N.D.N.Y. 2022), *rev'd on other grounds*, 120 F.4th 941
   (2d Cir. 2024) ....................................................................................................12, 13

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ............................................................................ *passim*

*Atkinson v. Garland*,
   70 F.4th 1018 (7th Cir. 2023) ..................................................................................23

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ..................................................................................................16

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ....................................................................................................25

*CompassCare v. Hochul*,
   125 F.4th 49 (2d Cir. 2025) .....................................................................................24

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................................7, 10, 14

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023) .................................................................. *passim*

*Lara v. Comm'r Pa. State Police*,
   125 F.4th 428 (3d Cir. 2025) .....................................................................................9

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ..................................................................................................10

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ..................................................................................................24

*Nat'l Rifle Ass'n v. Bondi*,
   133 F.4th 1108 (11th Cir. 2025) (en banc) ...............................................................8

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023) .................................................................................20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ............................................................................................. *passim*

*Nordlinger v. Hahn,*
   505 U.S. 1 (1992) ................................................................................25

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
   127 F.4th 583 (5th Cir. 2025) ...............................................................8

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
   487 U.S. 781 (1988) ............................................................................24

*Schall v. Martin,*
   467 U.S. 253 (1984) ............................................................................24

*Selletti v. Carey,*
   173 F.3d 104 (2d Cir. 1999) ..................................................................5

*Timbs v. Indiana,*
   586 U.S. 146 (2019) ..............................................................................9

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press,*
   489 U.S. 749 (1989) ............................................................................25

*United States v. Rahimi,*
   602 U.S. 680 (2024) ..........................................................................6, 8

*Wolford v. Lopez,*
   116 F.4th 959 (9th Cir. 2024) .............................................................20

*Wooley v. Maynard,*
   430 U.S. 705 (1977) ............................................................................24

*Worth v. Jacobson,*
   108 F.4th 677 (8th Cir. 2024) ...............................................................9

**Statutes**

1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN
   NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ..........................12

1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN
   NEW ENGLAND (1628-1641) 190 (Nathaniel B. Shurtleff ed., 1853) .....12

1 THE STATUTES: REVISED EDITION, HENRY III TO JAMES II. A.D. 1235-6–1685
   144–45 (1870) .....................................................................................19

42 U.S.C. § 1988 ...................................................................................5

9 DAVID J. MCCORD, THE STATUTES AT LARGE OF SOUTH CAROLINA 60–61
   (1841) ................................................................................................12

An Act Additional to an Act to Organize, Govern and Discipline the Militia of
This State, 1839 Me. Laws 421, ch. 276, § 5 ........................................................17

An Act Concerning the Militia, 1837 Mass. Acts 273, ch. 240, § 1 ...............................17

An Act for Repealing an Act, Made and Pass[ed] in the Year of Our Lord, One
Thousand Six Hundred and Ninety Two, Entitled "An Act for Punishing
Criminal Offenders," and for Reenacting Certain Provisions Therein, 1795
Mass. Gen. Laws 259, ch. 2, §§ 1-2 ......................................................................19

An Act for the Restraint of Idle and Disorderly Persons, 1801 Tenn. Code 708, ch.
22, § 6 ......................................................................................................................19

An Act Forbidding and Punishing Affrays, 1786 Va. Acts 35, ch. 49 ...........................19

An Act to Prevent Persons in this Commonwealth from Wearing Concealed
Arms, Except in Certain Cases, 1813 Ky. Acts 100, ch. 89, § 1 ......................12–13

An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, 1821 Tenn.
Pub. Acts 15–16, ch. XIII ........................................................................................13

An Act to Prohibit the Wearing of Concealed Weapons, 1819 Ind. Acts 39, ch.
XXIII, § 1 ................................................................................................................13

An Act to Regulate the Militia, 1844 R. I. Pub. Laws 501, § 1 ....................................17

N.Y. Penal Law § 265.01-D............................................................................... *passim*

N.Y. Penal Law § 265.01-E ............................................................................... *passim*

N.Y. Penal Law § 265.45 ...............................................................................................4, 23

N.Y. Penal Law § 400.00 ....................................................................................22, 23, 25

N.Y. Penal Law § 400.01 ...............................................................................................25

**Regulation**

N.Y.C. Admin. Code § 10-315(a)....................................................................................18

**Other Authorities**

*A Narrative History of Mass. General*, MASSACHUSETTS GEN. HOSP.,
https://www.massgeneral.org/museum/history (last visited Aug. 13, 2025)..........................16

*About*, N.Y. STATE RIFLE & PISTOL ASS'N, https://www.nysrpa.org/aboutnysrpa/
(last visited Aug. 12, 2025)...........................................................................................2

*America as a Religious Refuge: The Seventeenth Century, Part 1*, LIBR. OF CONG.,
    https://www.loc.gov/exhibits/religion/rel01.html (last visited Aug. 12, 2025) ......................13

*Bellevue History*, NYC HEALTH + HOSPITALS,
    https://www.nychealthandhospitals.org/bellevue/history/ (last visited Aug. 13,
    2025) ...........................................................................................................................16

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church
    Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 653, 697-99 (2014) ................................17

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y,
    2004, at 12-16 ..............................................................................................................17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
    Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203,
    232–34 & n.108, 244 (2018)........................................................................................17

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms
    Before 1900*, 50 J. LEGIS. 223, 238 n.78 (2024)......................................................13

Fed. R. Civ. P. 56...................................................................................................................5

G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary
    Roots of the Law of Gambling*, 16 RUTGERS L.J. 211, 232–65 (1985) ...................18

*Governor Hochul Announces Extraordinary Session of the New York State
    Legislature to Begin on June 30, Office of the Governor of New York*, STATE
    OF N.Y. (June 24, 2022), https://www.governor.ny.gov/news/governor-
    hochul-announces-extraordinary-session-new-york-state-legislature-begin-
    june-30 ....................................................................................................................7, 10

*Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and
    Bolster Restrictions on Concealed Carry Weapons in Response to Reckless
    Supreme Court Decision*, STATE OF N.Y. (July 1, 2022)
    https://www.governor.ny.gov/news/governor-hochul-signs-landmark-
    legislation-strengthen-gun-laws-and-bolster-restrictions ................................1, 7, 10

HARRIET BAILEY, NURSING MENTAL DISEASES 25-26 (1921) ......................................16

Harry Schenawolf, *Ferry Boats of Colonial America*, REVOLUTIONARY WAR J.
    (Dec. 11, 2019), https://revolutionarywarjournal.com/ferry-boats-of-colonial-
    america/#_edn2 ............................................................................................................12

*Historical Timeline*, WEILL CORNELL MED.,
    https://library.weill.cornell.edu/archives/historical-timeline (last visited Aug.
    13, 2025) ......................................................................................................................16

*History of Tufts Medical Center*, TUFTS MED., https://www.tuftsmedicine.org/get-care/our-locations/about-tufts-medical-center/history-tufts-medical-center (last visited July 14, 2025) ........................................................................................16

Ioana Popovici, et al., *Alcohol Use and Crime: Findings from a Longitudinal Sample of U.S. Adolescents and Young Adults*, 36 ALCOHOLISM, CLINICAL AND EXPERIMENTAL RSCH. 532 (2012) ..............................................................21

*Jamestown Churches*, HISTORIC JAMESTOWNE, https://historicjamestowne.org/archaeology/map-of-discoveries/jamestown-churches/ (last visited Aug. 12, 2025) ..............................................................14

Jonah E. Bromwich & Chelsia Rose Marcius, *Wait . . . Is This Times Square?*, N.Y. TIMES, Aug. 31, 2022, https://www.nytimes.com/2022/08/31/nyregion/wait-is-this-times-square.html ...................18

Joseph E. Wroblewski, *Loyalist "Banditti" of Monmouth County, New Jersey: Jacob Fagan and Lewis Fenton*, J. AM. REVOLUTION (June 10, 2021), https://allthingsliberty.com/2021/06/loyalist-banditti-of-monmouth-county-new-jersey-jacob-fagan-and-lewis-fenton/ ..............................................................12

Joshua J. Mark, *Religion in Colonial America*, WORLD HISTORY ENCYCLOPEDIA (April 12, 2021), https://www.worldhistory.org/article/1726/religion-in-colonial-america/................................................................................................14

Marcia Kramer & Dick Brennan, *Fresh off primary win, Gov. Kathy Hochul dives right into guns -- who can get them and where they can take them*, CBS NEWS (June 29, 2022, 11:26 PM) https://www.cbsnews.com/newyork/news/fresh-off-primary-win-gov-kathy-hochul-dives-right-into-guns-who-can-get-them-and-where-they-can-take-them/ ..............................................................1, 7

*Mayor Adams Announces Steps to Keep New Yorkers Safe as New Concealed Carry Regulations Go Into Effect*, CITY OF N.Y., (Aug. 31, 2022) https://www.nyc.gov/office-of-the-mayor/news/632-22/mayor-adams-steps-keep-new-yorkers-safe-new-concealed-carry-regulations-go-into#/0 ...................18

Nancy L. Struna, *The Formalizing of Sport and the Formation of an Elite: The Chesapeake Gentry, 1650-1720s* 13 .........................................................................18

NICHOLAS JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) .........................................12

Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, 12 Q.J. N.Y. State His. Ass'n 231, 231–33 (1931) ..............................................................12

OTTO ARTHUR ROTHERT, THE OUTLAWS OF CAVE-IN-ROCK: HISTORICAL
    ACCOUNTS OF THE FAMOUS HIGHWAYMEN AND RIVER PIRATES WHO
    OPERATED IN PIONEER DAYS UPON THE OHIO AND MISSISSIPPI RIVERS AND
    OVER THE OLD NATCHEZ TRACE 17-18 (1924)........................................................12

Paul Stephen Dempsey, *Transportation: A Legal History*, 30 TRANSP. L.J. 235,
    243–44 (2003)..........................................................................................................12

*Pennsylvania Hospital*, PENN MED.,
    https://www.pennmedicine.org/locations/pennsylvania-hospital (last visited
    Aug. 13, 2025) ........................................................................................................16

RANDOLPH ROTH, AMERICAN HOMICIDE 48-54, 92 (2009) ..........................................14

*Religion and the State Governments*, LIBR. OF CONG.,
    https://www.loc.gov/exhibits/religion/rel05.html (last visited Aug. 12, 2025) ......14

*St. Xavier Catholic Church*, NAT'L REG. OF HISTORIC PLACES (Nov. 9, 1972)
    https://npgallery.nps.gov/NRHP/GetAsset/b131f99c-e798-4be5-a5fd-
    cda02e8cf721 (last visited Aug. 12, 2025) ..............................................................14

*Stagecoach Travel*, THE HENRY FORD MUSEUM OF AMERICAN INNOVATION,
    https://www.thehenryford.org/collections-and-research/digitalcollections/
    expert-sets/11773/ (last visited Aug. 13, 2025) ......................................................12

U.S. Const. amend. II..........................................................................................................6

*Violent Crimes*, in 5 THE SOCIAL HISTORY OF CRIME AND PUNISHMENT IN
    AMERICA: AN ENCYCLOPEDIA (Wilbur R. Miller ed., 2012) ..................................12

WILLIAM G. ROTHSTEIN, AMERICAN MEDICAL SCHOOLS AND THE PRACTICE OF
    MEDICINE: A HISTORY 19-24 (1987) ......................................................................16

## INTRODUCTION

Ordinary citizens have a constitutional right to carry firearms for personal defense outside the home. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). New York's Concealed Carry Improvement Act (the "CCIA") bans handgun carry in virtually every public location within the state of New York and unreasonably burdens applicants for a carry license. Neither the CCIA's location bans nor its licensing requirements are consistent with our Nation's historical tradition. Plaintiffs New York State Rifle and Pistol Association ("NYSRPA") and six of its individual members respectfully request this Court declare these CCIA provisions unconstitutional and enjoin their enforcement.

Before the United States Supreme Court issued its opinion in *Bruen*, New York state law effectively banned public handgun carry by granting licensing officers discretion to decide who could carry a firearm. Licensing officers denied most applications, approving concealed carry licenses only rarely or for limited activities such as hunting or commuting, *see Bruen*, 597 U.S. at 15–16. NYSRPA and several of these individual Plaintiffs brought suit challenging New York's licensing regime and, on June 23, 2022, the Supreme Court ended New York's de facto carry ban, declaring that the Second Amendment forbids "broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 39. Just eight days later, Governor Kathy Hochul signed the CCIA into law to effectively preclude handgun carry throughout the state in defiance of the Supreme Court's ruling in *Bruen*. *See* Ex. 1; Ex. 2.[1]

The CCIA follows its predecessor statutes in some ways (such as vesting broad discretion in licensing officers). But it also takes a new approach—reinstituting New York's de facto ban by

---

[1] Plaintiffs attach supplemental sources as Exhibits to this Memorandum and cite those sources by their respective Exhibit number. Plaintiffs include an index of all Exhibits as an appendix to this Memorandum.

prohibiting carry in any of nineteen broad "sensitive location" categories, N.Y. Penal Law § 265.01-E(2)(a)–(t), as well as in all privately owned places open to the public, unless the owner gives permission or posts a sign allowing carry, *id.* § 265.01-D(1). This Court should enforce *Bruen* and put a stop to New York's defiance of the Supreme Court's ruling.

## STATEMENT OF MATERIAL FACTS

1.      Plaintiffs are all ordinary citizens of the United States and residents and citizens of the state of New York. Ex. 3, Nash Decl. ¶¶ 1–2, 4–5; Ex. 4, Koch Decl. ¶¶ 1–2, 4–5; Ex. 5, Stirnweis Decl. ¶¶ 1–2, 4–5; Ex. 6, Francis Decl. ¶¶ 1–2, 4–5; Ex. 7, Porter Decl. ¶¶ 1–2, 4–5; Ex. 8, Noren Decl. ¶¶ 1, 3–5. All Plaintiffs currently hold a valid New York concealed handgun carry permit. Ex. 3 ¶ 6; Ex. 4 ¶ 6; Ex. 5 ¶ 6; Ex. 6 ¶ 6; Ex. 7 ¶ 6; Ex. 8 ¶ 6. Plaintiffs are all members of NYSRPA. Ex. 3 ¶ 3; Ex. 4 ¶ 3; Ex. 5 ¶ 3; Ex. 6 ¶ 3; Ex. 7 ¶ 3; Ex. 8 ¶ 2.

2.      NYSRPA is New York state's oldest firearms advocacy organization. Ex. 9. Since 1871, NYSRPA has worked to preserve and promote Second Amendment rights and shooting sports; encourage and educate individuals on firearm ownership, usage, safety, and training; and support its membership throughout New York. *Id.*

3.      If not for the CCIA, Mr. Nash would carry a handgun in government administration buildings, places providing health care and services (where he takes his elderly mother for routine visits), public parks, locations licensed for on-premises alcohol consumption, and in privately owned places open to the public. Ex. 3 ¶¶ 8(a)–(e). Mr. Nash would carry a handgun at these locations for his and his mother's protection if not for the CCIA and the credible fear of arrest and prosecution. *Id.* ¶¶ 7–8(e).

4.      If not for the CCIA, Mr. Koch would carry a handgun at the unsecured government administration building where he works and plans to continue working. Ex. 4 ¶¶ 8–9(a). He would

carry a handgun at his workplace and in privately owned locations open to the public for his personal protection if not for the CCIA and the credible fear of arrest and prosecution. *Id.* ¶¶ 7–9(b).

5.     If not for the CCIA, Mr. Stirnweis would carry a handgun in government administration buildings, public parks, on public transportation and transit (including both physical locations and conveyances), on airport property outside of TSA security, in Times Square, at locations licensed for on-premises alcohol consumption, at special events on public sidewalks or other public areas, and in privately owned places open to the public. Ex. 5 ¶¶ 9(a)–(h). Mr. Stirnweis would carry a handgun at these locations for his and his family's protection if not for the CCIA and the credible fear of arrest and prosecution. *Id.* ¶¶ 8–9(h). Mr. Stirnweis is also a resident of Suffolk County, New York, which requires him to renew his handgun carry license every three years, requiring him to meet with a licensing officer, disclose four character references, disclose any other information the licensing officer deems relevant, and meet other requirements. *Id.* ¶ 7.

6.     If not for the CCIA, Mr. Francis would carry a handgun at his place of worship without having to be designated as a member of the security team, on public transportation and transit (including both physical locations and conveyances), and in privately owned places open to the public. Ex. 6 ¶¶ 9(a)–(c). Mr. Francis would carry a handgun at these locations for his and his family's protection if not for the CCIA and the credible fear of arrest and prosecution. *Id.* ¶¶ 8–9(c). Mr. Francis is also a resident of Nassau County, New York, which requires him to renew his handgun carry license every three years, requiring him to meet with a licensing officer, disclose four character references, disclose any other information the licensing officer deems relevant, and meet other requirements. *Id.* ¶ 7.

7.    If not for the CCIA, Mr. Porter would carry a handgun at public parks; residential settings licensed, certified, regulated, funded, or operated by the Department of Health; locations licensed for on-premises alcohol consumption; locations used for sporting events; special events on public sidewalks or other public areas; in Times Square; and in privately owned places open to the public. Ex. 7 ¶¶ 9(a)–(g). Mr. Porter owns and operates a gym in Congers, NY. *Id.* ¶ 7. Mr. Porter is compelled to post signage or give verbal consent to all individuals who enter his business in order to allow them to carry a firearm there. N.Y. Penal Law § 265.01-D. If not for the CCIA and the credible fear of arrest and prosecution, Mr. Porter would carry in the above-listed places and allow all individuals to carry firearms at his gym without posting signage or giving them express consent to do so. *Id.* ¶¶ 8–9(g), 11.

8.    If not for the CCIA, Dr. Noren would carry a handgun for his personal protection at his oral surgery practice where he works multiple days each week and at privately owned places open to the public. Ex. 8 ¶¶ 9(a)–(b). Because Dr. Noren owns and operates his own business, he is compelled to post signage or give verbal consent to all individuals who enter his business in order to allow them to carry a firearm there. N.Y. Penal Law § 265.01-D. If not for the CCIA and the credible fear of arrest and prosecution, Dr. Noren would carry in the above-listed places and allow all individuals who enter his oral surgery practice to carry without posting signs or giving them express permission to do so. *Id.* ¶¶ 8–9(b), 11.

9.    If not for the CCIA, Plaintiffs would ensure any firearms left in their vehicles unattended would be stored in a safe, responsible manner without first removing any ammunition or using a "safe storage depository" as required under N.Y. Penal Law § 265.45. Ex. 3 ¶ 10; Ex. 4 ¶ 11; Ex. 5 ¶ 11; Ex. 6 ¶ 11; Ex. 7 ¶ 12; Ex. 8 ¶ 12.

10.    Plaintiffs do not know where in New York, if anywhere, they can lawfully carry a firearm because the CCIA's broad and overlapping location prohibitions are expansive to the point of vagueness. Ex. 3 ¶ 11; Ex. 4 ¶ 12; Ex. 5 ¶ 12; Ex. 6 ¶ 12; Ex. 7 ¶ 13; Ex. 8 ¶ 13.

## PROCEDURAL HISTORY

Plaintiffs filed this case on August 31, 2022, alleging both facial and as-applied challenges to the CCIA under the First, Second, and Fourteenth Amendments. (ECF Nos. 1, 63). During Motion to Dismiss briefing, the case was stayed while the Second Circuit Court of Appeals and United States Supreme Court heard appeals in similar cases challenging the CCIA. (ECF No. 32); *see Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024). After briefing resumed and was finalized, the Court issued an Order on Defendant James' Motion to Dismiss on February 18, 2025, (ECF No. 81), holding that all individual Plaintiffs had standing to bring the remaining claims addressed below. (*Id.*). The individual Plaintiffs now move for summary judgment against Defendants James, Ryder, and Harrison on all those remaining claims.[2] Plaintiffs respectfully request this Court grant Plaintiffs' Motion for Summary Judgment, enter a permanent injunction in favor of Plaintiffs, and grant Plaintiffs' request for attorneys' fees under 42 U.S.C. § 1988. No discovery has been initiated by Defendants in the six months since the Motion to Dismiss was decided and none is either warranted or necessary, no genuine issues of material fact remain, and Plaintiffs are entitled to judgment as a matter of law.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[2] Plaintiffs do not move for summary judgment on the claims dismissed by this Court, *see* ECF No. 81, but reserve their right to appeal that Order upon entry of a final judgment in this case. *See Selletti v. Carey*, 173 F.3d 104, 109 n.5 (2d Cir. 1999).

to judgment as a matter of law." Defendants have the burden to establish the constitutionality of the laws they enforce. *See, e.g.*, *Bruen*, 597 U.S. at 24; *United States v. Rahimi*, 602 U.S. 680, 693 (2024).

## ARGUMENT

### I.    The CCIA's location prohibitions and licensing requirements violate the Second Amendment.

*Bruen* held that courts applying the Second Amendment must conduct a straightforward analysis: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. The CCIA's location restrictions and licensing requirements are unconstitutional because the plain text of the Second Amendment covers the right to carry in public, and the CCIA is not consistent with the Nation's historical tradition of firearms regulation.

### A.    The plain text of the Second Amendment protects Plaintiffs' right to carry firearms in public.

Defendants cannot dispute that the plain text of the Second Amendment covers and protects the right to carry or "'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33; *see* U.S. Const. amend. II; *Antonyuk*, 120 F.4th at 1044 (recognizing right to carry "outside the home" (citing *Bruen*, 597 U.S. at 33)). "Nothing in the Second Amendment's text draws a home/public distinction." *Bruen*, 597 U.S. at 32. The text does not distinguish among locations outside the home either. *See id*. at 32–33. It covers the right to bear arms "in case of confrontation," "for offensive or defensive action in a case of conflict with another person" anywhere outside the home. *Id*. at 32 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584, 592 (2008)). Nor can the state dispute that Plaintiffs (all law-abiding New Yorkers) are among "the people," or that handguns are protected "arms." *Bruen*, 597 U.S. at 31–32.

The Second Amendment's plain text protects Plaintiffs' proposed conduct. The CCIA's carry restrictions are unconstitutional because the state cannot meet its burden of showing the CCIA is consistent with this Nation's historical traditions.

**B.    Defendants cannot overcome Plaintiffs' presumptive right to public carry because no Founding Era precedents justify the CCIA's challenged provisions.**

Defendants must "show that the pre-existing right codified in the Second Amendment, and made applicable to the states through the Fourteenth, does not protect petitioners' proposed course of conduct." *Bruen*, 597 U.S. at 34. Defendants have the burden to "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. If Defendants cannot do so (and they plainly cannot), then the inquiry is over and the CCIA is invalid.

In this case, as in *Heller* and *Bruen*, the historical inquiry is straightforward. As in those cases, this case implicates "regulatory challenges posed by firearms" which are essentially "the same as those that preoccupied the Founders" and the "Reconstruction generation." *Id.* at 27. Governor Hochul admits that the CCIA was passed to address the criminal misuse of firearms, *see, e.g.*, Ex. 10; Ex. 1; Ex. 2, which remains a centuries-old "societal problem," *Bruen*, 597 U.S. at 26. This case does not implicate "unprecedented societal concerns or dramatic technological changes" which would require "nuanced" reasoning and analogies. *Id.* at 27. Even if it did, under a "nuanced" approach, Defendants must still identify "relevantly similar" precedents which show "well-established and representative" traditions to support the CCIA. *Id.* at 29–30.

Defendants must justify the CCIA's challenged provisions by proving an "enduring," "well-established," "representative," and "comparable tradition of regulation." *Bruen*, 597 U.S. at 27, 30, 69. They must cite, at the very least, "relevantly similar" statutory precedents that match the regulatory mechanism and purpose—the "how and why"—that underpins the challenged

provisions of the CCIA. *Id.* at 29. This comparison is "central" to determining whether a challenged law is constitutional. *Rahimi*, 602 U.S. at 692 (courts must assess what "particular problems" a cited precedent sought to "address"). But "[e]ven when a law regulates arms-bearing for a permissible reason," it may still be unconstitutional if it burdens Second Amendment rights "beyond what was done at the founding." *Id.*; *see also Bruen*, 597 U.S. at 26–27 ("the lack of a distinctly similar historical regulation . . . is relevant evidence" that a challenged law violates the Second Amendment).

The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. Faithful application of Supreme Court precedent compels the conclusion that historical tradition must be based on the understanding of the Second Amendment during the Founding Era. *See id.* at 37–38; *id.* at 36 ("to the extent later history contradicts what the text says, the text controls"). *Bruen* cautioned against the use of Reconstruction Era and later precedents—especially where they contradict earlier tradition— because those sources "do not provide as much insight into [the] original meaning as earlier sources." *Id.* at 36 (quoting *Heller*, 554 U.S. at 614); *see also id.* at 66 & n.28.

In keeping with this logic, at least four courts of appeals have held that the Founding Era is the critical period for understanding the scope of the Second Amendment. *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1115–16 (11th Cir. 2025) (en banc) ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was ratified, and its meaning fixed, in 1791.") (cleaned up)); *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 599–600 (5th Cir. 2025) (disregarding twenty-two 19th century statutes because they contradicted Founding Era evidence and because

"[t]he scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." (quoting *Bruen*, 597 U.S. at 37)); *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("[T]he constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that 'meaning is fixed according to the understandings of those who ratified it[.]'" (quoting *Bruen*, 597 U.S. at 28)); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."). *But see Antonyuk*, 120 F.4th at 972 n.15 (courts should "consider this Nation's *whole* tradition"), discussed *infra* page 20.

The *Bruen* Court ultimately found it unnecessary to resolve which era's history controls because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." 597 U.S. at 38 (emphasis added). *Bruen* nevertheless confirmed that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," which was, of course, determined when the Bill of Rights was ratified. *Id.* at 37 (collecting cases); *see also Timbs v. Indiana*, 586 U.S. 146, 150 (2019) ("[I]f a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires.").

In addition to being "relevantly similar," a proffered historical tradition must also be "representative." *Bruen*, 597 U.S. at 29–30. Regulations that come from "outliers," territorial governments, and municipalities should be ignored especially if they contradict earlier evidence. *Id.* at 30, 55 n.22, 67–70. Regulations enacted in only a handful of jurisdictions, or covering only a small portion of the population, or persisting only for a few years "are most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment.'" *Id.* at 67 (alteration in

original) (quoting *Heller*, 554 U.S. at 614). *Bruen*, for example, categorically rejected reliance on laws enacted in the Territories, including "Arizona, Idaho, New Mexico, [and] Oklahoma," *id.* at 67, or in Texas, which it termed an "outlier," *id.* at 65.

Nor can state defendants credibly rely on overtly racist laws—or facially neutral laws that were in practice enforced only against minorities—enacted as part of "systematic efforts" to disarm "blacks." *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010). *Bruen* cautioned against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement," for such a despicable practice is "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry." 597 U.S. at 58. Such laws are not representative of a valid tradition of arms regulation and should be left in the dustbin of history, not used as justification to restrict rights in the modern day.

**C.    The CCIA's location prohibitions are not consistent with the Nation's historical tradition of firearm regulation.**

As in *Heller* and *Bruen*, the constitutionality of the CCIA's sensitive and restricted locations provisions presents a straightforward historical analysis. The CCIA concerns the same centuries-old societal problem at issue in both *Heller* and *Bruen*: criminal misuse of firearms. *See, e.g.,* Ex. 10; Ex. 1. The CCIA's location prohibitions simply do not match the mechanism (the "how") and purpose (the "why") behind Founding Era firearms regulations. Nor can Defendants point to precedents that would otherwise save the location prohibitions. Because the CCIA was passed to address a longstanding societal problem, the absence of "distinctly similar" traditions is "relevant evidence" that the CCIA is "inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

The Second Circuit recently addressed some of the CCIA's location prohibitions in the *Antonyuk* case. *See Antonyuk*, 120 F.4th 941. As demonstrated below, the statutes offered in

*Antonyuk* were too late, too sparse, and too localized to be helpful precedents because they contradicted the Founding Era tradition allowing (and often even requiring) carry at locations deemed sensitive by the CCIA. *See Bruen*, 597 U.S. at 36–37, 66–67. Those statutes do not represent any tradition of banning firearms in the CCIA's sensitive and cannot satisfy the Defendants' burden.

The CCIA's location prohibitions infringe fundamental Second Amendment rights by unlawfully expanding the "category of 'sensitive places'" to essentially "all places of public congregation." *Bruen*, 597 U.S. at 30–31 (rejecting New York's definition of "sensitive place," which included all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available"). *Bruen* prohibited states from "defin[ing] the category of 'sensitive places' . . . too broadly" because doing so would "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 31. And yet, in direct defiance of *Bruen*'s command, New York passed the CCIA, broadening even further its definition of "sensitive location" to include virtually every public space in the state.

Plaintiffs challenge the CCIA's bans on carrying firearms in and on public transportation and transit (including airports), places of worship, government-owned or -controlled administration buildings, locations providing health care and services, places funded or overseen by the Department of Health, sporting venues, Times Square, areas being used for special events, public playgrounds, public parks, and locations serving alcohol for on-premises consumption, *see* N.Y. Penal Law §§ 265.01-E(2)(a), (b), (c), (d), (l), (n), (o), (p), (r), (t), as well as in all privately owned places open to the public, unless the owner gives permission or posts a sign allowing carry, *see id.* § 265.01-D(1) (criminalizing firearm possession in a "restricted location"). Each of these categories is addressed directly below.

11

1.     **Prohibitions not addressed by the Second Circuit in *Antonyuk***

a.     **Public transportation, transit, and airports**

Plaintiffs challenge the CCIA's firearm carry ban on public transportation, public transit, and airports.[3] Public and shared modes of transportation have existed in America since before the Founding. *See* Ex. 11; Ex. 12; Ex. 13; Ex. 14. In the 18th century, private enterprises sprang up to build turnpikes and toll roads, sometimes with government assistance. Ex. 14. Soon after the Constitution's ratification, Congress sought to establish Federal post roads to supplement private and state-sponsored roads. *Id.*

Shared stagecoaches, ferries, and riverboats traversing the early American roads and canals were commonplace both before and during the Founding Era. Ex. 11; Ex. 13; Ex. 15. Criminal activity on these forms of public transportation and on public roadways and waterways was no less common. *See, e.g.*, Ex. 16; Ex. 17; Ex. 18. But there were no laws banning firearm carry on any form of public transportation or transit at the time of the Founding. *Cf. Koons v. Platkin*, 673 F. Supp. 3d 515, 650 (D.N.J. 2023); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 329–31 (N.D.N.Y. 2022) (state failed to cite sufficient historical precedents to support the CCIA's carry bans as to aviation transport, airports, buses, and vans), *rev'd on other grounds*, 120 F.4th 941 (2d Cir. 2024). Both passengers and any guards often carried firearms on public transportation in early America. Ex. 19. Some colonial laws actually required individuals to carry when they travelled a certain distance from their home. *See, e.g.*, Ex. 20 (Massachusetts); Ex. 21 (Rhode Island).

Even when states enacted post-Founding restrictions on carrying handguns, they often simultaneously protected travelers' right to carry through "traveler's exceptions." *See, e.g.*, Ex.

---

[3] Plaintiffs do not seek to carry firearms past federal security checkpoints in airports. Unsecured liminal areas of airports like parking lots, terminal entrances, and baggage check areas, however, are no different from other kinds of unsecured transportation terminals for which there is no historical tradition of banning carry, and present manifest self-defense concerns.

22; Ex. 23; Ex. 24. The short-lived 17th-century East Jersey statute, which was disregarded as precedent by *Bruen*, 597 U.S. at 48–49, contained an exception allowing travelers to carry concealed firearms. *See* Ex. 25.

There simply is no evidence that travelers' right to carry firearms was infringed during the Founding Era. Defendants cannot point to a historical tradition to support the CCIA's public transportation and transit carry ban because none exists.

Similarly, New York cannot justify its airport carry ban outside of areas secured by TSA. As with many, if not all, of the "sensitive" locations Plaintiffs challenge, it is not clear from the text of the statute exactly what areas the airport ban covers. *See* N.Y. Penal Law § 265.01-E(2)(n). To the extent the ban extends outside an airport terminal's TSA security perimeter, Plaintiffs challenge its constitutionality because there is no historical tradition to justify that ban. *See Antonyuk v. Hochul*, 639 F. Supp. 3d at 329–31.

The CCIA's ban on carry in public transportation, public transit, and airports, N.Y. Penal Law § 265.01-E(2)(n), should be struck down.

### b.    Places of worship

Plaintiffs challenge the CCIA's designation of "any place of worship" as a sensitive location. N.Y. Penal Law § 265.01-E(2)(c). Defendants cannot meet their burden because there are no historical precedents that support the CCIA's carry ban at places of worship. To the contrary, citizens were often required to be armed when gathering at places of worship and other areas for public assembly during the Founding Era. The historical record shows an American tradition requiring citizens to be armed to protect places of worship.

Many colonists traveled to America in search of freedom from religious persecution. Ex. 26. With religion so central to their mission, they wasted no time establishing places of worship. Places of worship were present throughout the British colonies almost immediately, with the first

13

being established Jamestown in 1607. Ex. 27. *Cf.* Ex. 28 at 3 (St. Xavier Catholic church established in Maryland in mid-17th century). That search for religious freedom, however, did not free the colonies or the early American states from religious conflict or other physical threats to early congregations. *See, e.g.*, Ex. 29; Ex. 30; Ex. 31. Threat of physical attack was not merely a theoretical possibility in 17th- and 18th-century America; it was a prevalent risk.

To protect their communities from all kinds of violent attack from outsiders (including indigenous people, hostile religious sects, or criminals), many colonies adopted laws requiring citizens to carry firearms at meetings and religious services at places of worship. *Koons*, 673 F. Supp. 3d at 628–29 (collecting statutes). "[T]he historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies." *Id.* at 629 (citing *Heller*, 554 U.S. at 601) (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). There is no evidence that the colonies reversed course once they became states. *See id.* at 629–35 (rejecting as insufficient a few mid- to late-19th-century state and territory laws that generally made it unlawful to carry firearms at certain public assemblies, including churches in some cases). Both before and during the Founding Era, there was not merely a right, but often a duty, to carry at places of worship. The CCIA's ban on carry at places of worship should be struck down.

### c. Government administration buildings

The CCIA bans firearm carry in any government administration building owned or controlled by federal, state, or local government. N.Y. Penal Law § 265.01-E(2)(a). Although *Bruen* and *Heller* suggest that carry bans may be presumptively lawful in specific "sensitive" locations—polling places, legislatures, and courts—where critical government functions are carried out and where the government historically provided security, *see Bruen*, 597 U.S. at 30, these narrow historical exceptions do not allow New York to ban carry at all government

14

administration buildings. Plaintiffs challenge this provision of the CCIA in all respects, except as applied to polling places, legislatures, and courts.

There is no historical tradition of prohibiting firearm carry in all government administration buildings. No court has recognized such a tradition because none exists. It would make little sense for the *Bruen* Court to specify "legislative assemblies" and "courthouses" as two of the "relatively few" sensitive places where firearms may be prohibited, *id.*, if there otherwise existed a tradition of generally prohibiting carry in the multitudinous buildings where governments perform administrative functions. Had the *Bruen* Court intended to deem all government administration buildings "sensitive," it would have done so explicitly.

Government ownership or control of locations cannot alone make those locations "sensitive." *Koons*, 673 F. Supp. 3d at 601 ("[T]he State is not exempt from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property.") (emphasis omitted); *see also id.* at 601–05 (rejecting arguments that Second Amendment protections do not apply to locations where governments act as "proprietor" or "market participant" and finding state must support bans with historical precedents). To find otherwise would essentially strip all public lands and locations of Second Amendment protection. The few locations deemed "sensitive" by *Bruen* are not sensitive merely because government actors operate within them, but because historically they house important government functions and actors and are protected by heightened security. *See Koons*, 673 F. Supp. 3d at 605–06.

The state cannot show that the characteristics that make polling places, legislatures, and courts sensitive (*i.e.*, historically important government functions, heightened security, and tradition barring carry there) apply to all government buildings. The state may not sweep all government administration buildings into an omnibus ban and then justify its actions by pointing

out that its ban also applies to polling places, legislatures, and courts. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 326–27, 331–36 (2010) (striking down law on First Amendment grounds despite the existence of potentially valid applications); *id.* at 374–76 (Roberts, C.J., concurring). Defendants must prove, for particular government buildings, that historical precedents "can justify the challenged law." *Koons*, 673 F. Supp. 3d at 606. Defendants cannot do so. The ban should be struck down.

### 2.     Prohibitions touched on, but not directly addressed in *Antonyuk*

#### a.     Any location providing health care or services and places licensed or otherwise overseen by the Department of Health

The CCIA bans firearm carry at all locations providing "health . . . care or services," N.Y. Penal Law § 265.01-E(2)(b), and all residential locations "licensed, certified, regulated, funded, or operated by the department of health" ("DOH facilities"), N.Y. Penal Law § 265.01-E(2)(l). Such a broad prohibition cannot stand because there is no historical tradition of banning firearm carry in medical facilities. "Hospitals and medical care facilities existed before and after this Nation's founding." *Koons*, 673 F. Supp. 3d at 651; *see also Antonyuk*, 120 F.4th at 1009 ("both medical establishments and" criminal misuse of firearms "existed in the 18th- and 19th-centuries"); Ex. 32 (discussing operation of physicians' offices, almshouses, hospitals, and dispensaries in mid- to late-18th century). For example, Bellevue Hospital in New York—"America's oldest operating hospital"—opened in New York City in 1736, Ex. 33, Pennsylvania Hospital opened in 1751, Ex. 34, Ex. 35, Weill Cornell Medical Center opened as New York Hospital in 1791, Ex. 36, and Massachusetts opened the Boston Medical Dispensary (now the Tufts Medical Center) in 1796, Ex. 37, and the Massachusetts General Hospital in 1811, Ex. 38. *Koons*, 673 F. Supp. 3d at 651 (citations omitted).

Neither the state defendants nor the courts in *Koons* and *Antonyuk* uncovered any historical statutes banning firearm carry in medical facilities. *Koons*, 673 F. Supp. 3d at 651–52 (citing *Antonyuk v. Hochul*, 639 F. Supp. 3d at 318); *see Antonyuk*, 120 F.4th at 1009, 1013. Even if the state's proffered precedents were sufficient to uphold the CCIA's carry ban in locations providing behavioral health or chemical dependence treatment, as *Antonyuk* held, they are not sufficient to ban carry in all locations providing health care or services. Nothing in those statutes bans individuals from carrying handguns in specific locations, they merely ban certain classes of people from serving in state militias. And to the extent they actually disarmed *anyone*, the militia statutes were intended to disarm people who authorities believed could not be trusted to use firearms safely (children, the mentally ill, the mentally handicapped, addicts, felons), including all non-white and non-male individuals. *See* Ex. 39; Ex. 40; Ex. 41. The cited militia laws did not disarm all people within a certain proximity of vulnerable populations. Rather, the Founders relied on our Nation's robust tradition of permitting or requiring firearm carry to protect vulnerable populations in places lacking comprehensive government-provided security. Ex. 42; Ex. 43; Ex. 44; *see also* Section I.C.1.b, *supra*. The CCIA's ban on firearm carry in locations providing health care and services and residential settings overseen by the DOH should be stricken.

### b. Sporting venues

The CCIA bans carry at any location used for "sporting events." N.Y. Penal Law § 265.01-E(2)(p). This Court previously dismissed Plaintiffs' challenge to the CCIA's carry ban at stadiums and racetracks. (*See* ECF No. 81 at 21–22). Plaintiffs challenge this ban as it applies to non-professional sports venues, such as places used for informal, amateur, or youth sporting events such as Mr. Porter's son's basketball games. *See* Ex. 7 ¶ 9(d). The fields, gyms, courts, and other sporting venues at issue here are much more like the fields and areas used for sport during the colonial and Founding Eras than the modern stadiums used for professional sports where security

17

is provided. These venues are not the kind of "quintessentially crowded" entertainment locations discussed in *Antonyuk*. 120 F.4th at 1037–39.

Defendants cannot point to any historical precedent banning carry at locations used as venues for sports or entertainment generally. The spaces at issue here are most like the racetracks common at the Founding. Horseracing was well known to the American colonists. *See* Ex. 45 (detailing regulation of gambling in Colonial America); Ex. 46. But the Founding Era had no bans on carrying a firearm in areas used for sports or games, including informal racetracks. The lack of any Founding-Era regulations on firearm carry where sports or games were played is dispositive. Because the state cannot point to any historical tradition of banning firearms anywhere sports are played, the challenged provision should be struck down.

### c.    Times Square

The CCIA bans firearm carry within Times Square, "as determined and identified by the city of New York." N.Y. Penal Law § 265.01-E(2)(t); N.Y.C. Admin. Code § 10-315(a); *see also* Ex. 47 (containing map with visual representation of full "Times Square gun free zone"). The Times Square carry ban flies directly in the face of *Bruen*'s admonition against declaring Manhattan a sensitive location "simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. at 31. Even if the heart of Times Square at the intersections of Broadway and 7th Avenue is a "quintessentially crowded" location, *see Antonyuk*, 120 F.4th at 1019–24, *Bruen* made clear that crowdedness alone is not a sufficient reason to impose a carry ban, 597 U.S. at 31; *contra Antonyuk*, 120 F.4th 941. Times Square's crowdedness fails to make it an inherently "sensitive" location.

And this ban sweeps far more broadly than just Times Square. The three-dozen-block "gun free zone" surrounding Times Square includes many areas so far away from Times Square that even locals do not consider them to be "part of Times Square." Ex. 48. In any event, the state's

attempt in *Antonyuk* to show a historical tradition of banning firearms in crowded places fails to meet *Bruen*'s mandate. *Bruen*, 597 U.S. at 31. First, the Northampton statute, Ex. 49, and its colonial progeny, *see, e.g.*, Ex. 50; Ex. 51; Ex. 52, were focused on prohibiting threatening conduct ("riding *in terror* of the country"), *Bruen*, 597 U.S. at 49–50, not restricting where firearms could be carried. They did not prohibit mere possession or carriage of firearms at particular locations. *Id.*; *contra Antonyuk*, 120 F.4th at 1020 n.82. Second, the late-18th-century state statutes presented by the state in *Antonyuk* were too late and too few to represent a historical tradition of prohibiting carry in all crowded locations. *Bruen*, 597 U.S. at 30, 36–37, 55 n.22, 67–70. And finally, the municipal statutes cited in *Antonyuk* to support the state's "crowdedness" theory were entirely too late and unrepresentative of any national tradition. *Bruen*, 597 U.S. at 36–37, 55 n.22, 67–70. The Times Square carry ban should be stricken.

### d.     Public playgrounds and special events

The CCIA bans firearm carry at public playgrounds and public locations being used for special events. N.Y. Penal Law § 265.01-E(2)(d), (r). The playgrounds ban should not stand for the simple reason that during the Founding, citizens were often required to carry in places frequented by vulnerable populations like children. *See* Sections I.C.1.b, I.C.2.a, *supra*. There is no historical tradition generally banning carry wherever vulnerable populations are present.

Both the public playgrounds and special events bans suffer from many of the same issues as the sporting venue and Times Square bans. *See* Sections I.C.2.b & c, *supra*. The same logic that applies there holds for public playgrounds and special events like parades or festivals because the attempted justification is the same. New York may not ban firearm carry at public playgrounds or special events merely because they are sometimes crowded. *Id.* The bans are unconstitutional and should be struck.

### 3. Prohibitions *Antonyuk* upheld, but misapplied *Bruen*—public parks and places serving alcohol for on-premises consumption

*Antonyuk* misapplied the *Bruen* methodology to public parks and places serving alcohol for on-premises consumption.[4] *Antonyuk* followed *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), and the now-vacated panel decision in *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *Antonyuk*, 120 F.4th at 974, to support its reasoning that courts should "consider this Nation's whole tradition" when looking for historical evidence to support firearms regulations, *id.* at 972 n.15 (emphasis omitted). *Antonyuk* rejected the Third Circuit's pre-*Rahimi* decision in *Lara*, which held that the Second Amendment must be "understood according to its public meaning in 1791." *See id.* at 974 (quoting *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024), *cert. granted, judgment vacated*, 145 S. Ct. 369 (2024)). *Antonyuk* relied on numerous late-19th-century statutes which contradicted Founding Era evidence (in the form of directly antithetical regulations or a lack of supporting precedents) and the text of the Second Amendment. *See* 120 F.4th 941. In doing so, *Antonyuk* failed to account for the primacy of Founding Era evidence, including the lack of regulations banning firearms in the CCIA's sensitive and restricted locations.

To support the bans at public parks and places serving alcohol for on-premises consumption, *Antonyuk* cited (1) Reconstruction Era statutes banning carry at gathering places, (2) statutes banning intoxicated persons from possessing firearms, and (3) statutes banning carry to terrorize the population. 120 F.4th at 1015–32. The statutes *Antonyuk* cited are insufficient to show a historical tradition of disarming all citizens in crowded locations. *See* Section I.C.2.c, *supra*. Crowdedness is not a sufficient reason to disarm all citizens in a given location. *See Bruen*, 597

---

[4] *Antonyuk* only addressed these issues at the preliminary injunction stage and is not controlling precedent that would preclude Plaintiffs from maintaining their challenges to those bans here. *Antonyuk*, 120 F4th at 1048 n.126 ("Our affirmance or vacatur of the district court's injunction does not determine the ultimate constitutionality of the challenged CCIA provisions.").

U.S. at 31; Section I.C.2.c, *supra*. The lack of Founding Era regulations banning the carry of firearms in crowded locations or where vulnerable populations are present is dispositive as to that point. *See* Sections I.C.1.b, I.C.2.a, *supra*.

The statutes *Antonyuk* cited do not support the idea that all people near anyone who is intoxicated should be disarmed. As the Second Circuit acknowledged, those statutes were all "behavior-based"—not location-based. *Antonyuk*, 120 F.4th at 1032. *But see id.* at 1020 (noting one 1870 Texas statute banning firearms in non-bar spaces like "ball room[s]" and "social gathering[s]" and 1889 Arizona and 1890 Oklahoma statutes banning firearms in bars as exceptions). The only location-based bans *Antonyuk* cited were "late-in-time outliers." *Bruen*, 597 U.S. at 70. The behavior-based statutes disarmed intoxicated individuals while they were actually intoxicated, regardless of the individual's location. Because intoxicated individuals pose a greater threat than non-intoxicated persons due to their inebriated state, *see, e.g.*, Ex. 53, sober individuals should be allowed to protect themselves from intoxicated people. The danger—and the need to carry—is especially acute when sober people are in a place frequented by intoxicated people. For these reasons, *Antonyuk* misapplies *Bruen* to the CCIA. The Court should strike down New York's carry bans at public parks and places serving alcohol for on-premises consumption.

### 4. Prohibitions that *Antonyuk* correctly held unconstitutional—privately owned places open to the public

The CCIA's restricted locations provision created a default ban on firearm carry on or in privately owned property throughout the state. *See* N.Y. Penal Law § 265.01-D(1). New York cannot show a historical tradition where firearm carry is, by default, unlawful on private property open to the public. The Second Amendment codified historical tradition to ensure that ordinary citizens have the right to carry firearms in public, including in privately owned spaces open to the public. There is no distinction to be found in history among public spaces based on ownership

21

status. What matters is that the locations where Plaintiffs seek to carry are held open to the public, regardless of whether they are privately owned. Because the CCIA's restricted location provision bans carrying in such public spaces by default, it is unconstitutional. *Antonyuk* correctly reached this same conclusion and held that the restricted locations provision violates the Second Amendment. *Antonyuk*, 120 F.4th at 1047–48 (upholding injunction as to privately owned property open to the public). Plaintiffs request that the Court strike the restricted locations provision as applied to privately owned property open to the public.

*    *    *

As *Bruen* recognized, there were only a "few 18th- and 19th-century" regulations prohibiting firearms in certain specific sensitive locations—legislative assemblies, polling places, and courthouses. 597 U.S. at 30. But the existence of those few regulations is not sufficient to prohibit carry at nearly every public space in the state. The CCIA's location prohibitions cannot withstand constitutional scrutiny.

> **D.    The CCIA's licensing, renewal, and automobile storage requirements are not consistent with the Nation's historical tradition of firearm regulation.**

Like the New York licensing regulations at issue in *Bruen*, the CCIA's licensing provisions violate the Second Amendment. The CCIA requires that every initial and renewal applicant meet with a licensing officer in person and provide four character references. N.Y. Penal Law § 400.00(1)(o). The in-person meeting requirement and character reference provisions do not have a basis in any historical tradition of licensing practices. Although licensing authorities may inquire into "an applicant's potential dangerousness," *Antonyuk*, 120 F.4th at 999, the disclosures mandated by the CCIA are impermissibly invasive and burdensome, discouraging applicants. The in-person meeting provision, paired with the "such other information" provision (the "catchall") discussed below, requires applicants to disclose additional information at the discretion of a

22

licensing officer which would impose a burden not supported by any historical precedent. And applicants should not be required to reveal to four civilians that they are seeking a carry license or renewal of a carry license, or have their application depend upon obtaining such sponsors. Although minimally invasive licensing procedures are allowed under *Bruen*, that case did not grant states carte blanche to impose any licensing hurdles they see fit, especially where, as here, they unreasonably burden applicants and invade their privacy.

*Bruen*'s brief note about carry licensing preconditions not involved in that case, *see* 597 U.S. at 38 n.9, did not create a presumption that any and all licensing regimes are constitutional. The state may not "sidestep" historical analysis by pointing to a footnote in *Bruen* to negate its holding. *See Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023). And the state cannot show any historical tradition to validate the CCIA's burdensome licensing procedures.

The CCIA requires all applicants to disclose all of their cohabitants and allows a licensing officer the discretion to generally inquire into "such other information required by the licensing officer" with the only limitation being that the information must be "reasonably necessary and related to the review of the licensing application." N.Y. Penal Law § 400.00(1)(o). The statute does not give any guidelines or guardrails to curtail the licensing officer's discretion. *Antonyuk* misapplied *Bruen* to uphold the cohabitant disclosure and catchall provisions. There is no history or tradition giving licensing officers unfettered discretion to perform a fishing expedition into an applicant's life merely because that applicant wants to exercise a constitutional right.

Plaintiffs also challenge the CCIA's automobile storage provisions which require them to remove any ammunition and place their handgun into a "safe storage depository" when leaving it in their vehicle. *See* N.Y. Penal Law § 265.45. There is no Founding Era tradition requiring that

firearms be unloaded or specially secured when left in or on their owner's personal transportation. The challenged licensing and automobile storage provisions should be struck down.

## II.    The CCIA also violates the First and Fourteenth Amendments.

### A.    The CCIA's restricted locations provision impermissibly compels speech.

The CCIA's restricted locations provision requires property owners to affirmatively invite carry permit holders onto their property. *See* N.Y. Penal Law § 265.01-D(1). Because the CCIA conditions the exercise of Second Amendment rights on compelled speech, it is subject to strict scrutiny. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *CompassCare v. Hochul*, 125 F.4th 49, 63 (2d Cir. 2025); *cf. Antonyuk*, 120 F.4th at 1048 n.125. And because the CCIA mandates affirmative statements by property owners, it is a content-based requirement. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (citation omitted). Plaintiffs would not post signs or give express permission if not for the CCIA. *See, e.g.*, Ex. 7 ¶ 11; Ex. 8 ¶ 11.

Content based laws "are presumptively unconstitutional." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (quotation omitted). The government must prove the law is "narrowly tailored to serve compelling state interests." *Id.* There is no evidence that the CCIA is narrowly tailored. The contrary historical default rule—that public carry is presumptively lawful without compelled speech—is the only proper default under the First Amendment, just as it is under the Second Amendment. New York does not have a compelling interest here because property owners enjoy the full right to control the use of their property and the CCIA's compelled speech does not assist "in protecting the community from crime," *see Schall v. Martin*, 467 U.S. 253, 264 (1984). The provision merely makes compliance by lawful carry licensees more onerous in order to discourage the exercise of the right. The CCIA's compelled speech provision fails strict scrutiny, violates the First Amendment, and should be struck.

**B.      The CCIA is vague, intrusive on Plaintiffs' privacy, and discriminatory.**

The CCIA's location prohibitions and licensing provisions also fail because they violate the Fourteenth Amendment's due process and equal protection clauses. The Fourteenth Amendment guarantees that citizens will not be subject to any law that is impermissibly vague, violative of their right to privacy, or unlawfully discriminatory. First, the CCIA's location prohibitions, N.Y. Penal Law §§ 265.01-D, 265.01-E, are unconstitutionally vague because they "fail to provide the kind of notice that [would] enable ordinary people to understand what conduct [they] prohibit[]." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The location prohibitions are so broad that the law fails to inform an ordinary person, including Plaintiffs, where a carry license holder may carry a firearm. *See* Ex. 3 ¶ 11; Ex. 4 ¶ 12; Ex. 5 ¶ 12; Ex. 6 ¶ 12; Ex. 7 ¶ 13; Ex. 8 ¶ 13. Second, the CCIA's licensing provisions, N.Y. Penal Law § 400.00(1)(o), violate Plaintiffs' right to privacy because they invalidly force applicants to disclose their private personal information. *See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 762–63 (1989); Ex. 5 ¶ 7; Ex. 6 ¶ 7. Finally, the CCIA, N.Y. Penal Law §§ 265.01-D, 265.01-E, 400.01, impermissibly discriminates against Plaintiffs and other applicants in favor of former police officers. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

For these reasons, Plaintiffs request that the Court enjoin the enforcement of the CCIA's location prohibitions and licensing provisions under the Fourteenth Amendment.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' Motion for Summary Judgment, declare that the CCIA's challenged provisions are unconstitutional under the First, Second, and Fourteenth Amendments to the Constitution, permanently enjoin their enforcement, and award Plaintiffs their attorneys' fees, and such other relief as is just.

Dated: August 18, 2025                    Respectfully submitted,

                                          /s/ *John Parker Sweeney*
                                          John Parker Sweeney
                                          James W. Porter, III
                                          Bradley Arant Boult Cummings LLP
                                          1900 K Street NW, Suite 800
                                          Washington, D.C. 20006
                                          Phone: 202-393-7150
                                          Facsimile: 202-347-1684
                                          jsweeney@bradley.com
                                          jporter@bradley.com

                                          *Counsel for Plaintiffs*

**INDEX OF EXHIBITS**

| # | Exhibit Title or Citation | Related Page(s) |
|---|---|---|
| 1 | *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, STATE OF N.Y. (July 1, 2022) https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions | 1, 7, 10 |
| 2 | Marcia Kramer & Dick Brennan, *Fresh off primary win, Gov. Kathy Hochul dives right into guns -- who can get them and where they can take them*, CBS NEWS (June 29, 2022, 11:26 PM) https://www.cbsnews.com/newyork/news/fresh-off-primary-win-gov-kathy-hochul-dives-right-into-guns-who-can-get-them-and-where-they-can-take-them/ | 1, 7 |
| 3 | Declaration of Robert Nash | 2, 4, 5, 25 |
| 4 | Declaration of Brandon Koch | 2, 4, 5, 25 |
| 5 | Declaration of Thomas Stirnweis | 2, 3, 4, 5, 25 |
| 6 | Declaration of Wayne Francis | 2, 3, 4, 5, 25 |
| 7 | Declaration of Khoury Porter | 2, 4, 5, 17, 24, 25 |
| 8 | Declaration of Scott Noren | 2, 4, 5, 24, 25 |
| 9 | *About*, N.Y. STATE RIFLE & PISTOL ASS'N, https://www.nysrpa.org/aboutnysrpa/ (last visited Aug. 12, 2025) | 2 |
| 10 | *Governor Hochul Announces Extraordinary Session of the New York State Legislature to Begin on June 30, Office of the Governor of New York*, STATE OF N.Y. (June 24, 2022), https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-begin-june-30 | 7, 10 |
| 11 | Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, 12 Q.J. N.Y. STATE HIS. ASS'N 231, 231–33 (1931) | 12 |
| 12 | *Stagecoach Travel*, THE HENRY FORD MUSEUM OF AMERICAN INNOVATION, https://www.thehenryford.org/collections-and-research/digital-collections/expert-sets/11773/ (last visited Aug. 13, 2025) | 12 |
| 13 | 9 DAVID J. MCCORD, THE STATUTES AT LARGE OF SOUTH CAROLINA 60–61 (1841) | 12 |
| 14 | Paul Stephen Dempsey, *Transportation: A Legal History*, 30 TRANSP. L.J. 235, 243–44 (2003) | 12 |

| # | Exhibit Title or Citation | Related Page(s) |
|---|---|---|
| 15 | Harry Schenawolf, *Ferry Boats of Colonial America*, REVOLUTIONARY WAR J. (Dec. 11, 2019), https://revolutionarywarjournal.com/ferry-boats-of-colonial-america/#_edn2 | 12 |
| 16 | OTTO ARTHUR ROTHERT, THE OUTLAWS OF CAVE-IN-ROCK: HISTORICAL ACCOUNTS OF THE FAMOUS HIGHWAYMEN AND RIVER PIRATES WHO OPERATED IN PIONEER DAYS UPON THE OHIO AND MISSISSIPPI RIVERS AND OVER THE OLD NATCHEZ TRACE 17–18, 37–39 (1924) | 12 |
| 17 | Joseph E. Wroblewski, *Loyalist "Banditti" of Monmouth County, New Jersey: Jacob Fagan and Lewis Fenton*, J. AM. REVOLUTION (June 10, 2021), https://allthingsliberty.com/2021/06/loyalist-banditti-of-monmouth-county-new-jersey-jacob-fagan-and-lewis-fenton/ | 12 |
| 18 | *Violent Crimes*, in 5 THE SOCIAL HISTORY OF CRIME AND PUNISHMENT IN AMERICA: AN ENCYCLOPEDIA (Wilbur R. Miller ed., 2012) | 12 |
| 19 | NICHOLAS JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) | 12 |
| 20 | 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND (1628-1641) 190 (Nathaniel B. Shurtleff ed., 1853) | 12 |
| 21 | 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) | 12 |
| 22 | An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, 1813 Ky. Acts 100, ch. 89, § 1 | 12–13 |
| 23 | An Act to Prohibit the Wearing of Concealed Weapons, 1819 Ind. Acts 39, ch. XXIII, § 1 | 13 |
| 24 | An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, 1821 Tenn. Pub. Acts 15–16, ch. XIII | 13 |
| 25 | David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 238 n.78 (2024) | 13 |
| 26 | *America as a Religious Refuge: The Seventeenth Century, Part 1*, LIBR. OF CONG., https://www.loc.gov/exhibits/religion/rel01.html (last visited Aug. 12, 2025) | 13 |
| 27 | *Jamestown Churches*, HISTORIC JAMESTOWNE, https://historicjamestowne.org/archaeology/map-of-discoveries/jamestown-churches/ (last visited Aug. 12, 2025) | 14 |
| 28 | *St. Xavier Catholic Church*, NAT'L REG. OF HISTORIC PLACES (Nov. 9, 1972) https://npgallery.nps.gov/NRHP/GetAsset/b131f99c-e798-4be5-a5fd-cda02e8cf721 (last visited Aug. 12, 2025) | 14 |

| # | Exhibit Title or Citation | Related Page(s) |
|---|---|---|
| 29 | RANDOLPH ROTH, AMERICAN HOMICIDE 48–54, 92 (2009) | 14 |
| 30 | *Religion and the State Governments*, LIBR. OF CONG., https://www.loc.gov/exhibits/religion/rel05.html (last visited Aug. 12, 2025) | 14 |
| 31 | Joshua J. Mark, *Religion in Colonial America*, WORLD HISTORY ENCYCLOPEDIA (Apr. 12, 2021), https://www.worldhistory.org/article/1726/religion-in-colonial-america/ | 14 |
| 32 | WILLIAM G. ROTHSTEIN, AMERICAN MEDICAL SCHOOLS AND THE PRACTICE OF MEDICINE: A HISTORY 19-24 (1987) | 16 |
| 33 | *Bellevue History*, NYC HEALTH + HOSPITALS, https://www.nychealthandhospitals.org/bellevue/history/ (last visited Aug. 13, 2025) | 16 |
| 34 | HARRIET BAILEY, NURSING MENTAL DISEASES 25–26 (1921) | 16 |
| 35 | *Pennsylvania Hospital*, PENN MED., https://www.pennmedicine.org/locations/pennsylvania-hospital (last visited Aug. 13, 2025) | 16 |
| 36 | *Historical Timeline*, WEILL CORNELL MED., https://library.weill.cornell.edu/archives/historical-timeline (last visited Aug. 13, 2025) | 16 |
| 37 | *History of Tufts Medical Center*, TUFTS MED., https://www.tuftsmedicine.org/get-care/our-locations/about-tufts-medical-center/history-tufts-medical-center (last visited July 14, 2025) | 16 |
| 38 | *A Narrative History of Mass. General*, MASSACHUSETTS GEN. HOSP., https://www.massgeneral.org/museum/history (last visited Aug. 13, 2025) | 16 |
| 39 | An Act Concerning the Militia, 1837 Mass. Acts 273, ch. 240, § 1 | 17 |
| 40 | An Act Additional to an Act to Organize, Govern and Discipline the Militia of This State, 1839 Me. Laws 421, ch. 276, § 5 | 17 |
| 41 | An Act to Regulate the Militia, 1844 R. I. Pub. Laws 501, § 1 | 17 |
| 42 | David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 232–34 & n.108 (2018) | 17 |
| 43 | Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 653, 697–99 (2014) | 17 |

| # | Exhibit Title or Citation | Related Page(s) |
|---|---|---|
| 44 | Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y, 2004, at 12-16 | 17 |
| 45 | G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling*, 16 RUTGERS L.J. 211, 232–65 (1985) | 18 |
| 46 | Nancy L. Struna, *The Formalizing of Sport and the Formation of an Elite: The Chesapeake Gentry, 1650-1720s* 13 J. SPORT HIST. 212 (1986) | 18 |
| 47 | *Mayor Adams Announces Steps to Keep New Yorkers Safe as New Concealed Carry Regulations Go Into Effect*, CITY OF N.Y., (Aug. 31, 2022) https://www.nyc.gov/office-of-the-mayor/news/632-22/mayor-adams-steps-keep-new-yorkers-safe-new-concealed-carry-regulations-go-into#/0 | 18 |
| 48 | Jonah E. Bromwich & Chelsia Rose Marcius, *Wait . . . Is This Times Square?*, N.Y. TIMES, Aug. 31, 2022, https://www.nytimes.com/2022/08/31/nyregion/wait-is-this-times-square.html | 18 |
| 49 | 1 THE STATUTES: REVISED EDITION, HENRY III TO JAMES II. A.D. 1235-6–1685 144–45 (1870) | 19 |
| 50 | An Act Forbidding and Punishing Affrays, 1786 Va. Acts 35, ch. 49 | 19 |
| 51 | An Act for Repealing an Act, Made and Pass[ed] in the Year of Our Lord, One Thousand Six Hundred and Ninety Two, Entitled "An Act for Punishing Criminal Offenders," and for Reenacting Certain Provisions Therein, 1795 Mass. Gen. Laws 259, ch. 25, §§ 1–2 | 19 |
| 52 | An Act for the Restraint of Idle and Disorderly Persons, 1801 Tenn. Code 708, ch. 22, § 6 | 19 |
| 53 | Ioana Popovici, et al., *Alcohol Use and Crime: Findings from a Longitudinal Sample of U.S. Adolescents and Young Adults*, 36 ALCOHOLISM, CLINICAL AND EXPERIMENTAL RSCH. 532 (2012) | 21 |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th of August, 2025, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to all Counsel of Record.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)

31