# EXHIBIT 15

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Page 1

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE & PISTOL

ASSOCIATION, INC., ROBERT NASH,

BRANDON KOCH, THOMAS STIRNWEIS

WAYNE FRANCIS, KHOURY PORTER,

AND SCOTT NOREN,

    Plaintiffs,

V                                    Index No.:  22-CV-907

STEVEN G. JAMES, IN HIS OFFICIAL

CAPACITY AS SUPERINTENDENT OF THE

NEW YORK STATE POLICE, RODNEY K.

HARRISON, IN HIS OFFICAIL CAPACITY

AS COMMISSIONER OF THE SUFFOLK

COUNTY POLICE DEPARTMENT,

    Defendants.

_____X (Cont'g.)

DEPOSITION OF: KHOURY PORTER

DATE:          October 1, 2025

TIME:          10:07 a.m. to 3:26 p.m.

VENUE:         MS Teams

Reported by Howard Hubbard

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 2

NYS Rifle v James, et al – 10-1-25 – Khoury Porter (Cont'g.)

AND LICENSING OFFICER FOR SUFFOLK

COUNTY, AND PATRICK J. RYDER, IN

HIS OFFICIAL CAPACITY AS COMMISSIONER

OF THE NASSAU COUNTY POLICE DEPARTMENT,

AND LICENSING OFFICER FOR NASSAU

COUNTY,

     Defendants.

_____X

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 32

NYS Rifle v James, et al – 10-1-25 – Khoury Porter document, yes.

Q.    Okay.  Do you recall signing it?

A.    Yes.

Q.    Is there anything in this document -- I'm going to go back up to the first -- substance of page of it.  Is there anything in this document that is wrong or incomplete?

A.    No.

Q.    So, I'm going to scroll down to what's labeled paragraph eight and ask you to take -- to read this paragraph.  Let me know when you finished reading it.

A.    I finished reading.

Q.    All right.  So, I'd like to ask what you meant when you said many locations I visit are generally open to the public but lack State's provided security, either at the entrance or inside the location, sufficient to ensure my and my family's safety at those locations.

A.    I meant exactly what the statement says.  Different locations that I go to don't have adequate security or security at all.

Q.    Okay.  And why is State-provided security relevant here?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 33

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

A.   Because I want to ensure that myself and my family are safe.

Q.   Okay.  And what would be sufficient security measures from your perspective?

A.   A security officer of some form, whether they are armed or unarmed.

Q.   Okay.  Can you tell me what risks you see, for instance, from walking in a park?

A.   Please repeat the question.

Q.   What risks do you see, for instance, from walking in a park that would necessitate an armed or unarmed security guard?

A.   What I see is, if I'm walking say through a state park facility or even a local park, anyone can come into the park at any time with any intention.  And quite frankly, that doesn't make me feel too safe, you know?  So that --that's my best response I could give you.

Q.   Thank you.  I'm going to stop sharing this Exhibit.  All right.  Do you have a New York State firearms license?

A.   Yes, I do.

Q.   And I'm going to see if I can do this again.  When did you -- let's see, when did you

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                          www.courtsteno.com

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

you visit regularly?

A.   As of now, I visit Kings Park, which is located -- that's Congers, New York, and then frequently I must travel through Harriman State Park, New York.

Q.   Uh-huh.  Any other parks?

A.   No.

Q.   Okay.  Do you visit playgrounds presently?

A.   Not presently, no.

Q.   Okay, so for Kings Park --

A.   Uh-huh.

Q.   -- how often do you go there?

A.   Kings Park, because of my -- my son, he plays, like I said, travel basketball, definitely in the springs and summer, we'll go at least once a week.

Q.   Okay.  And when was the last time you visited Kings Park?

A.   This summer.

Q.   Okay.  Why do you want to carry a gun to Kings Park?

A.   So the reasons for me, like I've stated before, is that any -- in any park or any

Associated Reporters Int'l., Inc.                          www.courtsteno.com

NYS Rifle v James, et al – 10-1-25 – Khoury Porter facility or anything that doesn't have a -- a level of security, anybody can come into the park, and that would be my reason -- reasoning and that's the way I -- I think about it.

Q.   Okay.  For Harriman State Park, how often do you visit?

A.   So to clarify, I don't visit.  Like I said, I travel through.

Q.   Travel through.

A.   The reason for that is because I am a firearm instructor, and to get to the range that I use in Orange County, New York, you must travel through Harriman State Park, New York.  It's on the way there.  It's --

Q.   And -- and when you drive through Herriman State park, you have -- you have firearms in -- in your automobile?

A.   Correct.

Q.   Okay.  So it's fair to say the only park you visit with regularity is Kings Park, in Congers?

A.   Correct.

Q.   Okay.  Have you ever been threatened when you visited at King -- Kings Park?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 93

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

Q.   In New York State.

A.   New York State, let me think, what was the last one I went to?  Actually, no, it was a food court.

Q.   Uh-huh.

A.   Wasn't a restaurant.  It's a food court.

Q.   Okay, but in --

A.   Palisades --

Q.   -- a restaurant.  Yeah, in a restaurant with an active liquor license in New York State, can you tell me the last place?

A.   Yeah, sure.  At Nanuet, Chili's.

Q.   Chili's, and before that?

A.   Like I said, I go to so many when I, but I got to cut back.  I'm a little fluffy.  But no, seriously, before that would have been Number One Sushi --

Q.   Okay.

A.   -- in Nanuet.

Q.   So why -- could you tell me why you want to carry a gun when you go to a bar or a restaurant with a liquor license?

A.   So like, like I -- I stated

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 94

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

before, I'm -- I'm in belief in the practice of carrying a firearm for self-defense purposes or any legal reason.  Going specifically to a restaurant that has a liquor license, I'm not an avid drinker, so I don't go to a restaurant looking to have cocktails in any fashion.

But if -- if I'm going to a restaurant that has a li -- liquor license, it's kind of now putting me in the catch twenty-two area of the C.C.I.A. because I can't now have my firearm with me because that facility has alcohol.  It doesn't mean that I'm engaging in the use of alcohol because like I said, I'm not an avid drinker or you know.  So, but I would want to carry a firearm everywhere I go just with the what if, like we've used scenarios before, hypothetical situations of the what if.  So the what if is the reason why I personally would have a firearm.

But I -- I subjected to, not to because when I go to a restaurant, because if they have a liquor license, like an outback or yard house or Number One Sushi, I'm -- I'm not allowed to because of the -- of the ruling.

Q.   When you are at a restaurant with

Page 166

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

6th, in that area.

Q.   Now, Mr. Porter, you have -- you've sued the -- the State to invalidate the -- the prohibition on carrying guns in the Times -- excuse me, Time Square zone.  Is that correct?

A.   Correct.

Q.   Okay.  Do you know where the boundaries are that have been set for the Times Square gun-free zone?

A.   Yes, I do.  The funny thing about that is I can give you two reasons why.  As far as -- as I testified, I can tell you that it does extend as high, if I'm correct, as 56th Street.  How I know that is when I did go to the Museum of Modern Art with my family last summer, I actually took a picture of a sign that I saw.  There's an area around 54th, 55th, something like that.  That's -- it's like a 6-1/2 Avenue, is I believe.  And there's a small sign that says that firearm possession is illegal in Times Square.

So that's recently.  Prior to that the reason why I do know the boundaries is because many years ago I was a FedEx delivery driver for FedEx Corporation many lifetimes ago.  And my area was 41st

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 181

NYS Rifle v James, et al – 10-1-25 – Khoury Porter on the Hype Fest.  I know we said we're going to touch back on that.  And I -- because the mall is a private location, so --

Q.  We can come back to that in a second, but can you answer this question that I just asked you, and then we'll return to Hype Fest?

A.  So when you say private, are we meaning like a private home, private business, I'm trying to be -- so I can answer correctly?

Q.  Sure.  So we're not talking here right now about private homes, but private property open to the public.  So, that could be mostly businesses probably what we're thinking about here, but there might be other -- other kind of borderline areas.

A.  Okay.  All right.  All right.  Yes.  Yes, I would like to carry in private property, businesses, specifically speaking, if I was allowed to, yes.

Q.  Okay.  And which businesses in particular?

A.  Everyone I go into.

Q.  Okay.  Every -- every business you go into?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

A.   Yes, ma'am.

Q.   Could you describe to me in the last seven days which businesses that you've gone into that you would like to have carried a gun to or that you did carry it on to?

A.   The pizza -- the pizza -- pizzeria next to my business, the convenience store next to my business, the -- the Chinese restaurant next to my home.  I mean, if I could be more specific, I would, but I mean, in general, any business that I would patronize, I would like to be able to legally carry my firearm.

Q.   Okay.  I'm going to bring up Exhibit One again.  This is the declaration that you submitted earlier in this case.  Could you take a look at the paragraph labeled -- it's Nine G, privately owned places open to the public.  Can you read that to yours -- to yourself?  You don't need to read out loud.

A.   That's correct.

Q.   Okay.  So, did you write this?

A.   Yes, I did.

Q.   Okay.  So it -- in addition to the places you just mentioned, you also would like to

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 183

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

-- it sounds like, carry a gun to your local Stop and Shop grocery store.  Is that right?

A.   Yes.

Q.   And you'd also like to bring it to a gym.  Is that correct?

A.   No, what I said there is that, I was talking about my gym.

Q.   I see, okay.  Apologies.  All right.  Thank you.  So now we can go back to Hype Fest.  You said that there was something you wanted to -- to explain about Hype Fest.  Could you say what that was?

A.   Yes, ma'am.  So like I said, the Hype Fest, this was my first year of going to it.  It was in the Palisades Mall parking lot.  A lot of vendors, a lot of young people.  When I say young people, teenagers, young adults, mostly.

The thing about the event, it was a great event.  It was something great for the community.  But the one thing that I immediately noticed was no security and no police presence.  During the Hype Fest, there were two different or three different incidents.  I want to say two that I remember very, very convincingly.  The first one was

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 202

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

Q.   Okay.  So does the safe -- safe storage law, does it -- does it come into play when a gun is in your physical possession?

A.   Not in your physical possession, no.

Q.   Okay.  I'm going to bring up your declaration again.  Apologies, it will take me a few seconds.  Okay, so this is Exhibit One again.  It's the declaration that you filed earlier in this case.  Can I draw your attention to paragraph number twelve?

A.   Yes.

Q.   Okay.  What do you mean here by saying that you would ensure that a firearm left unattended would be stored in a safe, responsible manner without first removing ammunition and without you -- from my firearm, without utilizing a safe storage depository?

A.   Okay.  So what I mean by that is -- all right.  Well, first let's -- let's -- I'll address the -- the removing the ammunition part of it.  The law states that the firearm when you're going to have it not in your possession, says it has to be in a safe storage depository that has some kind of locking device combination or whatnot.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 203

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

Specifically, if we go to New York City, they add on to that, and it must be completely separate from the firearm.

In my opinion, you can leave the magazine rounds in the magazine if you choose so. The -- the rounds -- the one round does not have to be specifically into the chamber of the firearm, but the magazine, you could leave it in the firearm, then take that firearm and put it, like I said, into say, a center console or even a glove box that would lock. I'm not saying that it has to specifically not be locked because that would be irresponsible.  But safe storage depository, not everyone -- not everyone, you know, has the ability to have access to that, maybe can afford one or put one securely into their vehicle.

And also, too per the law, it never says, well, how does this safe storage depository, how -- how does it have to be affixed in the vehicle? Does it have to be mounted?  Does it have to be bolted?  Does it have to be strapped?  Where the vehicle does it have to be specifically located?  But they did mention, per the law, that it can't be the glove box or the center console, which to me,

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 204

NYS Rifle v James, et al – 10-1-25 – Khoury Porter referring back to your earlier statement, to clarify, I had to think about it, you know what, it would actually infringe on my right.  Because what if I don't want the firearm specifically on my person, but readily available to me in the vehicle because maybe I'm being accosted, I'm being carjacked, I'm being robbed.  If I'm a female, I'm being sexually assaulted.  If I'm a child, I'm being abducted, you know, and my parent wants to defend me.

If that gun is not physically on me, but it's in the trunk, stored in the safe, that doesn't help me.  So I hope that I've -- I've answered the question, you know, to the best of my ability there.

Q.   Sure.  So my understanding though is that we were talking about when a firearm is left unattended in a vehicle, right?

A.   Uh-huh.

Q.   So that's a firearm where you're not in the vehicle?

A.   Correct.

Q.   Okay.  So when you're not in the vehicle, my understanding is what you just said, and I want to make sure I understand this, is that you

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 205

NYS Rifle v James, et al – 10-1-25 – Khoury Porter

would like to leave it loaded, but with no round chamber and either in a locked center console or a locked glove box.  Is that right?

A.    Correct.

Q.    Okay.  Now, if you're -- if you're with the gun in the car, is it your understanding of the law that it would still need to be locked?

A.    So no, because it does not say that.

Q.    Okay.  So just now you were talking about how you wanted to be able to access the gun if you were in the car --

A.    Correct.

Q.    -- when something happened.

A.    Right.

Q.    What in the law would prevent you from doing that?

A.    So like I said, we're talking about interpretation.  In the law, it's -- there's -- it's very vague.  It never -- it never says in that -- in the specific statute we're talking about, it's not just in the vehicle.  The same statute we're talking about 265.50 and 265.45, it speaks