# EXHIBIT 18

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE & PISTOL    )
ASSOCIATION, INC.                )
ROBERT NASH,                     )
BRANDON KOCH,                    )
THOMAS STIRNWEIS,                ) Case No.
WAYNE FRANCIS,                   ) 1:22-cv-00907-MAD-CFH
KHOURY PORTER, and               )
SCOTT NOREN,                     )
                                 )
            PLAINTIFFS,          )
                                 )
            VS.                  )
                                 )
STEVEN G. JAMES, in his          )
official capacity as Acting      )
Superintendent of the New        )
York State Police,               )
RODNEY K. HARRISON, in his       )
official capacity as             )
Commissioner of the Suffolk      )
County Police Department, and    )
Licensing Officer for Suffolk    )
County, and                      )
PATRICK J. RYDER, in his         )
official capacity as Police      )
Commissioner of the Nassau       )
County Police Department, and    )
Licensing Officer for Nassau     )
County,                          )
                                 )
            DEFENDANTS.          )
_____)

DEPOSITION OF TERENCE YOUNG

TUESDAY, MARCH 31, 2026, 10:55 A.M.

VIA VIDEOCONFERENCE (ZOOM)

Reported by Desiree Cooks, CSR No. 14075

Job No. 7975355

Pages 1 - 148

Page 2

APPEARANCES:

ALL APPEARING VIA VIDEOCONFERENCE (ZOOM)

For the Plaintiffs:

        BRADLEY ARANT BOULT CUMMINGS LLP

        BY: W. CHADWICK LAMAR,JR., ESQ.

        1819 Fifth Avenue North

        Birmingham, Alabama 35203

        (205) 521-8533

        clamar@bradley.com


        BRADLEY ARANT BOULT CUMMINGS LLP

        BY: JOHN PARKER SWEENEY, ESQ.

        1900 K Street Northwest, Suite 800

        Washington, D.C. 20006

        (202) 393-7150

        jsweeney@bradley.com

   For the Defendants:

        NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

        DIVISION OF STATE COUNSEL

        BY: JAMES MARTIN THOMPSON, ESQ.

        --  MOLLY ANNE THOMAS-JENSEN, ESQ.

        28 Liberty Street, 18th Floor

        New York, New York 10005

        (212) 416-6556

        james.thompson@ag.ny.gov

        molly.thomas-jensen@ag.ny.gov

Q    Can you tell me the difference in the meaning of the term "gun" and the term "firearm," as used in 1800's statutes?

A    No.  I can't.  I'm not a lawyer.

Q    Is it fair to say that you included a statute in your 115 statute compilation if you thought it regulated firearms in parks?

A    I've read it.  And as I read all of them, each of them, I had to judge, yes, this is a regulation intended to address firearm regulations.

Q    Why did you look for firearms regulations from 1858 to 1936 but not from 1770 to 1810?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  Because parks began, more or less, with Central Park.

BY MR. LAMAR:

Q    What do you mean by the phrase "more or less"?

A    Well, there are -- I think -- I use Central Park as my launch point because it is the first large public park created in the United States.

And it generated or inspired -- probably a better word -- many examples across the United States. Which, I believe, we still use, more or less, the same

Page 45

model for urban parks.

That's why I use 1858. I mean, there is some debate as to what's the exact first park, but this is my -- my launch point.

Q    How do you know that you're not missing relevant statutes regulating firearms in parks?

A    I don't know. In parks? In modern -- in post-1858 parks? Is that what you're saying?

Q    How do you know that you're not missing any other examples of historical regulations regulating firearms in post-1858 parks?

A    I'm not saying I am missing any or whatever -- didn't see it or whatever. There could very well be other regulations. I just don't know of any others.

Q    Is it your opinion that the conclusions you reached in your declaration would not change even if you learned of additional statutes concerning the regulation of firearms in parks?

MR. THOMPSON: Object to the form of the question.

You can answer.

THE WITNESS: My suspicion is just given the overwhelming number of them, that there -- while there may be more, I -- I suspect there would be few that would change my opinion.

Page 59

Q    Does that mean that people could have visited public green spaces for recreational purposes, but you do not know whether they did or did not?

A    Yes.

Q    Did people visit Boston Common for recreational purposes?

A    Once it was a commons, apparently.

Q    When was Boston Common created?

A    I am not exactly sure when the term was applied to Boston, to the Commons of Boston when it started being called that, the Boston Commons.  But sometime in the 19th century is my understanding.

Q    Do you have any reason to dispute that Boston Common was established, even if not formally called Boston Common, in 1634?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  I -- I would take your word for that year.  I don't know off the top of my head.

BY MR. LAMAR:

Q    Do you know roughly when Boston Common was established, even if it was not yet called Boston Common?

A    I believe it was 17th century, as you said.

Q    Do you have any evidence to dispute

Page 60

Anne Beamish's observation in her article, Exhibit 2 to this declaration, that Boston Common "served as a site for informal socializing and recreation"?

A    I -- I don't necessarily disagree with her.  I can't specifically disagree with her.  She knows more about that particular than I do, I suspect.

Q    Do you agree with Anne Beamish's observation that Boston Commons "served as a site for informal socializing and recreation"?

A    As I say, I simply don't know.  That's her statement, not mine.

Q    But it is not a statement that you are prepared today to dispute?

MR. THOMPSON:  Objection.  Asked and answered.

THE WITNESS:  No, I am not.

BY MR. LAMAR:

Q    Do you have any reason to dispute Anne Beamish's observation that Boston Common was used as a place for strolling?

A    No.

Q    Do you have any reason to dispute that Boston Common was used as a place for horse and carriage riding?

A    No.

Q    Do you have any reason to dispute

Page 61

Anne Beamish's observation that Boston Common was used as a place for sports?

A    I am just skeptical of that one only because sports is really a 19th and 20th century notion.  But did people go there and play games of some sort, I suspect she knows more than I do.

Q    Do you have any reason to dispute Anne Beamish's observation that Boston Common was used as a place to gather for, quote, "celebration"?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No.

BY MR. LAMAR:

Q    Do you have any reason to dispute that Boston Commons served as a place for people to gather for religious preaching?

A    No.

Q    Were you aware that in the 1700s, George Whitefield preached to a crowd of 20,000 in Boston Common?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No, I wasn't aware of that.

Page 62

BY MR. LAMAR:

Q     Was Bowling Green in New York used as a place for recreation between 1780 and 1810?

A     Again, I don't know for sure.  I'd have to check what I have written.

Q     Sharing my screen again with you, Dr. Young.

Do you see the document on your screen?

A     Chapter -- excuse me -- Paragraph 18 at the bottom there, yes.

Q     Can you read for me the sentence of Paragraph 18 beginning with "Instead"?

A     Certainly.

"Instead, many of its public spaces, like the greens of New England, emerged as adaptive reuses of preexisting sites."

Q     Could you read the next sentence for me, please?

A     "Beamish points to three specific spaces where New Yorkers experimented with leisure -- leisure activities and socializing and where the demand for later publicly owned recreational spaces developed.  The battery:  The Battery, The Bowling Green, yes, and The Fields."

Q     Do you agree with me, based on Paragraph 18 of your declaration, that Bowling Green in New York is a

place where people experimented with leisure activities and socializing?

A    Yes.

Q    I'm going to unshare my screen.

Dr. Young, do you recall when Bowling Green was established?

A    Huh-uh.  No, I do not.

Q    Do you have any reason to dispute that Bowling Green was established by a New York ordinance in 1733?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No, I have no -- no.

BY MR. LAMAR:

Q    Do you know why it was named Bowling Green?

A    No, I do not.

Q    Are you aware of the game referred to as bowling skills or bocce?

A    Yes.

Q    Did people engage in the game of bowling skills or bocce at Bowling Green?

A    I do not know.

Q    Do you have any reason to dispute that Bowling Green was established as a place where people

could play games, such as bowling skills or bocce?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No.

BY MR. LAMAR:

Q    Dr. Young, I am going to share my screen with you again.

Do you see the document on your screen?

A    There it is.  Okay.

Q    Do you recognize this as Anne Beamish's 2021 article, Before Parks?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  It appears to be, yeah.

BY MR. LAMAR:

Q    Do you see the highlighted text on the screen?

A    I do now, yes.

Q    Could you read that paragraph?

A    "In 1733, in a highly unusual move for its time, the city decided to turn the site into a place for genteel strolling, rather than a meat market and rowdy games field.

"The corporation resolved to lease, quote, 'a

Page 65

Piece of Land lying at the lower End of the Broadway fronting to the Fort, to some of the Inhabitants of the Said Broadway in Order to be Inclosed to make A Bowling Green thereof with Walks therein, for the Beauty and Ornament of the Said Street, as well as for the Recreation and delight of the Inhabitants of this City,'" unquote.

If you want me to keep reading, I can, but I can't see it.

Q    That's enough.

Do you agree with me that Anne Beamish was quoting the 1733 ordinance establishing Bowling Green?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  It appears she is quoting a 1905 document.

BY MR. LAMAR:

Q    Do you agree with me that the 1905 site refers to the sentence, quote, "The rent was 'one pepper Corne' per year"?

A    I believe it also refers to the -- part of the paragraph you just had me read, Page 174 probably refers to that earlier quote from "a Piece of Land," and 221 to the "one pepper Corne."  That is -- that's what I take it

Page 66

to mean.

Q    Do you have any reason to dispute that the land now known as Bowling Green in New York was established for the "beauty and ornament" of the neighborhood?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No, I don't.

BY MR. LAMAR:

Q    Do you have any reason to dispute that the land now known as Bowling Green was established for the "recreation and delight of the inhabitants"?

MR. THOMPSON:  Same objection.

You can answer.

THE WITNESS:  No.  I don't.

BY MR. LAMAR:

Q    Under your definition of a modern park, does Bowling Green qualify as a park?

A    I would need to read more of the article to answer yes or no.  I don't recall.

Q    Is it your expert opinion today that you do not know whether Bowling Green qualifies as a modern park as you understand the term modern park?

MR. THOMPSON:  Object to the form of the question.

Page 67

You can answer.

THE WITNESS:  Not without reviewing the rest of the article, no.

BY MR. LAMAR:

Q    You cite Anne Beamish's article in your declaration, do you not?

A    I do.

Q    Did you read your declaration in preparation for this deposition?

A    Yesterday, yes.

Q    Do you agree with me that even if Bowling Green was privately run, it still shares characteristics with modern parks?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  Some, yes.

BY MR. LAMAR:

Q    What do you mean by the term "some"?

A    Well, it seems to be fairly focused on a particular -- particulars, but those particulars, "Beauty and Ornament of the Said Street," as well as the "Recreation and delight of the Inhabitants," seems these are specifics.  I don't know what else was intended.

Q    If a plot of land were established today for

Page 68

the beauty and ornament of the area and recreation and delight of the inhabitants of the area, would that space be a park?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  Yes.  It could be.

BY MR. LAMAR:

Q    Are you familiar with --

A    If it was public.  If it was public.

Q    What does "public" mean?

A    It's run by the public.  Owned, operated, managed by the public in some way.

Q    Is it your opinion that every plot of land in America today that qualifies as a park is managed by a government entity?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  I can't know.

BY MR. LAMAR:

Q    You don't know what proportion of parks today is run by government entities?

MR. THOMPSON:  Object to the form of the question.

Page 69

You can answer.

THE WITNESS:  I can only assume that public parks are run by the public.  Other places called parks, I can't tell you.

BY MR. LAMAR:

Q    Could a privately run plot of land for the recreation and the like of the inhabitants be an urban park, even if it's not a public park?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No.  No.

BY MR. LAMAR:

Q    On what basis do you limit parks today to publicly run parks?

A    On the basis that is the category I am talking about.  Private spaces are a different matter.

Q    Why are they a different matter?

A    Because they're run privately.

Q    My question is:  Why is the fact that a park is run privately a distinguishing characteristic from publicly run parks?

A    My declaration is dealing with public parks. It is not addressing private spaces.  I simply don't know what people do in private spaces.  I don't know the

rules.  I don't know the -- I don't know how they're organized or whatever.  I just don't know.

Q    Do you agree with me that Bowling Green in New York shared some characteristics of modern parks?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  If the term "corporation" refers to the municipality of New York, it would appear it is a public space and, yes, does share characteristics with a modern park.

BY MR. LAMAR:

Q    If Bowling Green were leased to a private entity in 1733, would that make it materially dissimilar from any modern park?

A    Yes.

MR. THOMPSON:  Same objection.

But, yes, you answered.

BY MR. LAMAR:

Q    Even if it is materially dissimilar, due to its management, do you agree that Bowling Green still shares characteristics with modern parks?

MR. THOMPSON:  Same objection.

You can answer.

THE WITNESS:  The space apparently, yes, it

Page 71

does.

MR. LAMAR:  Dave, would now be a good time for another break?

MR. THOMPSON:  Sure, yeah.  Do you want to try again at five past the hour?

MR. LAMAR:  Sounds great.

MR. THOMPSON:  All right.

(Break held off the record.)

BY MR. LAMAR:

Q    Dr. Young, was Boston Common ever privately managed?

A    I don't know.

Q    You don't have any evidence that the area now known as Boston Common was ever run by a private entity; correct?

A    No, no, I don't.

Q    Are you familiar with the term "pleasure garden"?

A    I've heard it, yes.

Q    As an expert in historical geography, can you tell me what constituted a pleasure garden in the 18th century?

MR. THOMPSON:  Objection to the form of the question.

You can answer.

Page 72

THE WITNESS:  Gosh, I don't know.

BY MR. LAMAR:

Q     Did Philadelphia in the 18th century have public green spaces?

A     18th century, yes, I understand it had five squares, the ones William Penn established.

Q     In your opinion, do those public squares qualify as parks?

A     Not in the 18th century, no.

Q     Why did they not qualify as public parks in the 18th century?

A     Again, they were being used for non -- they were being used for a variety of everyday utilitarian purposes like hangings, wells, a public well, I believe, and horse races, I think, in one of them.

You know, again, but they -- they -- I believe they're -- Penn had hoped they would be more ornamental. But if I remember right, Anne Beamish said the city just never got there at the time because they couldn't afford it.

Q     Is a horse race a utilitarian use of land?

A     I guess.  I don't know if they were for recreation, no.  I suppose not, but.

Q     Is a horse race in the 18th century a form of entertainment?

Page 73

A     I -- I will -- I would be guessing, and that -- and I would guess yes.

Q     Is activity for which people gather that constitutes entertainment a recreational activity in your understanding of the word recreational?

A     If it occurs in a single day, yes.

Q     To the extent that Philadelphia's public squares were used for horse racing, were those spaces used for recreational purposes?

A     To some degree, obviously, yes.

Q     Did you mention a moment ago Philadelphia's water pumping station?

A     I believe Beamish mentioned that, that one of them -- although I may have gotten it from another source, but one of the squares, I believe, had municipal water pumping.

Q     Sharing my screen with you, again.

Do you see the document on my screen, Dr. Young?

A     Yes.  There we are.

Q     Do you see the sentence in Paragraph 17 that I've highlighted?

A     I do.

Q     Could you read that for me?

A     Sure.

Page 74

"The largest square, Centre Square (now the site of City Hall) was mostly used for horse racing, militia training, and as the site for the city gallows until the very end of the 18th century, when it was chosen to be the location for new water pumping station."

Q    Was the late 18th century water pumping station the only addition that was made to Centre Square in the late 18th century?

A    I don't know.

Q    If Anne Beamish said that there was another purpose or instrumentality added to Centre Square in the late 18th century, would you agree with her?

MR. THOMPSON:  Objection to the form of the question.

You can answer.

THE WITNESS:  I have no reason to disagree with her.  No evidence for that.

BY MR. LAMAR:

Q    I'm moving over to Exhibit 2 to the declaration -- excuse me; strike that --  Exhibit 2 to the deposition.

Do you recognize the document on your screen?

A    Apparently, Anne Beamish's piece.

Q    Do you see the highlighted text on your screen?

A    I can.  It's rather small, if you could enlarge

Page 75

it just a bit.  Thank you.  That's fine.  There you go.  That's fine.  Yes, I see it.

Q    Could you read it out loud for me, please?

A    "When the city selected the site for its new water pumping distribution station, the building (designed by Benjamin Henry Latrobe) and surrounding land became a public pleasure garden."

Q    Is the text that you just read the same discussion of the water pumping station that you reference in your declaration?

A    I would -- I would assume that I -- certainly, I read this.  So yes.

Q    Why did you not reference in your declaration the fact that a public pleasure garden was added to Centre Square in the late 18th century?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  My understanding of public pleasure gardens is that they were private.

And I did not take the time because I don't know where I would look initially to identify whether or not this public pleasure garden was anything other than a privately run, privately owned public pleasure garden.

///

Page 76

BY MR. LAMAR:

Q    Do you have any evidence that the public pleasure garden referenced in Anne Beamish's article was privately run?

A    No, I don't.

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  I don't have any evidence to -- to -- that it wasn't run publicly.  But as I said, pleasure gardens were generally private.

BY MR. LAMAR:

Q    Earlier in this deposition, I asked you if you could describe pleasure gardens; correct?

A    Yes, you did.

Q    Why didn't you testify when I asked you the prior question about pleasure gardens that most of them were privately run?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  Well, my experience with public pleasure gardens is largely in the 19th century, and you asked about the 18th century, and I didn't feel confident to say what I knew to be more the case of the 19th and to

Page 77

mislead you or misrepresent what I know.

BY MR. LAMAR:

Q    Do you have any evidence that pleasure gardens in the 18th century were predominantly run by private entities?

A    I can't -- no, I don't have evidence that it could declare that, no.

Q    Looking back at the screen, do you see the highlighted text?

A    Yes.  It opened in 1801.

Q    Do you agree with me that Beamish is reporting that the pleasure garden opened in 1801?

A    Please hold a minute while I read this. Apparently, yes, they -- it is the public pleasure garden.

Q    Do you know the approximate year in which private entities began to predominantly run pleasure gardens in the 19th century?

A    The year, no.  I can -- I couldn't tell you.

Q    Do you agree with me that you don't know whether the public pleasure garden opened in Centre Square in 1801 was publically run?

A    I agree with you.  I don't know.

Q    Looking at the next page, do you see the highlighted text?

Page 78

A    "This much-admired place," yes.

Q    Could you read the entire sentence?

A    Certainly.  Although the sentence begins on the previous page; if you could scroll back to the beginning of the sentence, I'd feel better.

"As appreciated as the garden was, it was short-lived.  It opened in 1801, but when the pumping station was moved to Fairmount Park 15 years later, this much-admired place of strolling and public socializing for respectable Philadelphians quickly changed to a 'harbor for lewd and intemperate persons.'"

Q    Do you have any reason to dispute that between 1801 and 1815, the pleasure garden in Centre Square was a, quote, "much-admired place of strolling and public socializing"?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  Would you repeat the years you were referencing?

BY MR. LAMAR:

Q    Do you have any reason to dispute that between 1801, when the pleasure garden was open, and 1815, when it moved, that the pleasure garden was a, quote, "much-admired place strolling and public socializing"?

A     Can you scroll back to the beginning of the sentence begin, please, before I answer?  There we go.  I see, 15 years later.  Okay.  Again, I'm sorry to keep asking you, but would you repeat the question?

Q     Do you have any reason to dispute that the -- that the pleasure garden opened in Centre Square in 1801 was used as a place of strolling and public socializing between 1801 and 1816?

A     No.  I have no evidence to contradict that.

Q     If the pleasure garden that we have been discussing was run by a public entity, such as the City of Philadelphia, would it qualify as a park?

MR. THOMPSON:  Object to the form of the question.

You can answer.

THE WITNESS:  No.  I wouldn't -- I wouldn't put it in the same category of park that I would put Central Park or modern parks into.

BY MR. LAMAR:

Q     Why?

A     Because of this term garden, public garden, the ones I'm familiar with, the -- the -- they were very small, the green spaces relatively, and largely the property was a place for eating and drinking, like you said, maybe some strolling outside, but it's very

Page 101

beginning of the modern park movement in the 1850s?

A    It was stimulated by the growth of American cities in terms of size, complexity, and their industrialization and consequent disconnection between large portions of the population and surrounding nature.

Q    Is it your opinion that the modern park movement was a response to social problems?

A    It certainly is in great ways, yes.

Q    When you say in your declaration that, quote, "concentrations of people accentuated social problems," what do you mean by the term "accentuated"?

A    That I think the public in the cities became more aware of the problems surrounding them.  The concentration of people made it harder to ignore things like crime or, you know, public health issues, things like that.

Q    Is it fair to say that these social problems existed in the early 19th century, but until the 1850s didn't merit addressing?

A    I think the problems are much older than the -- the parks themselves, that they were spatially dispersed, and it is the rise of the cities, industrialization, urbanization that brings them -- all these people and the problems that they have, just being people, into everybody's kind of view.

And it was just harder to ignore them or think that they were somebody else's problem.

Q    Do you agree with me that these weren't unprecedented social problems?

A    Oh, no.  No.

Q    Is it your opinion that the Romantic Movement contributed to the beginning of the park tradition?

A    It does, yes.

Q    What was the Romantic Movement?

A    It's very complicated.  I can only give you in a few words a sort of sentiment.  It is a response to the enlightenment, which is more of an 18th century phenomenon, that romanticism was widespread through European and North American thinking by -- certainly by the late or the end of the first third of the 19th century.

And it involves things like seeing people as -- the idea of the nation or a nationality arises at this period from this idea of people are organic, whatever puts us together as something sort of organic.

And tied in with a lot of that, going back to parks, is that nature was God's handiwork.  And God is, by definition, good and therefore God's work is good.

And the perception of nature is to receive kind of God's influence through the eyes, which I can't go