# EXHIBIT 51

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NEW YORK STATE RIFLE & PISTOL
ASSOCIATION, INC., ROBERT NASH, BRANDON
KOCH, THOMAS STIRNWEIS, WAYNE FRANCIS,
KHOURY PORTER, and SCOTT NOREN,

                              *Plaintiffs*,

          -against-                         Case No. 1:22-cv-00907 (MAD/PJE)

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,
RODNEY K. HARRISON, in his official capacity as
Commissioner of the Suffolk County Police Department
and Licensing Officer for Suffolk County, *and*
PATRICK J. RYDER, in his official capacity as Police
Commissioner of the Nassau County Police Department
and Licensing Officer for Nassau County,

                              *Defendants*.

-------------------------------------------------------------------X


**DECLARATION OF DR. TERENCE YOUNG**

1

I, Terence Young, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

**Background**

1.    Since fall 2020, I am Emeritus Professor of Geography in the Department of Geography & Anthropology, California State Polytechnic University, Pomona.

2.    I was an Assistant, Associate, and full Professor of Geography, Department of Geography & Anthropology, California State Polytechnic University, Pomona between fall 2002 and spring 2020.  During the same period, I was also an adjunct in the university's Regenerative Studies program.  Before fall 2002, I held academic positions as a geographer at California State University, Long Beach, University of Southern California, UCLA, Clemson University, George Washington University, and Mary Washington University.  In 1996-1997, I was Acting Director of Studies in Landscape Architecture, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC.

3.    I earned a Bachelor of Arts in Anthropology at UC Berkeley (1973), a Master of Arts in Geography at UCLA (1987), and a Ph.D. in Geography at UCLA (1991).[1]

4.    As a scholar, I have studied the history and historical geography of the American park movement, including from its earliest years, the meanings, purposes, developments, designs, and usages of various types of protected areas since I began work on my doctoral degree in fall 1987.  In my professional capacity, I authored award-winning scholarly books, book chapters, and journal articles concerning American protected areas and the American park movement.  These publications have been cited by authors in multiple disciplines, including history, geography, anthropology, natural resources management, and more.

---

[1] For a full CV, please see **Exhibit 1** to this Report.

5.      I am aware of this lawsuit, have reviewed the Complaint ("Complaint") filed by New York State Rifle & Pistol Association, Inc., Robert Nash, Brandon Koch, Thomas Stirnweis, Wayne Francis, Khoury Porter, and Scott Noren ("Plaintiffs") in this matter, and am familiar with the claims and allegations of the Complaint.

6.      I am being compensated for services performed in the above-entitled case at an hourly rate of $250 for reviewing materials and preparing reports; and $500 per hour for depositions and court appearances.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

7.      The opinions in this Report are based upon a combination of my professional training, research, and work experiences in my various academic roles; and, from personally reviewing relevant documents, rules, regulations, and historical sources of information regarding the public parks and forests, including those referenced in the attached list of citations or in this report.  Any information I obtained from those outside sources is consistent with my own understanding.

**Overview of Opinions**

8.      America's tradition of public parks was launched in the 1850s.  Prior to that era, privately owned taverns and similar establishments had popular gardens while most publicly owned open spaces were utilitarian rather than ornamental spots for sociability and relaxation. The American park movement emerged from the idea that American urban society was flawed and that parks could repair and reform it.  Specifically, urban parks would foster a healthier, wealthier, more democratic, and less criminal urban society.  Backed by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly

3

and passively contemplated, was thought to improve someone's mind and body, and thus society. In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited.

9.      Near the end of the nineteenth century, a rationalistic ideology joined the earlier Romantic one.  The new ideology emphasized active play and recreation in parks, such as sandboxes, children's swings, baseball and bicycling because these were also thought to lead to a healthier, wealthier, more democratic and less criminal society.  However, the new ideology did not eliminate the passive contemplation of natural scenery.  Instead, urban parks were re-designed to provide separate spaces for both active play and for quiet contemplation.  These two uses of public urban parks continue to this day, each with its own spaces.

10.      In the late nineteenth and early twentieth centuries, America's natural national parks were also created to protect landscapes of natural scenery.  Like their urban counterparts, they were romantic places for quiet and passive contemplation in order to improve urban society. Later, national parks also became places for active recreation, but it was never as important as in the urban parks.  Today's national parks remain places for the contemplation of natural scenery and, to a lesser degree, for active play.

11.      At roughly the same time that national parks were being created, the first state parks appeared.  Like urban and national parks, they were protected to be places for contemplating natural scenery and for active play.  They remain so to this day.

**Growth of the 19th Century Parks Movement**

**Urban Parks**

12. The development of the American park system and the park movement evolved over decades and centuries in response to existing societal concerns and circumstances.

13. During the colonial era and into the early American Republic, public spaces were created in some settlements, for instance the pre-planned squares of Savannah, Georgia and Philadelphia, Pennsylvania, but the best known of these are the "greens" or "commons" of southern New England. Today, the remnants of these once larger spaces may be manicured with lawns and ornamental plants, but such elements are relatively recent additions. As early as 1961, the colonial legal historian, John D. Cushing, wrote about the origins and evolution of these spaces because "there are few …aspects of New England culture and history about which so much misinformation prevails." Dismissing the notion that the current appearance, purpose, and use of a place like the Boston Common tells us about their origins, he stated instead that "the idea that any common laid out either in the seventeenth or early eighteenth centuries was designed as an ornamental center for the community… [is] absurd" (Cushing, 1961, 86). Instead, they were multi-purpose utilitarian spaces until the mid-nineteenth century. At the beginning, a settlement's town common included a Puritan house of worship called a "meetinghouse," which is why in earlier times these spaces were called "meetinghouse lots." The open space surrounding the meetinghouse often contained the "close" or paddock for assembling and temporarily holding town livestock before the animals were led to the much larger common pasturage outside the settlement. The meetinghouse lot usually also contained a town's cemetery or "burying ground." And, sometimes, if it was large enough, a site for a community's men to practice basic military exercises as an organized militia. In contrast to today, these were not individuals visiting a public park but an organized community activity for its common defense. According to historian John Stilgoe (1982, 19-20), "Every town insisted

that its men drill once every three months at least, on 'muster day'; and it provided that its [meetinghouse] lot be used as a parade ground, where all men and boys of military age lined up for weapons inspection, close order drill, and lessons in advanced tactics by experienced officers." As support for such militia training, meetinghouse lots could contain a "magazine" for storing gunpowder and other supplies as well as a "gunhouse" for cannon and such (Cushing 1961, 91).

14.    Meetinghouse lots usually shrank in area over the decades as portions were re-purposed, sold, given away, and appropriated for roads. Furthermore, additional uses were found for what did remain of a given lot through the eighteenth century and into the nineteenth. By the middle of the eighteenth century, for example, innkeepers throughout this region knew that it was profitable to locate their taverns and any outdoor spaces nearby, adjacent to, or even upon the meetinghouse lot (Stilgoe, 22). In 1770, Salem, Massachusetts built a workhouse on its meetinghouse lot and, in 1782, Newburyport, Massachusetts ordered smallpox victims transported "to the pest house in the common pasture" in the town center. Newburyport repeated this order in 1788 and again in 1803 (Stilgoe, 20). It was during the nineteenth century that these spaces began to be called "the green" (Stilgoe, 20).

15.    Beyond a green's meetinghouse, graveyard, and other structures, the lot was generally neglected. According to Cushing (1961, 92), "Generally speaking, most commons were barren, unsightly plots from the earliest days until well after 1835. Brush, stumps, stones, rubbish, dead trees and stagnant pools, swarming in summer with disease-carrying insects, typified a great many meetinghouse lots for centuries." They were not analogs to today's public parks nor were they their predecessors except in the sense that some of these utilitarian spaces,

6

most famously the Boston Common, survived long enough to be adaptively re-used as community parks.

16.     A different approach was taken in Savannah, Georgia when that colonial-era town was laid out in 1733.  Each "ward" of residents surrounded a civic square of approximately two acres.  While today these squares are ornamented with plants, walks, fountains, and the like, they, like New England's greens, initially served several utilitarian purposes.  The principal instigator of the town, James Oglethorpe, wrote that each square would be "reserved for a Market place, and for exercising the Inhabitants" (quoted in Wilson, 2012, 86).  It would also provide a place for public gatherings as well as be a parade ground for militia training and for defense.  "The town," explains Thomas D. Wilson, historian of Savannah's plan, was "organized into militia units that together formed a battalion.  Units of the battalion would train in civic squares placed at regular intervals in the town and would form in those squares to defend against attack" (Wilson, 2012, 71). The situation began to change during the early nineteenth century.  In 1808, one visitor described the squares as "each …has a pump in the centre [for fire fighting], surrounded by a small plantation of trees," but it was not until the 1830s that the squares were developed with railings, walks, and lawns, (De Vorsey, 2012, 97).  Savannah's plan led to similar squares in the Georgia towns of New Ebenezer, Sunbury, and Brunswick, but that was it. They were neither widespread nor abundant in number like the greens of New England. According to Architectural Historian Turpin C. Bannister (1961, 62), "the promoters of later colonial and early republican new towns were so eager to exploit their land for maximum profit that the most generous felt expansively prodigal if he contributed a small central plaza for a market."

17.    The situation in Philadelphia, Pennsylvania was analogous to that of Savannah. Pennsylvania's proprietor, William Penn, included five public squares of either eight or ten acres in his 1682 plan for Philadelphia. Today, the remaining squares are popular public spaces that incorporate walks, fountains, lawns, flowers, and other ornamental features. The path to these features, however, was a twisted one. According to landscape architect, Anne Beamish (2021, 11), these publicly-owned sites were originally laid out and planned as formal public spaces, but "the squares were not used as such until the nineteenth century" because Philadelphia's population was small and could not support them and the city included many popular, privately owned taverns and inns with adjacent gardens (Beamish, 2021, 11). The largest square, Centre Square (now the site of City Hall), was mostly used for horse racing, militia training, and as the site for the city gallows until the very end of the eighteenth century when it was chosen to be the location for a new water pumping station. Like Centre Square, the other four squares "were not used for public pleasure and 'were completely without charm'" (Beamish, 2021, 12). Northeast (now Franklin) Square, for instance, included a city magazine for storing gunpowder and as a place for selling hay, straw, and lime. Southeast (now Washington) Square was designated a "burial ground for strangers, or potter's field" in 1706 (quoted in Beamish, 2021, 12) And, even though the city ordered the cemetery removed for public improvements in 1795, it was still renting out the square for grazing in 1813 (Beamish, 2021, 12). Again, these activities were mostly utilitarian in character.

18.    New York, New York was different than Savannah and Philadelphia in that it did not include an identified series of public squares in its original planning. Instead, many of its public spaces, like the greens of New England, emerged as adaptive re-uses of pre-existing sites. Beamish (2021, 2) points to three specific spaces where New Yorkers "experimented with leisure

activities and socializing and where the demand for [later, publicly owned] recreational spaces developed" – The Battery, The Bowling Green, and The Fields.  Also, like New England, Savannah, and Philadelphia, the early uses of these spaces were utilitarian rather than recreational.  The Battery, for example was a defensive military site with cannon.  The Bowling Green was the site of a marketplace and the city's first public well.  And The Fields was an animal grazing area that also enclosed a "magazine" (Beamish, 2021).  Moreover, when The Bowling Green became a leisure site, it was a privately operated space rather than a public one. The city rented the site to some local residents to run as a place of beauty, ornament, and recreation.  The Battery did not begin to function as a meeting place for the wealthy until about 1802 and the Fields, which later became the site of today's City Hall, was re-named City Hall Park during the building's construction (1803-1812).  Neither The Battery nor The Fields inspired a direct wave of imitations elsewhere in the United States.

19.    The small public spaces of southern New England, Savannah, Philadelphia, New York and elsewhere would only widely become urban greenspaces after the American public park movement arose with the appearance of Romanticism and urban expansion.

20.    During the early American Republic, cities were necessarily compact, usually about three square miles in area, and densely built.  Despite the resulting crowded conditions, most residents could readily retreat to relaxing rural areas nearby.  However, as the national economy shifted and cities developed into primary engines of commerce, their populations and physical sizes necessarily grew.  For example, from 1830 to 1860, the population of New Haven grew from 10,000 to 39,000, Boston from 61,000 to 178,000, Philadelphia from 80,000 to 566,000, and New York from 203,000 to 814,000.

21.     The push for larger greenspaces in cities began in earnest in the pre-Civil War years as increasing numbers of Americans chose to live in cities.  Early proponents of expanded urban greenspace drew upon the example of the recently popular "rural" cemeteries.  America's earliest cemeteries were undesigned graveyards and churchyards.  The first designed cemetery was New Haven's New Burying Ground of 1796, but it, unlike its successors, was gridded and rectilinear.  In 1831, the Massachusetts Horticultural Society created the first of and prototype for the many subsequent "rural" cemeteries – Boston's Mount Auburn.  These cemeteries, which were romantic in design, incorporated extensive tracts of suburban land with lawns, hills, woods, water features, and scenic vistas.  By the mid-nineteenth century, these cemeteries were popular tourist attractions drawing thousands each year (Linden-Ward, 1989).

22.     Rural cemeteries, however, inadequately addressed the societal concerns of the pre-Civil war era arising from increased urbanization because they were privately owned, did not permit full public access, and being suburban were inaccessible to many city dwellers due to their distance.  Moreover, they were inaccessible to most working people.  In the 1840s and 1850s, urban greenspace proponents applied the lessons of cemeteries when arguing for large publicly owned parks.

23.     New York's 843-acre Central Park was the first to achieve this goal and was based on an 1858 design by Frederick Law Olmsted and Calvert Vaux.  Unlike the small public spaces mentioned above, Central Park would stimulate a rapidly expanding and durable tradition of American parks.  Before the Nineteenth Century ended, America's best-known urban parks had appeared, including Boston's Franklin Park, Brooklyn's Prospect Park, Philadelphia's Fairmount Park, Chicago's Washington and Jackson Parks, San Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's Balboa Park.  The initiation and development of

10

each park was unique, but they all occurred where supported by a significant portion of the local population, were relatively large in area, generally over 500 acres, adopted the same design principles, and swiftly promulgated similar prohibitions concerning the carrying of firearms. They did so because they shared a common purpose – the improvement of American society (Schuyler, 1986; Young, 2004).

24.     The creation of large urban parks began in the 1850s in these rapidly growing cities for cultural reasons that go back to the early Republic – a national mistrust of and suspicion about urban life.  Thomas Jefferson, for example, had argued in 1787's *Notes on the State of Virginia* that the ideal society would flourish where the economy was agricultural and the settlements small and dispersed.  Invoking a geographic contrast, Jefferson promulgated a valorized rural-urban imaginary that regarded the former as healthy and positive while casting the latter as damaging and negative.  Farmers, he insisted, were the backbone of America. "Those who labor in the earth are the chosen people of God, if ever he had a chosen people, whose breasts he has made his peculiar deposite (sic) for substantial and genuine virtue." Manufacturing and cities, in contrast, were sources of vice.  Drawing a particularly repulsive word picture, Jefferson suggested that "The mobs of great cities add just so much to the support of pure government, as sores do to the strength of the human body."  The roots of the republican nation, urged Jefferson, lay in a rejection of urban life (Jefferson, 1829, 171-173; Young, 2022).

25.     In the immediate pre-Civil War years, industrialization increased rapidly, surface transportation encouraged urban spreading, and cities grew in area and population numbers. This concentration of people accentuated social problems, making them more obvious to more people.  Cities were increasingly perceived as socially degraded places in contrast to virtuous rural America.  In line with this perception, cities were condemned as unhealthy, impoverished,

11

undemocratic, and crime ridden.  A range of solutions were proposed to remedy these urban vices (Boyer, 1978), including municipal parks.  In a large park, urban residents could "retreat" from the city to be back in touch with nature, which would lead to social reform and improvement.  Parks, proponents and supporters argued, would produce a virtuous society characterized by health, wealth, equality, and little crime (Young, 2004).

26.    Park proponents believed that society's characteristics were strongly shaped by its physical environments.  An urban environment of noise, traffic, pollution, crowding, and ugly buildings led to a vicious society while an urban park's "natural" environment would lead to a virtuous one.  Urban vice did not occur because society was evil by nature but because its members were out of touch with nature, a principal source of goodness.  In other words, publicly owned urban parks were devices for social reform.  They would succeed best where urban environments and urban ways of life were excluded from a greenspace (Young, 2004).  For example, according to an 1867 Newark, New Jersey park report, a park was designed to produce "a certain [positive] effect upon the mind and the character of those who approach it" (Schuyler and Turner Censer, 1992, 211).  Forty years later, Charles Mulford Robinson made a similar link between society and its surroundings.  A leader in the "City Beautiful" movement that sought visible expressions to Progressive Era reforms aimed at revitalizing public life and instilling civic awareness, Robinson argued for the creation of public flower beds, new parks, and street trees because "Social problems are to a large degree problems of the environment."  Create parks where adults and children can find "brightness, entertainment, and fellowship without throwing them into temptation… and many of sociology's hardest problems will be solved" (Robinson, 1909, 245).

12

27.     The foundation for the ideology of the early urban park proponents and supporters lies in Romanticism and the Romantic Movement.  While the philosophy and movement had diverse expressions, it can be broadly recognized by a rejection of rationalism, a regard for history, and a focus on perception and beauty, particularly that of nature.  Moreover, the movement embraced the belief that a group of people's character or nationality grew organically and emerged over a long period of time.  In addition, Romanticism contributed to the growth of democracies, to a belief in progress and to the more open societies that are common features of modern life (Barzun 1961).  Romantic park supporters, like many contemporary artists and scientists (Novak 1995), saw nature as an interrelated world of mind, body, and being, an organic whole that included God, people, and the physical world.  Social problems resulted from the physical disjunction that developed between nature and people in any city large enough to be dominated by streets and buildings.  Ignoring the benefits from urban life, they viewed the city as a dangerous environmental aberration that could lead to the dissolution of society.  Parks were the necessary corrective because they brought nature, which was God's handiwork, balanced and inherently good, back into cities.  As the minister Henry Ward Beecher enunciated in 1869, for "the multitude," natural beauty was a gift of God "without price." It could "confer pleasure and profit from merely the looking at it" (Beecher, 281-284).

28.     As the Beecher quote suggests, nature in this era was approached as scenery, but it was not simple and unconsidered.  Park designers and their supporters believed nature appeared best in parks as three landscape art categories or "genres": the "Beautiful" (also called the "Pastoral" by Frederick Law Olmsted), the "Picturesque," and the "Sublime."  Each was yoked to a set of unique attributes.  Smallness, roundness, smoothness, delicacy, and color best captured the Beautiful, making it the preferred genre for parks with extensive lawns or water

13

features bordered by shrubs and trees.  The Sublime countered the Beautiful, being linked to terror, obscurity, difficulty, power, vastness, majesty, and infinity, but it remained beyond the ability of urban park designers because their landscapes were too restricted to create it.  However, it informed the selection of and lay behind the drive for the national parks discussed below.  The Picturesque mediated the two extremes, expressing the pleasure gained by abrupt, unexpected, or rude forms and textures, as well as the roughness that could exist at any scale.  Many large urban parks incorporated picturesque elements as a stimulating contrast to beautiful ones, but picturesque rarely dominated (Novak, 1995; Young 2004).

29.      And, like some painted landscape scene, municipal parks' "naturalistic" landscapes were intended to support only pastoral and picturesque activities.  These large urban parks were places for "passive recreation," which meant sitting, strolling, slow horse riding, and other quiet activities while contemplating the scenery.  Activities that were fast moving, active, boisterous or worse, ran counter to a park's purpose.  In support of these aesthetics, Parade Grounds were isolated from the park proper in both Olmsted and Vaux's Prospect Park and in Olmsted's unbuilt 1866 plan for San Francisco (Graff 1985; Young 2018).  Places for military exercises and displays, Parade Grounds were spaces "for citizens to demonstrate their commitment to defense of their government" (Rosenzweig and Blackmar, 1992, 143).  According to Olmsted (1990b, 532), these places may have been necessary, but they were not to conflict with "the safety or the quiet of those not interested in them."  That is, a park's visitors.  Consequently, Parade Grounds were closed off or moved away from a park proper.  They were, argued Schuyler (1986, 131), "locations for functions that, while essential in a city, would be antithetical to the tranquility of a naturalistic landscape."

30.    In addition to being informed by the same ideology and designed using the same three landscape genres, America's large urban parks embraced firearms prohibitions shortly after they came into existence.  Again, the official prohibitions began with Central Park.  In March 1858, one month before Central Park's Commissioners (Board of Commissioners, 1858, 166, **Exhibit 2**) awarded a plan for the new park, they voted seven to two to adopt the initial set of rules and regulations concerning it.  The Commissioners' attitude toward firearms in Central Park could not have been clearer.  "All persons are forbidden …To carry fire-arms or to throw stones or other missiles within it."  And, to be sure the public knew there were regulations, relates New York City archivist Cynthia S. Brenwall (2019, 26), the Commissioners had the regulations "posted in conspicuous locations that would be easily seen by all visitors."



(from Brenwall, 2019, 27)

The public did not necessarily know how to behave in their new park so the commissioners adopted rules to prompt proper behavior and decorum.  Aligned with these rules and regulations, and as a practical matter, they also created a force of Park Keepers in 1859 to

control activities deemed inappropriate. "A woods shared by 'thousands' demanded a different kind of care than woods visited by a few," noted historian David Thacher before quoting the *New York Times* of February 21, 1859: "Nature in the neighborhood of large towns needs rules and regulations to enable her to do herself justice, just as certainly as in the country she does better without them" (Thacher, 2015, 591). Proponents and supporters of large urban parks understood that the heavy use of the nature in a park that would result from its being easily accessible, necessarily mandated rules and regulations to control and direct visitors in order to allow nature to reform society.

31. The Central Park Commissioners' prohibition on carrying firearms in their park, often using the same or nearly the same language, was embraced by authorities in the other large parks that rapidly appeared across the United States. The Central Park Commissioners reprinted their prohibition exactly in 1861 (Board of Commissioners, 106, **Exhibit 3**). In 1866, as the development of Olmsted and Vaux's next park, Prospect Park, was getting underway, the Brooklyn Park Commissioners adopted the same language as their peers at Central Park: "All persons are forbidden… To carry firearms, or to throw stones or other missiles within the park" (Brooklyn Park Commissioners, 1873, 136, **Exhibit 4**). To the west, the city of Chicago also adopted a comparable prohibition in 1866 for its "Parks and Public Grounds": "All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks" (Chicago, Illinois, 1873, 88, **Exhibit 7**). Two years later, 1868, the rules and regulations for Philadelphia's Fairmount Park included a similar prohibition: "No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stones or other missiles therein" (Laws of the General Assembly, 1868, 1088, **Exhibit 5**). In April 1870, the Commissioners of San Francisco's new Golden Gate Park were appointed and authorized to

16

begin the park's development.  Twenty-nine months later, in 1872, they adopted a prohibition similar to Central Park's: "Within the said grounds [i.e., Golden Gate and Buena Vista Parks] all persons are hereby forbidden …To carry and especially to discharge firearms" (Board of Supervisors, 1875, 887, **Exhibit 6**).  And, in 1874, the Buffalo, New York Park Commissioners adopted an ordinance corresponding to that of Central Park and its successors to date: "All persons are forbidden to carry fire-arms or fire at or shoot any bird or animal, or throw stones or missiles within the several parks, approaches thereto or streets connecting the same" (Buffalo Park Commissioners, 1874, 24, **Exhibit 8**).  For approximately another decade, similarly purposed, Romantically inspired, and scenically designed parks appeared in cities across the country and their commissioners or similar authorities adopted comparable prohibitions or fines: Hyde Park, Illinois in 1875 (President and Board of Trustees, 1876, 310, **Exhibit 9**), Phoenixville, Pennsylvania in 1878 (Borough of Phoenixville, 1906, 135, **Exhibit 10**), Chicago reprinted its earlier prohibition in 1880 (Jamieson and Adams, 1881, 391, **Exhibit 11**), St. Louis in 1881 (Sullivan, 1881, 635, **Exhibit 12**) and then extended it to a new park in 1883 (MacAdam, 1883, 117, **Exhibit 13**), and Danville, Illinois in 1883 (Mann and Frazier, 1883, 83, **Exhibit 14**).  This is not a coincidence.  It is a firearms regulation tradition grounded in the purpose, form, and use of America's post-Central Park urban parks.

32.    Beginning in the late 1880s, an increasing number of American urban park advocates and supporters embraced a new rationale for municipal parks, what I term "rationalistic" parks.  American cities continued to be plagued by poverty, disease, undemocratic acts, and crime, but these new park proponents did not abandon the idea of urban social improvement through parks.  Instead, they stepped back from the romantic idea that scenic park landscapes alone reformed society to also embrace a more Darwinian and mechanistic view of

17

nature. As their perspective grew in importance, the value of nature contemplation somewhat retreated, and parks were re-imagined as favored settings for organized play and other leisure-time activities. Flower gardens, museums, baseball diamonds, and children's playgrounds became common park features as rationalistic park proponents pursued their formula for encouraging the good society. These advocates saw romantically designed parks as underdeveloped rather than mis-designed, so they did not seek to remove and replace the features of romantic-era parks. Instead, they wished to share the space of a large park by introducing the features they believed would reform society. In addition, municipal park authorities created parkways and numerous, generally small greenspaces throughout cities in order to bring the reforming abilities of parks into neighborhoods. Visitors would no longer have to travel long distances to the large parks. These small parks utilized both romantic and rationalistic characteristics and were more tools in the effort to improve urban society (Young, 2004).

33. Despite the addition of a rationalistic ideology and new landscape layouts, urban park authorities continued for decades to publish new and re-promulgate established prohibitions on the carrying of firearms in them: Boston's Park Commissioners declared in 1886 that "it is forbidden: …To throw stones or other missiles; to discharge or carry fire-arms, except by members of the Police Force in the discharge of their duties" (Boston, Massachusetts, 1888, 86, **Exhibit 15**). In 1887, the city of Reading, Pennsylvania announced that firearms would not be allowed in its new park, "Penn's Common": "No person shall carry firearms, or shoot in the common, or within fifty yards thereof" (Richards, 1897, 240, **Exhibit 16**). The following year, 1888, Saint Paul, Minnesota's Board of Park Commissioners published its Laws Relating to Parks, which included: "No person shall carry firearms or shoot birds in any Park or within fifty yards thereof" (Saint Paul, Minnesota, 1889, 689, **Exhibit 17**). Salt Lake City, Utah also

18

published a similar prohibition concerning its park in 1888: "No person shall, within Liberty Park, …Carry or discharge firearms" (Salt Lake City, Utah, 1888, 248, **Exhibit 18**).  And, in 1890, Trenton, New Jersey listed among its ordinances: "No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein" (Trenton, New Jersey, 1903, 390, **Exhibit 19**).  In addition to the above prohibitions, the carrying of firearms was prohibited in the parks of: Berlin, Wisconsin (1890, 76, **Exhibit 20**) and Williamsport, Pennsylvania (1900, 141, **Exhibit 21**) in 1890; Grand Rapids, Michigan (Campbell, 1906, 163, **Exhibit 22**), Milwaukee, Wisconsin (Park Commissioners of the City, 1892, 32, **Exhibit 23**), and Springfield, Massachusetts (1897, 82, **Exhibit 24**) in 1891; Cincinnati, Ohio (Board of Park Commissioners, 1893, 28, **Exhibit 25**), Lynn, Massachusetts (1892, 23, **Exhibit 26**), Peoria, Illinois (Slemons, Pinkney and Raum, 1892, 667, **Exhibit 27**), and Spokane, Washington (Connor, 1903, 316, **Exhibit 28**) in 1892; and, Pittsburgh, Pennsylvania (Thomson, 1897, 496, **Exhibit 29**) and Wilmington, Delaware (1893, 571, **Exhibit 30**) in 1893.  Before the decade ended, comparable prohibitions were published, republished, amended, and/or extended to new urban parks in: Saint Paul, Minnesota (Giltinan, 1896, 208, **Exhibit 31**); Canton, Illinois (Chiperfield, 1895, 240, **Exhibit 32**); Detroit, Michigan (Local Acts, 1895, 596, **Exhibit 33**); Centralia, Illinois (Noleman and Bundy, 1896, 188, **Exhibit 34**); Indianapolis, Indiana (Brown and Thornton, 1904, 648, **Exhibit 35**); Rochester, New York (Board of Park Commissioners, 1898, 97-98, **Exhibit 36**); Wilmington, Delaware (Board of Park Commissioners, 1898, 24, **Exhibit 37**); Kansas City, Missouri (Rozelle and Thompson, 1898, 657, **Exhibit 38**); New Haven, Connecticut (1898, 293, **Exhibit 39**); and, Boulder, Colorado (Greene, 1899, 157, **Exhibit 40**).  As the nineteenth turned to the twentieth century, more cities continued this tradition in their urban parks, including: Hartford, Connecticut (Smith, 1907, 493,

19

**Exhibit 41**), New Bedford, Massachusetts (Board of Park Commissioners, 1902, 493, **Exhibit 42**), and Springfield, Illinois (Board of Trustees, 1902, 69, **Exhibit 43**) in 1902; Lowell, Massachusetts (Board of Park Commissioners, 1904, 58, **Exhibit 44**), New York City (Board of Aldermen, 1903, 600, **Exhibit 45**), Pasadena, California (City of Pasadena, 1912, 29, **Exhibit 46**), and Troy, New York (1905, 375, **Exhibit 47**) in 1903; Houston, Texas (Roberts and Crawford, 1904, 358-59, **Exhibit 48**), Neligh, Nebraska (1906, 37, **Exhibit 49**), and Pueblo, Colorado (Highberger and Martin, 1908, 384, 386, **Exhibit 50**) in 1904; Harrisburg, Pennsylvania (Richards and Lamberton, 1906, 468, **Exhibit 51**), Haverhill, Massachusetts (Park Commissioners, 1907, Appendix A at 12, **Exhibit 52**), and Saginaw, Michigan (Common Council, 1905, 173, **Exhibit 53**) in 1905; Chicago Illinois (Padden, 1906, 40, **Exhibit 54**), Denver, Colorado (Varnum and Adams, 1906, 479, **Exhibit 55**), and Los Angeles, California (Stevens and Delorey, 1921, 41-42, **Exhibit 56**) in 1906; Portland, Oregon (City Council, 1910, 483, **Exhibit 57**), Oil City, Pennsylvania (Speer, 1907, 121, **Exhibit 58**), Olean, New York (Hill, 1922, 26, **Exhibit 59**), and Seattle, Washington (Gleason, 1908, 221, **Exhibit 60**) in 1907; Kansas City, Missouri (Turpin, Kingsley, and Shannon, 1909, 846, **Exhibit 61**), Memphis, Tennessee (Hughey, 1909, 659, **Exhibit 62**), Oakland, California (City Council, 1909, 15, **Exhibit 63**) and Paducah, Kentucky (Puryear, 1909, 489, **Exhibit 64**) in 1909; Jacksonville, Illinois (Morrisey and Gregory, 1910, 113, **Exhibit 65**) and Staunton, Virginia (1910, 115, **Exhibit 66**) in 1910; Colorado Springs, Colorado (Sherwin, Prince, and Bennett, 1923, 450, **Exhibit 67**) in 1911; New York City (Cosby, 1926, 389, **Exhibit 68**) and Oakland, California (Davie, 1918, 119, **Exhibit 69**) in 1912; Grand Rapids, Michigan (Ferguson and Shaw, 1915, 208, **Exhibit 70**) and New Haven, Connecticut (1914, 438, **Exhibit 71**) in 1914; New York City in 1916 (Department of Parks, 1916, 7, **Exhibit 72**); Birmingham, Alabama (Anderton, 1917,

20

662, **Exhibit 73**) and Joplin, Missouri (McIndoe and Cameron, 1917, 552, **Exhibit 74**) in 1917; Salt Lake City, Utah (Gregory, Folland, and Smith, 1920, 474, **Exhibit 75**) in 1920; Burlington, Vermont (1921, 93, **Exhibit 76**) in 1921; and Chattanooga, Tennessee (Carden and Evans, 1922, 145, **Exhibit 77**) and Chicago, Illinois (Ettelson, 1922, 809, **Exhibit 78**) in 1922. As these many incidences indicate, prohibitions on carrying firearms in urban parks was considered fundamental to the purpose and function of these spaces – urban social reform.

34. Today, the romantic and rationalistic ideals still thrive in America's urban parks.

35. At no point did my research reveal any historical evidence that supported the carrying of firearms for self-defense in urban parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of urban parks as promoted by those ideals.

**National Parks**

36. The emergence and development of America's national parks followed an ideological arc quite similar to urban parks and for much the same purpose – the improvement of American society. Like urban parks, national park advocates and supporters initially embraced Romanticism. The creation of American national parks and state parks (see below) began in 1864 when President Lincoln signed legislation ceding approximately 38,000 acres of federal land to the state of California as the Yosemite Valley and Mariposa Big Tree Grove park for the "public use, resort, and recreation; [and] inalienable for all time" (Dilsaver, 2016a, 4; Runte, 1990, 3). Frederick Law Olmsted, who lived in California at the time, was appointed a commissioner on the new park's board, which illustrates how much the purposes of urban and national parks were linked at the time. Olmsted supervised the creation of a report for its general development and administration. In addition to a "skillful" plan for Yosemite, Olmsted,

21

"advocated a policy of establishing national parks across the nation and laid the foundation for our current national park system" (Freeman, 1989, 172).

37.    For Olmsted, the creation of national parks was not a gift but a duty.  "It is the main duty of government, if it is not the sole duty of government, to provide means of protection for all its citizens in the pursuit of happiness" (Olmsted, 1990a, 502).  Where Romantic urban parks had employed the Beautiful and the Picturesque, California's Yosemite Park improved society through a blend of the Beautiful and the Sublime.  The new park was, argued Olmsted, a "union of the deepest sublimity with the deepest beauty of nature, not in one feature or another, not in one part or one scene or another, not any landscape that can be framed by itself, but all around and wherever the visitor goes, constitutes the Yo Semite the greatest glory of nature" (Olmsted, 1990a, 500).  Immersed in the park's natural beauty, visitors were improved through passive interaction with the scenery.  "[T]he enjoyment of scenery," stated Olmsted, "employs the mind without fatigue and yet exercises it, tranquilizes it and yet enlivens it; and thus, through the influence of the mind over the body, gives the effect of refreshing rest and reinvigoration to the whole system" (Olmsted, 1990a, 504).  Consequently, Olmsted thought the principal duty of the park's commissioners was "to give every advantage practicable to the mass of the people to benefit by that which is peculiar to this ground" (Olmsted, 1990a, 506).  At the same time, he cautioned that constraints had to be applied to the "mass" of visitors in order for the park to benefit society both in the present and in the future.  "[I]t should be remembered that in permitting the sacrifice of anything that would be of the slightest value to future visitors to the convenience, bad taste, playfulness, carelessness, or wanton destructiveness of present visitors, we probably yield in each case the interest of uncounted millions to the selfishness of a few individuals" (Olmsted, 1990a, 507).  Finally, he pointed to the uniqueness that had "caused

22

Congress to treat [Yosemite Valley and Mariposa Big Tree Grove] differently from other parts of the public domain" and to that which would guide the creation of subsequent national parks. "This peculiarity consists wholly in its natural scenery" (Olmsted, 1990a, 506).

38.     Less than a decade after the creation of the Yosemite park, the first, officially designated "national park" was created in 1872: Yellowstone. A large, protected area of approximately 2.2 million acres, its origin lay in the Romantic path of scenery identified by Olmsted. "Yellowstone's awesome natural phenomena had inspired a political phenomenon" (Sellars, 1997, 7). In the authorizing act, the park was "hereby reserved and withdrawn from settlement, occupancy or sale … and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people." Placed under the Interior Secretary, the act directed the Secretary "to make and publish such rules and regulations as he may deem necessary or proper for the care and management of the same." Among these, the Secretary "shall provide against the wanton destruction of the fish and game found within said park" and he "generally shall be authorized to take all such measures as shall be necessary or proper to fully carry out the objects and purposes of this act" (Dilsaver, 2016b, 20-21).

39.     In 1875, Three years after the creation of Yellowstone, America's second national park was created: Mackinac National Park in Michigan. At approximately 821 acres, Mackinac was smaller than either Yosemite or Yellowstone, but like them, it was "set apart as a National public park, or grounds, for health, comfort, and pleasure [and] for the benefit and enjoyment of the people" (Kelton, 1882, 17). Its 1882 "Rules and Regulations" included an explicit prohibition on firearms that clearly recalled the simple, declarative prohibitions in numerous urban public parks – "No person shall carry or discharge fire-arms in the park" (Kelton, 1882, 22, **Exhibit 81**).

23

40.     A decade later, in 1894, the Superintendent of Yellowstone promulgated a firearms regulation stating that "Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the Park guard parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park" (U.S. Department of the Interior. 1894, 662, **Exhibit 79**). A similar rule was established for Sequoia National Park in 1890, prohibiting the "carry[ing] into or having in the park any fire-arms … without a license in writing signed by the Secretary [of the Interior] or superintendent of the park." (U.S. Department of the Interior, 1890, CLXII, **Exhibit 80**).

41.     In 1897, a Report of the Secretary of the Interior made clear that there were already rules against carrying firearms in Yosemite National Park (park created in 1890)—and that they were strictly enforced. The Secretary wrote: "All the firearms are taken from their owners at Wawona and Crocker's, the two principal entrances to the park, and patrols take all the firearms found in possession of tourists and campers who have entered the park by unguarded routes. … The game in the park has increased in numbers and the deer and other animals show less fear of human beings than they have in past years; the result, no doubt, of the rigid enforcement of the rules against carrying firearms in the park." (U.S. Department of the Interior, 1897, LXXXIV-LXXXV, **Exhibit 82**).

42.     Over the next 40 years, Congress and the President designated (and sometimes transferred) numerous natural preserves under federal jurisdiction, including Sequoia, Yosemite, Mount Rainier, Glacier, and Rocky Mountain National Parks. Like the original Yosemite cession and Yellowstone National Park, these subsequent parks were large, relatively distant from most of America's population because they were out west while the people were back east, and

24

"preserved largely for their aesthetic qualities," which like urban parks, were thought to improve society (Mackintosh, 2005, 14).

43.    The rationalistic justification began to inform national park features and usage toward the end of the Nineteenth and the beginning of the Twentieth Centuries.  As the public, which increasingly lived in America's cities, came to expect urban parks to be both scenic and places for museums, bicycling, and other forms of active play, they also came to see county, state, and national parks as serving the same purpose.  In 1918, Interior Secretary Franklin K. Lane (Dilsaver, 2016c, 37) instructed Stephen T. Mather, first Director of the National Park Service created in 1916, that "All outdoor sports which may be maintained consistently with the observation of the safeguards thrown around the national parks by law will be heartily endorsed and aided wherever possible.  Mountain climbing, horseback riding, walking, motoring, swimming, boating, and fishing will ever be the favorite sports.  Wintersports will be developed in the parks that are accessible throughout the year."  In contrast, however, Lane specified that "Hunting will not be permitted in any national park."

44.    Prior to 1936, each national park had its own set of rules and regulations.  In 2008, the National Park Service conducted a historical survey of firearms regulations within those rules.  In addition to the regulations noted above, the survey found prohibitions on carrying firearms in eighteen national parks and all national monuments.  (National Park Service, 2008, **Exhibit 83**).  In 1936, the National Park Service adopted a uniform code: "Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian" (U.S. Department of the Interior, June 27, 1936, 674, **Exhibit 84**).

45.    The American Civic Association (ACA), a private, eastern-based organization that had originated in the nineteenth century and promoted the creation of all parks as social reforming devices,  incorporated all types of parks—municipal, county, state, and national—in their reform agenda because they believed that any given park comprised the local expression of a more durable concept, that all parks were socially impactful when they shared three important features: nature, scenery, and play, which when combined properly, created the ideal of the park. According to the ACA's president, J. Horace McFarland (1912, 3), this park performed a valuable social function; it "act[s] immediately and favorably on the health and the orderliness of the community, and consequently increase[s] materially the average of individual efficiency.  In other words, they pay dividends in humanity."  That is, such parks at every geographic scale reformed a rapidly urbanizing America.  National parks, like urban parks, would foster a virtuous society characterized by health and wealth.  The ACA further claimed that national parks would foster democracy and patriotism among Americans (Young, 1996).

46.    Today, the same rationales applicable to urban parks guide the public's expectations and inform the actions of national park proponents and supporters.

47.    Again, at no point in my research did I discover any evidence of historical support for the carrying of firearms for self-defense in national parks.  Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of national parks as promoted by those ideals.

**State Parks**

48.    America's state parks today appear in every state and in types that vary from state to state and sometimes even within a single state.  The history of their designation and development reveals a halting and uneven pattern, but it nonetheless followed the same

26

ideological arc that guided the unfolding of urban and national parks, and for much the same purpose – the improvement of society. Like national park advocates and supporters, state park activists thought striking scenic places would lead to a society that was healthier, wealthier, more democratic and more socially coherent.

49.    As noted above, it has been argued that the first state and national park was Yosemite Valley and Mariposa Big Tree Grove (Engbeck, 1980).  However, California returned it to the federal government in 1906 for incorporation into Yosemite National Park.  Nonetheless, while it existed, the valley and grove inspired such scenic state parks as Big Basin in California, Palisades and Watkins Glen in New York, and Mount Mitchell in North Carolina, as well as "sites uniquely worth preserving" in Connecticut, Indiana, Iowa, and Wisconsin (Cutler, 1989, 195).

50.    Another early state park was New York's Niagara Falls State Reservation [now Park].  Calls for protection of the site had begun as early as 1867 and by 1869 Frederick Law Olmsted had joined this movement (Olmsted, 1880, 27).  Like the city and national parks discussed above, scenery and its ability to improve society were principal concerns driving these advocates for the state park.  For example, in 1879, the New York Legislature passed a resolution that called on the State Survey to produce a report on "the Preservation of the Scenery around Niagara Falls."  According to the resolution, the Survey was to determine how much private development had "worked to public disadvantage through defacements of the scenery" and "to consider whether the proposed action by the State [that is, protection as a park] is necessary to arrest the process of destruction and restore to the scenery its original character" (Gardner, 1880, 3, 7).  Moreover, in March 1880, a large and influential group of Americans and Canadians sent a petition in support of a natural and scenic park to the Governor of New York

27

and the Governor General of Canada.  It emphasized the same concerns about scenery: "Objects of great natural beauty and grandeur are among the most valuable gifts which Providence has bestowed upon our race.  The contemplation of them elevates and informs the human understanding.  They are instruments of education.  They conduce to the order of society.  They address sentiments which are universal.  They draw together men of all races, and thus contribute to the union and the peace of nations" (Wheeler, et al., 1880, 31-32).   Finally, the efforts of Olmsted, other citizen advocates, and public officials convinced the New York Legislature to pass an act creating the Reservation in 1883 and the protected area was officially dedicated on July 15, 1885.  It remains "the oldest natural area state park continuously in operation to this day" (Landrum, 2004, 38).

51.    Most state parks, however, did not appear until the Twentieth Century when, as J. Horace McFarland (1910, 9) noted, they came to be seen as the logical extension between city or county parks and national parks.  "If, when a natural wonder is found to be of national importance and to need national protection, it may properly be controlled by the nation, surely a location or opportunity too large for local or municipal control may as properly be controlled by the state."  Furthermore, these and subsequent state parks, like urban and national parks, incorporated both romantic and rationalistic features as people saw them as places for the passive admiration of scenery and active recreation.  Nevertheless, the momentum to create and develop state parks built slowly during the first quarter of the Twentieth Century with only nineteen states creating any sites before a transformative national conference in 1921 (Landrum, 2004, xii).

52.    During the first two decades of the Twentieth Century, park proponents kept recommending new sites for designation, and especially to the new National Park Service after

28

1916.  The Park Service recognized that many of these recommendations had merit, but they did not rise to the level of national significance so instead of just rejecting the recommendations, it organized the National Conference on Parks in 1921 to facilitate the designation of these sites protected by the states.  This conference transformed the state park movement, stimulating more widespread interest in their creation (Landrum, 2004).

53.    Furthermore, the National Park Service developed a plan during the Great Depression to create "a healthier and happier citizenry by developing a nationwide system of state parks.  The goal was to 'cure the ills of society' by constructing a park within fifty to one hundred miles" of the American populace.  And, since a rationalistic park ideology was premier by the 1930s, "one of the primary principles of the plan was to place recreational parks within the reach of every citizen" (Smith, 2013, 207).  Working with the Civilian Conservation Corps (the "CCC"), the Park Service dramatically increased the number of state parks by building 800 between 1933 and 1942.

54.    As was the case with urban and national parks, many states regulated firearms in their parks, with Yosemite Valley and Mariposa Big Tree Grove ordering the earliest recorded.  On June 25, 1879, the Yosemite Valley Commission (n.d., 122)) voted to restrict firearms: "On motion it was resolved that the [Park] Guardian be & hereby is instructed to prevent the killing of birds and the discharge of firearms within the limits of the Yosemite Grant."   By 1935, at least eleven states—Connecticut (State Park Commission, 1918, 31, **Exhibit 85**), Indiana (See both Schortemeier, 1927, 98, **Exhibit 86;** and, Department of Conservation, 1927, 181, **Exhibit 87**), Kansas (Forestry, Fish and Game Commission, 1930, 23, **Exhibit 88**), Maryland (See both Board of Forestry, 1917, 61, **Exhibit 89**; and, State of Maryland, 1927, 1176, **Exhibit 90**), Michigan (Department of Conservation, 1928, 57, **Exhibit 91**), Minnesota (See both Secretary of

29

State, 1901, 396-97, **Exhibit 92**; and, Secretary of State, 1905, 620, **Exhibit 93**), New Jersey (State of New Jersey, 1935, 305, **Exhibit 94**), North Carolina (See both State of North Carolina, 1922, 54, **Exhibit 95**; and, Vetter, Digest II, 1936, 284, **Exhibit 96**), South Dakota (State of South Dakota, 1929, 32, **Exhibit 97**), Washington (See both Torrey, 1926, 247, **Exhibit 98**; and, Nelson, 1928, 278, **Exhibit 99**), and Wisconsin (Wisconsin Conservation, 1933, 23, **Exhibit 100**)—prohibited carrying firearms in at least some of their state parks, as did the District of Columbia (Commissioners, 1908, 85, **Exhibit 101**).

55.    In 1936, a National Park Service publication identified additional rules prohibiting the possession or carrying of firearms in state parks in New York (**Exhibits 106-114**) as well as in Alabama (**Exhibit 103**), California (**Exhibit 104**), Florida (**Exhibit 105**), Ohio (**Exhibit 115**), Rhode Island (**Exhibit 116**), and Virginia (**Exhibit 102**) (all available in Vetter, 1936).

56.    Today, the same rationales applicable to urban and national parks guide the public's expectations and inform the actions of state park proponents and supporters.

57.    For the third time, at no point in my research did I discover any evidence of historical support for the carrying of firearms for self-defense in state parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of state parks as promoted by those ideals.

58.    I reserve the opportunity to supplement this Report to reflect any additional research or context that may be necessary as this case proceeds.

Dated: Cambria, California,
      February 28, 2026

 

_____
                        TERENCE YOUNG