# Exhibit A

# EXPERT DECLARATION OF ROSS ALLEN ANDREW LARSEN, Ph.D.

*New York State Rifle & Pistol Association, Inc. v. James*

Case No. 1:22-cv-00907-MAD-CFH

United States District Court

Northern District of New York

Prepared by:

**Ross Allen Andrew Larsen, Ph.D.**

Behavioral Scientist and Methodologist

Arkansas State University

March 19, 2026

1

# TABLE OF CONTENTS

I. QUALIFICATIONS AND ENGAGEMENT ......................................................................... 4

II. EXECUTIVE SUMMARY: THE REQUIREMENTS OF EMPIRICAL VALIDITY ...................... 5

III. SCIENTIFIC STANDARDS FOR RELIABLE EMPIRICAL EVIDENCE ............................... 7

    A. The FJC Reference Manual Framework .................................................................. 7

    B. The RAND Corporation's Independent Assessment.................................................. 7

    C. Note on Peer Review ............................................................................................ 7

IV. THE FOUNDATIONAL REQUIREMENT OF RELIABLE MEASUREMENT......................... 8

V. THREE CRITICAL DEFECTS THAT PRECLUDE RELIABLE MEASUREMENT AND CAUSAL INFERENCE .................................................................................................................. 9

    A. Map-Drawing Artifacts: Specification Fragility (Studies 1, 2).................................. 9

    B. The Neighborhood Problem: Environmental Confounding (Studies 1, 2, 3, 4) ......... 9

    C. No Before-and-After: Temporal Invalidity (Studies 1, 2, 3)................................... 10

VI. STUDY 1 — MAP-DRAWING ARTIFACT: ST. LOUIS SCHOOL ZONES (Reeping et al., 2023) ............................................................................................................................ 11

VII. STUDY 2 — SPECIFICATION FRAGILITY AND OMITTED VARIABLE BIAS: TEXAS 51% ALCOHOL ESTABLISHMENTS (Reeping et al., 2025).................................................... 13

VIII. STUDY 3 — RETROSPECTIVE MATCHING AND INFORMATION BIAS: ACTIVE SHOOTINGS (Reeping et al., 2024)................................................................................ 15

    A. Differential Information Bias ................................................................................ 15

    B. Asymmetric Attrition and Control Replacement .................................................... 15

    C. Extreme Fragility ................................................................................................ 16

    D. Validation Gap ................................................................................................... 16

    E. Additional Design Deficiencies............................................................................ 16

    F. The "First Study Ever" Burden............................................................................. 17

IX. STUDY 4 — CAMPUS CARRY: NULL RESULTS, SPECIFICATION COLLAPSE, AND A SINGLE-INSTITUTION ARTIFACT (Kagawa, Reeping & Laqueur, 2025) ......................... 18

    A. The Authors' Own Results: Null Across All Four Estimators.................................. 18

    B. Independent Replication: Data Reconstruction and Forensic Analysis ................. 18

    C. Finding 1: The Grady Health Anomaly — A Single Institution Drives the Entire Analysis (CASE-DISPOSITIVE) .............................................................................. 19

    D. Finding 2: Count-Model Sign Reversal — The Paper's Null Is an Artifact of Functional Form.................................................................................................... 23

E. Finding 3: Texas Treatment Timing Error — An Objective Factual Error .................. 24

F. Finding 4: Differential Institution Attrition ............................................................ 24

G. Finding 5: The Authors' Own Documented Limitations ........................................ 24

H. Finding 6: Inappropriate Pooling of Medical Campuses ...................................... 25

I. Finding 7: Treatment Group Artificially Restricted to Three States ......................... 25

J. Finding 8: Treatment Group Artificially Restricted by Excluding Judicial Preemption
............................................................................................................................... 26

K. Finding 9: Advocacy-Sourced Classification ..................................................... 26

L. Finding 10: Pre-Treatment Parallel Trends Violated ............................................. 26

M. Finding 11: Four Concurrent Measurement Shocks ........................................... 27

N. Finding 12: Econometric Invalidity of N = 3 Inference ......................................... 27

X. THE CLERY ACT: WHY CAMPUS CRIME DATA CANNOT SUPPORT RELIABLE
STATISTICAL INFERENCE .................................................................................... 29

XI. THE DEFINITION PROBLEM: FAILURE TO OPERATIONALIZE KEY VARIABLES ........... 30

XII. "FOUR STUDIES AGREE" IS NOT PROOF — THEY SHARE SIMILAR STRUCTURAL
VULNERABILITIES ............................................................................................... 31

XIII. CONCLUSION ................................................................................................. 33

REFERENCES .......................................................................................................... 36

TABLES AND FIGURES ............................................................................................ 40

APPENDICES ........................................................................................................... 40

I, Ross Allen Andrew Larsen, Ph.D., competent to testify as a witness and based on my own personal knowledge, research, and experience, declare as follows:

## I. QUALIFICATIONS AND ENGAGEMENT

I have been retained by counsel for Plaintiffs to evaluate the methodological reliability of Dr. Paul Reeping's expert declaration filed in support of Defendants' motion for summary judgment. My engagement is limited to the evaluation of the scientific architecture of four observational studies cited in Dr. Reeping's declaration. I do not take sides on gun policy. My opinions concern only whether the cited studies employ methods sufficient to support the empirical conclusions drawn from them.

My qualifications to render this opinion are set forth in my curriculum vitae and publication record (Appendix A). I am being compensated at a rate of $500 per hour for my time in this matter. My compensation is not contingent on the outcome of this litigation or the substance of my opinions.

A complete list of publications I have authored in the prior ten years is provided in Appendix B. A complete list of cases in which I have provided trial or deposition testimony in the prior four years is provided in Appendix C. A comprehensive index of all facts, data, and materials considered in forming my opinions is provided in Appendix E.

## II. EXECUTIVE SUMMARY: THE REQUIREMENTS OF EMPIRICAL VALIDITY

Dr. Reeping's declaration relies on four observational studies to support the proposition that gun-free zone policies do not increase — and may reduce — firearm violence: (1) Reeping et al. (2023), examining gun-free school zones in St. Louis; (2) Reeping et al. (2025), examining 51% alcohol establishments in Texas; (3) Reeping et al. (2024), examining active shootings in gun-free zones nationally; and (4) Kagawa, Reeping & Laqueur (2025), examining campus carry laws. I have conducted a detailed methodological evaluation of each study, and for the campus carry study (Study 4), I have independently reconstructed the dataset from primary federal data sources and replicated the authors' analysis using multiple statistical estimators. My findings are as follows.

None of the four studies cited in the declaration employs measurement precise enough to establish a reliable statistical association between gun-free zone policies and reduced firearm violence, let alone a causal relationship. The structural design defects I identify below — unreliable outcome data, asymmetric exposure classification, specification-dependent results, and extreme outlier sensitivity — undermine not only causal inference but also the underlying correlations upon which any causal claim must rest.

The RAND Corporation's systematic review of gun-free zone research — which identified only one prior study meeting rigorous inclusion criteria (Gius, 2019) — independently rates the evidence on gun-free zones as "inconclusive" (RAND Corporation, 2020). Notably, even accepting the underlying data at face value, Dr. Reeping's own campus carry study — the strongest longitudinal design in his portfolio — produced null results across all four of the authors' own estimators, a finding consistent with RAND's assessment.

My independent replication of Study 4 reveals that this ostensible null result is itself an artifact. The study's entire statistical architecture is dominated by a single 60-student medical campus — Grady Health System Professional Schools in Atlanta — that reported hospital-wide violent crime divided by a tiny student denominator, producing violent crime rates 300 to 700 times the sample median (Appendix F, Script 03). When this single institution is removed from the panel of 497, the overall treatment effect flips sign, and when the statistically appropriate count-based model is applied, the estimated effect of campus carry on violent crime is a statistically significant 15.2% *increase* ($p = 0.005$; Appendix F, Script 04). I do not present this positive estimate as the true causal effect of campus carry, because the underlying data suffers from documented reporting failures too severe to support any directional conclusion. Rather, I present it as a mathematical demonstration that the study's findings are fundamentally unstable — the conclusion of any researcher using this dataset depends entirely on whether a single anomalous medical campus is included or excluded.

**Table 1: Study Deconstruction Summary**

| Study | Design | Critical Flaw | Consequence |
|---|---|---|---|
| (1) St. Louis School Zones (Reeping et al., 2023) | Cross-sectional, ecological | MAUP: result vanishes under the primary boundary specification | No reliable correlation — the association is a geographic artifact |
| (2) Texas 51% Alcohol (Reeping et al., 2025) | Cross-sectional, geospatial | Specification fragility: headline result ($p = 0.049$) non-significant in every sensitivity analysis; effect driven entirely by bars | The correlation is an artifact of a single arbitrary specification — it fails every robustness test the authors conducted |
| (3) Active Shootings (Reeping et al., 2024) | Matched case-control | Differential information bias: cases classified via news (53%), controls via phone (43%); 6–9 misclassifications degrade result to null boundary | The observed association is mechanically inflated by asymmetric measurement of the exposure variable |
| (4) Campus Carry (Kagawa et al., 2025) | Difference-in-differences (panel) | N = 3 treated states; entire result driven by single 60-student medical campus; 37/73 Texas institutions assigned wrong treatment year; 13:1 differential attrition; 8+ states excluded; 4 concurrent measurement shocks | Null across all four estimators; result flips sign upon removal of one institution; authors' own ASC confidence interval (−0.365 to 0.187) proves model is statistically blind |

## III. SCIENTIFIC STANDARDS FOR RELIABLE EMPIRICAL EVIDENCE

### A. The FJC Reference Manual Framework

The Federal Judicial Center's *Reference Manual on Scientific Evidence* (3rd ed., 2011) and the foundational validity framework of Shadish, Cook & Campbell (2002, *Experimental and Quasi-Experimental Designs for Generalized Causal Inference*) provide the methodological standards for evaluating the reliability of observational research offered in federal litigation. These authorities establish that observational studies — in which the researcher cannot randomly assign the policy exposure — face inherent threats to internal, external, construct, and statistical conclusion validity that must be affirmatively addressed through study design.

All four of the studies cited in Dr. Reeping's declaration are observational. None employs random assignment of the gun-free zone policy to the locations or populations under study. This is not, in itself, disqualifying — observational research can produce credible evidence when appropriate statistical controls are applied and when threats to internal validity are explicitly tested and bounded. The question before this Court is whether these particular studies meet that standard. It is my expert opinion that they do not. Under the standards governing scientific evidence in federal courts, the proponent of an observational study bears the affirmative burden of demonstrating that its methodology reliably isolates the policy effect.

### B. The RAND Corporation's Independent Assessment

The RAND Corporation, in its systematic review of the empirical literature on gun-free zones, identified only one prior study meeting rigorous inclusion criteria for causal evidence: Gius (2019), which examined campus carry laws using a state-level panel. RAND rated the overall evidence base on gun-free zones as "inconclusive" and explicitly noted that "a comprehensive national database on gun-free zones does not exist" (RAND Corporation, 2020). This independent assessment from a nonpartisan research institution corroborates the concerns I identify below.

### C. Note on Peer Review

Standard journal peer review audits internal statistical methodology and manuscript clarity. Peer reviewers do not independently re-run GIS spatial boundaries, audit underlying federal Clery Act raw data compliance, verify the geographic measurement choices of the researchers, or conduct leave-one-out diagnostic analyses of influential outliers. The presence of peer review does not immunize a study from the structural spatial and data-integrity deficits identified in this report.

7

## IV. THE FOUNDATIONAL REQUIREMENT OF RELIABLE MEASUREMENT

Before asking whether a study proves causation, sound scientific methodology requires that we first ask whether it reliably measures what it claims to measure. A statistical association is only as valid as the data from which it is computed.

This foundational requirement is not met by the studies under review. If only 12% of actual gunfire incidents result in a 911 call (Study 1, based on ShotSpotter acoustic validation data) — and an even smaller fraction (2–7%) results in a documented police report for assault with a dangerous weapon; if 55% of the sample is systematically excluded due to data linkage failure (Study 2); if the exposure variable is classified by fundamentally different methods for cases versus controls (Study 3); and if the crime data underlying the panel analysis has documented 15–30% error rates (Study 4, per state and federal Clery Act audits) — then no statistical association computed from these data can be trusted as a reliable description of reality.

The defects I identify in this report are not limited to the question of whether correlation implies causation. They strike at the prior question of whether a reliable correlation exists at all. The measurement failures I document below are so severe that the cited studies cannot establish a valid statistical association between gun-free zones and reduced firearm violence — the threshold requirement for any further claim of causation.

8

# V. THREE CRITICAL DEFECTS THAT PRECLUDE RELIABLE MEASUREMENT AND CAUSAL INFERENCE

Across the four studies, three structural defects recur under the standards articulated in the *Reference Manual on Scientific Evidence* (3rd ed., 2011), published jointly by the Federal Judicial Center and the National Academies of Sciences, Engineering, and Medicine.

## A. Map-Drawing Artifacts: Specification Fragility (Studies 1, 2)

When a statistical result does not replicate the moment an equally defensible analytic boundary is applied, the finding is a geographic artifact — a symptom of the Modifiable Areal Unit Problem (MAUP) (Openshaw, 1984). Study 1 produces a statistically significant result under a centroid boundary but a null result under the primary, legally accurate tax-parcel boundary. Study 2 produces a statistically significant result at a 50-meter buffer but a null result at a 100-meter buffer.

A statistical association that vanishes upon the slightest perturbation of the researcher's spatial parameters is not a measurement of reality. It is a textbook symptom of specification fragility (Leamer, 1983, "Let's Take the Con Out of Econometrics," *American Economic Review*, 73(1), 31–43), and there is no reliable correlation to explain.

## B. The Neighborhood Problem: Environmental Confounding (Studies 1, 2, 3, 4)

The four studies share a common inability to isolate the statutory designation of a "gun-free zone" from the physical security infrastructure through which the policy is enforced — or, more precisely, through which the *places* designated as gun-free zones are independently secured. To reliably measure the effect of a regulation, a spatial model must isolate the specific geographic footprint and population actually burdened by the policy. Comparing macro-level areas fails this fundamental requirement.

Study 1 compares areas near schools to areas far from schools. Study 2 compares areas near alcohol establishments to areas far from alcohol establishments. In both cases, the environments being compared differ in ways the statistical models cannot measure. Schools are fenced, gated, staffed, and surveilled (National Center for Education Statistics, *Indicators of School Crime and Safety*, 2023). Bars employ bouncers, conduct pat-downs, and operate under high-intensity lighting with closing-time police details (Graham & Homel, 2008, *Raising the Bar: Preventing Aggression in and Around Bars*, Willan Publishing). These security features deter violence independently of any statutory gun-free zone designation.

Study 3 matches cases and controls by Standard Industrial Classification (SIC) code, but a high-security federal courthouse (armed marshals, magnetometers, controlled entry) and an unsecured municipal annex share the same SIC code (e.g., SIC 9211, "Courts"; U.S. Department of Labor, *SIC Manual*, 1987). Study 4 nominally controls for time-invariant state-level differences through fixed effects, but this protection collapses when four concurrent time-varying measurement shocks — the 2014 UCR rape definition change, the

2016 DOE geographic boundary expansion, the 2017 #MeToo reporting surge, and the 2017 Title IX enforcement reversal — coincide with treatment timing (Section IX.M).

Because the statistical models cannot isolate the gun-free zone designation from the physical security infrastructure, any observed statistical association is irreparably confounded (Clarke, 1995, "Situational Crime Prevention," in *Building a Safer Society*, University of Chicago Press). What these studies purport to measure is the association between a statutory designation and reduced violence. What they actually capture is the association between intensive physical security and reduced violence — not between the gun-free zone designation and reduced violence.

## C. No Before-and-After: Temporal Invalidity (Studies 1, 2, 3)

Studies 1 and 2 are single-year cross-sections — snapshots that capture a statistical association at one moment in time but cannot determine whether the gun-free zone policy preceded the observed pattern of crime. Study 3 is a retrospective case-control design with no temporal variation in policy exposure. Without temporal variation, the observed cross-sectional associations cannot be distinguished from pre-existing baseline differences between locations. The correlation may reflect the physical environment, not the policy.

Study 4 (campus carry) is the exception. Its difference-in-differences panel design explicitly exploits before-and-after variation in policy adoption. This makes Study 4 the strongest econometric design in the portfolio, and as I demonstrate in Section IX, it produces null results across all four of the authors' own estimators.

## VI. STUDY 1 — MAP-DRAWING ARTIFACT: ST. LOUIS SCHOOL ZONES (Reeping et al., 2023)

Reeping et al. (2023) examine whether gun-free school zones in St. Louis are associated with reduced firearm violence using a 2019 cross-sectional analysis of geocoded crime data.

**Central Finding.** The authors report two specifications (Reeping et al., 2023). Both boundary measurements are defensible. A reliable finding must survive both (Leamer, 1983).

Under the tax-parcel boundary — the legally accurate property line that defines where the gun-free school zone actually begins and ends — the result is null: IRR = 1.000, p = 0.608. Under the geographic centroid boundary — a standard GIS practice that imposes a radial buffer around the school's center point — the result is a 13.7% "reduction" in firearm violence: IRR = 0.863, p = 0.008.

Same data. Same schools. Same crimes. Same year. The statistically significant result does not replicate under the alternative, legally accurate specification. This is the defining signature of a geographic artifact, not a real protective effect. A real protective effect would appear under both specifications.

**Centroid contamination.** The authors concede that the centroid buffer "is not inherently meaningful" and that the radial buffers "include land area that is within the school bounds" (p. 1124). The primary analysis deliberately excluded school grounds because no valid comparison group exists — all school grounds are gun-free by default, and schools are fenced, gated, staffed, and surveilled environments where crime density is inherently lower for reasons entirely unrelated to the gun-free zone law. The secondary centroid specification reintroduces school property into the buffer, meaning the statistically significant result partially captures the physical security infrastructure of the school itself — not the deterrent effect of the gun-free zone law.

**Unreliable outcome data.** The authors themselves cite ShotSpotter acoustic sensor data (Carr & Doleac, 2016) demonstrating that only 12% of gunfire incidents in comparable cities result in a 911 call to report gunshots — and an even smaller fraction (2–7%) results in a reported assault with a dangerous weapon. The outcome variable therefore captures a small, non-random fraction of actual firearm crime. The authors assume that underreporting is equally distributed across zones, but they immediately concede this assumption is likely violated: schools have staff, security, and parents who increase reporting density, creating a differential measurement error the statistical model cannot adjust for. When the outcome variable systematically misses 88% of the events it purports to measure, no statistical association computed from that variable can be considered a reliable correlation.

**Cross-sectional design.** As a 2019 snapshot, the study violates the temporality requirement. It cannot determine whether the gun-free zone policy preceded the observed

11

crime pattern or whether the observed pattern reflects pre-existing environmental characteristics that long predate the law.



**Figure 1.** MAUP Zoning Effect — Tax-parcel boundary (left, null result) vs. geographic centroid buffer (right, 13.7% "reduction"). Same data, same schools, same crimes — the statistically significant result does not replicate under the primary, legally accurate specification.

## VII. STUDY 2 — SPECIFICATION FRAGILITY AND OMITTED VARIABLE BIAS: TEXAS 51% ALCOHOL ESTABLISHMENTS (Reeping et al., 2025)

Reeping et al. (2025) examine whether proximity to Texas establishments with 51% alcohol sales permits — which are gun-free by statute — is associated with fewer shootings.

**Specification fragility.** The headline finding — 37% fewer shootings near 51% establishments (RR = 0.63, p = 0.049; Reeping et al., 2025) — is statistically significant in exactly one configuration. The authors' own sensitivity analyses (their Table 2) show the result becomes non-significant when zero-alcohol establishments are excluded (p = 0.063), when outliers are trimmed (p = 0.086), when the geographic buffer is expanded from 50 meters to 100 meters (p = 0.622), or when restaurants are analyzed separately from bars (p = 0.668). A finding that does not survive any perturbation of the authors' own analytical choices is not a robust result. The correlation itself is an artifact of a single arbitrary specification (Leamer, 1983) — it cannot be called a reliable finding of association.

**Aggregation bias.** The overall 37% protective association was driven entirely by bars; results for restaurants were completely null (Reeping et al., 2025, Table 2). This pattern demonstrates that the model captures the ambient security footprint unique to nightlife venues — the bouncers, pat-downs, high-intensity lighting, and closing-time police details that characterize bars (Graham & Homel, 2008) — not the gun-free zone law. The statutory prohibition on firearms applies equally to bars and restaurants holding 51% permits. If the gun-free zone designation were driving the result, the effect would appear in both venue types. It appears only in bars, where the physical security infrastructure is most intensive.

**Informative sample attrition.** Fifty-five percent of Texas alcohol-serving establishments could not be linked across data sources and were excluded from the analysis. The excluded establishments had systematically lower alcohol revenue ($358,000 versus $536,000) and a higher proportion of gun-prohibited status (14.7% versus 8.7%). This missingness is not random. It disproportionately removes the smaller, less-documented gun-free establishments — precisely the venues most likely to lack the professional security infrastructure the model attributes to the gun-free zone law. No sensitivity analysis (multiple imputation, inverse probability weighting) was conducted for the missing 55%. When 55% of the relevant population is non-randomly excluded, the remaining sample cannot support a reliable correlation.

**Uncontrolled security confounders.** The authors adjusted for macro-level census tract demographics (poverty, income, race, population density, proportion aged 18–35), but these variables operate at the tract level. They inherently fail to capture the micro-localized, point-source security infrastructure — bouncers, pat-downs, lighting, police details — that operates at the building level and is entirely independent of the gun-free zone statutory designation.

**Unreliable outcome data.** The shooting data were obtained from the Gun Violence Archive (GVA), a media-dependent crowdsourced database. An independent validation

study (Anchan et al., *JAMA Network Open*, 2025) found that GVA misses 26.5% of emergency-department-presenting gunshot injuries, with systematic bias toward capturing fatal and multi-victim incidents (OR = 14.22, 95% CI: 4.46–45.40, for fatalities). Single-victim nonfatal shootings — the most common type — are disproportionately missing. The GVA validation study cited by the authors (Gobaud et al., 2023) was co-authored by members of Dr. Reeping's own research team — a methodological concern because validation studies derive their authority from independence. When the same researchers who selected a data source also conduct its validation, they share the same analytical assumptions, coding conventions, and institutional incentives, undermining the independence that validation requires.

## VIII. STUDY 3 — RETROSPECTIVE MATCHING AND INFORMATION BIAS: ACTIVE SHOOTINGS (Reeping et al., 2024)

Reeping et al. (2024) use a matched case-control design to examine whether active shooting events are less likely to occur in gun-free zones, reporting a 62% protective effect (OR = 0.38).

### A. Differential Information Bias

The primary source of gun-free zone classification differs fundamentally between cases and controls (their Appendix Table 2). For cases — establishments where shootings occurred and were covered by the media — 53.3% were classified via news reporting. For controls — randomly selected businesses that were never in the news — only 13.3% could be classified this way; instead, 42.7% of controls were classified via retrospective telephone calls to the business.

This is textbook differential information bias (Rothman, Greenland & Lash, 2008, *Modern Epidemiology*, 3rd ed., Ch. 9): a systematic, directional measurement error in which the dominant classification method is completely different for cases versus controls. The bias is endogenous — the outcome (the shooting) generates the media coverage that becomes the primary classification method for cases, mechanically linking the outcome to the measurement of the exposure variable.

The authors ran a sensitivity analysis adjusting for exposure ascertainment type (their Table 1, Sensitivity 2), which produced a stronger effect (OR = 0.30, p = 0.004). But adding a categorical indicator for "data source" to a regression adjusts only for average baseline variance between methods. It cannot retroactively correct the underlying misclassification of historical data points gathered through asymmetric channels. A statistical control for ascertainment type does not fix systematically biased ascertainment (Rothman, Greenland & Lash, 2008, Ch. 19; Greenland, 1980, *American Journal of Epidemiology*).

Because the dominant method of measuring the exposure variable differs systematically between cases and controls, any observed statistical association is mechanically inflated by differential misclassification (Rothman, Greenland & Lash, 2008, Ch. 9 — outcome-dependent exposure classification biases estimates away from the null). The study cannot establish that a reliable correlation exists between gun-free zone status and active shooting occurrence.

### B. Asymmetric Attrition and Control Replacement

The authors could not determine gun-free zone status for 1.3% (2 of 152) of cases, who were dropped, versus 24.6% (37 of 150) of controls, who were replaced. The 19-fold disparity in unclassifiable rates confirms the differential information problem. The 37 replacement controls are not a random draw — they are the subset of businesses whose gun-free status could be determined. Standard survey non-response research establishes that units unreachable after repeated contact attempts are systematically different from

reachable units on the variables of interest (Groves et al., *Survey Methodology*, 2nd ed., 2009, Ch. 6). Businesses that cannot be reached after up to nine call attempts (as the authors report) are likely to be smaller, less-staffed operations lacking corporate switchboards, policy websites, or posted signage. The workplace security literature documents that formal violence prevention policies — including firearms prohibitions — are adopted predominantly by larger, better-resourced organizations with professional security programs (OSHA, *Guidelines for Preventing Workplace Violence*, 2016; ASIS International/SHRM, *Workplace Violence Prevention and Intervention Standard*, 2011). If the reachable replacement controls are even marginally more likely to carry formal gun-free policies than the unreachable businesses they replaced — a plausible inference given that formal policy adoption correlates with organizational resources — the control group's 61.3% gun-free rate is inflated, widening the apparent protective effect.

## C. Extreme Fragility

The authors' Appendix B (Reeping et al., 2024) deliberately models directional misclassification — errors that bias the estimate away from the null. Their own robustness analysis demonstrates that between six and nine directional misclassifications out of 300 observations are sufficient to degrade the statistical significance of the primary finding to the null threshold. Given that 42.7% of controls were classified via 8-year retrospective telephone recall and 24.6% of controls were replaced outright because they could not be classified at all, an error rate of 2–3% across the sample is well within the expected range. The authors' own defense inadvertently proves how fragile the result is.

## D. Validation Gap

The authors validated only telephone calls against company policy — on a sample of 20 establishments, 3 of which simply directed the caller to look up company policy online (Reeping et al., 2024). They never validated news reporting, the dominant classification method for 53% of cases. A study whose result is degraded to null significance by as few as 6 to 9 misclassifications cannot afford to leave its primary case-classification method entirely unvalidated. The error rate for the majority of case exposures is unknown — and unknowable from the data the authors provide.

## E. Additional Design Deficiencies

**Intra-category security variance.** The SIC-based matching fails to account for the security infrastructure that correlates with gun-free designation. The authors report an E-value of 4.78, but the E-value is informative only if no plausible confounder of that strength exists. Physical security infrastructure — magnetometers, controlled entry, armed security — is not a weak, stochastic confounder. It is a structural feature of gun-free zone enforcement that independently deters violence through access control. Clarke (1995) established that environmental modifications — controlled entry, surveillance, target hardening — are among the most effective crime reduction strategies in the empirical record, with point-source access controls (magnetometers, security checkpoints, controlled entry) routinely achieving dramatic reductions in targeted crimes, often

16

exceeding 80 percent in secured facilities (Clarke, 1995, pp. 91–150). Such reductions correspond to risk ratios of 5.0 or greater, which exceed the 4.78 E-value threshold — meaning the observed case-control association can be fully explained by physical security infrastructure without any residual contribution from the statutory gun-free zone designation.

**Control selection opacity.** Furthermore, the authors provide no documented sampling frame or reproducible protocol for how the geographic coordinates of open-space controls (parks, streets) were selected, rendering the spatial baseline mathematically opaque.

**Definitional heterogeneity.** The 150 cases were drawn from five databases with incompatible definitions — the FBI requires no fatality minimum, Mother Jones requires 3 or more killed, and the Violence Project requires 4 or more murdered while excluding gang, robbery, and domestic contexts. The merged sample is an undefined, non-replicable intersection of incompatible criteria.

**Base-rate futility and sparse-data bias.** The claim rests on 150 active shooting events drawn from tens of millions of eligible establishments over seven years. King & Zeng (*Political Analysis*, 2001) demonstrate that logistic regression with rare events systematically underestimates event probabilities with bias substantively meaningful below 200 cases. Greenland, Mansournia & Altman (*BMJ*, 2016) show that sparse-data bias inflates effect sizes away from the null, making associations appear stronger than they are.

**Non-public data.** The datasets are not publicly available, preventing independent replication or verification of the "first ever" finding in a field where the authors themselves acknowledge zero prior evidence.

## F. The "First Study Ever" Burden

The authors concede that their systematic literature search found zero quantitative studies showing gun-free zones have increased or decreased any firearm-related outcome (Reeping et al., 2024), a finding independently corroborated by RAND's systematic review (RAND Corporation, 2020). They frame this as "the first study ever to estimate the association between gun-free zones and the occurrence of active shootings." As Sagan (1980) observed, extraordinary claims require extraordinary evidence — a principle formalized by Ioannidis (*PLoS Medicine*, 2005), who proved mathematically that when the prior probability of a finding is low (i.e., no previous study in the field has detected the effect), the positive predictive value of a single new result is correspondingly low, regardless of its nominal statistical significance. A 62% protective effect emerging from an evidence desert in which no prior study has detected any effect in either direction is, by definition, a low-prior-probability claim. It demands extraordinary methodological rigor. For the reasons stated above, the study does not meet that standard.

## IX. STUDY 4 — CAMPUS CARRY: NULL RESULTS, SPECIFICATION COLLAPSE, AND A SINGLE-INSTITUTION ARTIFACT (Kagawa, Reeping & Laqueur, 2025)

Kagawa, Reeping & Laqueur (2025), published in *Injury Epidemiology*, use a difference-in-differences (DiD) panel design to estimate the effect of campus carry laws on violent crime at public colleges and universities, examining 3 treated states (Arkansas, Georgia, and Texas) and 21 control states over the period 2006–2019.

This is the strongest econometric design in Dr. Reeping's portfolio. It is also the only study for which the underlying data is publicly available, enabling independent reconstruction and replication. I have conducted that replication.

### A. The Authors' Own Results: Null Across All Four Estimators

The authors' central finding is stated directly: "This study does not find significant changes in crime rates following state implementation of permissive campus carrying laws" (Kagawa et al., 2025, p. 1). Four different statistical methods — legacy Two-Way Fixed Effects (TWFE), Callaway & Sant'Anna (2021), Augmented Synthetic Control, and Wooldridge Mundlak regression — all returned null results for the association between campus carry and violent crime. Under the authors' own analytical framework, there is no statistically significant association to explain.

I note that my independent Wild Cluster Bootstrap analysis (Section IX.N) does produce a statistically significant pooled TWFE result (WCB p = 0.031) — a finding that, taken in isolation, would support the proposition that campus carry reduces violent crime. I do not rely on this finding because it is entirely an artifact of the Grady Health anomaly documented in Section IX.C: removing a single institution from the panel of 497 eliminates the significance entirely (WCB p = 0.768). A result that depends on 0.2% of the dataset is not a reliable finding — it is a mathematical accident. I disclose it here because an objective expert must report results that cut against his conclusions, and because the fragility of this finding independently confirms the central thesis of this report.

This independently corroborates RAND's "inconclusive" rating of the broader gun-free zone evidence base. The strongest design in the declaration's portfolio found nothing that survives the removal of a single anomalous institution.

### B. Independent Replication: Data Reconstruction and Forensic Analysis

I independently reconstructed the authors' dataset from primary federal data sources — the Department of Education's Campus Safety and Security (CSS) statistics, reported under the Clery Act. I obtained CSS data releases Crime2009 through Crime2020, covering calendar years 2006–2019, and constructed an institution-year panel of 497 institutions (109 treated, 388 control) across 6,919 institution-year observations. Under a baseline unweighted specification, my Texas estimates match the paper's published values almost

exactly (violent crime: −0.048 versus their −0.04; burglary: 0.434 versus their 0.43), confirming that the underlying data extraction is structurally sound — even though this same specification entirely fails to reproduce the authors' results for other states (see Section IX.C, Table 4).

This replication revealed twelve additional methodological problems, seven of which are severe enough to warrant inclusion in this report. Taken together, they demonstrate that the study's statistical architecture is fundamentally unstable.

## C. Finding 1: The Grady Health Anomaly — A Single Institution Drives the Entire Analysis (CASE-DISPOSITIVE)

A foundational requirement for reliable empirical research is that aggregate, national policy conclusions must not be driven by idiosyncratic data errors at a single observation (Belsley, Kuh & Welsch, 1980). My forensic analysis reveals that this requirement is not met.

Grady Health System Professional Schools (federal UNITID 139746) is a medical campus in Atlanta, Georgia, with a student enrollment of 60 to 85 students. It reports crime for a large urban hospital complex. Dividing Grady's hospital-wide violent crime counts by its tiny student denominator produces violent crime rates ranging from 200 to 467 per 1,000 students — approximately 300 to 700 times the sample median (Appendix F, Script 03). Grady accounts for the six most violent institution-years in the entire 6,919-observation nationwide panel, exceeding the next highest institution by a factor of ten.

The fatal error occurs at the temporal boundary of the policy implementation. From 2011 to 2016, Grady reported between 12 and 30 violent crimes per year. In 2017 — the precise year Georgia implemented its campus carry law — the violent crimes reported by Grady dropped to exactly zero, where they remained through the end of the panel. The difference-in-differences estimator blindly absorbed this sudden disappearance of data at a single hospital and mechanically coded it as a massive, statewide reduction in violence attributable to the new law.

**Table 2: Grady Health's Share of the Treated Group Mean**

| Year | Treated Mean (all) | Treated Mean (no Grady) | Grady's Rate | Grady's Share |
|------|--------------------|--------------------------|--------------|---------------|
| 2011 | 2.39 | 0.556 | 200.0 | 76.7% |
| 2012 | 4.00 | 0.334 | 400.0 | 91.7% |
| 2013 | 4.84 | 0.567 | 466.7 | 88.3% |
| 2014 | 3.74 | 0.339 | 371.4 | 90.9% |
| 2015 | 4.29 | 0.362 | 428.6 | 91.6% |
| 2016 | 3.24 | 0.488 | 300.0 | 84.9% |
| 2017 | 0.433 | 0.437 | 0.0 | −0.9% |
| 2018 | 0.448 | 0.452 | 0.0 | −0.9% |

| Year | Treated Mean (all) | Treated Mean (no Grady) | Grady's Rate | Grady's Share |
|------|--------------------|-----------------------|--------------|---------------|
| 2019 | 0.483 | 0.488 | 0.0 | −0.9% |

*Negative values indicate Grady's zero rate pulls the group mean below the mean of remaining institutions.*

From 2011 to 2016, this single 60-student medical campus constitutes 77 to 92 percent of the entire treated group's mean violent crime rate. At the exact year of treatment, its contribution vanishes.

**Leave-One-Out Analysis.** I removed Grady Health — 14 observations out of 6,919, representing 0.2% of the dataset — and re-estimated every model:

**Table 3: Leave-One-Out Estimator Comparison**

| Estimator | With Grady | Without Grady | Collapse Factor |
|-----------|-----------|---------------|-----------------|
| C&S Overall ATT | −2.201* | **+0.051** (sign reversal) | — |
| TWFE Georgia | −9.298 | **+0.090** (sign reversal) | — |
| Event-study SE (t−5) | 1.295 | **0.372** | 3.5× |
| Event-study SE (t−4) | 2.217 | **0.064** | 34.8× |
| Event-study SE (t−3) | 1.037 | **0.349** | 3.0× |
| Event-study SE (t−2) | 1.735 | **0.053** | 33.0× |
| Event-study SE (t+0) | 4.039 | **0.130** | 31.0× |
| Event-study SE (t+1) | 4.037 | **0.073** | 55.7× |
| Event-study SE (t+2) | 4.059 | **0.083** | 48.8× |
| NegBin IRR | 1.123 (p = 0.081) | **1.152 (p = 0.005)** | — |

*\*The authors report a baseline C&S ATT of 0.01. The divergence between the standard C&S estimator applied to the raw data (−2.201) and the authors' published result further confirms that some undisclosed procedure neutralized Grady's influence before estimation.*

Removing one institution eliminates 99.7% of the treated group's variance (from 542.2 to 1.6; Appendix F, Script 05), flips the sign of the overall treatment effect, and collapses the event-study standard errors by 3 to 56 times — with the post-treatment periods (t+0 through t+2) collapsing by 31 to 56 times. The count-based model simultaneously becomes statistically significant at p = 0.005. Standard clustered standard errors further overstate the precision of these already-unreliable estimates (see Section IX.N for the Wild Cluster Bootstrap analysis confirming this overstatement).

**Non-Reproducibility and Methodological Opacity.** I attempted to reproduce the authors' state-specific estimates in Table 1 using the same publicly available CSS data. The paper describes these as "standard two-way fixed effects difference-in-differences models"

applied "for each state individually" (Kagawa et al., 2025, p. 3), but does not specify the unit of analysis, weighting scheme, or other choices sufficient to permit independent replication. I tested four standard TWFE specifications — institution-level and state-level aggregation, each with and without enrollment weighting — across both separate and pooled regressions. No single specification reproduces all three of the authors' published estimates:

**Table 4: Attempted Replication of Kagawa et al. (2025) Table 1**

| State | Kagawa et al. | Institution Unweighted | Institution Enrollment-Weighted | State-Level Unweighted | State-Level Enrollment-Weighted |
|---|---|---|---|---|---|
| AR | −0.15 | +0.005 | −0.056 | −0.001 | −0.053 |
| GA | −0.11 | **−9.298** | −0.100 | −0.066 | −0.121 |
| TX | −0.04 | −0.048 | +0.047 | +0.103 | +0.048 |

*Notes: All specifications use two-way fixed effects (unit and year) with state-clustered standard errors. Panel: 497 institutions (109 treated, 388 control), 14 years (2006–2019), constructed from the same publicly available CSS data. Results are substantively identical under pooled and separate specifications. The paper reports 430 institutions (106 treated, 324 control); minor sample differences cannot explain the 85-fold Georgia divergence.*

The paper's sensitivity analyses reference "using institutions as the unit of analysis," implying the primary model may have operated at the campus level. However, because federal Clery data reports student enrollment only at the institution level — not for individual campuses — calculating per-capita crime rates at the campus level requires an undisclosed formula to apportion students across sub-campus units. This hidden denominator allocation represents yet another layer of methodological opacity, and regardless of the aggregation level chosen, no standard specification successfully reproduces the authors' published estimates. Similarly, no specification comes close to reproducing the authors' Arkansas estimate of −0.15, confirming that the non-reproducibility extends beyond Georgia to the published table as a whole.

The Georgia estimate is the most diagnostic. Under the unweighted institution-level specification — the most literal implementation of "standard two-way fixed effects" — my replication produces a Georgia estimate of −9.298, not the −0.11 the authors report. This is not a rounding discrepancy; it is an 85-fold divergence. The only specification that approximates the authors' Georgia value is enrollment-weighted institution-level TWFE (−0.100), which gives each institution influence proportional to its student body, reducing Grady Health's 60-student contribution to near zero — because a 60-student campus receives 1/500th the weight of a 30,000-student university. No other standard specification matches Georgia within an order of magnitude.

Whatever undisclosed methodological choices produced Table 1 — whether enrollment weighting, an unreported level of aggregation, or some other adjustment — they had the

21

practical effect of neutralizing the single institution that dominates the treated group's variance. Enrollment weighting is a defensible analytical choice; indeed, the prior campus carry study on which the authors build met this standard with a single, clear disclosure: "All observations were weighted using college and university enrollments at the state level" (Gius, 2019, p. 5). The failures here are twofold. First, the authors' published state-specific estimates cannot be independently reproduced from their own public data under any standard TWFE specification, meaning their methods are insufficiently described for peer verification. Second, and more critically, the authors never identified Grady Health as an influential observation, never conducted leave-one-out diagnostics, and never disclosed that their Georgia estimate is sensitive to the effective neutralization of a single institution accounting for 77 to 92 percent of the treated group's mean violent crime rate. Their seven published sensitivity analyses — covariate inclusion, alternative estimators, outcome modifications, and differing control group definitions — address none of the vulnerabilities documented here. Removing Grady entirely reverses Georgia's sign to +0.090 (Table 3), yet the paper reports a stable −0.11 without acknowledging that this stability rests on whichever undisclosed procedure neutralized the most extreme observation in the dataset.

Responsible analytical practice requires explicit identification, disclosure, and sensitivity analysis of observations this influential (Belsley, Kuh & Welsch, 1980; *see also* Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd ed., 2011, emphasizing the need for robust sensitivity testing of key assumptions). A study whose flagship state-specific estimate swings from −9.3 to +0.09 depending on the inclusion of a single 60-student medical clinic has not demonstrated that its results reflect genuine policy effects rather than data artifacts. The authors performed none of the diagnostic steps that would distinguish between these interpretations. Because the authors' foundational estimates cannot be independently reproduced from public data using their described methods, the study fails to provide the transparent methodological basis required for independent scientific validation and reliable expert reliance.

**Clery Audit.** I traced UNITID 139746 across every CSS release from Crime2009 through Crime2020. Grady Health System Professional Schools was never merged with another institution, was never reclassified, was never absorbed by Augusta University or any other entity, and reports under the same UNITID with the same name and the same branch ("Main Campus") in every release. Its enrollment was stable throughout. The drop from 28 violent crimes in 2013 to exactly zero in 2017 has no identifiable administrative explanation in the CSS data. This is consistent with a change in local Clery reporting practices — such as a reassignment of reporting boundaries, outsourcing of campus security, or reclassification of incident types — but the CSS data provides no documentation of why. Even if an administrative reason for this drop exists — such as outsourced security or a Clery boundary reclassification — it proves the model's fatal flaw: it mechanically absorbed a local administrative paperwork change and falsely coded it as a statewide reduction in actual violence.

The statistical outcome of this nationwide panel is dictated almost entirely by the data anomalies of a single medical clinic. It is, in its entirety, the story of one hospital.

22

## D. Finding 2: Count-Model Sign Reversal — The Paper's Null Is an Artifact of Functional Form

The authors use a linear DiD model on count data where 22 to 35 percent of institution-years report zero violent crimes and the variance-to-mean ratio ranges from 8 to 15. Standard econometric practice dictates that such data requires a count-based estimator — Poisson Pseudo-Maximum Likelihood (PPML) or Negative Binomial — with institution and year fixed effects and log-enrollment as an exposure offset (Cameron & Trivedi, 2013, *Regression Analysis of Count Data*, 2nd ed., Cambridge University Press; Silva & Tenreyro, 2006, *Review of Economics and Statistics*).

When the appropriate count model is applied:

**Table 5: Count-Model Sign Reversal**

| Model | Coefficient | SE | p-value | IRR | Interpretation |
|---|---|---|---|---|---|
| Poisson PML (full sample) | +0.187 | 0.137 | 0.172 | 1.205 | +20.5% increase |
| NegBin (full sample) | +0.116 | 0.067 | 0.081 | 1.123 | +12.3% increase |
| NegBin (without Grady) | **+0.142** | **0.050** | **0.005** | **1.152** | **+15.2% increase** |

The sign reverses. The traditional linear TWFE model estimates a decrease in violence. The count model — which is the statistically appropriate estimator for zero-inflated, overdispersed count data — estimates an *increase*.

The Negative Binomial estimator is the mathematically correct model for this overdispersed count data. More sophisticated distributional approaches exist — zero-inflated Poisson, zero-inflated Negative Binomial, and hurdle models (Cameron & Trivedi, 2013, Ch. 4) — that decompose the excess zeros into structural and sampling components. However, these models address *distributional* misspecification, not *data integrity* failures. The underlying Clery Act data suffers from documented 15 to 30 percent error rates, jurisdictional boundary shifts, and the Grady Health anomaly documented in Section IX.C — systematic measurement corruption that no statistical model, however sophisticated, can correct (see Section X). The 15.2% increase mathematically proves that the authors' reported decrease is a phantom artifact of utilizing the wrong functional form on unreliable data. A dataset in which the removal of a single 60-student medical clinic — 0.2% of the sample — entirely flips the sign of the overarching treatment effect (Belsley, Kuh & Welsch, 1980, *Regression Diagnostics: Identifying Influential Data and Sources of Collinearity*, Wiley), and in which the choice between two standard statistical estimators reverses the

23

direction of the finding, cannot meet the baseline scientific threshold for reliability. It is a statistical artifact, not a stable correlation.

## E. Finding 3: Texas Treatment Timing Error — An Objective Factual Error

Texas Senate Bill 11 authorized campus carry at four-year institutions beginning August 1, 2016, and at two-year and junior colleges beginning August 1, 2017. The paper codes all 73 Texas institutions as treated from 2016. My analysis identifies 37 two-year institutions (sector code 4) that were coded with a treatment year one year too early — assigning pre-treatment observations to the post-treatment window (Appendix F, Script 01).

This is not a judgment call. It is an objective factual error in the coding of the independent variable, violating the standard under Federal Rule of Evidence 702(b) that expert testimony must be "based on sufficient facts or data."

This error is compounded by a second violation of the authors' own stated methodology. The paper specifies that a year is coded as post-treatment only if the policy was implemented "in the first six months" of that calendar year (Kagawa et al., 2025). Texas SB 11 took effect on August 1 — the eighth month. Under the authors' own coding rule, no Texas institution should have been classified as treated in 2016; treatment should begin in 2017 for four-year institutions. The paper nonetheless codes all 73 Texas institutions — the single largest treated state, comprising over half the treated sample — as treated from 2016. This means the entire Texas treatment window is shifted one year too early for four-year institutions (by the authors' own rule) and two years too early for two-year institutions (by both the statutory text and the authors' rule).

## F. Finding 4: Differential Institution Attrition

The paper reports removing 22 institutions with incomplete data. My reconstruction identifies 33 such institutions, with a striking asymmetry:

**Table 6: Differential Institution Attrition**

| Group | Dropped | Pre-Drop Total | Attrition Rate |
|-------|---------|----------------|----------------|
| Treated | 27 | 136 | 19.9% |
| Control | 6 | 394 | 1.5% |

Treated institutions are 13 times more likely to be dropped than controls (Appendix F, Script 01). Nearly all dropped treated institutions are from Georgia (18) and Texas (9) — the two largest treated states. If the dropped institutions differ systematically from those retained (as is likely, given that the reason for incomplete data is inconsistent federal reporting), the analysis suffers from severe survivorship bias.

## G. Finding 5: The Authors' Own Documented Limitations

The authors' own supplementary materials contain admissions that independently undermine the study's probative value. First, the Discussion section acknowledges that

24

"the policy changes considered are nuanced and likely constitute weak treatments" — an admission the study may lack statistical power to detect real effects even if they exist. Second, violence rates trended upward in treated states at $t$+3 (the final exposure period), and with covariates controlled, this increase was statistically significant at the 5% level (ATT = 0.04, 95% CI = 0.008–0.187; Kagawa et al., 2025, p. 5). Third, the Appendix reveals that burglary point estimates are in the wrong direction for the deterrence hypothesis: TWFE estimates +0.16, Wooldridge estimates +0.14 — suggesting campus carry may have *increased* property crime. Fourth, the Augmented Synthetic Control confidence interval for violent crime spans −0.365 to 0.187 — a range of 0.55 on a base rate of 0.58. This means the study cannot distinguish between a 63% protective effect and a 32% harmful effect. The model is statistically blind.

## H. Finding 6: Inappropriate Pooling of Medical Campuses

The dataset improperly retains specialized medical and military facilities whose structural security environments are incomparable to traditional university campuses. Healthcare facilities operate under fundamentally different violence-generating mechanisms than residential universities: the Occupational Safety and Health Administration has formally recognized healthcare settings as categorically high-risk environments where violence is driven by patient aggression, psychiatric emergencies, and emergency-department confrontations — not by the campus firearms-policy environment this study purports to measure (OSHA, 2015, *Workplace Violence in Healthcare: Understanding the Challenge*). Federal data confirm that healthcare workers experience workplace violence at rates 5–12 times higher than workers in other sectors (OSHA, 2015). These are not "outlier universities" — they are a different data-generating process entirely.

In addition to Grady Health (Section IX.C), the panel includes Southwest Collegiate Institute for the Deaf (Texas, historical enrollment fluctuating between 47 and 149, producing extreme per-capita variance) and New Mexico Military Institute (control, enrollment approximately 459–487, violent crime rate 34–43 per 1,000). Dividing facility-wide crime by a small student denominator produces explosive, meaningless per-capita rates. The Callaway & Sant'Anna (2021) estimator assumes that treatment and control units are drawn from the same population; pooling Level I trauma centers and 60-student medical clinics with 30,000-student residential universities without first identifying structurally incomparable institutions or applying common-support filtering violates this identifying assumption. Grady is not an isolated anomaly — it is a symptom of a systematic methodological failure to screen structurally heterogeneous units from the estimation sample.

## I. Finding 7: Treatment Group Artificially Restricted to Three States

At least four additional states meet the authors' stated criterion of moving from "explicitly prohibiting to explicitly allowing" campus carry during 2006–2019 through direct statutory action: Kansas (Personal and Family Protection Act exemption expired July 1, 2017), Idaho (SB 1254, effective July 1, 2014), Mississippi (HB 506, 2011), and Wisconsin (Act 35, 2011).

25

The authors cannot defend Idaho's or Mississippi's exclusion on enhanced-permit grounds: their own paper states that Arkansas also requires an enhanced permit. The omission of four functionally identical treatment states from a study with only three treated units more than doubles the treatment sample and fundamentally alters the statistical architecture.

## J. Finding 8: Treatment Group Artificially Restricted by Excluding Judicial Preemption

At least three additional states experienced legally binding transitions to campus carry during the study period via judicial preemption rather than direct statutory exemption: Colorado (2012 state Supreme Court ruling), Oregon (2011 Court of Appeals ruling), and Utah (2004/2006). Excluding every state that achieved campus carry through judicial preemption artificially restricts the treatment group from a potential 10 states to just 3, suppressing statistical power by more than two-thirds.

## K. Finding 9: Advocacy-Sourced Classification

The authors used Armedcampuses.org — a project of The Campaign to Keep Guns Off Campus and The Coalition to Stop Gun Violence — to classify control states. These are organizations engaged in policy advocacy, rather than objective forensic legal or statutory databases. The RAND State Firearm Law Database (Cherney, Morral, Schell, Smucker & Hoch, 2022) establishes the methodological standard for coding firearm policy variables: dual-coder agreement, primary statutory text review, transparent documentation, and version control. The authors used the RAND database for general firearm laws but deferred to an advocacy source for campus-specific classifications — the variable that defines their entire treatment assignment. Misclassification of treatment assignment in a DiD design biases estimates in unpredictable directions (Angrist & Pischke, 2009, *Mostly Harmless Econometrics*, Ch. 2). The failure to detect the transitions of Colorado and Oregon from prohibition to allowance is a direct consequence of importing unverified advocacy classifications rather than conducting primary statutory and case-law extraction.

## L. Finding 10: Pre-Treatment Parallel Trends Violated

The authors' own pre-treatment test reveals a statistically significant divergence at t−10 (0.14, 95% CI = 0.026–0.261), which they dismiss as "minimal." In fact, this divergence of 0.14 represents 24% of the sample's baseline violent crime rate (0.58 per 1,000), constitutes a medium effect size by conventional standards (Cohen's $d$ = 0.44; Cohen, 1988), and is fourteen times larger in magnitude than the authors' own estimated treatment effect of 0.01. Pre-treatment noise that dwarfs the purported signal is not "minimal" — it is a formal violation of the parallel trends assumption, the foundation of any DiD design. My leave-one-out analysis (Section IX.C) demonstrates that this t−10 violation is largely manufactured by Grady Health's aggravated assault spike in 2011–2012.

26

## M. Finding 11: Four Concurrent Measurement Shocks

(1) In 2014, the Clery Act adopted the FBI's revised UCR definition of rape (FBI, *Rape Addendum*, 2014), mechanically capturing up to 40% more sexual assaults previously excluded from statistics — inflating the primary outcome just prior to the 2016/2017 treatment dates. (2) In 2016, the DOE expanded Clery Act geographic reporting boundaries to include off-campus "public property" and "non-campus buildings," artificially inflating every institution's crime count the same year Texas received treatment; the DOE rescinded this expansion in 2020, acknowledging the distortion. (3) The #MeToo movement (October 2017) produced a documented 10% average increase in sex crime reporting (Levy & Mattsson, 2024), coinciding exactly with Arkansas and Georgia's treatment year. (4) In September 2017, Secretary DeVos rescinded the Obama-era Title IX "Dear Colleague" guidance (U.S. Department of Education, Office for Civil Rights, "Dear Colleague Letter," September 22, 2017), likely affecting treated (conservative) and control (liberal) states asymmetrically.

## N. Finding 12: Econometric Invalidity of N = 3 Inference

Conley & Taber (*Review of Economics and Statistics*, 2011) prove that standard DiD inference collapses with few treated groups: standard errors are severely biased downward and "point estimators of treatment effects should not be thought of as being consistent." Donald & Lang (*Review of Economics and Statistics*, 2007) establish that standard asymptotics provide a "remarkably poor approximation" with small treatment groups. MacKinnon & Webb (*The Econometrics Journal*, 2018) demonstrate that even the Wild Cluster Bootstrap fails with very few treated clusters. The literature consistently requires 15 to 42 balanced clusters for reliable DiD inference. Three treated states falls far below any published threshold.

**Wild Cluster Bootstrap results.** The paper clusters standard errors at the state level with G = 24, of which only 3 are treated. As surveyed by Cameron & Miller (*Journal of Human Resources*, 2015), cluster-robust variance estimators require G ≥ 42 for reliable size control. I implemented the Wild Cluster Bootstrap (WCB) with Webb (6-point) weights and B = 9,999 iterations using the validated `fwildclusterboot` package (Fischer & Roodman, 2021), following Cameron, Gelbach & Miller (*Review of Economics and Statistics*, 2008) (Appendix F, Script 06). Webb weights are required here because Rademacher (±1) weights with only 3 treated clusters cause the bootstrap distribution to collapse into just $2^3 = 8$ mass points, rendering the resulting p-values unreliable. The WCB reveals that the standard cluster-robust variance estimator produces unreliable p-values in both directions. Georgia's apparently overwhelming significance (CRV1 p ≈ 0.000) collapses to p = 0.063 under the bootstrap — no longer statistically significant at conventional levels. Texas remains deeply non-significant (CRV1 p = 0.351; WCB p = 0.546). Arkansas is similarly null (CRV1 p = 0.932; WCB p = 0.962). The pooled TWFE achieves bootstrap significance (CRV1 p = 0.355; WCB p = 0.031), but this pooled significance is entirely a Grady artifact: removing a single institution eliminates it (WCB p = 0.768). The WCB thus

27

confirms the central finding of this report from an entirely independent inferential framework: the campus carry study's results are mechanically driven by one anomalous medical campus, and the authors' three-state design lacks the statistical power to detect any real effect even if one existed.

## X. THE CLERY ACT: WHY CAMPUS CRIME DATA CANNOT SUPPORT RELIABLE STATISTICAL INFERENCE

The Clery Act requires postsecondary institutions to report annual campus crime statistics to the Department of Education. These data form the dependent variable for Study 4 — the foundation upon which the entire campus carry analysis rests. As I document in this section, the Clery Act data contains severe, systematic errors that undermine any statistical analysis that treats it as a reliable measure of actual crime.

**California State Auditor (Report 2024-032).** Five of six institutions audited reported inaccurate Clery statistics (California State Auditor, *The Clery Act: Colleges and Universities Struggle to Accurately Report Campus Crime Data*, Report 2024-032, 2024). UC Santa Cruz underreported 33 crimes (a 15% error rate — the campus appears safer than it is). Mount Saint Mary's University overreported 16 crimes (a 30% error rate — the campus appears more dangerous than it is). Over the past 21 years, 41 institutions have been found noncompliant with Clery reporting requirements (U.S. Department of Education, Federal Student Aid, Clery Act Enforcement Actions). In 2024, Liberty University was fined $14 million for systematic Clery violations (U.S. Department of Education, Final Program Review Determination, March 2024).

**Jurisdictional boundary shifts.** In 2016, the DOE expanded the geographic reporting boundary to approximately a 1-mile radius (U.S. Department of Education, Office of Postsecondary Education, *The Handbook for Campus Safety and Security Reporting*, 2016 ed.). In 2020, it retracted the boundary to "immediately adjacent" public property (34 CFR § 668.46, as amended by Final Rule, 85 Fed. Reg. 30026, May 19, 2020). Crime counts were mechanically inflated and then deflated independent of any change in actual criminal behavior. Any researcher analyzing 2015–2023 trends is analyzing a dataset where the measurement zone changed underneath the data.

**Symmetry.** These systematic measurement errors affect all downstream inference equally — not only causal inference but also the descriptive statistics and correlations upon which any claimed association rests. A dataset with documented 15 to 30 percent error rates cannot support a reliable finding of correlation in either direction (Hausman, 2001, *Journal of Economic Perspectives*, 15(4), 57–67; *Reference Manual on Scientific Evidence*, 3rd ed., 2011, Ch. 6). The null finding reported in Section IX.A is undermined by the same measurement error. Neither side can extract a reliable statistical signal from this dataset — including the present author.

# XI. THE DEFINITION PROBLEM: FAILURE TO OPERATIONALIZE KEY VARIABLES

The competing databases cited across this literature employ fundamentally incompatible definitions of the key outcome variables.

The FBI's definition of "active shooting" requires no fatality minimum and excludes gang violence (Blair & Schweit, 2014, *A Study of Active Shooter Incidents, 2000–2013*, Texas State University/FBI). The Gun Violence Archive defines "mass shooting" as 4 or more shot, including all contexts (Gun Violence Archive, "General Methodology"). Mother Jones requires 3 or more killed, public venues only (Follman, Aronsen & Pan, "A Guide to Mass Shootings in America," *Mother Jones*). The Crime Prevention Research Center restricts to public mass shootings (Lott, 2018). The Violence Project requires 4 or more murdered, excluding gang, robbery, and domestic contexts (Peterson & Densley, 2021, *The Violence Project*, Abrams Press). The NYPD database covers only 2014–2016 (NYPD, 2016, *Active Shooter: Recommendations and Analysis for Risk Mitigation*); the Secret Service covers only 2017–2019 (U.S. Secret Service, National Threat Assessment Center, 2020, *Mass Attacks in Public Spaces — 2019*, DHS).

The result of these incompatible definitions is dramatic: the proportion of shootings occurring in gun-free or gun-restricted zones ranges from approximately 10% to over 90%, depending entirely on which database and definition is applied. Study 3's merged case sample is an undefined, non-replicable intersection of these incompatible criteria.

Dr. Reeping's declaration never defines "mass shooting," "active shooting," or "violent act with a gun" — terms used interchangeably throughout without operationalization. Independent researchers cannot independently verify inclusion or exclusion criteria. Without operationalized definitions, the methodology cannot be independently verified or replicated, violating the core standards for empirical research articulated in the FJC Reference Manual.

When the key variables lack stable, operationalized definitions, no statistical association computed from them can be meaningfully interpreted (Shadish, Cook & Campbell, 2002, Ch. 3). A "correlation" between an undefined exposure and an unreliably measured outcome is scientifically vacuous.

## XII. "FOUR STUDIES AGREE" IS NOT PROOF — THEY SHARE SIMILAR STRUCTURAL VULNERABILITIES

The declaration implicitly invites the inference that because four studies point in the same direction, the evidence must be reliable. This inference is methodologically unsound.

**The thermometer analogy.** Four thermometers placed in direct sunlight all agree on the temperature — because they share similar structural vulnerabilities (solar radiation), not because they accurately measure the ambient air temperature. In econometrics, this is known as correlated measurement error (Bound, Brown & Mathiowetz, 2001, *Handbook of Econometrics*, Vol. 5, Ch. 59). Agreement among instruments that share a common source of systematic error is evidence of the error, not evidence of accuracy.

**Shared confounding.** The four studies share a common inability to isolate the statutory gun-free zone designation from the physical security infrastructure through which the designated places are independently secured. Studies 1–3 cannot separate the gun-free zone designation from point-source deterrents at the locations being compared — school fences and guards, bar bouncers and pat-downs, courthouse magnetometers and armed marshals. Study 4 cannot separate the campus carry policy from the time-varying security investments universities made in direct response to it. None of the four studies successfully isolates the gun-free zone designation from the physical security infrastructure, meaning none can establish a valid, independent correlation. What they measure, to the extent they measure anything, is the association between intensive physical security and reduced violence — not between gun-free zone designation and reduced violence.

**Shared measurement limitation.** The three cross-sectional studies (Studies 1–3) all rely on police-reported crime data. Acoustic sensor evidence demonstrates that only 12% of gunfire incidents result in a 911 call (Carr & Doleac, 2016), and an even smaller fraction (2 to 7%) results in a documented police report for assault with a dangerous weapon. Study 2 additionally relies on the Gun Violence Archive, which independent validation shows misses 26.5% of emergency-department-presenting gunshot injuries (Anchan et al., *JAMA Network Open*, 2025) with systematic bias toward dramatic incidents. Study 4 relies on Clery Act data with documented 15 to 30 percent error rates (California State Auditor, Report 2024-032; see Section X). The entire portfolio rests on outcome variables that systematically miss the majority of the events they purport to measure. When the outcome data systematically misses 12 to 88 percent of the events it purports to capture, the correlations computed from those data are scientifically unreliable.

**Programmatic bias.** These are not four independent validations by the scientific community. Dr. Paul Reeping is an author on all four studies. Studies 1 and 3 share additional co-authors (Gobaud, Morrison, Branas). The four papers were generated by an overlapping team of researchers applying the same fragile spatial and temporal assumptions across different datasets. Empirical analysis of replication patterns confirms that self-replications by overlapping research teams succeed at significantly higher rates

than independent replications, reflecting shared analytical assumptions rather than genuine evidential convergence (Makel, Plucker & Hegarty, *Perspectives on Psychological Science*, 2012). Their agreement reflects the consistency of a shared analytical approach, not an independent scientific consensus.

## XIII. CONCLUSION

The methodological defects identified in this report are not limited to the question of whether these studies prove causation. They strike at the more fundamental question of whether the studies establish a reliable statistical correlation.

When the statistical association vanishes under an equally defensible geographic boundary (Study 1); when it is non-significant in every sensitivity analysis the authors themselves conducted (Study 2); when it is mechanically inflated by asymmetric measurement of the exposure variable and degraded to the null boundary by as few as six to nine misclassifications (Study 3); and when there is no statistically significant association to explain in the first place, and the entire analytical framework collapses upon the removal of a single 60-student medical clinic (Study 4) — the cited literature cannot establish that a reliable correlation exists between gun-free zones and reduced firearm violence, let alone that the former causes the latter.

My independent replication of Study 4 — the strongest design in the portfolio — reveals that the study's apparent null result is itself an artifact. A single institution, Grady Health System Professional Schools, constitutes 77 to 92 percent of the treated group's mean violent crime rate during the pre-treatment period, then drops to exactly zero at the precise year of treatment. Removing this institution from the panel of 497 flips the sign of the treatment effect, collapses the event-study standard errors by 3 to 56 times, and causes the Negative Binomial count model to estimate a statistically significant 15.2% increase in violent crime ($p = 0.005$; Appendix F, Scripts 04–05). The statistical outcome of this nationwide panel is dictated almost entirely by the data anomalies of a single medical clinic. It is, in its entirety, the story of one hospital.

The critical methodological defects identified in this report include:

1. **Map-drawing artifact** (Study 1): the statistically significant result vanishes under the primary, legally accurate geographic boundary — the observed correlation is a geographic artifact.
2. **Specification fragility** (Study 2): the headline correlation ($p = 0.049$) is non-significant in every sensitivity analysis the authors conducted — the correlation fails every robustness test.
3. **Differential information bias** (Study 3): cases and controls are classified via fundamentally different methods (53% news vs. 43% phone), and 6 to 9 misclassifications are sufficient to degrade the statistical significance to the null boundary — the observed association is mechanically inflated.
4. **Single-institution domination** (Study 4): a 60-student medical campus accounts for 77–92% of the treated group mean; its removal flips the sign of the overall TWFE treatment effects and eliminates the only statistically significant Wild Cluster Bootstrap finding (pooled TWFE WCB $p = 0.031 \rightarrow p = 0.768$ without Grady).
5. **Non-reproducibility** (Study 4): the authors' state-specific Table 1 estimates cannot be independently reproduced from their own public data under any standard TWFE

specification — institution-level or state-level, weighted or unweighted (Table 4) — meaning their methods are insufficiently described for peer verification.

6. **Count-model sign reversal** (Study 4): the statistically appropriate estimator reverses the direction of the treatment effect, demonstrating the linear model is an artifact of functional form.

7. **Treatment timing error** (Study 4): 37 of 73 Texas institutions are coded with the wrong treatment year — an objective factual error.

8. **Differential attrition** (Study 4): treated institutions are 13 times more likely to be dropped than controls.

9. **Authors' own documented limitations** (Study 4): the Augmented Synthetic Control confidence interval spans −0.365 to 0.187 — the model cannot distinguish a 63% protective effect from a 32% harmful effect; burglary point estimates run in the wrong direction for the deterrence hypothesis.

10. **Treatment group artificially restricted** (Study 4): at least 7 additional states with campus carry transitions were excluded, reducing treatment from 10 states to 3.

11. **Advocacy-sourced classification** (Study 4): policy coding derived from organizations engaged in policy advocacy rather than primary legal extraction.

12. **Parallel trends violated** (Study 4): the authors' own test shows a statistically significant pre-treatment divergence — a formal violation of the foundational DiD assumption, largely manufactured by the Grady Health outlier.

13. **Four concurrent measurement shocks** (Study 4): the 2014 UCR rape definition change, the 2016 DOE boundary expansion, the #MeToo reporting surge, and the Title IX enforcement reversal all coincide with treatment timing.

14. **Econometric invalidity of N = 3 inference** (Study 4): the literature requires 15–42 clusters; 3 treated states is severely underpowered.

15. **Null results under the authors' framework** (Study 4): under the authors' own specifications, no statistically significant association exists across four estimators. The one significant bootstrap result (pooled TWFE WCB p = 0.031) is a Grady artifact that vanishes upon standard leave-one-out sensitivity analysis.

16. **Inappropriate pooling of medical campuses** (Study 4): specialized facilities with incomparable security environments receive equal weight with traditional universities, producing meaningless per-capita rates.

17. **Unreliable outcome data** (all studies): Clery Act 15–30% error rates; ShotSpotter data shows only 12% of gunfire triggers a 911 call, and an even smaller fraction (2 to 7%) results in a documented police report; GVA misses 26.5% of gunshot injuries — data this unreliable cannot support reliable correlations.

18. **Programmatic bias** (all studies): all four studies share overlapping authorship; they are not independent scientific replications.

19. **Shared structural vulnerability** (all studies): none of the four isolates the gun-free zone law from the physical security infrastructure through which it is enforced.

20. **Failure to operationalize key variables** (all studies): the declaration never defines "mass shooting" or "active shooting," and competing databases produce wildly divergent statistics depending on which definition is applied.

The campus carry study produced null results across all four of the authors' own estimators. The RAND Corporation independently reached the same "inconclusive" conclusion.

The methodology across the four studies fails to meet the standards of reliable scientific inquiry outlined by the National Academies and the Federal Judicial Center — not only for causal inference, but for the more basic requirement of establishing a valid, reproducible statistical association.

---

*Note on replication and symmetry.* The fundamental unreliability of the underlying Clery Act data, combined with the absence of a comprehensive national database of gun-free zone boundaries (as RAND explicitly notes), prevents valid statistical inference by any researcher using currently available data — including the present author. I do not claim that gun-free zones are ineffective. I claim that the cited studies are incapable of telling us whether they are effective or not. Because the burden of demonstrating scientific reliability falls upon the proponent of the study, a dataset that is structurally incapable of yielding a reliable signal cannot be admitted as evidence.

---

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2026

/s/ _____

Ross Allen Andrew Larsen, Ph.D.

35

# REFERENCES

Anchan, S., et al. (2025). Assessing the Gun Violence Archive and public police data as comprehensive sources for gun violence. *JAMA Network Open*, 8(1), e2458054.

Angrist, J. D., & Pischke, J.-S. (2009). *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press.

Belsley, D. A., Kuh, E., & Welsch, R. E. (1980). *Regression Diagnostics: Identifying Influential Data and Sources of Collinearity*. Wiley.

ASIS International/SHRM. (2011). *Workplace Violence Prevention and Intervention Standard* (ASIS/SHRM WVPI.1-2011).

Blair, J. P., & Schweit, K. W. (2014). *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*. Texas State University/Federal Bureau of Investigation.

Bound, J., Brown, C., & Mathiowetz, N. (2001). Measurement error in survey data. In J. J. Heckman & E. Leamer (Eds.), *Handbook of Econometrics* (Vol. 5, Ch. 59). Elsevier.

California State Auditor. (2024). *The Clery Act: Colleges and Universities Struggle to Accurately Report Campus Crime Data* (Report 2024-032).

Callaway, B., & Sant'Anna, P. H. C. (2021). Difference-in-differences with multiple time periods. *Journal of Econometrics*, 225(2), 200–230.

Cameron, A. C., & Trivedi, P. K. (2013). *Regression Analysis of Count Data* (2nd ed.). Cambridge University Press.

Cameron, A. C., & Miller, D. L. (2015). A practitioner's guide to cluster-robust inference. *Journal of Human Resources*, 50(2), 317–372.

Cameron, A. C., Gelbach, J. B., & Miller, D. L. (2008). Bootstrap-based improvements for inference with clustered errors. *Review of Economics and Statistics*, 90(3), 414–427.

Carr, J. B., & Doleac, J. L. (2016). The geography, incidence, and underreporting of gun violence: New evidence using ShotSpotter data. Brookings Institution Research Paper.

Cherney, S., Morral, A. R., Schell, T. L., Smucker, S., & Hoch, E. (2022). *Development of the RAND State Firearm Law Database and Supporting Materials*. RAND Corporation.

Clarke, R. V. (1995). Situational crime prevention. In M. Tonry & D. P. Farrington (Eds.), *Building a Safer Society: Strategic Approaches to Crime Prevention* (pp. 91–150). University of Chicago Press.

Cohen, J. (1988). *Statistical Power Analysis for the Behavioral Sciences* (2nd ed.). Lawrence Erlbaum Associates.

Conley, T. G., & Taber, C. R. (2011). Inference with "difference in differences" with a small number of policy changes. *Review of Economics and Statistics*, 93(1), 113–125.

Donald, S. G., & Lang, K. (2007). Inference with difference-in-differences and other panel data. *Review of Economics and Statistics*, 89(2), 221–233.

Federal Bureau of Investigation. (2014). *Rape Addendum: UCR Summary Reporting System*. U.S. Department of Justice.

Federal Judicial Center. (2011). *Reference Manual on Scientific Evidence* (3rd ed.). National Academies Press.

Fischer, A., & Roodman, D. (2021). fwildclusterboot: Fast wild cluster bootstrap inference for linear regression models. R package.

Follman, M., Aronsen, G., & Pan, D. (continuously updated). A guide to mass shootings in America. *Mother Jones*.

Gobaud, A. N., Mehranbod, C. A., Kaufman, E., Jay, J., Beard, J. H., Jacoby, S. F., Branas, C. C., Bushover, B., & Morrison, C. N. (2023). Assessing the Gun Violence Archive as an epidemiologic data source for community firearm violence in 4 US cities. *JAMA Network Open*, 6(6), e2316545.

Graham, K., & Homel, R. (2008). *Raising the Bar: Preventing Aggression in and Around Bars, Pubs and Clubs*. Willan Publishing.

Greenland, S. (1980). The effect of misclassification in the presence of covariates. *American Journal of Epidemiology*, 112(4), 564–569.

Greenland, S., Mansournia, M. A., & Altman, D. G. (2016). Sparse data bias: A problem hiding in plain sight. *BMJ*, 352, i1981.

Groves, R. M., Fowler, F. J., Couper, M. P., Lepkowski, J. M., Singer, E., & Tourangeau, R. (2009). *Survey Methodology* (2nd ed.). Wiley.

Gun Violence Archive. (n.d.). General methodology. https://www.gunviolencearchive.org/methodology

Gius, M. (2019). Campus crime and concealed carry laws: Is arming students the answer? *Social Science Journal*, 56(1), 3–9.

Hausman, J. (2001). Mismeasured variables in econometric analysis: Problems from the right and problems from the left. *Journal of Economic Perspectives*, 15(4), 57–67.

Ioannidis, J. P. A. (2005). Why most published research findings are false. *PLoS Medicine*, 2(8), e124.

Kagawa, R. M. C., Reeping, P. M., & Laqueur, H. S. (2025). Effects of implementing permissive campus carry laws on rates of major violence at public colleges and universities. *Injury Epidemiology*, 12, 14.

King, G., & Zeng, L. (2001). Logistic regression in rare events data. *Political Analysis*, 9(2), 137–163.

37

Leamer, E. E. (1983). Let's take the con out of econometrics. *American Economic Review*, 73(1), 31–43.

Levy, R., & Mattsson, M. (2024). The effects of social movements: Evidence from #MeToo. Foerder Institute for Economic Research Discussion Paper 8-2024, Tel Aviv University.

Lott, J. R. (2018). Comparing the global rate of mass public shootings to the U.S.'s rate and how mass public shootings are defined. Crime Prevention Research Center.

MacKinnon, J. G., & Webb, M. D. (2018). The wild bootstrap for few (treated) clusters. *The Econometrics Journal*, 21(2), 114–135.

Makel, M. C., Plucker, J. A., & Hegarty, B. (2012). Replications in psychology research: How often do they really occur? *Perspectives on Psychological Science*, 7(6), 537–542.

National Center for Education Statistics. (2023). *Indicators of School Crime and Safety*. U.S. Department of Education.

New York City Police Department. (2016). *Active Shooter: Recommendations and Analysis for Risk Mitigation*.

Occupational Safety and Health Administration. (2015). *Workplace Violence in Healthcare: Understanding the Challenge*. U.S. Department of Labor.

Occupational Safety and Health Administration. (2016). *Guidelines for Preventing Workplace Violence for Healthcare and Social Service Workers*. U.S. Department of Labor.

Openshaw, S. (1984). *The Modifiable Areal Unit Problem*. Geo Books.

Peterson, J., & Densley, J. (2021). *The Violence Project: How to Stop a Mass Shooting Epidemic*. Abrams Press.

RAND Corporation. (2020). The effects of gun-free zones. In *Gun Policy in America*. https://www.rand.org/research/gun-policy/analysis/gun-free-zones.html

Reeping, P. M., Gobaud, A. N., Branas, C. C., & Rajan, S. (2023). Gun-free school zones and risk for firearm violence: A cross-sectional geospatial study in St. Louis. *Journal of Urban Health*, 100(6), 1118–1127.

Reeping, P. M., Laqueur, H. S., & Kagawa, R. M. C. (2025). Gun-free zones in alcohol-serving establishments and risk for firearm violence: A cross-sectional, geospatial study in Texas. *Journal of Urban Health*, 102(3), 618–626.

Reeping, P. M., Kagawa, R. M. C., Laqueur, H. S., & Branas, C. C. (2024). Gun-free zones and active shootings in the United States: A matched case-control study. *The Lancet Regional Health — Americas*, 37, 100837.

Rothman, K. J., Greenland, S., & Lash, T. L. (2008). *Modern Epidemiology* (3rd ed.). Lippincott Williams & Wilkins.

Sagan, C. (1980). *Cosmos*. Random House.

Shadish, W. R., Cook, T. D., & Campbell, D. T. (2002). *Experimental and Quasi-Experimental Designs for Generalized Causal Inference*. Houghton Mifflin.

Silva, J. M. C. S., & Tenreyro, S. (2006). The log of gravity. *Review of Economics and Statistics*, 88(4), 641–658.

U.S. Department of Education, Federal Student Aid. (various years). Clery Act enforcement actions.

U.S. Department of Labor. (1987). *Standard Industrial Classification Manual*.

U.S. Department of Education, Office for Civil Rights. (2017). Dear Colleague Letter (September 22, 2017).

U.S. Department of Education, Office of Postsecondary Education. (2016). *The Handbook for Campus Safety and Security Reporting* (2016 ed.).

U.S. Department of Education. (2020). Final Rule, 34 CFR § 668.46. 85 Fed. Reg. 30026 (May 19, 2020).

U.S. Department of Education. (2024). Final Program Review Determination, Liberty University (March 2024).

U.S. Secret Service, National Threat Assessment Center. (2020). *Mass Attacks in Public Spaces — 2019*. U.S. Department of Homeland Security.

## TABLES AND FIGURES

- **Table 1:** Study Deconstruction Summary (Section II)
- **Table 2:** Grady Health's Share of the Treated Group Mean (Section IX.C)
- **Table 3:** Leave-One-Out Estimator Comparison (Section IX.C)
- **Table 4:** Attempted Replication of Kagawa et al. (2025) Table 1 (Section IX.C)
- **Table 5:** Count-Model Sign Reversal (Section IX.D)
- **Table 6:** Differential Institution Attrition (Section IX.F)
- **Figure 1:** MAUP Zoning Effect — Tax-parcel boundary (null result) vs. centroid buffer (13.7% "reduction") (Section VI)

## APPENDICES

- **Appendix A:** Dr. Larsen's Curriculum Vitae
- **Appendix B:** Complete list of publications authored in the previous 10 years
- **Appendix C:** Complete list of all cases with trial or deposition testimony in the previous 4 years
- **Appendix D:** Statement of compensation ($500/hour)
- **Appendix E:** Comprehensive index of all facts, data, and materials considered in forming opinions
- **Appendix F:** Replication code and data files (R scripts and CSV datasets)