# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NEW YORK STATE RIFLE & PISTOL
ASSOCIATION, INC., ROBERT NASH, BRANDON
KOCH, THOMAS STIRNWEIS, WAYNE FRANCIS,
KHOURY PORTER, and SCOTT NOREN,

*Plaintiffs*,

    -against-                           Case No. 1:22-cv-00907 (MAD/PJE)

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,
RODNEY K. HARRISON, in his official capacity as
Commissioner of the Suffolk County Police Department
and Licensing Officer for Suffolk County, *and*
PATRICK J. RYDER, in his official capacity as Police
Commissioner of the Nassau County Police Department
and Licensing Officer for Nassau County,

*Defendants*.
-------------------------------------------------------------------X

**DECLARATION OF DR. PAUL REEPING**

I, Paul Reeping, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I have been asked to render an opinion by the Office of the Attorney General of New York on the effect of sensitive place laws and gun-free zones on gun violence and public safety in the United States.

2.      This declaration is based on my own personal knowledge, research, and experience. If I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**BACKGROUND AND QUALIFICATIONS**

3.      Since June 2024, I have served as the Director of Research for Vital City, NYC, a think-tank and journal dedicated to enhancing public safety in New York City and cities across the country. I have also served as an Associate Research Scientist at the Columbia Mailman School of Public Health in the Department of Epidemiology (2024-2025) and was a Postdoctoral Fellow at the Violence Prevention Research Program at UC Davis (2022-2024). I earned my Ph.D. in Epidemiology, with a focus in gun violence prevention, in May 2022, from the Columbia Mailman School of Public Health. Prior to this, I earned my M.S. in Epidemiology from the Harvard T.H. Chan School of Public Health in 2017, and I earned my B.S. in Microbiology from the University of Pittsburgh in 2012.

4.      I am a researcher specializing in the topic of gun violence prevention, an area that I have researched and written about for the past eleven years. My early research focused primarily on state policies and their impact on mass and school shootings. However, my most recent research has been focused specifically on sensitive place laws—also known as gun-free zones—including my dissertation, which was funded by the National Collaboration on Gun Violence Research (NCGVR) and the Arnold Foundation. I have served as the first or primary author on several empirical studies on the impact of sensitive place laws on gun violence and public safety and have been the contributing author on others. I was among the first researchers to publish empirical evidence on the effects of gun-free zones outside the campus carry literature. My subsequent work has examined sensitive-place firearm laws across a range of contexts, including active shooting incidents, gun-free school zones, restaurants and bars, and university environments.

5.      To date, I have authored 25 peer-reviewed publications on public safety, violence, and gun violence since 2019 that have been cited over 500 times by other researchers. This work

has appeared in journals widely regarded as leading outlets in medicine and criminology, including *The BMJ, JAMA Psychiatry, JAMA Surgery, Lancet Regional Health–Americas, Criminology & Public Policy, Injury Epidemiology, Preventive Medicine*, and the *Journal of Urban Health*. My research examining differences in gun violence mortality by urbanicity was cited in the U.S. Surgeon General's Advisory on Firearm Violence, issued by Surgeon General Dr. Vivek Murthy, which formally identified firearm violence as a public health crisis in the United States and by the National Academy of Medicine (NAM). In addition, my research on the impact of gun-free zones on active shootings in the United States was recognized by the National Research Conference for the Prevention of Firearm-Related Harms as one of the most influential gun violence prevention studies published in 2024. I have also presented my work on gun violence prevention in sixteen academic conferences.

6.      My research on gun violence prevention has been cited by numerous national and regional media outlets, including *The New York Times*, CNN, *The Hill*, *Forbes*, *Newsweek*, *Vox*, PBS, the *Los Angeles Times*, *The Philadelphia Inquirer*, *Scientific American*, *The Guardian*, and *USA Today*. I have also been interviewed by *The New York Times*, National Public Radio (NPR), and multiple local radio programs regarding my expertise in public safety and violence prevention. In my role as Research Director at Vital City, my work on public safety has been referenced in public statements and policy discussions by New York State and New York City officials.

7.      A true, correct, and current copy of my curriculum vitae is attached to this declaration as **Exhibit A.** All publications authored in the last 10 years are included in this document.

3

8.      This is the first case that I have served as an expert witness. I will also be providing expert insight and analysis related to sensitive place law and gun-free zones for Antonyuk v. James, No. 22 Civ. 986 (NDNY).

9.      The declaration provided herein was compiled and completed outside of my official duties for Vital City, NYC. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of Vital City, NYC or Columbia University, or any previous or current funders of my research.

10.     I have received compensation in the amount of $7,500 for my work on this declaration from the Office of Attorney General of New York. This is calculated at 30 hours of work, including relevant research time, billed at a rate of $250 per hour. The rate would be the same if I were called upon to provide a deposition or testimony.

## SUMMARY OF OPINION

11.     The empirical research examining gun-free zones and sensitive place firearm laws is relatively new and continues to develop. As a result, this declaration reviews in detail the available peer-reviewed empirical studies that have evaluated these policies across multiple settings, including national analyses of active shootings, university campus carry laws, gun-free school zones, and firearm restrictions in alcohol-serving establishments. Based on my review of this evidence and my professional expertise in firearm violence epidemiology, the available research does not support the claim that gun-free zones increase crime or firearm violence. To the contrary, multiple studies across distinct contexts find effects consistent with neutral or protective outcomes, and none provide empirical evidence that gun-free zones increase the likelihood of violence.

4

**BACKGROUND INFORMATION AND SUPPORTING DATA**

**I. Sensitive Places and Gun-Free Zones**

12.     Gun-free zones are locations in which the possession or carrying of firearms is restricted or prohibited by law. In the empirical public safety literature, gun-free zones are a form of location-based firearm regulation that limits where firearms may be carried, rather than who may possess them. Federal law also restricts firearm possession in a range of locations, including K-12 schools, certain federal facilities such as post offices and the United States Capitol, as well as secure areas of airports and aircraft, subject to statutory exceptions.[1] [2]

13.     States[3] and local governments have long enacted additional location-based firearm restrictions. These laws vary by jurisdiction but commonly prohibit or limit firearm carry in places such as government buildings, courthouses, police stations, detention and correctional facilities, bars and other alcohol-serving establishments, childcare facilities, hospitals, sports arenas, and other venues characterized by high population density or heightened security concerns.[4] Some jurisdictions extend these restrictions to areas surrounding schools and to other locations where children or large groups of people are likely to be present, such as playgrounds, libraries, public housing developments, and recreational facilities.[5]

14.     In recent years, particularly following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, these location-based firearm restrictions have been commonly described as "sensitive place" laws. Sensitive place laws refer to statutes and

---

[1] 18 U.S.C. § 930 (2011), https://www.govinfo.gov/app/details/USCODE-2011-title18/USCODE-2011-title18-partI-chap44-sec930

[2] Giffords L. Ctr. to Prevent Gun Violence, *Location Restrictions*, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/location-restrictions/

[3] *Id.*

[4] Mo. Rev. Stat. § 571.107 (2013).

[5] D.C. Code § 22–4502.01 (2019).

regulations that prohibit or limit firearm carry in specific locations deemed to present heightened risks to public safety or to implicate distinct governmental interests. In the empirical research literature, however, these laws have historically been studied and described as "gun-free zones." Accordingly, much of the research cited in this declaration, and the terminology used throughout, employs the term "gun-free zones" to describe what are now commonly referred to as sensitive place laws.

15.     Gun-free zones and sensitive place restrictions may also be implemented by private entities. Private businesses, institutions, and venues frequently prohibit firearms on their premises through posted signage or internal policies, creating gun-free environments independent of state or local law. In both public and private settings, these restrictions are often accompanied by additional security measures, including controlled entry points, metal detectors, bag checks, and on-site security personnel.[6]

16.     From an empirical standpoint, gun-free zones and sensitive place laws are best understood as place-based firearm regulations that affect the spatial distribution of firearms in public settings. Research evaluating their public safety implications therefore examines outcomes within restricted locations and surrounding areas rather than changes in overall firearm ownership or statewide crime rates.

## II. Theoretical Mechanisms Underlying Gun-Free Zone and Sensitive Place Laws

17.     From a theoretical perspective, gun-free zones and sensitive place laws have the potential to either increase or decrease the risk of firearm violence within the locations to which

---

[6] Rand Corp., *The Effects of Gun-Free Zones* (2024), https://www.rand.org/research/gun-policy/analysis/gun-free-zones.html

they apply. The direction and magnitude of the effect depends on which underlying mechanisms dominate in practice.

18.    One commonly articulated mechanism through which gun-free zones may reduce firearm violence is by limiting the presence of firearms in a given location. By eliminating or reducing the number of guns present, the risk of firearm-related harm may be reduced through multiple pathways, including a lower likelihood of firearms being used during criminal activity, fewer disputes escalating unexpectedly into shootings, and a reduced risk of unintentional or negligent firearm discharge. These mechanisms are particularly relevant in environments characterized by high population density, alcohol consumption, or frequent interpersonal interactions.[7]

19.    At the same time, gun-free zones have also been theorized to increase risk under certain conditions. This argument rests on the assumption that individuals intent on committing violent acts may be less likely to comply with firearm restrictions, while others who are "law abiding" in the location may be disarmed as a result of the policy. Under this theory, a potential offender may perceive gun-free zones as locations with a lower likelihood of armed resistance, which could, theoretically, increase the attractiveness of such locations for firearm-related violence.[8]

20.    These competing theoretical perspectives underscore why the public safety effects of gun-free zones and sensitive place laws cannot be assumed a priori. Whether such laws are associated with reductions, increases, or no change in firearm violence is ultimately an empirical

---

[7] *Id.*
[8] *Id.*

question, one that has been examined across a range of settings and outcomes in the research literature.

### III. Gun-free Zones and Their Impact on Mass and Active Shootings

21.    Prior commentary has reported that anywhere from approximately 16 percent[9] to more than 90 percent[10] of mass shootings occur in gun-free zones, depending on how incidents and locations are defined. However, these figures are not informative about the effect of gun-free zones because they are based solely on counts of incidents and do not incorporate a comparison group. Without knowing the prevalence of gun-free zones among comparable locations where shootings did not occur, such percentages cannot indicate whether gun-free zones attract, repel, or are unrelated to the risk of active or mass shootings. These descriptive commentaries also varied widely in outcome definitions, classification of gun-free status, and inclusion criteria, and did not adjust for differences in establishment type, geography, or local firearm policy environments. Most importantly, they did not include a counterfactual, or comparable locations where shootings could have occurred but did not occur.

22.    To address these limitations, I conducted one of the only studies to date that examined the impact of gun-free zones on active shootings.[11] This was a nationwide, matched case-control study examining the association between gun-free zones and active shootings at the

---

[9] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (Prometheus Books 2016).

[10] John R. Lott, Jr., *Mass Public Shootings Keep Occurring in Gun-Free Zones: 94% of Attacks Since 1950* (Crime Prevention Research Ctr. June 2018), https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/

[11] Although public attention often focuses on mass shootings, limiting analyses to completed mass shootings would introduce selection bias. If gun-free zones were more likely to experience completed attacks while gun-allowing locations were more likely to see attempted attacks interrupted by defensive firearm use, analyses restricted to mass shootings would overstate risk in gun-free zones. For this reason, active shootings, which include both completed and attempted mass shootings, provide a more appropriate outcome for evaluating the relationship between gun-free zones and firearm violence and were therefore used in this analysis.

level of individual establishments.[12] In this analysis, cases were defined as establishments in the United States where an active shooting occurred between 2014 and 2020. Controls were establishments of the same type, located in the same county and year, where an active shooting did not occur but plausibly could have occurred. This design allowed for direct comparison between shooting and non-shooting locations while holding constant key confounders, including local firearm policy environments and establishment characteristics.

23.    Gun-free status was determined using a standardized protocol applied identically to cases and controls, incorporating statutory restrictions, posted signage, media reporting, and direct verification. Conditional logistic regression was used to estimate the association between gun-free status and the odds of an active shooting, accounting for the matched design. Sensitivity analyses examined potential misclassification of gun-free status and adjustment for proximity to law enforcement facilities.[13]

24.    By explicitly incorporating a comparison group and accounting for confounding by location type and geography, this approach directly addresses the principal methodological shortcomings of earlier descriptive commentaries. It allows for an assessment of whether gun-free zones are more or less likely to experience active shootings relative to comparable gun-allowing locations, rather than relying on raw counts or proportions of incidents alone.

25.    In the matched case-control analysis, establishments that were classified as gun-free were less likely to experience an active shooting than comparable establishments that permitted firearm carry. After matching on establishment type, county, and year, gun-free

---

[12] Paul M. Reeping et al., *Gun-Free Zones and Active Shootings in the United States: A Matched Case-Control Study*, 37 Lancet Reg'l Health–Am. 100837 (2024).
[13] *Id.*

locations had significantly lower odds of being the site of an active shooting relative to gun-allowing locations.[14]

26.     These findings were robust across multiple sensitivity analyses. Results did not meaningfully change when alternative classifications of gun-free status were used, when locations with potential ambiguity in firearm policy were excluded, or when proximity to law enforcement facilities was accounted for. There was no evidence that gun-free zones were systematically targeted for active shootings relative to similar locations where firearms were permitted. ***The results are inconsistent with the claim that gun-free zones attract active shooters. Instead, the evidence suggests that gun-free zones are associated with a reduced likelihood of active shootings when compared to otherwise similar locations.[15]***

## IV. Campus Carry and its impact on Public Safety

27.     Two studies have examined firearm restrictions in university settings through the implementation of campus carry laws. Campus carry laws refer to state statutes or regulations that permit individuals to carry firearms on public college and university campuses, thereby altering whether these campuses function as gun-free zones. Because colleges and universities are densely populated environments with frequent interpersonal interaction, campus carry laws represent a specific and analytically useful application of sensitive place regulation. Both studies evaluate the same underlying statutory change, with the more recent study conducted by a research team that updated the methods to address limitations identified in the earlier analysis.

28.     In the first university study, Gius examined whether state laws permitting concealed carry of firearms on public college and university campuses were associated with changes in

---

[14] *Id.*
[15] *Id.*

campus crime.[16] Using state-level panel data from all 50 states from 2005 to 2014, the study aggregated Clery Act–reported institution-level crime data to the state level and analyzed campus violent and property crime rates standardized by enrollment.

29.     State fixed-effects regression models were estimated with controls for demographic, socioeconomic, and policy factors, including general population concealed carry laws, population age structure, alcohol consumption, unemployment, population density, and baseline violent crime rates. Models were weighted by enrollment and included additional robustness checks.[17]

30.     The study found no statistically significant association between campus carry laws and campus violent crime, overall campus crime, or campus property crime. Although unpermitted concealed carry laws for the general population were associated with lower campus property crime rates, they were not associated with reductions in violent crime. Overall, the findings did not support the conclusion that allowing concealed carry on college campuses reduces campus crime.[18]

31.     The second study on campus carry laws addresses several methodological limitations present in prior analyses.[19] Unlike earlier work that relied on state-level aggregation, this study used institution-level data, which allows for a more precise assessment of changes in crime at individual colleges and universities. The study also employed a difference-in-differences framework with an explicit comparison group, comparing changes in crime at institutions in states that adopted permissive campus carry laws to changes at institutions in states that consistently

---

[16] Mark Gius, *Campus Crime and Concealed Carry Laws: Is Arming Students the Answer?*, 56 Social Science Journal 3 (2019).

[17] *Id.*

[18] *Id.*

[19] R. M. C. Kagawa, Paul M. Reeping & H. S. Laqueur, *Effects of Implementing Permissive Campus Carry Laws on Rates of Major Violence at Public Colleges and Universities*, 12 Injury Epidemiology 14 (2025), https://doi.org/10.1186/s40621-025-00566-0.

prohibited firearms on campus. In addition, treatment states were defined narrowly to include only those that implemented clear statutory changes that meaningfully expanded firearm carrying on campus. These design choices improve the ability to isolate the association between campus carry laws and campus crime.

32.    The analysis included public colleges and universities with on-campus housing in 24 states from 2006 through 2019. Three states, Arkansas, Georgia, and Texas, were classified as having adopted permissive campus carry laws during the study period, affecting a total of 106 institutions. Control institutions consisted of 324 public colleges in 21 states that prohibited firearm carrying on campus throughout the study period. Crime outcomes were measured using Clery Act data and included rates of major violent crime, defined as murder, rape, robbery, and aggravated assault, as well as rates of burglary. All outcomes were standardized by student enrollment.[20]

33.    The authors estimated difference-in-differences models with institution and year fixed effects to compare changes in crime before and after policy implementation in treatment states relative to changes in control states. Additional analyses were conducted to account for staggered adoption of campus carry laws and to test the robustness of results under alternative model specifications and assumptions.[21]

34.    The study found no statistically significant association between permissive campus carry laws and changes in campus major violent crime rates or burglary rates. Estimated effects were small and imprecise, and confidence intervals included both modest increases and decreases in crime. State-specific analyses similarly found no statistically distinguishable effects in Arkansas, Georgia, or Texas. Results were consistent across multiple sensitivity analyses. ***Overall,***

---

[20] *Id.*
[21] *Id.*

***the findings do not support the conclusion that allowing firearms to be carried on college campuses either reduces or increases campus crime.[22]***

### V. Gun-Free School Zones and Crimes Committed with a Firearm

35.     Gun-free zones in schools[23] are among the most controversial applications of location-based firearm restrictions. At the same time, schools are widely regarded as one of the most sensitive environments for firearm regulation due to the presence of children, high population density during school hours, and limited civilian defensive gun use. Despite the prominence of policy debate, schools are difficult to study empirically because school shootings are relatively rare[24] and school grounds are almost universally gun-free for the general public,[25] limiting available counterfactuals.

36.     To address these challenges, I conducted a quantitative study examining whether gun-free school zones were associated with firearm crime in St. Louis, Missouri.[26] The study compared firearm crimes occurring within federally defined gun-free school zones to crimes occurring in immediately adjacent areas where firearm carrying was permitted. This design allowed each gun-free zone to be compared directly to its surrounding area, thereby controlling for neighborhood characteristics and broader crime conditions.

37.     The analysis used police-reported firearm crime data from 2019 and included all public and private pre-kindergarten through twelfth-grade schools in St. Louis City and County. Gun-free zones were defined using two approaches: a one-thousand-foot buffer from school

---

[22] *Id.*

[23] Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q) (1990).

[24] Paul M. Reeping et al., *State Firearm Laws, Gun Ownership, and K–12 School Shootings: Implications for School Safety*, 21 Journal of School Violence 132 (2022), https://doi.org/10.1080/15388220.2021.2018332.

[25] Gun-Free School Zones Act of 1990, *Supra* note 23.

[26] Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118 (2023).

property boundaries and a one-thousand-foot radius from school centroids. In both cases, each gun-free zone was paired with a surrounding gun-allowing area of comparable size. Statistical models accounted for pair-matching, area differences, street length as a proxy for population flow, and spatial correlation.

38.     In the primary analysis, firearm crime rates did not differ significantly between gun-free school zones and adjacent gun-allowing areas. In the secondary analysis, firearm crimes occurred at significantly lower rates within gun-free school zones, with approximately fourteen percent fewer firearm crimes compared to surrounding areas. Across analyses, there was no evidence that gun-free school zones experienced higher rates of firearm crime.[27] ***These findings do not support the claim that gun-free school zones are targeted for firearm violence and are consistent with the conclusion that such zones are no more dangerous, and in some analyses less dangerous, than immediately surrounding areas.***

## VI. Gun-Free Zones in Alcohol-Serving Establishments

39.     Only one study has examined the impact of gun-free zones on restaurants and bars. This study examined whether prohibiting firearm carry in alcohol-serving establishments was associated with firearm violence near those establishments.[28] The analysis focused on Texas's "51% law," which requires establishments deriving more than half of their revenue from alcohol sales to prohibit firearms and post a visible warning. Bars and similar venues represent a setting of particular public safety concern given the established relationship between alcohol consumption and violence.[29]

---

[27] *Id.*

[28] Paul M. Reeping, H. S. Laqueur & R. M. C. Kagawa, Gun-Free Zones in Alcohol-Serving Establishments and Risk for Firearm Violence: A Cross-Sectional, Geospatial Study in Texas, 102 J. Urban Health 618 (2025), https://doi.org/10.1007/s11524-024-00928-x.

[29] Kittisak V. Sontate et al., *Alcohol, Aggression, and Violence: From Public Health to Neuroscience*, 12 *Frontiers Psych.* 699726 (2021).

40.     Using geocoded data on bars and restaurants in Texas during 2021 and 2022, the study examined firearm shootings occurring within fifty meters of each establishment, with a secondary analysis using a one-hundred-meter buffer. Gun-free status was determined using administrative data from the Texas Alcoholic Beverage Commission. Models adjusted for establishment type, alcohol sales, nearby venue density, and census-tract-level characteristics associated with firearm violence.

41.     After adjustment, establishments required to prohibit firearms experienced significantly fewer shootings within fifty meters than establishments that allowed firearms, with approximately thirty-seven percent fewer shootings overall. This association was driven primarily by bars rather than restaurants. No significant association was observed at the one-hundred-meter distance, suggesting the effect was concentrated in the immediate vicinity of the establishment.[30] There was no evidence that gun-prohibited establishments experienced higher rates of firearm violence. ***These findings are consistent with the conclusion that firearm prohibitions in alcohol-serving establishments are associated with lower rates of nearby shootings***. Because the analysis was cross-sectional, the results cannot establish causality and may be specific to Texas and the study period.

## VII. Limitations in Research on Gun-Free Zones and Sensitive Places

42.     The empirical literature evaluating gun-free zones and sensitive place laws remains relatively new and is still developing.[31] Compared with other areas of firearm policy research, the number of peer-reviewed studies directly examining these policies is limited, and additional research is needed to further refine estimates and assess heterogeneity across settings.

---

[30] *Id.*

[31] Rand Corp., *The Effects of Gun-Free Zones, Supra* note 6.

43.    One reason this literature is relatively thin is that identifying appropriate counterfactuals for gun-free zones is methodologically challenging. Gun-free zones are not randomly assigned, and they are disproportionately located in public or high-density spaces that differ systematically from comparison locations. As a result, credible evaluation requires careful study design, strong comparison groups, and statistical modeling approaches capable of addressing selection and confounding. These requirements limit the number of studies that can be conducted rigorously, but they also increase confidence in the findings of those that meet these standards. Another important limitation often raised related to this research is that existing studies generally measure the presence of gun-free zone policies or designations, rather than the degree to which those policies are actively enforced.[32] A location designated as gun-free may vary widely in enforcement practices, ranging from signage alone to active security screening, monitoring, or metal detectors. As a result, current estimates likely reflect an average effect across locations with heterogeneous and often limited enforcement.[33] This limitation has important implications for interpretation. To the extent that active enforcement mechanisms reduce the likelihood of firearms being brought into a location, observed reductions in firearm violence associated with gun-free zones are likely conservative.[34] In other words, the estimated effects in the literature may understate the potential impact of gun-free zones if such policies were consistently and robustly enforced.

---

[32] Joshua E. Lane et al., *Active Shooters and Gun-Free Zones: Emotional Versus Legal Motivations*, 39 Lancet Reg'l Health–Am. 100928 (2024).

[33] Paul M. Reeping, Active Shooters and Gun-Free Zones: Emotional Versus Legal Motivations—Author's Reply, 39 Lancet Reg'l Health–Am. 100929 (2024).

[34] *Id.*

16

**CONCLUSIONS**

44.     The empirical evidence reviewed in this declaration evaluates gun-free zones and sensitive place laws across several policy contexts, including nationwide analyses of active shootings, campus carry laws in university settings, gun-free school zones, and firearm restrictions in alcohol-serving establishments.

45.     The national study of active shootings found that gun-free zones are associated with lower rates of active shooting incidents, providing evidence consistent with a protective effect rather than attraction.[35] Research on campus carry laws, which alter whether college campuses function as gun-free zones, finds no evidence that firearm prohibitions increase violent crime, and does not support claims that gun-free campus policies elevate risk.[36] [37] The study examining gun-free school zones similarly found no evidence that gun-free school zones result in more crimes committed with a firearm, and instead that they may be protective closest to the school.[38] Research on alcohol-serving establishments also found that prohibiting firearms in these venues is associated with reductions in shootings.[39]

46.     Although this research base is relatively new and continues to develop, the available empirical evidence does not support claims that gun-free zones or sensitive place laws increase crime or firearm violence. To the contrary, multiple studies across distinct settings find effects consistent with reductions in firearm violence. While further research is warranted to refine estimates and assess enforcement variation, based on the existing evidence and my

---

[35]  Reeping et al., *Gun-Free Zones and Active Shootings*, *supra* note 12.

[36] Gius, *Campus Crime and Concealed Carry Laws*, *supra* note 16.

[37] Kagawa, Reeping & Laqueur, *Effects of Implementing Permissive Campus Carry Laws*, *supra* note 19.

[38] Reeping et al., *Gun-Free School Zones in Saint Louis*, *supra* note 26.

[39] Reeping, Laqueur & Kagawa, *Gun-Free Zones in Alcohol-Serving Establishments*, *supra* note 28.

professional judgment, I do not find credible empirical support for the assertion that gun-free zones increase violence.

47.     The findings described in this declaration are consistent with a broader and well-established body of gun violence research. Across multiple domains of firearm-related harm, including interpersonal violence, mass shootings, suicide, and unintentional firearm injury, empirical studies have repeatedly shown that policies which make firearms more difficult to obtain, carry, or access are associated with lower rates of these outcomes.[40][41][42][43][44] This pattern has been observed across different study designs, populations, and policy contexts, including schools[45] and alcohol-serving establishments.[46] In light of this broader evidence base, it is not surprising that research on gun-free zones and sensitive place laws similarly suggests that locations with fewer firearms present are associated with lower rates of firearm violence. These findings align with the general principle, well supported in the public health literature, that reductions in firearm availability are associated with reductions in firearm-related harm.

**Dated:** February 5th, 2026, in New York City, New York

_____
PAUL REEPING

---

[40] Mark Duggan, *More Guns, More Crime*, 109 J. Pol. Econ. 1086 (2001).

[41] M. C. Monuteaux et al., *Firearm Ownership and Violent Crime in the United States: An Ecologic Study*, 49 Am. J. Preventive Med. 207 (2015).

[42] Sanjay Bangalore & Franz H. Messerli, *Gun Ownership and Firearm-Related Deaths*, 126 Am. J. Med. 873 (2013).

[43] Arthur L. Kellermann et al., *Suicide in the Home in Relation to Gun Ownership,* 327 New Eng. J. Med. 467 (1992).

[44] Arthur L. Kellermann et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New Eng. J. Med. 1084 (1993).

[45] Reeping et al., *State Firearm Laws, Gun Ownership, and K–12 School Shootings, supra* note 24.

[46] Charles C. Branas, Shen Han & Douglas J. Wiebe, *Alcohol Use and Firearm Violence,* 38 Epidemiologic Reviews 32 (2016).