UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ROBERT NASH, BRANDON KOCH, THOMAS STIRNWEIS, WAYNE FRANCIS, KHOURY PORTER, *and* SCOTT NOREN,

Plaintiffs,

-against-

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, RODNEY K. HARRISON, in his official capacity as Commissioner of the Suffolk County Police Department, and Licensing Officer for Suffolk County, *and* PATRICK J. RYDER, in his official capacity as Police Commissioner of the Nassau County Police Department, and Licensing Officer for Nassau County,

Defendants.

Case No. 1:22-cv-00907
(MAD/PJE)

---

**SUPERINTENDENT JAMES' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
New York State Attorney General
The Capitol
Albany, New York 12224-0341
Attorney for Superintendent James

Jennifer J. Corcoran, NDNY Bar Roll No. 508740
Molly Thomas-Jensen, NDNY Bar Roll No. 705119
James M. Thompson, NDNY Bar Roll No. 703513
Of counsel

May 27, 2026

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    New York Passes the CCIA to Bring Its Law Into Compliance with *Bruen* ................ 3

    B.    Plaintiffs Bring Suit, But Their Claims Shrink Over Time ......................................... 4

STANDARD OF REVIEW ..................................................................................................... 7

ARGUMENT ......................................................................................................................... 8

    I.    PLAINTIFFS ALLEGE ONLY A DISFAVORED FACIAL CHALLENGE ............. 8

        A.    Plaintiffs Seek Only Facial Relief And Abandoned Any As-Applied Claim ...... 8

        B.    Facial Challenges Are Disfavored And Require Plaintiffs To Prove That A Law Will Be Unconstitutional In All Applications ......................................... 10

    II.    THE SENSITIVE LOCATION LAWS ARE SUPPORTED BY AMERICAN LAW AND HISTORY ................................................................................. 11

        A.    Second Amendment Methodology ................................................................. 11

            1.    Plaintiffs' Insistence On Founding-Era Analogues Is Contrary To Law .. 11

            2.    Plaintiffs Ignore the Societal Problems and Technological Changes At Issue ...................................................................................... 13

            3.    Plaintiffs' Formulas for Ignoring History Are Contrary to Law ............... 14

            4.    Plaintiffs Mischaracterize the CCIA and the Legislative Intent Behind It ...................................................................................... 15

        B.    There Is No Second Amendment Right to Carry a Gun in a Place of Worship against the Will of the Congregation ................................................ 16

            1.    Plaintiff Francis Lacks Standing to Challenge the Place-of Worship Provision ..................................................................................... 16

            2.    Our Nation's Tradition of Firearm Regulation Does Not Include a Right to Bring Weapons into a Place of Worship Without the Congregation's Permission ........................................................................... 17

        C.    The Prohibition on Guns in Libraries, Playgrounds, Summer Camps, and Zoos Are Constitutional ...................................................................... 20

i

1.    Plaintiffs Lack Standing to Challenge These Laws ................................. 20

2.    The Supreme Court and Second Circuit Have Recognized a Well-established and Representative Tradition of Regulating Firearms in Spaces Frequented by Children ................................................. 21

D.    History Supports the Prohibition on Guns in Public Parks .............................. 23

E.    Guns May Constitutionally Be Prohibited In Places Selling Alcohol .............. 26

F.    It is Constitutional to Prohibit Guns In Performance, Gaming, And Sports Venues ......................................................................................... 29

G.    Guns Can Be Prohibited Near Permitted Public Events ................................... 33

H.    The Second Amendment Does Not Prohibit Regulation Of Guns In Government Administration Buildings ............................................................... 36

I.    It Is Constitutional To Keep Guns Out of Health Care Facilities ..................... 38

J.    Guns May Be Prohibited In DOH Residential Facilities ................................... 41

1.    Plaintiffs Lack Standing ........................................................................ 41

2.    History Supports Keeping Guns Out of DOH Residential Facilities ........ 42

K.    The Second Amendment Does Not Prohibit Regulation of Guns on Public Transit or in Airports ....................................................................................... 42

1.    Plaintiffs Lack Standing to Challenge the Prohibition on Guns in Public Transit and Airport Facilities ....................................................... 42

2.    The Second Circuit Had "No Trouble Holding" That Prohibiting Guns on Public Transportation is Constitutional ............................................... 44

L.    Guns May Constitutionally Be Kept Out of Times Square, "The Crossroads of the World" ................................................................................................... 47

1.    Plaintiffs Lack Standing ........................................................................ 47

2.    Times Square Is a Sensitive Location Because it is "Our Modern-day, Electrified, Supersized Equivalent of Fairs, Markets, and Town Squares of Old." ..................................................................................... 48

III.    THE AUTOMOBILE STORAGE LAW IS IN LINE WITH AMERICA'S HISTORY OF REGULATING WEAPON STORAGE ........................................... 49

A.    The Automobile Storage Law Does Not Infringe the Text of the Right to Keep and Bear Arms ........................................................................................ 50

ii

B.    History Supports Regulation for Safe Storage of Firearms ............................... 52

IV.    PLAINTIFFS' CHALLENGE TO THE PRIVATE PROPERTY PROTECTION
LAW IS MOOT ..................................................................................................... 55

V.    THE SENSITIVE PLACES STATUTE IS NOT VOID FOR VAGUENESS .......... 57

VI.    THE EXCEPTIONS FOR LAW ENFORCEMENT OFFICERS EASILY
SURVIVE RATIONAL BASIS REVIEW ................................................................ 58

CONCLUSION.................................................................................................................... 59

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Andrews v. State*, 50 Tenn. 165 (1871) ...................................................................................... 19

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) ........................................................ 55

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)................................................................. passim

*Aymonier v. United States*, 432 F. App'x 66 (3d Cir. 2011)......................................................... 25

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ............................................. 17

*Betancourt v. Bloomberg*, 448 F.3d 547 (2d Cir. 2006) ................................................................ 57

*Calce v. Tisch*, No. 25-861-cv, 2026 WL 980092 (2d Cir. Apr. 13, 2026) .................................. 51

*Carr v. State*, 34 Ark. 448 (1879) ................................................................................................ 47

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 8

*Christian Fellowship Centers of N.Y., Inc. v. Village of Canton*, 377 F.Supp.3d 146
 (N.D.N.Y. 2019) .......................................................................................................................... 8

*Christian v. James*, Nos. 24-2847; 25-384, 2026 WL 1378796 (2d Cir. May 18, 2026) ...... passim

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .......................................................................... 58

*Conn. Citizens Defense Lg., Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021)................................ 17, 56

*District of Columbia v. Heller*, 554 U.S. 570 (2008).................................................. 11, 12, 25, 36

*Doe v. Reed*, 561 U.S. 186 (2010) ................................................................................................. 9

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ......................................................................... 52

*English v. State*, 35 Tex. 473 (1872)....................................................................................... 19, 34

*Eslava v. State*, 49 Ala. 355 (1873) ............................................................................................. 47

*Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167 (2d Cir. 2006)................................................. 8, 9

*Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025)....................................................... passim

*Giambalvo v. Suffolk County*, 155 F.4th 163 (2d Cir. 2025) ................................................... 52, 56

*Goldstein v. Hochul*, 680 F.Supp.3d 370 (S.D.N.Y. 2023) .............................................. 17, 18, 19

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................................ 57

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ............................................................... 13

*Hill v. State*, 53 Ga. 472 (1874) ...................................................................... 19

*In re Brokamp*, 573 F.Supp.3d 696 (N.D.N.Y. 2021)............................................................ 8

*Janakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314 (2d Cir. 2020) .................. 56

*Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir. 1998)........................................................ 8

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)................................................... passim

*Koons v. Att'y Gen. New Jersey*, 156 F. 4th 210 (3d Cir. 2025)...................................... 37

*Koons v. Att'y Gen. New Jersey*, 162 F.4th 100 (3d Cir. 2025) ..................................... 38

*Koons v. Platkin*, 673 F. Supp.3d 515 (D.N.J. 2023)............................................ 35, 37

*Lane v. Cacace*, No. 22 Civ. 10980, 2025 WL 903766 (S.D.N.Y. Mar. 25, 2025)...................... 40

*Libertarian Party of Erie Cty. v. Cuomo*, 300 F.Supp.3d 424 (W.D.N.Y. 2018)...................... 8, 9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................... 16, 20, 56

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024)............................. 52

*Metz v. Astrue*, No. 06 Civ. 1509, 2010 WL 2243343 (N.D.N.Y. Apr. 21, 2010) ................... 9, 55

*Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024) ....................................... 4, 15, 21, 22

*N.Y. State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025)............................. 51

*Nastri v. Dykes*, 807 F. Supp. 3d 112 (D. Conn. 2025) ........................................ 24, 25

*Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025)........................... 14

*Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98 (2d Cir. 2025) .................... 10

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)................................................... 25

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ...................................................... 59

*NYSRPA v. Bruen*, 597 U.S. 1 (2022)...................................................... passim

*NYSRPA v. James*, No. 1:22-CV-907 (MAD/PJE), 2025 WL 553423
  (N.D.N.Y. Feb. 18, 2025) ................................................................. 5, 6, 56

*Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186 (6th Cir. 2024) ................ 51

*Owens v. State*, 3 Tex. Ct. App. 404 (Tex. Ct. App. 1878) ........................................................... 32

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) ........................................................... 48

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) ........................................................... 8

*Samia v. United States*, 599 U.S. 635 (2023) ........................................................... 12

*Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025) ........................................................... 44, 45

*Sibley v. Watches*, 460 F.Supp.3d 302 (W.D.N.Y. 2020) ........................................................... 9

*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976) ........................................................... 41

*Smith v. State*, 50 Tenn. 511 (1871) ........................................................... 47

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................................... 56

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................................................... 44

*Tann v. Bennett*, 807 F.3d 51 (2d Cir. 2015) ........................................................... 17

*Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007) ........................................................... 57

*United States v. Gomez*, 159 F.4th 172 (2d Cir. 2025) ........................................................... 13, 50, 51

*United States v. Rahimi*, 602 U.S. 680 (2024) ........................................................... passim

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................... 10

*United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025) ........................................................... 51, 52

*Vidal v. Elster*, 602 U.S. 286 (2024) ........................................................... 12

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ........................................................... 10

*We the Patriots, Inc. v. Grisham*, 119 F.4th 1253 (10th Cir. 2024) ........................................................... 56

*Wildlife Preserves, Inc. v. Romero*, 153 F.4th 192 (2d Cir. 2025) ........................................................... 8

*Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025) ........................................................... 14

**Statutes**

18 U.S.C. § 926B ........................................................... 59

N.Y. C.P.L. § 2.30 ........................................................... 59

vi

N.Y. Penal Law § 265.01-d .................................................................................... 4, 55

N.Y. Penal Law § 265.01-e................................................................................... passim

N.Y. Penal Law § 265.45..................................................................................... passim

N.Y. Penal Law § 400.00...................................................................................... 4

N.Y.C., N.Y. Admin. Code § 10-315 ...................................................................... 47

**Rules**

Fed. R. Civ. P. 56................................................................................................ 8

**Historical Sources**

1852 N.M. Laws 69 ............................................................................................ 27

1869 Tenn. Pub. Acts 23...................................................................................... 31

1870 Ga. Laws 421 ............................................................................................. 31

1874 Mo. Laws 50 .............................................................................................. 31

1883 Mo. Laws 76 .............................................................................................. 31

1889 Ariz. Sess. Laws 16...................................................................................... 31

1890 Okla. Stat. 496............................................................................................ 31

1919 Me. Laws 193.............................................................................................. 54

William Hand Browne, ed., *Proceedings and Acts of the General Assembly of Maryland*
(Maryland Historical Society 1883)...................................................................... 36

III Bernard Bush, *Laws of the Royal Colony of New Jersey 1746-1760* (New Jersey State Library
1980) ........................................................................................................... 27, 54

IX William Waller Hening, *The statutes at large: being a collection of all the laws of Virginia*
273................................................................................................................. 14

John L. Hopkins, Clifford Anderson &  Joseph R. Lamar, *Code of the State of Georgia* (Atlanta,
Foote & Davies Co. 1895) .................................................................................. 46

II George W. Paschal, *A Digest of the Laws of Texas* (W.H. & O.H. Morrison, 1873) ......... 22, 31

vii

2 Nathaniel B. Shurtleff, ed., *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston, William White 1853) ................................................................ 54

Acts and Laws of the English Colony of Rhode-Island (Newport, Samuel Hall 1767) ............... 53

*Acts and Laws Passed by the Great and General Court or Assembly of the Commonwealth of Massachusetts* (Benjamin Edes & Sons 1783) ......................................................... 53

An Act for the better Securing of the City of Philadelphia, from the Danger of Gun-Powder, 1725 Pa. Acts 33 ................................................................................... 54

*The Perpetual Laws of the State of New-Hampshire* (Portsmouth, John Melcher 1789) ............. 53

**Other Authorities**

About the Long Island Rail Road, https://www.mta.info/agency/long-island-rail-road .............. 45

CDC National Center for Health Statistics, *Stats of the States: Firearm Mortality* (Mar. 3, 2026) https://www.cdc.gov/nchs/state-stats/deaths/firearms.html ......................................... 3

Deborah Azrael & Susan T. Parker, *Trends in gun theft: Leveraging data to inform crime policy*, Council on Criminal Justice (June 2025) .................................................. 50

Katilin O'Shea, *How We Came to Play: The History of Playgrounds*, NAT'L TRUST FOR HISTORIC PRESERVATION (Aug. 15, 2013) ............................................................ 21

Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, 49 INFORMATION & CULTURE 2 (2014) ......... 21

Peter Gray, Autumn Erdahl Solomon, & Leah Tatgenhorst, *Public Libraries as Centers for Play: A Survey and Case Examples*, 14 AM. J. OF PLAY 2 (2022) ........................................ 22

Sponsor's Memo, N.Y. Senate Bill S51001 (2022) ........................................................ 4

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, respectfully submits this Memorandum of Law in opposition to the motion for summary judgment filed by Plaintiffs New York State Rifle & Pistol Association, Inc., Robert Nash, Brandon Koch, Thomas Stirnweis, Wayne Francis, Khoury Porter, and Scott Noren (collectively, the "Plaintiffs"), ECF No. 130, and in support of his motion for summary judgment, submitted contemporaneously herewith.

## PRELIMINARY STATEMENT

Plaintiffs, six individuals and the New York affiliate of the National Rifle Association, have challenged virtually the entirety of New York's Concealed Carry Improvement Act, based on their profound political disagreement with the law that the People's elected representatives passed.  But under the governing *Bruen/Rahimi* test, "[h]istory, not policy, is the proper guide." *United States v. Rahimi*, 602 U.S. 680, 717 (2024).  And each of the challenged laws is entirely "consistent with the principles that underpin our regulatory tradition."  *Id.* at 692.

The challenged sensitive locations laws fit into principles that the Second Circuit already derived from history, including the principle that firearms may be prohibited in "places frequented by vulnerable populations such as children*," Antonyuk v. James*, 120 F.4th 941, 1012-13 (2d Cir. 2024), and in "quintessentially crowded areas and public forums," *Id.* at 1019.  The Second Circuit expanded on the law and history regarding these traditions in its subsequent sensitive location cases, *Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025), and *Christian v. James*, Nos. 24-2847; 25-384, 2026 WL 1378796 (2d Cir. May 18, 2026), which upheld the bans on guns on public transportation, in Times Square, and in public parks—all provisions Plaintiffs are challenging here again.  Each of the sensitive locations discussed below is supported by expert testimony and citations to historical laws, not credibly rebutted by the Plaintiffs.

1

Plaintiffs' arguments center not on honoring history, but rather on ignoring it. Again and again, they argue that the history adduced by New York and its experts should not count—that the history is too old, too close to the Fourteenth Amendment rather than the Second, too municipal, too territorial, or subject to other arbitrary rules under which the choices of previous generations of Americans don't count. Instead, Plaintiffs say that the Court should reach its decision based on historical *silence*, assuming that if legislatures did not pass laws in the years immediately adjacent to the Second Amendment's enactment in 1791, it was based on a belief that such laws were unconstitutional. Accordingly, they seek a declaration of unconstitutionality any time there is a "lack of any Founding Era regulations." MSJ[1] at 18.

That is not the law – in fact, it is the vision of history that the Supreme Court rejected in *Rahimi* by an 8-to-1 margin, explaining that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." 602 U.S. at 691-92. Court after court has warned against "assum[ing] that founding-era legislatures maximally exercised their power to regulate," with Justice Barrett cautioning that Plaintiffs' "assumptions are flawed, and originalism does not require them." *Id.* at 739-40 (Barrett, J. concurring). Instead, the historical inquiry must be "calibrated to reveal something useful and transferable to the present day," not "so exacting as to be useless, a too-sensitive alarm that sounds whenever a regulation did not exist in an essentially identical form at the founding." *Id* at 702-03 (Sotomayor, J., concurring). Viewed through a test that honors history rather than ignores it, informed by the binding precedent from the Supreme Court and the Second Circuit, New York's sensitive location

---

[1] "MSJ" refers to the memorandum of law filed in support of Plaintiffs' Motion for Summary Judgment (ECF No. 130-2).

laws comfortably pass muster.

The same is true of New York's Automobile Storage Law, whose constitutionality is the major issue of first impression raised in this lawsuit.  The law should be upheld at the first step of the *Bruen*/*Rahimi* test, as it simply does not impact anyone's right to armed self-defense.  The storage law applies only when a weapon is left "out of such person's immediate possession or control inside a vehicle," N.Y. Penal Law § 265.45(2), meaning that it only applies when someone is *not* bearing arms.  And even if the law materially impacts armed defense, it is comfortably supported by history, as colonial and founding-era legislatures often regulated the storage of guns and gunpowder, not only to prevent fires, but to prevent theft as well.

**STATEMENT OF FACTS**[2]

New York State has the fourth-lowest gun death rate in the country. CDC National Center for Health Statistics, *Stats of the States: Firearm Mortality* (Mar. 3, 2026) https://www.cdc.gov/nchs/state-stats/deaths/firearms.html [https://perma.cc/JPJ3-U2AJ].  At 4.4 firearms deaths per 100,000 persons, New York is just behind the national leader (Hawai'i at 3.7), and far ahead of states with laxer gun laws, such as Alabama (23.7), Tennessee (19.8), or Mississippi (28 per 100,000, or nearly seven times New York's rate). *Id.* New York's gun laws, in particular its sensitive places and licensing laws, make this possible.

**A.      New York Passes the CCIA to Bring Its Law Into Compliance with *Bruen***

In June 2022, the Supreme Court held in *New York State Rifle & Pistol Association v. Bruen* that New York State's requirement of "proper cause" to carry a concealed firearm in public

---

[2] Plaintiffs include a "statement of material facts" in their memorandum of law that does not comply with Local Rule 56.1, insomuch as: (1) it is not separate; (2) it includes legal conclusions; and (3) it groups multiple material facts in each numbered paragraph. Defendant James does not respond to the defective statement of material facts in this brief, but rather in a separate response, which will accompany the separate statement of material facts, as directed by the Local Rules.

3

violated the U.S. Constitution. 597 U.S. 1, 8 (2022). In response, the New York Legislature adopted the Concealed Carry Improvement Act ("CCIA") in July 2022, with the twin goals of "protect[ing] individuals' Second Amendment rights as determined by the Supreme Court" and "preventing death and injury by firearms." Sponsor's Memo, N.Y. Senate Bill S51001 (2022) (quoted in *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 45 (N.D.N.Y. 2024) (D'Agostino, J.)). The CCIA created new "shall issue" rules for issuing handgun permits, N.Y. Penal Law § 400.00; prohibited carrying guns in an enumerated list of "sensitive locations," N.Y. Penal Law § 265.01-e; established a default rule regarding carrying guns on private property of another, N.Y. Penal Law § 265.01-d; and amended a statute requiring responsible storage of guns when left unattended in cars, N.Y. Penal Law § 265.45. These provisions went into effect on September 1, 2022.

The CCIA was enacted to "combat the gun violence epidemic." P. Ex. 1.[3] The Legislature and the Governor passed this bill to "keep New Yorkers safe." P. Ex. 17. While some of its provisions are intended to address "criminal misuse of firearms," as Plaintiffs note (MSJ at 11), the text of the statute makes plain that the purpose was broader. From provisions that require responsible storage in vehicles to limiting carriage of guns in places like nursing homes and preschools, the bill addresses the risks of both unintentional discharge and intentional discharge of guns. The licensing provisions, which require training on conflict de-escalation, safe gun handling, and other best practices also reflect a broader purpose focused on keeping New Yorkers safe from intentional and unintentional shootings.

### B.    Plaintiffs Bring Suit, But Their Claims Shrink Over Time

On August 31, 2022, Plaintiffs New York State Rifle & Pistol Association, Robert Nash,

---

[3] "P. Ex." refers to Exhibits to the Plaintiffs' motion for summary judgment. All references to exhibits to the Declaration of James M. Thompson will be abbreviated to "TD Ex." followed by the exhibit number. Exhibits to Expert Declarations are abbreviated as [Expert's Last Name] Ex. Thus, an exhibit to the Declaration of Dr. Brennan Rivas is abbreviated as "Rivas Ex."

and Brandon Koch (each of whom was a plaintiff in *Bruen*) filed this lawsuit. ECF No. 1. The lawsuit sought to invalidate "New York's limitations of and burdens on the right to carry firearms as enacted in" the CCIA. *Id*. at 1. A month later, Plaintiffs filed a First Amended Complaint, adding Plaintiffs Stirnweis, Francis, Porter, and Noren. ECF No. 8. Superintendent James moved to dismiss, arguing *inter alia*, that the licensing claims for Plaintiffs were moot because all of them had received unrestricted handgun permits. ECF No. 53. In response, Plaintiffs amended their complaint again, dropping claims against Justice Richard McNally, Jr. (a licensing officer for Rensselaer County) and conceding that the Plaintiffs had all received unrestricted handgun permits, but now alleging that the obligation to recertify or renew their licenses was an impermissible burden on their Second Amendment rights. *See,* Second Amended Complaint, ECF No. 63 (hereinafter "SAC").

Superintendent James again moved to dismiss, and this Court issued a decision which granted that motion in part, further narrowing the claims in this case. *NYSRPA v. James*, No. 1:22-CV-907 (MAD/PJE), 2025 WL 553423 (N.D.N.Y. Feb. 18, 2025) ("MTD Opinion"). Following the MTD Opinion, no licensing claims remain against Superintendent James. *Id*. at *3-*4. The Court also dismissed Plaintiff New York State Rifle & Pistol Association because it lacked standing to sue. *Id*. at *4-*5. And the Court concluded that no plaintiff had standing to challenge the "[m]ajority of the CCIA's Sensitive Place Restrictions." *Id*. at *10. Following the motion to dismiss, the remaining claims against Superintendent James relate only to the private property provisions, the automobile storage provisions, and the following sensitive places: (1) places of worship; (2) libraries, public playgrounds, public parks, and zoos; (3) establishments licensed for on-premise consumption of alcohol; (4) sporting venues; (5) public areas restricted from general public access for a limited time or a permitted special event; (6) government administration

buildings; (7) health care facilities; (8) residential facilities, such as nursing homes, that are licensed by the State Department of Health; (9) public transit; and (10) Times Square. *Id.*

While it is readily apparent that Plaintiffs *dislike* the CCIA, during discovery it became apparent that Plaintiffs lacked standing to bring many of the claims that survived the Second Motion to Dismiss. Two Plaintiffs indicated that they never carry their guns in public and had no plans to do so. TD Ex.1, Excerpts from Koch Depo. Tr. 49:13-15 ("Q: So just to be clear, you – you don't carry a weapon anywhere? A: That is correct."); TD Ex. 2, Excerpts from Francis Depo. Tr. 57:4-6 ("Q: How often do you carry a weapon with you? A: Never.")). Indeed, Plaintiff Francis conceded that, even if the Court were to enter a permanent injunction allowing him to carry his gun on public transportation or to his church, he would not carry a gun to those places. TD Ex. 2 at 65:24-66:6.[4]

In some instances, Plaintiffs had not visited the sensitive places in question in many years and had no plans to do so in the future. *See, e.g.*, TD Ex. 3, Excerpts from Porter Depo. Tr. 105:13-16 ("Q: Okay, when was the – when was the last time you were at a zoo? A. How old is  -- prior to COVID, so 2019'ish, '18, '19."). In other instances, Plaintiffs visited the sensitive places prior to the CCIA without carrying guns and gave no indication that post-CCIA they wanted to visit sensitive places with guns. *See, e.g.*, *id.* at 89:4-11 (nursing homes); 105:17-110:14 (summer camps); 180:17-19 (theaters). And in some instances, Plaintiffs were complaining about policies that the owners of private locations had enacted, and they were unable to tie their dispute to any

---

[4] Plaintiffs contend that Mr. Francis testified that he chooses not to carry "in part because of the confusion and concern caused by the CCIA." MSJ at 3 n. 1. But the cited portions of his deposition transcript do not support that contention, and instead demonstrate that, while Mr. Francis does not like the CCIA, he chooses not to carry for reasons that are not connected to the statute, namely a concern about the risks associated with carrying a deadly weapon outside the home as well as concerns about societal racism . *See* P. Ex. 14; *see also* TD Ex. 2, Excerpts from Francis Depo. Tr. at 57:4-60:4.

provision of the CCIA. For instance, Plaintiff Noren stated that he wanted private property—including malls and stores—to permit concealed carry if the person carrying were "subject to a heightened kind of training requirement or testing for their abilities." TD Ex. 4, Excerpts from Noren Depo. Tr. 103:2-11. And Plaintiff Stirnweis testified that he was unsure if restaurants had a right to prohibit guns on their property and that he believed that the Second Amendment gave him the "the right to carry a gun onto other people's property without their consent." TD Ex. 5, Excerpts from Stirnweis Depo. Tr. 200:24-201:2, 201:11-14.

During discovery, it also became apparent that in many instances Plaintiffs did not know the substance of the laws they were challenging and, when informed thereof, indicated that they had no opposition to the requirements imposed. *See, e.g.*, TD Ex. 1 at 67:16-68: 4 (conceding that Plaintiff Koch "wasn't aware" that private property law did not require private properties to display signs permitting weapons); 96:22-97:23 (Plaintiff Koch wrongly believed that CCIA prohibited carrying a gun on sidewalk and parking lot); 106:23-107:11 ("Q: Sitting here right now, do you think that laws requiring guns to be stored safely in vehicles are Constitutional? A. Yeah, I can't – I can't say."). When asked about their claims that the laws were unconstitutionally vague, Plaintiffs could not articulate what they did not understand about the statutes, indicated that they did not believe the statutes were vague, or said that the statutes were vague because they disagreed with them. *See, e.g.,* TD Ex. 4 at 137:8-153:10; TD Ex. 3 at 222:4-230:17 ("Well, it's vague because, like -- like I've stated, most of the locations in the sensitive location that this Act was passed for are private property . . . . there was no legal restriction until my Governorness felt that that's what she needed to do for the betterment of public safety.").

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and

7

the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of showing that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. If this initial burden is met, the opposing party must show that there is a material dispute of fact for trial. *Id*. at 324. To defeat a motion for summary judgment, the non-movant must point to specific evidence showing a genuine issue for trial. *See Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal citation omitted). A disputed fact must also be genuinely material: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wildlife Preserves, Inc. v. Romero*, 153 F.4th 192, 205 n.14 (2d Cir. 2025).

## ARGUMENT

### I.    PLAINTIFFS ALLEGE ONLY A DISFAVORED FACIAL CHALLENGE

#### A.    Plaintiffs Seek Only Facial Relief And Abandoned Any As-Applied Claim

Constitutional challenges come in two varieties: "a 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual, [while] [a]n 'as-applied' challenge requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Christian Fellowship Centers of N.Y., Inc. v. Village of Canton*, 377 F.Supp.3d 146, 154 n.6 (N.D.N.Y. 2019) (quoting *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006)).  In other words, "[a] claim is facial if it 'challenges application of the law more broadly,' but a 'claim is as-applied if it is limited to a plaintiff's particular case.'" *In re Brokamp*, 573 F.Supp.3d 696, 704 n.3 (N.D.N.Y. 2021) (quoting *Libertarian Party of Erie Cty. v. Cuomo*, 300 F.Supp.3d 424, 438 (W.D.N.Y. 2018), *aff'd in part, appeal dismissed in part*,

8

970 F.3d 106 (2d Cir. 2020).

The four corners of Plaintiffs' moving papers demonstrate that they raise a facial challenge and seek facial relief. Their notice of motion targets "the statute itself," *Field Day*, 463 F.3d at 174, demanding "summary judgment, a declaration of unconstitutionality, and a permanent injunction barring enforcement of" the challenged statutes. ECF No. 130 at 2 (repeating the formulation three times). It makes no mention of any request for relief tailored to any specific Plaintiff or any "application to the particular circumstances of an individual." *Field Day*, 463 F.3d at 174. Plaintiffs' brief likewise makes clear that this is a facial relief case, as it similarly demands that the Court issue an order targeting the statute itself, not any application of it.[5] *See* MSJ at 30 (requesting that "the Court grant Plaintiffs' motion for Summary Judgment, declare that the CCIA's challenged provisions are unconstitutional . . . [and] permanently enjoin their enforcement). The argument section of Plaintiffs' brief contains no contention that the challenged laws are unconstitutional to any Plaintiff's specific facts and indeed makes virtually[6] no reference to the specific Plaintiffs at all. *See generally Id.* at 6-30; *cf. Sibley v. Watches*, 460 F.Supp.3d 302, 317 (W.D.N.Y. 2020) ("In an as-applied challenge, factual context and the challenger's circumstances are critical."). And the facial nature of the challenge is further underscored by the

---

[5] Plaintiffs' moving brief does contain a single stray reference to an as-applied challenge, asserting that the original complaint in this case "alleg[ed] both facial and as-applied challenges to the CCIA." MSJ at 5. Even if this could be interpreted as asserting an as-applied challenge as part of Plaintiffs' current motion, "'the label is not what matters.' Rather, it is the plaintiff's claim and the relief that follows." *Libertarian Party*, 300 F. Supp. 3d at 439 (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)). Nor would the Court be required to address a hypothetical as-applied challenge after Plaintiffs chose not to include one in their brief, since "[i]t is settled beyond peradventure that issues mentioned in a perfunctory matter, unaccompanied by some effort at developed argumentation are deemed waived." *Metz v. Astrue*, No. 06 Civ. 1509, 2010 WL 2243343, at *10 (N.D.N.Y. Apr. 21, 2010) (quotation omitted).
[6] Plaintiffs' moving brief mentions briefly in a list that Plaintiff Porter attends his son's basketball games at "non-professional sports venues," but does not otherwise reference any Plaintiff's individual facts. MSJ at 17.

fact that none of the challenged statutes have been enforced or applied against any Plaintiff. *See Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 107 (2d Cir. 2025) ("Generally, however, a challenge to a statute before its enforcement will presumptively constitute a facial challenge."). Accordingly, [Plaintiff]s' challenge is properly characterized as facial, notwithstanding any [belated] suggestions to the contrary." *Id.*

**B.    Facial Challenges Are Disfavored And Require Plaintiffs To Prove That A Law Will Be Unconstitutional In All Applications**

Because Plaintiffs' suit targets the law itself rather than any individual application of it, Plaintiffs must "establish that the law cannot be constitutionally applied against anyone in any situation." *NSSF*, 144 F.4th at 107, 108. The Supreme Court recently re-emphasized the importance of the facial challenge standard in the Second Amendment context, explaining that "[t]his is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Accordingly, in adjudicating this case the "[C]ourt's task is to seek harmony, not to manufacture conflict," meaning that the Court should "consider the circumstances in which [the challenged law] was most likely to be constitutional," rather than invent "hypothetical scenarios where [the law] might raise constitutional concerns." *Id.* at 701.

"'Facial challenges are disfavored' because they 'often rest on speculation,' 'raise the risk of premature interpretation of statutes on the basis of factually barebones records,' and 'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the constitution.'" *Antonyuk*, 120 F.4th at 987 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)). Plaintiffs cannot meet this high standard, particularly in their challenge to sensitive places laws,

10

which the Supreme Court has repeatedly emphasized as "longstanding" and "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 627 & n.26 (2008); *see also, Bruen*, 597 U.S. at 30 ("we are also aware of no disputes regarding the lawfulness of such prohibitions.").

## II.    THE SENSITIVE LOCATION LAWS ARE SUPPORTED BY AMERICAN LAW AND HISTORY

Plaintiffs challenge a broad swath of New York's sensitive places laws. For many of the provisions they challenge, none of the Plaintiffs have standing because none of the Plaintiffs intend to engage in a course of conduct arguably proscribed by the law; this is an independent basis for denying these challenges. And on the merits, all of the challenged provisions are "consistent with this Nation's historical tradition of firearms regulation," and therefore constitutional. *Antonyuk*, 120 F.4th at 968.

### A.  Second Amendment Methodology

Prior to addressing the merits, it is necessary to correct the skewed picture Plaintiffs provide about application of the history-and-tradition test for Second Amendment claims announced in *Bruen* and *Rahimi*. The methodological section of Plaintiffs' Memorandum of Law, MSJ at 7-11, lays out a version of the *Bruen*/*Rahimi* test that is contrary to the plain meaning of both cases, and explicitly contrary to the Second Circuit's precedents interpreting them, all geared toward achieving an outcome that ignores "the principles that underpin the Nation's regulatory tradition" instead of honoring them. *Rahimi*, 602 U.S. at 681.

#### 1.    *Plaintiffs' Insistence On Founding-Era Analogues Is Contrary To Law*

Plaintiffs are simply wrong on the law when they assert that the "historical tradition must be based on the understanding of the Second Amendment during the Founding Era," and that a modern law must be struck down in the absence of "colonial and Founding Era regulations." MSJ at 9, 19-20. To the contrary, because the Second Amendment is only applicable to state laws via

11

the Fourteenth Amendment, the Second Circuit has held that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 120 F.4th at 972. The Supreme Court likewise rejected Plaintiffs' view in *Rahimi*, emphasizing that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." 602 U.S. at 692.

Implicit in Plaintiffs' version of the history-and-tradition test is the assumption that if eighteenth-century legislatures did not pass a law, it was because they thought it was unconstitutional to do so. But the Second Circuit has cautioned courts against "[r]easoning from historical silence" in this manner, since "it is not necessarily the case that, if no positive legislation from a particular time and place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." *Antonyuk*, 120 F.4th at 969; *see Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (explaining that "a challenged regulation need not be an updated model of a historical counterpart," and that "a test that demands overly specific analogues has serious problems"). Moreover, considering history from the nineteenth and early twentieth century is entirely consistent with Supreme Court practice, as even the Court's strictest originalists "ha[ve] repeatedly employed post-ratification history to determine the mean of vague constitutional text." *Rahimi*, 602 U.S. at 729 (Kavanaugh, J., concurring); *see, Heller*, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); *see, e.g., Vidal v. Elster*, 602 U.S. 286, 301-08 (2024) (Thomas, J.) (considering cases from 1867 through 1928 in surveying the "history and tradition" of the First Amendment's application to trademark law and concluding that "[w]e need look no further in this case"); *Samia v. United States*, 599 U.S. 635, 645 (2023) (Thomas, J.)

12

(citing to cases from 1878 through 1896 in interpreting the Confrontation Clause); *Harmelin v. Michigan*, 501 U.S. 957, 982-85 (1991) (Scalia, J.) (finding that "early judicial constructions" were "[p]erhaps the most persuasive evidence of what 'cruel and unusual' meant," and citing to cases from 1823 through 1901).

2.      *Plaintiffs Ignore the Societal Problems and Technological Changes At Issue*

The Supreme Court directed federal courts to apply "a more nuanced approach" when there are "cases implicating unprecedented societal concerns or dramatic technological changes," *Bruen*, 597 U.S. at 27, but Plaintiffs attempt to minimize the importance of the laws at issue (and to curtail the Court's analysis) by dismissing all the laws they are challenging as "passed to address the criminal misuse of firearms" and "essentially the same as th[e policy challenges] that preoccupied the founders." MSJ at 7-8.  This assertion is silly, both historically and legally.

Virtually every gun statute is geared toward reducing the criminal misuse of firearms; if issues are framed at that level of generality, the *Bruen*/*Rahimi* test would be functionally useless. *Cf. United States v. Gomez*, 159 F.4th 172, 176 (2d Cir. 2025) (rejecting argument that "characterizes the regulated conduct at too high a level of generality.").  Instead, the laws at issue in this case seek to protect certain narrowly specified locations, many of which, like public parks, Department of Health residential facilities, airports, or public transit, did not exist at the time of the Founding.  *See Frey v. City of New York*, 157 F.4th 118, 136 (2d Cir. 2025) ("There were no mass transit systems at the time of the founding, so the lack of historical laws that specifically regulated transit systems was a natural consequence.").  Moreover, Plaintiffs' attempt to portray today's firearm threats as substantively identical to those of the Founding ignores the dramatically greater lethality of modern weapons as compared to "the comparatively primitive firearms that were widely available in the founding and reconstruction eras."  *Nat'l Ass'n for Gun Rights v.*

13

*Lamont*, 153 F.4th 213, 237 (2d Cir. 2025). The weapons of those eras "could do much less harm," and "could kill only at a rate of less than one person per minute," meaning that "[t]he Founders faced no problem comparable to a single gunman carrying out a mass murder in seconds." *Id.* at 237, 238, 239.

        3.      *Plaintiffs' Formulas for Ignoring History Are Contrary to Law*

Plaintiffs also show their hand when they insist that the Court apply categorical rules as to what historical evidence "should be ignored" or "categorically rejected." MSJ at 10. The Second Circuit specifically rejected such an approach in *Antonyuk*, finding "error" when a district court "erroneously discounted many of the State's proffered analogues" because they fell into categories such as "medieval English law," "territorial and municipal laws," or "laws from the late 19th century."[7] 120 F.4th at 1023-24. Plaintiffs' version of the *Bruen* test mirrors that of the dissent in *Rahimi*, "applying the strictest possible interpretation of *Bruen*" by "pick[ing] off the Government's historical sources one by one, viewing any basis for distinction as fatal." 602 U.S. at 704 (Sotomayor, J., concurring). The Supreme Court, by an 8-to-1 margin, rejected that approach as "error[]," *id.* at 701 (majority opinion), and the Second Circuit likewise repeatedly considered historical laws from the federal, state, territorial, and municipal levels in sensitive location cases. *See, e.g., Antonyuk*, 120 F.4th at 1019-24; *Frey*, 157 F.4th at 132-33. Supreme

---

[7] Plaintiffs also obliquely discuss "overtly racist restrictions on firearms possession" or "facially neutral laws that were in practice enforced only against minorities," MSJ at 10, though they nowhere assert that any of the historical laws discussed by New York's experts fall into either category. Unfortunately, many laws passed in Founding-era America reflected pervasive societal racism against Indigenous and Black people, and the colonial militia was often a tool of racial terror. *See, e.g.,* IX William Waller Hening, *The statutes at large: being a collection of all the laws of Virginia* 273, TD Ex. 6 (1777 Virginia law requiring that militia members serve as "patrollers" to "visit all negro quarters" and terrify or assault the persons there). To the extent that any of the laws cited may have involved racial animus, like the Second Circuit "[w]e cite them not as examples to be followed, but rather, according to the analysis the Supreme Court has directed we undertake." *Zherka v. Bondi*, 140 F.4th 68, 90 (2d Cir. 2025).

14

Court and Second Circuit precedent make clear that the *Bruen*/*Rahimi* test must be "a historical inquiry calibrated to reveal something useful and transferable to the present day," not a system of arbitrary exclusion rules that "would make the historical inquiry so exacting as to be useless." *Rahimi*, 602 U.S. at 702 (Sotomayor, J., concurring); *see id.* at 701 (majority op.) ("when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not manufacture conflict.").

      4.     *Plaintiffs Mischaracterize the CCIA and the Legislative Intent Behind It*

Lastly, Plaintiffs provide the Court an inaccurate picture of the legislation they are challenging, asserting (without citation to any legislative history or other authority) that "New York passed the CCIA in direct defiance of the Supreme Court's command." MSJ at 12; *see also Id.* (accusing New York, again without citation, of "[h]aving defied *Bruen*'s direct command"). To the contrary, as multiple federal courts including this one noted, "the bill was enacted to comply with *Bruen* and to respect Second Amendment rights," and the Sponsor's Memo explicitly said that its provisions were designed both to "protect[] individuals' Second Amendment rights as determined by the Supreme Court" and to "prevent[] death and injury by firearms." *Mintz*, 724 F. Supp. 3d at 45 (quoting Sponsor's Memorandum, N.Y. Senate Bill S51001 (2022)); *see* https://www.nysenate.gov/legislation/bills/2021/S51001. "The CCIA is in conversation with *Bruen*," and its authors enacted it "to revise New York's gun laws to *withstand Bruen*, not to attempt exactly what it forbade." *Antonyuk*, 120 F.4th at 1041 (emphasis in the original). And as a matter of text, history, tradition, and legal precedent, New York's sensitive places laws are fully "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

**B.      There Is No Second Amendment Right to Carry a Gun in a Place of Worship against the Will of the Congregation**

New York law prohibits most people[8] from carrying guns in places of worship, unless they are a person "responsible for security at such place of worship." N.Y. Penal Law § 265.01-e(2)(c). No Plaintiff has standing to challenge this provision, but even if one did, the provision is consistent with the text, history, and tradition of the Second Amendment.

*1.      Plaintiff Francis Lacks Standing to Challenge the Place-of Worship Provision*

Only one Plaintiff, Mr. Francis, "plausibly alleged, albeit barely," that he was harmed by not being able to bring a gun to his place of worship. MTD Opinion at *9; SAC ¶ 99.[9] Subsequent discovery confirmed that Plaintiff Francis does not have standing to challenge this provision.

At summary judgment, it is Plaintiffs' burden to "set forth by affidavit or other evidence specific facts," showing the plaintiff's injury-in-fact and that the injury was "traceable to the challenged action of the defendant" and "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation modified). In his deposition, Mr. Francis testified that he "never" carries a weapon outside of his home and is "not interested in carrying" a gun to church. TD Ex. 2 at 57:6, 153:5-8. He confirmed that he has not asked to carry a gun to his church or asked to join the church security team, *id.* at 152:10-16, 160:6-8, and that, if he wanted to carry a gun to his church, it "would not be a burden to ask" his church leadership to allow him to do so. *Id.* at 153:9-15. In a pre-enforcement challenge such as this, standing requires that the plaintiff intends "to engage in a course of conduct arguably affected with

---

[8] New York's sensitive location statute expressly exempts certain categories, including law enforcement and active-duty military personnel. The full list of exemptions can be read at N.Y. Penal Law § 265.01-e(3).

[9] Plaintiff Noren alleged in the Second Amended Complaint that he wished to bring a gun with him to his place of worship, SAC ¶ 76, but later dropped that claim. ECF No. 68 (Opp'n to MTD) at 15 n.1.

a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). The "statute does not prohibit [Francis] from doing what he seeks to do," and without that, there is no justiciable claim here. *See Antonyuk*, 120 F.4th at 1014; *accord Conn. Citizens Defense Lg., Inc. v. Lamont*, 6 F.4th 439, 445 (2d Cir. 2021) ("a live controversy is not maintained by speculation that a party might in the future be prevented from conducting an activity that it currently asserts no plan to conduct" (quotation omitted)).

Furthermore, because the law allows individuals to carry guns if they are designated by the congregation as a member "responsible for security at such place of worship," N.Y. Penal Law § 265.01-e(2)(c), any Plaintiff challenging this provision would need to show that they wanted to carry a gun against the will of the congregation. *See Antonyuk*, 120 F.4th at 1014. No Plaintiff makes such a showing, and even if they did, it is hard to see how they could have a "'legally cognizable interest'" in carrying guns at a place of worship against the will of the congregation. *Id.* (quoting *Tann v. Bennett*, 807 F.3d 51, 52 (2d Cir. 2015)).

2.    *Our Nation's Tradition of Firearm Regulation Does Not Include a Right to Bring Weapons into a Place of Worship Without the Congregation's Permission.*

The sensitive places restriction on carrying firearms in places of worship is permissible under the Second Amendment. "[T]here is a longstanding historical tradition of regulating firearm carriage in houses of worship." *Goldstein v. Hochul*, 680 F.Supp.3d 370, 394 (S.D.N.Y. 2023). Laws prohibiting carriage of firearms in places of worship date back to (at least) 1403 in Wales. *See* Declaration of Patrick J. Charles (Charles Dec.) ¶ 35. More recently, the mid-to-late nineteenth century saw the spread of sensitive places restrictions prohibiting guns in places of worship. Charles Dec. ¶¶ 34-36. Examples include a Texas law prohibiting guns in "any church or religious assembly"; a Georgia law that prohibited carrying a "pistol or revolver, or any kind of deadly weapon to any . . . place of public worship"; a Virginia law that prohibited "carrying any gun,

17

pistol, . . . or other dangerous weapon to any place of worship while a meeting for religious purposes is being held at such place"; an Arizona territorial law that prohibited "go[ing] into any church or religious assembly" while "carry[ing] about his person a pistol or other firearm"; an Oklahoma territorial law that prohibited carrying dangerous weapons "into any church or religious assembly"; and a Columbia, Missouri Ordinance prohibiting guns in "any church, or place where people have assembled for religious worship." *Id*. The Missouri statute that allowed Columbia to enact its prohibition was challenged as unconstitutional, but the Supreme Court of Missouri concluded in 1878 that it did not violate the state or federal constitution's right to bear arms. Charles Ex. 121. These historical statutes are "dead ringer[s] for historical precursors" and thus easily satisfy *Bruen*. 597 U.S. at 30.

In *Goldstein v. Hochul*, the District Court for the Southern District of New York declined to enjoin a prior version of the place of worship restriction (that did not include the carve-out allowing members of a security team to carry firearms), after reviewing the broad and extensive history of similar sensitive places restrictions. 680 F. Supp.3d at 394-96. After surveying the historical analogues, the Court there noted that the sheer volume of historical laws prohibiting carriage of firearms in places of worship was significant: "the number of historical legislative references that support a finding that a house of worship is a sensitive place far surpasses the number of references cited in *Bruen* and *Heller* as support for finding schools and government buildings as sensitive places." *Id*. at 394. The Court also relied upon judicial decisions from the 1870s declining to recognize a right to carry firearms in places of worship, including an 1871 Texas Supreme Court decision stating that it was "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church." *English v. State*, 35 Tex. 473,

18

478–7 (1872); *see also Andrews v. State*, 50 Tenn. 165, 182 (1871) ("Therefore, a man may well be prohibited from carrying his arms to church, or other public assemblage."); *Hill v. State*, 53 Ga. 472, 475 (1874) ("The practice of carrying arms at . . . places of worship [] is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee.")

Finally, Plaintiffs point to a handful of laws that required parishioners to bring arms with them to church. Plaintiffs rely primarily on laws dating from the 1600s, a time when there was "warfare between the colony and nearby Native American groups" and reflect circumstances quite different from the time of the Founding. TD Ex. 7, Excerpts from Rivas Depo. Tr. 203:11-205:15; *see* P. Ex. 27 (1631 Massachusetts Bay colonial law); P. Ex. 28 (1639 Rhode Island and Providence Plantations colonial law); P. Ex. 29 (1619 Virginia colonial law); P. Ex. 30 (1642 Maryland colonial law); P. Ex. 31 (Narrative of early 1600s in Virginia); P. Ex. 32 (1619 Virginia colonial law); P. Ex. 33 (1643 Connecticut colonial law). Plaintiffs also rely upon two later laws, one enacted in South Carolina in 1740 as "An Act for the Better Ordering and Governing Negroes and other Slaves in this Province," which declares that it was enacted "for the better security of this Province against the Insurrections and other wicked attempts of Negroes and other Slaves," and which requires "every white male inhabitant" of South Carolina to carry a weapon. P. Ex. 34. The second example is an 1800 statute from Georgia that requires "every male white inhabitant" to carry guns. P. Ex. 35. These statutes were enacted to "quell potential slave revolts." Charles Dec. ¶ 34 n. 95. They do not codify a right to bear arms, and rather "had the reprehensible and shameful goal of preserving slavery." *Goldstein*, 680 F.Supp.3d at 397. As Plaintiffs concede, laws that are "overtly racist" or that are facially neutral but were effectuated in a racist manner "should be left

19

in the dustbin of history." MSJ at 10-11.

The prohibition on carrying guns into places of worship, without being designated by the congregation as responsible for the congregation's security, is consistent with our national tradition of firearms regulation.

**C.     The Prohibition on Guns in Libraries, Playgrounds, Summer Camps, and Zoos Are Constitutional**

New York prohibits most people from carrying firearms in "libraries, public playgrounds, . . . and zoos" as well as "summer camps." N.Y. Penal Law § 265.01-e(2)(d), (2)(f). No plaintiff has standing to challenge these provisions, and in any event, they are well supported by the nation's tradition of regulating firearms in places frequented by children.

*1.     Plaintiffs Lack Standing to Challenge These Laws*

Only one plaintiff, Mr. Porter, alleged in the SAC that he visits libraries, playgrounds, summer camps, and zoos. SAC ¶ 83. Here, too, subsequent discovery confirmed that no Plaintiff has standing to challenge these sensitive places.

At summary judgment, a Plaintiff must proffer in evidence "specific facts" showing standing. *Lujan*, 504 U.S. at 561. "'[S]ome day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of" injury-in-fact. *Id*. at 564 (emphasis in original). Plaintiff Porter's testimony establishes that he has no intention, let alone a specific plan, to visit zoos, playgrounds, or summer camps. Mr. Porter testified that he does not visit zoos regularly and in fact had not been to a zoo since 2019. TD Ex. 3 at 105:10-16. Mr. Porter also testified that he does not visit playgrounds. *Id*. at 79:9-11. Mr. Porter further testified that while he previously worked for a summer camp, he had not done so since 2022 and when he did work for the summer camp (prior to the enactment of the CCIA) he did not carry a gun with him. *Id*. at 105:25-106:3, 109:16-18.

20

While Mr. Porter occasionally visits his local library, he declined to say that he wanted to carry a gun while doing so. TD Ex. 3 at 99:2-5, 100:16-250. Indeed, he testified that prior to the CCIA, he could not remember bringing a gun with him when he went into his local library, although he thought that he "probably" brought a gun with him on a "couple of" occasions when his son was much younger. *Id*. at 103:15-104:15. This is not sufficient for standing.

In their motion for summary judgment, Plaintiffs appear to have abandoned their challenge to the prohibition on guns in libraries and zoos, although they continue to challenge the prohibition on guns at playgrounds.

> 2.       *The Supreme Court and Second Circuit Have Recognized a Well-established and Representative Tradition of Regulating Firearms in Spaces Frequented by Children*

Public playgrounds, zoos,[10] and summer camps did not exist in their modern form in either 1791 or 1868. *Antonyuk*, 120 F.4th at 1026 n. 98 (first public zoo in United States opened in 1874); *Mintz*, 724 F.Supp.3d at 63 (summer camps "emerg[ed] at the end of the nineteenth century"); TD Ex. 8, Katilin O'Shea, *How We Came to Play: The History of Playgrounds*, NAT'L TRUST FOR HISTORIC PRESERVATION (Aug. 15, 2013), https://savingplaces.org/stories/how-we-came-to-play-the-history-of-playgrounds/ [https://perma.cc/W8MC-VSR8] (first playground in America opened in 1886). While at least one private membership library predates the founding, the public library as it currently operates—a public space that does not require membership—originated in the 1830s but did not begin spreading until after the Civil War. TD Ex. 9, Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, 49 INFORMATION & CULTURE 2, 117-144 (2014).

The Second Circuit already concluded that because "nearly 70 percent of visitors to zoos

---

[10] Zoos are separately supported by the tradition of regulating guns in parks, which is discussed in Section II(D) *infra*.

21

are parties with children," it is appropriate to rely upon "analogues that establish a history of regulating firearms in crowded places and locations frequented by children." *Antonyuk*, 120 F.4th at 1026-27. And this Court has already determined that these analogues are appropriate for summer camps. *Mintz*, 724 F.Supp. 3d at 65. The same conclusion is appropriate for public playgrounds and libraries, which are often attached to schools and are places that "serve children through many school activities" as well as "crowded municipal spaces that are frequented by children." *Kipke v. Moore*, 165 F.4th 194, 212 & 217 (4th Cir. 2026); *see also* TD Ex. 10, Peter Gray, Autumn Erdahl Solomon, & Leah Tatgenhorst, *Public Libraries as Centers for Play: A Survey and Case Examples*, 14 AM. J. OF PLAY 2, 131 (2022), https://files.eric.ed.gov/fulltext/EJ1359210.pdf [https://perma.cc/F5HV-RKRL].

Both *Antonyuk* and *Bruen* support the conclusion that there is a long tradition of regulating firearms in places frequented by children. *Antonyuk*, 120 F.4th at 1026 ("We rely on *Bruen* for the proposition that the tradition of regulating firearms in spaces frequented by children is also well-established and representative."). Indeed, the most common form of firearm regulation in the mid-to-late nineteenth century "was that of protecting children from firearms-related violence." Charles Dec. ¶ 20. These laws included prohibitions on firearms in any "place where persons are assembled for amusement," which Texas adopted in 1871. II George W. Paschal, *A Digest of the Laws of Texas* (W.H. & O.H. Morrison, 1873), TD Ex. 27, at 1322; Charles Dec. ¶ 21. Similar laws were enacted by the City of New Orleans, Louisiana in 1879, the Territory of Arizona in 1889, the Territory of Oklahoma in 1890, and the State of Montana in 1903. Charles Dec. ¶ 21.

Around the same time, States also began enacting prohibitions on carrying firearms at schools (initially adopted by schools themselves and subsequently enacted by State legislatures). Charles Dec. ¶¶ 22-24. Laws prohibiting carriage of firearms in schools expanded as public

education expanded in the mid-to-late nineteenth century. Charles Dec. ¶ 23. The States of Maryland, Missouri, Texas, Vermont, and Washington and the Territories of Arizona and Oklahoma all enacted prohibitions on carrying guns in schools in this time period. *Id*. Similar prohibitions were enacted by local governments and school boards, in "virtually every state and territory" in the country. Charles Dec. ¶ 24 n. 70.

Plaintiffs make no arguments as to the constitutionality of the prohibition on guns in zoos and guns at libraries. As to playgrounds, they contend that "during the Founding, citizens were allowed and often required to carry in places frequented by vulnerable populations like children." MSJ at 18. But as *Antonyuk* explained, "the tradition of regulating firearms in spaces frequented by children is . . . well-established and representative." 120 F.4th at 1026. And as *Bruen* itself noted, there are "no disputes" regarding the lawfulness of prohibitions in schools—the quintessential place where children congregate. 597 U.S. at 30.

The long-standing history of regulating firearms in places where children congregate is well-established and supports New York's prohibitions on guns in zoos, libraries, public playgrounds, and summer camps.

### D.    History Supports the Prohibition on Guns in Public Parks

The constitutionality of New York's law prohibiting guns in "public parks"—a term that excludes forest preserves and privately held land within public parks, *see* N.Y. Penal Law § 265.01-e(2)(d)—was conclusively adjudicated in the Second Circuit's recent decision in *Christian v. James*, No. 24-2847, 2026 WL 1378796 (2d Cir. May 18, 2026). In *Christian*, the Court considered a record substantially identical to this one, including a substantially identical declaration from Dr. Terence Young (with its attached exhibits), and found that "[t]he State has more than carried its burden, by demonstrating a long, unbroken history of prohibiting gun carriage in urban public parks and placing the Public Parks provision . . . within that tradition." *Id.* at *12.

23

Reviewing Dr. Young's extensive set of historical regulations, the Circuit found that "[t]his 'deliberate and sustained course of post-enactment action' spanning over 60 years in major urban areas without any known constitutional challenge comfortably 'settle[s] the meaning of' whether the scope of the Second Amendment right can be limited in this way." *Id.* at *11 (quoting *Frey*, 157 F.4th at 129). The plaintiffs-appellants in *Christian*, like Plaintiffs here, argued that the parks regulations, "came too late, and that post-Founding era history 'cannot alone establish the historical tradition of regulation required by *Bruen*,'" but the Circuit noted that it "expressly rejected such a view in *Frey*" and that courts "may rely on later history to discern the historical tradition because it can 'provide persuasive evidence of the original meaning.'" *Id.* at *12 (quoting *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring)). And the plaintiffs-appellants in *Christian*, again like Plaintiffs here, attempted to point to spaces like Boston Common that existed before the modern parks movement, arguing that the lack of firearm regulations in such spaces stemmed from an implicit belief that prohibiting guns there was unconstitutional. *Compare* MSJ at 24-25 *with Christian*, 2026 WL 1378796 at *12. The Second Circuit, relying on Dr. Young's expert testimony, found that "Boston Common . . . is not akin to the Olmstead vintage of urban parks that were principally created as dedicated spaces for peaceful recreation and quiet contemplation of natural scenery." *Christian*, 2026 WL 1378796 at *12; *accord Nastri v. Dykes*, 807 F. Supp. 3d 112, 115–16 (D. Conn. 2025) ("There were no modern style parks around 1791 when the Second Amendment was adopted.").

The Second Circuit declined to reach the question of whether there was a similar tradition in non-urban parks, *Christian*, 2026 WL 1378796 at *10, but the Court need not reach the issue because Plaintiffs in this case do not raise any as-applied challenge regarding non-urban parks. The brief discussion of parks in Plaintiffs' moving brief contains no specific argument regarding

24

non-urban parks, MSJ at 24-25, and their statement of material facts does not discuss any challenge regarding non-urban parks, nor does it identify any specific non-urban park any plaintiff intends to visit with a gun, let alone allege facts about its ruralness sufficient to give rise to an as-applied challenge. *See id.* at 2-5. And even if they had specifically raised such a challenge, federal courts that have analyzed the question have concluded that prohibitions on carrying guns in rural parks are consistent with our national tradition of gun regulation. *Kipke*, 165 F.4th at 214-16; *Nastri*, 807 F.Supp.3d at 143-44 (applying *Antonyuk* and granting summary judgment against facial and as-applied challenge to law prohibiting carrying guns in Connecticut state parks of all kinds).

There is also a long tradition of regulating firearm carriage in rural parks—whether National Parks (including their antecedents prior to the National Park System) or state parks.[11] These parks emerged from the same movement as urban parks. Young Dec. ¶¶ 36, 48. Early on, many of these parks prohibited firearms within their bounds. Thus, the country's second National Park (Mackinac National Park in Michigan) prohibited carrying or discharging firearms in regulations enacted in 1882, only seven years after the park opened, *Id.* ¶ 39, and Sequoia National Parks adopted similar rules not long after. *Id.* ¶ 40. Similarly, the first rural state park was California's Yosemite Valley and Mariposa Big Tree Grove Park; early on, the commissioners of that park voted to restrict firearms by prohibiting discharge of guns within the park's borders. *Id.*

---

[11] The tradition of prohibiting guns in national parks is particularly relevant for two reasons. First, national parks such as Yellowstone or Yosemite are indisputably rural. *Cf. Aymonier v. United States*, 432 F. App'x 66, 68 (3d Cir. 2011) (finding that even the Gateway National Recreation Area, on the South end of New York Harbor, is "a rural or semi-rural tract of land."). Second, national parks were federal land, and thus among the very few places where the Second Amendment always applied directly. *See Heller*, 554 U.S. at 625 ("For most of our history, the Bill of Rights was not thought applicable to the states."). If prohibitions on guns in rural parks were unconstitutional, any plaintiff could have filed a successful lawsuit against the National Park Service at any time for over a century. Instead, the practice of prohibiting guns in the national parks was "open, widespread, and unchallenged." *Bruen*, 597 U.S. at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring)).

¶¶ 48, 54. Rural parks were more slowly adopted by other states, but they spread throughout the twentieth century. *Id.* ¶ 51. As they expanded, so, too, did State prohibitions on carrying guns in rural parks. *Id.* ¶¶ 54-55 (collecting examples).

As long as there have been public parks—whether urban or rural—in this country, the People's elected representatives regulated and prohibited carriage of firearms there. This "mountain of regulations," *Christian*, 2026 WL 1378796 at *11, is more than sufficient to show that the challenged statute "is consistent with principles that underpin our regulatory tradition" *United States v. Rahimi*, 602 U.S. at 692.

### E.    Guns May Constitutionally Be Prohibited In Places Selling Alcohol

New York law prohibits possession of a gun in "any establishment holding an active license for on-premise consumption pursuant to article four, four-A, five, or six of the alcohol beverage control law where alcohol is consumed." N.Y. Penal Law § 265.01-e(o). The rationale for the law is straightforward: as Plaintiff Stirnweis acknowledged, alcohol lowers a person's inhibitions, contributes to bad decisionmaking, and leads people who drink to get into conflicts that they wouldn't get into while sober; when alcohol and guns mix, it creates a danger to both the persons who drink and to bystanders. TD Ex. 5 at 197:23-198:18.

The Second Circuit recognized an American tradition of regulating firearms to address the dangers of mixing guns and alcohol. In *Antonyuk v. James*, the Court of Appeals held that the "historical analogues establish a consistent and representative tradition of regulating access to firearms by people with impaired self-control or judgment, specifically those who are intoxicated." 120 F.4th 941, 1029-30 (2d Cir. 2024).[12] In reaching this conclusion, the Court of Appeals looked

---

[12] Even Plaintiffs' proposed rebuttal expert, F. Lee Francis of Widener Law School, acknowledges the existence of this tradition. F. Lee Francis Expert Report, TD Ex 11 ¶ 62 ("Historically, alcohol-related regulations addressed the danger of armed intoxication").

to three statutes that "prohibited intoxicated persons from carrying firearms" and to other statutes that prohibited selling guns to intoxicated people, required owners of bars to post signs prohibiting guns, and prohibiting carriage of guns in any place where alcohol was sold. *Id*. at 1030.

The history of regulating liquor and arms bearing dates back to at least the mid-eighteenth century. *See* Charles Dec. ¶ 37. As early as 1746, New Jersey prohibited selling liquor to any militiaman during the time when he was "obliged to appear in Arms, at the place of Mustering or Training, or within a Mile thereof." *An Act for Better Settling and Regulating the Militia of the Colony of New-Jersey, for the Repelling of Invasion, and Suppressing Insurrections and Rebellions*, May 8, 1746, *reprinted in* III Bernard Bush, *Laws of the Royal Colony of New Jersey 1746-1760*, at 11 (New Jersey State Library 1980), TD Ex. 17. Delaware and Maryland had similar statutes. Charles Dec. ¶ 37. States continued to enact these statutes following the ratification of the Constitution. Charles Dec. ¶ 38. And while there is no doubt that one of the aims of these laws was to ensure that militiamen were competent to train and fight, they also stand for the proposition that American lawmakers long recognized the dangers of mixing alcohol and guns.

Outside of the militia context, laws regulating access to firearms at balls or other events where liquor is sold long predate the ratification of the Fourteenth Amendment. As early as 1804, the municipal government prohibited anyone from attending a "public ball with any weapon, cane or cudgel." Rivas Dec. ¶ 21. In 1852, the Territory of New Mexico enacted a similar restriction, requiring that "Any person desiring to give a Ball or Fandango" shall apply for a license and shall affirm "that he will not permit any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons." 1852 N.M. Laws 69, TD Ex. 28. Following the Civil War, Kansas, Missouri, Oklahoma, and Wisconsin, each enacted statutes restricting arms bearing while intoxicated or while in a place

27

where liquor is sold—these were among the statutes relied upon by the Second Circuit in *Antonyuk*. Charles Dec. ¶ 39; *see* 120 F.4th at 1030. In 1878, Mississippi prohibited selling guns to an intoxicated person. *Id.* Around the same time, localities also began restricting arms-bearing while intoxicated. Charles Dec. ¶ 40 (collecting examples). Similar ordinances were adopted in New York, including a broad prohibition in New York City and a Brooklyn ordinance against selling or giving a "fire-arm, or other deadly or dangerous weapon, when there shall be reason . . . to think or believe that any danger to life" could result from accessing the firearm. Charles Ex. 126. In the expert opinion of historian Patrick Charles, this "naturally would have precluded the selling, loaning or giving of any dangerous weapons to intoxicated persons." Charles Dec. ¶ 40. Finally, there is no evidence of any court or legal commentator viewing liquor-related arms-bearing restrictions as even potentially unconstitutional. *See* Charles Dec. ¶ 41. Taken together, these laws establish a national tradition of regulating access to alcohol for people bearing arms as well as access to firearms in places serving alcohol.

Plaintiffs argue that the lack of Founding era historical analogues here is dispositive. MSJ at 25. But that requires ignoring both the existence of the Militia laws from the 1700s and *Antonyuk*'s holding that both the Founding era and Reconstruction era are relevant. What history shows is a keen awareness that mixing guns and alcohol is a bad idea, with initial Founding-era statutes focusing on prohibiting sales of liquor to armed militiamen and a movement (beginning as early as 1804) towards prohibiting guns in places where people consume alcohol.

Finally, Plaintiffs argue that "sober individuals should be allowed to protect themselves from intoxicated people," citing hearsay evidence that there is a "strong positive relationship between alcohol consumption, the commission of crimes, and criminal victimization for both genders." MSJ at 25; P. Ex. 73. But this cuts the other way, as epidemiologist Dr. Paul Reeping

28

noted in his expert report. Reeping Dec. ¶¶ 39-41. Specifically, there is "no evidence that gun-prohibited [alcohol-serving] establishments experienced higher rates of firearm violence," and evidence to the contrary, namely, that "firearm prohibitions in alcohol-serving establishments are associated with lower rates of nearby shootings." Reeping Dec. ¶ 41.

### F.      It is Constitutional to Prohibit Guns In Performance, Gaming, And Sports Venues

New York prohibits carrying guns in "any place used for performance, art entertainment, gaming, or sporting events." N.Y. Penal Law § 265.01-e(p). This provision also prohibits carrying guns in "racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission." *Id.* Plaintiffs do not allege[13] that they visit the vast majority of these locations; this was confirmed in discovery. Following discovery, the State does not dispute that Plaintiff Porter visits sporting event venues with regularity, and that both Plaintiffs Porter and Stirnweis have visited theaters in recent years. TD Ex. 3 at 110:15-130:17; TD Ex. 5 at 180:21-184:13.

The purpose of this provision of the sensitive places law is "to reduce the threat of gun violence toward large groups in confined locations." *Antonyuk*, 120 F.4th at 1036. The Second Circuit already recognized a "tradition of regulating firearms in quintessential crowded places that are (1) discrete in the sense that they contain crowds in physically delineated or enclosed spaces, e.g., circuses, ball rooms, fairs and markets, and (2) 'where persons are assembled for amusement,' or for 'educational or literary purposes.'" *Id.* at 1038 (citations omitted). In reaching this

---

[13] This Court already determined that Plaintiffs lack standing to challenge the prohibition on carrying arms in the following venues: "stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission." MTD Opinion at *10.

29

conclusion, the Second Circuit found that the Statute of Northampton, which forbade "going or riding 'armed by night [ ] or by day, in fairs, markets,'" and which was replicated by "at least two Founding-era states and several Reconstruction-era states" was a part of a broader "robust showing of a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Id*. at 1019. The Second Circuit then held that "§ 265.01-e(2)(p) is consistent with that tradition" because "[i]t regulates firearms in discrete, densely crowded physical spaces wherein people assemble for amusement, educational, or literary purposes." *Id*. at 1038. While the Second Circuit's analysis of this provision in *Antonyuk* focused on theaters, conference centers, and banquets, there is every reason to extend this reasoning to sports venues. *Antonyuk* does not limit its analysis, and sports venues are, like the venues at issue there, "quintessentially crowded places . . . wherein people assemble for amusement." *Id*; *see also Frey*, 157 F.4th at 133.

American life prior to the nineteenth century was "overwhelmingly rural," with only "5% of the national population liv[ing] in areas with 2,500 inhabitants or more" at the time of the founding. Rivas Dec. ¶ 16. "[T]here were few public gathering spaces comparable to modern sports stadiums." *Id*. However, even with these smaller gathering spaces, early colonial and founding-era governments saw fit to ban weapons during gatherings in public markets. Thus, after independence, Massachusetts, Virginia, and North Carolina adopted versions of the Statute of Northampton, which prohibited carrying arms, especially in places where crowds gathered. Rivas Dec. ¶14. Municipalities also restricted carriage of guns in crowded spaces. Thus, in colonial Philadelphia, the "mayor opened every market day with a proclamation mandating that 'no person . . . carry any unlawful weapon.'" Rivas Dec. ¶ 14. These examples are as close a historical analogy to a prohibition on carrying guns into a theater or sports venue as is possible during this early

30

period, given how many Americans lived in rural, sparsely populated areas at the time of the Founding.

By the mid-to-late nineteenth century, as the country's demographics shifted, States were expressly adopting prohibitions on carrying guns at places where people gather for amusement. Thus, in 1869, Tennessee prohibited carrying "pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick" at "any fair, race course, or other public assembly of the people." Ch. 22, 1869 Tenn. Pub. Acts 23, TD Ex. 29. Georgia adopted a similar law in 1870, 1870 Ga. Laws 421, as did Texas. The Texas statute prohibited all weapons in any "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering." II George W. Paschal, *A Digest of the Laws of Texas* (W.H. & O.H. Morrison, 1873), TD Ex. 27, at 1323. Missouri adopted a substantially similar law to Texas' in 1874 and increased the penalties in 1883.  1874 Mo. Laws 50, TD Ex. 30; 1883 Mo. Laws 76, TD Ex. 31. In 1889 and 1890, the Arizona and Oklahoma Territories (respectively) adopted prohibited carrying weapons in a similar, but even broader, list of sensitive places. 1889 Ariz. Sess. Laws 16 § 3, TD  Ex. 32; 1890 Okla. Stat. 496 § 7, TD Ex. 33. These laws were upheld as against constitutional challenges at the time. Rivas Dec. ¶ 27-28 (collecting cases). Thus, in the opinion of expert historian Dr. Brennan Rivas, "nineteenth-century Americans understood recreational and entertainment venues to count among the public spaces protected by locational restrictions. . . . People of the time would have understood these laws to apply to entertainment and recreational spaces like theaters, public assembly halls, fairs, political meetings, worship services, lectures, and social services." Rivas Dec. ¶ 34.

The logic for such laws is straightforward: armed self-defense is impracticable in crowded

31

spaces, and the presence of weapons in such spaces carries the potential for chaos.  Plaintiff Porter described just such an incident at a Pennsylvania basketball tournament that his son attended, where a disagreement with a referee led a disgruntled person to let off "one or two shots in the air, which caused a – a stampede.  When that stampede happened, just to let you know, there were thousands of people in this location during this incident.  All of these people started to run panicked, hysteric as hundreds and thousands of people ran past me screaming, 'active shooter,' 'active shooter.'"[14]  Porter Tr. 67:11-18.  Americans in prior centuries understood the way that firearms cause death or chaos in crowded spaces, with the Court of Appeals of Texas writing in 1878 that it does not "matter how much or with what good reason I may be in dread of an immediate and pressing attack upon my person from a deadly enemy; the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where his attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed." *Owens v. State*, 3 Tex. Ct. App. 404, 407 (Tex. Ct. App. 1878).

Plaintiffs suggest, despite this record, that there is no "relevant historical precedent banning carry at locations used as venues for sports or entertainment generally." MSJ at 18. Not so, as the exhaustive recitation herein shows. Plaintiffs also argue that the sporting events venues they visit are "most like the racetracks and green spaces common at the Founding"[15] and therefore the absence of regulation of guns in those spaces at the time of the Founding should end the inquiry. *Id.*  But this argument ignores the statutes that did prohibit guns at markets and fairs at the time of the Founding and ignores the masses of historical analogs that are "dead ringers" for this statute

---

[14] Although Plaintiff Porter had a concealed weapon at the time and drew it, he could not locate the shooter and was not able to influence the situation in any way.  *See* TD Ex. 3 at 67:19-68:7.

[15] There is no venue discussed in the cited articles that is equivalent to the youth sports facility in which Plaintiff Porter described a "stampede," TD Ex. 3 at 67:11-18, let alone professional sports facilities like Madison Square Garden, Citi Field, Highmark Stadium, or MVP Arena.

that States passed during the Reconstruction era.

The historical record establishes a long-standing, broad national tradition of regulating firearms in spaces where people congregate for amusement—precisely what New York Penal Law § 265.01-e(2)(p) does. This provision of the CCIA is constitutional.

### G.    Guns Can Be Prohibited Near Permitted Public Events

New York law prohibits carrying a gun on "any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage." N.Y. Penal Law § 265.01-e(2)(r). In practice, this statute applies at parades, marches, street fairs, and similar events.

As detailed in section II(F) *supra*, there is a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 120 F.4th at 1019. This tradition encompassed prohibitions of firearms in "fairs and markets." *Id*. at 1020, 1038. Similarly, the *Antonyuk* court concluded that there was a "tradition of regulating firearms in . . . spaces that are . . . 'where persons are assembled for amusement.'" *Id*. at 1038.

Expert historians agree. Historian Patrick Charles writes in his declaration:

> Without question, the overarching historical rationale that binds virtually all firearms regulations from their genesis…through the close of the nineteenth century is that of public safety. Whether it be laws prohibiting armed assemblage without the consent of government officials or laws prohibiting the discharge of firearms withing city limits, the long arc of firearm regulation historically informs…that ensuring public safety from firearms violence has always been an important legislative interest. This especially bodes true for historical "sensitive places" laws, which were generally adopted to protect the public from firearms-related violence at designated places and times where the public was generally known to gather, whether it be to engage in commerce or recreation.

Charles Dec. ¶ 25 (internal quotation marks and citations omitted). Charles notes that in the nineteenth century, many localities adopted "event specific firearms prohibitions." Charles Dec. ¶ 28. His declaration surveys firearms prohibitions at Fourth of July events, concluding that "the historical fact remains that it was common for localities to severely restrict the use and carrying of firearms to reduce firearms-related deaths and injuries during the Fourth of July, as well as during other festive holidays." Charles Dec. ¶ 31. From Wilmington, Delaware to St. Louis, Missouri to Brooklyn, New York, local governments frequently prohibited firearms at specific events and during holiday periods in the 19th Century. Charles Dec. ¶ 32; Charles Ex. 95-118 (collecting examples of prohibitions on firearms at Fourth of July and similar events). These regulations were intended to address "firearms-related injuries that typically took place within urban centers during Fourth of July festivities." Charles Dec. ¶ 31; *see also* Charles Ex. 89-94. Similarly, Dr. Rivas described Reconstruction-era statutes that prohibited guns in a variety of settings including all public assemblies. Rivas Dec. ¶¶ 24-25 (1870 Texas law prohibiting guns at "a social party or other social gathering composed of ladies and gentlemen" or "any other public assembly"; almost identical 1879 Missouri law; similar 1889 Arizona Territory law; similar 1890 Oklahoma Territory law). It was uncontroversial that prohibiting guns at places of public assembly fell within the States' powers. *See, e.g., English v. State*, 35 Tex. 473, 478 (1871).

The prohibition on carrying guns at permitted public events is consistent with this tradition. The "how"—prohibiting carrying guns at public assemblages of persons, limited to times and places when such people gather—and the "why"—to avoid gun-related injuries that occur when there are large gatherings of people—are the same. The State's historical analogs more than suffice to establish that the representative tradition of regulating firearms at places like parades and fairs encompasses the challenged statute.

34

Plaintiffs argue that the Statute of Northampton was "focused on prohibiting threatening conduct" (MSJ at 19), but they introduce no evidence to counter the State's expert testimony. They offer, instead, cherry-picked quotations from Dr. Rivas' testimony. Though Plaintiffs omit all context from the excerpts of her deposition that they appended to their motion, Dr. Rivas' testimony emphasized that while the Statute of Northampton is not dispositive of these questions, it provided useful background for understanding subsequent locational restrictions, beginning with the colonial era and up through Reconstruction. TD Ex. 7 at 81:5-19 ("Q. Was the Statute of Northampton a locational restriction in your opinion? A. I Included it here as a starting point for thinking about locational restrictions, but it does differ somewhat from the kinds of locational restrictions challenged in the statute for this case and for some of the analogues that came later. So I think it ought -- I think it is a locational restriction, but it's also because of its antiquity a little bit different than those that came along after it."); *see also id.* at 75:14-93:16, Rivas Dec. ¶¶ 11-17 (providing historical context about the Statute of Northampton and early locational restrictions in the American legal tradition).

Plaintiffs also argue that this Court should somehow disregard *Frey* and *Antonyuk* (both of which are, of course, binding) in favor of a district court decision from New Jersey that is currently on appeal. MSJ at 19-20 (citing *Koons v. Platkin*, 673 F. Supp.3d 515, 628-29 (D.N.J. 2023)). But even if this Court were free to disregard Second Circuit precedent, Plaintiffs' arguments fall apart on examination. First, though Plaintiffs argue that the Second Circuit's methodology was erroneous because both cases looked to Reconstruction era historical analogues, that argument ignores that both the colonial era and Founding era did in fact have locational restrictions, which the *Antonyuk* and *Frey* courts relied upon. *See, e.g.*, *Antonyuk*, 120 F.4th at 1011-12; *Frey*, 157 F.4th at 132-36. Second, as noted above, Plaintiffs' reliance upon the colonial-era statutes (P. Exs.

35

27-33) is at best irrelevant. This reliance upon the racist statutes that required white men to arm themselves to enable the "ordering and governing [of] Negroes and other Slaves," (P. Exs. 34-35) should likewise be disregarded.

### H. The Second Amendment Does Not Prohibit Regulation Of Guns In Government Administration Buildings

New York law prohibits carrying a gun in "any place owned or under the control of federal, state, or local government, for the purpose of government administration, including courts." N.Y. Penal Law § 265.01-e(2)(a). The Supreme Court recognized that forbidding guns in government buildings is a "longstanding prohibition" within the American legal tradition. *Heller*, 554 U.S. at 626. In *Bruen*, the Supreme Court noted that "although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions." 597 U.S. at 30. *See also Antonyuk*, 120 F.4th at 971 (discussing same). More recently, the Fourth Circuit Court of Appeals upheld Maryland's prohibition on carrying guns in government buildings, citing *Bruen* and *Heller*. *Kipke*, 165 F.4th at 208.

Expert testimony about historical regulation of guns separately supports the constitutionality of this provision. Dr. Brennan Rivas explained that "[t]he known locational restrictions from the colonial and early republic periods specifically designated sites of government activity as those falling under their protection." Rivas Dec. ¶ 30. As early as 1647, Maryland prohibited "com[ing] into the howse of Assembly (whilst the house is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit." William Hand Browne, ed., *Proceedings and Acts of the General Assembly of Maryland*, 215-16, 216, §6 (Maryland Historical Society 1883), TD Ex. 34. Because of the way that Maryland's government was

structured at the time, this provision had the effect of "prohibit[ing] arms in the in the governor's mansion while simultaneously protecting an upper chamber headed by the executive and which wielded mixed judicial-legislative functions." Rivas Dec. ¶ 30. Prohibitions on carrying weapons in court were also enacted in both the Founding era and the Reconstruction era. Rivas Dec. ¶ 31. And prohibitions on carrying weapons at election sites were commonplace in the Colonial, Founding, and Reconstruction eras. Rivas Dec. ¶¶32-33. In looking at these analogues, it is helpful to understand how government functioned in these earlier eras. For instance, in the colonial era there was a "blurring of the lines between and among different branches of government, and between public and private spaces," which should inform our understanding of the early prohibitions on carrying guns in legislative buildings. Rivas Dec. ¶ 30. Similarly, early elections occurred in a variety of settings—from stores to courthouses to public buildings—and these prohibitions are best understood as "at a minimum protect[ing] the government buildings and public spaces that served as electoral sites." Rivas Dec. ¶ 33. Even Plaintiffs' purported rebuttal expert, F. Lee Francis, concedes that a "purpose of historical sensitive places laws was to safeguard governmental decision-making and civic order."[16] F. Lee. Francis Report, TD Ex. 11 ¶ 39.

Plaintiffs concede that New York State can prohibit guns in "polling places, legislatures, and courts," but rely on *Bruen* to argue that this prohibition is otherwise unconstitutional because "[t]here is no historical tradition of prohibiting firearm carry in all government administration buildings." MSJ at 14-15. But this misreads *Bruen* and misstates the legal standard.[17] The *Bruen*

---

[16] To be clear, the Superintendent maintains that Mr. Francis, a law professor with no meaningful historical training, who wrote his first Second Amendment article in 2024 and used artificial intelligence to help produce his Rule 26 report, is not qualified to opine as a historian. *See* ECF No. 129 (discussing upcoming *Daubert* briefing).

[17] In support of this standard, Plaintiffs again cite *Koons v. Platkin*, 673 F.Supp.3d 515 (D.N.J. 2023), a district court decision in New Jersey, much of which was reversed by a panel decision (*Koons v. Att'y Gen. New Jersey*, 156 F. 4th 210, 274 (3d Cir. 2025)), that is pending en banc

Court noted the 18th and 19th century laws prohibiting carrying at "legislative assemblies, polling places, and courthouses," as part of a broader discussion about analogical reasoning in which it clarified that the modern-day laws at issue need not find perfect analogies for a statute "to pass constitutional muster." 597 U.S. at 30. Thus, *Bruen* concluded these "relatively few" examples were sufficient to describe a "longstanding" tradition of prohibiting guns in government buildings. *Id.* Contrary to what Plaintiffs argue, *Bruen* and *Rahimi* do not require that the State adduce historical analogues for every possible type of government administration building that might be covered by the sensitive location law. Rather, the question before this Court is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," by looking at whether there are "relevantly similar" historical antecedents. *Rahimi*, 602 U.S. at 692. And Founding era laws prohibiting guns in places where the work of governing was done are "relevantly similar" to this law, both in the "how" (prohibiting carriage of guns) and the "why" (to ensure safety and prevent interruptions to government work). New York's prohibition on carrying guns at sites of government administration is consistent with the long-standing American tradition of regulating guns in places where government administration is conducted. *See Kipke*, 165 F.4th at 208.

## I. It Is Constitutional To Keep Guns Out of Health Care Facilities

New York law prohibits carrying guns in "any location providing health, behavioral health, or chemical dependence care or services." N.Y. Penal Law § 265.01-e(2)(b). Though two Plaintiffs have standing to challenge the prohibition on carrying guns in health care settings,[18] their testimony sheds light on how ill-judged this challenge is. Plaintiff Noren testified that he would

---

review with the Third Circuit. *Koons v. Att'y Gen. New Jersey*, 162 F.4th 100 (3d Cir. 2025).
[18] No Plaintiff challenges the prohibition on carrying guns in places providing behavioral health care or chemical dependence care.

like to keep a gun in his oral surgery practice without telling his patients, that he would like to prohibit patients from carrying guns when they come to his practice for procedures, and that he would like to carry a gun when he visits certain other health care facilities as a patient. TD Ex. 4 at 61:4-63:2, 89:3-92:4. Plaintiff Noren also admitted that, although he would not want his patients to be armed while he operated on them, "there's no fool-proof way of knowing" that someone is not carrying a gun. *Id.* at 90:20-21. Plaintiff Nash testified that he would like to carry a gun when he takes his mother to the doctor and when he goes his own doctor's visits. TD Ex. 12 at 64:16-72:15. But Plaintiff Nash also admitted that he had "never thought about" what he would do to secure his gun when he was required to undress or undergo a medical procedure. *Id.* at 71:18-23.

In *Antonyuk*, the Second Circuit weighed analogue statutes and concluded that the prohibition on carrying guns at behavioral health and substance abuse sites was constitutional. 120 F.4th at 1012-13. In particular, the Court of Appeals determined that it was justified by both statutes that "excluded people with intellectual disabilities, mental illnesses, and alcohol addictions from militia service" and by statutes that regulated "firearms in locations frequented by vulnerable populations such as children." *Id.* at 1009. Both of these analogues "place § 265.01-e(2)(b) within this Nation's tradition of firearm regulation in locations where vulnerable populations are present," with the militia laws confirming that "individuals with behavioral or substance dependence disorders have historically been viewed as a vulnerable population justifying firearm regulation." *Id.* at 1010, 1012.

Though Plaintiffs acknowledge that *Antonyuk* upheld this provision, they seek to limit it to the ban on carrying guns in places providing behavioral health care and substance abuse dependency care. MSJ at 17. But there is no reason to think that *Antonyuk*'s holding does not apply with the same force here. Hospitals and other health care sites are places where people are often at

39

their most vulnerable and are disproportionately places where the ill and elderly gather. Plaintiffs also argue that because almshouses and hospitals were present at the time of the Founding, the lack of evidence of firearms regulation in those spaces should be viewed as dispositive. MSJ at 16-17. *Antonyuk* directly rejected this argument and found that the longstanding tradition of regulating firearms in places frequented by vulnerable populations was sufficiently analogous to a prohibition on guns in behavioral health and substance abuse treatment sites. 120 F.4th at 1013.[19] Additionally, the Fourth Circuit in *Kipke*, citing extensively to *Antonyuk*, noted that "[m]odern hospitals and medical facilities do not resemble the hospitals at the Founding" and concluded that "[i]n light of our historical tradition of prohibiting the carrying of guns in places that serve vulnerable populations and engage in scientific pursuits, the *why* and the *how* of Maryland's regulation match that of historic regulations." 165 F.4th at 216. Finally, Plaintiffs' argument that "the Founders relied on our Nation's robust tradition of permitting or requiring firearm carry to protect vulnerable populations in places lacking comprehensive government-provided security" (MSJ at 17), cites to three hearsay exhibits that contain not evidence, but law review articles authored by gun rights activists[20] and not peer reviewed. *See* P. Ex. 46-48; *see also Lane v. Cacace*, No. 22 Civ. 10980, 2025 WL 903766, at *8-9 (S.D.N.Y. Mar. 25, 2025) (rejecting such documents on evidentiary grounds in Second Amendment case).

---

[19] Plaintiffs also argue that the historical laws prohibiting "those with mental illness, intellectual disabilities, and alcohol addiction from serving in the militia" are "not sufficient to ban carry in all locations providing health care or services." MSJ at 17. Those laws were invoked to establish "*who* has historically been considered to make up a vulnerable population justifying firearm regulation on their behalf." *Antonyuk*, 120 F.4th at 1011. Here, there can be no disagreement that the sick and ailing are "vulnerable," and that there is a longstanding history of prohibiting guns in places where vulnerable people congregate.

[20] These activists include Joseph Greenlee, who is Director of the Office of Litigation Counsel for the NRA, parent organization of Plaintiff NYSRPA. *See* https://fedsoc.org/bio/joseph-greenlee. Plaintiffs do not disclose the affiliation.

As discussed in section II(C) *supra*, there is a well-established and representative tradition of regulating firearms in places where vulnerable populations, like children, gather. And, as both *Antonyuk* and *Kipke* held, a prohibition on carrying guns in healthcare settings is consistent with that tradition.

### J.    Guns May Be Prohibited In DOH Residential Facilities

New York prohibits carrying guns in "residential settings licensed, certified, regulated, funded, or operated by the department of health." N.Y. Penal Law § 265.01-e(2)(l). This prohibition applies in nursing homes and similar locales, and it is well justified by the nation's tradition of regulating guns in places where vulnerable populations congregate.

#### 1.    *Plaintiffs Lack Standing*

Only one plaintiff, Mr. Porter, alleged that he visits residential settings licensed by the Department of Health. SAC ¶ 84. But in his deposition, Mr. Porter testified that he did not carry a gun when he visited such settings prior to the enactment of the CCIA. TD Ex. 3 at 88:18-24. And while Mr. Porter testified that he regularly visits Friedwald Rehabilitation and Nursing in New City, New York, *id*. at 84:13-85:9, the Friedwald Center prohibits "all Associates, residents, or visitors form possessing any weapons of any kind," including guns, while on site. Dec. of Adam Geller ¶ 4. To the extent that Mr. Porter has any dispute, it is with the Friedwald Center, which independently prohibits visitors such as Mr. Porter from carrying guns. And Mr. Porter acknowledges that private property owners may make such decisions. *See* TD Ex. 3 at 175:15-18, 179:12-15. Mr. Porter therefore does not have standing because he cannot show that any injury stemming from Friedwald's policy is traceable to Superintendent James or redressable by him. *See Simon v. E.Ky. Welfare Rts. Org.*, 426 U.S. 26, 42-43 (1976) (concluding that denial of hospital services could not fairly be traced to IRS ruling that permitted favorable tax status to nonprofit hospital that only offered emergency room services to indigent patients and that change to that

41

ruling would not necessarily lead to more services for indigent patients).

### 2. History Supports Keeping Guns Out of DOH Residential Facilities

The reasoning in *Antonyuk* (analyzing behavioral health care settings and substance abuse care settings) and *Kipke* (analyzing health care facilities more broadly) applies with even more force in this setting. It is, quite simply, hard to imagine a place where more vulnerable people congregate than residential facilities that are licensed or regulated by the Department of Health. Nursing homes and rehabilitation centers are, by definition, places where sick, injured, and elderly people reside to recover when they are at their most vulnerable. Plaintiffs lump residential facilities licensed or otherwise regulated by DOH with health care facilities, MSJ at 16-17, and make no arguments specific to this provision. New York's prohibition on carrying guns in DOH residential facilities is consistent with the long-standing national tradition of regulating firearms in places where vulnerable people congregate, as outlined in section II(C), *supra*.

### K.   The Second Amendment Does Not Prohibit Regulation of Guns on Public Transit or in Airports

New York prohibits guns in "any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals." N.Y. Penal Law § 265.01-e(2)(n). Plaintiffs have standing to challenge only the prohibition on ferries, and that prohibition fails as it is consistent with our nation's tradition of regulating firearms.

### 1. Plaintiffs Lack Standing to Challenge the Prohibition on Guns in Public Transit and Airport Facilities

Only one Plaintiff—Mr. Stirnweis—even arguably testified that he would like to take his

42

gun in any place covered by § 265.01-e(2)(n).[21] He testified that he took privately operated ferries with some regularity. TD Ex. 5 at 165:21-170:6. He also testified that he visited John F. Kennedy International Airport regularly and wanted to be able to carry a gun while driving or parking on the airport grounds and at the passenger drop off area and that he wanted to be able to bring a firearm in his checked luggage in compliance with federal regulations. *Id*. at 185:8-191:21. Mr. Stirnweis testified that the most recent time he used commuter rail was a year and a half prior and he could not remember the time before that. *Id.* at 170:14-19. Similarly, he had not ridden the subway since April of 2024. *Id.* at 174:20-24.

New York law only prohibits guns on vehicles, like ferries, that are "used for public transportation or public transit." N.Y. Penal Law § 265.01-e(2)(n). And none of the ferries that Mr. Stirnweis testified he uses are operated by public entities such that they would qualify as "public transit" or "public transportation." *See* TD Ex. 5 at 166:12-16; 167:21-24; 168:16-20; 169:19-24.  As for airports, Mr. Stirnweis could not articulate how having a gun in his car as he drove to and from the airport (including stops in parking lots) violated the sensitive places law, which in relevant part prohibits possession of a gun in "any place, conveyance or vehicle used for aviation transportation; or any facility used for or in connection with service in . . . airports." N.Y. Penal Law § 265.01-e(2)(n). The first provision applies to the airplanes themselves, while the

---

[21] Though Plaintiffs suggest that Mr. Francis testified that he wanted to bring a gun with him on public transit (MSJ at 3), he testified to the contrary:

> Q. And so if you win this case, would you take a firearm onto the L.I. double R and the New York City subway?
> A. I believe you all call that asked and answered because we spoke about that at length earlier in regards to my intent. Is -- does – this case is not affected by my mindset and my decisions around training and waiting until I -- I feel that I'm actually ready for that.
> Q. So is that a no?
> A. That is a no.

TD Ex. 2 at 143:17-144:3.

43

second applies to airport "facilit[ies]." The statute does not define "facilities," but common use of the term limits this to airport buildings (which Mr. Stirnweis has not said that he would like to enter while carrying his gun). Mr. Stirnweis said that he is unsure if he can stow a gun in checked luggage, but that is also something that is permitted. Dec. of Michael Deyo ¶ 3. Thus, Mr. Stirnweis cannot establish that he intends to engage in a course of conduct proscribed by a statute. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Similarly, he does not establish, to the degree required at summary judgment, that he is likely to use any other means of public transport. A single trip on the LIRR or subway—more than a year and a half ago—without more, does not establish constitutional injury. *Antonyuk*, 120 F.4th at 1033 ("A past but unfulfilled intention to violate the law does not support pre-enforcement standing.").

### 2. *The Second Circuit Had "No Trouble Holding" That Prohibiting Guns on Public Transportation is Constitutional*

In *Frey v. City of New York*, the Second Circuit held that § 265.01-e(2)(n), as applied to the New York City Subway and Metro-North commuter rail was consistent with the nation's tradition of regulating firearms in quintessentially crowded places. 157 F.4th 118, 135 (2d Cir. 2025). The Court of Appeals emphasized both that the Subway and Metro-North were crowded and enclosed: "once the familiar command—'stand clear of the closing doors'—sounds and the car doors slam shut, riders are sealed within the slender metal tube until, absent misadventure, they emerge at the next station stop." *Id.*. The *Frey* opinion relied upon these features to conclude that "Firearm prohibitions in subway and train systems are therefore especially akin to those historical laws that specifically singled out *enclosed* crowded spaces, such as ballrooms, as places where prohibiting firearm carriage was appropriate." *Id*. (emphasis in original). And other Circuits are in agreement. *See Kipke*, 165 F.4th at 210; *Schoenthal v. Raoul*, 150 F.4th 889, 914 (7th Cir. 2025). Plaintiffs' challenge to the prohibitions on carrying guns on the New York City subway system

44

and the Long Island Rail Road (a commuter rail system that is "the busiest commuter railroad in North America"[22]) are squarely foreclosed by *Frey*. The features that *Frey* relied upon—crowds of people in enclosed spaces—are present in the other forms of public transit that Plaintiffs seek to challenge: various ferry services on Long Island and airport terminals. *Frey* also concluded that the absence of Founding-era analogues was not dispositive, as "[t]here were no mass transit systems at the time of the Founding." 157 F.4th at 136. The Court explained: "the lack of historical government gun regulations specifically targeting public transport systems is attributable to this 'dramatic technological change[] [that] may require a more nuanced approach' under *Bruen*'s analogical method, and therefore has little bearing on the constitutionality of our modern-day regulations." *Id*. (citation omitted); *see Schoenthal*, 150 F.4th at 914 ("The Founders could not have anticipated the modern transit system, either as mass transit exists in Illinois or in air travel.").

In addition to the historical analogues regulating firearms in crowded and enclosed spaces, it bears emphasis that as transportation technology changed with the advent of railways, it became accepted to limit or restrict carriage of firearms on railways. In her declaration, Dr. Rivas explained that "though passenger transportation in the nineteenth-century differed dramatically from modern public transit (which is really a product of the twentieth century)," the expansion of rail travel in the nineteenth century was accompanied by state legislatures granting quasi-public powers to railways, which included the power to prohibit and regulate guns. Rivas Dec. ¶¶ 39-40, 43. Thus, in the 1880s, the Georgia legislature enacted a bill that provided that "conductors of a train carrying passengers, are invested with all the powers, duties, and responsibilities of police officers while on duty on their trains," and statutes enacted in the 1860s in Ohio and Pennsylvania allowed rail

---

[22] *See* About the Long Island Rail Road, https://www.mta.info/agency/long-island-rail-road [https://perma.cc/C6D2-WV7V] (noting that LIRR carries "250,000 customers each weekday on 947 daily trains.").

companies to establish their own police forces. John L. Hopkins, Clifford Anderson & Joseph R. Lamar, *Code of the State of Georgia* (Atlanta, Foote & Davies Co. 1895), 230 (sec. 902), TD Ex. 35; *see* Rivas Dec. ¶¶ 40-41. Many railway companies used this authority to confiscate guns and regulate carriage of firearms on board trains. Rivas Dec. ¶¶ 42-43. The *Frey* Court considered these regulations and concluded that it did not need to "decide whether" it was proper to "rel[y] on these private yet quasi-public railroad company regulations," because Section 265.01-e(2)(n) was "sufficiently similar to the historical tradition of prohibiting firearms in quintessentially crowded enclosed places." 157 F.4th at 136 n. 9.

Plaintiffs argue that this Court should find relevant that "there were no laws banning firearm carry on any form of public transportation or transit at the time of the Founding," and suggest that this Court should disregard the Second Circuit's disposal of this argument in *Frey* in favor of the District of New Jersey's decision (which is being appealed) in *Koons*. MSJ at 23. But even if this Court were free to ignore the Second Circuit's conclusions, the *Frey* opinion quite rightly notes why this absence of regulation at the Founding era is not dispositive: namely, any form of transportation present during the Founding era was neither "mass transit" nor public, insomuch as they were not operated by public entities. 157 F.4th at 135-36; *see also* Rivas Dec. ¶¶ 39-47. As for the colonial-era laws that Plaintiffs cite for their contention that people were required to carry arms and were rewarded for carrying them while they traveled, those reflect the concerns about active warfare with Native peoples and do not provide insight into the Founding era. Rivas Depo. Tr. 203:11-205:15; *see also* P. Ex. 61 (discussing security as a method of avoiding "their being surprised by Indians"). Similarly, the three 19th century prohibitions on carrying guns, except while traveling (P. Exs. 68-70) do not compel a different result. As Dr. Rivas testified, "Traveling then was very different from now" insomuch as it involved "long distances, vulnerability to thieves

46

on the highway and to predatory animals."[23] Rivas Depo. Tr. 152:24-153:2. Because of these massive changes in travel (and the fact that no publicly operated mass transit existed until the twentieth century), it is appropriate to analogize this prohibition to the broader tradition of regulating firearms in quintessentially crowded places. *Frey*, 157 F.4th at 135-36.

### L.    Guns May Constitutionally Be Kept Out of Times Square, "The Crossroads of the World"

New York prohibits guns in "the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage." N.Y. Penal Law § 265.01-e(2)(t). New York City in turn defined the boundaries of Times Square. N.Y.C., N.Y. Admin. Code § 10-315; *see also* TD Ex. 13, Map of Times Square Gun Free Zone.

#### 1.    *Plaintiffs Lack Standing*

Plaintiffs Porter and Stirnweis both alleged that they visited Times Square with regularity, and in Plaintiff Porter's case, that he no longer visits Times Square "because he may not carry a firearm there." SAC ¶¶ 88, 94. But Mr. Porter testified that none of the sites he visited near Times Square were in fact located within the Times Square Gun Free Zone. TD Ex. 3 at 167:8-180:19. Mr. Porter also testified that the main reason he visited Times Square prior to the CCIA was to see

---

[23] Caselaw from the period also shows that travel exceptions were understood narrowly to allow only for travelers to protect themselves while on a long-distance journey, and not to cover weapons carriage in everyday life—such as a person's daily commute. *See Carr v. State*, 34 Ark. 448, 449 (1879) ("The exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others."); *Eslava v. State*, 49 Ala. 355, 357 (1873) ("the 'travelling or setting out on a journey,' which under the statute excuses the act, must be a travel to a distance from home, and not within the ordinary line of the person's duties, habits, or pleasure."); *Smith v. State*, 50 Tenn. 511, 513-14 (1871) (travel exception designed to protect against "such possible perils of the highways as are not supposed to exist among one's own neighbors," while law prohibited "carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating.").

47

Broadway shows, but prior to the enactment of the CCIA, he did not bring a gun with him to any Broadway theaters. *Id.* at 171:14-18, 180:17-19. Mr. Stirnweis estimated that he had been to Times Square once in the last one-to-two years, but he could only recall one specific instance in which he visited Times Square and could not remember precisely where he went. TD Ex. 5 at 177:4-178:21. Put simply, neither Mr. Stirnweis nor Mr. Porter can establish that they changed their conduct in response to the CCIA's prohibition of carrying guns in Times Square or that they engage in any conduct proscribed by the statute. That is fatal to their standing to challenge this sensitive place restriction. *Picard v. Magliano*, 42 F.4th 89, 98-99 (2d Cir. 2022).

> 2.    *Times Square Is a Sensitive Location Because it is "Our Modern-day, Electrified, Supersized Equivalent of Fairs, Markets, and Town Squares of Old."*

In *Frey*, the Second Circuit considered a challenge to § 265.01-e(2)(t) and concluded that the inquiry was "straightforward" insomuch as the prohibition was consistent with the lengthy history of laws prohibiting guns in fairs, markets, and similar crowded places:

> There is perhaps no public place more quintessentially crowded than Times Square. Extending approximately from 40th to 53rd Street, and from Sixth to Ninth Avenue in Manhattan, this block at the heart of Manhattan, known as the "Crossroads of the World," teems with "rivers of neon and seas of tourists." The Nasdaq Exchange and Broadway theaters, as well as hundreds of restaurants and stores are among those that call it home. Over 300,000 people visit Times Square every day. Moreover, Times Square serves as a civic commons where thousands gather to exercise their fundamental democratic and First Amendment rights—to speak, demonstrate, and protest. In short, Times Square is our modern-day, electrified, supersized equivalent of fairs, markets, and town squares of old. We therefore "need not stretch the analogy far," to conclude that Section 265.01-e(2)(t) is entirely consistent with our historical tradition of regulating firearms in quintessentially crowded places in both the "how" and "why."

*Frey*, 157 F. 4th at 134–35 (citations omitted).

As the above-quoted passage suggests, the tradition of regulating firearms in crowded markets and public squares originates with the 1328 Statute of Northampton, which prohibited "going armed" at "fairs" and "markets." Charles Dec. ¶ 10. This provision was adopted by several

48

Founding-era States (*see* sections II(F) and II(G) *supra*). As expert historian Patrick Charles explained in his declaration, "historical 'sensitive places' laws . . . were generally adopted to protect the public from firearms-related violence at designated places and times where the public was generally known to gather, whether it be to engage in commerce or recreation." Charles Dec. ¶ 25. Thus, localities forbade carrying guns on fairgrounds or more broadly in town centers. *See, e.g.,* Charles Ex. 7-17, 85. By the nineteenth century, "Americans understood recreational and entertainment venues to count among the public spaces protected by locational restrictions," as legislatures prohibited guns in "a wide array of public places and social settings," including "ballrooms[,] . . .. circuses, race courses, shows, public explanations" and other places where people gathered for entertainment. Rivas Dec. ¶ 34. Because Times Square is at once a marketplace, a public square, a place where people gather for entertainment, and a public fair, it squarely falls within the American tradition of regulating firearms in places where crowds congregate and in public squares.

Plaintiffs' main argument is that prohibiting gun in Times Square "flies directly in the face of *Bruen*'s admonition against declaring Manhattan a sensitive location." MSJ at 22. But *Bruen* simply instructed that New York could not designate the entire "island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. at 31. Nothing in the Supreme Court's opinion precludes designating a discrete area—here, perhaps the most "quintessentially crowded" public place in New York State. *Frey*, 157 F.4th at 134.

### III.    THE AUTOMOBILE STORAGE LAW IS IN LINE WITH AMERICA'S HISTORY OF REGULATING WEAPON STORAGE

Separate from their sensitive locations challenge, Plaintiffs also assert that the Constitution forbids New York from requiring them to safely store their guns when left unattended in a car. The

statute at issue is N.Y. Penal Law § 265.45(2) (the "Automobile Storage Law"), which requires anyone who "store[s] or otherwise leave[s]" a gun "out of such person's immediate possession or control inside a vehicle" to unload the gun and place it in a locked "safe storage depository[24] out of sight from outside the vehicle." The logic of the law is straightforward: stolen guns play a significant role in violent crime, and thefts from motor vehicles are the single most significant source of stolen guns. *See* Deborah Azrael & Susan T. Parker, *Trends in gun theft: Leveraging data to inform crime policy*, Council on Criminal Justice (June 2025), https://counciloncj.org/trends-in-gun-theft/ [https://perma.cc/24KT-DZEP]. Plaintiffs assert that this law is "onerous" and that without it they would "safely and responsibly secure their firearms in their unattended automobiles without first removing ammunition from their firearms and without utilizing a safe storage depository." SAC ¶ 43. They do not explain how they would do so "safely."

### A.    The Automobile Storage Law Does Not Infringe the Text of the Right to Keep and Bear Arms

The Automobile Storage Law should be upheld because it simply does not impact anyone's right to armed self-defense. In step one of the *Bruen*/*Rahimi* framework, a reviewing court "consider[s] whether the conduct regulated by [the challenged law] is covered by the 'plain text of the Second Amendment as historically understood.'" *United States v. Gomez*, 159 F.4th 172, 176 (2d Cir. 2025) (quoting *Antonyuk*, 120 F.4th at 968) (brackets omitted). "To determine under step one whether the Second Amendment's plain text covers certain conduct, th[e] [c]ourt looks to: whether the weapons at issue are 'weapons in common use today for self-defense' and whether the conduct at issue implicates the right to armed self-defense." *Calce v. Tisch*, No. 25-861-cv, 2026

---

[24] A "safe storage depository" is, essentially, any locked container that is fire, impact, and tamper resistant and is not a car's glove compartment.  N.Y. Penal Law § 265.45(3).

WL 980092, at *1 (2d Cir. Apr. 13, 2026) (summary order) (quoting *Gomez*, 159 F.4th at 177-78). "Plaintiffs bear the burden of proof on both of these inquiries." *Id.*

Moreover, for Plaintiffs to carry their burden the impact of the challenged law on a plaintiff's right to armed self-defense must be a substantial one. "When the challenged law regulates unenumerated 'ancillary' conduct—such as the acquisition and maintenance of firearms and ammunition—the conduct is 'only protected to the extent that it is necessary to the realization of the textually-specified right to keep and bear arms.'" *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 244 (2d Cir. 2025) (quoting *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025)) (brackets omitted). "Thus, 'regulations on the means of [] transporting and storing firearms only implicate the text of the Second Amendment if they *meaningfully constrain* the right to possess and carry arms." *Id.* (quoting *Vereen*, 152 F.4th at 95) (emphasis in the original). In addition to this Second Circuit precedent, the Sixth Circuit analyzed the issue of storage in its leading case on ancillary rights, explaining that "the right covered by the Second Amendment's plain text is the right to possess and carry arms in case of confrontation," and therefore if a "storage regulation [] does not restrict conduct necessary to effectuate that right, the proposed conduct . . . is not protected by the plain text of the Second Amendment and the regulation need not satisfy *Bruen*'s second step, even though it regulates conduct connected to firearms." *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1195, 1196 (6th Cir. 2024).

That is the case with the Automobile Storage Law, which the State Legislature carefully tailored to avoid any material impact on any person's right to self-defense. Its provisions are only applicable when someone "store[s] or otherwise leave[s] a rifle, shotgun, or firearm out of such person's immediate possession or control inside a vehicle." N.Y. Penal Law § 265.45(2). The law does not prevent any person from carrying a gun on his or her person when traveling in a vehicle;

51

all it does is require that person to keep the gun safely when he or she chooses to leave the weapon behind. In other words, this law only applies when a person is *not* bearing arms. Because the law does not impact the Second Amendment's text, "the constitutional inquiry ends, and a plaintiff's challenge to the law fails." *Giambalvo v. Suffolk County*, 155 F.4th 163, 176 (2d Cir. 2025).

## B.      History Supports Regulation for Safe Storage of Firearms

Even if Plaintiffs carried their burden of demonstrating that the Automobile Storage Law meaningfully constrained their right to armed self-defense, the law would succeed at the second step of the *Bruen*/*Rahimi* test because it is fully "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. 680, 692 (2024). "Central to this inquiry" is an analysis of how and why a modern law impacts the keeping and bearing of arms, *id.* at 692, and the Automobile Storage Law fits comfortably into historical traditions in both respects.

As to the "how," colonial and early American laws commonly regulated the storage of firearms and gunpowder, as the eight-member Supreme Court majority in *Rahimi* recognized. *See id.* at 691 ("At the founding, the bearing of arms was subject to regulations . . . about firearm storage."). "Early in the Nation's history, gunpowder was necessary to shoot a firearm. But the storage of gunpowder increased the risk of explosions or fires, which posed an obvious threat to innocent persons. To mitigate the danger to innocent lives, several colonies and states enacted laws restricting the storage of gunpowder." *Duncan v. Bonta*, 133 F.4th 852, 874 (9th Cir. 2025); *see also Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 233 n.2 (4th Cir. 2024) (Rushing, J., concurring) (collecting examples of laws that "require[d] forfeiture of a firearm or ammunition that was not safely stored"); *see Vereen*, 152 F.4th at 100-01 (discussing several of these laws as examples of how "[c]olonies also tightly regulated the transportation of both gunpowder and ammunition."). There were a great many such laws enacted during the colonial and founding eras; the Superintendent has included 14 examples as exhibits to the Thompson Declaration. TD Exs.

52

14-26, 36. These laws often limited the amount of gunpowder any individual could keep for personal use and specified how it should be stored. *See, e.g., The Perpetual Laws of the State of New-Hampshire* (Portsmouth, John Melcher 1789), TD Ex. 21 (1786 law limiting the keeping of any gunpowder to ten pounds, "which ten pounds shall be kept in a tin cannister properly secured for that purpose"); Acts and Laws of the English Colony of Rhode-Island (Newport, Samuel Hall 1767) 116, TD Ex. 18 (1750 law requiring all persons keeping gunpowder in the Town of Newport to deposit it in the town Powder-House, excepting only a limited amount "which shall be kept in a Tin Powder-Flask."). These laws were common in New York, with laws passed governing New York City, TD Ex. 20 & 22; Albany, TD Ex. 23; and Utica, TD Ex. 26, with additional cities passing their own laws as the nineteenth century progressed. And this tradition was not limited to regulating gunpowder, with some laws requiring that firearms be separated from ammunition when left unattended. *See* An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder within the Town of Boston (1783), reprinted in *Acts and Laws Passed by the Great and General Court or Assembly of the Commonwealth of Massachusetts* 218-19 (Benjamin Edes & Sons 1783), TD Ex. 36.

The "why" of the Automobile Storage Laws also lines up with the founding-era storage tradition. While the primary focus of these laws was to protect the public from fires or explosions, these laws were also explicitly enacted to prevent theft of weapons, powder, or ammunition by dangerous persons. That legislative purpose can be seen in records from the earliest days of English settlement in America, as when the Massachusetts Bay Colony in 1643 empowered militia leaders to direct whether weapons are carried to church and "other times of meeting" and to ensure "that ammunition bee safely disposed of, that an enemy may not possesse himself of them." 2 Nathaniel B. Shurtleff, ed., *Records of the Governor and Company of the Massachusetts Bay in New England*

53

38 (Boston, William White 1853), TD Ex. 14. And as the colonies grew and became more urbanized, legislators continued to pass storage laws geared in part toward preventing weapons or gunpowder from falling into the wrong hands. *See, e.g.,* An Act for the better Securing of the City of Philadelphia, from the Danger of Gun-Powder, 1725 Pa. Acts 33, TD Ex. 16 (complaining that without a mandated central depository, gunpowder was kept "too often, within the Access of Sailors and Servants, to the manifest danger of the People of the said City"); An ACT for the better settling and regulating the Militia of this Colony of New Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions (1746), reprinted in III Bernard Bush, *Laws of the Royal Colony of New Jersey 1746-1760* 9, TD Ex. 17 (1980) (setting strict limits on the distribution and retention of gunpowder and weapons by the militia "to prevent the said Arms being seized by an Enemy, or persons disaffected to the Government").

Cars and trucks, of course, did not exist in 1791 or 1868, though they remade America in the 20th Century. *Cf. Bruen*, 597 U.S. at 27 ("dramatic technological changes may require a more nuanced approach" to historical analysis). But in keeping with this historical tradition, as soon as automobiles became commercially prevalent, states began enacting laws regulating the transportation of guns in cars, with the support of the National Rifle Association, parent entity of Plaintiff NYSRPA. *See* Charles Dec. ¶ 44 & n.105 (collecting statutes from 1919-27 regulating transport of guns in automobiles); 1919 Me. Laws 193, reprinted in Bath Daily Times, April 9, 1919, at 17, Charles Dec. Ex. 133) ("No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests."). Even if the Second Amendment's text were implicated by a mere storage regulation, applicable only to a weapon kept "outside of [the owner]'s immediate possession or control," N.Y. Penal Law § 265.45(2), New York's Automobile Storage Law would

54

be fully consistent with the centuries-long American tradition of requiring the safe storage of guns and ammunition.

## IV.    PLAINTIFFS' CHALLENGE TO THE PRIVATE PROPERTY PROTECTION LAW IS MOOT

Plaintiffs' challenge to N.Y. Penal Law § 265.01-d (the "Private Property Provision"), which protected the right to private property by ensuring that persons must obtain an owner or lessee's express consent prior to bringing a gun onto his or her property, has been mooted by the Second Circuit's recent decision in *Christian*.  In addition to affirming the constitutionality of New York's law prohibiting guns in public parks (as discussed in section II(D), above) the *Christian* decision also affirmed a district court order that "permanently enjoined [Superintendent James] from enforcing the Private Property provision, as applied to private property open to the public."[25] 2026 WL 1378796 at *1.  Because of that injunction, there is no reasonable expectation that any Plaintiff will have the Private Property Provision enforced against them, and any challenge to it is moot.

To have standing to sue (and therefore for the Court to have subject-matter jurisdiction to hear a claim), a plaintiff must establish an injury that is "actual or imminent, not conjectural or

---

[25] Like the plaintiffs in *Christian*, Plaintiffs in this case limit their challenge to the law to "private property open to the public." MSJ at 26; *see also id.* at 26-27 ("Plaintiffs request that the Court strike the [Private Property] provision as applied to privately owned property open to the public."). In the event that Plaintiffs were to attempt to recharacterize their challenge as covering all private property, including homes and other locations not open to the public, the Court should deem the argument waived since it was not raised in their moving papers, *see Metz*, 2010 WL 2243343 at *10, or else reject the arguments on the merits for the reasons found by the District and Circuit Courts in *Antonyuk*. *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 343 (N.D.N.Y. 2022) (rejecting argument that Second Amendment allows "concealed carry on privately owned property that is *not open to the public* . . . because thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's *own* home or in *public*."); *Antonyuk*, 120 F.4th at 1046 ("We assume without deciding that the State's analogues demonstrate a well-established and representative tradition of creating a presumption against carriage on enclosed private lands, *i.e.*, private lands closed to the public.").

hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Similarly, "If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." *Conn. Citizens Defense League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021) (quoting *Janakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020)).

The application to this case is governed by the Second Circuit's holding in another recent Second Amendment action, *Giambalvo v. Suffolk County*, 155 F.4th 163, 179 (2d Cir. 2025). In *Giambalvo*, a group of Long Island plaintiffs sued to enjoin N.Y. Penal Law § 400.00(1)(o)(iv), which was already covered by a preliminary injunction from another case. The Court of Appeals held that "[t]hat determination renders the challenge against the same provision here moot" because a "subsequent request for similar relief in a different case . . . 'would not have any real-world effect.'" *Id.* (quoting *We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1258 (10th Cir. 2024)). This was the case even though the parties were not identical, as there was "no indication in the record" that any party was "presently enforcing a state law provision that the State is actively enjoined from enforcing." *Id.* Given that the preliminary injunction in *Giambalvo* was held sufficient to moot challenges to the enjoined statute, the same outcome is all the more warranted in the context of the *permanent* injunction in *Christian*. This Court reached the same outcome in its motion to dismiss opinion, declining to allow Plaintiffs' challenge to the same already-enjoined law at issue in *Giambalvo* because the injunction had already "been [] upheld by the Second Circuit" and "any relief granted by this Court would not have any real-world effect." *NYSRPA v. James*, No. 22 Civ. 907, 2025 WL 553423, at *9 (N.D.N.Y. Feb. 18, 2025). Because Plaintiffs' private property challenge seeks an injunction of a statute that is already permanently enjoined,

there is no live case or controversy, and the challenge must be dismissed as moot.

## V.    THE SENSITIVE PLACES STATUTE IS NOT VOID FOR VAGUENESS

Plaintiffs assert that the CCIA is void for vagueness, but it is impossible to discern from either the operative complaint or their motion for summary judgment what provisions of the CCIA they contend are unduly vague. And in depositions, no Plaintiff was able to articulate an explanation of what, precisely, was vague. The burden was Plaintiffs' and they have not carried it.

"The Due Process Clause of the Fourteenth Amendment requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Betancourt v. Bloomberg*, 448 F.3d 547, 552 (2d Cir. 2006) (internal quotation marks and citations omitted). This standard does not require "meticulous specificity" from a legislature. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Rather, courts recognize that "language is necessarily marked by a degree of imprecision," and instead focus on whether a statute provides "individuals [with] . . . fair notice or warning when the state has prohibited specific behavior or acts." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (Sotomayor, J.).

In depositions, Plaintiffs were either unable to identify specific provisions of the CCIA that they thought were vague or their testimony revealed that their understanding of what "vague" meant was not relevant to whether a statute was void for vagueness. Thus, Plaintiff Porter testified that he thought the sensitive places law was vague because some of the places covered were private property and prior to the change in the law, some of those places allowed guns. TD Ex. 3 at 226:6-227:9. He also testified that "the whole—the concept of the exception, if you're law enforcement, if you're armed security" was vague. *Id*. at 222:4-13. But in both of these instances, it was not the case that Mr. Porter could not understand what the law required, but rather that he disagreed with it:

57

Q: But you understand that the law says that you cannot carry a gun in a sensitive place, right?
A: I do.
Q: And you disagree with it?
A: I disagree with it because I said, like—like, I keep stating that these areas are a private property. . . .

*Id*. at 227:10-17. Plaintiff Noren could not identify any provision of the CCIA that he did not understand. TD Ex. 4 at 137:2-141:12. And Plaintiff Nash testified that he understood the prohibitions of the CCIA but still thought the CCIA was vague because the list of sensitive places was "just too many places to memorize." TD Ex. 12 at 94:13-14, 92:13-96:25.

In their summary judgment motion, Plaintiffs merely argue that "[t]he location prohibitions are so broad that the law fails to inform an ordinary person . . . where a carry license holder may carry a firearm." MSJ at 30. Leaving aside whether it is appropriate to characterize the CCIA's sensitive locations and private property provisions as "broad," this bare assertion does not establish vagueness. The reference to a "broad" statute is coupled with a citation to *City of Chicago v. Morales*, 527 U.S. 41 (1999), which involved a local ordinance that vested near complete discretion in local police officers to order persons to leave any location open to the public, if the person in question was with someone who the police officer believed was a gang member and was standing without "an apparent purpose." The standard was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Id*. at 62. Here, the descriptions of sensitive locations and the rules governing carrying weapons on private property are objective and easy to ascertain. They are not void for vagueness.

## VI.    THE EXCEPTIONS FOR LAW ENFORCEMENT OFFICERS EASILY SURVIVE RATIONAL BASIS REVIEW

Finally, Plaintiffs argue that the sensitive places law "impermissibly discriminates against Plaintiffs and other applicants in favor of retired police officers by exempting the latter from its sensitive location carry bans and its no-carry default" and that the CCIA's separate provisions

58

governing licensing of former police officers is discriminatory.[26] MSJ at 30.

While the Fourteenth Amendment requires that States apply "equal protection of the laws," "most laws differentiate in some fashion between classes of persons." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The Fourteenth Amendment "simply keeps governmental decisionmakers from treating differently persons who are in *all relevant respects alike*." *Id*. (emphasis added). Plaintiffs contend that there is no rational basis for treating them differently from retired police officers. That is, of course, not so. Under New York law, peace officers must complete the State-mandated training, which includes training "in the use of deadly physical force and firearms and other weapons" and they must "annually receive" that instruction during their employment. N.Y. C.P.L. § 2.30.[27] No Plaintiff contends that they have completed peace officer training, nor that they have the experience that comes from having spent their working years serving as law enforcement officers. They are not "in all relevant respects alike" retired law enforcement officers and therefore, their challenge is without merit.

## CONCLUSION

For the reasons set forth above, and upon all prior proceedings, the Superintendent respectfully asks the Court to grant his motion for summary judgment, deny Plaintiffs' motion for summary judgment, dismiss this action in its entirety and with prejudice, and grant such other and further relief as the Court deems just and proper.

---

[26] Because no licensing claims remain against the State, see MTD Opinion at *3-*4, the State only addresses this issue as it pertains to the sensitive places law. However, just as the differentiation between those who retired after working as law enforcement officers and the general public is justified by a rational basis for sensitive places laws, the same reasoning makes any challenge to the licensing law on this basis equally meritless.

[27] Separately, the federal Law Enforcement Officers Safety Act, codified at 18 U.S.C. §§ 926B, 926C, allows qualified law enforcement officers and qualified retired law enforcement officers to carry concealed weapons in any State, provided that they follow certain requirements.

Dated: Albany, New York
      May 27, 2026

LETITIA JAMES
New York State Attorney General
<u>Attorney for the Superintendent</u>

By: _____

Jennifer J. Corcoran
Assistant Attorney General
NDNY Bar Roll No. 508740
The Capitol
Albany, NY 12224
Tel: (518) 776-2581
jennifer.corcoran@ag.ny.gov

Molly Thomas-Jensen
Special Counsel
NDNY Bar Roll No. 705119
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-8679
molly.thomas-jensen@ag.ny.gov

James M. Thompson
Special Counsel
NDNY Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-6556
james.thompson@ag.ny.gov

CC: All Counsel of Record
     (via ECF)