UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NEW YORK STATE RIFLE & PISTOL
ASSOCIATION, INC., ROBERT NASH, BRANDON
KOCH, THOMAS STIRNWEIS, WAYNE FRANCIS,
KHOURY PORTER, and SCOTT NOREN,

        *Plaintiffs*,

       -against-                    Case No. 1:22-cv-00907 (MAD/PJE)

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,
RODNEY K. HARRISON, in his official capacity as
Commissioner of the Suffolk County Police Department
and Licensing Officer for Suffolk County, *and*
PATRICK J. RYDER, in his official capacity as Police
Commissioner of the Nassau County Police Department
and Licensing Officer for Nassau County,

        *Defendants*.
-------------------------------------------------------------------X

## DECLARATION OF DR. BRENNAN RIVAS

I, Brennan Rivas, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am over the age of eighteen (18), competent to testify to the matters contained herein, and testify based on my personal knowledge and information. The views I state herein are drawn from my research and professional experience.

2.     I have been retained by the State of New York to provide expert opinions and testimony in this case. For this engagement, I was asked to provide expert opinions about historical gun regulations—including, but not limited to, those pertaining to sensitive places. I have been asked specifically to address historical regulations that restricted the presence of

1

weapons at places of public gathering, sites of government administration, and public transportation.

3.    I have reviewed Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief as well as the challenged statute. I make this Declaration on the basis of my training, professional expertise, and research.

4.    For my work on this case, I am being compensated at a rate of $280 per hour for document review and consultation, $300 per hour for writing and editing, and $400 per hour for deposition and trial testimony.

### BACKGROUND & QUALIFICATIONS

5.    I am a historian and currently work as a Senior Postdoctoral Researcher and Associate Director at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut. During the 2021–2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the 1820s to the 1930s. My CV is attached to this declaration as Exhibit A.

6.    My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles, and a chapter in an edited collection published by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis*

*Law Review*. I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

7.      I have provided written expert witness testimony in numerous cases, all involving firearm regulations. A complete list is attached as Exhibit B.

**METHODOLOGY**

8.      This Declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. My knowledge and expertise with respect to historical gun laws was gained by reading numerous peer-reviewed, scholarly books and articles, in addition to law review articles and media such as blogs and news articles. I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers. Where I considered a specific historical document or source of law to form my opinions as expressed in this declaration that material is cited within the declaration itself.

9.      This Declaration also relies upon research about the city of Philadelphia that I undertook for prior transportation-related cases. I consulted scholarly works of history about Philadelphia, particularly those addressing architecture, urban planning, and sites of social gathering. I also consulted relevant primary sources, from paintings of the city and its structures (often reprinted in architecture books) to maps and population statistics. A particularly important source for this study is a multivolume history called *Annals of Philadelphia*. Though it was written

and published in the nineteenth century, the author, John F. Watson, related oral histories from longtime residents and reprinted some government records from the seventeenth and eighteenth centuries. I also visited some of Philadelphia's historic sites and colonial-era gathering places during July 2023.

## SUMMARY OF OPINIONS

10.    This Declaration proceeds in two parts. First, it presents a history of locational restrictions barring firearms or other deadly weapons in the public concourse, paying special attention to the application of historical analogues to modern regulations protecting government buildings as well as recreational and entertainment venues. Then, the Declaration turns to historical regulations and practices limiting the presence of firearms and weapons aboard transportation vehicles.

11.    Locational restrictions date to the medieval Statute of Northampton (1328) and represent a throughline of regulation in early modern England, colonial America, and the nineteenth-century United States. Confronting new challenges posed by technology and remarkably high homicide rates, nineteenth-century Americans looked to their state and local governments to make new rules that would reduce the violence they saw around them. Nineteenth-century gun laws built upon the solid foundation of the Statute of Northampton, but evolved in ways that better addressed the problems at hand.

12.    Locational restrictions akin to the challenged statute appeared in the mid- to late nineteenth century, when urbanization and industrialization created more opportunities for people to gather in confined spaces. Prior to that, public assemblies usually took place outdoors—in the open spaces specifically protected by the Statute of Northampton. These laws cast a purposefully

4

wide net, and together with colonial-era analogues provide ample support for modern prohibitions against carrying weapons into government buildings and entertainment venues.

13.    In the same way that American law and practice restricted the presence of weapons in crowded or otherwise important public areas, they also restricted the presence of deadly weapons aboard transportation and transit services. State and local gun regulations applied within transportation vehicles, and governments authorized conductors or railroad police to enforce the law where regular peace officers could not. As private companies, transportation providers like ferries, railways, streetcars and others had the authority to establish rules for passengers carrying or transporting firearms. While much of this evidentiary base has been lost, the extant records show that rail companies established such rules and tended to require customers traveling with firearms to keep them stowed away or in a separate baggage car.

## SENSITIVE PLACES

14.    The Anglo-American tradition of weapon regulation has proceeded under the assumption that the public needs and deserves protection from armed threats. The Statute of Northampton (1328), which forms the basis for the regulation of weapon-carrying in public spaces, prohibited members of the public to "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere."[1] This medieval enactment by the English Parliament built upon royal proclamations issued previously to quell specific disturbances, and it remained in force through the early modern period.[2] The well-established tradition of restricting armed travel in the public concourse held force in the

---

[1] Statute of Northampton, 2 Edw. 3, c. 3 (1328).
[2] On prior disturbances, see Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022), 631-632 and accompanying notations. On its applicability in the early modern period, see *Idem*., 632-635. See also Saul Cornell, "History, Text, Tradition, and the future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (2020), 80-87.

British North American colonies, too. Not only did manuals for justices of the peace include this offense in their guidance to the lay administrators of local law enforcement, but colonial officials reiterated its applicability.[3] For instance, records from Philadelphia indicate that the city's colonial mayor opened every market day with a proclamation mandating "that no person…carry any unlawful weapon, or gallop or strain horses within the built part of the city."[4] After independence, the states of Massachusetts, Virginia, and North Carolina explicitly adopted descendant laws from this tradition within their legal codes.[5] The public spaces protected under the Statute of Northampton and its descendant laws in the early United States were the ones that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, which formed the very heart of community life. Thus, at the time of the Founding, to enter such a space with weapons (and especially with firearms like pistols that were disconnected from hunting, militia service, and local policing) constituted a disturbance of the peace and invited the intervention of local officials.

---

[3] Cornell, "History, Text, Tradition," 87-94.

[4] Philadelphia City Ordinance, 1753, quoted in Watson, *Annals of Philadelphia*, 364. In his description of the city's markets and the colonial-era fairs (that had ceased to be held by the time of his writing), Watson provided the 1753 mayoral proclamation as an example of how such fairs would be opened. The suggestion is that the process of opening with a proclamation along these lines was standard procedure. It is worth noting that the rules laid out in the proclamation align with the Statute of Northampton and the common law view of keeping the peace. "O yez! &c. Silence is commanded while the Fair is proclaiming, upon pain of punishment! A. B., Esq., Mayor of the city of Philadelphia, doth hereby, in the King's name, strictly charge and command all persons trading and negotiating within the Fair to keep the King's peace, and that no person presume to set up any booth or stall for the vending of strong liquors within this Fair—that none carry any unlawful weapon, or gallop or strain horses within the built part of the city. And if any person be hurt by another, let him repair to the Mayor here present. God save the King!"

[5] 1795 Mass. Acts 463 (instructing officials to arrest anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth. . ."); 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (… "nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth,"); Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792) ("…nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure,").

*Significant Contextual Factors*

15.     An appreciation of context is crucial to the study of history, and there are certain contextual factors that aid in our understanding of historical gun regulation. While most Americans today generally live in large metropolitan areas, this was not the case prior to the twentieth century. Instead, most Americans lived in small communities that lacked the kinds of public spaces that modern locational restrictions seek to protect. Another key factor is the relative frequency of weapon-carrying. Because many Americans today support the everyday carrying of handguns and knives, it is tempting to look back on Americans of the past and assume that they did and felt the same. But the act of weapon-carrying is itself a phenomenon worth historicizing— the practice grew during the nineteenth century as concealable weapons became more common and as rates of homicide and violence rose. As weapon-carrying became more prevalent and more of a societal problem, Americans adopted regulations (including locational restrictions) designed to discourage the practice and safeguard the public.

**Rural Nature of Early American Life**

16.     The overwhelmingly rural nature of life in the United States prior to the twentieth century presents a challenge for the historian drawing comparisons between historic sensitive places and modern ones. During the Founding period, approximately 5% of the national population lived in areas with 2,500 inhabitants or more.[6] By 1860, that number had only grown to 20%, meaning that 80% of the American population still lived in small, rural communities.[7] Because so many Americans lived in small farming communities, there were few public gathering

---

[6] The 1790 census took returns from twenty-four so-called "urban places," which featured populations ranging from 33,000 down to about 2,500. The first census year in which there were one hundred or more "urban places" with a population of 2,500 or more was 1840. See also David Schley, "Industry, Commerce, and Urbanization in the United States, 1790-1870," (Published Online June 25, 2018), in Timothy J. Guilfoyle, ed., *Oxford Encyclopedia of American Urban History* (New York: Oxford University Press, 2019).
[7] Ariel Ron, *Grassroots Leviathan: Agricultural Reform and the Rural North in the Slaveholding Republic* (Baltimore: Johns Hopkins University Press, 2020), 1-2.

spaces comparable to modern sports stadiums, convention centers, hospitals, school buildings, office complexes, and the like. When early Americans gathered together in significant numbers for civic or religious purposes, or for holidays and recreation, they usually did so outdoors. Court Days in rural areas and seaside communities were opportunities for local families to travel to the county seat from miles away to conduct business but also to visit, barter, and reinforce their bonds of community.[8] In the nation's early cities, public gatherings also tended to occur outside in greenspaces, parks, or otherwise outside public buildings.

17.    Research that I have previously conducted into the gathering spaces of Founding-Era Philadelphia has shown that this second-largest city in the early United States featured relatively few sizeable buildings, and that members of the public gathered outside Independence Hall and in other green spaces to exercise their right to assembly. Some of the largest structures in the city were private homes and churches, and even the well-known sites of assembly like Independence Hall and Carpenter's Hall are dwarfed by modern spaces like sports stadiums, hospitals, convention centers, etc.[9]

---

[8] On Court Day and other occasions in rural communities, see Rhys Isaac, *The Transformation of Virginia, 1740-1790* (Chapel Hill: University of North Carolina Press, 1982), 88-114; Robert M. Ireland, *Little Kingdoms: The Counties of Kentucky, 1850-1891* (Lexington: University Press of Kentucky, 1977), 90-100; A. G. Roeber, "Authority, Law, and Custom: The Rituals of Court Day in Tidewater, Virginia, 1720 to 1750," *The William and Mary Quarterly* 37, no. 1 (January 1980), 29-52; E. Lee Shepherd, " 'This Being Court Day': Courthouses and Community Life in Rural Virginia," *The Virginia Magazine of History and Biography* 103, no. 4 (October 1995), 459-470; Carl Lounsbury, *The Courthouses of Early Virginia: An Architectural History* (Charlottesville: University of Virginia Press, 2005).

[9] The main room of Carpenter's Hall is now an open space of 2,400 square feet, but it was originally divided into two smaller rooms on either side of a central hallway. See James D. Kornwolf, *Architecture and Town Planning in Colonial North America*, 3 vols. (Baltimore: Johns Hopkins University Press, 2002), II: 1187-1188. Independence Hall, also called the State House, featured a large assembly hall upstairs offering access to five separate rooms. The downstairs area was divided into separate, equally sized rooms of 40' x 40'. See Kornwolf, *Architecture*, II: 1181; Charlene Mires, "Independence Hall," *Encyclopedia of Greater Philadelphia* (2012), https://philadelphiaencyclopedia.org/essays/independence-hall/. Large structures for their time, these spaces still have more in common with a modern banquet hall than a hospital, movie theater, sports stadium, Times Square, etc.

**Frequency of Weapon-Carrying in Early American History**

18.     Another key factor in analyzing the history and tradition of protecting public spaces from the dangers posed by deadly weapons is the frequency with which Americans have tended to carry knives and pistols about with them. While backcountry and southern folk were more likely to go armed when they left home, Americans of the colonial and Founding periods simply did not carry concealable personal weapons at the rates which their counterparts in the mid- and late nineteenth century did. Single-shot, muzzle-loading firearms were not conducive to impulsive acts of violence because they could not be left loaded for extended periods of time. And when Americans did commit murder in a moment of passion, they used their hands and everyday blunt objects much more often than they used firearms.[10]

19.     This state of affairs began to change in the nineteenth century, starting in the South and spreading across much of the rest of the country by about 1850. A growing number of men took to carrying knives and small pistols, which they then drew from concealment in altercations.[11] By the Civil War Era, revolvers could be easily stored or carried loaded, offering their owners as many as six shots at an enemy. They were manufactured by the tens of thousands in American and European factories, making their way with ever increasing ease into the hands

---

[10] Randolph Roth, "Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History," in, et al, eds. *A Right to Bear Arms*, 116-117 ("Gun use in homicides [during the colonial and revolutionary period] was rare because muzzle-loading firearms had limitations as murder weapons.").

[11] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 218-219 ("Few whites [southerners] had carried pistols or fighting knives in the eighteenth century, but the practice became popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent.").

of American buyers.[12] At the same time, sharply rising rates of homicide presaged a violence problem of national proportions.[13]

20.     While the Statute of Northampton and its progeny in the United States represent a consistent form of regulation dating back to medieval England, this new, nineteenth-century problem of weapon-carrying generated new avenues of regulation. For instance, numerous American state and municipal governments adopted public carry laws that restricted or prohibited the carrying of certain specified weapons that were not conducive for either militia service or hunting.[14] Later, when economic growth and changes to local commercial life allowed minors to buy pistols, knives, and other deadly weapons, Americans restricted such sales.[15] They similarly restricted sales to intoxicated people, and levied occupational taxes on dealers in pistols and their ammunition to encourage responsible marketplace activity.[16] More locational restrictions emerged during this time period as well.

### Nineteenth-Century Locational Restrictions

21.     During the nineteenth century, locational restrictions emerged in areas where weapon-carrying within certain spaces posed a special threat. For instance, in 1804 the municipal

---

[12] Roth, "Why Guns Are and Are Not the Problem," 121 ("Breech-loading guns, particularly revolvers, were not produced for the consumer market until the mid-1850s and were not available in quantity until after the Civil War."); Idem., 123 (That Colt had produced some 850,000 revolvers by 1873, with "similar" production output by Smith and Wesson; and that "The greatest surge in production, however, occurred in the late nineteenth century, as the patents on the first breech-loading rifles, shotguns, and revolvers expired and self-contained ammunition was perfected and mass produced.").

[13] On the worsening of homicide rates during and after the Civil War, *see* Roth, *American Homicide*, 297-385.

[14] Public carry laws are often referred to as "concealed carry laws" even though many of them restricted open-carry as well. On the development of public carry regulation in the United States generally, see Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55 (June 2022), 2545-2602.

[15] On the social and economic history surrounding minors' growing access to guns and the consequent regulation of such sales in the latter nineteenth century, see Kellen Heniford, "The Young and the Armed:  History for Litigating Firearms Age Restrictions in a Post-Bruen World," *Indiana Law Journal Supplement* 101 (forthcoming).

[16] See e.g., 1867 Kansas ch. 12, § 1 (prohibiting any person "not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States" from carrying any "deadly weapon"); 1886 Ala. ch. 4, § 5.17 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars.").

government of New Orleans—just recently absorbed into the United States—adopted a resolution prohibiting anyone from "enter[ing] the public ball with any weapon, cane, or cudgel."[17] This resolution came on the heels of deadly conflicts between American and French military personnel who went armed to social gatherings during the period of political transition from French to American rule.[18] The municipal government refined and reiterated this policy in 1808 (prohibiting canes, swords, and other weapons in ballrooms) and 1817 (prohibiting canes, sticks, swords, and other weapons in ballrooms).[19] In 1813, the Louisiana legislature adopted a statewide public carry restriction prohibiting concealed weapons "that do not appear in full open view."[20] New Orleans, then, was subject not only to the state's public carry law, but also enforced a stricter set of regulations than surrounding rural areas in its disarming of ballrooms. This acceptance of local variation, in which more densely populated areas could (and often did) have stricter weapon-carrying regulations than rural ones, was not the exception but the rule in the early United States and through the nineteenth century.[21]

22.     A collection of analogues we see in the historical record came after the Civil War, when gun violence and weapon-carrying posed a significant problem in much of the United

---

[17] Kellen Heniford and Kari Still, "Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons Ban in a Post-*Bruen* Context," *Buffalo Law Review* 73 (May 2025), 692-693 (describing the 1804 resolution, which required ball attendees (governor and his officers excepted) to check their arms before entrance, and which also established an order for English and French dances to be played at said balls).

[18] Idem., 685-693 (describing the context surrounding the 1804 resolution).

[19] Idem., 696-697 (describing a follow-up 1808 ordinance and 1817 post-statehood ordinance, both of which made this weapons regulation even stricter than the one initially passed in 1804).

[20] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . .").

[21] Patrick J. Charles, "The Second Amendment and Heller's 'Sensitive Places' Carve-Out Post-*Rahimi*: A Historiography, Analysis, and Basic Framework," *University of Illinois-Chicago Law Review* 58, no. 4 (2025), 870-877 (providing numerous examples of municipal or other local ordinances restricting the carrying of deadly weapons). See also Joseph Blocher, "Firearm Localism," *Yale Law Journal* 123, no. 82 (2013), 81-146 (that "guns have consistently been regulated more heavily in cities" throughout American history and across the United States.).

States.[22] For the jurisdictions adopting these laws in the late 1860s and early 1870s, the context of Reconstruction is crucial to understanding their intent. This time period after the Civil War, stretching from 1865 to 1877, is generally understood to be one of rampant violence and virulent racism in the former slaveholding states. This assessment is certainly true—white supremacist violence was an important tool for the planter elite and white Democrats to intimidate Freedpeople and restore themselves to power. Reconstruction-era gun laws, however, were a hallmark of Republican governments that included Black Americans among their voters and officeholders. Black southerners relied upon assemblies, gatherings, and social-political events to make real their freedom, build bonds of community, and exercise their newfound rights. The events and places enumerated in locational restrictions were therefore important sites of civic engagement, and keeping weapons away from them was an attempt to protect Black residents from white supremacist terror.[23]

23.    In 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[24] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to

---

[22] On gun use and violence after the Civil War, see Roth "Why Guns Are and Are Not the Problem," 123-124.

[23] Brennan Gardner Rivas, "Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship," in Joseph Blocher, et al, eds., *New Histories of Gun Rights and Regulation: Essays on the Place of American Law and Society* (New York: Oxford University Press, 2023), 149-165 (arguing that the contextual history of Reconstruction challenges the commonplace assumption that laws and constitutional provisions from that era were adopted with racially discriminatory intent.). On Reconstruction generally, see Eric Foner, *Reconstruction: America's Unfinished Revolution* (New York: W. W. Norton, 1988).

[24] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," §2. The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[25]

24.    That same year (1870), Texas lawmakers prohibited all weapons, including "fire-arms, whether known as a six shooter, gun or pistol of any kind," at a host of crowded social events: "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly." The municipal government of San Antonio, the second most populous city in Texas at the time, adopted the same rule as a local ordinance.[26] In 1871, this list of protected locations was slightly modified and incorporated as its own discrete section into a restrictive public carry law that disallowed both open- and concealed-carry.[27]

25.    In the ensuing years, more states and territories adopted similar measures. A Missouri law from 1879 was almost identical to the Texas law.[28] Oklahoma Territory's

---

[25] Act No. 285, 1870 Ga. Laws 421. The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20-50), imprisonment (10-20 days), or both.

[26] According to *Texas Almanac*, San Antonio had a population of approximately 12,000 in 1870, and the only city larger was Galveston, with a population approaching 14,000. See "Texas Almanac: City Population History from 1850-2000," (accessed January 25, 2026), https://www.texasalmanac.com/drupal-backup/images/CityPopHist%20web.pdf. For the San Antonio ordinance, see "An Ordinance," *San Antonio Express* (San Antonio, Tex.), Dec. 23, 1870. The ordinance differed from the state law in that the maximum fine was lower, and there was an added phrase also prohibiting anyone to "hav[e] about his or her person, what is known as brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence."

[27] 1871 Texas 34, § 3 ("…any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly… ."). For the open- and concealed-carry restriction, see Idem., § 1.

[28] *Revised Statutes of the State of Missouri* (1879), ch. 24, § 1274 ("…any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court,

13

comparable law from 1890 went further, specifically prohibiting deadly weapons at establishments serving alcohol, political conventions, and all public assemblies.[29] An 1889 law from Arizona Territory prohibited carrying weapons within settled areas, and repeated a similarly long list of settings in which "a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense" could not be carried.[30] Upon statehood, Oklahoma (1907) and Arizona (1912) retained these sweeping regulations.[31] Recent scholarship compellingly shows that locational restrictions were commonplace throughout the United States—the product of numerous state governments, city councils, school boards and other local institutions.[32]

### *Historical Constitutionality and Sufficiency of Locational Restrictions*

26.    Jurisdictions adopting locational restrictions tended to retain them over time, and when challenged these laws passed constitutional muster. As previously described (Paragraph 21), the city of New Orleans restricted weapons in ballrooms through a resolution in 1804, and reiterated the policy multiple times over the ensuing years through the passage of municipal

---

or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state… .").

[29] 1890 Okla. Stat. 496, § 7 ("…any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly… ."). It is worth noting that § 5 of the same code and chapter restricted the carrying of rifles and shotguns to "the purposes of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise."

[30] 1889 Ariz. Terr. Ch.13, 17, § 3 ("…any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the days or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly… .").

[31] Samuel L. Pattee, comp., *Revised Statutes of Arizona 1913* (Phoenix: McNeil Co., 1913), 91, Title 12, § 429; Henry G. Snyder, comp., *Compiled Laws of Oklahoma 1909* (Kansas City: Pipes-Reed Book Co., 1909), 687, Ch. 25, Art. 58, § 2750.

[32] Charles, "The Second Amendment and Heller's 'Sensitive Places' Carve-Out," 834-887 (Part IV, laying out dozens of examples of locational restrictions adopted at the state and local levels.).

14

ordinances. Oklahoma and Arizona territories retained their locational restrictions upon statehood

in 1907 and 1912, respectively (Paragraph 25). The Missouri (Paragraph 25) and Georgia

(Paragraph 23) laws described above remained on the books into the twentieth century.[33]

27.     In Texas, a state whose history I have studied in great detail, Democratic political

leaders kept the strict gun regulations adopted during Reconstruction (even though they decried

the Republicans who had enacted them) because they understood the dangers of indiscriminate

weapon-carrying.[34] When challenged, judges upheld the law's constitutionality by saying "We

confess it appears to us little short of ridiculous, that any one should claim the right to carry upon

his person any of the mischievous devices inhibited by the statute, into a peaceable public

assembly, as, for instance into a church, a lecture room, a ball room, or any other place where

ladies and gentlemen are congregated together."[35] Later challenges allowed the state's high court

to flesh out the contours of this law, which encompassed gatherings as disparate as misdemeanor

courtrooms[36], a school entertainment event[37], and parties held on private property.[38] Texas judges

also disallowed a self-defense exception to the sensitive places law, saying "Nor does it matter

---

[33] *Annotated Statutes of the State of Missouri, 1906* (St. Paul: West Pub. Co., 1906), 1283, §1862 ("If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this state"  carrying "any kind of fire-arms" or other deadly weapon was guilty of misdemeanor."); John L. Hopkins, comp., *Code of the state of Georgia, Adopted August 15, 1910*, 2 vols. (Atlanta: Foote & Davies Company, 1911), II: 71, §348 ("Whoever shall carry about his person any…[deadly weapon], to or while at a court of justice or an election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds, shall be punished as for a misdemeanor.").

[34] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019).

[35] *English v. State, 35 Tex. 473 (1872).*

[36] *Summerlin v. State*, 1878 3 Tex. Ct. App. 444 (1878) (that a Justice of the Peace court when in session is a public assembly at which arms are not permitted).

[37] *Alexander v. State*, 11 S.W. 628 (Tex. App. 1889) ("We can not believe that it was the purpose and intent of the Legislature to permit school teachers to carry prohibited weapons upon their persons in their school rooms among their pupils, or on the occasion of public assemblies in such school rooms.").

[38] *Owens v. State*, 3 Tex. Ct. App. 404 (1878) (that neither the owner of a premises hosting a ball nor the owner's designated doorman could carry weapons at a social gathering).

how much or with what good reason I may be in dread of an immediate and pressing attack upon my person from a deadly enemy; the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where his attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed."[39]

28.    When Georgia's locational restriction was challenged on constitutional grounds, the state supreme court upheld the law. The opinion declared that "[t]he practice of carrying arms at courts, elections and places of worship, etc.," as "improper in itself," "shocking to all sense of propriety," and "wholly useless and full of evil." It went on to say that the right to bear arms "is in no fair sense a guarantee that the owners of these arms [concealable weapons] may bear them at concerts, and prayer-meetings, and elections," and that the presence of arms "[a]t such places…is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners."[40] In Missouri, appellate judges applied the law without questioning or undermining its constitutionality.[41] The retention and enforcement of locational restrictions adopted during Reconstruction, and the expansion of that regulatory approach across the country in subsequent decades, both demonstrate that Americans understood the barring of weapons in some places to be constitutional.[42]

29.    In addition to the evidence in favor of the constitutionality of historical locational restrictions, the historian must bear in mind the broader context of American public carry

---

[39] *Owens v. State*, 3 Tex. Ct. App. 404 (1878). See also *Livingston v. State*, 3 Tex. Ct. App. 74 (1877). The sensitive places law was, in 1871, combined with a public carry law such that the public carry law formed Sec. 1 and the sensitive places law formed Sec. 3. The court ruled that the self-defense exception to the law only applied to Sec. 1, prohibiting the open or concealed carrying of deadly weapons in most instances—the exception did not, in the court's view, apply to Sec. 3 barring all firearms and other deadly weapons from social gatherings, etc.
[40] *Hill v. State*, 53 Ga. 472 (1874).
[41] *Ex Parte Caldwell*, 138 Mo. 233 (1897); *State v. Pigg*, 85 Mo. App. 399 (1900).
[42] Charles, "The Second Amendment and Heller's 'Sensitive Places' Carve-Out," 888-889 (That the relevant question is "whether there is evidence that a particular body of historical firearm regulation existed, and whether that body of regulation was constitutionally accepted by historical contemporaries," and that "without question, the history and tradition of 'sensitive places' firearm prohibition satisfies [that question].").

regulation in the nineteenth century.  These regulations often reserved the carrying of concealed weapons to people who met special criteria or merited certain exceptions, like peace officers, travelers, or license holders. Outside of those exceptions, the people carrying pistols, fighting knives, slung shots, and the like were generally doing so *concealed*, and therefore doing so contrary to the law.[43] This context of more prevalent concealed-carry—and widespread public condemnation and legal restriction of it—suggest that additional, specific locational restrictions were not always necessary for Americans to police the presence of firearms in public spaces. In other words, the sufficiency of the public carry laws in many jurisdictions at that time meant that added locational restrictions were not necessary in the same way that, for instance, sales prohibitions to minors or intoxicated people were.

### *Application of Analogues to Modern Sensitive Places*

### Government Buildings

30.    The known locational restrictions from the colonial and early republic periods specifically designated sites of government activity as those falling under their protection. For instance, Maryland laws from 1647 and 1650 prohibited entering the legislative assembly "with any gun or weapon."[44] At that time, the legislature met at Calvert House, which was the governor's private residence and was later purchased to serve as the state house. The governor and council possessed judicial powers and, beginning in 1650, functioned as the upper chamber

---

[43] On the prevalence of concealed- as opposed to open-carry of pistols, knives, and the like, see Mark Anthony Frassetto, "The Myth of Open Carry," *UC-Davis Law Review* 55 (May 2022), 2515-2544.

[44] William Hand Browne, ed., *Proceedings and Acts of the General Assembly of Maryland* (Baltimore: Maryland Historical Society, 1883), 215-216 at 216, §6 ("That noe one shall come into the howse of Assembly (whilst the howse is sett) wth any weapon uppon perill of such fine or censure as the howese shall thinke fit."); Ibid., 273-274 at 273, §5 ("That none shall come into either of the houses whillst they are sett, with any gun or weapon uppon perill of such fine or censure as the howses shall thinke fitt."). Maryland's legislature was unicameral in 1647 and bicameral in 1650.        See        "House        of        Delegates:        Origin        and        Functions," https://msa.maryland.gov/msa/mdmanual/06hse/html/hsef.html (accessed February 6, 2026).

of the bicameral legislature.[45] By disarming the site of legislative assembly, these historical

Maryland laws prohibited arms in the governor's mansion while simultaneously protecting an

upper chamber headed by the executive and which wielded mixed judicial-legislative functions.

This blurring of the lines between and among different branches of government, and between

public and private spaces, was commonplace during the colonial period.[46] It should be brought to

bear on analyses of historical sensitive places restrictions by encouraging us to think more

capaciously about the intent and function of the proffered historical analogues.

31.    Historical analogues also consistently restricted weapons at courts or before justices

of the peace. Virginia's 1786 law, emulating the Statute of Northampton, prohibited going "before

the justices of any court…with force and arms."[47] Georgia's 1870 law prohibited weapon-carrying

"to any court of justice."[48] The Texas locational restriction applied to public assemblies writ large,

which the high court ruled to apply to courtrooms.[49] In Texas, local sentiment even criticized the

wearing of weapons by court officers. In 1871, one commenter asked "Is it necessary for sheriffs

and their deputies to wear large ungainly six shooters in the court-room?" He went on to say that

the practice was "not done anywhere else besides San Antonio that we know of," and that "[t]he

practice has a demoralizing effect."[50] Missouri's locational restriction specifically prohibited

---

[45] On the significance of the Calvert House as a site of government function and social gathering, see Wesley R. Willoughby, "Community, Identity, and Public Spaces: The Calvert House as the First State House of Maryland," in *Unearthing St. Mary's City: Fifty Years of Archaeology at Maryland's First Capital*, Henry M. Miller and Travis G. Parno, eds. (Tallahassee: University Press of Florida, 2021), 163-164.

[46] On the "blurred" nature of governments' executive, legislative, and judicial functions during the colonial period, see Edwin C. Surrency, "The Courts in the American Colonies," *American Journal of Legal History* 11, no. 3 (July 1967), 253-273, quotation at 253.

[47] "An Act Forbidding and Punishing Affrays," 1786 Va. 35, Ch. 49.

[48] 1870 Ga. Laws 421.

[49] 1871 Tex. 34, §3; *Summerlin v. State*, 1878 3 Tex. Ct. App. 444 (1878) (that a Justice of the Peace court when in session is a public assembly at which arms are not permitted).

[50] Untitled, *San Antonio Express* (San Antonio, Texas), January 9, 1871 ("Is it necessary for sheriffs and their deputies to wear large ungainly six shooters in the court-room? We think not. It is not done anywhere else besides San Antonio that we know of. Sheriffs here have no more need of such things, except for special purposes on special occasions, than anywhere else in the State or in the Union. The practice has a demoralizing effect. The law prohibits the wearing

weapons in "any court room during the sitting of court." In 1895, an editorial in a St. Louis newspaper expressed outrage that a judge turned a blind eye to a counselor carrying a weapon in the courtroom, asking "Is the offense of a man who willfully carries a weapon in his court not greater than that of a man who carries it outside of the court?"[51] Laws restricting weapons in courtrooms built upon a shared recognition that the levers of justice should not be manipulated by armed intimidation.

32.    Another colonial analogue, the 28th Article of the Delaware Constitution of 1776, explicitly disarmed election sites. The document's drafters introduced this rule as a way of "prevent[ing] any violence or force being used at the said elections."[52] Nineteenth-century laws mentioned previously in this Declaration similarly prohibited weapons at polling places and elections (Paragraph 22-25). In Texas, an additional separate statute barring regular citizens (not peace officers) from carrying "any gun pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within the distance of one-half mile of any poll or voting place."[53]

33.    In early American history, elections were rowdy, raucous affairs, and they could occur in any number of settings.[54] In the larger cities, voting might take place in public buildings or courthouses, while a store, school, or barn would suffice in more isolated areas.[55] By protecting

---

of deadly weapons, and yet peace officers wear them in the halls of justice, before the eyes of the Judge of the court. We think the whole practice out of taste and character,—a relic of the frontier savagery of the past.").

[51] "Bently Drops His Revolver," *St. Louis Republican* (St. Louis, Missouri), November 27, 1895. This multi-page article featured a drawing of the episode and quoted the locational restriction in full.

[52] Del. Const. of 1776, Art. 28 ("To prevent any violence or force being used at the said elections, no person shall come armed to any of them, and no muster of the militia shall be made on that day."). The article goes on to limit the presence of armed militia units before, during, and immediately after elections.

[53] *The Penal Code of the State of Texas, Passed by the Sixteenth Legislature, February 21, 1879* (Austin: State Printing Office, 1887), 24, Title VI, Ch. 3, Art. 163.

[54] Daniel Walker Howe, *What Hath God Wrought? The Transformation of America* (New York: Oxford University Press, 2007), 491-492 (describing rowdy elections during the antebellum nineteenth century).

[55] Richard F. Bensel, *The American Ballot Box in the Mid-Nineteenth Century* (New York: Cambridge University Press, 2004), 9-14 (describing how and where voting occurred in the nineteenth century).

the democratic process, the above-mentioned locational restrictions at a minimum protected the government buildings and public spaces that served as electoral sites. Taking into consideration the fact that today's local, state, and federal governments carry out more sophisticated, bureaucratized functions in larger and more numerous structures, it is not inapposite to see them casting a wider net of protection within the *Bruen* analogical framework. Government buildings today not only host elections, but house courts, committees, boards, and commissions that conduct public business and represent a critical part of the modern democratic process.

**<u>Recreational and Entertainment Venues</u>**

34.    Historical analogues also provide ample justification to conclude that nineteenth-century Americans understood recreational and entertainment venues to count among the public spaces protected by locational restrictions. The abovementioned nineteenth-century statutes (Paragraph 21-25) enumerated a wide array of public places and social settings from which weapons could be barred. These ranged from ballrooms to circuses, race courses, shows, public exhibitions, and "place[s] were persons are assembled for amusement or for educational or scientific purposes."[56] To read the listed settings in these laws is to see legislators endeavor to cover as many gathering places as possible under the umbrella of protective disarmament—in fact some employ catch-all language like, "or to any other public assembly,"[57] "or any other public gathering in this State."[58] People of the time would have understood these laws to apply to entertainment and recreational spaces like theaters, public assembly halls, fairs, political

---

[56] 1871 Tex. 34, §3.
[57] 1890 Okla. Stat. 496, §7.
[58] 1870 Ga. Laws 421.

meetings, worship services, lectures, and social occasions. The intention of the lawmakers to prohibit weapons in these crowded gathering places is obvious.[59]

35.    It is also important to bear in mind that without mass media, a consumer-driven culture, and surplus wages, early Americans spent what leisure time they had differently than we do today.[60] Mass entertainment spectacles like professional sports emerged in the latter nineteenth century and became prevalent in the twentieth.[61] In early America, there simply was no equivalent structure to the size and cultural significance of Yankee Stadium or the modern Madison Square Garden. Still, the theaters and race tracks, and open fields for circuses to perform or pitch a tent, fell under the protections provided by the legal heritage traceable back to the Statute of Northampton. These crowded gathering spaces where members of the public came together in community formed a part of the public concourse in which weapons simply did not belong.

### *Sensitive Places—Conclusions*

36.    In sum, there is a long, deep history of Americans regulating or restricting the presence of firearms and other weapons in public places. This tradition has evolved from the medieval Statute of Northampton, which was enacted by the English Parliament in 1328. Subsequent royal proclamations, colonial legal codes, justice of the peace manuals, and American state-level laws show this tradition moving across the Atlantic to the North American colonies and later United States. When technological factors made gun access, gun lethality (especially

---

[59] See also *Hill v. State*, 53 Ga. 472 (1874) ("The right to bear arms in order that the state may, when its exigencies demand, have at call a body of men, having arms at their command, belonging to themselves and habituated to the use of them, is in no fair sense a guarantee that the owners of these arms may bear them at concerts, and prayer-meetings, and elections. At such places, the bearing of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners.").

[60] Rebecca Edwards, *New Spirits: Americans in the 'Gilded Age', 1865-1905* (New York: Oxford University Press, 2006), 117-121 (describing a "modern youth culture" of dance halls, amusement parks, and competitive sports, and its impact of American leisure practices in the late nineteenth century).

[61] On the rise of "leisure for the masses" and the popularization of professional sports in the latter nineteenth century, see Gary Cross, *A Social History of Leisure since 1600* (State College, PA: Venture Publishing, Inc., 1990).

repeat-fire), and remarkably high homicide rates a recipe for problematic gun violence, American state and local governments responded with regulations for the carrying and sale of deadly weapons.

37.    Among the regulations adopted by American jurisdictions were locational restrictions, which provided an added layer of protection for states, territories, and municipalities seeking to protect the public peace. The historical evidence shows that Americans understood these laws to be constitutional.

38.    Importantly, nineteenth century newspapers and other sources of cultural and social history show widespread denunciation of habitual weapon carrying, not support for it—and certainly not support for it in crowded areas or spaces where innocent people might be harmed. Nor do we see any significant legal conflict over the constitutionality of locational restrictions the way we do with more general carry regulations.

## TRANSPORTATION & INTRA-URBAN TRANSIT

39.    Transportation vehicles and facilities are also sites historically subject to firearm restrictions and regulations. Even though passenger transportation in the nineteenth-century differed dramatically from modern public transit (which is really a product of the twentieth century), rail travel represented a paradigm shift in transportation that consequently called for some firearm regulation. The historical record shows us that the laws of a jurisdiction applied to rail vehicles passing through or stopping over within them. As private companies, railroads retained the right to prescribe how passengers could stow, carry, and ship firearms—a right which they exercised.

### *Quasi-Public Powers of Railways and Their Employees*

40.     In response to the new challenge posed by criminal activity taking place within rail cars, lawmakers could vest conductors, the authority figures on trains, with the same powers as policemen. In the 1880s, the Georgia legislature declared that "[t]he conductors of a train carrying passengers are invested with all the powers duties, and responsibilities of police officers while on duty on their trains,"[62] and decided a decade later that "the conductors, motormen, and drivers of street railroad cars are invested with all the powers, duties, and responsibilities of police officers while on duty on their trains or cars, and while on duty at the termini of their lines."[63] Included within this power of conductors to police aboard their trains was a responsibility to enforce weapon regulations in effect at the time.

41.     Another approach to policing railways was to authorize rail companies to employ their own police forces. Statutes in Ohio and Pennsylvania from the 1860s show the legislatures of those states setting out parameters in which designated rail police could "possess and exercise all the powers, and be subject to all the liabilities of policemen of cities… ."[64] This approach was not at all unusual at a time when powerful corporations in industries as disparate as manufacturing and cattle ranching turned to private detectives and police for assistance in defending company interests against labor organizers and marketplace competitors. That legislatures made special

---

[62] John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, *Code of the State of Georgia* (Atlanta: Foote & Davies Co., 1895), 230 (sec. 902).

[63] "Conferring Police Powers on Conductors, etc., of Street Railroads," Georgia - General Assembly, Acts and Resolutions (1890-1891), 230-231.

[64] Joseph R. Swan and Milton Sayler, "Policemen for Railroads, An act to authorize the employment of a police force by railroad companies," *Supplement to the Revised Statutes of the State of Ohio, Embracing All Laws of a General Nature, Passed since the Publication of Swan and Critchfield's Revised Statutes, 1860* (Cincinnati, R. Clarke & Co., 1868), 121-122. See also "No. 228, An Act Empowering railroad companies to employ police forces," *Laws of the General Assembly of the State of Pennsylvania, passed at the session of 1865* (Harrisburg: Singerly & Myers, State Printers, 1865), 225-226.

arrangements for authorizing railway police and holding them accountable only underscores the significance of protecting the peace and safety of passengers in transit.

42.     By the early twentieth century, large railway companies had sizeable departments overseeing their railway special agents. The Union Pacific Railroad (UPRR) maintained records pertaining to the firearms owned by the company, most of which were pistols assigned to specified employees. At periodic intervals, the supervisors of the special agents' division undertook inventories of company-owned firearms. Extant records from the early 1930s show that some of the firearms held in the company gun locker were classified as "confiscated guns," presumably confiscated from passengers carrying them illegally.[65] The UPRR special agents and rail watchmen were expected to be on the lookout for passengers carrying guns; correspondence from the Federal Bureau of Investigation from 1950 shows the FBI requesting the assistance of all law enforcement agencies, including the UPRR special agents, in tracking down the carriers of certain guns that had been used in the commission of crimes.[66]

### *Railways as Private Entities with Internal Regulatory Powers*

43.     As private companies, railroads and other passenger transportation services had the authority to set reasonable safety regulations for their passengers and employ internal policing agencies to enforce them. These regulations generally established rules for passengers traveling with firearms stipulating that they be stowed separately, and unloaded. A nineteenth century jury instruction manual contained a section for "Rules and Regulations of Carrier," which specifically stated that "a railroad company has a right to require of its passengers the observance of all reasonable rules, calculated to insure the comfort, convenience, good order and behavior of all

---

[65] "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

[66] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

persons on the train, and to secure the proper conduct of its business; and if a passenger wantonly disregards any such reasonable rule, the obligation to carry him farther ceases, and the company may expel him from the train at any regular station, using no more force than may be necessary for that purpose."[67] The North Pennsylvania Railroad's "rules and regulations" document for conductors specifically charged passenger conductors with the responsibility of preventing passengers from taking "into the cars guns, dogs, valises, large bundles or baskets."[68]

44.     Extant records for rail companies indicate that regulating the carriage of guns on board was not uncommon. Several companies, including Union Pacific and Central Pacific, North Pennsylvania Railroad, South Carolina Canal and Rail Road Company, International and Great Northern Railroad Company, and Albany Railway had specific gun-carriage policies during the nineteenth century.[69] Some rail companies shipped firearms for hunters but treated them like any other baggage—by separating them from the passengers and placing them in a designated baggage space.[70] But another company prohibited the practice ostensibly out of concern that they would be held liable for lost, damaged, or stolen firearms. In the relevant caselaw, "[c]ourts generally deemed guns baggage when they determined that the weapons were 'necessary' to the object of a trip or 'usual' among similarly situated travelers."[71] Depending upon the size and traffic of the line, some rail cars also had space for passengers to carry their own bags and stow

---

[67] Albert W. Brickwood, *Brickwood's Sackett on Instructions to Juries*, 3 vols., 3d. ed. (Chicago: Callaghan & Company, 1908), II: 1174-1175 (Sec 1819, "Right to Prescribe Rules").

[68] "Rules and Regulations for Running the Trains on the North Pennsylvania Railroad, adopted June 1, 1875, and approved by the president" (Philadelphia, 1875), 13.

[69] Josh Hochman, "The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation," *Yale Law Journal* 133 (2024), 1690-1701 (describing "limits on gun carriage in passenger cars" and "limits on firearms in baggage.").

[70] In his detailed description of American rail baggage service, Marshall Monroe Kirkman wrote: "Who has not felt a tremor of apprehension as he saw his baggage melt away into the indiscriminate mass of trunks, band boxes, gripsacks, gunbags, umbrellas, burial cases, canaries and bundles that fill the station?" Kirkman, *The Science of Railways, Revised and Enlarged Edition* (New York: The World Railway Publishing Co., 1898), 389.

[71] Hochman, "Second Amendment on Board," 19-20.

them under their seats or by their feet, particularly if those bags were relatively small. In the event that it was legal and permissible by company policy for a passenger to transport a firearm or other deadly weapon, stowing it away in closed baggage was altogether different from carrying in one's pocket or waistband (which was de facto a violation of the law in many American jurisdictions).

45.     The sources described here take on added significance when one considers the dearth of relevant corporate records. While researchers have identified some employee handbooks, the safety regulations and ridership policies of most historical transportation service providers are no longer available. The pertinent manuscript collections held at archival centers typically consist of records gathered after the year 1900.[72] Furthermore, rail companies appear to have retained records related to assets and finances rather than passenger rules or employee standards. For instance, the UPRR records previously cited contain a series called "Firearms Records." But it only dates back to 1931, and even though it refers to a company "Rules" document for employees carrying firearms on the job, the rules themselves have not been preserved within the collection.[73] This is a silence in the documentary record that does not suggest a lack of regulation, but rather a lack of extant evidence of such regulation.

### Public Sentiment Opposed to Carrying Deadly Weapons

46.     Broader custom and sentiment should also be taken into consideration. The general consensus among nineteenth-century Americans was that the public carrying of weapons was dangerous and unbecoming.[74] This overarching public attitude would not have condoned

---

[72] See the Library of Congress guide for railroad research: https://guides.loc.gov/railroads/association-research-collections.

[73] "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

[74] Charles, *Armed in America*, 163 ("Certainly, each and every person living in the United States from the mid to late nineteenth century maintained their own opinions on the carrying of dangerous weapons in public, and in many cases those reasons have been lost to time. However, based on the evidence that has survived, most Americans detested the practice on the grounds that it violated the social compact, needlessly induced homicides and murders, and contradicted Christian theology.").

26

indiscriminate weapon-carrying within train cars, streetcars, and the like any more so than in other public settings—certainly not without some special and urgently compelling reason, and not to satisfy undifferentiated personal fears.

47.    The use and adjudication of the traveler exception to public carry laws also illustrates quite clearly that there was a general public attitude condemning the presence of deadly weapons in developed, urban areas as a threat to public safety. Far from a blanket exception for people to go armed at all times outside their homes, the travel exception to public carry laws was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transit. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and that formed a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors.[75]

**CONCLUSION**

48.    This Declaration has presented evidence that locational restrictions are a longstanding part of American gun regulation. They are rooted in the medieval Statute of Northampton and evolved in the nineteenth century to address new problems posed by more widespread weapon-carrying, rising homicide rates, and technological changes that facilitated the use and carrying of concealable weapons. Locational restrictions and the tradition established by the Statute of Northampton not only protected the customary, outdoor gathering sites like lawns and marketplaces, but also the growing number of assembly halls, theaters, and public buildings.

---

[75] Rivas, "The Deadly Weapon Laws of Texas," 108-110; John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484. For illustrative cases, see *Smith v. State*, 50 Tenn. 511 (1872); *Carr v. State*, 34 Ark. 448 (1879); *Eslava v. State*, 49 Ala. 355 (1873).

The extant analogues also provide ample support for modern regulations that restrict or prohibit weapons in government buildings and entertainment venues.

49.    The historical statutes analogous to modern sensitive places laws cast a purposefully wide net. Laws from Texas, Missouri, Georgia, Oklahoma, and Arizona prohibited the carrying of deadly weapons in settings that ranged from circuses and social parties to places of worship, courtrooms, electoral sites, racetracks, schools, and public entertainments. They employed catch-all language to create an umbrella that protected as many gathering places and public assemblies as possible, only exempting lawful militia activities from their purview. These laws clearly intended to protect the public at sites of assembly, recreation, education, and democratic participation. When two of these locational restrictions were challenged in Texas and Georgia, courts upheld them in terms that clearly reiterated legislatures' intention to protect the public from the dangers of indiscriminate weapon-carrying. This regulatory method also aligned with broader public sentiment of the time, which generally disparaged the everyday carrying of fighting knives, pistols, and other concealable weapons.

50.    The historical record also shows that nineteenth-century Americans did not possess an unfettered right to carry firearms and weapons aboard transportation vehicles. Rather, the public carry laws of a jurisdiction applied to transportation vehicles within that jurisdiction. Railway companies could be invested with the public police power to enforce gun regulations, and they developed their own police forces to protect the public in transit. These transportation companies also established and enforced ridership policies requiring firearms to be stowed away, unloaded, with baggage.

51.    Taken together, the historical evidence about locational restrictions and the regulation of weapons aboard public transportation supports modern sensitive place laws. Rooted

in a longstanding regulatory heritage and developed in response to unprecedented problems, these

laws harmonize with Anglo-American legal history in addition to public sentiment at the time.


Dated:  Fort Worth, Texas
        February 23, 2026


                                    _Brennan Rivas_
                                    BRENNAN RIVAS