# **<u>NYSRPA, et al. v. James, et al.</u>**

# No. 22 Civ. 907 (N.D.N.Y.)

# Thompson Declaration Exhibit 5

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 1

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE & PISTOL

ASSOCIATION, INC., ROBERT NASH,

BRANDON KOCH, THOMAS STIRNWEIS

WAYNE FRANCIS, KHOURY PORTER,

AND SCOTT NOREN,

    Plaintiff,

V                                    Docket No.:  22-CV-907

STEVEN G. JAMES, IN HIS OFFICIAL CAPACITY AS

SUPERINTENDENT OF THE NEW YORK STATE POLICE,

RODNEY K. HARRISON, IN HIS OFFICIAL CAPACITY

AS COMMISSIONER OF THE SUFFOLK COUNTY POLICE

DEPARTMENT,

Defendants.

_____X (Cont'g.)

DEPOSITION OF: THOMAS J. STIRNWEIS

DATE:            October 22, 2025

TIME:            10:12 a.m. to 5:09 p.m.

VENUE:           MS Teams

Reported by Becky Foster

800-523-7887                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                www.courtsteno.com

Page 2

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis (Cont'g.)

AND LICENSING OFFICER FOR SUFFOLK

COUNTY, AND PATRICK J. RYDER, IN HIS OFFICAL

CAPACITY AS COMMISSIONER OF THE NASSAU COUNTY

POLICE DEPARTMENT, AND LICENSING OFFICER FOR

NASSAU COUNTY,

        Defendants.

_____X

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 3

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

APPEARANCES:

   FOR THE PLAINTIFF:

        BRADLEY, ARANT, BOULT & CUMMINGS, LLP

        BY:  JAMES W. PORTER III, ESQ.

                                            th
        One Federal Place 1819 5  Avenue North

        Birmingham, Alabama 35203

   FOR THE DEFENDANT:

        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

        BY:  JAMES THOMPSON, A.A.G.

             MOLLY THOMAS JENSEN, A.A.G

        28 Liberty Street, 18th Floor

        New York, New York 10005

   FOR THE SUFFOLF COUNTY

        SUFFOLK COUNTY ATTORNEY'S OFFICE

        BY:  ARLENE ZWILLING, ESQ.

        100 Veterans Memorial Parkway

        Hauppauge, New York 11788

   ALSO PRESENT:

        SAMIRA SARAN, AG INTERN

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

share Exhibit Twelve again.  Let me know when you can see it.

A.   I can see it.

Q.   So, I have us at paragraph nine C covering public transportation and transit.  Do you - - do you see that?

A.   I see it.

Q.   When you say, I live on an island and travel to nearby islands, can you tell me about that?

A.   Shelter Island is an island adjacent to Kings Park.  To Greenport, Fire Island is off of the southern coast of Long Island.

Q.   Got you.  I'm sorry.  My -- my question may not have been precise enough.  When you say, I live on an island, are you referring to Long Island or are you referring to an island off of Long Island?

A.   I'm referring to Long Island.

Q.   Okay.  So, how often would you say that you take the ferries that are listed here, Shelter Island, Fire Island, Crosstown Ferry and the Bridgeport and Port Jefferson Ferry?

A.   At least once a year, twice a

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 166

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

year.

Q. So, let's start with Shelter Island Ferry. About how often do you ride that?

A. Four times a year.

Q. When's the last time that you rode it?

A. Within the last couple of months.

Q. Have you ever been threatened on the Shelter Island Ferry?

A. No.

Q. So, I'll -- I'll represent to you that the Shelter Island Ferry is run by two private companies. The South Ferry Company, Inc. and North Ferry Company, Inc. Does that sound correct?

A. It sounds correct.

Q. So, is the ferry public transportation?

A. I would interpret it as such, yes.

Q. Why?

A. It connects routes between the North Fork and the South Fork.

Q. But is it run by any public entity?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.    I have no idea if they're subsidized in any way.  I do not know.

Q.    And do you know if the companies that run the Shelter Island Ferries allow guns on board?

A.    I do not know.

Q.    Do you know if they did prior to the C.C.I.A.?

A.    I do not know.

Q.    How often do you ride the Fire Island Ferry?

A.    Less frequently.  I haven't been there in a couple of years.

Q.    Do you know a ballpark of roughly the last time that you rode on the Fire Island Ferry?

A.    Could have been three years ago.

Q.    Have you ever been threatened on the Fire Island Ferry?

A.    No.

Q.    And similarly, were you aware that the Fire Island Ferry is run by a private entity called Fire Island Ferries, Incorporated?

A.    Doesn't surprise me.

Q.    And same question, do you think

Associated Reporters Int'l., Inc.                              www.courtsteno.com

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

the Fire Island Ferry is public transportation?

A.    I would assume so.

Q.    And why?

A.    Just because it's not run by the Metropolitan Transit Authority or a governmental agency, I'm not sure that's the criteria to determine if it's public or private.

Q.    So, similar question about the Cross Sound Ferry, about how often do you ride that?

A.    Once or twice a year.

Q.    And when's the last time that you rode it?

A.    That could have been two years ago.

Q.    And similarly, I'll represent to you that the Cross Sound Ferry is run by a private entity called Cross Sound Ferry Services, Incorporated.  Does that sound correct?

A.    Could be.

Q.    And do you still think that the Cross Sound Ferry is public transportation?

A.    I would interpret it as such, yes.

Q.    So, it -- it seems that you're

Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 169

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

able to interpret the statute in that sense?

            MR. PORTER:  Object to the form of the question.  You can answer.

            A.   Sure, I guess the statute could be a bit more clear of what exactly they're trying to prevent people from carrying on.  I guess we're going back to vagueness.  I guess you're proving vagueness.

            Q.   Or perhaps you're proving that the statute is comprehensive.  So, how often do you ride the Bridgeport and Port Jefferson Ferry?

            A.   Same thing, once or twice a year.

            Q.   And when's the last time you rode it?

            A.   Probably two years ago.

            Q.   Have you ever been threatened on the Bridgeport and Port Jefferson Ferry?

            A.   No.

            Q.   And I'll represent to you that the Bridgeport and Port Jefferson Ferry is run by a private entity called the bride -- apologies, I mangled that.  Call the Bridgeport and Port Jefferson Steamboat Company.  Does that sound correct?

            A.   Yes.

            Q.   And do you still think that the

Associated Reporters Int'l., Inc.                    www.courtsteno.com

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

ferry is public transportation?

A.    Yes.

Q.    Do you know if any of these ferries allow guns on board?

A.    I do not know.

Q.    How often do you ride the Long Island Railroad?

A.    Very infrequently, maybe once a year.

Q.    When is the last time that -- sorry.  Once or twice a year?

A.    Yeah.

Q.    When is the last time that you rode on the Long Island Railroad?

A.    It could have been a year and a half ago.

Q.    And when's the time before that?

A.    I don't recall.

Q.    Ballpark?

A.    Two years ago.

Q.    Are you familiar with the fact that there was a mass shooting on the Long Island Railroad where six people were killed and twenty-one people were injured?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 171

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.   Absolutely.

Q.   And after that, do you understand why people might not want guns on the Long Island Railroad?

MR. PORTER:  Object to the form of the question.  You can answer.

A.   That makes me think that people would want to carry guns on the Long Island Railroad.

Q.   Can you explain that to me?

A.   You had a car full of victims who could do nothing but be victims.  That's exactly what self-defense is all about.

Q.   So, let me ask you this.  If the people wanted guns on the Long Island Railroad, they could pass a law allowing it, right?

MR. PORTER:  Object to the form of the question.  You can answer.

A.   No, we already have a law.  It's the Constitution, which is the supremacy law of the nation.

Q.   Maybe -- maybe my question wasn't clear enough.

A.   It was, yeah.

Q.   Couldn't the New York State

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 172

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

Legislature pass a law saying guns are allowed on the Long Island Railroad?

A.   No.

Q.   Why not?

A.   Because they're flipping it on its head again.

Q.   Can you explain flipping it on its head?

A.   The Second Amendment says we have a right to self-defense, among other lawful purposes. That's the supreme law of the land. Everything comes under that.

Q.   So, you're saying it would be illegal for the legislature to allow guns on the Long Island Railroad?

A.   It would be superfluous. It would be unnecessary to make that statement.

Q.   Do you think that most people on Long Island want guns on the Long Island Railroad?

MR. PORTER:  Object to the form of the question.  You can answer.

A.   I know those people in that car did that day.

Q.   So, the Long Island Railroad is

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

generally crowded, right?

A.   Yes.

Q.   It's got rows of seats and oftentimes, peak times, there's people standing up in the aisles as well, correct?

A.   Correct.

Q.   Can you safely defend yourself with a gun on the crowded train?

A.   Yes.

Q.   How?

A.   How?

Q.   Yeah, how do you make sure that you don't harm innocent people if you're defending yourself with a gun on a crowded train?

A.   There's a risk.  There's a risk. There's a risk.  But those people with Colin Fergu --

Q.   The risk of them shooting --

A.   The people, who are on the train with Colin Ferguson wouldn't take the risk.  They can only be victims.

Q.   And so, there is a risk to innocent people if you use a gun on the crowded train, correct?

A.   Seven of them died.  Seven

Associated Reporters Int'l., Inc.                        www.courtsteno.com

Page 174

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

innocents died, you said, right?

Q.   I think I said six.

A.   Six, okay, six people died, helplessly.

Q.   And the train is in -- an enclosed space, correct?

A.   Correct.

Q.   Generally speaking, those people have no way to protect themselves from your fire, do they?

A.   No, they don't.  But maybe there would have been four.  Maybe there would have been three less deaths if someone was able to step up.

Q.   Maybe there would have been more.

A.   Maybe there would have been more.

Q.   How often do you ride the New York City subway?

A.   Once or twice a year.

Q.   When's the last time that you rode the New York City subway?

A.   A year-and-a-half ago.

Q.   So, April of 2024?

A.   Yes.

Q.   What were you riding the New York

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 177

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

attend a live theater show, on or off-Broadway each year during the holidays, I pass through Times Square.  When's the last time you were in Times Square?

A.   Probably when I drove through and I remember that was what I talked about earlier. Within the last year, two years.

Q.    This is when you got the documents for your daughter?

A.   No, no, no.  Again, I was coming from Harrison, New Jersey, coming east.  I decided to go through Manhattan, through the Lincoln Tunnel and wound up in Times Square.

Q.   As a Manhattan advisor, I strongly advise you not to drive through Times Square.  That will take you forever.

A.   Yeah, it did.

Q.   Prior to that, when was the previous time you were in Times Square?

A.   During the holiday seasons, we usually go in, walk around, see this tree, whatnot.

Q.   So, in 2023, when you did you saw Sleep No More, did you go to Time Square?

A.   Probably, for a dinner before or

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 178

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

afterwards.  Yeah, we did have a dinner before.

Q.    Do you remember where you had dinner?

A.    No, I don't.

Q.    How about prior to 2023, when was the previous time that you went to Time Square?

A.    Again, most likely the holiday seasons.

Q.    Is there any specific time you can think of?

A.    Well, we normally do in December before -- before Christmas or shortly thereafter.

Q.    Apologies.  Rather than a specific time, is there a specific incident that you can think of?

A.    No, no.  Again, general tourist things that people in New York do, you know, these are run-of-the-mill activities that normal people participate in.  They're not memorable.  They're just how we live our life.

Q.    Why do you want to take a gun into Times Square?

A.    To protect myself for -- in case of confrontation.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 180

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.    Yes.

MR. PORTER:  Tom, please let him finish his question.  You start talking over each other.

THE WITNESS:  Yeah, I thought he was, I'm sorry.  No problem.

MR. THOMPSON:  That's all right.

BY MR. THOMPSON:  (Cont'g.)

Q.    So, I guess a similar question. Can you defend yourself with a gun in Times Square without endangering innocent lives?

A.    There's a risk.

Q.    That risk in Times Square is pretty high, isn't it?

A.    Yeah.  And even with all the security you just mentioned, we still have incidents in Times Square, do we not?

Q.    Occasionally.

A.    Okay.

Q.    So, when you visit Times Square to go to the Brooklyn -- Broadway shows that you refer to and off-Broadway shows, apologies, that you refer to in this paragraph.  Are these shows put on in private theaters?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 181

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.   Probably, yes.

Q.   Did you ever carry a gun to any of these on-Broadway or off-Broadway shows?

A.   No.

Q.   Do you know if the theaters permit guns?

A.   I do not know.

Q.   How do you think members of the audience would feel about you having a gun in the theater?

A.   They would not know.

Q.   If they did?

A.   There's a difference between carrying and afraid.  I'm looking to carry.  I'm not looking --

Q.   The question I'm asking -- the question I'm asking is not the --

A.   I'm not looking at --

Q.   -- a phrase, the question I'm asking is about, would it scare people?

A.   That's an afraid, isn't it, that's an afraid.

Q.   So, the question that I'm asking and -- and let me just try to make it as clear as

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

possible. If people knew that you had a gun in the audience of a Broadway show, would that scare people?

MR. PORTER: Object to the form of the question. You can answer.

A. Some.

Q. So, is that an afraid?

MR. PORTER: Object to the form of the question. You can answer.

A. No.

Q. If it causes terror?

MR. PORTER: Object to the form of the question. You can answer, Tom.

A. It's not an intent to terrorize the people.

Q. The phrase isn't about an intent to terrorize the people. It's about whether they're scared.

MR. PORTER: Object to the form of the question. If that was a question, I object to the form of the question.

Q. You can answer.

A. I would think intent matters. Mens rea.

Q. Do you think that it would be

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 183

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

disruptive to the show if people found out that someone had a gun?

A.   No.

Q.   You don't think that it could cause a commotion?

MR. PORTER:  Object to the form of the question.  You can answer.

A.   No.

Q.   Why not?

A.   Concealed is concealed.  They would not know.

Q.   Understood.  The premise of the question is that people find out.

A.   I do not think it would cause terror.

Q.   Do you think it would cause disruption?

A.   No.

Q.   As I can tell you, if you pull out a cell phone at a Broadway show, it will cause disruption.  Mandy Patinkin will stop the whole thing.

A.   So, the way I think about it is –
–

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 184

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

MR. PORTER:  There wasn't even a question, Tom.  You don't have to say anything.

THE WITNESS:  Okay.

BY MR. THOMPSON:  (Cont'g.)

Q.   Does that cause you to reconsider whether there would be disruption if people found out that you had a gun in the audience of a Broadway show?

A.   No.  And if that was the issue, then off-duty policemen and retired policemen could cause the same amount of terror and yet they're excluded from the sensitive places.

Q.   So, off-duty policemen and retired policemen are very well trained, correct?

A.   I don't know.  Presumably so.

Q.   And they will have sworn an oath to serve and protect the people of their jurisdiction, correct?

A.   Sure.

Q.   In many cases, they will have spent up to a lifetime learning how to use their gun and not to use their gun, correct?

MR. PORTER:  Object to the form of the question.  You can answer.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 185

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.    I have no idea what training they go through.

Q.    Do you know if private theatres allowed guns prior to the Concealed Carry Improvement Act?

A.    I don't know.

Q.    Let's move up to paragraph nine D, covering airports including, for example, John F. Kennedy International Airport.  Do you see that?

A.    Yes.

Q.    When was the last time you went to J.F.K. Airport?

A.    Early in September.  I was in Italy.

Q.    Where'd you go?

A.    Italy.

Q.    Oh no, where in Italy?

A.    Florence, Venice, Rome.

Q.    Sounds beautiful.  I've always -- I've always wanted to go to Italy.

A.    You need to go.  It's excellent.

Q.    So, I hear.  We had grand plans to go during COVID or before COVID, and then, COVID happened.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Page 186

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.   Yeah, that's not when you wanted to go.

Q.   True enough.  So, in paragraph nine D, you write about, I'm going to highlight it, the airport's roadways, grounds, cell phone, parking lot, and passenger drop-off and pickup areas near the terminals.  Do you see that section that I've highlighted?

A.   Yes, I do.

Q.   And similarly, further down, give me just a moment.  You talk about J.F.K. Airport grounds.   Do you see what I have highlighted here?

A.   Yes.

Q.    Is that referring to that same space, roadways, grounds, cell phone, parking lot, et cetera?

A.   Yes.

Q.   So, the law only applies in the airport, correct?

A.   I haven't read that recently, but sure.

Q.   Are the grounds part of the airport?

A.   I would think so.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 187

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

Q.    Do you have any reason to believe that the N.Y.P.D. or the state police interpret it that way?

A.    Yes.

Q.    And what reason is that?

A.    The lack of the word buildings in the statute.

Q.    So, other than having read the statute, do you have any information about how the State police or the N.Y.P.D. interpret the law?

A.    No.

Q.    Is there any particular reason why you say you need -- the need for quote, Self-defense and the defense of my family and friends at J.F.K. Airport?

A.    Well, that's just an overarching statement.  That applies to everywhere.

Q.    But the security at J.F.K. Airport is very, very high, isn't it?

A.    Some places, yes.  Others, no.

Q.    Can you explain which is which?

A.    I don't think there's a lot of security in the cell phone parking lot.  And much more inside the terminals.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 188

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

Q.    But there are police throughout the airport grounds.  Isn't that correct?

A.    Yes.

Q.    And security?

A.    Yes.  In the airport.

Q.    You write and I'm going to highlight up here, I'm going to highlight the passage.  I would like to bring a firearm with me while ensuring that it is properly unloaded, locked, and declared in my checked baggage in compliance with federal regulations.  Can you explain what you mean by that?

A.    You are permitted to carry a gun, federal statutes, through airports as long as it's, like you said, it's unloaded in concealed baggage, not carried onto the plane.

Q.    And why do you interpret the State law as prohibiting that?

A.    The State law in all these sensitive places uses the word possession.  It doesn't use the word carry.  And even back to your -- your -- every other example you've brought up, okay, without even terrorizing people.

I can't even transport an unloaded,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 189

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

locked gun anywhere in these sensitive places based on the word possession.

Q.    And is that your interpretation?

A.    Possession is not --

Q.    Go ahead, I apologize.  I didn't mean to stop you.

A.    I would believe that's a plain English interpretation, possession.

Q.    Is that your plain English interpretation?

A.    I think it would be substantially everybody's interpretation.

Q.    Without inquiring into your conversations with counsel, are you aware of any legal interpretation that interprets the law in a way to prevent carrying a firearm that's unloaded in a checked baggage?

A.    I think possession in its plain language as interpreted by the average person is possession, not carry.

Q.    Understood.  Oh, I'm sorry, continue.

A.    I just said words matter.

Q.    Understood.  That's not quite my

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 190

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

question.  My question is not what you think the common-sense interpretation is.  My question is outside of your conversations with your counsel, which are privileged.  Are you aware of any legal interpretation of this law that prevents firearms being carried -- carried unloaded and in checked baggage?

A.    For this law, no.

Q.    So, it's safe to say that this is just your plain language interpretation of the law, correct?

A.    I would assume the vast majority of people's interpretation, statutes are interpreted by the plain meaning of their words, possession is possession, carry is carry.

Q.    All right.

A.    I used to write S.E.C. documents very precisely and clearly.  So, I may be more particular than others.

Q.    So, similar question, are you aware of any legal interpretation from the State police that indicates that the law prevents someone carrying a firearm unloaded and declared in checked baggage?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 197

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

be answered with a no.

Q.    And would you want other people who are drinking in these establishments to have guns?

A.    Yes.

Q.    Why?

A.    You didn't say intoxicated.

Q.    Can you explain the distinction a little more?

A.    One is responsible behavior, the other is not.

Q.    So, if one drinks alcohol, but -- let me see if I'm summarizing this right.  Are you saying that if someone drinks alcohol, but is not intoxicated, that's not irresponsible, even with a gun?

A.    It may not be, if someone has a glass of wine with lunch and again all events and circumstances has that in their mind that may alter their behavior, the mere possession is not what it's hinged on.  It's all events and circumstances.

Q.    Generally speaking, alcohol lowers people's inhibitions, correct?

A.    Correct.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 198

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

Q. And sometimes people who are drinking alcohol make bad decisions that they wouldn't make if they didn't drink, correct?

A. Correct, correct.

Q. And similarly, isn't it true that sometimes people who are drinking get into fights that they wouldn't get into or conflicts that they wouldn't get into if they were sober?

A. Yes.

Q. And isn't it also true that sometimes if you're drinking, you don't always realize how intoxicated you are?

A. Yes.

Q. So, I guess the question is, doesn't the mixture of alcohol and guns create danger to innocent people?

A. There's a risk.

Q. And isn't that risk alleviated by just not having guns in places where people drink alcohol?

A. If everyone followed the rule, but you think okay. I don't believe everyone will follow the rule and not carry in such establishments. So, having a rule is not one hundred percent

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 200

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

Q.   Can you explain that in a little bit more detail in terms of what not a good idea means and -- and the costs and the benefits?

A.   So, again, we're having the tail wag the dog, because a small fraction of people will break the law you're inhibiting the vast majority of people, gun owners, who have a -- a more law-abiding history than most people from carrying responsibly.

But yet permitting in the same places for the fear of others retired law enforcement and other people.

Q.   The restaurants that are listed in paragraph nine F, Gino's in Kings Park, RedCafe, Faraday's, Mannino's, Chop Shop Bar and Grill and the Old Street Restaurant & Bar.  Do you know if they prohibited guns prior to the C.C.I.A.?

A.   I do not know.

Q.   Do you know if they still prohibit guns?

A.   I do not know.

Q.   Have you ever asked?

A.   No.

Q.   It's their right to prohibit guns in their establishment if they want, correct?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 201

NYS Rifle v Steven James – 10-22-25 – Thomas Stirnweis

A.   Undecided on that one.

Q.   Can you explain --

A.   Sure.

Q.   -- what you mean?

A.   I have a second amendment right to defend myself.  They have a different right about their property usage.  I'm not sure which right trumps which right.

Q.   So, let me ask the question another way.  Do you think that the second amendment gives you the right to carry a gun onto other people's property without their consent?

A.   Yes.

Q.   Let me ask a slightly different first that question.  Do you think the second amendment gives a right to carry a gun into other people's homes without their consent?

A.   Yes, administered the way trespass laws are administered.

Q.   Explain to me what you mean by that last clause, administered the way trespass laws are administered.

A.   The way I understand it is you're not trespassing until basically you're told you're