# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., | ) ) ) | |
| ROBERT NASH, | ) ) | |
| BRANDON KOCH, | ) ) | |
| THOMAS STIRNWEIS, | ) ) | |
| WAYNE FRANCIS, | ) ) | |
| KHOURY PORTER, *and* | ) ) | |
| SCOTT NOREN | ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civ. Action No. 1:22-cv-00907-MAD-PJE |
| STEVEN G. JAMES, in his official capacity as Acting Superintendent of the New York State Police, | ) ) ) ) ) | |
| RODNEY K. HARRISON, in his official capacity as Commissioner of the Suffolk County Police Department, and Licensing Officer for Suffolk County, *and* | ) ) ) ) ) | |
| PATRICK J. RYDER, in his official capacity as Police Commissioner of the Nassau County Police Department, and Licensing Officer for Nassau County | ) ) ) ) ) | |
| *Defendants.* | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY

**TABLE OF CONTENTS**

                                                                 **Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 6

I.      The Court should exclude the testimony of Charles, Rivas, and Young because their opinions are legal conclusions masquerading as expert testimony. ................................... 6

II.     Reeping's testimony must be excluded because it is wholly irrelevant. ........................... 15

III.    Defendant James' experts are unreliable and methodologically unsound. ...................... 16

CONCLUSION ................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*,
  2011 WL 13254283 (E.D.N.Y. Apr. 1, 2011) ..........................................................................14

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env'tl Consulting, Inc.*,
  743 F. Supp. 3d 530 (S.D.N.Y. 2024)........................................................................................4

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  137 F. Supp. 2d 147 (E.D.N.Y. 2001) .......................................................................................5

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*,
  742 F. Supp. 3d 421 (D.N.J. 2024) ...........................................................................................6

*Barber v. United Airlines, Inc.*,
  17 F. App'x 433 (7th Cir. 2001) ................................................................................................6

*Barnett v. Raoul*,
  2024 WL 4719468 (S.D. Ill. Nov. 8, 2024) ..............................................................................6

*Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*,
  315 F. Supp. 3d 101 (D.D.C. 2018).........................................................................................8

*Burkhart v. Washington Metro. Area Trans. Auth.*,
  112 F.3d 1207 (D.C. Cir. 1997).................................................................................................8

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001).......................................................................................................5

*Christian v. James*,
  176 F.4th 189 (2d Cir. 2026) ............................................................................................ *passim*

*Christian v. Nigrelli*,
  642 F. Supp. 3d 393 (W.D.N.Y. 2022) ...................................................................................14

*Daniels-Feasel v. Forest Pharms., Inc.*,
  2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021)..................................................................6, 24, 25

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).....................................................................................................................6

*Diversified Carting, Inc. v. City of New York*,
  423 F. Supp. 2d 85 (S.D.N.Y. 2005).........................................................................................9

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997)............................................................................................5, 16

*In re Golden*,
 2022 WL 362913 (Bankr. E.D.N.Y. 2022)............................................................6, 7

*Hygh v. Jacobs*,
 961 F.2d 359 (2d Cir. 1992)...................................................................................1, 7

*Indep. Living Res. v. Or. Arena Corp.*,
 982 F. Supp. 698 (D. Or. 1997) ...............................................................................9

*Initial Pub. Offering Sec. Litig.*,
 174 F. Supp. ..............................................................................................................6

*In re Initial Pub. Offering Sec. Litig.*,
 174 F. Supp. 2d 61 (S.D.N.Y. 2001)...............................................................6, 7, 14

*Kipke v. Moore*,
 165 F.4th 194 (4th Cir. 2026) ..................................................................................1

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999)...........................................................................................4, 5, 16

*Lara v. Delta Int'l Mach. Corp.*,
 174 F. Supp. 3d 719 (E.D.N.Y. 2016) ..................................................................4, 16

*Lickteig v. Cerberus Cap. Mgm't, L.P.*,
 589 F. Supp. 3d 302 (S.D.N.Y. 2022)......................................................................5

*Linde v. Arab Bank, PLC*,
 922 F. Supp. 2d 316 (E.D.N.Y. 2013) .....................................................................5

*Marbury v. Madison*,
 5 U.S. 137 (1803)......................................................................................................1

*Marx & Co., Inc. v. Diners' Club, Inc.*,
 550 F.2d 505 (2d Cir. 1977).....................................................................................7

*Navigators Ins. Co. v. Goyard, Inc.*,
 608 F. Supp. 3d 44 (S.D.N.Y. 2022).........................................................................7

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
 597 U.S. 1 (2022)............................................................................................ *passim*

*In re Rezulin Prod. Liability Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004).................................................................5, 15

*Schoenthal v. Raoul*,
    150 F.4th 889 (7th Cir. 2025) ....................................................................................1

*Specht v. Jensen*,
    853 F.2d 805 (10th Cir. 1988) .................................................................................6, 7

*Stobie Creek Invs., LLC v. United States*,
    81 Fed. Cl. 358 (Fed. Cl. 2008) .................................................................................7

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
    949 F.3d 825 (3d Cir. 2020)......................................................................................4

*United States v. Hemani*,
    608 U.S. ----, 2026 WL 1751710 (June 18, 2026)...................................................15

*United States v. Hernandez-Fundora*,
    58 F.3d 802 (2d Cir. 1995).......................................................................................6

*United States v. Jackson*,
    5 F.4th 676 (7th Cir. 2021) ......................................................................................9

*United States v. Rahimi*,
    602 U.S. 680 (2024)................................................................................................15

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988).....................................................................................14

*Vicuna v. O.P. Schuman & Sons, Inc.*,
    298 F. Supp. 3d 419 (E.D.N.Y. 2017) .....................................................................5

**Other Authorities**

Fed. Jud. Ctr., *Reference Manual on Scientific Evid.* (4th ed. 2025)............................16

Fed. R. Evid. 401 .............................................................................................................4

Fed. R. Evid. 702 ..........................................................................................................4, 6

Paul M. Reeping, *et al.*, *The Effect of Gun-Free School Zones on Crimes
    Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118
    (2023)........................................................................................................................17

Paul M. Reeping, *et al.*, *Gun-Free Zones and Active Shootings in the United
    States: A Matched Case-Control Study*, 37 Lancet Reg'l Health-Am. 100837
    (2024)........................................................................................................................19

Paul M. Reeping, *et al.*, *Gun-Free Zones in Alcohol-Serving Establishments and
    Risk for Firearm Violence: A Cross-Sectional, Geospatial Study in Texas*, 102
    J. Urban Health 618 (2025)......................................................................................18

Rose M.C. Kagawa, Paul M. Reeping, & Hannah S. Laqueur, *Effects of Implementing Permissive Campus Carry Laws on Rates of Major Violence at Public Colleges and Universities*, 12 Injury Epidemiology 14 (2025)....................................20

U.S. Const. amend. I ................................................................................................3

U.S. Const. amend. II................................................................................. *passim*

U.S. Const. amend. XIV .............................................................................................3

**INTRODUCTION**

Defendant James attempts to justify New York's unconstitutional locational restrictions through the expert testimony of Patrick J. Charles, Brennan Rivas, Terrance Young, and Paul Reeping. New York is increasingly deploying "experts," who submit declarations replete with legal conclusions that seek to reframe history in the state's favor.[1] In prior cases, courts have been misled by these untested opinions. Unlike in prior cases, those experts were deposed by Plaintiffs here—and that discovery reveals that their testimony is improper and unnecessary under *Bruen*, irrelevant, and unreliable.

This Court should exclude Charles, Rivas, Young, and Reeping. These so-called experts have been presented for the improper purpose of clothing advocacy in a veneer of authority that does not exist. The Second Circuit's recent decision in *Christian* illustrates the issue: the Court relied on New York's expert testimony that was false, misleading, and unreliable. This Court should not make the same mistake. It should disqualify New York's experts.

***First***, Expert witnesses are neither necessary nor appropriate for this Court's application of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Charles, Rivas, and Young inappropriately offer legal opinions and legal conclusions masquerading as historical analysis. In the Second Circuit and everywhere else, "[i]t is emphatically the province and duty of the [judiciary] to say what the law is"—not expert witnesses. *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other

---

[1] *See, e.g.*, *Christian v. James*, 176 F.4th 189, 206 (2d Cir. 2026) (relying on Young's declaration to uphold New York's parks ban); *Kipke v. Moore*, 165 F.4th 194, 210 (4th Cir. 2026) (relying on Rivas' untested declaration to uphold Maryland's public-transportation ban); *id.* at 217 (relying on Charles' untested declaration to uphold Maryland's locations-selling-alcohol ban); *Schoenthal v. Raoul*, 150 F.4th 889, 921 (7th Cir. 2025) (relying on Rivas' untested expert report to uphold Illinois' public-transportation ban).

circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). Each of them opines on the meaning of statutes, the existence of supposed traditions these statutes represent, or even the relevant similarities among locations during the Founding, Reconstruction, and Modern eras—quintessential legal questions under *Bruen*. While other courts have adopted experts' opinions as being the historical record, *see, e.g.*, *Christian*, 176 F.4th at 206, the discovery taken in this case reveals that their opinions are improper, incorrect, and misleading. This Court should apply *Bruen*, under which the parties' counsel compile the historical record, and the Court interprets and decides the legal questions concerning the extent and scope of historical tradition. 597 U.S. at 25 n.6. The Court should exclude the testimony of Charles, Rivas, and Young.

*Second*, Reeping's testimony is entirely irrelevant. *Bruen* definitively rejected means-end scrutiny as a method of assessing whether a firearms regulation is constitutionally sound. *See Bruen*, 597 U.S. at 23–24, *id*. at 29 n.7 (analogical reasoning "is not an invitation to [engage in] means-end scrutiny"). But that is precisely what Reeping offers: a collection of studies purporting to analyze the *effect* of modern firearms regulation. *Bruen*, 597 U.S. at 25. That testimony could only be relevant if the Court intended to perform a means-end balancing test that *Bruen* forbids.

*Third*, each of the experts faces reliability problems. Reeping relies on studies that employed unreliable methodologies and produced demonstrably suspect results. Young provides opinions far beyond his area of expertise and, at his deposition, acknowledged that many of his historical findings were incorrect. And Charles and Rivas cherry-pick the historical record in a manner that fundamentally misstates the law and undermines their reliability, as each of them essentially conceded during their depositions. Each witness should be excluded.

## BACKGROUND

Plaintiffs filed this case on August 31, 2022, alleging both facial and as-applied challenges

to the CCIA under the First, Second, and Fourteenth Amendments. (ECF Nos. 1, 63). Defendants disclosed four expert witnesses.

Charles purports to "expound on the history of the law restricting armed carriage in locations jurisprudentially referred to as 'sensitive places.'" Declaration of Patrick J. Charles ("Charles Decl.") ¶¶ 2, 4, attached as **Exhibit A**. Charles is a lawyer, "historian, legal scholar, and author." *Id*. ¶¶ 5–6; *see* Excerpts of Charles Dep. Tr., attached as **Exhibit B**.

Rivas provides "expert opinions about historical gun regulations—including, but not limited to, those pertaining to sensitive places," and "specifically to address historical regulations that restricted the presence of weapons at places of public gathering, sites of government administration, and public transportation. Declaration of Brennan Rivas ("Rivas Decl.") ¶ 2, attached as **Exhibit C**; *see* Excerpts of Rivas Dep. Tr., attached as **Exhibit D**. Rivas is not a lawyer.

Reeping offers opinions "on the effect of sensitive place laws and gun-free zones on gun violence and public safety in the United States." Declaration of Paul Reeping ("Reeping Decl.") ¶ 1, attached as **Exhibit E**; *see* Excerpts of Reeping Dep. Tr., attached as **Exhibit F**.

Young is an "Emeritus Professor of Geography." Declaration of Terence Young ("Young Decl.") ¶ 1, attached as **Exhibit G**; *see* Excerpts of Young Dep. Tr., attached as **Exhibit H**.  Young is not a lawyer. His declaration offers opinions on the development of "America's tradition of public parks" in the Founding, Reconstruction, and Modern eras, and the proliferation of firearms restrictions in parks only after 1858. Young Decl. ¶¶ 8, 30. Among other things, Young opines in his declaration that "parks" did not exist at the Founding, *id.* ¶¶ 8, 15; that Founding Era public parks were not "analogs" to modern parks, *id.* ¶ 15; and that the 19th- and 20th-century restrictions on firearms in parks show a "comparable" "firearms regulation tradition," *see id.* ¶ 31.

Plaintiffs disclosed two rebuttal experts. Professor Lee Francis rebuts Defendant James'

Charles, Rivas, and Young. Declaration of F. Lee Francis ("Francis Decl."), attached as **Exhibit I**. Dr. Ross Larsen refutes Reeping's irrelevant means-end empirical opinions on the effects of firearms regulations. Declaration of Ross Allen Andrew Larsen, Ph.D. ("Larsen Decl."), attached as **Exhibit J**; Excerpts of Larsen Dep. Tr., attached as **Exhibit K**.

Defendant James filed his Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of His Cross-Motion for Summary Judgment on May 27, 2026. ECF No. 142-1 ("James MSJ Br."). Defendant James relies on each of his experts in his summary-judgment brief. *Id.* at 23–26 (Young); *id.* at 28–29 (Reeping); *id.* at 27, 30, 31, 34–37, 45–47, 49 (Rivas); *id.* at 17–19, 22–23, 27–28, 33–34, 48–49, 54 (Charles).

## LEGAL STANDARD

A trial court assessing the admissibility of expert testimony must assess whether the proffered expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The court "functions in a 'gatekeeping' capacity in order to ensure 'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 728 (E.D.N.Y. 2016) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Expert testimony "is admissible only if it is both relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Rule 702 applies with equal force when the court is the trier of fact. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020); *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env'tl Consulting, Inc.*, 743 F. Supp. 3d 530, 537 (S.D.N.Y. 2024).

The relevance standard under Rule 702 mirrors that of Rule 401—"assessing admissibility, the trial court must determine whether the proffered expert testimony is relevant, *i.e.*, whether it

'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001); *accord Vicuna v. O.P. Schuman & Sons, Inc.*, 298 F. Supp. 3d 419, 443 (E.D.N.Y. 2017).

It is within the relevance inquiry that a court should determine "whether the expert testimony assists the trier of fact." *Lickteig v. Cerberus Cap. Mgm't, L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022) (quoting *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014)) ("[W]hether the expert testimony assists the trier of fact goes primarily to relevance."). To be sure, though, "[t]his helpfulness requirement . . . 'goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry.'" *In re Rezulin Prod. Liability Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (explaining *Daubert*'s "fit" requirement) (citation omitted). As a general rule, "[e]xpert testimony is not helpful if it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Lickteig*, 589 F. Supp. 3d at 329 (citation omitted).

Reliability demands that the expert testimony have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire*, 526 U.S. at 149 (alteration accepted). This inquiry is "a flexible one," *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 321 (E.D.N.Y. 2013) (quoting *Daubert*, 509 U.S. at 594), but an expert's conclusions must be "generated by a reliable methodology," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 162 (E.D.N.Y. 2001). The Court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

A "propensity to cherry-pick data that supports [an expert's] conclusions and disregard contrary data that is highly relevant to [their] conclusions renders [an expert's] opinion unreliable."

*Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at \*16 (S.D.N.Y. Sept. 3, 2021); *see also, e.g.*, *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (upholding exclusion where the expert "cherry-picked the facts he considered to render an expert opinion").[2]

## ARGUMENT

**I.      The Court should exclude the testimony of Charles, Rivas, and Young because their opinions are legal conclusions masquerading as expert testimony.**

The Court should exclude Defendant James' legal opinions and conclusions. "[E]very [C]ircuit," including the Second, "has explicitly held that experts may not invade the court' s province by testifying on issues of law." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (collecting cases). Indeed, "even the most reliable expert cannot be permitted to testify as to a legal conclusion." *In re Golden*, 2022 WL 362913, at \*11 (Bankr. E.D.N.Y. 2022). The opinions of Charles, Rivas, and Young should not be considered because they only provide legal opinions and conclusions – legal advocacy that should be done by counsel, not experts.

Experts may not provide legal opinions or conclusions; that is an "axiomatic principle." *Initial Pub. Offering Sec. Litig.*, 174 F. Supp. at 64 (quoting Thomas Baker, *The Impropriety of Expert Witness Testimony on the Law*, 40 U. Kan. L. Rev. 325, 352 (1992)); *see also Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("[I]t is axiomatic that the judge is the **sole** arbiter of the law and its applicability." (emphasis added)). The rule is clear: "where an expert testifies as to legal opinions couched as expert testimony, that testimony cannot be considered." *Golden*, 2022

---

[2] It is not clear whether Rule 702 applies to expert testimony concerning "legislative facts," such as the historical laws underlying the history-and-tradition analysis. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 812 (2d Cir. 1995). But this Court can exclude Defendant James' improper expert testimony even if Rule 702 does not apply. *Barnett v. Raoul*, 2024 WL 4719468, at \*6-7 (S.D. Ill. Nov. 8, 2024) (excluding a study introduced by plaintiffs as unreliable). It also can apply *Daubert* analysis to inform whether New York's evidence is "credible" at summary judgment. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, 742 F. Supp. 3d 421, 427–28 (D.N.J. 2024).

WL 362913, at *14 (internal quotations omitted); *see also Initial Pub. Offering Sec. Litig.*, 174 F.

Supp. 2d at 63 (quoting *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000)) (the Second

Circuit "**requires** the exclusion of [expert] testimony [that] states a legal conclusion" emphasis

added)); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other

circuits in requiring exclusion of expert testimony that expresses a legal conclusion.")). Put

differently, "expert testimony that would supplant the role of the court in interpreting the law and

applying the law to the facts, or that offers a legal opinion on the ultimate issue to be decided, is

not allowed." *Golden*, 2022 WL 362913, at *14.

That is a common-sense proposition. "[E]xpert testimony on law is excluded because the

tribunal does not need the witness' judgment"—such expert testimony is "superfluous." *Marx &

Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (cleaned up). Such testimony

undermines our justice system at its most basic level: "In order to justify having courts resolve

disputes between litigants, it must be posited as an a priori assumption that there is one, but only

one, legal answer for every cognizable dispute," which in turn "requires only one spokesman of

the law, who is of course the judge." *Specht*, 853 F.2d at 807 (quoting William B. Stoebuck,

*Opinions on Ultimate Facts: Status, Trends, and a Note of Caution*, 41 Den. L. Ctr. J. 226, 237

(1964)). All of these principles "hold[] just as true when the finder of fact is the court, if not more

so; the court is well equipped to instruct itself on the law." *Stobie Creek Invs., LLC v. United States*,

81 Fed. Cl. 358, 361 (Fed. Cl. 2008).

An expert may not testify as to "the **legal** significance of various facts." *Marx & Co.*, 550

F.2d at 510 (emphasis added); *see also Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 48

(S.D.N.Y. 2022).  That is, "an expert may offer his opinion as to facts that, if found, would support

a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the

7

legal standard has been satisfied." *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 127 n. 8 (D.D.C. 2018).

In addition to the well-established rules against expert legal opinions, the Supreme Court in *Bruen* made perfectly clear that it is "[t]he job of judges . . . to resolve legal questions presented." *Bruen*, 597 U.S. at 25 n.6. "[I]n our adversarial system," it is properly the role of "the parties" to "compile[]" "the historical record." *Id.* (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). The *Bruen* framework leaves no room for experts to opine on legal issues. Defendant James' historical experts violate these rules at every turn.

*Charles.* Charles admits up front that he was retained "as a historical **and constitutional** expert." Charles Decl. ¶ 2 (emphasis added). There is no need for a "constitutional expert"; after all, "[e]ach courtroom comes equipped with a 'legal expert,' called a judge." *Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (citation omitted). In his deposition, Charles claimed that all he was doing was "help[ing]" Defendant James "locate" and "provide" historical evidence. Charles Dep. Tr. at 31:3–32:9. But that simply is not true—if it were, there would be no reason to introduce him as an expert. And Charles' declaration clearly goes far beyond that role—it assumes the role of both advocate and judge. For example, beyond the "text and social history" of the "mid-to-late nineteenth century 'sensitive places' laws" Charles collects and presents in his Declaration, he asserts to have divined the "multiple **whys** for their adoption." Charles Decl. ¶ 19 (emphasis in original). He not only provides a history of statutes he claims are relevant to this case, but he also offers his own legal interpretations of the **legislative intent** behind the statutes.[3] That is improper; "legislative intent is 'a matter of statutory

---

[3] Charles declares that "several of these *whys* are expounded upon" throughout, and presents statutes that—according to *his* interpretation of legislative intent—fit the bill. One such "why" is "protecting children from firearms-related violence." *See* Charles Decl. ¶¶ 20–24. Another is

8

interpretation.'" *Diversified Carting, Inc. v. City of New York*, 423 F. Supp. 2d 85, 95 (S.D.N.Y. 2005) (quoting *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 432 (2d Cir. 2002)). "[A]ny statutory interpretation" question is a "legal question for the court" on which expert testimony is prohibited. *See United States v. Jackson*, 5 F.4th 676, 681 (7th Cir. 2021); *see also Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 765 (D. Or. 1997) ("As a general rule . . . the interpretation of a law is peculiarly within the court's own expertise and thus is not a proper subject for expert testimony.").

Charles' conclusion demonstrates the inappropriateness of his testimony. He opines that "[l]aws restricting and/or prohibiting the use and carrying of dangerous weapons at 'sensitive places'" and "in motor vehicles" "are an important part of our American history and tradition of firearm regulation." Charles Decl. ¶¶ 45–46. Whether the CCIA is consistent with the American "historical tradition of firearm regulation" is not just **a** legal question, but the **central** legal question this Court is called upon to resolve. *Bruen*, 597 U.S. at 17. Thus, under the guise of "compil[ing]" "the historical record," Charles opines on the key "legal questions presented." *Id*. at 25 n.6. These are questions for this Court to decide with the historical record and argument provided by counsel—expert opinions play no role.

Charles' deposition confirmed that his testimony is entirely unnecessary. Charles admitted that "the court in this case doesn't need [his] opinion at all in order to reach an appropriate conclusion." Charles Dep. Tr. at 40:4–12. When asked "[w]hy is an expert opinion necessary," when he could have simply "given these [historical] laws" to Defendant James' counsel to present

_____

"ensuring public safety from firearms violence," which Charles says is "an important legislative interest" and from which he draws the conclusion that "sensitive places laws . . . were generally adopted to protect the public from firearms-related violence." *Id*. ¶ 25. The "why"—the intent—of a statute is properly left to the Court's interpretation without any need for supposed legal experts.

9

to the court, Charles answered "I don't know" and said that proceeding in that *Bruen*-compliant manner simply was "not on [his] radar." *Id.* at 33:2–22. Charles also **attempted** to limit his role to "history" rather than legal advocacy: "I'm not here to make an analogue between the past and the present." *Id.* at 211:12–13. And yet, as explained above, Charles repeatedly offers opinions on disputed legal questions, such as whether history reflects "tradition," and on the "why" and "how" earlier generations purportedly regulated the keeping and bearing of firearms. *Supra* at 8–9. The Court should exclude Charles' legal advocacy masked as objective historical testimony.

*Rivas.* Rivas presents many of the same issues. Rivas testified that she is opining "as a historical expert, not as a legal expert," and that her opinions are not "meant to be legal analysis." Rivas Dep. Tr. at 23:7–11. But "legal analysis"—indeed, legal advocacy—is exactly what Rivas marches forth in her declaration. Even at the outset of her declaration, Rivas says that she "presents a history of locational restrictions barring firearms or other deadly weapons in the public concourse, paying special attention to the **application of historical analogues to modern regulations**." Rivas Decl. ¶ 10 (emphasis added). Rivas admits to doing what *Bruen* said is the role of the judge: "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation." *Bruen*, 597 U.S. at 28–29. She should be excluded.

Rivas' declaration is largely only legal opinions and conclusions. *See, e.g.*, Rivas Decl. ¶ 12 (mid- to late-19th century restrictions were "akin to the challenged statute" and, "together with colonial-era analogues provide ample support for modern prohibitions."); ¶ 33 (of government buildings, "[t]aking into consideration the fact that today's local, state, and federal governments carry out more sophisticated, bureaucratized functions in larger and more numerous structures, it is not inapposite to see them casting a wider net of protection within the *Bruen* analogical framework"); ¶ 49 ("The historical statutes analogous to modern sensitive places laws cast a

10

purposefully wide net."); ¶ 51 ("Taken together, the historical evidence . . . supports modern sensitive place laws."). Each instance is a legal opinion or conclusion that warrants exclusion.

Rivas also improperly opines as to legislative intent. She maintains that "the context of Reconstruction is crucial to understanding [the] intent" behind certain locational restrictions: "protect[ing] Black residents from white supremacist terror." *Id*. ¶ 22. She also "encourag[es] us to think more capaciously about the intent and function of the proffered historical analogues." *Id*. ¶ 30. She opines it "obvious" that lawmakers in the nineteenth century had an "intention . . . to prohibit weapons in [certain] crowded gathering spaces." *Id*. ¶ 34. Like her testimony on tradition, Rivas' opinions on legislatures' intent should be excluded.

Her deposition testimony also confirms that this Court does not need help from experts. Rivas testified that the meaning of historical laws is "obvious just from a straight forward reading of the laws," Rivas Dep. Tr. at 178:19–179:9, and admitted that "most of the lawyers handling cases like these . . . don't have expert witnesses," *id.* at 60:7–61:3. Plaintiffs agree. This Court can discern the "straight forward" meaning of historical statutes, in compliance with *Bruen*, without experts.

**Young.** Young's opinions about American parks are equally inappropriate. He opines that a host of mid-to-late 19th century regulations amounted to "a firearms regulation tradition grounded in the purpose, form, and use of America's . . . urban parks." Young Decl. ¶ 31. He also purports to opine on their meaning and purpose: "America's best-known urban parks . . . swiftly promulgated similar prohibitions concerning the carrying of firearms . . . because they shared a common purpose – the improvement of American society." *Id.* ¶ 23. He also purports to conduct analogical reasoning concerning the existence, purposes, and differences of parks in the Founding, Reconstruction, and Modern Eras. *Id.* ¶ 8 ("America's tradition of public parks was launched in

11

the 1850s."); ¶ 15 (Founding Era park spaces "were not analogs to today's public parks nor were they their predecessors except in the sense that some of these utilitarian spaces, most famously the Boston Common, survived long enough to be adaptively re-used as community parks."). Contrary to his declaration, Young acknowledged in his deposition that parks **did** exist in the Founding Era and had many relevant similarities to Reconstruction and Modern Era parks. *See infra* at 13, 22.

Despite using *Bruen*-analysis language (e.g., "tradition," "analog," "similar") and conducting analogical reasoning in his declaration, Young Decl. ¶¶ 8, 15, Young conceded in his deposition that he assigned such terms his "own understanding," **not** the meaning of those terms under *Bruen*, 597 U.S. 17, 28–29; Young Dep. Tr. at 41:10–42:3.  In fact, Young testified that he was "not sure" that he had even "read the entire *Bruen* decision." Young Dep. Tr. at 41:1–2. It is not helpful to this Court for an expert to carelessly throw around legal terms of art without a grasp on what they mean in the context of this important case. Even at best, this can only lead to confusion of the issues and legal standard. Young should be excluded.

There is, of course, even more troubling testimony. Despite opining on the meaning and scope of over a hundred historical restrictions, Young Decl. ¶¶ 30–55, Young repeatedly admitted the obvious—that he is "not a lawyer" and **cannot** offer an opinion on what those historical laws actually meant, what they regulated, and why they were enacted, Young Dep. Tr. at 44:1–4, 89:10–23, 90:3–17, 94:3–9, 95:6–11, 97:7–24, 99:4–11, 117:21–118:15, 128:10–23. Young's testimony confuses the historical record and invites the Court to reach unsupported conclusions.

Young's admissions demonstrate the danger of allowing governments to hire experts to present historical laws, opine on their meaning, and try to ask the court to adopt those opinions as the Court's own legal interpretation of historical traditions. That very-real danger was recently demonstrated in the Second Circuit's misguided decision in *Christian*. 176 F.4th at 206.

The court relied on Young's then-untested opinions on issues that his deposition confirms are simply wrong. *First*, *Christian* relied on Young's opinion that "America's tradition of public parks was launched in the 1850s," 176 F.4th at 206, a statement Young repeats verbatim here, Young Decl. ¶ 8. His rationale was that Founding Era parks "were utilitarian" in purpose, while modern parks are "ornamental spots for sociability and relaxation." *Id.* But Young conceded at his deposition that Founding Era parks as well as modern parks share relevant characteristics and purposes with parks in the 19th and 20th centuries. Young Dep. Tr. at 59:5–79:9 (conceding that various Founding Era spaces, like modern spaces, were used for recreational and ornamental purposes); *id.* at 37:18–38:9; 81:24–83:18 (conceding that modern parks, like Founding Era parks, serve "utilitarian purposes"). *Second*, *Christian* relied on Young's opinions about Boston Common to support its conclusion that Boston Common did not serve recreational purposes and therefore is too dissimilar to modern parks to serve as an analogue. 176 F.4th at 206; *see also* Young Decl. ¶¶ 13, 15 (same). But, at his deposition, Young could not dispute that Boston Common **was** used at the Founding "for informal socializing and recreation," "for strolling," "for horse and carriage riding," "for sports," for "celebration[s]," and "for religious preaching." Young Dep. Tr. at 59:22–61:18. The *Christian* decision is irretrievably flawed because the Court accepted Young's testimony as true; the record in this case demonstrates conclusively that it was false.

\* \* \*

Charles, Rivas, and Young feign disinterest and objectivity, but **all three** offer legal arguments meant to sway this Court in favor of Defendant James that track nearly verbatim (or, for Rivas, expressly apply) the standard set out in *Bruen*. *See, e.g.,* Charles Decl. ¶¶ 45–46 ("Laws restricting and/or prohibiting the use and carrying of dangerous weapons at 'sensitive places'" and "in motor vehicles" "are an important part of our American history and tradition of firearm

13

regulation."); Young Decl. ¶ 31 ("This is . . . a firearms regulation tradition grounded in the purpose, form, and use of America's post-Central Park urban parks."); Rivas Decl. ¶ 33 ("[I]t is not inapposite to see [today's governments] casting a wider net of protection within the *Bruen* analogical framework."). They make "no attempt to couch the opinion testimony at issue in even conclusory factual statements but [draw] directly upon the language" of *Bruen*. *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988). Terms like "history," "tradition," "analog," and "similar" have a specific legal meaning and carry tremendous weight. They are not "not self-defining terms." *Id*. Their opinions are improper.

Charles, Rivas, and Young provide legal arguments. "Argument is argument whether in the [witness] box or at the bar, and its proper place is the last." *Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d at 69 (quoting *Nichols v. Univ. Pictures Corp.*, 45 F.2d 119, 123 (2d Cir. 1930)). After all, "[i]n our adversarial system, lawyers make arguments, judges write legal opinions—and there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court." *Id*. Charles, Rivas, and Young offer "would-be brief[s] masquerading as . . . expert opinion[s]." *246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*, 2011 WL 13254283, at *6 (E.D.N.Y. Apr. 1, 2011). The experts are certainly free to "consult with the . . . defendants, sign their brief, or both," *Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d at 69, but Defendant James cannot launder dozens of pages of legal argument through expert declarations. Permitting such testimony introduces the risk that the Court will afford experts' arguments more deference than it otherwise might if the arguments were raised in a brief written by an attorney. *Christian* illustrates this risk. The Court should exclude Charles, Rivas, and Young.[4]

---

[4] Even if this Court does not exclude their declarations and testimony in the entirety, it should still ignore any portions of their testimony that constitute a legal opinion. "The historical record itself, and not expert arguments or opinions, informs the analysis." *Christian v. Nigrelli*, 642 F. Supp. 3d

14

**II.    Reeping's testimony must be excluded because it is wholly irrelevant.**

Reeping's opinions focus "on the effect of sensitive place laws and gun-free zones on gun violence and public safety in the United States." Reeping Decl. ¶ 1. But *Bruen* made clear that the *effect* of a regulation is utterly irrelevant to its constitutionality. Reeping's opinions are irrelevant.

An expert's testimony must "have a valid connection to the pertinent inquiry." *Rezulin Prod. Liability Litig.*, 309 F. Supp. 2d at 540. *Bruen* held that the only relevant inquiry is "text, as informed by history." 597 U.S. at 19. *Bruen* expressly rejected any "interest balancing" and "means-end scrutiny in the Second Amendment context." *Id.* at 2. And, despite Defendant James' contrary belief, "[a]nalogical reasoning . . . is not an invitation to [engage in] means-end scrutiny." *Id.* at 29 n.7; *accord United States v. Rahimi*, 602 U.S. 680, 692 (2024) (reaffirming that "the appropriate analysis" is the historical-tradition test); *United States v. Hemani*, 608 U.S. ----, 2026 WL 1751710, at *4–5 (June 18, 2026) (same).

Means-end scrutiny is precisely and exclusively what Reeping offers. He declares up front that he was retained to provide an opinion on "the effect of sensitive place laws." Reeping Decl. ¶ 1. He focuses on "firearm violence epidemiology," which informs his opinions that locational restrictions do not "increase crime or firearm violence" and, instead, have "effects consistent with neutral or protective outcomes." *Id.* ¶ 11. *Bruen*'s rejection of means-end scrutiny forbids consideration of Reeping's opinions. 597 U.S. at 23–25. Reeping confirmed that he is not even "offering an opinion on America's historical tradition of firearm regulation." Reeping Dep. Tr. at 34:12–15. That alone is fatal to his opinion, yet his declaration contains nothing but empirical analysis. *See, e.g.*, Reeping ¶ 16 ("From an empirical standpoint . . . ."); *id.* ¶ 20 (setting out to answer "an empirical question"); *id.* ¶ 44 ("The empirical evidence reviewed in this declaration

---

393, 400 n.6 (W.D.N.Y. 2022).

evaluates gun-free zones and sensitive place laws across several policy contexts.").

Reeping's testimony is simply irrelevant "to the task at hand," *Lara*, 174 F. Supp. 3d at 728. Reeping offers **nothing** of use in the Court's analysis as to whether the challenged CCIA provisions are consistent with the right to keep and bear arms. His opinions are a not too subtle effort to inject means-end scrutiny, rejected by *Bruen*, back into Second Amendment analysis. Reeping should be excluded.

### III.    Defendant James' experts are unreliable and methodologically unsound.

Defendant James' experts should be excluded because each lacks "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co.,* 526 U.S. at 149 (1999).

**A. Reeping**. Reeping opines that locational restrictions are statistically "associated" with reductions in firearms violence or, at least, as a weak fallback, not associated with increases in firearms violence. *See* Reeping Decl. ¶¶ 44-46. Reeping bases his testimony on four empirical studies that examined firearms restrictions in four contexts: (1) St. Louis school zones; (2) Texas bars and restaurants; (3) active shootings on a national scale; and (4) college campuses. *Id.*

Reeping concedes that he is not making—because he cannot make—any opinion on causation. Reeping Decl. ¶ 41; Reeping Dep. Tr. at 96:16–20, 137:22–138:2, 203:10–23.  His methodologies are too unreliable even to establish **correlation**—which is generally a prerequisite to **causation**.  *See* Fed. Jud. Ctr., *Reference Manual on Scientific Evid.* (4th ed. 2025), at 92; *see* Larsen Rep. at 5–6.  Reeping couches his findings as "associations," Reeping Decl. ¶¶ 30, 34, 36, 39, 41, which Defendant James parrots in his briefing, James MSJ Br. at 28–29. But Reeping's testimony is inadmissible *ipse dixit* with "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146–47. As Plaintiffs' rebuttal expert demonstrates, each of Reeping's studies—and, thus, each of his opinions—suffers from

16

fundamental methodological defects that prevent Reeping's alleged "association[s]" from being "trusted as a reliable description of reality."  Larsen Rep. at 5–6, 8.

*St. Louis Study.*[5] Reeping opines that "gun-free zones are associated with a reduced likelihood of active shootings when compared to otherwise similar locations." Reeping Decl. ¶ 26 (emphasis omitted). But the St. Louis Study, which tried to compare firearms violence inside and outside of 1,000 foot buffer zones surrounding schools within a single year in a single city—does not yield any reliable association between school-zone bans and firearm violence reductions. *First*, Reeping's study was a "cross-sectional" analysis from a single year, which cannot establish any causal relationship. Reeping Dep. Tr. at 70:10–17. *Second*, Reeping's finding is unreliable because the purported protected effect Reeping found when starting the buffer zone from the geographic center of the school (his secondary analysis) vanished when he started the zone from the school's property boundary (his primary analysis). St. Louis Study at 1123.  In other words, the association vanished under a boundary line that Reeping concedes was equally "defensible." Reeping Dep. Tr. at 71:24–72:6 (conceding that both boundaries are "defensible boundary methods"); Larsen Decl. at 11 (explaining that "[a] real protective effect would appear under both specifications" and "[a] reliable finding must survive both" boundary methods). As Larsen explained during his deposition:

> So it's the same data, same school, same crime, same year. The statistical significant result does not replicate under the alternate legally accurate specification. This is a defining effects of what is called a geographical artifact, not a real protective effect. A real protective effect would appear under both specifications.

Larsen Dep. Tr. at 135:5–11. *Third,* Reeping's geographic-center boundary (that purported to find a protective effect) is also unreliable because it conflated the effects of hard security (*e.g.*, fences, security cameras, on-site police), with the effects of the positive law banning firearms. Larsen

---

[5] Paul M. Reeping, *et al.*, *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118 (2023) ("St. Louis Study").

Decl. at 11 (explaining that Reeping's analysis "partially captures the physical security infrastructure of the school itself — not the deterrent effect of the gun-free zone law"). Reeping conceded that he made no effort to "account for" hard security in conducting his study. Reeping Dep. Tr. at 77:4–7. And *fourth*, Reeping's underlying data is unreliable: his method for gathering alleged firearms-violence events only captured about 12% of gunfire incidents. St. Louis Study at 1125. As Larsen explained, a study that fails to account for "88% of the events it purports to measure" cannot be viewed as a "reliable correlation." Larsen Rep. at 11–12; Larsen Dep. Tr. at 125:4–126:6 (explaining that Reeping's unreliable data precludes finding "an association").

*Texas Alcohol Study.*[6] Reeping opines "that firearm prohibitions in alcohol-serving establishments are associated with lower rates of nearby shootings." Reeping Decl. ¶ 41 (emphasis omitted). He relies solely on his own study purporting to compare rates of firearms violence inside Texas's gun-prohibiting bars and restaurants to violence outside of a 50-meter buffer zone (primary analysis) and a 100-meter buffer zone (secondary analysis). *See* Texas Alcohol Study at 619–20.

This study suffers multiple fundamental defects that preclude any reliable result. *First*, Reeping's protective-effect finding that appeared using a 50-meter buffer zone disappeared under a 100-meter buffer zone. *Id.* at 622. Such an "arbitrary" finding—dependent on the boundary— "cannot be called a reliable finding of association." Larsen Decl. at 13. *Second*, Reeping's finding "was driven entirely by bars": when restaurants were considered on their own, there was not any significant reduction of firearm violence. *See id.* Reeping's clumping bars and restaurants together creates the misleading appearance of a broader protective effect—called aggregation bias. *Id.*; *see*

_____

[6] Paul M. Reeping, *et al.*, *Gun-Free Zones in Alcohol-Serving Establishments and Risk for Firearm Violence: A Cross-Sectional, Geospatial Study in Texas*, 102 J. Urban Health 618 (2025) ("Texas Alcohol Study").

*also* Reeping Decl. ¶¶ 39–41.[7] ***Third***, the protective effect appearing only in bars—and not restaurants—suggests that any protective effect likely results from "security infrastructure" in bars rather than Texas's firearm prohibition. Larsen Decl. at 13. But Reeping did not even consider this in conducting the study or offering his opinions on the effectiveness of banning firearms from alcohol-serving establishments. Reeping Dep. Tr. at 165:21–166:25. Reeping's reliance on the Texas Alcohol Study is too unreliable to be admissible. Larsen Decl. at 13–14.

 ***Active Shootings Study***.[8]  Reeping opines that "gun-free zones are associated with a reduced likelihood of active shootings when compared to otherwise similar locations." Reeping Decl. ¶ 26. Reeping's underlying study purports to find that banning firearms reduces the likelihood of active shootings by an extraordinary **61.3%** because places "where no active shooting occurred" restricted firearms more frequently than places where "active shooting" cases occurred. Active Shootings Study at 1; Reeping Decl. ¶ 25. Reeping's underlying study: (1) took 150 active shootings and determined, if possible, whether those locations banned firearms; (2) matched each case to a control (a randomly selected establishment) and then determined, if possible, whether that control location bans firearms; and then (3) compared whether cases more or less often banned firearms than controls. Active Shootings Study at 1; Reeping Decl. ¶¶ 22–25. This approach is not scientifically rigorous enough to be reliable.

 As Larsen explained, Reeping's Active Shooting Study is methodologically unsound and "cannot establish that a reliable correlation exists." Larsen Decl. at 15. The study suffers from "differential information bias," because Reeping classified cases as firearm allowing or firearm

---

[7] Defendant James relies upon this misleading opinion to argue that firearms restrictions have a protective effect in "alcohol-serving establishments." James MSJ at 28–29.

[8] Paul M. Reeping, *et al., Gun-Free Zones and Active Shootings in the United States: A Matched Case-Control Study*, 37 Lancet Reg'l Health–Am. 100837 (2024) ("Active Shootings Study").

restricting generally through a different method than controls. Larsen Decl. at 15. Because different methods have different error rates, the result is unreliable. *Id.* Confirming the bias, Reeping dropped unclassifiable cases at a much lower rate than controls—which, rather than drop, he replaced. *Id.* at 15–16; Reeping Dep. Tr. at 192:3–24. And replacing controls plausibly "inflated" the gun-free rate of the control group (and, thus, the alleged protective effect) because locations Reeping was able to contact plausibly could be more likely to ban guns.  Larsen Decl. at 16. Reeping did not study that risk because, according to him, he could not.   Reeping Dep. Tr. at 192:21-193:17.  Regardless, his findings and opinions are too unreliable to be admissible in this Court.

 ***Campus-Carry Study***.[9] Reeping also opines that there is "no statistically significant association" between laws prohibiting carry on college campuses and violent-crime rates. Reeping Decl. ¶¶ 30, 34. In other words, Reeping has no opinion about the effect of campus-carry laws on crime. Regardless of the irrelevancy of this study's finding, it **still** fails to follow reliable methodological principles. For example, Larsen's analysis revealed that the study appears to have unreliably included a single "idiosyncratic" hospital-based campus in Atlanta, Georgia with aberrational data that swayed the "entire analysis."  *Id.* at 19–20.  Reeping, who was not the primary authority, could not recall whether this campus was excluded from the study.  Reeping Dep. Tr. at 127:22–128:21. This study suffers from multiple other issues—*e.g.*, incorrectly coding when certain institutions began to allow campus-carry, failing to include a reliable number of treatment states, including unrepresentative campuses, and relying on unreliable data about campus-crime rates.  Larsen Rep. at 18–29 (cataloguing this study's unreliable methodologies).

---

[9] *See* Rose M.C. Kagawa, Paul M. Reeping, & Hannah S. Laqueur, *Effects of Implementing Permissive Campus Carry Laws on Rates of Major Violence at Public Colleges and Universities*, 12 Injury Epidemiology 14 (2025).

Reeping's opinions based on this unreliable study—irrelevant as it may be—are not admissible.

Reeping's opinions rely on four unreliable empirical studies that cannot be trusted as fairly reflecting reality. Defendant James appears to understand this—he barely cites Reeping in his summary-judgment brief. James MSJ Br. at 28–29 (relying only on Reeping's opinion about "alcohol-serving establishments"). Reeping's testimony must be excluded in its entirety.

**B. Young.** Young's historical methodology is also too suspect for admissibility. Young is a scholar of geography—he had no experience in the history of firearms regulations until he started serving as an expert witness in Second Amendment cases in 2023. Young Dep. Tr. at 40:6–22. While purporting to opine on the historical tradition of firearms regulation in American parks, Young conceded that, because he is "not a lawyer," the parties' attorneys are "better capable" of assessing the meaning of historical laws and conducting the *Bruen* analogical analysis. *See, e.g.*, Young Dep. Tr. at 118:6–15. Plaintiffs agree. Young's admission on the obvious demonstrates precisely why he should be excluded. Young's opinions on firearms restrictions are not reliable.

Even to the extent Young focused on the existence and comparability of parks throughout American history (rather than firearms restrictions), his deposition testimony contradicts the bases of his opinions. For example, he notes in his Declaration that Founding Era parks were "not analogs to today's public parks," because they "were barren, unsightly plots" and "utilitarian spaces." Young Decl. ¶ 15. But he then conceded that modern parks **do** serve utilitarian purposes— contradicting his rationale for why Founding Era parks were dissimilar to modern parks. Young Dep. Tr. at 37:18–38:9; 81:24–83:18. Young also conceded that Founding Era parks, like modern parks, were used for recreational activities and served as ornamental spaces. *Id.* at 59:5–79:9 (conceding that various Founding Era spaces were used for recreational and ornamental purposes). And Young had not even attempted to look for any evidence of firearm regulation in parks prior to

21

1858 because he assumed that "modern" parks did not exist until after 1858, *id.* at 44:5–45:14; but Young acknowledged that Founding Era green spaces **were** similar to modern parks in relevant ways. *Id.* at 59:5–79:9. Young's opinions simply are not reliable.

**C. Charles.** Charles reveals his true colors when he takes on the Supreme Court's controlling rulings. He criticized *Heller* for "cherry-picking historical analogues," Charles Dep. Tr. at 66:14-67:4, and he labeled *Bruen* as "dishonest" and "[m]ethodologically . . . fake" by "deploy[ing] different methodologies to come to different interpretations" of history. *id.* at 58:19–25. But Charles' testimony violates his own supposed standards at virtually every turn.

*First*, Charles testified that a "textualist" reading of historical statutes is impermissibly "speculative" in the absence of "enforcement records" showing how the historical law was applied. Charles Dep. Tr. at 154:23–155:3, 160:10–13. Charles repeatedly criticized Plaintiff's counsel for interpreting Northampton-style laws without "examples of enforcement that would dictate to come to your conclusion." *Id.* at 153:4–14; *id.* at 160:8–13 (accusing Plaintiffs' counsel of "speculative interpretation" because "we don't have any enforcement records that support your interpretation"). According to Charles, interpreting historical statute without enforcement history is "a really bad way to do it." *Id.* at 153:19–20. Importantly, however, when Plaintiffs' counsel asked Charles if **he** could support his interpretations with "record of enforcement proceedings which supports [his] interpretation," Charles responded that he had "no enforcement records" to support **his** reading. *Id.* at 164:7–24.

Charles opines that there was a "broad" tradition of restricting carry in "densely populated areas" because English laws like the Statute of Northampton prohibited carry in places like "fairs" and "markets," Charles Decl. ¶ 10, along with similar colonial restrictions, *id.* ¶ 12. But Charles conceded at his deposition that he has no "evidence or history of enforcement actions from the

22

Founding Era for people simply going armed at a market or a fair." Charles Dep. Tr. at 162:20–25. Charles conceded that, "in fact, for most colonial laws, we don't have the enforcement records of it. So it's not just this law. It's most laws." *Id.* at 163:23–25. In other words, the historian, by his own standard, lacks the support he says matters most: enforcement history regarding the laws he cites. Thus, by Charles' own admission, his opinions claiming a Founding Era tradition of "broad[ly]" restricting the right to bear arms is necessarily unreliable and inadmissible.

*Second*, Charles otherwise cherry-picks the historical record to support his restrictive view of the Second Amendment. He contends that Northampton-style laws did not require, as *Bruen* held, that the person carry weapons "in a manner likely to terrorize others," 597 U.S. at 59, casting aside the statute's requirement of "terror" as "boilerplate." Charles Dep. Tr. at 148:14–22; *id.* at 151:7–152:7 (same). But Charles has no historical evidence for his disagreement with *Bruen*; he admits that he has no "enforcement records" to support his view that a person could be prosecuted under a Northampton-style law without causing an affray. *Id.* at 149:18–23. Charles' reading is wrong: Northampton-style statutes were directed not at the idle carrying of firearms in certain locales, but at "conduct that created fear or terror among the public." Francis Decl. ¶¶ 14–16; *Bruen*, 597 U.S. at 47. In the 1686 case of Sir John Knight, the jury acquitted a man charged with carrying guns on the street and into a church because he lacked "the intent to terrorize," as the purpose of the statute "was to punish people who go armed to terrify the King's subjects." *Id*. ¶¶ 15–16 (quoting *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). But Charles' *ipse dixit* rejection of this historical evidence – one of the few examples of an actual enforcement action informing the actual meaning of the Statute of Northampton – demonstrates that his "expert" testimony is not a reliable source. Charles' testimony suffers from a demonstrated "propensity to cherry-pick data that supports [his] conclusions" and "disregard contrary data that is highly relevant to [his]

conclusions." *Daniels-Feasel*, 2021 WL 4037820, at \*16. That propensity "renders [his] opinion[s] unreliable" and thus inadmissible. *Id*.

**D. Rivas.** Rivas similarly cherry-picks evidence to suit Defendant James' arguments and Rivas' own policy preferences. *See* Rivas Dep. Tr. at 37:5–9 (testifying that "regulations that limit the presence of firearms in public spaces are generally good things"). Rivas opines that there is a tradition—*i.e.*, "a throughline"—of "[l]ocational restrictions" "in early modern England, colonial America, and the nineteenth-century United States" that "restricted the presence of weapons in crowded or otherwise important public areas." Rivas Decl. ¶ 11–13. But she only discusses laws that seemingly support Defendant James' legal positions, while ignoring laws that undercut his positions—*i.e.*, laws that required individuals to carry firearms when attending church or while traveling. Rivas Dep. Tr. at 126:15–24 (conceding that she did not "factor" laws requiring firearm carry into her "opinions in this case"). Her "throughline" can be achieved only by disregarding contradictory precedent. Rivas defended her disregard of those laws by saying that they "addressed a **particular local problem**," *i.e.*, "fear of attack," *id.* at 127:12–25 (emphasis added), that is "significantly different than the questions at issue in this case," *id.* at 129:2–17. But Rivas contemporaneously conceded that laws are "often" passed "in response to specific concerns." *Id.* at 128:2–13. And she never explained how the laws requiring carry addressed issues "significantly different" than the analogues she relies on. Rivas' *ipse dixit* does not rehabilitate her reliability.

Rivas' improper cherry-picking similarly impacted her opinions about Northampton-style laws. Rivas opined that the Statute of Northampton prohibited firearm carry in specific "public spaces"—*e.g.*, "town markets and gatherings"—because of its reference to "fairs" and "markets." Rivas Decl. ¶ 14. She made no effort in her declaration to address the fact that the Statute of Northampton prohibited firearm carry "nor in no part elsewhere," which shows that the statute

24

banned **all** public carry when the individual carried arms to terrorize others. *See, e.g.*, *Bruen*, 597 U.S. at 59. Nor did Rivas acknowledge that the Northampton-style analogues contained similar catch-all language. *See* Rivas Decl. ¶ 14 n.4 (quoting American analogues). Except to say that England was "quite different" from colonial America (which is not a response at all), Rivas never explained how these catch-all phrases did not destroy her opinions. *See* Rivas Dep. Tr. at 84:11–17 (testifying that she did not "have the full text" on her screen and could not answer); *id.* at 84:21–85:8 (testifying that "in the American colonies, there were . . . some lawful reasons for carrying weapons"); *id.* at 86:13–19 (testifying that she "would want to read the full text"); *id.* at 92:20–93:16 (testifying that England was "quite different" and that it was not "surprising . . . to see a very restrictive . . . rule about not going about armed"). None of that is a sufficient answer to justify Rivas' disregarding contrary evidence that is relevant to her opinions. *Daniels-Feasel*, 2021 WL 4037820, at *16. Rivas' opinions are unreliable and inadmissible. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion to exclude the opinions of Patrick J. Charles, Brennan Rivas, Paul Reeping, and Terence Young. Their opinions are improper, irrelevant, unreliable, misleading, and—in some cases—simply false. This Court should disregard them and faithfully apply the *Bruen* test.


Dated: June 24, 2026

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
Bradley Arant Boult Cummings LLP
1900 K Street NW, Suite 800
Washington, D.C. 20006
Phone: 202-393-7150

Facsimile: 202-347-1684
jsweeney@bradley.com
jporter@bradley.com

*Counsel for Plaintiffs*

**OF COUNSEL**
W. Chadwick Lamar, Jr. (*pro hac vice*)
Mason A. Kruse (*pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue N.
Birmingham, AL 35223
clamar@bradley.com
mkruse@bradley.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th of June, 2026, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to all Counsel of Record.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)