*New York State Rifle and Pistol Association, Inc. v. James,*
Case Number:22-CV-00907-MAD-PJE

# Exhibit I

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **New York Rifle and Pistol Association, et al.,** | ) ) ) |
| **Plaintiffs,** | ) Civ. Action No.: 1:22-cv-00907 |
| | ) |
| **v.** | ) ) |
| **Steven G. James, et al.** | ) |
| **Defendants.** | |

## EXPERT REPORT AND DECLARATION
## OF PROFESSOR F. LEE FRANCIS

I, F. Lee Francis, declare that the following is true and correct:

1. I have been asked to provide an expert opinion on the history of sensitive place restrictions and to address the Declarations of Professor Patrick Charles and Brennan Rivas. My report below explores these issues in detail.

2. This declaration is based on my own knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

1

3.      I am an Assistant Professor of Law at Widener Commonwealth Law School. Prior to my appointment at Widener, I was an Assistant Professor of Law at Mississippi College School of Law in Jackson, Mississippi. I have a master's degree in English from the University of North Carolina at Greensboro, and a Juris Doctorate from the Maurice A. Deane School of Law at Hofstra University. At Widener University, my course load includes teaching courses in Constitutional Law, Criminal Procedure, Administrative Law, and Evidence. Prior to my academic appointments as a professor, I served as a Special Assistant United States Attorney in the Eastern District of North Carolina where I prosecuted firearms related offenses. A copy of my complete curriculum vitae (CV) is attached to this declaration as Exhibit A.

4.      My scholarship on the Second Amendment and the history of firearms regulation has been cited by federal courts.[1] I have published multiple articles on this topic that have appeared in leading law journals.[2]

---

[1] For a complete list of court citations, see my CV attached as Exhibit A to this report.
[2] Particularly relevant publications include F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms,* WEST VIRGINIA LAW REVIEW

5.      I have been invited to present lectures, papers at faculty workshops, and participated in conferences on the Second Amendment and the history of firearms regulation at Duke University Law School, Southern Methodist University Dedman School of Law, and the University of Virginia School of Law.

## RETENTION AND COMPENSATION

6.      I have been retained to render expert opinions in this case. I am being compensated for services performed in the above-entitled case at an hourly rate of $400 for reviewing materials, participating in meetings, and preparing reports, $400 for depositions and court appearances, and compensation for travel expenses. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

7.      My report is based on my independent research. In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related

_____

*(Forthcoming 2025)*; F. Lee Francis, *Defining Dangerousness: When Disarmament is Appropriate*, TEXAS TECH LAW REVIEW (Forthcoming 2024). A full list of relevant publications is also included in my CV.

materials on which I based my opinions. The materials cited in this report are a subset of the relevant materials I have consulted to understand the contours of American constitutional history that are relevant to understanding the historical issues posed by this case.

**Summary of Opinions**

8.      The evidence discussed below demonstrates that the sources relied upon by Dr. Rivas and Mr. Charles do not establish a history and tradition of broadly prohibiting the nonviolent carrying of arms in public places. Properly understood, the Statute of Northampton addressed the misuse of weapons in a manner that terrorized the public or disturbed the peace, not the everyday bearing of arms by law-abiding citizens. Indeed, early American statutes derived from Northampton preserved this same focus on threatening conduct rather than the mere presence of firearms in public.

9.      Much of the remaining evidence cited by the Government's experts consist of statutes enacted decades after the ratification of the Second Amendment or regulations addressing different problems altogether. These sources include general public carry prohibitions, private property rules, and militia discipline regulations governing

4

intoxication rather than civilian firearm possession.

10.    Taken together, they do not demonstrate the well-established history and tradition required under the Supreme Court's framework. Instead, the record reflects a consistent distinction between laws regulating dangerous conduct and laws prohibiting the nonviolent bearing of arms in ordinary public settings.

## I.    CONTEXTUALIZING THE STATUTE OF NORTHAMPTON

11.    Dr. Rivas's declaration places significant weight on the Statute of Northampton of 1328 as evidence that Anglo American law historically prohibited the carrying of arms in public places. However, that interpretation is not supported by the historical record nor does it comport with the history and tradition standard established by the Supreme Court.[3] The statute of Northampton addressed a narrow problem involving the use of arms to terrorize the public, not the peaceful carrying of weapons.

---

[3] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 41, 142 S. Ct. 2111, 2139, 213 L. Ed. 2d 387 (2022) ("Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791. The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment.").

12.      Consider the text of the 1328 statute:

Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's justices in their presence, sheriffs, and other ministers in their bailiwicks, lords of franchises, and their bailiffs in the same, and mayors and bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables, and wardens of the peace within their wards, shall have power to execute this act. And that the justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.[4]

13.      True, the Statute of Northampton provided that no person shall go or ride armed "by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere."

14.      However, Rivas mistakenly reads this language in isolation.[5] Medieval and early modern English courts consistently interpreted the

---

[4] Statute of Northampton, 2 Edw. 3, c. 3 (1328).
[5] *See* Dr. Rivas's Declaration at p.5.

6

statute as prohibiting conduct that created fear or terror among the public.[6]

15.     Consider the Sir John Knight's case of 1686. In that case, the Catholic King James II charged Knight with "going or riding armed in affray of the peace." Knight had carried guns on the street and into a church.[7] Because Knight did not possess the requisite intent—the intent to terrorize—the jury elected for acquittal.[8]

16.     Writing for the Court, the Chief Justice explained that the purpose of the Statute "was to punish people who go armed to terrify the King's subjects. It is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects…." Thus, the Court held "But tho' this statute be almost gone in desuetudinem [disuse], yet where the crime shall appear to be malo animo [with evil intent], it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)…."[9]

---

[6] *See* Rex v. Knight, 90 Eng. Rep. 330 (K.B. 1686); *See generally* David B. Kopel, *The First Century of Right to Arms Litigation*, Georgetown Journal of Law & Public Policy (2015); see also STEPHEN HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? (2021) (discussing the Sir John Knight case).

[7] *Id.* ("The information sets forth, that the defendant did walk about the streets armed with guns, and that he went into the church of St. Michael[.]")

[8] *Id.* ("This case was tried at the Bar, and the defendant was acquitted.").

[9] *Id.*

17.     This interpretation is consistent with the Court's treatment of the Statute of Northampton. The Court explained that the statute was directed at carrying arms "to the terror of the people," not the peaceable bearing of arms for lawful purposes.[10]

18.     Explaining why Knight was acquitted, Dr. Stephen Halbrook wrote:

> The facts were undisputed that he had walked in the streets and went into a church with a gun. But the crime was not simply going or riding armed. A further element of the crime was that one must do so "to terrify the King's subjects," with "malo animo," and "in affray of peace." Nothing in the evidence suggests that he threatened anyone, brandished a weapon, or started a fight. He had gone armed, but that did not suffice to be convicted under the Statute of Northampton. Nothing in the decision suggested that Knight was acquitted for any other reason.[11]

19.     Rivas's declaration fails to address the relevant historical context surrounding the 1328 statute, including the cases in which individuals such as Sir John Knight were charged.

20.     At bottom, the statute was closely associated with affray and breaches of the peace. The gravamen of the offense was not the mere possession of arms but the manner in which those arms were carried and

---

[10] STEPHEN HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? (2021).
[11] *Id.*

displayed.

### A.   FIREARMS DURING THE FOUNDING ERA

21.     During the Colonial and Founding periods, firearms were an essential part of daily life. They were primarily used for hunting and for defending one's home or community.[12]

22.     Colonial statutes and legal guidebooks repeatedly adopted language derived from Northampton but preserved the same emphasis on conduct that created fear or terror. For example, the Massachusetts law of 1795 prohibited persons from going armed "to the fear or terror of the good citizens."[13] Similar formulations appeared other jurisdictions. These enactments demonstrate that American lawmakers understood the relevant offense as one tied to threatening behavior.[14]

23.     Importantly, these laws did not establish a general

---

[12] Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35 (2023) ("Since the earliest colonial days, Americans have been busily manufacturing and repairing arms. In the colonies, the ability to defend one's home and community, hunt, fight wars, and ultimately win American independence depended largely on the ability to produce arms. For the newly independent nation, arms production was critical to repel invasions and insurrections, and eventually, to western expansion. The skill was always valued and in demand, and many Americans made their own arms rather than depend on others.").

[13] MASS. GEN. LAWS, ch. 25, §§ 1–2 (I. Thomas & E. T. Andrews 1801) (Law Passed 1795).

[14] *See* An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35, 35 (Dixon, Holt, Nicolson, & Davies).

prohibition on carrying arms in public places. Instead, they targeted a specific type of conduct that was understood to disturb the peace. A person who carried arms peaceably was not engaged in the offense described by these statutes. This understanding is consistent with the broader legal context of the Founding era.

24.    Americans frequently traveled with arms for lawful purposes such as self-defense, hunting, and militia service. If the Statute of Northampton had been understood to impose a sweeping prohibition on public carry, such widespread practices would have been unlawful.

25.    Dr. Rivas's declaration instead adopts a reading of Northampton that treats it as a broad prohibition on the presence of arms in public spaces. That interpretation reflects a modern reinterpretation of the statute that emerged in recent scholarship. It is not consistent with how the statute was historically understood or applied.

26.    For purposes of historical analysis under the Supreme Court's framework in *New York State Rifle & Pistol Association v. Bruen*, the Statute of Northampton therefore cannot serve as evidence of a tradition of broadly prohibiting the carrying of arms in public places. At most, the statute demonstrates a longstanding rule against using arms

10

in a manner that terrorizes the public or breaches the peace. It does not establish a tradition of banning peaceable armed carry in ordinary public settings.

### B.    WEAPON-CARRYING IN EARLY AMERICA

27.    Dr. Rivas spends very little time analyzing the relevant Founding era history. Instead, Dr. Rivas's declaration relies heavily on statutes enacted in the decades following the Civil War. These include laws adopted by states and territories such as Tennessee, Georgia, Texas, Missouri, Oklahoma, and Arizona during the late nineteenth century. This evidence is of limited relevance to determining the original understanding of the Second Amendment.[15] As such, these are simply not responsive to the government's burden nor are they reflective of the Nation's tradition.

28.    Proper analysis must give primary weight to the period surrounding the ratification of the Second Amendment in 1791. Laws adopted many decades later cannot establish the original meaning of the constitutional provision. At most, they may reflect later policy

---

[15] Bruen, 597 U.S. at 66. ("As we suggested in *Heller*, however, late-19th [and 20th] centur[ies] evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

developments or changing social conditions.

29.    Indeed, Dr. Rivas concedes that many of these laws arose in response to conditions unique to the post-Civil War period, including rising homicide rates, new firearm technology, and increased weapon carrying.[16] Those circumstances reflect the social and political conditions of Reconstruction and the late nineteenth century, not the legal tradition that existed at the Founding.

30.    The declaration of Mr. Charles also relies on post–Civil War statutes. As such, these laws are of limited relevance to the historical inquiry required under *Bruen*, which focuses primarily on the public understanding of the right to keep and bear arms at the time of the Founding.[17]

31.    The record must reflect a well-established and representative tradition of firearm regulation. Obscure statutes enacted decades after ratification cannot satisfy that requirement.[18]

---

[16] *See* Dr. Rivas's Declaration at pp. 10-14.

[17] Bruen, 597 U.S. at 36-37 ("As we recognized in Heller itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.").

[18] Bruen, 597 U.S. at 30 ("analogical reasoning requires only that the government identify a well-established and representative historical *analogue.").

32.     Since these statutes were enacted decades after the ratification of the Second Amendment and in response to distinct historical conditions, they cannot establish a longstanding tradition of firearm regulation dating to the founding era. Accordingly, they provide limited support for the claims advanced in Dr. Rivas's declaration.

33.     To test the point further, not only did colonists carry arms in the regular course of their daily lives, but legal commentators in the decade following ratification also acknowledged this practice.[19]

## C.     RIVAS'S USE OF NINETEENTH CENTURY LOCATIONAL RESTRICTIONS

34.     Dr. Rivas's declaration also treats a number of nineteenth century statutes as evidence of a tradition of locational restrictions on firearms.[20] In many instances, however, the cited laws were not limited location-based regulations. Rather, they were broader public carry

---

[19] STEPHEN HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? (2021) ("Throughout the early American Republic, ordinary Americans used and carried firearms as a regular part of their lives as citizens. But even beyond these lived experiences, the right to bear arms was being progressively recognized in most new state constitutions as the United States grew."); 1 BLACKSTONE COMMENTARIES App. n.D, at 289 (St. George Tucker ed., 1803) ("In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side.").
[20] *See* Dr. Rivas's Declaration at pp. 14-22.

prohibitions that restricted the carrying of certain weapons generally.

35.     For example, several statutes discussed in her declaration formed part of broader regulatory schemes that restricted both open and concealed carry in most circumstances. The provisions addressing specific locations were therefore embedded within broader bans on carrying weapons in public. Historical laws structured this way cannot be treated as relevant analogues to modern sensitive place laws as they typically allow public carry while prohibiting it only in specific locations.

36.     *Bruen* requires more. Thus, the relevant inquiry centers on why and how the regulation burdens the right to keep and bear arms.[21]

37.     A general prohibition on public carry burdens the right by eliminating the ability to bear arms in public altogether. In contrast, location-based restrictions assume the existence of a general right to public carry and merely limit the exercise of that right in discrete places.

---

[21] United States v. Rahimi, 602 U.S. 680, 692 (2024) ("Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin.").

38.     Consider, for example, a statute that provides, "No driving anywhere." Such a law would constitute a general prohibition on driving. A location restriction would permit one to drive generally, but not inside a courthouse. Both regulate cars, but the structure and purpose of the regulation are different.

39.     The purpose of historical sensitive places laws was to safeguard governmental decision-making and civic order.[22] General bans historically served very different purposes, such as suppressing political opposition, disarming certain populations, maintaining public order through broad disarmament. The purpose was often to preventing widespread citizen arming.[23]

40.     Because the two regimes regulate the right in fundamentally different ways and serve different purposes, they are not comparable under *Bruen's* requirement that historical analogues impose a similar burden ("how") for a similar justification ("why").

41.     True, there were narrow restrictions on sensitive places historically, including legislatures and courts, but those restrictions were

---

[22] See Mark W. Smith, *Dangerous, but Not Unusual*, Georgetown JL&PP (2024); David B. Kopel and Joseph Greenlee, *The "Sensitive Places" Doctrine*, Charleston L. Rev. (2018).
[23] *Id*.

limited and context-specific, operating only to protect governmental proceedings while leaving the general right of peaceable public carry otherwise undisturbed.[24]

42. Indeed, *Bruen* makes this point clear:

It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.[25]

43. Failing to distinguish between general carry prohibitions and true locational restrictions risks overstating the evidence. Laws that broadly restricted the carrying of arms do not demonstrate a tradition of narrowly defined sensitive places. Instead, they reflect a different regulatory approach that operated within a primarily different legal framework.

44. Dr. Rivas's reliance on nineteenth-century railroad restrictions is also misplaced. Railroads were private enterprises, and

---

[24] *Id.*

[25] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 31, 142 S. Ct. 2111, 2134, 213 L. Ed. 2d 387 (2022).

any limitations on the carrying of arms aboard trains reflected the authority of private property owners to regulate conduct on their property. But private rules imposed by rail companies do not establish a historical tradition of government regulation of the right to bear arms.

45.     Because the Second Amendment constrains governmental action, *Bruen* requires evidence of comparable state-imposed restrictions, not policies adopted by private actors. As such, railroad regulations cannot serve as meaningful analogues for modern government prohibitions on carrying firearms in public places.[26]

46.     At most, these examples establish the longstanding authority of private property owners to control conduct on their premises, not the existence of a tradition of government-imposed location bans.

## II. FIREARM RESTRICTIONS ON CHURCHES

47.     In his section on places of worship, as elsewhere, Mr. Charles relies heavily on statutes that fall outside the relevant period identified

---

[26] *See* Mark W. Smith, *Dangerous, but Not Unusual*, Georgetown JL&PP (2024) ("A proposed historical analogue must be an actual "regulation"; that is, the provision in question must be a law (as evidenced by constitutions, statutes or the common law), it must have had binding effect, and it cannot be a mere discussion, statement of opinion, or a proposal never adopted. The Supreme Court requires the government to prove a historical tradition of "firearm regulation," which means a binding legal obligation that, upon violation, may give rise to a legal penalty. The exclusive focus of this inquiry should be primary legal sources.").

in *Bruen*.[27]

48.     The record does not support the proposition that churches were traditionally treated as "sensitive places" in which the carrying of arms was broadly prohibited. To the contrary, available evidence reflects a far more varied and often contrary practice.[28]

49.     Notably, in colonial Georgia, the law affirmatively required individuals eligible for the militia to bring firearms to church, mandating that attendees carry "a gun, or a pair of pistols" to worship services.[29]

50.     The statute reads, in part, requiring males eligible for the militia and other security forces "on any Sunday or other times, to any church, or other place of divine worship within the parish where such person shall reside, shall carry with him a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gunpowder and ball, and shall take the said gun or pistols with him to the pew or seat where such person shall sit, remain, or be, within or about the said

---

[27] Mr. Charles Declaration at pp. 33-36.

[28] *See* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (collecting colonial- and Founding-era historical law for requiring firearms at church services).

[29] An Act for the Better Security of the Inhabitants, by Obliging the Male White Persons to Carry Fire Arms to Places of Public Worship, §§ 1-4 GA. CODE (R. Aitken 1800) (Passed 1770).

church or place of worship."[30]

51.   As to the *why*, the law was not limited to militia service or periods of military readiness, but instead applied broadly to individuals attending public worship, reflecting a general expectation that arms be carried in ordinary civic life rather than a narrow military obligation.[31]

52.   As to the *how*, the statute required individuals to bring firearms into church and exposed them to punishment for noncompliance, demonstrating a sweeping and affirmative mandate rather than a targeted regulation tied to militia structure or discipline.[32]

53.   In both respects, the law operated as a general requirement of public carry, not a limited militia measure.

54.   To press the point further, the Georgia statute may have been motivated, by a desire to protect congregants during worship, that purpose cuts against, rather than supports, post-Civil War firearm prohibitions in churches.[33]

55.   Under *Bruen's* "why" inquiry, the relevant question is not

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.* ("WHEREAS it is necessary for the security and defence of this province from internal dangers and insurrections, that all persons resorting to places of public worship shall be obliged to carry fire arms.").

simply whether a law relates to safety, but how that safety concern was addressed.

56.     These statutes addressed the risk of violence by requiring the presence of arms, not by prohibiting them. Analyzing the "how" of it, the law imposed an obligation on individuals to carry functional weapons into church, subject to penalty. Such obligations indicate a system of armed conduct, not disarmament.

57.     While I do not dispute the existence of the nineteenth-century statutes upon which Mr. Charles relies, they are far from being instructive.

58.     At a minimum, this history demonstrates the absence of any consistent tradition of disarming individuals in places of worship. Rather than reflecting a settled understanding that churches were uniquely sensitive locations, the record reveals that firearms were, at times, required in such settings. Under *Bruen*, this lack of a relevant tradition is significant. Where evidence is mixed or contradictory, it cannot sustain a modern prohibition.

59.     The secondary literature confirms this point. As one commentator has noted, "[w]hat was once required is now prohibited,"

reflecting a marked shift in the regulation of firearms in churches over time.[34]

60.      This evolution further underscores the absence of any continuous or deeply rooted tradition of prohibition.

### III.      ALCOHOL RESTRICTIONS AS ANALOGUES

61.      Mr. Charles's reliance on alcohol restrictions is irrelevant. To the extent he suggests these laws demonstrate a tradition of designating locations as "sensitive places" because they present elevated risks, his argument either impermissibly expands the scope of the sensitive-places doctrine or fundamentally misunderstands it.

62.      Historically, alcohol-related regulations addressed the danger of armed intoxication, not the mere presence of firearms in particular locations. In other words, the concern was the condition and conduct of the individual, not the designation of entire places as categorically off-limits to peaceable carry. Interpreting such laws as evidence of a broad location-based prohibition therefore mischaracterizes

---

[34] Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ("Some of our forefathers were required to bears arms in church. What was once required is now prohibited, and some of our forefathers' descendants must disarm themselves in church.").

both the purpose and operation of these regulations.[35]

63.     During the seventeenth and eighteenth centuries, habitual drunkenness was a common and widely recognized feature of social life.[36]

64.     The militia were no exception.[37]

65.     What is more, implicit in Mr. Charles's analysis of intoxicant laws is the fact that those laws did not prohibit an individual from simply carrying or possessing firearms.[38]

66.     Further still, militia alcohol regulations governed discipline

---

[35] *See* F. Lee Francis, *Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen*, 107 Marq. L. Rev. 803 (2024).

[36] *Id.* ("Heavy drinking was not merely limited to the occasional social or political gatherings; it extended to court proceedings and was even prevalent during militia training activities:

[Alcohol] flowed freely at weddings, christenings and funerals, at the building of churches, the installation of pews and the ordination of ministers. For example, in 1678 at the funeral of a Boston minister's wife, mourners consumed 51 l/2 gallons of wine . . . ; at the ordination of Reverend Edwin Jackson of Woburn, Massachusetts, the guests drank 6 1/2 barrels of cider, along with 25 gallons of wine, 2 gallons of brandy and 4 gallons of rum . . . . Heavy drinking was also part of special occasions like corn huskings, barn raisings, court and meeting days, and especially militia training days. Workers received a daily allotment of rum, and certain days were set aside for drunken bouts; in some cases, employers paid for the liquor.").

[37] *Id. See also* W.J.RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 15 (1979) ("Liquor was so popular that the army dared not bar the recruitment or reenlistment of habitual drunkards.").

[38] State v. Christen, 2021 WI 39 (2021) (R.G. Bradley, J., dissenting) ("From before the enactment of the Second Amendment through the late-18th and early-19th centuries, legislatures did not limit the individual right to bear arms while under the influence of an intoxicant. Indeed, few colonial-era laws even regulated the use of firearms while consuming alcohol, and none dealt with carrying while intoxicated."); *see also* F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (2025).

within organized military service and addressed the dangers of intoxicated soldiers while on duty. They did not regulate civilian firearm possession or designate particular locations as firearm-free zones. As such, these rules do not demonstrate a proper tradition of restricting the right of peaceable citizens to carry arms in public places.

67. Simply put, these are insufficient analogues because they fail the "how" and "why" framework articulated in *Bruen*. Their relevance, and their weakness, ultimately turns on whether they satisfy that test, and they do not.

68. These militia alcohol regulations addressed the problem of intoxicated soldiers while performing military duties and therefore regulated conduct within a military command structure. Modern sensitive place laws impose categorical location based prohibitions on the public carry of firearms by ordinary citizens. Since the purpose and mechanism of the regulations differ in these important respects, militia alcohol rules cannot serve as meaningful historical analogues.[39]

---

[39] United States v. Connelly, 117 F.4th 269, 281 (5th Cir. 2024) ("The purpose behind these militia laws concerns military service—intoxicated servicemembers cannot perform their duties while impaired. More than that, these laws applied only to militia members; none of them spoke to a militia member's ability to carry outside of military service. Then, as today, restrictions on the liberties of service members tell us little about the limits acceptable for citizens at large.").

69. At bottom, the relevant historical evidence demonstrates a consistent distinction between regulations addressing dangerous conduct and laws prohibiting the peaceable carrying of arms. While governments punished the misuse of weapons or the carrying of arms in a manner that threatened the public peace, the record simply does not reveal a tradition of broadly prohibiting the peaceable bearing of arms in ordinary public settings.

## IV. THE RIGHT TO TRANSPORT FIREARMS

70. History confirms that the right to transport firearms is not a distinct or newly invented entitlement, but an inherent and unavoidable component of the right to "bear" arms.

71. At the Founding, Americans did not merely possess firearms in the home; they routinely carried them in public for lawful purposes such as travel, hunting, militia service, and self-defense.

72. For example, in 1785, Thomas Jefferson urged his nephew to keep his gun with him, writing that it should be "the constant companion of your walks."[40]

73. Jefferson himself traveled with pistols for self-defense and a

---

[40] 1 THE WRITINGS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884).

holster to allow for easy access.[41] He also explained that the Constitution protected an individual's "right and duty to be at all times armed."[42]

74.    Alexander Hamilton was regularly "seen wandering through the woods of Harlem with a single-barrelled fowling-piece."[43]

75.    John Adams was so excited about firearms that he would bring his gun to school, leave it in the entryway, and, as soon as classes ended, head into the fields to hunt crows and squirrels.[44]

76.    The practices at the Founding demonstrate that firearms were regularly brought from place to place as a matter of course.

77.    This historical practice is dispositive under *Bruen*.

78.    A right to "bear" arms, understood as carrying weapons for confrontation, cannot be meaningfully exercised if the government may prohibit the ordinary transportation required to bring those arms to the places where lawful carrying occurs.[45]

---

[41] *See* Firearms, Monticello, https://bit.ly/3hJJsvb. ("I fixed one in a wooden holster to hang in the loop of the pommel of my saddle to be handily taken out & in ... I had other holsters also made for both to hang them at the side of my carriage for road use; & with locks & staples to secure them from being handled by curious people.").

[42] Thomas Jefferson, *Letter to John Cartwright*, June 5, 1824, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/2TedtKb

[43] ALLAN MCLANE HAMILTON, THE INTIMATE LIFE OF ALEXANDER HAMILTON 349 (1910).

[44] John Adams, *Argument for the Defense*: 3–4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh.

[45] *See generally* F. Lee Francis, *The Waiting Is the Hardest Part: The*

79.    The absence of any historical tradition restricting such transportation is therefore unsurprising. Transportation was not treated as a separate category of regulated conduct because it was understood as implied in the right itself.[46]

## V.    EMPIRICAL MEANS-END ANALYSIS UNDER *BRUEN*

80.    Dr. Reeping's declaration ultimately rests on a premise that the Supreme Court has expressly rejected: that the constitutionality of firearm regulations turns on their empirical effectiveness in promoting public safety. His analysis is a policy-based, means-end inquiry, using social science evidence to argue that sensitive place laws may reduce violence. But under *Bruen*, that inquiry is not merely unpersuasive; it is legally irrelevant.

81.    As the Court made clear, "[t]he government may not simply posit that the regulation promotes an important interest."[47] Instead, the government must demonstrate that the challenged regulation "is

---

*Constitutionality of Firearm Waiting Periods*, 129 DICK. L. REV. 939 (2025) (explaining that the right to keep and bear arms include certain implied rights).

[46] *Id.*

[47] Bruen, 597 U.S. at 17. ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").

consistent with this Nation's historical tradition of firearm regulation."
*Bruen* thus expressly rejected the very sort of interest-balancing that underlies Dr. Reeping's report, explaining that courts are not to engage in "means-end scrutiny" or weigh the costs and benefits of firearm restrictions.[48]

82.     Dr. Reeping's declaration does exactly what *Bruen* forbids. It compiles modern empirical studies evaluating whether gun-free zones are associated with reductions in violence and concludes that such laws may be "protective" or "neutral."[49]

83.     Even if every one of those studies were accepted at face value, that would not satisfy the government's burden.

84.     Under *Bruen*, the question is not whether a law is effective, desirable, or supported by contemporary research; it is whether the law is consistent with the historical understanding of the right to keep and bear arms.

85.     What is more, even Dr. Reeping acknowledges that the literature is "relatively new" and still "developing," and that identifying

---

[48] *Id.* at 19. ("[Our precedents] do not support applying means-end scrutiny in the Second Amendment context.").
[49] *See* Dr. Reeping Declaration p.4.

appropriate counterfactuals is "methodologically challenging."[50]

86.    Dr. Reeping's declaration may be relevant to a legislative policy debate. It is not relevant to the constitutional inquiry this court must undertake. The Government's burden is historical, not empirical.

## VI.    DR. YOUNG'S DECLARATION

87.    Nearly all of Dr. Young's cited regulations arise decades after the Founding, clustering in the late nineteenth and early twentieth centuries. That timing is dispositive. Under *Bruen*, late-19th-century enactments are at best "secondary" evidence and cannot establish the original scope of the right. A handful of postbellum municipal ordinances cannot overcome the absence of Founding-era analogues.

88.    He acknowledges that pre-1850 public spaces were utilitarian, multi-use areas, including militia training grounds and locations where arms were present and expected.[51]

89.    That history cuts directly against the existence of any longstanding tradition of disarmament in such spaces.

90.    Even taking the cited park regulations at face value, they fail *Bruen's* "why" requirement. The stated purpose of these rules was not to

---

[50] *See* Dr. Reeping Declaration pp. 15-16.
[51] *See* Dr. Young Declaration pp.3-5.

mitigate interpersonal violence or prevent armed confrontation, but to promote aesthetic tranquility, passive recreation, and social reform grounded in Romantic ideology.[52]

91.    That is a fundamentally different justification than modern "sensitive places" laws, which are premised on public safety and risk mitigation. A regulation designed to preserve scenic contemplation is not analogous to one that disarms citizens based on perceived danger.

## VII.    HISTORICAL SILENCE FAVORS THE SECOND AMENDMENT

92.    *Bruen's* ruling that a modern regulation must comport with the Nation's historical tradition of firearm regulation cannot be overstated.[53]

93.    Accordingly, the Government must identify a relevant historical analogue to justify its modern regulation. Thus, if the

---

[52] *Id.* ("Backed by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly and passively contemplated, was thought to improve someone's mind and body, and thus society. In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited.").

[53] Bruen, 597 U.S. at 17. ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").

government cannot produce a sufficiently relevant and historically analogous regulation, the modern law cannot be sustained.[54] Put differently, historical silence cannot supply the tradition of regulation that *Bruen* requires.[55]

94. Consider the following example. The principle can be illustrated by a modern example involving the absence of historical analogues.

95. Federal statute 18 U.S.C. § 922(g)(3) makes it a felony for a person 'who is an unlawful user of or addicted to any controlled substance' to possess a gun.[56] Consider the facts of *U.S. v. Connelly*.[57] In that case, Paola Connelly is a non-violent gun owner who occasionally uses marijuana to help with sleep and anxiety. El Paso police responded

---

[54] *Id*. *See also* Mark W. Smith, *Dangerous, but Not Unusual*, Georgetown JL&PP (2024) ("Simply put, the government needs an actual historical tradition of legal regulation to establish a historical tradition of regulation. A history of non-regulation cannot establish a historical tradition of regulation, which is what the government needs to demonstrate.").

[55] Mark W. Smith, *Dangerous, but Not Unusual*, Georgetown JL&PP (2024) ("[H]istorical silence is always to be construed in favor of the Second Amendment. For absent historical regulation, there is no affirmative basis for limiting the textual coverage of the right. Because governmental inaction, by definition, cannot evince a tradition of regulation to limit the plain-text scope of the Amendment, in the presence of a lack of regulation, the plain text controls. In other words, if the historical record is ambiguous, the tie goes to the Second Amendment and favors the private (textual) individual right to keep and bear arms.").

[56] 18 U.S.C. § 922(g)(3)

[57] United States v. Connelly, 117 F.4th 269, 272 (5th Cir. 2024).

to a "shots fired" call and arrived to find her husband, John Connelly, firing a shotgun at a neighbor's door. After arresting him, officers spoke with Paola, who acknowledged that she sometimes smoked marijuana. A subsequent sweep of the Connellys' home revealed drug paraphernalia and several firearms, including firearms belonging to Paola.[58]

96.     At the Founding, there were simply no laws regulating the possession of firearms based solely on an individual's use of intoxicants such as alcohol or drugs.[59]

97.     To test the point further, much like alcohol regulations, laws restricting drug use were not enacted until 1875.[60] Notably, this ordinance did not restrict an individual's right to keep and bear arms, nor did it prevent individuals from obtaining firearms while under the

---

[58] *Id.*

[59] F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (2025) ("However, it would take Congress until the early twentieth century to pass significant legislation regulating the use of drugs. True, these laws were keen on regulating the use and distribution of drugs, but nowhere was a restriction on an individual's right to bear arms contemplated. Indeed, a prohibition of this sort did not become law until 1993.").

[60] *See Order No.* 1254, S.F. EXAMINER, Nov. 24, 1875, at 2; see also James Baumohl, *The Dope Fiend's Paradise' Revisited: Notes from Research in Progress on Drug Law Enforcement in San Francisco*, 1875-1915, 24 THE SURVEYOR 3 (1992) ("[To] keep or maintain, or become an inmate of, or visit, or … in any way contribute to the support of any place, house or room, where opium is smoked, or where persons assemble for the purpose of smoking opium, or inhaling the fumes of opium[.]").

influence. Such laws did not exist until the twentieth century.[61]

98.    Historical silence, coupled with the incongruous burden imposed by the statute, led the court to conclude that the law was unconstitutional as applied to the defendant.[62]

99.    The same principle applies more broadly to modern firearm regulations that lack meaningful historical antecedents. Where the historical record reveals no comparable regulation from the Founding era or early Republic, courts cannot infer a tradition of regulation simply from later policy judgments or modern concerns.

100.    The *Bruen* framework requires affirmative historical evidence demonstrating that the challenged regulation fits within a well-established tradition of firearm regulation. Absent proper evidence, the Constitution's protection of the right to keep and bear arms controls. In other words, when the historical record is silent, the inquiry does not permit courts to fill that silence with modern regulatory preferences.

---

[61] *See supra* n.37. ("[T]he government offers no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if their intoxication was routine.")

[62] *Id.* ("Boiled down, § 922(g)(3) is much broader than historical intoxication laws. These laws may address a comparable problem—preventing intoxicated individuals from carrying weapons—but they do not impose a comparable burden on the right holder. In other words, they pass the "why" but not the "how" test.").

I declare under penalty of perjury the foregoing is true and correct.

Executed on March 20, 2026

/s/ _____
                              F. Lee Francis

33

# F. LEE FRANCIS
Assistant Professor of Law
Widener University Commonwealth Law School
lfrancis@widener.edu

## ACADEMIC APPOINTMENTS

**Widener University Commonwealth Law School**
*Assistant Professor of Law*, July 2024
- Courses: Constitutional Law, Criminal Procedure, Evidence, Administrative Law

**Mississippi College School of Law**
*Assistant Professor of Law*, August 2023 – June 2024
- Courses: Civil Procedure, Administrative Law

*Director, Center for Litigation and Alternative Dispute Resolution*

## LEGAL EXPERIENCE

**Special Assistant U. S. Attorney, EDNC, 2022-2023**
- Prosecuted criminal cases in the US Court of Appeals for the Fourth Circuit.
- Prosecuted misdemeanors and felonies in the Eastern District of North Carolina.

**Judge Advocate General Corps, US Army, 2021-2023**
- Advised on employment and dozens of sexual harassment cases.
- Advised senior leaders on matter relating to employment law, ethics, and federal regulations.

## ARTICLES

*The Waiting is the Hardest Part: The Constitutionality of Firearm Waiting Period Laws,* PENN STATE-DICKINSON LAW REVIEW 2025).

*The Mutability of Dangerousness: Domestic Violence and Second Amendment Restoration after Rahimi,* SOUTHERN METHODIST UNIVERSITY LAW REVIEW (2025).

- Cited in *United States v. Cockerham* (Court of Appeals for the Fifth Circuit, 2025) (Higginson, J., dissenting).

*The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (2025).

- Recipient of Douglas E. Ray Excellence in Faculty Scholarship Award, 2025

1

*Defining Dangerousness: When Disarmament is Appropriate*, 56 TEXAS TECH LAW REVIEW 593 (2024).

- Cited in *United States v. Duarte* (Court of Appeals for the Ninth Circuit, 2024) (Van Dyke, J., dissenting from the grant of rehearing en banc).

- Cited in *United States v. Perez-Garcia* (Court of Appeals for the Ninth Circuit, 2024) (Van Dyke, J., dissenting from the denial of rehearing en banc).

*Of the Rights of Parents: Parental Authority and the Common Law*, TEXAS REVIEW OF LAW AND POLITICS (2024) (Invited).

*Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen,* MARQUETTE LAW REVIEW (2024).

- Cited in SUPPLEMENT FOR FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY. Ed. Johnson, et al, 2023. (Casebook)

*The History of Policing and the Impact on Minority Communities*, MISSISSIPPI COLLEGE LAW REVIEW (2024).

*In Loco Parentis and the Fourth Amendment Rights of Minors in Public Schools,* SOUTHERN UNIVERSITY LAW REVIEW (2022).

*Who Decides: What the Constitution Says About Parental Authority and the Rights of Minor Children to Seek Gender Transition Treatment,* SOUTHERN ILLINOIS UNIVERSITY LAW JOURNAL (2022).

- Mentioned on HealthLawProf Blog.
- Cited in the Journal of the American Academy of Matrimonial Lawyers (2022).
- Cited in *Kanuszewski v. Shah* (Eastern District of Michigan, 2023).

*Remembering Congress and the Separation-of-Powers: The Case Against 'Judicial Updating' of Title VII of the Civil Rights Act of 1964* 12 JOURNAL OF RACE, GENDER, & POVERTY (2021).
- Mentioned on Legal Theory Blog.

*In Memoriam: The Republican Form and the Separation-of-Powers Among the Four Branches of Government* Brazilian Journal of Public Policy (2020) (Peer-reviewed).

## **BOOK CHAPTERS**

"A Sartorial Tapestry: The Rhetorical Shifts of Hillary Rodham Clinton." HILLARY RODHAM CLINTON AND THE 2016 ELECTION: HER POLITICAL AND SOCIAL DISCOURSE. Ed. Michele Lockhart and Kathleen Mollick. Lexington Books, 2015. (with Rochelle Gregory).

- Cited in THE DYNAMICS OF POLITICAL COMMUNICATION: MEDIA AND POLITICS IN A DIGITAL AGE (2017).

"Pardoning Marijuana Possession While Using Marijuana to Criminalize Firearm Ownership." SUPPLEMENT FOR FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY. Ed. Johnson, et al, 2023. (Casebook)

## BOOK REVIEWS

RADICAL MOVES: CARIBBEAN MIGRANTS AND THE POLITICS OF RACE IN THE JAZZ AGE (Chapel Hill: The University of North Carolina Press, 2013. Pp. 336), 540-542.

CULTIVATION AND CATASTROPHE: THE LYRIC ECOLOGY OF MODERN BLACK LITERATURE (Baltimore, MD: Johns Hopkins University Press, 2017. Pp. 304), 719-721.

## AMICUS BRIEFS

Brief of Amicus Curiae Scholars of Second Amendment Law and The Independence Institute in Support of Defendant-Appellant, *U.S. v. Daniels*, U.S. Court of Appeals for the Fifth Circuit (2023) (principal author of brief addressing the constitutionality of 18 U.S.C. §922(g)(3)).

- Cited in *United States v. Daniels* (US Court of Appeals for the Fifth Circuit, 2023).

Brief of Gun Owners of America, Inc., et al as Amicus Curiae in Support of Appellant, *Fitzgerald v. Commonwealth of Virginia*, Supreme Court of Virginia (2026) (principal author of brief addressing the constitutionality of Va. Code § 18.2-308.4).

3

Brief of the National Rifle Association of America and Independence Institute as Amici Curiae in Support of Respondent, *United States v. Hemani*, U.S. Supreme Court (2026) (principal author of brief addressing the constitutionality of 18 U.S.C. §922(g)(3).

## PRESENTATIONS

*Courthouse Steps Oral Argument: United States v. Hemani* – Federalist Society (2026)

*All the Presidents Men? The Future of Humphrey's Executor and Presidential Removal Power* – Dauphin County Bar Association (2025)

*Law Day: The First and Second Amendments* – Dauphin County Bar Association (2025)

*Firearms Law in Criminal Defense at the 2025 Annual Conference* – Pennsylvania Association of Criminal Defense Lawyers (2025)

*Middle District of Pennsylvania Chapter: CLE – "Armed with Knowledge: Understanding New Developments in Second Amendment Law" (2025)*

*The Waiting is the Hardest Part: The Constitutionality of Firearm Waiting Period Laws* – Dickinson Law School (2025)

*The Mutability of Danger: Domestic Violence and the Second Amendment* – Southern Methodist University Law School (2024)

*Addiction and the Right to Bear Arms* – University of Virginia Law School (2024)

*The Addiction Restriction: Addiction and the Right to Bear Arms* – Duke University Law School (2024)

"Litigating the Second Amendment" – Miss. State Public Defenders Conf. (2023)

## EXPERT WITNESS

*Delaware State Sportsmen's Association, Inc. et al v. Delaware Department of Safety and Homeland Security et al* – Delaware Superior Court (2025)

*Ortega v. Grisham* – US District Court New Mexico (2025)

*Garcia v. Polis* – US District Court Colorado (2025)

4

## ADMISSIONS

State of New Jersey
United States District Court – Eastern District of North Carolina
United States District Court – Western District of Wisconsin
United States Court of Appeals – Fourth Circuit

## AWARDS

**Douglas E. Ray Excellence in Faculty Scholarship Award**, 2025

**Best Oralist** – NEBLSA Moot Court, 2019

**Military Honors:** Army Commendation Medal, National Defense Service Medal, Secret Security Clearance

## MEMBERSHIP

**Federalist Society,** 2019 - Present

## EDUCATION

**Maurice A. Deane School of Law at Hofstra University**, J.D., 2020
- Associate Editor, Journal of Labor and Employment Law

**University of North Carolina at Greensboro**, M.A., English (Rhetoric and Composition) 2015

**Campbell University,** B.S., Social Science (Political Science and Humanities) 2013

5