## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ) ) ) ROBERT NASH, ) ) BRANDON KOCH, ) ) THOMAS STIRNWEIS, ) ) WAYNE FRANCIS, ) ) KHOURY PORTER, *and* ) ) SCOTT NOREN ) )    *Plaintiffs,* ) ) v. ) ) STEVEN G. JAMES, in his official capacity ) as Acting Superintendent of the New York ) State Police, ) ) RODNEY K. HARRISON, in his official ) capacity as Commissioner of the Suffolk ) County Police Department, and Licensing ) Officer for Suffolk County, *and* ) ) PATRICK J. RYDER, in his official ) capacity as Police Commissioner of the Nassau ) County Police Department, and Licensing ) Officer for Nassau County ) )    *Defendants.* ) | Civ. Action No. 1:22-cv-00907-MAD-CFH |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO DEFENDANTS' CROSS-MOTIONS**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| TABLE OF AUTHORITIES | | iii |
| INTRODUCTION | | 1 |
| ARGUMENT | | 2 |

I. The Plaintiffs' intended conduct is presumptively protected by the Second Amendment. ... 2

II. The state's application of *Bruen* does not align with Supreme Court precedent. ... 4

    A.    The state cannot ignore Founding Era tradition, whether evidenced by laws or their absence, which cannot be overcome by Reconstruction or later laws. ... 8

    B.    The CCIA's purpose is clear: to restrict the right to publicly carry firearms for self-defense nearly everywhere. ... 12

    C.    Because the relevant history is not on its side, the state rejects controlling Supreme Court precedent. ... 13

    D.    The state has the burden of justifying the CCIA in this facial challenge. ... 17

III. The state fails to meet its burden on Plaintiffs' Second Amendment Claims ... 18

    A.    The state's standing argument mischaracterizes Plaintiff Francis' intentions and misconstrues the text of the CCIA's place of worship restriction; and the relevant Founding Era evidence demonstrates firearms carry was not only permitted but often required at places of worship. ... 18

    B.    There is no historical tradition of banning firearms in all government administration buildings. ... 23

    C.    The state offers only its policy choices rather than evidence of historical tradition to support its health care service centers ban. ... 27

    D.    Just because DOH residential facilities may house "vulnerable" populations does not mean the state can ban all firearms carry there. ... 30

    E.    The state's late-19th century statutes are insufficient to justify its sporting venues ban. ... 32

    F.    The playgrounds ban is not supported by history. ... 35

    G.    The special events ban is not supported by any Founding Era tradition of banning firearms carry during celebrations or festivals. ... 38

    H.    The Times Square ban offends *Bruen*'s mandate against declaring Manhattan a sensitive place. ... 40

    I.    Public transit existed at the Founding; there is no evidence that riders were banned from carrying firearms. ... 42

    J.    The state failed to justify its airports ban. ... 46

K.      *Christian* is not controlling as to the public parks provision because the state's expert has admitted facts in this case that directly undermine the findings in that case. ...................................................................................... 49

L.      The state cannot support its ban at places that serve alcohol............................. 52

M.      The private property restriction cannot survive after *Wolford*............................ 54

IV.     The licensing and automobile storage provisions are not supported by any historical tradition. ............................................................................................... 54

A.      Licensing..................................................................................................... 54

B.      Automobile storage restriction.................................................................... 57

V.      Plaintiffs are entitled to judgment on their First and Fourteenth Amendment claims ................................................................................................................... 58

A.      The private property restriction fails under the First and Fourteenth Amendments too. ....................................................................................... 58

B.      The sensitive place provisions create an overlapping web of bans so broad as to be unconstitutionally vague............................................................ 59

C.      Licensing and automobile storage restrictions do not provide Plaintiffs equal protection of the law.......................................................................... 60

CONCLUSION............................................................................................................. 60

CERTIFICATE OF SERVICE ...................................................................................... 62

ii

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. State*,
   11 S.W. 628 (Tex. Ct. App. 1889) ........................................................................15

*Andrews v. State*,
   50 Tenn. 165 (Tenn. 1871) .................................................................................22

*Antonyuk v. Hochul*,
   639 F. Supp. 3d 232 (N.D.N.Y. 2022), *rev'd on other grounds*, 120 F.4th 941
   (2d Cir. 2024) ....................................................................................................45

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900, 221 L. Ed. 2d 646
   (2025) ........................................................................................... *passim*

*Ex parte Caldwell*,
   138 Mo. 233 (Mo. 1897) ....................................................................................15

*Cayuga Nation v. Tanner*,
   824 F.3d 321 (2d Cir. 2016) ...............................................................................19

*Christian v. James*,
   176 F.4th 189 (2d Cir. 2026) ................................................................. *passim*

*City of Mesquite v. Aladdin's Castle, Inc.*,
   455 U.S. 283 (1982) ...........................................................................................48

*Connecticut Citizens Def. League, Inc. v. Lamont*,
   6 F.4th 439 (2d Cir. 2021) .................................................................................48

*D.C. v. Heller*,
   554 U.S. 570 (2008) ............................................................................... *passim*

*English v. State*,
   35 Tex. 473 (Tex. 1871) ...............................................................................15, 22

*Frey v. City of New York*,
   157 F.4th 118 (2d Cir. 2025) ................................................................. *passim*

*Giambalvo v. Suffolk Cnty., New York*,
   155 F.4th 163 (2d Cir. 2025) ..............................................................................55

*Goldstein v. Hochul*,
   680 F. Supp. 3d 370 (S.D.N.Y. 2023)................................................................6, 21, 22

*Hill v. State*,
   53 Ga. 472 (Ga. 1874)........................................................................................15, 22

*Kipke v. Moore*,
   165 F.4th 194 (4th Cir. 2026) ............................................................................25, 29

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023), *aff'd in part, vacated in part, rev'd in part
   sub nom., Koons v. Att'y Gen. New Jersey*, 156 F.4th 210 (3d Cir. 2025), *as
   amended* (Sept. 17, 2025), *reh'g en banc granted, opinion vacated*, 162 F.4th
   100 (3d Cir. 2025)......................................................................................................45

*Livingston v. State*,
   3 Tex. App. 74 (Tex. Ct. App. 1877).........................................................................15

*Marbury v. Madison*,
   5 U.S. 137 (1803).......................................................................................................16

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978)...................................................................................................55

*Morrison v. Garraghty*,
   239 F.3d 648 (4th Cir. 2001) .....................................................................................60

*Morse v. Frederick*,
   551 U.S. 393 (2007) (Thomas, J., concurring) ..........................................................36

*New York State Firearms Ass'n v. James*,
   157 F.4th 232 (2d Cir. 2025) .....................................................................................57

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022)................................................................................................ *passim*

*Oakland Tactical Supply, LLC v. Howell Twp. Mich.*,
   103 F.4th 1186 (6th Cir. 2024) ..................................................................................57

*Owens v. State*,
   3 Tex. App. 404 (Tex. Ct. App. 1878)........................................................................15

*Silva v. Farrish*,
   47 F.4th 78 (2d Cir. 2022) ...........................................................................19, 40, 43

*State v. Pigg*,
   85 Mo. App. 399 (Mo. Ct. App. 1900) ......................................................................15

iv

*Summerlin v. State,*
  3 Tex. App. 444 (Tex. Ct. App. 1878) ........................................................................15

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)..........................................................................................19, 40, 43

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press,*
  489 U.S. 749 (1989)....................................................................................................60

*United States v. Gould,*
  536 F.2d 216 (8th Cir. 1976) .......................................................................................4

*United States v. Hemani,*
  No. 24-1234, 2026 WL 1751710 (U.S. June 18, 2026) .................................... *passim*

*United States v. Hernandez-Fundora,*
  58 F.3d 802 (2d Cir. 1995)...........................................................................................4

*United States v. Rahimi,*
  602 U.S. 680 (2024)........................................................................................ *passim*

*United States v. Salerno,*
  481 U.S. 739 (1987)............................................................................................17, 18

*Vitagliano v. Cnty. of Westchester,*
  71 F.4th 130 (2d Cir. 2023) ...............................................................................19, 40, 43

*Wolford v. Lopez,*
  116 F.4th 959 (9th Cir. 2024), *cert. granted on other grounds,* 146 S. Ct. 79
  (2025)*, and rev'd and remanded on other grounds,* No. 24-1046, 2026 WL
  1825723 (2026)............................................................................................ *passim*

*Wolford v. Lopez,*
  No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026).................................... *passim*

**Statutes**

N.Y. Penal Law § 265-01(e)(2)(n)..................................................................................42

N.Y. Penal Law § 265.01-d ......................................................................................54, 60

N.Y. Penal Law § 265.01(e) ....................................................................................49, 60

N.Y. Penal Law § 265.01-e(1)......................................................................................46

N.Y. Penal Law § 265.01-e(2)(a)............................................................................23, 26

N.Y. Penal Law § 265.01-e(2)(b) ................................................................................28

N.Y. Penal Law § 265.01-e(2)(c)......................................................................................20

N.Y. Penal Law § 265.01-e(2)(d) .................................................................................35, 49

N.Y. Penal Law § 265.01-e(2)(l)......................................................................................30

N.Y. Penal Law § 265.01-e(2)(n)......................................................................................46

N.Y. Penal Law § 265.01-e(2)(o)......................................................................................52

N.Y. Penal Law § 265.01-e(2)(p)......................................................................................32

N.Y. Penal Law § 265.01-e(2)(q)......................................................................................25

N.Y. Penal Law § 265.01-e(2)(r)......................................................................................38

N.Y. Penal Law § 265.01-e(2)(t)......................................................................................40

N.Y. Penal Law § 265.01e(2)(n)......................................................................................46

N.Y. Penal Law § 265.45.................................................................................................57

N.Y. Penal Law § 400.00(1)(o) .......................................................................................54

N.Y. Penal Law § 400.01.................................................................................................60

## Other Authorities

Antonin Scalia and Bryan A. Garner, "Reading Law: Interpretation of Legal
    Texts," 469 (2012) ....................................................................................................47

Fed. R. Civ. P. 25............................................................................................................55

Fed. R. Evid. 201 ..............................................................................................................4

Merriam Webster, https://www.merriam-webster.com/dictionary/facility .................................47

N.Y.C. Admin. Code § 10-315(a)......................................................................................40

No. 142-2, Rivas Dec. ¶ 33 ..............................................................................................45

Stephen P. Halbrook, *How a Fake Citation Misled Courts to Uphold "Sensitive
    Place" Gun Bans: The Second Circuit's Misunderstanding of Founding-Era
    Law on Going Armed*, 2 J.L. & Civ. Gov., https://jlcgtamu.com/wp-
    content/uploads/2026/05/halbrook-how-a-fake-citation-misled-courts.pdf ..........................17

Town of Clarkstown Parks, https://www.clarkstown.gov/recreation/parks/ ...............................35

U.S. Const., amend. I.................................................................................................58, 60

U.S. Const. amend. II ....................................................................................................... *passim*

U.S. Const., amend. XIV ....................................................................................16, 58, 59, 60

**INTRODUCTION**

Just four years ago in *Bruen*, the United States Supreme Court affirmed that American citizens—like Plaintiffs Robert Nash, Brandon Koch, Thomas Stirnweis, Wayne Francis, Khoury Porter, and Dr. Scott Noren—have "the right to carry handguns outside the[ir] home[s] for self-defense." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *3 (U.S. June 25, 2026). Almost immediately after the Court struck down the New York law that stripped that right from them, the state "responded by replacing its old law . . . with new laws that achieved a similar result." *Id.* (referring to Hawaii's near identical sensitive places restrictions). Now six law-abiding citizens come before the Court seeking protection from that "eviscerat[ion]" of their self-defense rights. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31 (2022). Indeed, two of the *Bruen* Plaintiffs have been forced to return to the Court for help restoring and preserving those rights today.

Plaintiffs' opposition to the CCIA is not mere "political disagreement," as the state argues. ECF No. 142-1 at 1. To be sure, the state's "long history of antipathy" towards lawfully permitted carry of firearms is on full display here, but New York's political disapproval of the fundamental American right to the right to keep and bear arms carries absolutely no weight in this case. *Wolford*, 2026 WL 1825723, at *11. The CCIA, as a piece of legislation, is a product of political coordination by third party interest groups and legislators, pretextually balancing the Second Amendment with public safety. But the Second Amendment is itself the "product of an interest balancing *by the people,*" and restrictions of this nature are off the table. *Bruen*, 597 U.S. at 26 (2022) (emphasis added; emphasis omitted; quoting *D.C. v. Heller*, 554 U.S. 570, 635 (2008)); *Heller*, 554 U.S. at 636.

1

The state may not substitute its own political values for those of the Founders in this area. Under the state's view, New Yorkers' right to bear arms in public for self-defense is a second-class right that can be limited whenever the legislature believes its legislation "align[s] with" the Supreme Court's Second Amendment jurisprudence. *See* ECF No. 130-3 at 3. But the CCIA does not align with our nation's historical tradition of firearms regulation any more than the state's Opposition aligns with Supreme Court precedent. The Second Amendment was designed to "guard" the individual right to self-defense against "later erosion by majoritarian legislation or judicial fiat." *United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at *5 (U.S. June 18, 2026) (citation omitted). Because the CCIA violates the Second Amendment, the fact that New York's "elected representatives" passed it into law, ECF No. 142-1 at 1, is irrelevant as it was in *Bruen*. *Wolford*, 2026 WL 1825723, at *11. What matters is that the CCIA restricts the right to keep and bear arms in public in ways that are irreconcilable with the Second Amendment's text, tradition and history.

## ARGUMENT

### I. The Plaintiffs' intended conduct is presumptively protected by the Second Amendment.

Plaintiffs begin, as they must, with *Bruen*'s first step, examining whether the CCIA regulates conduct that "fall[s] within the plain text of the Second Amendment." *Wolford*, 2026 WL 1825723, at *9 (citing *Bruen*, 597 U.S. at 17). Because it clearly does, the state concedes this point. Skipping directly to the second step, the state does not contest that the conduct barred by the various sensitive places bans and the private property restriction fall within the Second Amendment's textual protection. Here are six law-abiding New York citizens who seek to peaceably carry handguns—the self-protection firearm "overwhelmingly chosen by American society." *Id.* at *4 (citing *Heller*, 554 U.S. at 628). There is no question that Plaintiffs' intended

conduct falls within the "'plain text' of the Amendment's language." *Id.* at *6 (quoting *Bruen*, 597 U.S. at 24); *Bruen*, 597 U.S. at 31–32 (finding it undisputed that Plaintiffs Brandon Koch and Robert Nash are part of "the people" and that handguns are "'in common use' today for self-defense" (citation omitted)). And it is equally undisputed that The CCIA restricts how Plaintiffs can bear arms within New York state. *Wolford*, 2026 WL 1825723, at *6. The CCIA is thus "presumptively unconstitutional." *Id.* at *6 (citing *Bruen*, 597 U.S. at 24).

Plaintiffs, like many other Americans, seek to carry these common, constitutionally protected firearms for the valid purpose of self-defense. *See id.* at *9–10. But, even after going through a "rigorous" and "stringent" licensing process, Plaintiffs' right to carry is subject to further, burdensome restrictions. *Id.* at *8. In *Wolford*, the Court explained how a hypothetical citizen, like the real Jaime Caetano who carried a handgun to protect herself from a violent ex-partner, might try to navigate a private property restriction like New York's. *Id.* at *9–10. The Court's illustrative analysis of those burdens would be multiplied many times over to account for the additional restrictions imposed by New York's sensitive places restrictions. In response to ordinary self-defense concerns, Plaintiffs—like Ms. Caetano—seek to exercise their Second Amendment rights. *See, e.g., Bruen*, 597 U.S. at 15 (discussing Mr. Nash's pre-*Bruen* application for a carry license due to "a string of recent robberies in his neighborhood"). Of course, Plaintiffs are not required to show any "special need" to carry in public, but their very real concerns underscore the fact that their desire to carry is not mere "political disagreement." *Bruen*, 597 U.S. at 70–71; ECF No. 142-1 at 1.

The state argues that neither New York citizens like Plaintiffs nor this Court should question the legislature's choices, even when those choices concededly infringe upon Plaintiffs' fundamental rights. The Supreme Court commands otherwise. The state's political policy choices

3

must give way to the Second Amendment's textual command unless the state can show its newly crafted restrictions are consistent with our Nation's historical tradition as understood by the Founders.

## II.    The state's application of *Bruen* does not align with Supreme Court precedent.

Where the conduct at issue is covered by the Second Amendment's plain text, courts must inquire into whether the restriction is consistent with our historical tradition of firearm regulation. That inquiry most often involves examining historical analogues, first considering the numbers of jurisdictions in which the analogue was adopted, then the extent to which it was well accepted, and finally whether the analogue is relevantly similar to the challenged law, comparing both "how" a law achieves its restriction and its rationale (the "why"). *Wolford*, 2026 WL 1825723, at *6, 8–9; *see id.* at *15 (Barrett, J., concurring) ("Both the end pursued and means deployed must be 'consistent with the principles that underpin our regulatory tradition.'" (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)). And in comparing both the "how" and "why" underpinning any proposed historical analogues and the challenged law, courts must consider both at the proper level of generality. *Hemani*, 2026 WL 1751710, at *5; *see, e.g., Wolford*, 2026 WL 1825723, at *13 (finding "gap" between challenged law and analogue "too wide"); *id.* at *16 (Barrett, J., concurring) (Hawaii pitched its analogues at "too high a level of generality"). Because the CCIA "diverges from traditional laws in purpose and operation" it cannot "survive review." *Hemani*, 2026 WL 1751710, at *5.

The state's arguments cannot succeed because they require the Court to ignore Plaintiffs' Founding Era evidence[1] and overgeneralize the statutes the state cites as analogues. The state has

---

[1] The state takes issue with Plaintiffs' citation to journal articles and other evidence to demonstrate the historical tradition, but to the extent these are "facts" at all, they are legislative, rather than

4

no response to binding Supreme Court precedent requiring courts to interpret the absence of colonial or Founding Era regulation as evidence of a preference for free exercise of the right, except to point to contradictory Second Circuit case law misapplying *Bruen*. With each successive Supreme Court decision, that slender precedent becomes ever less able to support the weight the state would have it bear. The state's overgeneralizations allow it to draw "infinite" supposed similarities tying its proposed historical analogues to the CCIA's modern provisions. *See Bruen*, 597 U.S. at 28–29. But such tenuous similarities are not enough to support a law that infringes upon individuals' presumptive Second Amendment rights. *Wolford*, 2026 WL 1825723, at *12– 14; *id.* at *16 (Barrett, J., concurring); *Bruen*, 597 U.S. at 28–29.

Failing to consider how a regulation "burden[s] . . . the right of armed self-defense" and why it does so renders the Second Amendment text and history analysis useless. *Bruen*, 597 U.S. at 29; *see id.* at 28 ("[A] green truck and a green hat are relevantly similar if one's metric is 'things that are green.' . . . They are not relevantly similar if the applicable metric is 'things you can wear.'" (internal citations omitted)). Pulling broad principles from one law or set of laws and applying them to support laws that operate in different ways for different reasons ignores Supreme Court precedent. If a challenged law does not match the specific "how" and "why" underlying the proffered analogues, it cannot stand. *Wolford*, 2026 WL 1825723, at *12–14; *id.* at *16 (Barrett,

---

adjudicative, facts and are properly before the court. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 812 (2d Cir. 1995) ("Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally." (quoting *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976)); *Gould*, 536 F.2d at 220 (legislative facts "are an indispensable tool used by judges when discerning the applicable law through interpretation"); *see also* Fed. R. Evid. 201 note; ECF No. 145-2 at 6 n.2. The state's point is also disingenuous, as it points to similar pieces of evidence in its own brief masquerading under the thin veneer of "expert opinion" that is irrelevant here. ECF No. 145-2 at 1, 6–14.

J., concurring); *Hemani*, 2026 WL 1751710, at \*5 (citing *Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 29); *see id.* at \*6.

If the minimum standard is whether a law "limit[s] the ability for law-abiding individuals to carry weapons in public generally," *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 394 (S.D.N.Y. 2023), any Founding Era restriction on the right to bear arms—no matter how minimal or incidental to its purpose—can broadly justify any sort of infringement on Second Amendment rights. Supreme Court precedent does not condone such "freewheeling" analogizing. *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (quoting *Bruen*, 597 U.S. at 83 (Barrett, J., concurring)). And if firearm carry bans were generally acceptable in any location, neither *Heller* nor *Bruen* would have enumerated the very few specific locations where firearms bans were historically justifiable. *See Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626. The Supreme Court's very categorization of these specific places as "sensitive" restricts the scope of those areas where carry may be banned. The state's indiscriminate labeling of places "sensitive" does not justify banning handgun carry there.

The Supreme Court requires courts to look at whether the challenged law "regulates arms-bearing . . . beyond what was done at the founding." *Rahimi*, 602 U.S. at 692. "[I]dentical" regulations are not required, but "relevantly similar" ones that match the challenged law's regulatory mechanism and purpose are. *Rahimi*, 602 U.S. at 692 (citations omitted). None of the CCIA's sensitive place bans were "unimaginable at the founding," so straightforward analysis rather than nuanced reasoning is appropriate here. *Bruen*, 597 U.S. at 28. Founding Era legislatures knew how to ban firearms at places they deemed sensitive (polling places, legislatures, and courts). *See Bruen*, 597 U.S. at 30. The lack of a tradition of banning firearms in certain ways or in certain places evidences the national historical tradition. The text of the Second Amendment

6

presumptively protects New Yorkers' right to publicly carry firearms for their individual self-defense, *Bruen*, 597 U.S. at 17, 24, and there is no "relevantly similar" colonial or Founding Era analogue that can support the CCIA's infringement on that right, *see id.* at 28–29; *see also Wolford*, 2026 WL 1825723, at *6, *12–14.

The "unprecedented societal concerns or dramatic technological changes" required to apply "nuanced" analysis do not exist here. *Bruen*, 597 U.S. at 27; *cf. Wolford*, 2026 WL 1825723, at *6. According to its sponsors, the CCIA seeks to broadly "prevent[] death and injury by firearms." Ex. 1, Sponsor's Memorandum. The Founders also sought to do so, but did so in materially different ways and in relatively few locations. Those few locations they deemed sensitive enough to prohibit firearms were very few and far between. *Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626. Nor are technological changes at issue here. The location-based bans here are not characteristic-based and do not apply to specific types of firearms, they ban all firearms within a given location. Neither the creation of new technologies like subways and airplanes nor advancements in fields like medical science allow the application of nuanced reasoning. The Founders were well aware of similar types of spaces during their Era, including especially crowded spaces within cities. Although a nuanced approach is not required here, Plaintiffs' challenge would still succeed even if it were because the state's analogues are still "not close enough" to carry its burden. *Wolford*, 2026 WL 1825723, at *6.

Because "protecting the fundamental right to self-defense" is "the Second Amendment's central objective," *Wolford*, 2026 WL 1825723, at *13, the state may not "eviscerate the general right to publicly carry arms for self-defense," *Bruen*, 597 U.S. at 31, by creating an overlapping web of bans outlawing carry in all public spaces except "some streets," ECF No. 130-4 at 5.

7

**A.**    **The state cannot ignore Founding Era tradition, whether evidenced by laws or their absence, which cannot be overcome by Reconstruction or later laws.**

*Bruen* made clear that the "Second Amendment's plain text . . . presumptively guarantees" Plaintiffs the "right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33; *see id.* at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). After assessing the text of the Amendment, courts must then turn to "'historical tradition of firearm regulation' to . . . delineate the contours of the [Second Amendment] right." *Rahimi*, 602 U.S. at 691.

Courts first consider the Founding Era because "post-Civil War discussions" of Second Amendment rights "do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614) (internal quotation marks omitted). "[T]o the extent later history contradicts what the text says, the text controls." *Id*. And "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." (emphasis omitted; citation omitted). *Id.; see id.* at 66.

Binding Supreme Court precedent does not condone the freewheeling historical dart-throwing the state attempts here. *Wolford*, 2026 WL 1825723, at *6 ; *Hemani*, 2026 WL 1751710, at *5–6; *Bruen*, 597 U.S. at 26–27; *see also Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) ("[T]he use of postenactment history requires some justification other than originalism simpliciter."). Courts should "guard against giving postenactment history more weight than it can rightly bear" because "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 35–36 (citations omitted); *see also id.* at 36 ("[T]o the extent later history contradicts what the text says, the text controls."). Courts are also barred from considering any of the "tainted" "Black

8

Codes that aimed to perpetuate the subjugation of blacks" that arose in the "defeated Confederate States" after the Civil War. *Wolford*, 2026 WL 1825723, at * 14.

The lack of a relevantly similar colonial or Founding Era analogue is dispositive because courts presume that the Second Amendment protects covered conduct unless the state can show otherwise, *Wolford*, 2026 WL 1825723 at *6 (citing *Bruen*, 597 U.S. at 24). In the absence of colonial or Founding Era evidence showing a national historical tradition of regulating firearms in the same way and for the same reason, an individual's general right to carry a handgun for self-defense outside the home is presumptively protected at all public locations. Skipping over colonial and Founding Era evidence of the free exercise of the right, the state turns directly to mid-to-late 19th century laws, requesting the Court rely on regulations that contradict the Second Amendment's general presumption in favor of public carry. "[F]reewheeling reliance on historical practice from the mid-to-late 19th century" cannot "establish the original meaning of the Bill of Rights" as ratified in 1791. *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (quoting *Bruen*, 597 U.S. at 83 (Barrett, J., concurring)).

Although the Supreme Court has thus far declined to decide the "ongoing scholarly debate" about how far from the Founding courts may look for valid analogues when reviewing Second Amendment challenges, it certainly never endorsed relying solely on late-19th century and 20th century evidence. *Cf. Bruen*, 597 U.S. at 37-38 & n.28; *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) ("[E]vidence of 'tradition' unmoored from original meaning is not binding law." (citing *Vidal v. Elster*, 602 U.S. 286, 322–325 (2024) (Barrett, J., concurring in part)). The Court expressly declined to even consider such evidence because it "contradict[ed] earlier evidence" and was too "temporal[ly] distan[t] from the founding." *Bruen*, 597 U.S. at 66 & n.28. When, as here, late-19th and 20th century evidence contradicts the text of the Second Amendment and the

9

Founding Era preference for free exercise of the right, it fails to "provide insight into the meaning of the Second Amendment." *Id.* at 66 n.28.

Reviewing and relying upon mid-to-late 19th century laws without regard to Founding Era evidence that the right was unrestricted is directly contrary to Supreme Court precedent. *Bruen*, 597 U.S. at 26–27. "Reasoning from historical silence," ECF No. 142-1 at 12 (quoting *Antonyuk v. James*, 120 F.4th 941, 969 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900, 221 L. Ed. 2d 646 (2025)), which is at times required under *Bruen*, 597 U.S. at 26–27, does not require the assumption that "legislatures maximally exercised their power to regulate." ECF No. 142-1 at 2 (quoting *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring)). Such silence demonstrates the contours of the nation's historical tradition of regulating firearms, just as affirmative legal rules do *because* courts presume that a law is unconstitutional unless the state can prove the "challenged law did not infringe the historical understanding of the codified right." *Wolford*, 2026 WL 1825723 at *6. The Court need not presume that a Founding Era legislature maximally exercised its powers when confronted with a lack of Founding Era regulations. Nor does Supreme Court precedent require it to analyze the minds of the Founders or Founding Era legislators. It does require the Court to consider the absence of restriction as evidence of a preference for free exercise of the right to carry at the state's newly identified "sensitive" places.

The state's evidence of post-ratification practice does not create a presumption of constitutionality because in every case, courts look to the text and meaning of the Second Amendment, the contours of which can be understood by looking to Founding Era practice. *Bruen*, 597 U.S. at 36. The ubiquity of a regulatory practice does not matter if that practice came about long after the Second Amendment's ratification. *Id.* at 36–37. Such later practice tells us little about the Founders' understanding of the scope of the right they codified in the Second

10

Amendment and cannot establish a national historical tradition sufficient to uphold a challenged law. *Id.*; *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring).

The Court need not "manufacture [constitutional] conflict," ECF No. 142-1 at 10 (citation omitted); the New York legislature has already done so by enacting the CCIA. *Rahimi*, 602 U.S. at 701. Even to the extent that Supreme Court precedent allows the Court to look at the "whole tradition," *Frey v. City of New York*, 157 F.4th 118, 130 (2d Cir. 2025) (emphasis omitted), its analysis must be consistent with the "*[n]ation's historical tradition* of firearm[s] regulation," *Bruen*, 597 U.S. at 24 (emphasis added). The Supreme Court asks courts to determine whether the alleged principle is supported by a tradition that is both national and historical. *Id.* at 24, 33–34, 66–68. To do so, the state must present evidence of historical regulations that reflect the Founders' understanding and that are "relevantly similar" to the challenged law in how and why they limit the individual right to bear arms. *Id.* at 29.

*Rahimi* does not endorse the sort of "freewheeling reliance" on mid-to-late 19th century private rules, municipal laws, and statutes the state puts forth. *See Wolford*, 2026 WL 1825723, at *6; *Hemani*, 2026 WL 1751710, at *5; *Rahimi*, 602 U.S. at 692; *id.* at 738 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." (quoting *Bruen*, 597 U.S. at 83 (Barrett, J., concurring))). The state argues that to "honor[] history," the Court must elevate mid-to-late 19th century private rules, municipal laws, and statutes above colonial and Founding Era evidence. ECF No. 142-1 at 2. Often, the earlier evidence is silence, showing that there was a tradition allowing the free exercise of Second amendment rights at the Founding. As the Supreme Court highlighted in *Bruen*, courts cannot ignore this silence, it is relevant (and often, controlling) evidence.

11

The Second Amendment presumptively protects arms-bearing conduct. The lack of any Founding Era tradition regulating the bearing of arms in certain places the state *now* deems "sensitive" reinforces that presumption. The conduct at issue is protected.

**B.      The CCIA's purpose is clear: to restrict the right to publicly carry firearms for self-defense nearly everywhere.**

The Court need not delve into the CCIA's legislative history or its drafters' carefully crafted pronouncements to understand what it does and why it was passed. Upon the most cursory inspection, the CCIA creates a "a tight web of laws that severely restricts the carrying of firearms for self-defense." *Wolford*, 2026 WL 1825723, at \*8 (discussing Hawaii's near identical restrictions). The CCIA was clearly designed to infringe on the right of self-defense and to diminish the growing number of individuals who would exercise their Second Amendment rights post-*Bruen*. *See* ECF No. 130-3 (CCIA was intended to address the "resulting increase in [carry] licenses and in the number of individuals who will likely purchase and carry weapons in New York State"). If the CCIA were intended to "protect[] individuals' Second Amendment rights," Ex. 1, Sponsor's Memorandum, it would not have banned firearm carry so widely as to effectively eliminate the "general right to publicly carry arms for self-defense," *Bruen*, 597 U.S. at 31.

The state's failure to present Founding Era regulations is dispositive and fatal to its defense, despite its insistence to the contrary. Equally unavailing here is the state's resort to "nuanced" reasoning. ECF No. 142-1 at 13. Nuanced reasoning is not appropriate here because the Court is reviewing a statute that seeks to prevent the same centuries-old societal concern at issue in both *Heller* and *Bruen*: "firearms-related violence." *See* ECF No. 142-1 at 33; *Wolford*, 2026 WL 1825723 at \*17 (Barrett, J., concurring) (Hawaii's private property ban had no purpose other than to respond to the "general danger associated with the presence of firearms"). Even if the Court were to apply nuanced reasoning, the state's analogues are not "close enough" to "infer that the

12

restriction imposed by the modern law is . . . consistent with [the Second Amendment] right." *Wolford*, 2026 WL 1825723, at *6. Like those presented in *Wolford*, the state's analogues here are too dissimilar in both how and why they burden the right to keep and bear arms.

### C.     Because the relevant history is not on its side, the state rejects controlling Supreme Court precedent.

The Supreme Court's rules for reviewing Second Amendment challenges are not "arbitrary" as the state argues, ECF No. 142-1 at 2, but merely require an understanding that "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. The state makes much ado over the evidence it presents, demanding that the Court ignore the lack of Founding Era restrictions and focus solely on the state's "scattered cases [and] regulations pulled from history." *Rahimi*, 602 U.S. at 738 (Barett, J., concurring). But without analogues that are widely adopted, "well-accepted," and "relevantly similar" to the challenged law, a state cannot overcome the "'overwhelming weight' of historical evidence" supporting the "'right of the public to peaceably carry handguns for self-defense'" virtually everywhere at time of the Founding and thereafter. *Wolford*, 2026 WL 1825723, at *6–7 (citations omitted).

The state claims that Plaintiffs assume "founding-era legislatures maximally exercised their power to regulate." ECF. No. 142-1 at 2 (quoting *Rahimi*, 602 U.S. at 739–40 (Barett, J., concurring)); *id.* at 12. But legislatures at the Founding showed they could and did regulate very few "sensitive places." *Bruen*, 597 U.S. at 30-31. The lack of regulations restricting carry in the many additional locations the state now deems "sensitive" is dispositive evidence that the CCIA is not consistent with our historical tradition that preferred the free exercise of the right.

***First***, despite the state's accusations, Plaintiffs rather than the state are true to *Bruen*'s guidance about how to weigh historical evidence. Like the Supreme Court in *Bruen*, the Court can give proper weight to Founding Era silence without assuming that Founding Era legislatures

maximally exercised their powers. *See* Section II.A, *supra*; *Bruen*, 597 U.S. at 26–27, 35–36. The Court need not assume that legislatures maximally exercised their power to divine the contours of the national historical tradition of firearms regulation through Founding Era silence, especially when that silence is clear and consistent. In urging the Court to rely entirely on mid-to-late 19th (and even 20th) century analogues, the state ignores *Bruen*'s guidance that courts must account for the absence of earlier restrictions. 597 U.S. at 26–27, 35–36.

When later regulations contradict Founding Era silence, the precedent of freedom from the Founding Era controls. *Id.* at 36 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (citation omitted; emphasis in original)). "The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." *Hemani,* 2026 WL 1751710, at *5 (citation omitted). Supreme Court precedent "demand[s] this attention to history . . . because the Second Amendment was designed to codify a 'pre-existing' individual right." *Id.* (citation omitted).

Elevating Founding Era evidence, whether it comes in the form of affirmative regulation or "silence," over later "postenactment history" allows courts to better understand the animating principles and contours of Second Amendment rights. *Bruen*, 597 U.S. at 26–27, 35. Giving Founding Era evidence its proper status does not require that Courts *assume* anything about how Founding Era legislatures interpreted the Second Amendment. It merely requires a review of the Second Amendment's text, an understanding of what that text presumptively protects, and a review of the available Founding Era evidence showing how the text's presumptions were restricted *or not* in practice.

14

And *second*, despite recognizing the logical fallacy underlying the "maximalist legislature" argument, the state fails to recognize that its argument suffers from that same logical fallacy. The state argues that the lack of successful challenges to the mid-to-late-19th century laws it offers means that those laws were and are presumptively valid. Just as legislatures do not always "maximally exercise[] their power to regulate," ECF No. 142-1 at 2 (quoting *Bruen*, 597 U.S. at 739–40 (Barrett, J., concurring)), citizens do not always maximally challenge a law's constitutionality.

The state's conclusion assumes that the reviewing courts' understanding of the Second Amendment's scope was identical to *Bruen*'s. It also assumes that those courts applied the Second Amendment when reviewing a challenged law. But the biggest problem with the state's case-based argument is that it assumes individuals maximally challenged regulations that they thought were unconstitutional.

Take, for example, *English v. State*, 35 Tex. 473 (Tex. 1871). It was reviewed and considered but ultimately discarded as an outlier by *Bruen*. *See* 597 U.S. at 64–65. Other state-cited cases applied state constitutional provisions containing carveouts that granted the legislature "power to prescribe by Law the Manner in which Arms may be borne." *Hill v. State*, 53 Ga. 472, 474 (Ga. 1874). Still others fail to evidence any discernable constitutional challenge under the Second Amendment or a state analogue. *See State v. Pigg*, 85 Mo. App. 399 (Mo. Ct. App. 1900); *Ex parte Caldwell*, 138 Mo. 233 (Mo. 1897); *Alexander v. State*, 11 S.W. 628 (Tex. Ct. App. 1889); *Summerlin v. State*, 3 Tex. App. 444 (Tex. Ct. App. 1878); *Owens v. State*, 3 Tex. App. 404 (Tex. Ct. App. 1878); *Livingston v. State*, 3 Tex. App. 74 (Tex. Ct. App. 1877). Simply put, the cited cases do not give credence to the state's "maximalist challenger" assumption.

During the 19th century, the body of law supporting constitutional legal challenges was not as developed as it is today and the practice of challenging laws on constitutional grounds was not nearly as prevalent. Although judicial review was enshrined through *Marbury v. Madison*, 5 U.S. 137 (1803), the state's late-19th century cases illustrate the rarity of the practice at the time. Just because a law is unconstitutional does not necessarily mean it will be held to be unconstitutional at or near its time of enactment. *Bruen* itself is evidence of this—the Sullivan Law was passed in the early-20th century, but was not invalidated until 2022. The fact that Homer Plessy's challenge to the Separate Car Act of 1890 failed does not mean that law was constitutional under the Fourteenth Amendment; nor does it mean that *Brown v. Board* was aberrational.

When the state does point to earlier analogues, it fundamentally misreads them. In reviewing the Northampton statutes, the state ignores the actual texts, preferring to remove phrases like "fairs and markets" from their context to imagine a false narrative of centuries-old location-based arms bans. Even if the Northampton statute itself (rather than its American descendants) mattered here, the historical record shows that the statute barred threatening conduct, not peaceable firearms carry at particular locations. *Rahimi*, 602 U.S. at 697–98; *Bruen*, 597 U.S. at 46–52; *cf. Frey*, 157 F.4th at 133 n.6. *Contra Antonyuk*, 120 F.4th at 1020 n.82. But the Northampton statute is relevant only to the extent it was adopted by colonial and Founding Era governments. *Bruen*, 597 U.S. at 41. The colonial and Founding Era laws codifying the Northampton statute in certain colonies and various American states expressly incorporated the *in terrorem* element identified by the Supreme Court. *See, e.g.*, ECF Nos. 130-55, 56, 57 (Virginia, Massachusetts, and Tennessee statutes barring riding in terror of the "county" or the "people" or the "good citizens of this Commonwealth"); *Bruen*, 597 U.S. at 49–50.

16

The language of those statutes and the Supreme Court's interpretation of them in *Bruen* both confirm that there was no American historical tradition of barring firearms in all "crowded" locations, including even "fairs," or "markets." *Antonyuk* relied on a North Carolina version of a Northampton-style "statute" that was not widely accepted to support the state's theory that there was a historical tradition of banning firearms in quintessentially crowded places, but that reliance has been demonstrated to have been misguided. *Compare Antonyuk*, 120 F.4th at 1019–20 & n.82, 1039, *with Bruen*, 597 U.S. at 47, 51–52, *and* Ex. 2, Stephen P. Halbrook, *How a Fake Citation Misled Courts to Uphold "Sensitive Place" Gun Bans: The Second Circuit's Misunderstanding of Founding-Era Law on Going Armed*, 2 J.L. & Civ. Gov., https://jlcgtamu.com/wp-content/uploads/2026/05/halbrook-how-a-fake-citation-misled-courts.pdf. *Frey*'s reliance on *Antonyuk* for this proposition irreparably taints its conclusions. *Bruen* already made clear that crowdedness alone is not a sufficient reason to impose a carry ban. 597 U.S. at 31 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly."). *Contra Frey*, 157 F.4th at 134–35; *Antonyuk*, 120 F.4th at 1019-21.

The state's mid-to-late 19th and early-20th century evidence is insufficient and inapplicable because it comes too late and directly contradicts Founding Era evidence. It is incapable of revealing let alone contradicting evidence of a national historical tradition of firearms regulation.

**D.      The state has the burden of justifying the CCIA in this facial challenge.**

Under the Supreme Court's precedent, the state may not transfer to Plaintiffs its burden to prove the CCIA's constitutionality merely by referencing *United States v. Salerno*, 481 U.S. 739, 745 (1987). The *Bruen* Court recognized that in a facial challenge "the burden falls on [the state] to show that" the challenged law "is consistent with this Nation's historical tradition of firearm

regulation." *Bruen*, 597 U.S. at 33–34. If the state cannot "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," then the regulation fails. *Id.* at 24.

*Heller*, *Bruen*, and (most recently) *Wolford* all involved similar facial challenges. Rather than indulge the state in hypothetical valid applications of the Sullivan Law, *Bruen* struck it down as unconstitutional. There no doubt could be a hypothetical scenario where the discretion afforded under the Sullivan Law allowed the state to bar a mentally ill, violent felon from receiving a carry license, but the Court did not entertain such scenarios to avoid its facial review. The *Wolford* Court similarly refused to conjure a far-fetched scenario to uphold Hawaii's default ban. The laws at issue in *Heller*, *Bruen*, and *Wolford* were, like the CCIA, broad-sweeping and unconstitutional. The Court need not imagine hypotheticals to avoid its facial review.

Nor do Plaintiffs "manufacture [constitutional] conflict" here. *Rahimi*, 602 U.S. at 701 (citation omitted). The CCIA itself conflicts with the Second Amendment's presumptive right to bear arms in public for self-defense. *See Bruen*, 597 U.S. at 17, 24, 33. The state does not, and cannot, contest that the plain text of the Second Amendment covers Plaintiffs' proposed conduct: carrying a concealed firearm in public places for self-defense. *See Hemani*, 2026 WL 1751710, at *5. Because the Second Amendment presumptively protects the ability to carry in public for self-defense, the government bears the burden of demonstrating that the CCIA is lawful. *Salerno* does not relieve the state of this burden.

III.   **The state fails to meet its burden on Plaintiffs' Second Amendment Claims**

     A.   **The state's standing argument mischaracterizes Plaintiff Francis' intentions and misconstrues the text of the CCIA's place of worship restriction; and the relevant Founding Era evidence demonstrates firearms carry was not only permitted but often required at places of worship.**

*Standing* – Mr. Francis has standing to challenge the place of worship provision. The state acknowledges that Plaintiffs bring a pre-enforcement constitutional challenge to the place of worship provision. ECF No. 142-1 at 16. Mr. Francis is not required to first engage in conduct that would subject him to criminal prosecution. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *Silva v. Farrish*, 47 F.4th 78, 86–87 (2d Cir. 2022); *see also Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (discussing "low threshold" for "preenforcement review" (citation omitted)). Nor is he required to "specif[y] . . . the date and time [he] plans to do something of constitutional significance." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 137 (2d Cir. 2023) (citation omitted).

Mr. Francis meets the low threshold required to prove standing here. He has not specifically stated a desire to carry a firearm at his place of worship on a certain date, but he "want[s] to be able to do so." ECF No. 130-16, Excerpts from Francis Dep. Tr. at 57:23–25, 147:13–17. Mr. Francis desires to "have the right and ability to carry [his] firearm wherever [he] go[es], which would include church," when he chooses to carry. *Id.* at 147:15–17. If Mr. Francis decides to carry at his church, he will face criminal penalties, and the state does not claim that it will refrain from enforcing the place of worship provision against him. That infringement on his ability to carry, should he choose to do so, is traceable to the CCIA and the state's enforcement of it. Mr. Francis meets the standing threshold to challenge the place of worship ban.

The state's interpretation of the place of worship provision attempts to add unwritten requirements to defeat Mr. Francis's standing because he has not first sought his congregation's permission to carry. In place of the Sullivan Law's unconstitutional requirement that an individual first convince a government official that he has a "special need" to carry a handgun, the state now seeks rewrites the CCIA to impose the high bar of first convincing his entire congregation that he

19

has such a "need." *See Bruen*, 597 U.S. at 70–71. First, the text of the CCIA does not require that the "congregation" approve an individual's appointment as a member of the security team. *See* N.Y. Penal Law § 265.01-e(2)(c). The law does not require that a person be appointed at all or receive approval from any member of the congregation to carry at a place of worship. It only requires that the individual be "responsible for security." *Id.* But more importantly, no individual need receive approval from other civilians to exercise his Second Amendment rights. Plaintiffs have a cognizable legal right to carry firearms at their places of worship without seeking approval from other civilians to do so. Just last week, the Supreme Court affirmed that a state cannot condition the exercise of protected conduct ("peacefully carrying a concealed weapon" that "[o]thers on the premises will not even notice") upon the "express" approval of another private citizen. *Wolford*, 2026 WL 1825723, at *7, *9, *13–14; *see id.* at *15 (Barrett, J., concurring).

*Merits* – The state cannot overcome the existence of the colonial and Founding Era statutes not just permitting but requiring carry at churches and assemblies. The state does not proffer contrary laws from the colonial or Founding eras because it cannot. Rather, the principles that can be gleaned from the church and assembly laws, ECF Nos. 130-29, 30, 31, 32, 33, 34, 35, 36, 37, is that individuals were often *required* to carry firearms to certain spaces in defense of the vulnerable populations who might be gathered there.

The state refers to a Welsh law from the early 1400s, claiming that the tradition of "prohibiting carriage of firearms in places of worship date[s] back to (at least) 1403 in Wales." ECF No. 142-1 at 17. The state fails to explain how that law was incorporated into the American national historical tradition of firearms regulation (it was not) or how its mechanism (barring terrifying carry) matches the CCIA's mechanism (barring even peaceable carry in a certain specified location, here, places of worship). That law, like the Northampton statute, qualifies its

20

ban with a limiting clause; it only bars carry "in affray of the peace or the King's liege people." 4 Hen 4, c. 29 (1403). The state also fails to discuss the final clause of that ban which excepts "tho[s]e which be lawful liege people to our [s]overeign lord the King." *Id.*

The state's citation to *Goldstein* is inapposite—that case is not binding precedent and the court failed to consider earlier evidence that contradicts the late-19th century statutes and cases that almost entirely inform its holding. *See Goldstein*, 680 F. Supp. 3d at 394–96. The *Goldstein* court discussed late-19th century cases reviewing statutes passed in the late-19th century as "various examples from state courts from the founding era." *Id.* at 396. And although it claimed to rely on a "number of historical legislative references" that "far surpasse[d]" *Bruen* and *Heller*'s, those references are not reliable analogues. *Id.* at 394. Those references include (1) colonial and Founding Era statutes that do not match the CCIA's animating principles, (2) late-19th century laws, and (3) late-19th century cases discussing late-19th century laws. None of the state's cited evidence supports the places of worship ban. *See Hemani*, 2026 WL 1751710, at *5–*6 (analogues are not "relevantly similar" when they "differ dramatically from" the challenged law on the relevant metrics); *id.* at *9–*12; *Bruen*, 597 U.S. at 28-29.

Distilling overly generalized principles from historical laws runs contrary to the *Bruen* test because it allows "infinite" similarities to be drawn between historical analogues and modern regulations. *Bruen*, 597 U.S. at 28–29; *see Wolford*, 2026 WL 1825723, at *6–7, *12–14; Section II, *supra*. The state and the *Goldstein* court fail to consider how its cited regulations "burden . . . the right of armed self-defense" and why they do so. *Id.* at 29; *see id.* at 28; *Wolford*, 2026 WL 1825723, at *6–7, *12–14. *Goldstein*'s conclusion that "broader founding era regulations" like the 1686 New Jersey and 1813 Louisiana laws barring the wearing of unusually dangerous weapons can support all manner of sensitive place laws, 680 F.Supp.3d at 394, is contrary to Supreme Court

21

precedent. The CCIA does not match the specific mechanisms and principles underlying the proffered analogues, so it cannot stand. And *Goldstein*'s "freewheeling" analogizing cannot save it.

The state then points to mid-to-late-19th century laws that banned carry at places of worship. But these statutes directly contradict the colonial and Founding Era tradition of allowing and even requiring carry at places of worship. And *Bruen* already reviewed and rejected the late-19th century cases assessing some of those statutes. *See Bruen*, 597 U.S. at 54, 65. "Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms." *Id.* at 68. And those cases did not uniformly apply the Second Amendment. *Supra* at 15; c*ompare English v. State*, 35 Tex. 473 (Tex. 1871), *with Andrews v. State*, 50 Tenn. 165 (Tenn. 1871), *and Hill v. State*, 53 Ga. 472 (Ga. 1874).

The state attempts to distinguish its selected statutes and cases from the colonial and Founding Era statutes through a process of ignoring and categorically rejecting them based on personal preference rather than historical substance. The state takes issue with the colonial and Founding Era laws requiring individuals to carry firearms to church and other public assemblies. The state makes no attempt to show that the church and assembly laws cited by Plaintiffs were ever disregarded or overturned in the interim between their passage and the Founding. Instead, it attempts to show that Plaintiffs' proffered laws were based upon differing historical circumstances or were otherwise "racist." ECF No. 142-1 at 19.

The fundamental animating principle underlying these church and assembly laws (individual self-defense and collective defense of vulnerable populations) and the mechanism (requiring individuals to carry arms with them to certain public locations and during certain public events) are instructive. They were widely accepted and can be relied upon as relevantly similar

22

because they were passed to deter internal and external threats to the communities they sought to protect. The state offers a false historical narrative that vulnerable populations should be protected from citizens lawfully carrying firearms. The evidence of the historical tradition is the exact opposite—the Founders looked to citizens peaceably carrying firearms to protect vulnerable populations. *See Bruen*, 597 U.S. at 31; *see Wolford v. Lopez*, 116 F.4th 959, 1000 (9th Cir. 2024) (finding "unlikely" a historical tradition of banning "firearms at all places that contain a vulnerable population"), *cert. granted on other grounds*, 146 S. Ct. 79 (2025), *and rev'd and remanded on other grounds*, No. 24-1046, 2026 WL 1825723 (2026).

Even if those statutes are set aside, however, the state still points to no colonial or Founding Era tradition of barring firearms in places of worship. The places of worship ban should be stricken.

**B.     There is no historical tradition of banning firearms in all government administration buildings.**

The state cannot show that there is a historical tradition of banning firearms in all places where government functions occur. The CCIA's sweeping language bans firearms in "any place owned or under the control of federal, state or local government, for the purpose of government administration" (the "government buildings" ban). N.Y. Penal Law § 265.01-e(2)(a). One of the state's proposed experts highlighted just how broad the challenged ban is—urging that the broad animating principle drawn from colonial and Founding Era statutes is that there is an American historical tradition of banning firearms anywhere any kind of "democratic process" occurs. Ex. 3, Excerpts from Rivas Dep. Tr. at 168:18–173:5.[2] The state's even broader view is that the government buildings ban applies to any site where any kind of minimal government participation occurs, including places where an agency like a water board conducts business or a place where a

---

[2] Plaintiffs maintain that Rivas' opinions, testimony, and report should be excluded in full. *See* Pls.' Mot. to Exclude, ECF No. 145-2.

mail-in ballot is mailed. *See* ECF No. 142-1 at 37; ECF. No. 142-2, Rivas Dec. ¶ 33 (arguing that broader government functions like "committee[], board[], and commission[]" meetings today allow governments to "cast[] a wider net of protection"). That broad principle is not borne out by the colonial or Founding Era evidence cited by the state itself and is contradicted by the Supreme Court's discussion of enumerated sensitive places in *Bruen*.

The state acknowledges that no historical analogues, much less any from the colonial or Founding eras, prohibited weapons at all buildings where any kind of government business occurs. *See* ECF No. 142-1 at 36–38. Despite the lack of colonial or Founding Era historical analogues and in the face of *Bruen*'s discussion of sensitive places, the state argues its government buildings ban should be upheld.

Even if the state can prohibit civilians from carrying firearms in certain specific "sensitive" locations enumerated in *Bruen*—polling places, legislatures, and courts—(which *Bruen* did not decide), neither Supreme Court precedent nor the state's proffered historical evidence can support the sweeping ban at issue here. *Heller* and *Bruen* do not allow for such a broad ban, or why else would they both carefully enumerate only a select few "sensitive" places.

Despite its dicta referencing "schools and government buildings," *Heller* expressly left its historical analysis open for later cases to allow parties to develop and present evidence. 554 U.S. at 626, 635. *Bruen* narrowed *Heller*'s narrow dicta even further to exclude "schools and government buildings" from its reference to "sensitive places," recognizing that there were "relatively few" places where firearms were outright banned during the Founding Era. 597 U.S. at 30. If the *Bruen* Court intended to validate firearms bans at all government buildings, it could have simply reiterated *Heller*'s language in a binding holding. The CCIA's government buildings ban must fall because it is not limited only to the historical tradition of ensuring the free administration

24

of the historically sensitive government functions identified in *Bruen*: elections,[3] legislative sessions, and court proceedings.

The state asks the Court to follow the Fourth Circuit's approval of Maryland's similarly broad government buildings ban. ECF No. 142-1 at 36, 38 (citing *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)). The state fails to mention that in *Kipke* the Fourth Circuit did not perform any historical analysis relating to Maryland's government buildings ban. *Id.* at 208. The court relied solely on the "guidance from the Supreme Court" in *Heller* and *Bruen* listing the relatively few historically sensitive locations "to uphold Maryland's prohibition of firearms in government buildings." *Id.* The state's citation to *Antonyuk* is similarly inapposite because the Second Circuit was not presented with the issue, so it also had not analyzed any historical tradition or analogues relating to the CCIA's broad government buildings ban. *See* 120 F.4th at 971–72.

The state points to only four precedents—two statutes imposing limited weapons bans at the colonial Maryland legislature, the Delaware Constitution of 1776, and Virginia's Founding Era Northampton-style statute—in support of its ban, along with some mid-to-late 19th century statutes that barred firearms at courts and polling places. ECF No. 142-1 at 37. The state and its proposed expert admit that the Maryland colonial statutes only barred weapons while the legislatures were in session. ECF No. 142-1 at 36; Ex. 3, Excerpts from Rivas Dep. Tr. at 161:2–7, 162:21–163:10; ECF No. 142-2, Rivas Dec. at 17 n.44 (statutes bar firearms "whilst the howse is sett" and "whillst they are sett"). Such a limited ban falls far short of the state's claim of a historical broad prohibition on carrying "in the governor's mansion while simultaneously protecting an upper chamber headed by the executive and which wielded mixed judicial-legislative functions." ECF No. 142-1 at 37.

---

[3] The CCIA separately bans firearms in "any location being used as a polling place." N.Y. Penal Law § 265.01-e(2)(q).

25

Even if we presume that Calvert House operated in the way the state's proposed expert claims, the bans were limited to the actual legislative assembly and only while the assembly was in session. If the Maryland colonial legislature desired to pass a law prohibiting firearms at Calvert House or other governmental buildings generally, it knew how to do so. But did not.

The Delaware Constitution of 1776 barred weapons carry by civilians at polling places and barred militia muster on any election day. ECF No. 130-48 at n.115 ("TO prevent any Violence or Force being used at the said Elections, no person shall come armed to any of them, and no Muster of the Militia shall be made on that Day" (quoting Del. Const., art. 28 (1776))). The express language of that early state constitution contradicts the state's theory that it was intended to protect "government buildings" or "public spaces," ECF No. 142-1 at 37. *See* ECF No. 130-48 at n.115 (quoting Del. Const., art. 28 (1776)). The provision was included in the state constitution to "prevent any Violence or Force being used at . . . Elections." *Id.* Although that provision banned firearms at polling places *on election days*, its mechanism and reasoning were entirely different from the challenged ban, which applies to all government administration buildings at all times. There is no evidence that, absent an election, firearms would be prohibited at any place used for polling any other time of the year. The CCIA's government buildings ban is not limited in time and its mechanism is entirely location-based, untethered by the specific critical government functions it is supposedly designed to protect. N.Y. Penal Law § 265.01-e(2)(a) (barring carry at "any place owned or under the control of federal, state or local government, for the purpose of government administration").

Neither of the Founding Era laws cited by the state match the much broader prohibition imposed by the government buildings ban. Where those earlier bans were limited in time, the government buildings ban is not. And where those earlier bans were limited in scope to specific

26

sites of important government functions (legislatures, polling places, courts), the government buildings ban is not. They simply do not match the "how" sufficiently to uphold the government buildings ban. *See Wolford*, 2026 WL 1825723, at *6–7, *12–14.

To the extent the Virginia Northampton-style statute can be read to prohibit firearms in courts, it did not expand on that principle identified by the Supreme Court in *Bruen*. *See* ECF No. 130-55. It certainly did not ban firearms everywhere government administration occurred. *Id.* In addition to being too late in time to clarify the issue, the mid- and late-19th century laws the state cites do not otherwise expand on or alter *Bruen*'s limited list. The state merely points to bans on carrying firearms "in court" and "at election sites." ECF No. 142-1 at 37.

The state also claims that there was a "blurring of the lines between and among different branches of government, and between public and private spaces" that "should inform" how the Court reviews the government buildings ban.  ECF No. 142-1 at 37. That approach is not only disallowed by *Bruen*, but also unsupported by history. The how and why of the proffered statutes simply do not work as broadly as the state claims. They are limited to legislative assemblies while the legislature is in session, polling places on election day, and courts. The CCIA's government buildings ban is unlimited in time and applies to far more disparate locations, with tenuous relationships to the places where the governmental functions most important to the Founders take place.

The historical evidence that the state cites here simply cannot support the government buildings ban. The government buildings ban should be stricken down.

**C.**      **The state offers only its policy choices rather than evidence of historical tradition to support its health care service centers ban.**

Rather than historical analogues (because it has none), the state proffers its own policy choices in support of the CCIA's ban on firearms at all "location[s] providing health . . . care or

services," N.Y. Penal Law § 265.01-e(2)(b) (the "health care service centers" ban). The state cannot show a national historical tradition exists sufficient to support the CCIA's ban at all "location[s] providing health . . . care or services." N.Y. Penal Law § 265.01-e(2)(b). The state instead makes irrelevant arguments relating to Dr. Noren's and Mr. Nash's testimony regarding the health care service centers ban and hypothetical individuals' choices to carry at health care service centers.

The state does not, and cannot, dispute that Plaintiffs are all responsible, law-abiding citizens whose proposed conduct is covered by the Second Amendment. The Court need not and should not consider any discussion about the state's disapproval of carrying at health care service centers because these interest balancing arguments are irrelevant. *See Bruen*, 597 U.S. at 26 (barring judicial interest balancing when reviewing Second Amendment challenges).

The state relies on *Antonyuk*, despite acknowledging that the challenged ban was not reviewed by the Court in that case. ECF No. 142-1 at 39. The proposed principle from the *Antonyuk* court was that "firearm prohibition" is allowed in "places frequented by and for the protection of vulnerable populations." 120 F.4th at 1012. The *Antonyuk* court bifurcated its analysis of the proposed laws in direct contradiction to the *Bruen* requirement that a proffered law match *both* the "how" and the "why" of a challenged statute. *Compare Antonyuk*, 120 F.4th at 1011–12, *with Wolford*, 2026 WL 1825723, at *6, *and Bruen*, 597 U.S. at 29. *Antonyuk* separately found that (1) there was a history of prohibiting firearms at places frequented by vulnerable populations*, which it based entirely on laws banning firearms in schools* and (2) Founding Era militia laws deemed "intellectually disabled, mentally ill, or those with substance use disorders" a "historically . . . vulnerable population." *See* 120 F.4th at 1012. Neither of these categories of analogues matches the CCIA's mechanism. Such piecemeal analysis is not compliant with *Bruen*. To the extent the

28

state relies on the Fourth Circuit's opinion in *Kipke*, that decision is not binding on this Court and is unreliable because it relied entirely on *Antonyuk's* flawed analysis for its conclusions about health care centers.

The state makes no response to Plaintiffs' showing regarding the lack of statutes banning firearms at medical facilities. Again, the state asks the Court to ignore this critical Founding Era evidence showing a preference for the free exercise of the right to carry at health care facilities. The state again attempts to cite changed circumstances to support the challenged ban. But locations providing health care services, including physicians' offices, almshouses, hospitals, and dispensaries, existed before and at the Founding. The state cites to *Kipke* for the proposition that "[m]odern hospitals and medical facilities do not resemble the hospitals at the Founding," 165 F.4th at 216, but it cannot refute the fact that health care service centers existed in the Founding Era and no laws barred carry in those locations.

The state acknowledges that the militia laws reviewed in *Antonyuk* do not match the CCIA's mechanism because they were merely found by the court to mark certain categories of individuals as "vulnerable" and thus exempt from militia service. ECF No. 142-1 at 40 n.19. This bifurcated analysis is not allowed under *Bruen* or *Wolford*. A proposed analogue is not "relevantly similar" (and cannot support a finding of constitutionality) unless it matches both "how and why" a challenged law burdens "law-abiding citizen[s'] right to armed self-defense." *Bruen*, 597 U.S. at 29; *see also Wolford*, 2026 WL 1825723, at *6–7, *12–14. Neither the militia laws nor the late-19th century laws match the CCIA's "how" and "why" because they regulate different groups (potential militia members, students) in different ways (exempting them from militia service, barring firearm carry at schools) than the CCIA.

29

To the extent any historical principle can be gleaned from the colonial and Founding Era evidence presented in this case, it is this: individuals were permitted or required to carry firearms to protect vulnerable populations when comprehensive government-provided security was lacking. ECF No. 130-2 at 16–17; ECF Nos. 130-29, 30, 31, 32, 33, 34, 35, 36, 37; ECF Nos. 130-48, 49, 50[4]. The state cannot avoid the evidence that the colonial and Founding Era church and assembly laws required citizen firearm carry to protect vulnerable populations. *See Bruen*, 597 U.S. at 31; *Wolford v. Lopez*, 116 F.4th at 997. The state's cited bans on firearms at schools are "belated innovations" from "the mid- to late-19th-century" that come "too late to provide insight into the meaning of [the Constitution in 1787]." *Bruen*, 597 U.S. at 36–37 (alteration in original) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C. J., dissenting)). And these belated innovations are especially unhelpful because they are separated in time from the Founding Era militia laws with which they are grouped. *Bruen* requires courts to analyze analogues as a whole, rather than pick and choose principles and graft them together.

But it is unnecessary for the Court to consider any of those laws because health care service centers existed at the Founding and the state presents no colonial or Founding Era laws banning firearms there. That preference for free exercise of the right to carry is dispositive; there is no national historical tradition of prohibiting firearms at health care service centers.

### D. Just because DOH residential facilities may house "vulnerable" populations does not mean the state can ban all firearms carry there.

The CCIA impermissibly bans firearms at all residential facilities "licensed, certified, regulated, funded, or operated by the department of health" (the "DOH facilities" ban), N.Y. Penal Law § 265.01-e(2)(l). As with locations providing health care services, the DOH facilities ban is

---

[4] These articles contain legislative, not adjudicative, facts and are appropriately before the Court. *See supra*, at 4 n.1.

30

not supported by any national historical tradition. The ban—and the alleged historical principles the state cites to support it—are both undermined by the colonial and Founding Era tradition of allowing and even requiring firearm carry at places where vulnerable populations are present at places of worship and public assemblies. *Bruen*, 597 U.S. at 31; *Wolford v. Lopez*, 116 F.4th at 1000.

*Standing* – Mr. Porter has standing to challenge the CCIA's ban on firearms at DOH facilities notwithstanding Friedwald's internal employment policy banning firearms at its facility does not mean that he lacks standing to challenge the DOH facilities ban. First, Mr. Geller's affidavit does not state whether the policy at issue has ever been shared with the general public prior to this case or whether it is supported by signage or other information given to visitors. There is no information to support the conclusion that Friedwald notifies any visitors like Mr. Porter that this alleged employment policy is in effect.

Second, Mr. Geller's affidavit does not state whether the employment policy has ever been enforced against any Friedwald visitor. The policy includes consequences for "owners, directors, officers, clinical staff, employees, independent contractors, consultants, and others working for the Facility" (collectively called "Associates" in the policy), there is no discussion of consequences for breach of the employment policy by any visitors. *See* ECF No. 142-25 at 3–5. Nor is there any indication that the employment policy is separate and apart from the CCIA or whether, in the absence of the CCIA, Friedwald would still ban firearms. It is unclear whether the employment policy is merely descriptive of the CCIA's DOH facilities ban or if it imposes further restrictions on top of the CCIA's.

Finally, the fact that Mr. Porter did not carry at DOH Facilities prior to the CCIA's passage does not bar him from challenging the DOH facilities ban. Mr. Porter did not obtain an unrestricted

31

carry license until at least December of 2020. ECF No. 130-9, Porter Dec. ¶ 6; Ex. 4, Excerpts from Porter Dep. Tr. at 34: 4–14. At most he had the opportunity to carry legally at Friedwald for approximately a year and a half before the CCIA was passed. The fact that he "just didn't carry those particular days" when he was visiting DOH facilities is not sufficient to dispute his desire to carry at DOH facilities in the future, if not for the CCIA. *See* Ex. 4, Excerpts from Porter Dep. Tr. at 89:2–3. One does not waive one's constitutional rights by not exercising them continuously.

*Merits –* As with health care service centers, the CCIA's prohibition on firearms carry at DOH facilities is not supported by any national historical tradition and is similarly unconstitutional. *See* Section III.C, *supra*.

### E.    The state's late-19th century statutes are insufficient to justify its sporting venues ban.

The state has not justified the CCIA's ban on firearms carry at locations used for "sporting events" (the "sporting venues" ban), N.Y. Penal Law § 265.01-e(2)(p). Plaintiffs seek to carry at places used for informal, amateur, or youth sporting events. *See* ECF No. 130-9, Porter Dec. ¶ 9(d). The fields, gyms, courts, and other sporting venues at issue here are much more like the horse tracks and fields used for sport during the colonial and Founding eras and are materially different from the modern arenas and stadiums used for professional sports where substantial security is provided.

Nor do the sporting venues at issue here fit the state's characterization as "quintessentially crowded places." ECF No. 142-1 at 30. These venues are nothing like professional sports stadiums. The state's discussion of "modern sports stadiums" *id.*, misreads Plaintiffs' challenge; Plaintiffs do not seek to carry at places like Madison Square Garden, Yankee Stadium, Highmark Stadium, or the USTA Billie Jean King National Tennis Center. The local public fields, gyms, and courts at issue here are a far cry from modern professional sporting venues in terms of scale, size, and

32

crowdedness. Unlike professional venues that can hold tens of thousands of fans, the small venues at issue here have minimal, if any, spectator seating. Many are located within parks or are local gyms with little additional space outside of the actual courts or fields used for sport. They are not gathering places for tens of thousands of individuals. Nor are the small venues at issue here subject to comprehensive security.

Professional arenas and stadiums are secured through comprehensive screening at entrances and the presence of security guards throughout the venues during events. A local basketball court, soccer field, or baseball diamond often does not have any kind of perimeter fence to keep people off the sporting surface during non-game times, much less comprehensive screening and security. A venue where access is completely uncontrolled (like an open field or court) or minimally controlled (like a gym with no security screening that is open to the general public) has nothing in common with a highly secure professional stadium except that a sport is played there.

The small venues where Plaintiffs seek to carry are much more like the racetracks and green spaces common at the Founding than modern professional stadiums. As the state's alleged parks expert readily admitted, people often recreated in public green spaces at the Founding. *See* ECF No. 130-20, Excerpts from Young Dep. Tr. 59:5–79:9 (conceding that various Founding Era spaces were used for recreational purposes); ECF No. 130-53, Young Dec. ¶ 18. Those localized spaces where individuals within a given community gathered for various forms of recreation and sport are easily comparable to modern locations used for informal, amateur, or youth sporting events. But critically the state presents no colonial or Founding Era law banning firearm carry at horse tracks or in other areas used for sports or games.

Neither the Northampton statute, nor the later American Northampton-style statutes, are proper analogues to support the sporting venues ban. As Plaintiffs have shown, the colonial and

33

Founding Era Northampton-style statutes, *e.g.*, ECF Nos. 130-55, 56, 57, by their very terms prohibited threatening conduct, not firearms possession in certain locations. The state asks the Court to disregard the Supreme Court's reading of the Northampton statute and its progeny, but *Bruen* could not have been clearer: "They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." 597 U.S. at 50; *cf. Frey*, 157 F.4th at 133 n.6 (questioning *Antonyuk*'s reading of Northampton statute and acknowledging *Bruen*'s *in terrorem populi* reading). *Contra Antonyuk*, 120 F.4th at 1020 n.82. The state's insistence that (1) the Northampton statute is relevant outside of its codification into American law through later similar American laws and (2) that the relevant Northampton-style American laws were location-based regulations, rather than (threatening) conduct-based, is dead wrong. The Supreme Court has required a much closer fit than the state offers here. *Wolford*, 2026 WL 1825723, at *12–13; *Hemani*, 2026 WL 1751710, at *6.

The late-19th century laws the state cites come too late and contradict the Founding Era tradition preferring the free exercise of the right to carry at these sporting venues. There were no bans on carrying firearms in areas used for sports or games during the Founding Era. The state's late in time prohibitions on carry at fairs and racecourses cannot be relied upon to determine a national historical tradition under the *Bruen* test. *See* 597 U.S. at 36 ("[T]o the extent later history contradicts what the text says, the text controls").

The presumption that the Second Amendment protects public carry for self-defense is controlling here in the absence of any colonial or Founding Era evidence to the contrary. The sporting events ban should be struck down.

**F.**      **The playgrounds ban is not supported by history.**

There is no historical tradition to support the CCIA's firearms ban at playgrounds, N.Y. Penal Law § 265.01-e(2)(d).

*Standing* – Mr. Porter has standing to challenge the CCIA's ban on firearms at playgrounds. Mr. Porter no longer brings his son to public playgrounds for recreation, so he no longer makes special trips to visit playgrounds. Ex. 4, Excerpts from Porter Dep. Tr. at 79:9–12. But he still regularly visits parks and other locations that contain or are adjacent to playgrounds. *See e.g.*, *id.* at 78:25–79:18; Ex. 5, Town of Clarkstown Parks, https://www.clarkstown.gov/recreation/parks/. For instance, Mr. Porter regularly practices basketball with his son at Kings Park, where the basketball courts share a parking lot with the playground. There is no definition of "playground," and it is unclear whether that term includes adjacent spaces like parking lots. If Mr. Porter were to use the parking lot or walk through or around a playground to get to another area of a park (such as Kings Park) or sports facility while carrying a firearm, he would be in violation of the CCIA's playgrounds ban. The potential for him to unintentionally violate the CCIA's playgrounds ban by traveling through or around a playground is sufficient to grant him standing to challenge the playgrounds ban.

*Merits* – The playgrounds ban cannot stand because it is not supported by any historical analogues sharing its mechanism or underlying purpose. The state relies upon the possibility that vulnerable populations will be present at playgrounds. But the colonial and Founding Era evidence produced by Plaintiffs shows that individuals were required to carry arms where vulnerable populations like children would be present for the protection of those populations. *See* ECF Nos. 130-29, 30, 31, 32, 33, 34, 35, 36, 37. The colonial and Founding Era church and assembly laws

35

Plaintiffs cite required firearms carry to protect vulnerable populations at places like churches and other public gatherings. *Id.*

The state's analysis here suffers from the same bifurcation issue as its review of the health care service centers ban. *See* Section III.C, *supra*. The state and the *Antonyuk* court claim that *Bruen* found that "the tradition of regulating firearms in spaces frequented by children is also well-established and representative." ECF No. 142-1 at 22 (quoting *Antonyuk*, 120 F.4th at 1026). But *Bruen* did not authorize reasoning by analogy from schools to any place children could be found, which is virtually anywhere, *see* 597 U.S. at 30–31: *Heller* itself acknowledged that the idea that schools were "sensitive places" was a presumption untested against actual historical evidence, 554 U.S. at 635. Unlike other public locations (even those that children purportedly frequent), schools exercise "*in loco parentis*" authority over children and stand in the place of a parent. *Morse v. Frederick*, 551 U.S. 393, 413–14 (2007) (Thomas, J., concurring); *id.* at 416 ("[T]he doctrine of *in loco parentis* limited the ability of schools to set rules and control their classrooms in almost no way"). Schools have a duty to protect children on premises during the school day, and *in loco parentis* authority confers leeway in determining how best to fulfill that duty. *Id.* at 413–14.

Historical firearm bans at schools are a poor comparator because up until the mid-to-late 19th century, they were private rules (not enacted laws or statutes), Ex. 6, Excerpts from Charles Dep. Tr. at 105:20–106:2, and they applied to students and sometimes teachers, not the public at large, *see* ECF No. 142-5, Charles Dec. ¶¶ 20–24. They also fail to establish a broad principle that any place where children or other vulnerable populations are present can be deemed a sensitive place. *Contra Antonyuk*, 120 F.4th at 1026.  The state does not have *in loco parentis* authority over all individuals who visit all places where children might be present.

*Antonyuk* ignores how and why firearms were regulated at schools. *Antonyuk* extracted a broad proposition from historical firearm bans at schools—firearms can be banned wherever children are frequently present. *Id*. In doing so, it disassociated the broad outcome (banning possession of firearms where children are) from the mechanism (barring children from possessing firearms at schools) and animating principle (*in loco parentis* authority) underlying the school bans. *Bruen* does not allow bifurcating the necessary analysis to extract pieces that may be helpful to a party's preferred outcome.

The vulnerable populations theory also fails because it "defines the category of 'sensitive places' far too broadly." *Bruen*, 597 U.S. at 31; *Wolford*, 116 F.4th at 1000. The potential for a location to host a vulnerable population thus cannot serve as a substitute for historical analysis. Nor is vulnerability a valid justification for forbidding arms in places anywhere children might be found. Colonial and Founding Era precedents require the opposite conclusion: firearms were historically *required* to be carried by adults for the protection of vulnerable populations when comprehensive government-provided security was lacking. ECF No. 130-2 at 16–17; ECF Nos. 130-29, 30, 31, 32, 33, 34, 35, 36, 37; ECF Nos. 130-48, 49, 50

The state's references to late-19th and early-20th century carry bans at places of "amusement" fail. Those carry bans come far too late to have any probative value since they contradict the Founding Era evidence. *See Bruen*, 597 U.S. at 36.

During the colonial and Founding Eras, individuals were permitted or required to carry firearms to protect vulnerable populations in locations and at times when the need for self defense was most acute. ECF Nos. 130-29, 30, 31, 32, 33, 34, 35, 36, 37. Those times included when populations gathered together for church or public assemblies, when children might be present or when the community might be vulnerable to attack by either internal or external threats. ECF Nos.

37

130-29, 30, 31, 32, 33, 34, 35, 36, 37. Firearms bans at schools are not relevantly similar to and do not support the playgrounds ban. The late-19th century laws the state cites came far too late and directly contradict the Founding Era tradition requiring carry at places where vulnerable populations were present. *See Bruen*, 597 U.S. at 31; *Wolford*, 116 F.4th at 1000. The general proposition that firearms may be banned where children frequently go is not supported by historical evidence and it cannot serve as a basis for the playgrounds ban. The playgrounds ban should be deemed unconstitutional.

G.    **The special events ban is not supported by any Founding Era tradition of banning firearms carry during celebrations or festivals.**

The CCIA's ban on firearms carry at both registered and unregistered events occurring on public ground, (the "special events" ban) N.Y. Penal Law § 265.01-e(2)(r), is not supported by colonial or Founding Era evidence. The state presents no evidence that there is a national historical tradition of banning firearms carry during celebrations or festivals. The state points heavily to the Northampton statute and *Antonyuk*'s analysis of that statute in support of its arguments. But it fails to acknowledge *Rahimi*'s, *Bruen*'s, and *Frey*'s interpretation of that statute. *Rahimi*, 602 U.S. at 697–98; *Bruen*, 597 U.S. at 46–52; *Frey*, 157 F.4th at 133 n.6. The Supreme Court and Second Circuit in those cases found that the Northampton statute was a prohibition on threatening conduct; it was "no[t] [an] obstacle to public carry for self-defense in the decades leading to the founding." *Bruen*, 597 U.S. at 45. The Northampton statute and the colonial and Founding Era laws that followed it "require[d] something more than merely carrying a firearm in public." *Id.* at 50. They prohibited "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.*; *see* ECF Nos. 130-55, 56, 57.

The state's and *Antonyuk*'s conclusion that there was a tradition of regulating firearms where people are assembled for amusement is based on similarly shaky ground. Outside of its

38

misreading of the Northampton statutes and its progeny, *Antonyuk* cited no colonial or Founding Era laws in support of the proposition that firearms can be banned anywhere people gather for amusement. The state fails to cite any laws from before the mid-to-late 19th century that regulated firearms at places of amusement. Supreme Court precedent requires at least a close fit between the proposed analogues and the challenged law. *Wolford*, 2026 WL 1825723, at *6–7, *12. The state fails to provide any here. To the contrary, colonial and Founding Era laws often required individuals to carry firearms to public assemblies and church gatherings. *See* Section III.A, *supra*.

One of the state's proposed experts, Patrick Charles, cites mid-to-late 19th century laws regulating firearm discharge on certain holidays. ECF No. 142-5, Charles Dec. ¶ 31 ns.83, 85–86. First, these statutes come too late to make up a national historical tradition when confronted with a total lack of firearms regulation around special events at the Founding. And second, the statutes are not proper analogues to support the CCIA's special events ban because their mechanism is completely different. Where the CCIA bans firearms possession entirely at certain special events while they are occurring, Charles' cited laws merely prohibited firearms "discharge" or "use" at specified times of the year. His cited laws do not match the CCIA's mechanism and therefore burden Second Amendment rights in a different way than the special events ban does.

Even if the holiday statutes were proper analogues, Charles also admits that some late-19th century laws "provided almost carte blanche licenses for their residents to discharge their firearms in the air in celebration" on certain holidays. ECF No. 142-5, Charles Dec. ¶ 31. Others "directed residents to discharge their firearms in celebration . . . at specific locations and/or during specific times." *Id.* Accordingly, there is no national historical tradition that can be gleaned from these statutes because the cited laws directly contradict one another. Some jurisdictions banned the practice of discharging firearms on holidays, others expressly sanctioned it. Such disagreement

39

among the cited analogues countervails any attempt to claim a national tradition of regulating firearms at specified events or holidays.

There is no national historical tradition of banning firearms carry during public events, celebrations, or festivals. The special events ban should be permanently enjoined.

**H.    The Times Square ban offends *Bruen*'s mandate against declaring Manhattan a sensitive place.**

The CCIA's designation of a three-dozen-block "gun free zone" surrounding Times Square is an attempt to make a mini-Manhattan within New York City in defiance of *Bruen*. The Times Square ban, codified at N.Y. Penal Law § 265.01-e(2)(t) and N.Y.C. Admin. Code § 10-315(a), cannot be supported by the state's proposed analogues or its theory that firearms may be banned in all locations that are at times crowded.

*Standing* – Mr. Porter and Mr. Stirnweis have standing to challenge the Times Square ban because they have both shown that they would act contrary to the CCIA, if not for fear of criminal prosecution. *See Susan B. Anthony List*, 573 U.S. at 158–59; *Silva*, 47 F.4th at 86–87; *Vitagliano*, 71 F.4th at 136. Mr. Porter has standing to challenge the ban because he would, at a minimum, carry a firearm while traveling in and through Times Square if not for the CCIA. ECF No. 130-9 ¶ 9(f). The state claims that "Mr. Porter testified that none of the sites he visited near Times Square were in fact located within the Times Square Gun Free Zone." ECF No. 142-1 at 47. Mr. Porter produced photographic evidence that he had traveled through the Times Square gun free zone while on his way to the Museum of Modern Art. Ex. 4, Excerpts from Porter Dep. Tr. at 169:15–170:16; Ex. 7, Times Square Photograph NYSRPA_00000120. This squarely aligns with his proposed conduct in his declaration. If not for the CCIA's Times Square ban, Mr. Porter "would travel in and through Times Square more frequently and carry a firearm while doing so for self-

40

defense." ECF No. 130-9 ¶ 9(f). He has demonstrated that the Times Square ban's infringement on his Second Amendment rights creates a redressable injury for which the Court can grant relief.

Mr. Stirnweis similarly seeks to "continue traveling[] through Times Square." ECF No. 130-7 ¶ 9(e). Plaintiffs are not required to show that they have actually violated the CCIA because this is a pre-enforcement challenge. The infringement on their Second Amendment rights and their desire to carry in Times Square is sufficient to prove standing here.

*Merits –* The Times Square ban is not supported by the historical evidence nor is the state's claimed tradition of banning firearms in all quintessentially crowded places. Crowdedness alone is not sufficient to uphold a firearm carry ban. *Bruen*, 597 U.S. at 31. In concluding that Times Square is a sensitive location due to its crowdedness, *Frey* looks to the exact characteristics *Bruen* dismissed as unsupportive of a broad carry ban. *Compare Frey*, 157 F.4th at 134–35, *with Bruen*, 597 U.S. at 31. The state follows this lead in concluding that there was a tradition of banning firearms "in crowded markets and public squares." ECF No. 142-1 at 48. But the state's alleged bases for this "tradition" *id.,* simply do not bear the weight the state gives them. The Northampton statute and the colonial and Founding Era laws that codified it in American states did not ban carry in fairs and markets generally. *See* Sections II.C, III.E, III.G, *supra*. They barred carrying in a threatening manner in those spaces, not peaceable carry by law-abiding citizens. *See* Sections II.C, III.E, III.G, *supra*. *Frey* expressly acknowledges the binding interpretation of these statutes by the Supreme Court, 157 F.4th at 133 n.6, but still finds a tradition of banning carry in crowded spaces by turning exclusively to late-19th century laws. *See id.* at 132–33. Those laws contradicted the colonial and Founding Era absence of regulation barring carry in crowded spaces and accordingly cannot be relied upon to create a national historical tradition sufficient to uphold the Times Square ban.

41

Broad carry bans covering entire city limits or broad categories of spaces like public assemblies and social gatherings were unknown to the Founders and did not appear until the late-19th century. Those bans are a 180 degree turn from the colonial and Founding Era preference for the free exercise of the right to carry. This turn away from earlier unrestricted carry regimes at least partially motivated the Supreme Court's mandate against declaring entire cities sensitive places. *See Bruen*, 597 U.S. at 31. Under that binding precedent, the state may not deem "all places of public congregation that are not isolated from law enforcement" as "sensitive." *Id.* Just as the state cannot ban firearms carry within city limits, it cannot arbitrarily designate large chunks of cities as "sensitive" like it has done under the Times Square ban. The attempt to carve out a large portion of a city and justify the ban with broad pronouncements about crowdedness fail both because it is unsupported by the historical evidence and because *Bruen* has directly barred the act of designating cities "sensitive."

*Bruen* was rightly worried about states slapping a "sensitive place" label on "all places of public congregation that are not isolated from law enforcement." *Id.* Giving a state broad license to do so also gives them the power to "effect[ively] deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring) (citation omitted). *Bruen* does not allow such de facto bans. The Times Square ban should be stricken.

## I.      Public transit existed at the Founding; there is no evidence that riders were banned from carrying firearms.

The state has not presented evidence sufficient to uphold its firearms bans on public transportation and public transit, N.Y. Penal Law § 265-01(e)(2)(n).

***Standing*** – Mr. Stirnweis and Mr. Francis have standing to challenge the public transport ban. The state admits that Mr. Stirnweis has standing to challenge the ban. ECF No. 142-1 at 42.

42

Mr. Francis desires the freedom to carry a handgun on public transit, if he so chooses. ECF No. 130-16, Excerpts from Francis Dep. Tr. 143:10–16 ("I don't want to be prohibited from taking a firearm if I chose to do so"). The state does not challenge the fact that Mr. Francis rides public transport multiple times each week and intends to continue doing so. Ex. 8, Excerpts from Francis Dep. Tr. at 142:10–143:4.

Neither Mr. Stirnweis nor Mr. Francis is required to allege the specific place and time that they would like to perform a certain action in violation of the CCIA. *See Vitagliano*, 71 F.4th at 136. Mr. Stirnweis and Mr. Francis have standing here because they both have alleged that they would like to carry on transport systems open to the public or desire freedom to do so. *See Susan B. Anthony List*, 573 U.S. at 158–59; *Silva*, 47 F.4th at 86–87. The infringement on their ability to carry on public transport is traceable to the CCIA and the state's enforcement of it.

The state attempts to limit the terms "public transportation" and "public transit" to only ban firearms carry on transport services that are "operated by public entities." *See* ECF No. 142-1 at 43. Although Plaintiffs would like to accept the state's admission that any transport services owned or operated by non-governmental entities fall outside of the public transport ban, the language of the statute does not so limit the ban based on a service's ownership or operation. Nor does the state promise that it does not intend to enforce the public transport ban at facilities and on transportation services that are operated by nonpublic and semi-public entities. The language of the ban encompasses any transportation services *open to the public*, rather than only those that are operated by public or governmental entities. Under this plain language, Plaintiffs have standing to challenge the public transport ban generally.

*Merits* – The state's argument hinges on its underestimation of the Founders. ECF No. 142-1 at 45 ("The Founders could not have anticipated the modern transit system") (quoting *Schoenthal*

43

*v. Raoul*, 150 F.4th 889, 914 (7th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 380 (Apr. 6, 2026)). Neither the state nor *Frey* defines what counts as "mass transit." Yet both summarily conclude that "mass transit" did not exist at the Founding and rely on the lack of "mass transit" as a basis for their argument. They reason that the Founders could not possibly have imagined the kinds of shared transportation available today, even though shared transportation already existed throughout America during the Founding, ECF No. 130-2 at 22–23, to say nothing of the maritime intercontinental travel that brought pilgrims to Plymouth Rock. Nor do they contest that Founding Era passengers and guards often carried firearms while riding shared transit. *Id.* at 23. Attempting to reverse engineer what the Founders might have thought or daydreamed about is a fool's errand and it is unnecessary here. The text of the Second Amendment and the lack of firearm restrictions on shared transportation at the Founding control.

Like elsewhere in its brief, the state points to other late-19th century evidence. First the state points to *Frey*'s conclusion that "*enclosed* crowded spaces" writ large can be considered sensitive. ECF No. 142-1 at 44 (citing *Frey*, 157 F.4th at 135) (emphasis in original). But that conclusion was misguided; no such tradition exists. *See* Section II.C, *supra*. And, in any case, there is no fit between the proposed analogues and the public transport ban. *See Wolford*, 2026 WL 1825723, at *6–7, *12.

The state also asks the Court to find a tradition from private railway restrictions on firearm carry. Those restrictions were private regulations imposed at whim by private companies on their rail lines. Not only are they too late, but the state's proposed expert admits they the surviving records of those restrictions are too sparse to draw any kind of meaningful pattern, and certainly not a national historical tradition. *See* ECF No. 142-2, Rivas Dec. ¶ 45 ("[T]he safety regulations and ridership policies of most historical transportation service providers are no longer available").

44

But rather than follow *Bruen*'s command and properly weigh such historical silence, the state asks the Court to presume (from evidence that has been lost to time) that railroads *did* regulate firearms in the same way the CCIA does and for the same purposes. *See* ECF No. 142-1 at 46 (claiming that "[m]any railway companies . . . confiscate[d] guns and regulate[d] carriage of firearms on board trains"); ECF. No. 142-2, Rivas Dec. ¶ 45 (discussing lack of records but claiming surviving 19th century records should be given "added significance"). The state asks the Court to assume that prior actors regulated firearms in the same way because it suits the state's case. That is flatly contrary to the Supreme Court's command. The very few restrictions the state does cite are too late in time and cannot show anything other than policy choices being made by private companies. The Court should disregard this evidence.

The state does not attempt to rebut the fact that were no laws banning firearms carry on any form of shared or public transportation or transit at the Founding. *Cf. Frey*, 157 F.4th at 135–36; *Koons v. Platkin*, 673 F. Supp. 3d 515, 650 (D.N.J. 2023), *aff'd in part, vacated in part, rev'd in part sub nom., Koons v. Att'y Gen. New Jersey*, 156 F.4th 210 (3d Cir. 2025), *as amended* (Sept. 17, 2025), *reh'g en banc granted, opinion vacated*, 162 F.4th 100 (3d Cir. 2025); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 329–31 (N.D.N.Y. 2022), *rev'd on other grounds*, 120 F.4th 941 (2d Cir. 2024) (state failed to cite sufficient historical precedents to support the CCIA's carry bans as to aviation transport, airports, buses, and vans). In response to the colonial and Founding Era laws requiring travelers to carry arms, ECF Nos. 130-29, 30, 31, 32, the state makes reference to "active warfare with Native peoples," but fails to explain how those circumstances—American citizens carrying firearms in response to a potential "threat of attacks," ECF No. 142-34 at 204:25—are so markedly different from any Founding Era or contemporary situation giving rise to a self-defense need. ECF No. 142-1 at 46.

45

The public transport ban is not supported by historical evidence. Plaintiffs request that the Court enter an order enjoining the enforcement of the public transport ban.

**J.      The state failed to justify its airports ban.**

The CCIA bans firearms in any "place, conveyance, or vehicle used for . . . aviation transportation; or any facility used for or in connection with service in the transportation of passengers, [and] airports." N.Y. Penal Law § 265.01e(2)(n).

*Standing* – Mr. Stirnweis has standing to challenge the CCIA's airports ban. Mr. Stirnweis seeks to carry on airport property but does not wish to carry past TSA security. He also seeks to travel with a firearm, declared in checked luggage, as allowed under federal law. The state claims, without citing any source, that the first portion of the challenged provision "applies to the airplanes themselves" and that "common use" limits the meaning of the term "facilities" as used in the airports ban provision to "airport buildings" and not their grounds or parking lots. ECF No. 142-1 at 43–44. But the plain language of the statute does not agree with such limited reading.

The statute bans more than concealed carry; it bans simple "possession" of firearms in the listed locations. N.Y. Penal Law § 265.01-e(1). The first portion of the airport ban provision certainly bars possession of firearms in airplanes themselves ("conveyance, or vehicle used for . . . aviation transportation"), but it also bars possession in any "place" used for aviation transport. *Id.* § 265.01-e(2)(n). The word "place" is not limited or defined in any way and the state does not make any real attempt to dispute that it includes all airport property like parking lots, drop off and pick up lanes, terminal entrances, and baggage pick up areas outside of its own "common sense" interpretation. Because the CCIA imposes serious criminal penalties, Plaintiffs are rightfully worried about ensuring their actions comply with the law. And as the state admits, Plaintiffs

brought a pre-enforcement challenge; they do not seek to test the limits of the CCIA by first breaking it. *See* Section III.A, *supra*.

The second portion of the airport ban provision also bans firearms within airport "buildings," but again it bans firearms in many more places. It bans firearms in "any facility used for or in connection with service in the transportation of [airplane] passengers" as well as in "airports" broadly. *Facility*, Merriam Webster, https://www.merriam-webster.com/dictionary/facility (defining "facility" as "something (such as a hospital) that is built, installed, or established to serve a particular purpose"). Even if the plain language of the term "facility" did conform to the state's reading, the catchall term "airports" used in the statute is not limited to specific sections of an airport. Statutes must always be read to give their terms their ordinary meaning and when general terms are used, they should be read according to their ordinary, general meaning. *See, e.g.*, Antonin Scalia and Bryan A. Garner, "Reading Law: Interpretation of Legal Texts," 469 (2012). Common sense and the canons of construction confirm that a when broad general phrases like "any facility used in connection with" transporting airplane passengers and "airport" are used in a statute, they are read according to their broad, general meaning. The airports ban, by its clear terms, prohibits firearms on all grounds of an airport. An "airport" is not limited to its terminal buildings. It also includes the spaces where Plaintiffs seek to carry (like parking lots, drop off and pick up lanes, and baggage claims) and other spaces where Plaintiffs do not seek to carry (like runways, hangars, and air traffic control buildings). There is no indication from the statute that the airports ban is limited to "airport buildings," whatever that term means.

The state also offers a declaration that purports to allow ticketed passengers to possess firearms within airports so long as that possession complies with federal law. *See* ECF No. 142-26 ¶ 3. First, that "understanding" does not match the plain language of the statute. Plaintiffs cannot

47

rely on that interpretation to ensure they will not be prosecuted in the future, as "understandings" can change at will—especially when they run directly contrary to the actual language of a statute. And the state's interpretation of the airports ban does not deprive this Court of jurisdiction to adjudicate the constitutionality of the airports ban. "[V]oluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 445 (2d Cir. 2021) (same).

Because Plaintiffs seek to perform acts that are directly contrary to the terms of the statute, the state's interpretation is as immaterial to their standing as its self-imposed discretionary concessions are unenforceable. Even under its interpretation, the state does not explicitly state that it will not prosecute individuals (Plaintiffs included) for carrying firearms on unsecured airport grounds like parking lots or pickup lanes. Plaintiffs still seek injunctive relief because they otherwise cannot ensure that they will not be prosecuted for (1) carrying firearms on unsecured airport grounds or (2) possessing a firearm at an airport in compliance with federal law.

*Merits* – The state fails to meaningfully support the airports ban. The CCIA's ban on firearms at airports should be stricken. Plaintiffs are only interested in carrying in unsecured liminal areas of airports like parking lots, drop off and pick up lanes, terminal entrances, and baggage claim areas. *See* ECF No. 130-7, T.Stirnweis Dec. ¶ 9(d). Those areas are no different from other kinds of unsecured transportation terminals for which there is no historical tradition of banning carry and where self-defense concerns persist. Plaintiffs otherwise seek to possess firearms in airports, but only to the extent federal law allows. They do not seek to carry past airport security or otherwise possess a firearm in a controlled area of an airport in any way that

48

contravenes federal law. The state does not proffer any independent historical analogues to support the airports ban.

The state apparently attempts to justify both the public transit and the airports bans with citations to *Frey* and its discussion of mass transit systems to support the airports ban. Even if that reliance on *Frey*'s discussion of those transit systems was proper—and it is not, *see* Section III.I, *supra*—the state is attempting to compare New York City subway cars and Metro-North commuter trains to relatively open or open-air spaces like parking lots and pickup lanes. The state admits that *Frey* discussed highly compact "enclosed" spaces, 157 F.4th at 135, not the parking lots and other kinds of relatively open spaces where Plaintiffs seek to carry. *See* ECF No. 142-1 at 44. Even if it was appropriate to apply *Frey* here, *see* Section III.I, *supra*, the distinction is dispositive—highly enclosed spaces cannot be analogized to relatively open or open-air spaces when the relevant metric is the relative "crowdedness" of an enclosed space.

Plaintiffs cannot rely on the state's current interpretation of the airports ban to ensure they avoid prosecution in the future. Plaintiffs therefore request that the Court enjoin the airports ban with regard to airport grounds outside of TSA security and as it relates to possessing a firearm in checked luggage in compliance with federal law.

> **K.**     ***Christian* is not controlling as to the public parks provision because the state's expert has admitted facts in this case that directly undermine the findings in that case.**

The CCIA prohibits Plaintiffs from carrying firearms in public parks within New York. N.Y. Penal Law § 265.01-e(2)(d). The state bases its defense on *Christian*, but that decsion is not controlling here because the Court in that case did not have the benefit of the additional facts presented in this case, and is based on an inaccurate factual record. The *Christian* court reviewed the CCIA's public parks ban, codified at N.Y. Penal Law § 265.01(e), along with the state's expert

49

Young's opinion. *See Christian v. James*, 176 F.4th 189 (2d Cir. 2026). Young's declaration in that case, as the state admits, was "substantially identical" to the one he submitted here. ECF No. 142-1 at 23. A brief comparison of the two documents confirms that is the case. *Compare* ECF No. 130-53 *with* Ex. 9, *Christian* Young Dec. Plaintiffs seek to exclude Young's opinion in this case because he impermissibly presents legal opinions as well as factual opinions far beyond his area of expertise. *See* Pls.' Mot. to Exclude, ECF No. 145-2. But even more importantly, Young's opinions should be disregarded because he implicitly acknowledged that many of the historical findings contained in his declaration were incorrect.

In his declaration, Young opined on the meaning and scope of over a hundred historical restrictions, concluding that they supported the CCIA's public parks ban. ECF No. 130-53 ¶¶ 30–55. During his deposition, Young turned about-face, repeatedly admitting that he is "not a lawyer" and that he cannot offer an opinion on what those historical laws actually meant, what they regulated, or why they were enacted. Ex. 10, Excerpts from Young Dep. Tr. at 44:1–4, 89:10–23, 90:3–17, 94:3–9, 95:6–11, 97:7–24, 99:4–11, 117:21–118:17, 128:10–23. Despite using *Bruen*'s language and attempting to offer legal readings of historical laws in his declaration, ECF No. 130-53 ¶¶ 8, 15, Young testified that he was "not sure" that he had even "read the entire *Bruen* decision." Ex. 10, Excerpts from Young Dep. Tr. at 41:1–2. Young admitted in his deposition that he used those terms according to his "own" non-legal "understanding." *Id.* at 41:10–42:3.

Young's testimony directly undermines his declaration, which is replete with unsupported legal and factual conclusions. He acknowledged during his deposition that Founding Era green spaces were similar to modern parks because both were used for recreational and ornamental purposes. *Id.* at 59:5–79:9. Despite opining that late-19th and early-20th century firearm prohibitions in parks were "fundamental to the purpose and function of these spaces," ECF No.

50

130-53, Young Decl. ¶ 33, he agreed in his deposition that the social issues they allegedly attempted to cure were not "unprecedented." Ex. 10, Excerpts from Young Dep. Tr. at 101:17–102:5. No nuanced reasoning or reliance on late-19th century laws is warranted here.

The state readily admits that *Christian* "rel[ied] on Dr. Young's expert testimony" in forming its conclusions. ECF No. 142-1 at 24. But the court in *Christian* did not have the benefit of Young's testimony and concessions here when assessing his opinions and conclusions in that case. The court relied on Young's then-untested opinions on issues that his deposition confirms are simply wrong.

*Christian* relied on Young's opinion that "America's tradition of public parks was launched in the 1850s," 176 F.4th at 206, which Young repeats verbatim here, ECF No. 142-19 Young Decl. ¶ 8. He distinguishes "utilitarian" Founding Era parks from modern parks, which are allegedly "ornamental spots for sociability and relaxation." *Id.* But Young conceded at his deposition that Founding Era parks and modern parks share many relevant characteristics and purposes with modern parks from the 19th century through today. Ex. 10, Excerpts from Young Dep. Tr. at 59:5–79:8 (conceding that various Founding Era spaces, like modern spaces, were used for recreational and ornamental purposes); *id.* at 37:18–38:14; 81:24–83:18 (conceding that modern parks, like Founding Era parks, serve "utilitarian purposes").

*Christian* also relied on Young's opinions about Boston Commons to support its conclusion that Boston Commons did not serve recreational purposes and therefore is too dissimilar to modern parks to serve as an analogue. 176 F.4th at 206; *see also* ECF No. 130-53, Young Decl. ¶¶ 13, 15 (same). But Young admitted during his deposition that Boston Commons was used at the Founding "for informal socializing and recreation," "for strolling," "for horse and carriage riding," "for sports," for "celebration[s]," and for "religious preaching." Ex. 10, Excerpts

51

from Young Dep. Tr. at 59:22–61:18. Young's own testimony directly refutes his declarations in *Christian* and this case. His testimony also refutes the Second Circuit's conclusion that parks did not exist in the modern sense during the Founding. The Second Circuit relied on his declaration; his testimony shows that reliance to be misplaced and his prior statements to be inaccurate.

The state's references to 20th century national park regulations do not save its argument because those regulations are far too late to "provide insight into the meaning of the Second Amendment." *Bruen*, 597 U.S. at 66 n.28. In any case, the state claims National Parks "emerged from the same movement as urban parks." ECF No. 142-1 at 25. If that is the case, then National Parks and rural parks more generally fall within the same lineage as Boston Commons and other Founding Era parks, where there were *no firearm restrictions*. Without Young's false conclusions, the state cannot establish a national historical tradition of banning firearms in public parks. The public parks provision should be stricken.

**L.      The state cannot support its ban at places that serve alcohol.**

There is no national historical tradition of prohibiting firearms at places that serve alcohol. The CCIA's firearms prohibition at locations serving alcohol for on-premises consumption (the "bars and restaurants" ban), N.Y. Penal Law § 265.01-e(2)(o), is unconstitutional.

The statutes *Antonyuk* and the state cite do not support the idea that all people near anyone who is intoxicated should be disarmed. At most, they allow the state to prohibit intoxicated individuals from possessing firearms while they are intoxicated. The colonial and Founding Era militia statutes the state points to were "behavior-based"[5] and were therefore unlike the CCIA's

---

[5] Contrary to the state's assertion, ECF No. 142-1 at 26 n.12, Plaintiffs' rebuttal expert Lee Francis' opines that there was a Founding Era tradition of regulating "armed intoxication, not the mere presence of firearms in particular locations." ECF No. 142-38 ¶ 62; *id.* ("In other words, the concern was the condition and conduct of the individual, not the designation of entire places as categorically off-limits to peaceable carry").

location-based restrictions. *See Antonyuk*, 120 F.4th at 1032. Those militia statutes regulated the act of firearms carry while intoxicated, and as the state admits, were passed to "ensure that militiamen were competent to train and fight." ECF No. 142-1 at 27. The cited militia laws do not operate in the same way or govern the same populations as the CCIA. And the state cannot rest the CCIA's bars and restaurants ban upon broad principle that "mixing alcohol and guns" is "danger[ous]." *See id*. Such an overgeneralization is not allowed under the *Bruen* test. 597 U.S. at 29; s*ee Wolford*, 2026 WL 1825723, at *6–7, *12. Because the militia laws' mechanism does not match the CCIA's location-based prohibition barring all individuals from carrying in places serving alcohol, they are not proper analogues.

The state points to an early-19th century New Orleans municipal ordinance (requiring guests to check their weapons when entering a public ball), a general Louisiana concealed carry ban from 1813 (which did not ban open carry), and a mid-19th century New Mexico territorial law requiring anyone throwing a public ball with liquor to ensure no one is allowed to enter with a firearm. ECF No. 142-1 at 26–27. These outliers are not sufficient to overcome the lack of colonial or Founding Era laws barring firearms in locations serving alcohol. None of these laws were "widespread" or "widely accepted." *Wolford*, 2026 WL 1825723, at *14. As one of the state's proposed experts admits, the New Orleans municipal law came about in response to a highly localized issue relating to fights at public balls at the time. Ex. 3, Excerpts from Rivas Dep. Tr. at 130:16–131:5. Nor are the late-19th century laws that the state cites relevant because they directly contrast with the lack of colonial or Founding Era prohibitions on carrying in locations serving alcohol. Another one of the state's experts confirmed that no colonial or Founding Era laws prohibited firearms possession in places that sold alcohol. Ex. 6, Excerpts from Charles Dep. Tr.

237:20–24. The only location-based bans the state cites (the late-19th century laws) were "late-in-time outliers." *Bruen*, 597 U.S. at 70.

The state fails to provide proper analogues to support the bar and restaurant ban. The proffered laws are either mismatched or come too late to support a national historical tradition of banning firearms in places serving alcohol. The CCIA's bar and restaurant ban should be deemed unconstitutional.

### M.    The private property restriction cannot survive after *Wolford*.

The CCIA contains a presumption against firearms carry in privately owned spaces, whether open to the public or not (the "private property restriction"). N.Y. Penal Law § 265.01-d. Plaintiffs challenge the private property restriction as it applies to private property open to the public. As the Second Circuit properly held in both *Antonyuk* and *Christian*, there is no historical tradition of banning firearms at all on private property open to the public. *Antonyuk*, 120 F.4th at 1045–48; *Christian*, 176 F.4th at 195–202. And *Wolford*, just decided on June 25, 2026, properly reaches that same result. *Wolford*, 2026 WL 1825723, at *14. The private property restriction violates New Yorkers' right to keep and bear arms for self-defense.

### IV.    The licensing and automobile storage provisions are not supported by any historical tradition.

### A.    Licensing

The state fails to support its licensing requirements, N.Y. Penal Law § 400.00(1)(o), with historical analogues showing a tradition supporting the CCIA's requirements. Defendant Ryder is the only Defendant who supports the CCIA's licensing and renewal provisions. *See* ECF Nos. 140, 142-1, 143. But Defendant Ryder cites no historical analogues to support the CCIA's unconstitutional licensing and renewal scheme. In bare reliance on *Antonyuk* and his fellow Defendants' submissions, Defendant Ryder makes broad pronouncements that Nassau County's

licensing scheme is "facially constitutional." ECF No. 140 at 17. He submits no historical evidence in support of the challenged licensing provisions.

Defendant Ryder spends pages arguing that *Monell* applies to bar Plaintiffs claims against him. *Id.* at 8–14; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). But he seems to miss the fact that although he is an officer being sued in his official capacity, he is an individual, not a municipal government. While a municipality itself "likely cannot be enjoined from implementing mandatory state laws as to which it exercises no discretion," officers like Defendant Ryder and Defendant Harrison[6] absolutely can be. *Giambalvo v. Suffolk Cnty., New York*, 155 F.4th 163, 176 n.3 (2d Cir. 2025). In *Giambalvo*, the court rejected this argument, finding that federal courts can enjoin municipal officers "from enforcing state laws, if it finds those laws to be unconstitutional." *Id.*" [I]ndividual County defendants" like Defendants Ryder and Harrison "can be enjoined from implementing" challenged laws, even if they are "mandatory state laws." *Id.* And qualified immunity does not protect Defendants Ryder and Harrison from claims for declaratory or injunctive relief, such as those brought here. Defendants Ryder and Harrison can, and should, be enjoined from enforcing the CCIA's challenged licensing provisions.

***Standing –*** Mr. Stirnweis and Mr. Francis have standing to challenge the CCIA's licensing and renewal provisions. The standing inquiry here is far simpler than the state makes it out to be. No defendant disputes Mr. Stirnweis' standing to challenge the CCIA's licensing and renewal provisions. And there is no question that he has standing to do so. Mr. Francis likewise has standing

---

[6] Plaintiffs bring their licensing and renewal claims against the Suffolk County and Nassua County Police Commissioners (who also serve as those counties' licensing officers), in their official capacity. Counsel for the Suffolk County Defendant recently submitted a letter motion (ECF No. 143) in which they identified Kevin Catalina as the current Suffolk County Police Commissioner and Licensing Officer. Because Mr. Catalina has not yet been substituted as a party for Defendant Harrison pursuant to Federal Rule of Civil Procedure 25, Plaintiffs continue to refer to the Suffolk County Defendant as "Defendant Harrison" in this Reply.

because he is a resident of Nassau County and will be required to renew his license every three years indefinitely. Mr. Francis need not first be subject to an adverse licensing decision to have standing because it is the disclosure of information itself that is impermissible under the Second Amendment and the invasion of his privacy that makes the licensing provisions unconstitutional. Mr. Francis, by going through and continuously facing the licensing and renewal process, has been subject and will be subject to these unconstitutional requirements.

*Merits* – No defendant disputes Plaintiffs' arguments in favor of Mr. Stirnweis' challenge made in their opening summary judgment brief, but Plaintiffs respond to the state's arguments here as they relate to Mr. Francis' challenge as well out of an abundance of caution. Although licensing authorities may inquire into "an applicant's potential dangerousness," Antonyuk, 120 F.4th at 999, the disclosures mandated by the CCIA are impermissibly over-broad, invasive, and burdensome, discouraging applicants.

The CCIA's licensing provisions violate the Second Amendment because they do not have a basis in any historical tradition of licensing practices. The in-person meeting provision, paired with the "such other information" provision (the "catchall" provision) requires applicants to disclose any additional information a licensing officer deems necessary. No historical precedent supports such a broad disclosure by a concealed carry license applicant. But the disclosure goes even further—applicants are required to reveal to four other civilians that they are seeking a carry license or renewal of a carry license. Their application then also depends upon those sponsors' determination of their fitness to carry a firearm. Although minimally invasive licensing procedures are allowed under *Bruen*, the state does not have carte blanche to impose any licensing hurdles it sees fit.  There is no history or tradition giving the state the power to impose such broad disclosure requirements in concealed carry licensing.

56

### B.    Automobile storage restriction

The automobile storage restriction requires firearm owners to unload, specially lock inside an approved "depository," and conceal from view any firearms they store in their car when outside of their "immediate possession or control." N.Y. Penal Law § 265.45. Because the automobile storage restriction implicates the Second Amendment and is not supported by history, it should be stricken.

Rights that are "ancillary" to the central right to keep and bear arms for self-defense are also protected under the Second Amendment. *See New York State Firearms Ass'n v. James*, 157 F.4th 232, 244 (2d Cir. 2025). In *Heller*, the Supreme Court struck down a Washington, D.C. law that required firearms stored in the home to be unloaded and disassembled or specially locked. 554 U.S. at 635. *Heller* found that there was a right to keep firearms operable even when stored so that they may be readily usable for self-defense. *See id.* at 630, 635. The state's citation to *Oakland Tactical Supply, LLC*, the Sixth Circuit's "leading case on ancillary rights," ECF No. 142-1 at 51, is irrelevant because that court was discussing a "*hypothetical* storage regulation." *Oakland Tactical Supply, LLC v. Howell Twp. Mich.*, 103 F.4th 1186, 1195–96 (6th Cir. 2024). Here, the automobile storage restriction aligns very closely with the law stricken down in *Heller*. It clearly implicates the Second Amendment because it, like the law in *Heller*, requires specially locking and unloading a firearm to render it inoperable in case of emergency. Although the law at issue here only applies when a firearm is left outside of an individual's immediate control or possession, it additionally burdens the right to make oneself ready to respond to a self-defense scenario upon return to the vehicle and the stored firearm.

History does not support the automobile storage restriction. The state cites gunpowder storage and fire safety laws to support the restriction. As the state admits, though, gunpowder

57

storage laws were intended to ensure safe "storage of gunpowder" to avoid "the risk of explosions or fires" from exploding gunpowder. ECF No. 142-1 at 52 (quoting *Duncan v. Bonta*, 133 F.4th 852, 874 (9th Cir. 2025)). The state does not even attempt to argue that modern firearms and ammunition pose the same sorts of fire and explosion risks as an 18th century keg of gunpowder. The few colonial and Founding Era storage laws that regulate firearms storage to prevent theft are too few to create a national historical tradition. *See* ECF No. 142-1 at 53–54. And those laws operate differently than the CCIA—they have minimal requirements on the actual safe storage, allowing individuals to "safely dispose of" ammunition as they see fit, ECF No. 142-41 at 4, and requiring firearms and ammo to be spread amongst militia officers evenly, ECF No. 142-44 at 9.

The 20th century laws the state cites do not save the automobile storage restriction. None of those laws have matching mechanisms or purposes. Some were intended to prevent poaching, ECF No. 142-18 at 37 (act "Relating to the Use of Automobiles in Hunting Wild Birds and Animals"), and simply required firearms to be kept unloaded while in cars, *id.*. Still others simply created firearm carry licensing regimes. ECF No. 142-5 at 45 n.105 (discussing various carry licensing laws). None of those laws work in the same way as the CCIA. The automobile storage restriction should be struck.

## V.    Plaintiffs are entitled to judgment on their First and Fourteenth Amendment claims

### A.    The private property restriction fails under the First and Fourteenth Amendments too.

The state does not attempt to defend the private property restriction under the First Amendment. And it therefore concedes that the private property restriction is unconstitutional under the First Amendment. *Wolford* recently held that laws imposing a default concealed carry ban on private property open to the public violate the right to keep and bear arms as applied to the states through the Fourteenth Amendment. *See Wolford*, 2026 WL 1825723, at *14. New York's

private property restriction is unconstitutional under both the First and Fourteenth Amendment as well as the Second.

**B.**    **The sensitive place provisions create an overlapping web of bans so broad as to be unconstitutionally vague.**

The state's own brief undermines its argument that the CCIA's sensitive place provisions are "objective and easy to ascertain." ECF No. 142-1 at 58. As one example, the state argues—contrary to the language of the statute—that the word "airport" means exclusively "airport buildings," which (apparently) only means airport terminals and that "possession" doesn't really mean "possession." The state asks Plaintiffs to rely on its interpretation of that provision and, with a wink and a nod, implies that it will not enforce the express terms of the statute because "New York State Police's [current] understanding" of the statute does not match the words codified into law. *See* ECF No. 142-26. Setting aside whether Plaintiffs can rely on this representation, this proves that even the state itself fails to understand what the words of the CCIA mean. The scheme it has enacted is such a morass of overlapping and gap-filling prohibitions that no sane person could read the list of sensitive places and come away with an understanding that they could legally concealed carry a firearm anywhere within New York state except "[p]robably some streets." ECF No. 130-4.

This same issue arises with the public transport ban with regard to the meaning of the word "public." This certainly proves that the statute is comprehensive in where it bans carry. But it also proves that the confusion and disagreements about the interpretation and application of certain bans (such as the airports ban and the public transport ban) exemplify the CCIA's vagueness issues. The "tight web" of overlapping bans here makes it effectively impossible for a person to determine where he can carry. *Wolford*, 2026 WL 1825723, at *8. This in effect is the same as barring all

59

carry. The broad nature of the CCIA's language means that no reasonable person—and not even the state itself—can fully and finally identify where he may legally carry.

**C.      Licensing and automobile storage restrictions do not provide Plaintiffs equal protection of the law.**

The CCIA impermissibly discriminates against Plaintiffs and other applicants in favor of former police officers. N.Y. Penal Law §§ 265.01-D, 265.01-E, 400.01. Under the Fourteenth Amendment, governmental decisionmakers may not treat individuals differently when they are similarly situated. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). The state does not provide convincing reasoning for why Plaintiffs, who are required to train as part of the licensing scheme, are so different from trained officers of the law. Plaintiffs and former police officers are similarly situated because they are both civilians and New York residents who are subject to firearms training and education. There is no constitutionally sufficient rationale to justify this distinction. The CCIA also violates Plaintiffs' right to privacy under the Fourteenth Amendment. The CCIA's catchall provision, because it is unlimited in scope, cannot stand. But even if New York can require applicants to disclose certain personal information to a licensing officer during the licensing process, it cannot force applicants to disclose personal matters to fellow civilians as a bar to exercising their Second Amendment rights. *See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 762 (1989) (right of personal privacy includes "avoiding disclosure of personal matters") (citation omitted).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' Motion for Summary Judgment, declare that the CCIA's challenged provisions are unconstitutional under the First, Second, and Fourteenth Amendments to the Constitution, permanently enjoin their enforcement, and award Plaintiffs their attorneys' fees, and such other relief as is just.

60

Dated: July 1, 2026

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
Bradley Arant Boult Cummings LLP
1900 K Street NW, Suite 800
Washington, D.C. 20006
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com
jporter@bradley.com

*Counsel for Plaintiffs*

**OF COUNSEL**
W. Chadwick Lamar, Jr. (*pro hac vice*)
Mason A. Kruse (*pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue N.
Birmingham, AL 35223
clamar@bradley.com
mkruse@bradley.com

61

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st of July, 2026, the foregoing was served, via electronic delivery to Defendants' counsel via the CM/ECF system which will forward copies to all Counsel of Record.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)