UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ROBERT NASH, BRANDON KOCH, THOMAS STIRNWEIS, WAYNE FRANCIS, KHOURY PORTER, *and* SCOTT NOREN,

Plaintiffs,

-against-

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, RODNEY K. HARRISON, in his official capacity as Commissioner of the Suffolk County Police Department, and Licensing Officer for Suffolk County, *and* PATRICK J. RYDER, in his official capacity as Police Commissioner of the Nassau County Police Department, and Licensing Officer for Nassau County,

Defendants.

Case No. 1:22-cv-00907
(MAD/PJE)

---

**SUPERINTENDENT JAMES' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY
AND IN SUPPORT OF HIS CROSS-MOTION TO EXCLUDE WITNESSES F. LEE
FRANCIS AND ROSS LARSEN**

LETITIA JAMES
New York State Attorney General
The Capitol
Albany, New York 12224-0341
Attorney for Superintendent James

Jennifer J. Corcoran, NDNY Bar Roll No. 508740
Molly Thomas-Jensen, NDNY Bar Roll No. 705119
James M. Thompson, NDNY Bar Roll No. 703513
Of counsel

July 15, 2026

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

GOVERNING STANDARD ............................................................................................... 2

ARGUMENT ...................................................................................................................... 4

    I.     THE HISTORIAN EXPERTS ................................................................................. 4

          A.     History Is A Field Of Specialized Knowledge That Relies Upon Established Principles And Methods ........................................................................................ 4

          B.     Superintendent James' Historian Experts Are Qualified And Their Testimony Surpasses FRE 702's Requirements ...................................................... 8

          C.     By Contrast, Plaintiffs' Proffered Expert Is Unqualified And Offers Opinions Without Basis In Specialized Knowledge, Sufficient Facts, or Reliable Principles And Methods .................................................................................... 17

    II.    THE SOCIAL SCIENCE EXPERTS ...................................................................... 22

          A.     Dr. Reeping's Testimony Is Relevant ................................................................ 22

          B.     Dr. Reeping's Testimony Relies Upon Established Principles And Methodology, Sufficient Facts And Data, And Specialized Knowledge ........... 26

          C.     Dr. Larsen's Testimony Was Riddled With Errors And Bias, And Does Not Help The Trier Of Fact Understand The Evidence ........................................... 30

CONCLUSION ................................................................................................................... 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ...................................................................................5, 16, 25

*Bocoum v. Daimler Trucks N. Am. LLC*,
   No. 17-CV-7636 (JPC) (BCM), 2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ........................3

*Carbajal-Carbajal v. Blanche*,
   No. 23-6930, 2026 WL 1030149 (Apr. 16, 2026) ...................................................................10

*Christian v. James*,
   176 F.4th 189 (2d Cir. 2026) ........................................................................................ *passim*

*City of Chicago v. Morales*,
   527 U.S. 41 (1999)......................................................................................................................4

*Daniels-Feasel v. Forest Pharmaceuticals, Inc.*,
   No. 17 CV 4188, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021) ...........................................7, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)....................................................................................................................3

*Deutsch v. Novartis Pharms. Corp.*,
   768 F. Supp. 2d 420 (E.D.N.Y. 2011) ........................................................................................3

*Devito v. Smithkline Beecham Corp.*,
   No. 02-CV-745, 2004 WL 3691343 (N.D.N.Y. Nov. 29, 2004) .................................................3

*Do No Harm v. Pfizer Inc.*,
   126 F.4th 109 (2d Cir. 2025) ....................................................................................................34

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006).............................................................................................................23, 26

*F.C.C. v. Beach Commc'ns*,
   508 U.S. 307 (1993)..................................................................................................................24

*Frey v. City of New York*,
   157 F.4th 118 (2d Cir. 2025) .............................................................................................9, 12, 13

*Frey v. Nigrelli*,
   661 F. Supp. 3d 176 (S.D.N.Y. 2023)..............................................................................11

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).................................................................................................4, 32

*GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*,
   943 F. Supp. 2d 320 (N.D.N.Y. 2013).............................................................................18

*Glowczenski et al. v. Taser Intern., Inc.*,
   No. 04-CV-4052, 2012 WL 976050 (E.D.N.Y. Mar. 22, 2012)..........................................3

*Goldstein v. Hochul*
   680 F. Supp. 3d 370 (S.D.N.Y. 2023)..............................................................................13

*Hartford v. Ferguson*,
   676 F. Supp. 3d 897 (W.D. Wash. 2023)...........................................................................6

*Heller v. Doe*,
   509 U.S. 312 (1993).....................................................................................................24

*Higbie v. James*,
   795 F. Supp. 3d 307 (N.D.N.Y. 2025)..............................................................................20

*Hume v. Moore-McCormack Lines*,
   121 F.2d 336 (2d Cir. 1941)............................................................................................7

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018)..............................................................................31

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................................18

*In re Unisys Sav. Plan Litig.*,
   173 F.3d 145 (3d Cir. 1999)...........................................................................................35

*In re Vioxx Prods.*,
   489 F. Supp. 2d 587 (E.D. La. 2007)...............................................................................35

*In re Weinstein*,
   272 F.3d 39 (1st Cir. 2001)............................................................................................13

*In re Zyprexa Products Liability Litigation*,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..............................................................................4

iii

*Indep. Living Res. v. Or. Arena Corp.*,
    982 F. Supp. 698 (D. Or. 1997) ....................................................................................13

*Kipke v. Moore*,
    165 F. 4th 194 (4th Cir. 2026) .......................................................................................8

*Knife Rights, Inc. v. Bonta*,
    165 F.4th 1330 (9th Cir. 2026) .....................................................................................11

*Koons v. Attorney General of New Jersey*,
    156 F.4th 210 (3d Cir. 2025) ..........................................................................................8

*Koppell v. N.Y. State Bd. Of Elections*,
    97 F.Supp.2d 477 (S.D.N.Y. 2000) ..............................................................................32

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..............................................................................................3, 4, 20

*LaFave v. County of Fairfax*,
    No. 23 Civ. 1605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024) ..................................14

*Langbord v. U.S. Dep't of Treasury*,
    832 F.3d 170 (3d Cir. 2016)............................................................................................8

*LaRock v. Albany County Nursing Home*,
    No. 19 Civ. 604, 2024 WL 4566362 (N.D.N.Y. Oct. 24, 2024)....................................17

*Lego A/S v. Zuru Inc.*,
    --- F. Supp. 3d ---, No. 3:18-CV-2045, 2026 WL 905318 (D. Conn. Apr. 2, 2026) ........7

*Mar-Can Transp. Co., Inc. v. Local 854 Pension Fund*,
    722 F. Supp. 3d 355 (S.D.N.Y. 2024)...........................................................................17

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013)............................................................................................8

*McCoy v. ATF*,
    140 F.4th 568 (4th Cir. 2025) .........................................................................................8

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)......................................................................................................37

*McGregor v. Suffolk Cnty.*,
    No. 23-1130, 2025 WL 3704289 (E.D.N.Y. Dec. 22, 2025)............................................5

iv

*Mintz v. Chiumento*,
   724 F. Supp. 3d 40 (N.D.N.Y. 2024)................................................................5, 8, 20

*Nastri v. Dykes*,
   807 F. Supp. 3d 112 (D. Conn. 2025)..................................................................5, 14

*Nat'l Ass'n for Gun Rts. v. Lamont*,
   153 F.4th 213 (2d Cir. 2025) ....................................................................................5

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)................................................................................................25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022).............................................................................................. *passim*

*Nimely v. City of N.Y.*,
   414 F.3d 381 (2d Cir. 2005)..............................................................................3, 33

*NRA v. Bondi*,
   133 F.4th 1108 (11th Cir. 2025) ...............................................................................8

*Or. Firearms Fed'n v. Kotek*,
   No. 22 Civ. 1815, 2023 WL 4698752 (D. Or. May 31, 2023)...........................12, 24

*Or. Firearms Fed'n v. Kotek*,
   682 F. Supp. 3d 874 (D. Or. 2023) ...........................................................................6

*Ortega v. Grisham*,
   148 F.4th 1134 (10th Cir. 2025) ...............................................................................6

*Osterweil v. Bartlett*,
   819 F. Supp. 2d 72 (N.D.N.Y. 2011)......................................................................20

*Palmer v. Sisolak*,
   No. 21 Civ. 268, 2024 WL 4432818 (D. Nev. Oct. 7, 2024)...................................11

*Petroleos de Venezuela, S. A. v. MUFG Union Bank, N.A.*,
   No. 19 Civ. 10023, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025)..........................11

*Prohaska v. Sofamor, S.N.C.*,
   138 F. Supp. 2d 422 (W.D.N.Y. 2001) ....................................................................19

*Rocky Mtn. Gun Owners v. Polis*,
   121 F.4th 96 (10th Cir. 2024) ..................................................................................11

*Russell v. District of Columbia*,
  804 F. Supp. 3d 192 (D.D.C. 2025) ..............................................................................6

*Schoenthal v. Raoul*,
  150 F.4th 889 (7th Cir. 2025) .....................................................................................12

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................................32

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*,
  No. 6:15-CV-641-ORL-28TBS, 2017 WL 11457208 (M.D. Fla. Apr. 13, 2017)..................34

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
  467 F.3d 107 (2d Cir. 2006)...........................................................................................7

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997)...........................................................................................31

*Tiffany & Co. v. Costco Wholesale Corp.*,
  971 F.3d 74 (2d Cir. 2020)..............................................................................................7

*United States v. Carbajal-Flores*,
  143 F.4th 877 (7th Cir. 2025) .......................................................................................8

*United States v. Escobar-Temal*,
  161 F.4th 969 (6th Cir. 2025) (Thapar, J., concurring) ...............................................8

*United States v. Hemani*,
  No. 24-1234, 2026 WL 1751710 (U.S. June 18, 2026)................................................5

*United States v. Jackson*,
  5 F.4th 676 (7th Cir. 2021) ..........................................................................................13

*United States v. Kantengwa*,
  781 F.3d 545 (1st Cir. 2015)...........................................................................................7

*United States v. Rahimi*,
  602 U.S. 680 (2024).......................................................................................................10

*United States v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004)............................................................................................31

*United States v. Vazquez-Ramirez*,
  711 F. Supp. 3d 1249 (E.D. Wash. 2024) ......................................................................6

*Upstate Jobs Party v. Kosinski,*
   106 F.4th 232 (2d Cir. 2024) ...............................................................................................11

*Vann v. City of New York,*
   72 F.3d 1040 (2d Cir. 1995)...................................................................................................7

*Vermont Fed'n of Sportsmen's Clubs v. Birmingham,*
   741 F. Supp. 3d 172 (D. Vt. 2024)..........................................................................................6

*Vermont Fed'n of Sportsmen's Clubs v. Birmingham,*
   No. 2:23-CV-710, 2024 WL 2150522 (May 14, 2024) ............................................................6

*Waldman v. Palestine Liberation Organization,*
   171 F.4th 575 (2d Cir. 2026) .................................................................................................10

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001)................................................................................................................13

*Wolford v. Lopez,*
   No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026)................................................... *passim*

*Worth v. Harrington,*
   666 F. Supp. 3d 902 (D. Minn. 2023)......................................................................................6

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,*
   571 F.3d 206 (2d Cir. 2009)...................................................................................................13

**Federal Regulations**

91 Fed. Reg. 24444 .....................................................................................................................9

**Rules**

Federal Rule of Evidence 702........................................................................................... *passim*

Federal Rule of Evidence 704....................................................................................................7

Federal Rule of Evidence 401....................................................................................................3

**Miscellaneous Authorities**

Bruce A. Antkowiak, *Judicial Nullification*, 38 Creighton L. Rev. 545, 550 (2005)....................10

Michael Bentley, *Modern Historiography: An Introduction* (1999) ...........................................21

Stephen P. Halborook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* 39 (2021).......................................................................21

Tim Harris, The Right to Bear Arms in English and Irish Historical Context, *in A Right To Bear Arms? The Contested Role of History In Contemporary Debates On The Second Amendment* 23 (Jennifer Tucker, et al., eds., 2019) ......................................................21

*Primary, Secondary, and Tertiary Sources: A Quick Guide: Tertiary Sources*, Corn. Univ. Libr., https://guides.library.cornell.edu/sources/tertiary (May 22, 2025).....................21

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, respectfully submits this Memorandum of Law in opposition to Plaintiffs' motion to exclude testimony of Superintendent James' expert witnesses, ECF No. 145, and in support of his cross-motion to exclude the testimony of Plaintiffs' rebuttal witnesses F. Lee Francis and Ross Larsen.

## PRELIMINARY STATEMENT

An expert witness's testimony must be relevant and reliable. New York State Rifle & Pistol Association, Inc., Robert Nash, Brandon Koch, Thomas Stirnweis, Wayne Francis, Khoury Porter, and Scott Noren (collectively, "Plaintiffs") seek to exclude the testimony of each of Superintendent James' expert witnesses, arguing first that this Court should not look to expert historians to provide context, analysis, and interpretation of historical evidence and second that, notwithstanding the fact that they have put the efficacy of the challenged laws at issue, the testimony of an expert in the efficacy of sensitive places laws is "entirely irrelevant."

Taking the historical experts first: courts in the Second Circuit routinely rely upon expert historians to explain Anglo-American historical traditions, to situate particular analogue statutes within their proper historical context, and to explain both the "how" and the "why" of early firearms regulations. Superintendent James' historical experts—Patrick Charles, Dr. Brennan Rivas, and Dr. Terence Young—are leaders in their fields and are uniquely well positioned to evaluate historical evidence and proffer opinions to the Court about the history of firearms in public spaces in America and the ways in which governments have regulated the carriage of firearms in sensitive places and while they are being transported.

Plaintiffs seek to exclude Dr. Paul Reeping, an epidemiologist and expert on the efficacy of sensitive places laws, by arguing first that the testimony is irrelevant and then that the studies

1

Dr. Reeping relies upon are methodologically flawed. But their argument about relevance overlooks that: (1) they bring more than just Second Amendment claims; (2) they have put these laws' efficacy at issue (even as to their Second Amendment claims); (3) the "how" and "why" inquiry touches upon how these laws work, which is squarely within Dr. Reeping's methodology; and (4) Dr. Reeping's testimony is plainly relevant to whether they are entitled to a permanent injunction. Their arguments about methodology fall apart upon examination—Dr. Reeping's testimony is reliable and the product of his years of experience studying the efficacy of laws that restrict guns in sensitive places.

Plaintiffs' rebuttal witnesses—a law school professor and a "methodologist"—should be excluded. Professor F. Lee Francis has no training as a historian, no understanding of historical methods, and no opinions based on any expertise. His report offers nothing other than partisan argumentation and should be excluded. Dr. Ross Larsen has no background in epidemiology or in studying the effectiveness of gun laws, but more troubling are the errors in his reports and testimony, his over-reliance on generative artificial intelligence, his misrepresentations about his qualifications, and his refusal to answer questions about methodology during his deposition. Both rebuttal witnesses should be excluded.

## GOVERNING STANDARD

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence 702. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

2

is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

In assessing the admissibility of expert testimony under Rule 702, courts consider three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (i.e., whether the expert's testimony as to a particular matter will assist the trier of fact)." *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (*quoting Nimely v. City of N.Y.*, 414 F.3d 381, 396-97 (2d Cir. 2005)). Trial courts serve as gatekeepers for expert opinions and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In other words, whether an expert witness' "opinion is ultimately admissible depend[s] on the reliability and relevance of the proffered testimony." *Devito v. Smithkline Beecham Corp.*, No. 02-CV-745, 2004 WL 3691343, at *2 (N.D.N.Y. Nov. 29, 2004). A court must act as a "gatekeeper" even when testimony is non-scientific. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999).

The "trial court's gatekeeping task is to determine whether an expert's testimony is relevant to the task at hand. . ." *See Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011) (internal quotation marks omitted). Under Rule 401, evidence is relevant if it has it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. of Evid. 401; *see also Glowczenski et al. v. Taser Intern., Inc.*, No. 04-CV-4052, 2012 WL 976050, at *6 (E.D.N.Y. Mar. 22, 2012) ("The Court in *Daubert* described the Rule 401 relevance consideration as one of 'fit' requiring a 'valid scientific connection' between the subject matter of the expert's testimony and the factual issues to be determined by the jury."). The Court must

3

confirm that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. "Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony." *In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007). "Expert opinions based on insufficient facts or data, or on unsupported suppositions [are] not acceptable" and "[a]necdotal evidence and 'generalized assumptions' are inadequate bases for an expert report." *Id*. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## **ARGUMENT**

### I.     **THE HISTORIAN EXPERTS**

### A.     **History Is A Field Of Specialized Knowledge That Relies Upon Established Principles And Methods**

History is made up of facts, not legal arguments. There are accepted principles and methods to discover and examine those facts. And there are experts in those facts, principles, and methods—experts that courts across the country have found helpful in Second Amendment cases. Historical experts' testimony is admissible when they demonstrate the proper qualifications and apply the tools of their trade.

*1.  Historical experts provide helpful testimony regarding material facts.*

Analogical reasoning under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), requires fact-intensive analysis of historical evidence. First, a reviewing court must understand the contours of historical laws and practices that were "understood to be compatible

with the right codified by the Second Amendment." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *6 (U.S. June 25, 2026). That inquiry requires evidence about the underlying "regulatory challenges" that "earlier generations faced," including how those challenges relate to the ones "posed by firearms today." *United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at *5 (U.S. June 18, 2026) (quoting *Bruen*, 597 U.S. at 27). It might include evidence of whether the laws and practices were "widespread, well-known, and widely accepted." *Wolford*, 2026 WL 1825723, at *14. And depending on all these factors, historical evidence might carry more or less "probative value" in the legal inquiry that follows. *Id.*; *see also Antonyuk v. James*, 120 F.4th 941, 990 n.41 (2d Cir. 2024) ("Twentieth-century evidence is not as probative as nineteenth-century evidence."), *cert. denied*, 145 S. Ct. 1900 (2025). In short: A court can "apply faithfully the balance struck by the founding generation" only after it has assessed what that balance was. *Bruen*, 597 U.S. at 29 n.7.

Because that assessment often involves obscure historical facts and complex contextual judgments, courts in this Circuit and across the country have considered expert advice for virtually every historical finding that *Bruen*'s analysis requires. At the threshold of the analogical inquiry, courts have cited expert testimony to find that cases presented "'new circumstances' and 'modern regulations that were unimaginable at the founding.'" *Christian v. James*, 176 F.4th 189, 206 (2d Cir. 2026) (quoting *Bruen*, 597 U.S. at 28); *accord Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 237-38 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026). Courts have cited experts to identify historical analogues in the tradition of regulating sensitive places, *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 60-63 (N.D.N.Y. 2024); *Nastri v. Dykes*, 807 F. Supp. 3d 112, 139-40 (D. Conn. 2025), requiring licensure, *McGregor v. Suffolk Cnty.*, No. 23-1130, 2025 WL 3704289, at *3 (E.D.N.Y. Dec. 22, 2025),

5

preventing "episodes of mass violence," *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 199, 199-201 (D. Vt. 2024), and regulating the manner of weapons carriage, *Russell v. District of Columbia*, 804 F. Supp. 3d 192, 213-14 (D.D.C. 2025); *Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023). Experts have helped courts identify dangerous and unusual weapons, *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 904-05 (W.D. Wash. 2023), and categories of persons traditionally prohibited from possessing weapons, *United States v. Vazquez-Ramirez*, 711 F. Supp. 3d 1249, 1259 (E.D. Wash. 2024), *aff'd*, 163 F.4th 706 (9th Cir. 2026). Even courts that disagree with historical experts' analyses typically admit and engage with their testimony. *See Ortega v. Grisham*, 148 F.4th 1134, 1150 (10th Cir. 2025); *Worth v. Harrington*, 666 F. Supp. 3d 902 (D. Minn. 2023), *aff'd sub nom. Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024). *Bruen*'s analogical reasoning turns on questions of historical fact, and expert historians routinely help courts reach well-informed answers. Against this background, Plaintiffs cite no holding by any court that "[e]xpert witnesses are neither necessary nor appropriate for this Court's application of [*Bruen*]." ECF No. 145-2, Plaintiffs' Mem. of Law In Support of Motion to Exclude Expert Testimony ("P. Br.") at 1. Indeed, courts that have considered such arguments have consistently rejected them. An expert historian's "testimony," the District of Vermont held, "does not deal with whether [state] laws violate the Second Amendment. It deals with the history of American gun regulation, which is a verifiable issue of fact material to this litigation." *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-CV-710, 2024 WL 2150522, at *6 (May 14, 2024).

Nor is there anything unique about experts' role in Second Amendment proceedings. Plaintiffs object to Charles, Rivas, and Young's use of "[t]erms like 'history,' 'tradition,' 'analog,' and 'similar,'" which, they assert, "have a specific legal meaning." P. Br. at 14. Yet experts in civil

6

cases testify to dispositive issues in diverse areas of law. *Cf.* Fed. R. Evid. 704(a). In contract-interpretation cases, for example, experts can describe the meaning of key terms under industry "custom and practice." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133-34 (2d Cir. 2006). In Fourth Amendment use-of-force cases, parties can "[show] through expert testimony" that a police practice "presented an unusually high risk that constitutional rights would be violated." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). And in trademark cases, experts can testify to "similarities" between products, even though "similarity" is a dispositive legal standard. *Lego A/S v. Zuru Inc.*, --- F. Supp. 3d ---, No. 3:18-CV-2045, 2026 WL 905318, at *50 (D. Conn. Apr. 2, 2026) (citation omitted) (describing binding law); *id.* at *52 (quoting expert witness); *see also Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74 (2d Cir. 2020) (citing expert opinion regarding "confused" customers under "actual confusion" legal standard). That expert historians routinely testify in Second Amendment proceedings is unexceptional.

### 2. *Established principles and methods apply to historical inquiry.*

"[G]enerally accepted historical methodology" requires "'gathering multiple sources . . . including original and secondary sources' to reach conclusions about historical facts." *United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015) (quoting *United States v. Paracha*, 69 Fed. R. Evid. Serv. 130, 2006 WL 12768, at *20 (S.D.N.Y. Jan.3, 2006)). That methodology—and the "selection of 'significant' facts" that it entails—involves an "inherent subjective factor" because "history is not an exact science." *Hume v. Moore-McCormack Lines*, 121 F.2d 336, 346 (2d Cir. 1941).

Plaintiffs' arguments ignore this complexity. ECF 145-2 at 5-6, 23-24. Relying on *Daniels-Feasel v. Forest Pharmaceuticals, Inc.*, No. 17 CV 4188, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021), Plaintiffs repeatedly characterize historical judgments as arbitrary exclusions of relevant

7

data. P. Br. at 23-24. Yet all historians must make reasoned decisions about how to consider different sources. *See Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (describing expert historian's role "surveying a daunting amount of historical sources" and "evaluating their reliability" (quoting *Katengwa*, 781 F.3d at 562)); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013) (noting expert historians' role "synthesiz[ing] dense or voluminous historical texts"). And *Daniels-Feasel* describes a different situation—one where an expert failed to meet all four *Daubert* factors, "disregard[ed] the limitations expressed" by his sources, and "dismisse[d] inconsistent findings *without explanation*." 2021 WL 4037820, at *8 (emphasis added). Historians' reasoned judgments do not constitute the kind of bespoke and contradictory explanation (or lack of explanation) that *Daniels-Feasel* rejected.

### B.    Superintendent James' Historian Experts Are Qualified And Their Testimony Surpasses FRE 702's Requirements

#### 1.    *Patrick Charles Is One Of The Nation's Most-cited And Most-respected Historians On The History Of Firearm Regulation*

Mr. Charles is more than qualified to opine on the history of American firearms regulation, and his opinions are more than reliable, as evidenced by the multitude of federal courts, including this one, that have cited to his work in assessing American history and tradition. *See*, *e.g*, *Mintz*, 724 F. Supp. 3d at 59-63; *Kipke v. Moore*, 165 F. 4th 194, 217 (4th Cir. 2026); *United States v. Escobar-Temal*, 161 F.4th 969, 987 (6th Cir. 2025) (Thapar, J., concurring); *Koons v. Attorney General of New Jersey*, 156 F.4th 210, 230 n. 222, 252 n. 107 (3d Cir. 2025), *vacated pending en banc rehearing*, 162 F.4th 100 (3d Cir. 2025); *United States v. Carbajal-Flores*, 143 F.4th 877, 883-84 (7th Cir. 2025); *McCoy v. ATF*, 140 F.4th 568, 579 (4th Cir. 2025); *NRA v. Bondi*, 133 F.4th 1108, 1138 (11th Cir. 2025) (Rosenbaum, J., concurring); *id.* at 1177 (Brasher, J., dissenting); *see also* Declaration of Patrick J. Charles, attached to Corcoran Decl. as Exhibit A (hereinafter "Charles Decl."); Curriculum Vitae of Patrick J. Charles, attached to Corcoran Decl.

8

as Exhibit B (hereinafter "Charles CV") at 7-11 (listing courts that have cited Charles' scholarship). He holds an L.L.M. in Legal Theory and History from Queen Mary-University of London School of Law, has published four full-length books and dozens of articles on the history of firearm regulation, and has a decade-and-a-half of relevant historical experience in his day job as a senior historian for the United States Air Force. *See generally* Charles CV. And he cannot be politically pigeonholed, as evidenced by his regular practice of filing *amicus* briefs on behalf of neither party in significant Second Amendment cases, *see id.* at 11, and the Trump Justice Department's recent citation of Mr. Charles' opinion in favor of a historically-based right to transport firearms. *See* 91 Fed. Reg. 24444.

Plaintiffs' attack on Mr. Charles is geared less toward any objection to his expertise or methodology, and more toward antipathy to the historical conclusions he reached. *See* P. Br. at 9 ("Charles' conclusion demonstrates the inappropriateness of his testimony."). Plaintiffs accuse Mr. Charles of acting as "both advocate and judge," *id.* at 8, but he does no such thing; instead, his declaration is geared toward explaining "the history of the law restricting armed carriage in locations jurisprudentially referred to as 'sensitive places.'" Charles Decl. ¶ 4. This includes far more than just "helping [to] locate and provide historical evidence," as Plaintiffs would have it,[1] P. Br. at 8 (quotation omitted), but extends to providing broader historical context, including enumerating the English origins of sensitive place laws and their spread to early America,[2] *e.g.*,

---

[1] Mr. Charles' ability to locate and contextualize sources alone would nonetheless justify his role as an expert. Mr. Charles is perhaps the most accomplished current historian in terms of finding the local, county, and municipal ordinances that make up the majority of historical firearm measures. *See Frey v. City of New York*, 157 F.4th 118, 141 (2d Cir. 2025) (enumerating the "strong historical tradition of allowing localities to implement their own, often stricter, regulatory measures within their jurisdictions").

[2] Plaintiffs attack Charles for his opinion on the Statute of Northampton as "cherry-pick[ing] the historical record," but their quotation from the Francis Declaration' paraphrase of Sir John Knight's case underscores their lack of familiarity with it, as discussed in Section I(C)(3), below.

Charles Decl. ¶¶ 10-13, explaining the limits of what historians know and cannot know about the past, *e.g., id.* ¶¶ 11, 18, 29, considering non-legal sources to provide context, *e.g. id.* ¶ 30, and engaging not only with individual statues and ordinances, but with the historical scholarship analyzing them. *E.g., id.* ¶ 13, 16; *cf. Wolford*, 2026 WL 1825723, at *6 ("a variety of sources, including scholarship, may aid [the Court's] inquiry.").[3]

Plaintiffs object that Mr. Charles' testimony touches on the ultimate issue in the case, but "[a]s an initial matter, experts in civil cases may, while providing otherwise appropriate expert opinions, . . , provide ultimate-issue opinions." *Waldman v. Palestine Liberation Organization*, 171 F.4th 575, 597 (2d Cir. 2026) (citing Fed. R. Evid. 704(a)). But even if this were an issue, there is no plausible reading of the Charles Declaration as providing an ultimate-issue opinion: the testimony cites *Bruen* only once (for one of its historical holdings), *see* Charles Decl. ¶ 12, and does not presume to instruct the Court as to how it should apply the law to the historical facts and statutes it discusses. Nor is there any merit to their argument that the Charles declaration is inadmissible because his expertise is legal as well as historical in nature. Federal courts regularly consider the testimony of legal experts, particularly in cases involving foreign law. *See, e.g.*,

---

And they acknowledge, as they must, that the Knight case involved a jury acquittal, which is not legally precedential. *See* Bruce A. Antkowiak, *Judicial Nullification*, 38 Creighton L. Rev. 545, 550 (2005) (acquittal is "a joyous event for the client but a circumstance carrying no precedential value to later generations of litigators or clients"); Deposition Transcript of F. Lee Francis, attached to Corcoran Decl. as Ex. C (hereinafter "Francis Tr."), 201:9-202:18.

[3] Plaintiffs criticize Mr. Charles for his disagreement with certain of the Supreme Court's holdings, P.Br. at 22, but he is far from the only major historian with those criticisms. *See McDonald v. City of Chicago*, 561 U.S. 742, 914 (2010) (Breyer, J., dissenting) ("Since *Heller,* historians, scholars, and judges have continued to express the view that the Court's historical account was flawed."). Disagreement with the Supreme Court is no basis to exclude legitimate history, and there is no basis in law to impose an ideological test on what expert testimony federal courts will consider, particularly as historical evidence becomes more central to the constitutional analysis. *See United States v. Rahimi*, 602 U.S. 680, 717 (2024) (Kavanaugh, J., concurring) ("History, not policy, is the proper guide.").

*Carbajal-Carbajal v. Blanche*, No. 23-6930, 2026 WL 1030149, at *2 (Apr. 16, 2026)); *Petroleos de Venezuela, S. A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, 2025 WL 2675871, at *13 (S.D.N.Y. Sept. 18, 2025); *cf.* L.P. Hartley, *The Go-Between* 7 (Penguin Books 1953) ("The past is a foreign country: they do things differently there."). Federal courts will also consider testimony from legal experts in niche or highly technical areas of our own law. *See, e.g.*, *Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 246, 250 (2d Cir. 2024) (considering testimony from expert in New York election law). There is nothing inappropriate in an expert in historical laws providing his expertise.

### 2. Dr. Rivas Is A Deeply Qualified Scholar Whose Work Has Been Cited In Courts Across The Country

After objecting to Mr. Charles on the basis that he was a lawyer and constitutional expert, (P. Br. at 8), Plaintiffs object that "Rivas is not a lawyer," P. Br. at 3. They are correct—Dr. Rivas is a historian. *See also* Deposition Transcript of Dr. Rivas, attached to Corcoran Decl. as Ex. D (hereinafter "Rivas Tr."), 23:10-11 ("I'm here as a historical expert, not as a legal expert."). Although Dr. Rivas is earlier in her career than Charles or Young, having earned her Ph.D. in 2019, she has been widely published on the history and evolution of firearms laws in the 18th and 19th centuries, and now serves as Associate Director of the Center for the Study of Guns and Society at Wesleyan University in Connecticut. Federal courts across the country regularly cite her testimony or scholarship when attempting to understand our nation's tradition of firearm regulation. *See, e.g.*, *Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1343, 1345 (9th Cir. 2026); *Kipke v. Moore*, 165 F.4th 194, 211 (4th Cir. 2026); *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024); *Palmer v. Sisolak*, No. 21 Civ. 268, 2024 WL 4432818, at *6 (D. Nev. Oct. 7, 2024); *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 205 (S.D.N.Y. 2023), *aff'd sub nom. Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025). She is eminently qualified to "offer opinions as to what kinds

11

of firearms regulations existed during the relevant historical time periods, how and why those regulations came into existence, and what burdens those regulations imposed at the time." *Or. Firearms Fed'n v. Kotek*, No. 22 Civ. 1815, 2023 WL 4698752, at \*3 (D. Or. May 31, 2023) (rejecting *Daubert* challenge to Dr. Rivas' testimony).

Plaintiffs' characterization of Dr. Rivas' work as "largely only legal opinions and conclusions," P. Br. at 10, is unsupported by any good-faith reading of her Declaration. The historical analysis Dr. Rivas conducted is, of course, geared toward presenting "evidence that locational restrictions are a longstanding part of American gun regulation," and to connecting the laws at issue in this case to "Anglo-American legal history" and "public sentiment at the time." Declaration of Dr. Brennan Rivas, attached to Corcoran Decl. as Ex. E (hereinafter, "Rivas Decl."), ¶¶ 48, 51; *cf. Wolford*, 2026 WL 1825723, at \*11 (courts must "seek the general understanding of that codified right at the relevant point in time"). But Dr. Rivas' testimony discusses these issues through the lens of history, not law. Take her analysis of firearm prohibitions on public transportation; a legal argument would parse the Supreme Court's language in its Second Amendment jurisprudence or look to case law directly on point—perhaps *Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025), the governing precedent here, or *Schoenthal v. Raoul*, 150 F.4th 889, 921 (7th Cir. 2025), which cites Dr. Rivas. Viewing 21st century caselaw as a historical source is the approach Plaintiffs' purported expert takes, improperly. *See* Section I(C)(3), below. Dr. Rivas instead provides the history behind the law, demonstrating how States empowered private railways with police powers, Rivas Decl. ¶¶ 40-41, and how those entities (including the Albany Railway) had specific policies regulating or forbidding firearms on board, and confiscated weapons from passengers. *Id.* ¶¶ 42-44. This is providing the history of the law, not asserting legal conclusions and telling the Court how to rule.

Plaintiffs' second major criticism of Dr. Rivas is that her testimony "improperly opines as to legislative intent." P. Br. at 11. But there is no prohibition on expert testimony regarding legislative intent, and federal courts regularly view historical context as important to determining what a legislature's goals were. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) (Scalia, J.) (Looking to statute's "historical context" in determining meaning); *In re Weinstein*, 272 F.3d 39, 48 (1st Cir. 2001) (looking to the Bankruptcy Code's "historical context and its underlying policies.").[4] As to Plaintiffs' attack on Dr. Rivas as "cherry-pick[ing] evidence," P. Br. at 24, such allegations, even if true "go to the weight, not the admissibility, of the testimony," unless an expert's testimony is "so unrealistic and contradictory as to suggest bad faith," which Plaintiffs do not (and could not) contend. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009). More broadly, the historical assertions that Plaintiffs contend "destroy her opinions" have in fact been rejected by New York federal courts. *Compare, e.g.*, P.Br. at 24 (chastising Dr. Rivas for saying that scattered laws that required the carrying of guns in church were motivated by "a particular local problem" of "fear of attack) *with Goldstein v. Hochul* 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023) (finding that these laws "were passed so they could defend against potential attacks by Native Americans and Blacks during slave uprisings"

---

[4] Plaintiffs' authorities for the proposition that experts cannot testify on legislative intent are out-of-circuit, unpersuasive, and do not support the cited proposition. For instance, Plaintiffs cite *United States v. Jackson*, 5 F.4th 676, 681 (7th Cir. 2021), for the proposition that statutory interpretation (which is not the same as legislative intent) is a subject "on which expert testimony is prohibited." But *Jackson* did not make any such ruling and is completely inapposite: it concerned the propriety of a duplicity challenge in a criminal case; expert testimony was not at issue in any way. Similarly, *Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 765 (D. Or. 1997) involved testimony "on what the law means," not on legislative intent, and did not exclude the relevant testimony, only noting that the court did not "find such 'expert' testimony to be of much use." Notably, both cases involved the analysis of current laws rather than historical ones, and *Independent Living* even contemplated that expert testimony would be appropriate "where there is an issue regarding [] historical meaning." 982 F. Supp. at 765.

and "were not rooted in the Second Amendment's tradition"); *Frey*, 157 F.4th at 132 (placing early laws prohibiting guns "in fairs and markets" within "a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond.").

> 3.  *Dr. Young Is A Respected Authority Not Only On The History Of Regulations, But On The Specific Social And Historical Trends That Govern The Parks Question*

In keeping with their challenge-everyone approach, Plaintiffs also ask the Court to exclude the testimony of Dr. Terence Young, Emeritus Professor of Geography at California State Polytechnic University and an expert on the history of the parks movement whose work has been cited in courts across the country, including the Second Circuit. *See, e.g.*, *Christian*, 176 F. 4th at 206; *LaFave v. County of Fairfax*, No. 23 Civ. 1605, 2024 WL 3928883, at *11-12 (E.D. Va. Aug. 23, 2024), *aff'd in relevant part*, 149 F.4th 476 (4th Cir. 2025); *Nastri v. Dykes*, 807 F. Supp. 3d 112, 118, 139 & n.2 (D. Conn. 2025). Plaintiffs' criticism of Dr. Young is contradictory: they characterize his statement as "only provid[ing] legal opinions and conclusions," P. Br. at 6, and "offer[ing] legal arguments meant to sway this Court," *id.* at 13, but they also criticize his testimony for not being legal *enough*, pointing out that Young's use of language reflects "his 'own understanding,' **not** the meaning of those terms under *Bruen*," and that he "repeatedly admitted the obvious—that he is 'not a lawyer'." *Id.* at 12 (emphasis Plaintiffs'). That is, of course, as it should be: Dr. Young is opining not as an attorney but as a historical authority on parks, their characteristics, and their development.

What is missing from Plaintiffs' attack on Dr. Young is any argument that his testimony does not meet the standards of Federal Rule of Evidence 702. Plaintiffs do not argue that he lacks "specialized knowledge," Fed. R. Evid. 702(a), or that he is otherwise unqualified. Nor could they: Dr. Young has a Ph.D. in Cultural-Historical Geography from UCLA and has taught parks and

14

their history for decades. *See* Curriculum Vitae of Terence Young, attached to Corcoran Decl. as Exhibit F (hereinafter "Young CV"). He has published extensively on parks, wild areas, and the cultural and historical movements behind them, including publishing two full-length books: *Building San Francisco's Parks: 1850-1930* and *Heading Out: A History of American Camping*. *See id.* at 2. They do not dispute that his testimony is "based on sufficient facts or data," Fed. R. Evid. 702(b), and any such contention would be absurd given the "mountain of regulations" that Dr. Young included as exhibits to his declaration. *Christian*, 176 F.4th at 205; *see* Declaration of Terence Young, attached to Corcoran Decl. as Exhibit G (hereinafter "Young Decl."), Exs. 2-116. Nor do they take issue with Dr. Young's historical "principles and methods," Fed. R. Evid. 702(c), or dispute that his opinion reflects a reliable application of those principles and methods. Fed. R. Evid. 702(d).

Instead, Plaintiffs simply disagree with Dr. Young's conclusions and assert that the Court should accept their own legal argument over Dr. Young's historical expertise. Plaintiffs acknowledge that the Second Circuit "relied on" Dr. Young's opinion, P. Br. at 13; *see Christian*, 176 F.4th at 206, but disagree with his (and the Circuit's) conclusion, for two reasons. First, they say there were things they call "Founding Era parks," and that these locations "share relevant characteristics and purposes with parks in the 19th and 20th centuries." P. Br. at 13. And second, they argue that "Christian relied on Young's opinions about Boston Common to support its conclusion that Boston Common did not serve recreational purposes," and that therefore Young's conclusion is wrong. *Id.* This simply mischaracterizes both *Christian*'s holding and Dr. Young's testimony, which explained that these areas were "multi-purpose utilitarian spaces until the mid-nineteenth century," and discussed examples of non-recreational uses. Young Decl. ¶¶ 13-15; *see Christian*, 176 F.4th at 206 (acknowledging that these areas, including Boston Common, had "a

15

variety of uses, both practical and recreational."). None of this argumentation undermines Dr. Young's conclusion, and certainly none of it suggests any ground for exclusion under Fed. R. Evid. 702.

More broadly, Plaintiffs' criticism of Dr. Young underscores why their approach to excluding historian testimony is wrongheaded. True, New York could have simply introduced Dr. Young's "mountain of regulations," *Christian*, 176 F.4th at 205, and let them speak for themselves, and that alone should be enough to sustain the statute. *See, e.g.*, *Antonyuk*, 120 F.4th at 1018-26 (sustaining parks law's constitutionality without expert testimony); *cf. Wolford*, 2026 WL 1825723, at *6 ("A party defending against a Second Amendment claim may rely on a single analogue or a group of analogues."). But the testimony of a historian with genuine subject-matter expertise helps provide the Court with an important grounding in fact to help understand what is and isn't an analogue, and why. "Everything is similar in infinite ways to everything else," as the Supreme Court noted, *Bruen*, 597 U.S. at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 774 (1993)), meaning that clever lawyers will often be able to claim similarities based on legal argument alone—to claim, for instance, that there were such things as "Founding Era parks." P. Br. at 13. Historical expert testimony can provide the key to resolving these ambiguities, what *Bruen* referred to as a "metric enabling the analogizer to assess which similarities are important and which are not." *Id.* By explaining the history and development of the 19th Century parks movement, Dr. Young situates the "mountain of regulations" within its historical and cultural context. And through his knowledge of the historical facts about the nature and use of previous common spaces, which contained meetinghouses, livestock pens, militia exercises, cemeteries, workhouses, taverns, and "pest houses" for smallpox victims, Young Decl. ¶¶ 13-15, Dr. Young's expertise shows why Plaintiffs' legal argument for "Founding Era parks"

16

is not justified by the history.

That kind of insight is far from "inappropriate," P. Br. at 11, when courts evaluate history; in fact, it is compelling. There is no basis in law or fact to reject the Charles, Rivas, or Young Declarations.

**C.     By Contrast, Plaintiffs' Proffered Expert Is Unqualified And Offers Opinions Without Basis In Specialized Knowledge, Sufficient Facts, or Reliable Principles And Methods**

While Charles, Rivas, and Young are all trained historians explaining and analyzing "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, Plaintiffs' purported rebuttal expert, F. Lee Francis of Widener University Commonwealth Law School, is something altogether different. Francis is a partisan advocate with no meaningful historical training. He employs no legitimate historical methods and has provided the court with an *amicus* brief rather than a historical analysis.

### 1. Francis' Testimony Is A Lawyer's Amicus Brief, Not A Historian's Expert Analysis

Francis is a legal advocate rather than a historian, and the document he produced is an *amicus curiae* brief consisting of legal argument, rather than an expert opinion providing historical evidence and context. "Where an expert testifies as to legal opinions couched as expert testimony in support of summary judgment, that testimony cannot be considered." *Mar-Can Transp. Co., Inc. v. Local 854 Pension Fund*, 722 F. Supp. 3d 355, 363 (S.D.N.Y. 2024) (quotation omitted); *accord LaRock v. Albany County Nursing Home*, No. 19 Civ. 604, 2024 WL 4566362, at *5 (N.D.N.Y. Oct. 24, 2024).

Of course, Plaintiffs have attacked each of Charles, Rivas, and Young on this ground, *see, e.g.*, P. Br at 9, 11, 12, but the difference between Francis' brief and the historians' declarations is present on the face of the documents, both qualitatively and quantitatively. Francis directly

mentions or cites the *Bruen* decision 28 times, in contrast to twice in the Charles Declaration, once in the Rivas Declaration, and not at all in the Young Declaration. And when Francis does so, it is virtually always in the context of telling the Court what legal ruling to make, rather than in discussing any substantive aspect of English or American history.[5] *See, e.g.*, Report of F. Lee Francis, attached to Corcoran Decl. as Exhibit H (hereinafter "Francis Report") ¶30 ("these laws are of limited relevance to the historical inquiry required under *Bruen*"); *id.* ¶ 36 ("*Bruen* requires more."); *id.* ¶ 40 (State's historical laws "are not comparable under *Bruen*'s requirement[s]"); *id.* ¶ 45 ("*Bruen* requires evidence of comparable state-imposed restrictions, not policies adopted by private actors."); *id.* ¶ 55 ("Under *Bruen's* 'why' inquiry, the relevant question is . . ."); *cf. In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004) (cautioning against "'expert' witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise."). Francis testified he used "essentially the same process" to write his report as he would use for an *amicus* brief and could not identify any way in which he would have done anything different in generating an *amicus* brief as compared to his nominally historical expert testimony. Francis Tr. 185:19-186:9; *see also id.* 186:13-16.

"Courts within this Circuit have not hesitated to preclude expert reports and testimony that 'embodied legal conclusions and exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence.'" *GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 343 (N.D.N.Y. 2013) (D'Agostino, J.) (citation and brackets omitted). Because Francis—unlike each of the historian experts—has provided a brief telling the Court what to do rather than a declaration tracing the relevant history, his testimony should be excluded.

---

[5] Francis cites exclusively to conservative legal scholars, including Joseph Greenlee, the Director of Litigation for the National Rifle Association, parent entity of Plaintiff NYSRPA, an affiliation he did not disclose. *See* Francis Tr. 241:16-242:17.

> 2. *Francis Has Little Or No "Specialized Knowledge" That Would "Help The Trier Of Fact To Understand The Evidence"*

Even if Francis' report could be viewed as historical rather than argumentative in nature, any historical opinion he asserts would be inadmissible because he does not have the specialized knowledge required to assert it. Because Francis "lacks both practical and formal training, experience, and knowledge in the area," *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 437 (W.D.N.Y. 2001), his historical assertions will not benefit the trier of fact.

Unlike Charles, Rivas, and Young, Francis has no graduate degree in history or any related field, and he has never been employed as a practicing historian. *See* F. Lee Francis Curriculum Vitae, attached to Corcoran Decl. as Exhibit I (hereinafter "Francis CV"). Even as an undergraduate, Francis did not study the subject and could not recall any specific history course he took. Francis Tr. 27:19-28:7. After college, Francis taught high school social studies, but he was suspended without pay following an incident in which he attempted to desecrate an American flag as a part of a history lesson. *Id.* 41:6-42:8; 50:10-19. Eventually, Francis went to law school, where he did no coursework in the Second Amendment, firearms law, or legal history. *Id*. 123:4-124:12. After graduating he worked for the Army JAG Corps for two years, focusing on employment and sexual harassment matters, then spent a year as a Special Assistant U.S. Attorney in the Eastern District of North Carolina, but in neither role could he recall doing any work involving the Second Amendment. *Id.* 137:5-18; 139:7-21; 140:8-22. In 2023, Francis was hired to a tenure-track position at Mississippi College Law School, based on a connection. *See id.* 148:23-24 ("You know, they say it's all in who you know."). He immediately began publishing on hot-button cultural issues, first issues related to trans rights, *see* Francis CV at 2, and then, beginning with several paragraphs in a casebook in August 2023, on the Second Amendment. *Id.*; *see* Nicholas J. Johnson et al., *2023 Supplement for Firearms Law and the Second Amendment:*

19

*Regulation, Rights, and Policy* 308-10 (3d ed. 2023).

This background puts Francis in a unique position in the ongoing American culture wars, but none of it qualifies him as a historian. He holds no history degrees, has no historical training, has published in no historical journals, has never taught history above a high school level, and has never held a position on any history faculty. *See* Francis CV; Francis Tr. 172:17-173:4. He is, at most, an early-career law professor who works on Second Amendment issues, but he has done so for less than two years, which provides him with far less subject-matter experience than the Court already has given its decades of work and many published opinions on the subject. *See, e.g.*, *Osterweil v. Bartlett*, 819 F. Supp. 2d 72 (N.D.N.Y. 2011); *Mintz*, 724 F. Supp. 3d 40; *Higbie v. James*, 795 F. Supp. 3d 307 (N.D.N.Y. 2025). And whatever experience the last two years may have provided Francis with regarding the Second Amendment in general, it has given him little or none regarding the history of sensitive locations in specific: he has never taken any coursework on the subject, Francis Tr. 182:20-183:2, has never published any articles on sensitive places, *id.* 183:13-15, and has never even filed an *amicus* brief on the subject. *Id.* 184:16-22. Because Francis is not "qualified as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, his opinion should be excluded.

### 3.   *Francis' Testimony Is Not Based On Reliable Principles And Methods*

Lastly, there is no plausible basis to conclude that Francis' testimony "has a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd.*, 526 U.S. at 149 (alteration in original) (citation omitted). History is not a hard science, but it is a discipline with broadly-accepted techniques for research and analysis, of which Professor Francis is largely unaware. Francis was not familiar with the term "historical method." Francis Tr. 124:13-125:2. He could not correctly define the term "historiography." *Compare id.* 125:8-10 ("not just the study of history or . . . historical events, but it would also include looking at sources, whether primary or

20

secondary sources"), *with* Michael Bentley, *Modern Historiography: An Introduction*, at vii (1999) ("philosophy of history," or "deep-structural enquiry" examining a "school of historical writing," or methodological "explanation of what historians do and how they think"). He misdefined the term "tertiary source." *Compare* Francis Tr. 127:3-17 ("could be . . . contemporaneous with the primary document"), *with Primary, Secondary, and Tertiary Sources: A Quick Guide: Tertiary Sources*, Corn. Univ. Libr., https://guides.library.cornell.edu/sources/tertiary (May 22, 2025) ("publications that summarize and digest the information in primary and secondary sources"). He views 21st century Supreme Court opinions as historical sources. Francis Tr. 208:5-10. And his research was superficial: although his report relied heavily on the Sir John Knight case from 1686 to rebut Dr. Rivas' historical assertions, *see* Francis Report ¶¶ 15-19, he did not review any primary sources regarding the case beyond "the statute [of Northampton] itself" and "the short case as it is on Westlaw," explaining that "that's all that – that, you know, really seemed to be required." Francis Tr. 207:20-208:4.

That led him into error. While his preferred secondary source, Dr. Stephen Halbrook, wrote that "[t]he facts were undisputed that [Knight] had walked in the streets and went into church with a gun," those facts were very much in dispute. Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* 39 (2021). In fact, the Knight matter "is a more complicated case than usually recognized." Tim Harris, The Right to Bear Arms in English and Irish Historical Context, in *A Right To Bear Arms? The Contested Role of History In Contemporary Debates On The Second Amendment* 23 (Jennifer Tucker, et al., eds., 2019), attached as Exhibit J to the Corcoran Decl. Knight had been inflaming the Protestant population of Bristol against Catholics and Irishmen; the information against Knight was much broader than simply carrying guns into a church, focusing on "words which might tend to the disturbance of the

21

government" and "being a very disloyall and Sedition and ill affected man." *Id.* at 26. Knight testified that "he left the gun with a servant in the church porch" rather than taking it inside. *Id.* at 25-26. The jury "acquitted Knight because he was able to produce 'very greate Evidence of his Loyalty,' ' both to the late and this King,' which convinced the jury that Knight had not intended to 'Create feares and jealousies in the People Ag[ains]t the Govrnment' by his words and actions." *Id.* at 27; *see Bruen*, 597 U.S. at 44 n.11 (acknowledging "multiple plausible interpretations of *Sir John Knight's Case*"). Francis knew nothing of this context, despite testifying that it was "possible" he had read the Harris piece. Tr. 210:15-211:8. Francis did not know what city the Knight case was prosecuted in, did not know whether the church was within the city, and did not know whether Knight was Catholic or Protestant. *Id.* 204:25-206:11.

The record before the Court provides no basis to conclude that Francis' report "is the product of reliable principles and methods," Fed. R. Evid. 702(c), or that he approached his work in the manner a professional historian would. Superintendent James also notes that Francis testified that he utilized artificial intelligence in researching his report, though the nature and scope of that use is not fully clear, with a request to obtain Francis' AI prompts and responses currently pending before Magistrate Judge Evangelista. *See* ECF No. 144.

## II.    THE SOCIAL SCIENCE EXPERTS

In addition to the historian experts, Superintendent James designated Dr. Paul Reeping as an expert who has studied sensitive places laws from a data-driven, epidemiological perspective. Plaintiffs introduced Dr. Ross Larsen as a rebuttal expert, notwithstanding the fact that he had no training as an epidemiologist and no previous experience studying sensitive places laws or using crime data.

### A.  Dr. Reeping's Testimony Is Relevant

Dr. Paul Reeping has studied the efficacy of restrictions on carrying firearms in sensitive

22

places and currently serves as the Director of Data and Research at Vital City NYC, a think tank. Reeping Decl. ¶ 3-4, attached to Corcoran Decl. as Exhibit K. He has a Ph.D. in Epidemiology from the Columbia Mailman School of Public Health and was awarded a Postdoctoral Fellowship at the Violence Prevention Research Program at the University of California at Davis. *Id.* ¶ 3. Dr. Reeping has published 25 studies in peer-reviewed journals on numerous topics relating to public safety and gun violence. *Id.* ¶ 5. Dr. Reeping's declaration "review[ed] in detail the available peer-reviewed empirical studies that have evaluated [gun-free zones and sensitive place firearms laws]," and concluded that "multiple studies across distinct contexts find effects consistent with neutral or protective outcomes, and none provide empirical evidence that gun-free zones increase the likelihood of violence." *Id.* ¶ 11.

Plaintiffs argue that Dr. Reeping's testimony should be excluded because "*Bruen* expressly rejected any 'interest balancing' and 'means-end scrutiny in the Second Amendment context.'" P. Br. at 15. Plaintiffs urge this Court not to consider whether the CCIA is likely to reduce gun deaths, because it is, in their words, "wholly irrelevant." P. Br. at 15. This argument misses the mark, for at least four reasons. First, Plaintiffs have not brought only Second Amendment Claims. Second, Plaintiffs have repeatedly put the efficacy of the CCIA at issue in this case. Third, Dr. Reeping's testimony is relevant to "how and why" a challenged regulation works, which is indisputably relevant under *Bruen*, 597 U.S. at 29. And fourth, Plaintiffs seek a permanent injunction, which requires a balancing of the equities and consideration of the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)

First, Plaintiffs have brought non-Second Amendment claims, at least one of which requires means-end scrutiny. *See* Second Am. Compl. ¶¶ 113-49, ECF No. 63 (causes of action asserting violations of First, Fourth, and Fourteenth Amendments to U.S. Constitution). Dr.

23

Reeping's testimony is plainly relevant to the Plaintiffs' claims that the sensitive places and private property laws violate the Equal Protection clause and are void for vagueness. Under the Equal Protection clause, Dr. Reeping's testimony is relevant to whether there is a "rational basis" for the disputed classification. *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 313 (1993); *see also Heller v. Doe*, 509 U.S. 312, 320-21 (1993). And while the test of whether a law that is void for vagueness does not involve means-end scrutiny, how the law works in practice is relevant. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *cf., e.g.*, Reeping Decl. ¶¶ 17-20 (discussing theories about mechanisms by which sensitive places laws reduce gun violence and use of empirical evidence to test those theories).

Second, though Plaintiffs now argue that how well sensitive places laws work is not relevant to the constitutionality of the laws they challenge (P. Br. at 15), they have made an issue of whether the CCIA's sensitive places restrictions reduce gun violence. As one example, Plaintiffs argue that New York's prohibition on guns in bars should be struck down "[b]ecause intoxicated individuals pose a greater threat than non-intoxicated persons due to their inebriated state," and therefore the "danger—and the need to carry—is especially acute when sober people are in a place frequented by intoxicated people." Pls.' Mem. in Supp. of Mot. for Summ. J. 25-26, ECF No. 130-2. Dr. Reeping's testimony directly responds to this assertion, as he is a co-author of a study that evaluated the effectiveness of prohibitions on guns at alcohol-serving establishments and concluded that these prohibitions were associated with *reductions* in shootings near those establishments. Reeping Dec. ¶¶ 39 n.28, 41. Similarly, the Declarations that Plaintiffs filed in support of their Motion for Summary Judgment assert that Plaintiffs will be less safe in sensitive places without guns, which is another issue directly addressed by Dr. Reeping's Declaration. *Compare* Robert Nash Decl. ¶ 7, ECF No. 130-5, *with* Reeping Decl. ¶ 11. Plaintiffs cannot argue

24

about the efficacy of New York's laws at reducing gun violence and then turn around and seek to exclude expert testimony on that question. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel appropriate where a party argues "contrary position[s]").

Third, while *Bruen* eliminated means-end scrutiny as a method of Second Amendment analysis, Dr. Reeping's testimony is relevant to a different question under *Bruen*, namely "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. "[I]n examining history and tradition, a court must identify the societal problem that the challenged regulation seeks to address and then ask whether the challenged regulation is consistent with the principles that underpin our regulatory tradition for firearms." *Antonyuk*, 120 F.4th at 969 (citation modified), *cert. denied*, 145 S. Ct. 1900 (2025). While *Wolford v. Lopez* affirmed that means-end scrutiny is not applicable, the Court also emphasized that this analysis is "not mechanical" and "necessitates an exercise of judgment." 2026 WL 1825723 at *6. Because Dr. Reeping's testimony sheds light on how these laws work, it is relevant. *See, e.g.*, Reeping Decl. ¶¶ 15-16 (discussing private and public sensitive places, and additional security measures that frequently accompany sensitive places restrictions); *Or. Firearms Fed'n v. Kotek*, No. 22 Civ. 1815, 2023 WL 4698752, at *3 (D. Or. May 31, 2023) (rejecting *Daubert* challenge and finding testimony of social scientists "relevant to determining . . . whether [modern] and historical regulations 'impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" (quoting *Bruen*, 597 U.S. at 29)).

Fourth, Plaintiffs seek a permanent injunction, which requires that they show: (1) "irreparable injury," (2) the inadequacy of non-equitable relief, (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and (4) "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange,*

25

*L.L.C.*, 547 U.S. 388, 391 (2006). Dr. Reeping's testimony, which among other things, goes to whether these laws make Plaintiffs more vulnerable, as they contend, or whether they are associated with reductions in violence, is plainly relevant to these factors.

### B. Dr. Reeping's Testimony Relies Upon Established Principles And Methodology, Sufficient Facts And Data, And Specialized Knowledge

Many of Plaintiffs' arguments about the reliability of Dr. Reeping's opinions—and the underlying studies he cites—are premised on a misunderstanding of what Dr. Reeping testified. *See, e.g.*, P. Br. at 17 ("Reeping's study . . . cannot establish any causal relationship"). These straw-man arguments should be disregarded. Dr. Reeping's opinions were carefully tailored to the current state of knowledge about the effects of sensitive places laws. Dr. Reeping explained that, in epidemiology, "there are different levels of causation"—causation is not understood to be "binary." Dep. of Dr. Paul Reeping, attached to Corcoran Decl. as Exhibit L (hereinafter "Reeping Tr."), at 19:22-23. He further noted, "causal research usually requires an RCT which is a randomized control trial. A randomized control trial is not possible to do in this specific type of research." Reeping Tr. 19:6-10. And even RCTs do not conclusively establish causation. Reeping Tr. 22:11-16. Instead, Dr. Reeping testified that he had "fairly great confidence that gun free zone [and] sensitive place laws are unlikely to increase violence and I say it's also very possible and I would say moderate confidence that there is, at least in protective effects of these laws on preventing violence, in the places where they are enacted." Reeping Tr. 36:15-23.

Plaintiffs also dispute the methodology used in four of the five studies that Dr. Reeping described in his report. (Dr. Reeping cited numerous other studies, but five of these squarely address the effects of sensitive place laws and are therefore spotlighted in his report; all of these studies were published in peer-reviewed journals. *See* Reeping Decl. ¶¶ 22-41. Their arguments fall apart on examination.

26

The **St. Louis Study**[6] "compared firearm crimes occurring within federally defined gun-free school zones to crimes occurring in immediately adjacent areas where firearm carrying was permitted," which "allowed each gun-free zone to be compared directly to its surrounding area, thereby controlling for neighborhood characteristics and broader crime conditions." Reeping Decl. ¶ 36. Plaintiffs argue that it does not "establish" causation, P. Br. at 17, but Dr. Reeping's testimony does not seek to do so, instead noting that the study's "findings do not support the claim that gun-free school zones are targeted for firearm violence and are consistent with the conclusion that such zones are no more dangerous, and in some analyses less dangerous, than immediately surrounding areas." Reeping Decl. ¶ 38 (emphasis deleted). Plaintiffs argue that the fact that the study showed different results at different geographic variables should discount its effects, P. Br. at 17, but the effects at different geographic variables were precisely what the study was examining, as Plaintiffs' own rebuttal expert admitted. Dep. of Dr. Ross Allen Andrew Larsen, attached to Corcoran Decl. as Exhibit O (hereinafter "Larsen Tr."), at 143:3-11. Plaintiffs also argue that Dr. Reeping "conflated the effects of hard security (*e.g.*, fences, security cameras, on-site police), with the effects of the positive law banning firearms." P. Br. at 17. But as Dr. Reeping explained:

> The physical measures are often in place because of the gun free zone. So they're indistinguishable often in these places. A fence will often have a gun free zone on it. The way that these places are enforced to have people not bringing in guns are through these same physical structures that you are discussing.

Reeping Tr. 80:2-11; *see also* Reeping Tr. 85:5-14. And as he further explained, Dr. Reeping chose not to measure "hard security" as a variable in his study, out of a concern that it would bias the results and "could make the result and the study look even stronger than what they already are." Reeping Tr. 82:11-13. Plaintiffs also argue that the study "only captured about 12% of gunfire

---

[6] In this brief, Superintendent James uses Plaintiffs' shorthand for studies in Dr. Reeping's declaration.

incidents," leading to inaccuracy. P. Br. at 18. But as Dr. Reeping explained, the 12% estimate comes from Shotspotter data, which is likely overinclusive because it frequently counts fireworks, car exhaust, and similar noises as gunshots. Reeping Tr. 87:3-19. And, more to the point, his study relied upon the best and most accurate information available for shootings, police data, which is "the gold standard for reporting." Tr. 87:20-90:22.

The **Texas Alcohol Study** "examined whether prohibiting firearm carry in alcohol-serving establishments was associated with firearm violence near those establishments," and found that "establishments required to prohibit firearms experienced significantly fewer shootings within fifty meters than establishments that allowed firearms, with approximately thirty-seven percent fewer shootings overall." Reeping Decl. ¶¶ 39, 41. Plaintiffs attack this study on three grounds. First, they say that the fact that this effect was observed at a 50-meter radius, but not a 100-meter radius from alcohol-serving establishments makes the finding "arbitrary." P. Br. at 18. Not so. Rather, this difference "suggest[s] the effect was concentrated in the immediate vicinity of the establishment," Reeping Decl. ¶ 41, or as Dr. Reeping explained:

> If you have a very localized law within a block where you cannot carry firearms within a certain establishment that law is going to have less and less of an effect on gun violence as you move away from that establishment. We would not expect like a place that has gun free zone laws or sensitive place legislation in one town to have an effect across another town so there is -- you would expect there to be dissipating effects as it goes further away.

Reeping Tr. 155:10-21. Dr. Larsen argued that this should not have happened, but he could not explain why it was unreasonable for a study to find differing rates of gun violence in expanding geographic areas. Larsen Tr. 177:11-181:16. Second, Plaintiffs argue that aggregating bars with restaurants that serve alcohol "create[d] the misleading appearance of a broader protective effect." P. Br. at 18. But as Dr. Reeping testified, this is not an instance of "aggregation bias" because what Plaintiffs complain of "is heterogeneity and [is] expected across studies." Reeping Tr. 163:20-

28

165:13. Third, Plaintiffs argue that "any protective effect likely results from 'security infrastructure' in bars rather than Texas's firearm prohibition." P. Br. at 19. But as with schools, different bars and restaurants have very different levels of security, and excluding bars with more security would skew the data.

The **Active Shootings Study** "was a nationwide, matched case-control study examining the association between gun-free zones and active shootings at the level of individual establishments." Reeping Decl. ¶ 22. Plaintiffs' only argument is that the study's methods for assessing whether a location allowed guns were different in cases (where there had been an active shooting) from the methods used for control locations. P. Br. at 19-20. But during Dr. Reeping's deposition, he explained that, in fact, "[t]he standard for classifying the cases and controls were exactly the same." Reeping Tr. 187:7-9. While it was the case that the study had to drop more control sites because they could not verify the gun-free zone status, Dr. Reeping emphasized that the sensitivity analyses that he ran found no evidence the classification created a directional bias; and that in his professional opinion, it was unlikely to have done so. Reeping Tr. 194:14-21, 204:6-24, 207:6-15.

Though Dr. Reeping relied upon two studies about laws that allow guns on college campuses, Plaintiffs confine their attacks to one of these studies, the **Campus-Carry Study** (and appear not to dispute that the second study cited by Dr. Reeping ("the Gius Study"), which found the same effect, is methodologically sound). P. Br. at 20-21; *see also* Larsen Tr. 83:10-88:25. Plaintiffs rely on Dr. Larsen's testimony to argue that the Campus-Carry Study included in its data a campus that they deem to be "idiosyncratic"; that the study "incorrectly cod[ed]" when campuses began allowing guns; that it wrongly excluded similarly situated states from the cohort of states in the study; and that it "rel[ied] on unreliable data about campus-crime rates." P. Br. at 20. None of

29

these arguments held up to scrutiny in Dr. Larsen's deposition. For example, Dr. Larsen opined that Dr. Reeping should have included Idaho and Mississippi in the treatment group, because they were "functionally identical" to the included states. Report of Dr. Ross Larsen, attached to Corcoran Decl. as Exhibit M (hereinafter "Larsen Rep."), at 26. But in his deposition, he testified that his conclusion was based on "Google," and that he was unaware that both of these states did not broadly allow campus carry (unlike the treatment states). Larsen Tr. 226:19-233:16. Dr. Larsen also contended that relying on "advocacy-sourced classification" for classifying state laws was erroneous, Larsen Rep. 26, but when questioned, he did not know anything about the website in question, including that is a clearinghouse for statutes and college policies, redirecting visitors to the website to view state and college materials directly. Larsen Tr. 234:2-242:13.

Dr. Reeping's testimony is reliable and methodologically sound. Plaintiffs respectfully submit that his testimony can assist this Court in assessing how effective sensitive places laws are and how they work in practice.

C.    **Dr. Larsen's Testimony Was Riddled With Errors And Bias, And Does Not Help The Trier Of Fact Understand The Evidence**

Dr. Larsen's testimony should be excluded because he is not qualified and his testimony was neither reliable nor relevant. Dr. Larsen: (1) has no background in epidemiology and offered opinions that were too general to be reliable; (2) made errors in his report and testimony, including misrepresenting Dr. Reeping's opinions; (3) offered up opinions that he represented to be his own, but had in fact been drafted by a generative artificial intelligence platform; (4) misrepresented his qualifications and attempted to obscure evidence that might suggest bias; and (5) refused to answer questions about his opinions during his deposition.

Plaintiffs' rebuttal expert, Dr. Ross Allen Andrew Larsen, completed a Ph.D. in Educational Psychology at Texas A&M University. Ross Larsen Curriculum Vitae, attached to

30

Corcoran Decl. as Exhibit N (hereinafter "Larsen CV"). He confined his testimony to identifying what he deemed to be the flaws in the four studies Dr. Reeping co-authored but did not directly respond to Dr. Reeping's declaration (or even acknowledge that Dr. Reeping relied upon other studies in his declaration). Larsen Rep. at 4.

**Qualification:** "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted). "[A] district court may properly conclude that witnesses are insufficiently qualified . . . because their expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997). Dr. Larsen has no background in public health or epidemiology and could not remember if he had ever taken an epidemiology class. Larsen CV; Larsen Tr. 38:13-41:12. Nor could Dr. Larsen recall any previous work that he had done using crime data. Larsen Tr. 41:13-19. When asked about basic concepts in epidemiology, he struggled to answer. *See*, *e.g.*, Larsen Tr. 72:18-73:18 (epidemiological causation); 135:12-137:19 (centroid unit for geospatial analysis); 171:7-174:14 (basic epidemiological theory). At points, Dr. Larsen did not understand the direction in which bias was likely to run, which is a key analysis for assessing the reliability of epidemiological studies. Larsen Tr. 165:2-172:21 (assumptions relating to security levels at bars); 191:18-192:20 (assumptions relating to likelihood that excluded business would be small). Quite simply: Dr. Larsen is not qualified to testify about epidemiology or public health research. *See In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 251, 260, 278 (S.D.N.Y. 2018) (disqualifying expert based on mismatch between field of study and subject of testimony), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

**Relevance:** Dr. Larsen's testimony is not relevant because it does not address "the facts

31

before the Court." *Koppell v. N.Y. State Bd. Of Elections*, 97 F.Supp.2d 477, 480 (S.D.N.Y. 2000); *accord* Fed. R. Evid. 702(d). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146. Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. Dr. Larsen, as an expert witness, was expected to confine himself to rebutting the opinions of the opposing party's expert witness. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016). And while Dr. Larsen testified that his task was to assess the strength of the studies Dr. Reeping relied upon, Larsen Tr. 37:7-10, Dr. Larsen devoted much of his report to attacking straw-man assertions that appear nowhere in Dr. Reeping's report. Take, for instance, whether Dr. Reeping asserted causation. Dr. Larsen argued in his deposition that "he does make all those claims implicitly," *id.* 56:21, but he could point to no place in Dr. Reeping's declaration where he did so, *id.* 49:4-65:16. In other instances, he misapplied "burdens" that he believed (based on no explanation or based on a misunderstanding) Dr. Reeping should have met. *See*, *e.g.*, *id.* 213:3-219:14 (misapplying "first study ever" burden based on mistaken belief that there were similar studies to Dr. Reeping's active shooter study); *id.* 175:9-176:3 (arguing that every published study should describe every sensitivity analysis conducted, "to assuage my concerns as a reader").

**Reliability:** Dr. Larsen's testimony was riddled with errors. Among the many errors in Dr. Larsen's report are: (1) incorrectly asserting that Idaho, Mississippi, and several other states were "functionally identical" to states that allowed full "campus carry" on university campuses, Larsen Tr. 226:12-233:16 (discussing Larsen Rep. 25-26); (2) citing an out-of-date assessment from RAND corporation that had been superseded by a newer edition, *id.* 76:11-79:18; (3) arguing that quadrupling the study area constituted "the slightest perturbation" in a study's parameters, *id.*

32

177:6-181:16 (discussing Larsen Rep. 7); (4) asserting that gun-free enforcement zones in a study "independently deter[red] violence through access controls" without understanding that the areas study were heterogeneous in terms of access control, Larsen Rep. at 16; Larsen Tr. 202:14-207:21. These types of errors weigh against "the required indicia of scientific reliability" that *Daubert* and Rule 702 require. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

Perhaps more concerning, though, was that many of Dr. Larsen's opinions were not fully his own: they were generated by artificial intelligence ("AI"), which he did not affirmatively disclose. Upon questioning, Dr. Larsen revealed that he had brought AI-generated notes with him to the deposition and that he had used AI to edit his report. Larsen Tr. at 15:10-21, 146:9-12. The notes consisted of an AI-created "Deposition Cheat Sheet," with suggested answers to questions, instructions on how to "deflect[]" difficult questions, and a stock answer to give when "lost." *See* Deposition Cheat Sheet, attached to Corcoran decl. as Exhibit P (hereinafter "Larsen Sheet"). He relied upon the document while testifying, at one point parroting word-for-word the "thesis statement," that he later testified that the generative AI platform had drafted. *Compare* Larsen Tr. 46:11-18 ("my concern is that – that there is plausible alternative explanations for the observed results that the authors did not account for. In any observational study, the burden is – is on the researchers to demonstrate that competing explanations have been reasonably excluded before drawing a causal inference. The studies I evaluated did not meet that standard."), *with* Larsen Sheet ("THESIS STATEMENT—RETURN TO THIS WHEN LOST: "My concern is that there are plausible alternative explanations for the observed results that the authors did not account for. In any observational study, the burden is on the researchers to demonstrate that competing explanations have been reasonably excluded before drawing a causal inference. The studies I evaluated do not meet that standard."); Larsen Tr. 149:19-23 (confirming that AI drafted the thesis

33

statement). Just as plagiarism of an expert report may be a basis for exclusion, using AI to draft the central thesis statement of his testimony, and then not disclosing that fact, renders the expert's testimony (at best) unreliable. *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-CV-641-ORL-28TBS, 2017 WL 11457208 (M.D. Fla. Apr. 13, 2017).

The reliability of Dr. Larsen's testimony is further undermined by his lack of candor and credibility. Dr. Larsen's Curriculum Vitae ("CV") misrepresented facts both large and small about his work experience. Dr. Larsen's CV indicated that he had been a "Statistical Process Engineer" at Intel, but in fact he had been an intern. Larsen Tr. 34:18-37:2. When confronted about this discrepancy, incredibly, Dr. Larsen would not admit that engineer sounded more impressive than intern and instead argued "they're kind of equivalent." Larsen Tr. 36:22-23. Though this exaggeration of past work experience, on its own, would be concerning, Dr. Larsen also appears to have tried to obscure the fact that he works for a controversial conservative organization dedicated to rooting out diversity and transgender-inclusive education at medical school, while claiming at the same time to be "neutral and non-ideological." Larsen Tr. 244:5. On his CV, Dr. Larsen listed employment at an organization called "Cambridge Shield." Larsen CV. When asked about it in his deposition, he first described it as "a project that I am working on right now." Larsen Tr. 27:14-16. As questioning went on, it became apparent that he did not work for Cambridge Shield, but instead worked for a controversial non-profit, Do No Harm,[7] and that Cambridge Shield was simply a project name, and not an entity. Larsen Tr. 94:13-107:25. Once he admitted to working for Do No Harm, Larsen testified that he did not know the purpose of Do No Harm and

---

[7] "Do No Harm is a Virginia-based, nationwide membership organization whose stated mission is 'to protect healthcare from radical, divisive, and discriminatory ideologies, including the recent rise in explicit racial discrimination in graduate and postgraduate medical programs.'" *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 115 (2d Cir. 2025) (citation omitted).

that he "know[s] nothing about their work," (Larsen Tr. 30:23-31:5); that he did not know how much they paid him (Larsen Tr. 31:14-33:9); and that he had not updated his resume since he started working for Do No Harm, notwithstanding the fact that he had put "Cambridge Shield" on the resume (Larsen Tr. 99:24-100:16). These statements were not credible and should "call into question the Court's acceptance of him as an expert witness." *In re Vioxx Prods.*, 489 F. Supp. 2d 587, 594 (E.D. La. 2007); *see also In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156-57 (3d Cir. 1999) ("Because [expert] had testified untruthfully at *voir dire*, his testimony could well have been held unreliable."). Given that Dr. Larsen misrepresented facts on his CV, there is no reason to believe he would not do that in his report and testimony.

The misrepresentation about his work for Do No Harm was a part of a broader pattern that emerged during Dr. Larsen's deposition, in which he was evasive and sought to avoid getting to the truth of the matter. *See*, *e.g.*, Larsen Tr. 49:17-53:22 (refusing to acknowledge that Dr. Reeping did not assert causation in report); 55:13-65:16 (same; then arguing that it is "irrelevant" whether Dr. Reeping asserted causation); 69:23-72:17 (refusing to answer questions about how to design studies to test for causation); 110:6-117:10 (evading questions about assertion in report about security and violence on school grounds); 177:6-181:6 (evading questions about assertion in Larsen report that quadrupling of geographic area was "slight[]"); 187:2-191:16 (evading questions about workplace violence policies); 194:7-195:22 (same); 197:9-201:2 (evading questions about Dr. Larsen's assertion about Dr. Reeping's motivations); 207:22-212:15 (evading questions about definition of active shooting); 226:12-243:9 (evading questions about classification of treatment states for campus carry study). In one instance, Dr. Larsen refused to answer questions about how to design studies to assess temporality unless the State paid him for eighty hours of his time, and then he continued to evade questions. *Id*. 131:17-132:24, 126:12-

35

133:5. Dr. Larsen's attitude towards the truth-finding process is also apparent in the AI cheat sheet, which suggests techniques to look "thoughtful[]," provides tips to deflect questions, suggests answers to questions about bias and compensation, describes a technique as "Your #1 weapon", and provided a sheet of opposition research on the attorney taking the deposition. Ex. P. This type of gamesmanship and evasion is the opposite of what Rule 702 requires, namely that the expert witness "help the trier of fact."

**CONCLUSION**

For the reasons set forth above, and upon all prior proceedings, Superintendent James respectfully asks the Court to deny Plaintiffs' motion to exclude the expert testimony of Patrick Charles, Dr. Paul Reeping, Dr. Brennan Rivas, and Dr. Terence Young; grant his motion to exclude the testimony of rebuttal experts F. Lee Francis and Ross Larsen; and grant such other and further relief as the Court deems just and proper.


Dated: Albany, New York
       July 15, 2026


                                        LETITIA JAMES
                                        New York State Attorney General
                                        Attorney for Superintendent James


                                        By: _____

                                        Molly Thomas-Jensen
                                        Special Counsel
                                        NDNY Bar Roll No. 705119
                                        28 Liberty Street
                                        New York, NY 10005
                                        Tel.: (212) 416-8679
                                        molly.thomas-jensen@ag.ny.gov

                                        Jennifer J. Corcoran
                                        Assistant Attorney General


36

NDNY Bar Roll No. 508740
The Capitol
Albany, NY 12224
Tel: (518) 776-2581
jennifer.corcoran@ag.ny.gov

James M. Thompson
Special Counsel
NDNY Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-6556
james.thompson@ag.ny.gov

CC:  All Counsel of Record
     (via ECF)

37