# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., <br><br> ROBERT NASH, <br><br> BRANDON KOCH, <br><br> THOMAS STIRNWEIS, <br><br> WAYNE FRANCIS, <br><br> KHOURY PORTER, *and* <br><br> SCOTT NOREN <br><br> *Plaintiffs,* <br><br> v. <br><br> STEVEN G. JAMES, in his official capacity as Acting Superintendent of the New York State Police, <br><br> RODNEY K. HARRISON, in his official capacity as Commissioner of the Suffolk County Police Department, and Licensing Officer for Suffolk County, *and* <br><br> PATRICK J. RYDER, in his official capacity as Police Commissioner of the Nassau County Police Department, and Licensing Officer for Nassau County <br><br> *Defendants.* | Civ. Action No. 1:22-cv-00907-MAD-PJE |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY AND IN OPPOSITION TO DEFENDANT JAMES' CROSS-MOTION TO EXCLUDE**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................ 1

I.      The Court can resolve the summary judgment motions without expert testimony............. 1

II.     Charles' opinions should be excluded................................................................ 4

III.    Rivas' opinions should be excluded.................................................................. 6

IV.     Young's opinions should be excluded................................................................ 9

V.      Reeping's opinions should be excluded. .......................................................... 10

VI.     If the state's experts meet the Rule 702 standard, so do Plaintiffs' experts. ...................... 11

        a.   Francis' rebuttal opinions should not be excluded....................................... 11

        b.   Larsen's rebuttal opinions should not be excluded. ................................... 13

CONCLUSION............................................................................................................. 14

CERTIFICATE OF SERVICE ....................................................................................... 16

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*,
  2011 WL 13254283 (E.D.N.Y. Apr. 1, 2011) ..................................................................2

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*,
  37 F.3d 804 (2d Cir. 1994)..............................................................................................1

*Burkhart v. Washington Metro. Area Trans. Auth.*,
  112 F.3d 1207 (D.C. Cir. 1997)........................................................................................1

*D.C. v. Heller*,
  554 U.S. 570 (2008)....................................................................................................10, 11

*Daniels-Feasel v. Forest Pharms., Inc.*,
  No. 17 CV 4188-LTS-JLC, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021)..............................4

*Fisher v. Kanas*,
  487 F. Supp. 2d 270 (E.D.N.Y. 2007) ..............................................................................10

*Frey v. City of New York*,
  157 F.4th 118 (2d Cir. 2025) ........................................................................................7, 12

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992)..........................................................................................2, 5

*In re Initial Pub. Offering Sec. Litig.*,
  174 F. Supp. 2d 61 (S.D.N.Y. 2001)..............................................................................2, 5, 6

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010)....................................................................................................10, 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) .......................................................................................... *passim*

*Rutledge v. Walgreen Co.*,
  No. 24-1121, 2026 WL 2015284 (2d Cir. July 13, 2026)........................................................6

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................................1, 3, 5

*In re Unisys Sav. Plan Litig.*,
  173 F.3d 145 (3d Cir. 1999)..............................................................................................8

*United States v. Rahimi*,
    602 U.S. 680 (2024).................................................................................................12

*In re Vioxx Prods.*,
    489 F. Supp. 2d 587 (E.D. La. 2007).......................................................................8

*Wolford v. Lopez*,
    No. 24-1046, 2026 WL 1825723 (2026) ................................................2, 3, 10, 11

**Other Authorities**

*Donor and Financial Transparency*,
    https://www.thetrace.org/donor-financial-transparency/ .........................................8

Guns & Society, *CSGS Research*, https://gunsandsocietycenter.com/csgs-
    research/ ....................................................................................................................8

Patrick J. Charles, *The Second Amendment and Heller's "Sensitive Places"
    Carve-Out Post-Rahimi: A Historiography, Analysis, and Basic Framework*,
    58 UIC L. Rev. 813, 835 (2025) ...............................................................................5

**INTRODUCTION**

The Court can decide the issues in this case without the hundreds of additional pages of state briefing masquerading as "expert reports." The state's history experts—Charles, Rivas, Young—all should be excluded because they seek to provide legal conclusions and unreliable opinions barred by the Federal Rules of Evidence and Second Circuit precedent. And the state's interest-balancing expert—Reeping—should be excluded because his opinions are unreliable and irrelevant.

**ARGUMENT**

**I.    The Court can resolve the summary judgment motions without expert testimony.**

The parties agree the material facts are not in dispute and no experts are necessary to help the Court determine whether either side is entitled to judgment as a matter of law. The Court is the appropriate expert when it comes to interpreting historical as well as contemporary statutes and drawing legal conclusions. *Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (citing *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977), *cert. denied*, 434 U.S. 861 (1977)); *accord In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 826–27 (2d Cir. 1994), *abrogated on other grounds by Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996). Because the Court is performing functions that are within its own expertise as a jurist, it needs no assistance from the state's proposed experts. *See Burkhart*, 112 F.3d at 1213 ("[e]ach courtroom comes equipped with a 'legal expert,' called a judge" (citing *Marx & Co.*, 550 F.2d at 509–10)).

The merits evidence in this case consists of historical laws and regulations which are for the Court to interpret. And the parties' counsel—not their experts—should provide legal arguments based on legal precedents. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016)

1

(citations omitted); *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 69 (S.D.N.Y. 2001) (quoting *Nichols v. Univ. Pictures Corp.*, 45 F.2d 119, 123 (2d Cir. 1930)); *cf. Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

The state's experts gratuitously submit hundreds of pages of "would-be briefs" serving up legal conclusions under the guise of expert opinion. *246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*, 2011 WL 13254283, at *6 (E.D.N.Y. Apr. 1, 2011); *see, e.g.*, Rivas Decl. ¶ 12 ("These laws . . . together with colonial-era analogues provide ample support for modern prohibitions against carrying weapons into government buildings and entertainment venues."); *id.* ¶ 29 (discussing "evidence in favor of the constitutionality of historical locational restrictions"); *id.* ¶ 51 ("the historical evidence about locational restrictions and the regulation of weapons aboard public transportation supports modern sensitive place laws"); Charles Decl. ¶¶ 19, 45–46; Young Decl. ¶¶ 8, 15, 31. The central question presented to the Court is a purely legal one: whether historical analogues support New York's modern prohibitions against carrying weapons in certain locations. *See Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *6, *8–9 (2026); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 29 (2022). Defendants would have their experts usurp the role of the Court.

The state points out that other courts have previously cited its proposed experts. But, as Plaintiffs have already shown, credulous adoption of their opinions is not indicative of their reliability. *See* ECF No. 145-2 at 12–14. At least one of these experts has already led another court into adopting mistaken conclusions. In *Christian,* Young's then-untested opinions in his "substantially identical declaration," ECF No. 142-1 at 23, misled that court into adopting conclusions that Young has since admitted were incorrect. *See* ECF No. 145-2 at 12–14, 21–22.

2

The state also suggests that the court's interpretive function "might include," ECF No. 150-1 at 5, reviewing whether proposed analogues are "widespread, well-known, and widely accepted." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at \*14 (June 25, 2026). But reviewing courts "must consider" those factors. *Id.* Supreme Court precedent requires that every court faced with a Second Amendment challenge perform the *Bruen* analysis based on the historical analogues presented by the parties. If an analogue can meet *Bruen*'s requirements, it may inform the court's analysis; if not, it may not be considered. *See id.* In any case, that interpretive function involves legal analysis and conclusions that are reserved for the Court, not for experts. *See Scott*, 315 F.R.D. at 48 (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), then citing *Hygh*, 961 F.2d at 363); *id.* ("courts exclude expert testimony that provides legal opinions, legal conclusions, or interprets legal terms" since "those roles fall solely within the province of the court") (cleaned up).

Allowing these "experts"—a non-barred J.D., an "earlier . . . career" history Ph.D., and a geographer—to provide legal arguments regarding the constitutionality of modern laws is far outside the bounds of the Federal Rules of Evidence and Second Circuit precedent. A thin veneer of "historical" polish cannot obscure the framework of legal conclusions the state's experts try to build. Charles, Rivas, and Young blatantly use *Bruen* buzzwords in their "historical" analysis to present their legal conclusions as historical. But, again, the danger of accepting their legal conclusions is on full display here.

Young's now disavowed legal conclusions misled the *Christian* court, *see* ECF No. 145-2 at 12–14, but the state nevertheless demands that the Court accept those conclusions here. The state asks the Court to swallow Charles' and Rivas' legal interpretations whole—including various

analogues' legislative intent and purpose, relevance within the national "historical tradition," and propensity to "support . . . modern prohibitions against carrying weapons."

The state dismisses its experts' failure to account for more directly on-point historical analogues and lack of Founding Era evidence, blithely defending these critical omissions as "reasoned decisions about how to consider different sources." ECF No. 150-1 at 8. *Daniels-Feasel* involved a similar "selective review" that the court found unreliable. *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 WL 4037820, at *16 (S.D.N.Y. Sept. 3, 2021), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023). The state's experts, like in *Daniels-Feasel*, failed to consider or discuss contrary evidence. *See id.*; ECF No. 145-2 at 22–25.

Rivas not only ignores *Bruen*'s empirical, evidence-based test, but asks the Court to presume (from a lack of evidence, no less) that there is a national historical tradition of restricting firearm carry on board railways and public transportation. Rivas Decl. ¶¶ 39, 45, 50. She nevertheless admitted during her deposition that because "we don't know what we don't know," courts can only rely on the records of regulations that have been found and must account for a tradition of freedom from regulation in the absence of regulations. Rivas Dep. Tr. at 187:7–13. The Court should not accept the state's invitation to manufacture any national historical tradition of regulation from a lack of regulations. The absence of regulations can mean only one thing: a tradition of freedom from regulation.

## II. Charles' opinions should be excluded.

Charles' opinions and testimony should be excluded. The state vainly attempts to rehabilitate Charles by pointing to his amicus briefing history. It claims he resists "political[] pigeonhol[ing]" because he has a "regular practice of filing *amicus* briefs on behalf of neither party in significant Second Amendment cases." ECF No. 150-1 at 9. A cursory review of those

"unbiased" submissions mainly offering conclusions identical to those contained in his declaration in this case will tell the Court everything it needs to know. But to avoid doubt, Charles himself confirmed the obvious: he has never filed an amicus brief in support of a party challenging a firearm restriction. Charles Dep. Tr. at 83:4–15. In his fourteen appearances as a paid expert witness, Mr. Charles has always served as "an expert for the government imposing a firearm restriction." Charles Dep. Tr. at 43:11–15, 45:3–11. And he admits that much firearm regulation research is "advocacy masquerading itself as objective fact-based history." *See* Charles Dep. Tr. at 59:4–60:9, 64:18–65:5; *see also* Patrick J. Charles, *The Second Amendment and Heller's "Sensitive Places" Carve-Out Post-Rahimi: A Historiography, Analysis, and Basic Framework*, 58 UIC L. Rev. 813, 835 (2025).

Notwithstanding the weight of contrary precedent, the state argues that Charles' legal conclusions are "ultimate-issue opinions" and that historical laws are so highly technical as to be like foreign law, requiring the intervention of a legal expert to explain how the Court should view those laws. But the state's position is untenable. The state ignores Charles' own admission that his opinions are unnecessary. Charles Dep. Tr. at 40:4–12. And it admits that the Court is eminently qualified to make legal conclusions without expert help, "given its decades of work and many published opinions on the subject." ECF No. 150-1 at 20. The state ignores that the law at issue here is American, not foreign law. The state cannot overcome the Federal Rules of Evidence and controlling Second Circuit precedent that bar Charles from offering legal analysis or conclusions. *See Hygh*, 961 F.2d at 363; *see also Scott*, 315 F.R.D. at 48; *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d at 69.

Charles is not an attorney. Charles Dep. Tr. at 25:8–13. He has never been barred, *id.*, and he is not serving as counsel in this case. The Federal Rules of Evidence do not permit Charles to

offer legal conclusions, and the state does not explain how this case presents interpretive issues that allow a deviation from the rule barring expert opinions that assert legal conclusions. *See In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d at 69 ("[L]awyers make arguments, judges write legal opinions—and there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court."). Charles' legal conclusions in the guise of historical analysis should be excluded.

The state also points to Charles' publications and CV as evidence of his reliability, but it cannot overcome the lack of evidentiary support for his opinions. As Plaintiffs demonstrated in their opening brief, for example, Charles dismissed Plaintiffs' historical evidence because they purportedly lacked "enforcement records" but then conceded that he had "no enforcement records" to support his own interpretations of history. *See* Doc. 145-2 at 22–23. In other words, Charles' opinions are speculative and unreliable by his own reasoning. The state has no answer. Regardless, the state's unsupported "appeal to authority" is routinely rejected by courts considering the reliability of an expert opinion. *Rutledge v. Walgreen Co.*, No. 24-1121, 2026 WL 2015284, at *9 (2d Cir. July 13, 2026) (*citing Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). His opinions should be excluded as unsupported and unreliable.

## III.    Rivas' opinions should be excluded.

As with Charles, Rivas' opinions and testimony should be excluded. The state claims that Rivas' opinions cannot possibly be legal conclusions because she avoids citing case law. But such a superficial distinction between her opinions and the state's briefs ignores the crux of Plaintiffs' objection: that Rivas, like Charles and Young, presents legal argument and conclusions under the guise of historical analysis. The content of Rivas' opinions is apparent. She presents legal conclusions and advocacy under a thin veneer of "history." *See, e.g.*, Rivas Decl. ¶ 12, 29, 51. One

6

of the best examples of this advocacy masquerading as history is "her analysis of firearm prohibitions on public transportation," ECF No. 150-1 at 12.

Rather than present the "dearth of relevant . . . records" for what it is—a lack of evidence that cannot prove the existence of a national historical tradition of regulation, pointing instead to a tradition of free exercise—Rivas argues that there is a national historical tradition of restricting firearms carry on board railways and public transportation. Rivas Decl. ¶¶ 39, 45, 50. She asks the court to assume (because she can only offer a few outlier examples) not only that such firearms regulations existed, but that they were also relevant, widespread, well-known, and widely accepted. She argues that the Court must assume all of these things notwithstanding the absence of supporting evidence because they are consistent with her view of history. She asks that the Court extrapolate from a few scattered later 19th century regulations and backwards from 20th century records to presume the existence of a national historical tradition of restricting firearms possession and carry on public transportation. Such extrapolation is inconsistent with the *Bruen* standard and cannot be the basis for any reliable expert opinion, even if it were not merely legal conclusions.

Rivas' proffered misreading of the Statute of Northampton has been contradicted by the Supreme Court and questioned by the Second Circuit. The state claims that *Frey* "plac[ed] early laws prohibiting guns 'in fairs and markets' within 'a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond.'" ECF No. 150-1 at 14 (citing *Frey v. City of New York*, 157 F.4th 118, 132 (2d Cir. 2025)).  But *Frey* merely recites *Antonyuk*'s findings before expressly questioning the validity of those findings. *See Frey*, 157 F.4th at 133 n.6 (citing *Bruen*, 597 U.S. at 43–44, then citing *Wolford v. Lopez*, 116 F.4th 959, 998 n.12 (9th Cir. 2024), *rev'd on other grounds by Wolford*, 2026 WL 1825723).

The state makes much of Larsen's part-time work on a project called "Cambridge Shield" and his lack of knowledge about the entity that provides funding for that project. But the state conveniently ignores Rivas' testimony about the source of her research funding. Rivas acknowledged that her research is currently "funded by an organization called Arnold Ventures," but she testified that she does not know what Arnold Ventures is, has "never spoken to anyone there," "had never heard of them before the grant," is not aware of any other organizations or research that Arnold Ventures funds, and is not aware of who its founder (John D. Arnold) is. Rivas Dep. Tr. 63:8–65:21. Even though Arnold Ventures funds her current research through an $830,000 grant to the Wesleyan University Center for the Study of Guns & Society, Rivas does not list Arnold Ventures as the funder of her current research on her CV. *Compare* Wesleyan University Center for the Study of Guns & Society, *CSGS Research*, https://gunsandsocietycenter.com/csgs-research/ (last visited July 19, 2026), *with* ECF No. 142-3.

If Larsen's lack of knowledge about the funder of his part-time research project is grounds to exclude his opinion, ECF No. 150-1 at 34–35, then Rivas' lack of knowledge about the grant funder for her current full-time research position is similarly grounds for her exclusion. Rivas' lack of knowledge about Arnold Ventures or its funding of other organizations like the Trace[1] is similarly "not credible" and should likewise "call into question the Court's acceptance of [her] as an expert witness." *In re Vioxx Prods.*, 489 F. Supp. 2d 587, 594 (E.D. La. 2007); see also *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 157 (3d Cir. 1999) ("Because [expert] had testified untruthfully at voir dire, his testimony could well have been held unreliable."). The state's criticism of Larsen is equally applicable to Rivas. Given that Rivas failed to disclose her affiliation with

---

[1] The Trace, *Donor and Financial Transparency*, https://www.thetrace.org/donor-financial-transparency/ (last visited July 19, 2026).

Arnold Ventures or her knowledge of its funding of third parties, "there is no reason to believe [s]he would not" make similar omissions "in [her] report and testimony." *See* ECF No. 150-1 at 35; ECF No. 145-2 at 24–25.

**IV.    Young's opinions should be excluded.**

Like Charles and Rivas, Young's opinions and testimony should be excluded. Like those two, Young attempts to cloak his legal advocacy in "history," all the while scattering *Bruen* buzzwords throughout his declaration. Young offers legal conclusions despite his admissions that he is "not a lawyer" and cannot offer an opinion on what his cited historical laws meant, what they regulated, or why they were enacted. Young Dep. Tr. at 44:1–4, 89:10–23, 90:3–17, 94:3–9, 95:6–11, 97:7–24, 99:4–11, 117:21–118:15, 128:10–23. Young offers legal conclusions with no legal background. Young purports to provide a *Bruen* analysis but admits he does not know what *Bruen*'s terms of art mean. Young Dep. Tr. at 41:10–42:3. His opinions are unreliable and cannot be helpful to the Court.

His opinions are also factually unreliable because, as Plaintiffs have already shown, and as Young admitted, Founding Era parks shared relevant characteristics with "modern" parks, but Founding Era parks did not share any similar prohibitions on firearms. *See* ECF No. 145-2 at 11–14, 21–22. Young's declaration claimed that Founding Era parks were "utilitarian" and that later parks were mainly "ornamental spots for sociability and relaxation." Young Decl. ¶ 8. But Young admitted during his deposition that Boston Common and other Founding Era parks, like modern parks, were both utilitarian and recreational spaces that shared many relevant characteristics with their modern counterparts. Young Dep. Tr. at 59:5–79:9; *id.* at 37:18–38:9; 81:24–83:18. And in any case, the state concedes in its Response that Founding Era parks were also places of recreation, similar to later parks. The state claims Young provides a "mountain of regulations," but

9

conveniently ignores that he did not provide, nor did he even attempt to research, any firearm regulations prior to 1858. Young Dep. Tr. at 44:5–45:14. Young's opinions are unreliable and should be excluded.

## V.    Reeping's opinions should be excluded.

Reeping's opinions and testimony should be excluded. The state admits Reeping's studies fail to show any kind of correlation, much less any causal effect. The state agrees that Reeping's declaration and testimony do not demonstrate any reliable connection between firearm prohibitions and any outcome (whether to increase or reduce firearms-related incidents as defined in his studies) sufficient to inform legal analysis. The state fails to explain how Reeping's studies or report could possibly be "helpful" to the Court when his studies fail to reliably show the correlation he claims exists, much less any causational relationship.

The state now claims only that Reeping "sheds light on how" the challenged "laws work," but at most his declaration describes theoretical possibilities for ways that firearm prohibitions can be implemented by state or private actors. *See* Reeping Decl. ¶¶ 15–20. It does not actually explain how the CCIA works or what its benefits are. *See id.*

The state also now claims that Reeping's testimony is relevant to Plaintiffs' Equal Protection and vagueness claims, but the state failed to even mention Reeping's testimony or declaration in its summary judgment briefing on those issues. The state may not belatedly proffer Reeping's opinions to challenge Plaintiffs' Equal Protection or vagueness claims on reply; it has waived those arguments. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (collecting cases), *aff'd,* 288 F. App'x 721 (2d Cir. 2008).

Finally, interest balancing cannot possibly come back into play merely because Plaintiffs seek a permanent injunction. The plaintiffs in *Heller*, *McDonald*, *Bruen*, and *Wolford*, like nearly

every Second Amendment challenge to a firearm restriction, also sought permanent injunctive relief. The Supreme Court nevertheless expressly rejected judicial interest balancing in those Second Amendment challenges seeking injunctive relief. *See D.C. v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785–86 (2010); *Bruen*, 597 U.S. at 26; *Wolford*, 2026 WL 1825723, at \*5. There is no basis for the state's claim that a claim for permanent injunctive relief resurrects interest balancing. Reeping's opinions should be excluded in their entirety.

**VI.    If the state's experts meet the Rule 702 standard, so do Plaintiffs' experts.**

**a.    Francis' rebuttal opinions should not be excluded.**

Although Francis agrees that neither his nor any other expert's opinions are necessary to help the Court to perform its legal analysis, his rebuttal opinions in this case are no less reliable or relevant than the state's experts' opinions. The state attacks Francis' expert report as a "partisan" "*amicus* brief," but fails to recognize that its own experts' reports and testimony contain all of the characteristics that they argue warrant Francis' exclusion. And unlike the state's experts, Francis is a barred attorney with expertise in Second Amendment jurisprudence and interpreting historical firearms regulations.

The state seems preoccupied with the process by which Francis prepared his declaration. But Francis made clear that he drafted his declaration using "most of [the same] skills" he would in drafting an amicus brief because the process is "not unlike writing a law review article" or a rebuttal expert report. Francis Dep. Tr. 185:2–186:2. Like a journal article responding to another article or an amicus brief, a rebuttal expert report requires the expert to "respond to the other experts" on the given topics. *Id.* at 186:10–11. Francis identified key differences in his report preparation process, including focusing on primary and secondary sources and the state's expert

11

reports, while reviewing less case law than he might in preparing an article or brief. *Compare id.* at 185:2–186:2, *with id.* at 189:6–17.

Francis has published numerous law review articles and book sections, given numerous presentations, and has previously served multiple times as an expert witness on Second Amendment issues.[2] The state takes issue with the extensiveness of his experience, but explains away Rivas' relatively short tenure as a professional expert witness, finding some distinction between Francis (an "early-career law professor who works on Second Amendment issues," ECF No. 150-1 at 20) and Rivas (who is "earlier in her career," *id.* at 11). There is certainly one distinction that differentiates Francis from Rivas; unlike Francis, Rivas has received somewhere "in the ballpark of a couple hundred thousand dollars" from governmental entities since 2022 while serving as a professional expert witness, Rivas Dep. Tr. 18:13–19:4. The state claims that bias undermines Francis' report, but fails to acknowledge that Rivas in her thirty-nine expert engagements and Charles in his fourteen have only ever served as experts on behalf of governmental entities seeking to uphold firearms regulations. *Id.* at 70:20–23, 71:10–13; Charles Dep. Tr. at 43:11–15, 45:3–11.

Francis' opinions are also reliable because they are consistent with Supreme Court and Second Circuit precedent interpreting key regulations. For example, *Rahimi*, *Bruen*, and *Frey* all agree with his reading of Sir John Knight's case and the Statute of Northampton. *See United States v. Rahimi,* 602 U.S. 680, 697–98 (2024); *Bruen*, 597 U.S. at 46–52; *Frey*, 157 F.4th at 133 n.6. The state disagrees with these decisions' reading of that case and statute. ECF No. 150-1 at 21–22. But as discussed above, using proposed experts to relitigate issues already decided by the Supreme

---

[2] The state's personal attacks relating to Francis' background as a teacher and his capability of securing a professorship on his own merits, ECF No. 150-1 at 19, are irrelevant to either his qualifications or reliability as an expert in this case.

Court is not allowed under the Federal Rules of Evidence and calls for the exclusion of Charles' and Rivas' opinions.

### b.  Larsen's rebuttal opinions should not be excluded.

As an expert on methodology, Larsen is qualified to opine on the accuracy or methodological sufficiency of Reeping's studies. Larsen need not be an epidemiologist to present rebuttal opinions relating to Reeping's methodological soundness. The methodologies used in those studies are directly relevant here and are squarely within the purview of a rebuttal expert, whose sole job is to discuss and rebut the affirmative opinions including methodology presented by the experts to whom they are responding. The language Reeping uses (*i.e.*, "associated with") is obviously offered to make causal inferences about the efficacy of laws like the CCIA. To the extent the state disagrees, it admits that Reeping's opinions fail to create any meaningful connection between firearm prohibitions and the protective outcomes that allegedly result.

The state exaggerates Larsen's minor errors to distract from Reeping's material ones. For example, the fact that he put the project name rather than the ultimate project funder of a part-time research project on his CV is immaterial to his credibility. If an expert's failure to disclose their ultimate research funder's identity on their CV is grounds for exclusion, then Rivas' opinions should be excluded. In discussing Larsen's other alleged errors and omissions, the state again tries to re-brief the AI discovery issues without the benefit of Plaintiffs' responsive briefing contained in the letter briefs currently before Judge Evangelista. *See* ECF Nos. 133, 144.

The state points to the AI distillation of Larsen's expert report (the "cheat sheet"), but it fails to explain how using AI to distill a summary of his report into a manageable set of notes in preparing for his deposition makes his opinions unreliable. The state has already questioned Larsen extensively about the reliability of his opinions and findings. The fact that the state does not like

13

the testimony he provided is not a reason to exclude his opinions. At its core, the state essentially argues that any summarization or distillation of a report into a set of notes makes any testimony based on that summary or distillation invalid and unreliable. There is no support for this outlandish claim.

*        *        *

The state points to alleged infirmities in the Plaintiffs' expert reports, but if those minor errors are bases for exclusions, then its own experts should also be excluded on similar grounds. If the Court were to find that Plaintiffs' experts fail to meet Rule 702's reliability standards, then the state's experts must also be excluded.

But unlike the state's experts, Plaintiffs' experts are merely rebuttal experts. Nothing about Plaintiffs' legal analysis in its summary judgment briefing changes based on their exclusion or admission.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion to exclude the opinions of Patrick J. Charles, Brennan Rivas, Paul Reeping, and Terence Young. To the extent the Court allows the state's expert opinions into the record, Plaintiffs request that the Court similarly allow Plaintiffs' rebuttal expert opinions.

14

Dated: July 22, 2026

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
Bradley Arant Boult Cummings LLP
1900 K Street NW, Suite 800
Washington, D.C. 20006
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com
jporter@bradley.com

*Counsel for Plaintiffs*

**OF COUNSEL**
W. Chadwick Lamar, Jr. (*pro hac vice*)
Mason A. Kruse (*pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue N.
Birmingham, AL 35223
clamar@bradley.com
mkruse@bradley.com

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd of July, 2026, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to all Counsel of Record.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)

16