UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE & PISTOL ASSOCIATION,
INC., ROBERT NASH, BRANDON KOCH, THOMAS
STIRNWEIS, WAYNE FRANCIS, KHOURY PORTER,
*and* SCOTT NOREN,

Plaintiffs,

-against-

Case No. 1:22-cv-00907
(MAD/PJE)

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police, RODNEY
K. HARRISON, in his official capacity as Commissioner
of the Suffolk County Police Department, and Licensing
Officer for Suffolk County, *and* PATRICK J. RYDER, in
his official capacity as Police Commissioner of the Nassau
County Police Department, and Licensing Officer for
Nassau County,

Defendants.

**SUPERINTENDENT JAMES' REPLY MEMORANDUM OF LAW
IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
New York State Attorney General
The Capitol
Albany, New York 12224-0341
Attorney for Superintendent James

Jennifer J. Corcoran, NDNY Bar Roll No. 508740
Molly Thomas-Jensen, NDNY Bar Roll No. 705119
James M. Thompson, NDNY Bar Roll No. 703513
Of counsel

July 22, 2026

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ............................................................................................................... 1

I. PLAINTIFFS' INTERPRETATION OF THE SECOND AMENDMENT MISREADS SUPREME COURT AND SECOND CIRCUIT PRECEDENT ............ 1

II. PLAINTIFFS CONCEDE THAT THIS IS A FACIAL CHALLENGE, AND AS *RAHIMI* AFFIRMED (AND *WOLFORD* DOES NOT CHANGE), THEY MUST MEET THE *SALERNO* TEST .......................................................................... 6

III. PLAINTIFFS CONCEDE THEY HAVE NO STANDING TO CHALLENGE SEVERAL SENSITIVE PLACES ............................................................................ 7

IV. PLAINTIFFS HAVE INTRODUCED NO EVIDENCE SUPPORTING STANDING TO CHALLENGE SEVERAL SENSITIVE PLACES........................... 7

V. PLAINTIFFS' REMAINING ARGUMENTS ON SENSITIVE PLACES FAIL ..... 12

    A. History supports a prohibition on guns in places of worship, and it is no burden to seek the permission of a worship to carry a weapon ......................... 12

    B. History supports the CCIA's prohibition on adults seeking to carry guns onto playgrounds..................................................................................... 14

    C. The prohibition on guns in parks is constitutional........................................... 15

    D. The State may prohibit guns in places selling alcohol for on-site consumption..................................................................................................... 17

    E. Both the prohibition on bringing guns to performance, gaming and sport venues and the prohibition on bringing guns to permitted public events are supported by America's history of regulating guns in crowded spaces where people gather for entertainment ........................................................................ 18

    F. The prohibition on guns in government administration buildings is constitutional..................................................................................................... 20

    G. The prohibition on guns in health care facilities and nursing homes is constitutional..................................................................................................... 22

    H. The prohibition on guns on public transit and in airports is constitutional ....... 23

    I. Plaintiffs mistake Times Square for Manhattan................................................ 25

i

VI. THE PRIVATE PROPERTY CHALLENGE IS MOOT ........................................... 25

VII. THE AUTOMOBILE STORAGE PROVISION FALLS OUTSIDE THE SECOND AMENDMENT'S TEXT AND IS SUPPORTED BY HISTORICAL GUN LAWS................................................................................................................ 26

VIII. PLAINTIFFS HAVE NOT MET THEIR BURDEN ON THE EQUAL PROTECTION AND VAGUENESS CLAIMS .......................................................... 28

IX. PLAINTIFFS' FACIAL CHALLENGE TO THE LICENSING LAW ALSO FAILS ................................................................................................................. 28

X. PLAINTIFFS HAVE NOT MADE THE NECESSARY SHOWING TO OBTAIN PERMANENT INJUNCTIVE RELIEF ................................................................... 30

CONCLUSION.............................................................................................................. 30

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019)................................................. 11

*Antonyuk v. Hochul*, 693 F. Supp. 3d 232 (N.D.N.Y. 2022) ........................................... 6

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)................................................... passim

*CardX, LLC v. Schmidt*, 522 F. Supp. 3d 929 (D. Kan. 2021) ...................................... 12

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016)................................................. 8

*Champion v. Artuz*, 76 F.3d 483 (2d Cir. 1996) ........................................................... 7

*Christian v. James*, 176 F.4th 189 (2d Cir. 2026)................................................. passim

*Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) ..................... 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................. passim

*EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)........................................... 31

*Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025)................................ 4, 24, 26, 30

*Giambalvo v. Suffolk County*, 155 F.4th 163 (2d Cir. 2025) ................................... 26, 30

*Goldstein v. Hochul*, 680 F.Supp.3d 370 (S.D.N.Y. 2023) ........................... 12, 13, 14, 21

*Higbie v. James*, 795 F. Supp. 3d 307 (N.D.N.Y. 2025) ............................................... 26

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................................ 28

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)...................................................... 22, 23

*Knife Rights, Inc. v. Vance*, 802 F.3d 377 (2d Cir. 2015)............................................. 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................. passim

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)....................................................... 3

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)...................................... 31

*Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244 (S.D. Cal. 2024) ......... 12

*N.Y. State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025) ............................. 27

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ....................................................................... 29

*NYSRPA v. Bruen*, 597 U.S. 1 (2022) ........................................................................ passim

*NYSRPA v. James*, No. 1:22-CV-907 (MAD/PJE), 2025 WL 553423
(N.D.N.Y. Feb. 18, 2025) ...................................................................................... 29

*O'Brien v. City of Syracuse*, No. 5:22-CV-948, 2025 WL 1519411
(N.D.N.Y. May 27, 2025) ...................................................................................... 26

*Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025) ................................................... 24

*Sulzer Mixpac AG v. DXM Co.*, No. 19 CIV. 9404, 2024 WL 3536366
(S.D.N.Y. July 25, 2024) ........................................................................................ 31

*Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007)................................................. 28

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ..................................................... 11

*United States v. Diaz*, 122 F. Supp. 3d 165 (S.D.N.Y. 2015)....................................... 4

*United States v. Gomez*, 159 F.4th 172 (2d Cir. 2025) ............................................... 27

*United States v. Hemani*, 146 S.Ct. 1677 (2026)......................................................... 3

*United States v. Rahimi*, 602 U.S. 680 (2024) ...................................................... passim

*United States v. Rivers*, No. 24-CR-6154, 2025 WL 1006338 (W.D.N.Y. Apr. 4, 2025).............. 4

*United States v. Salerno*, 481 U.S. 739 (1987) ....................................................... 6, 19

*United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025)................................................. 27

*Vidal v. Elster*, 602 U.S. 286 (2024).......................................................................... 13

*Warth v. Seldin*, 422 U.S. 490 (1975)........................................................................... 8

*Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026)............................ passim

*Ziegenfuss v. Martin*, 824 F. Supp. 3d 540 (N.D. Tex. 2026) ..................................... 18

## Statutes

N.Y. Crim. Proc. Law § 2.30 ........................................................................................ 29

N.Y. Penal Law § 265.01-e............................................................................................ 9, 10

N.Y. Penal Law § 265.45............................................................................................... 27

N.Y. Penal Law § 400.00 ................................................................................................ 29

**<u>Rules</u>**

Fed R. Civ. P. 56 .......................................................................................................... 31

**<u>Regulations</u>**

9 N.Y.C.R.R. § 6020.3 .................................................................................................. 29

9 N.Y.C.R.R. § 6022.3 .................................................................................................. 29

**<u>Othher Authorities</u>**

Merriam-Webster, "Public Transportation," https://www.merriam-webster.com/dictionary/
    public%20transportation ............................................................................................. 9

United States Census Bureau, *2020 Census Gazetteer Files: New York County Subdivisions* .... 25

United States Census Bureau, *QuickFacts, New York City, New York,* ....................................... 26

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, respectfully submits this Reply Memorandum of Law in support of his Cross-Motion for Summary Judgment (Dkt. No. 142).

## PRELIMINARY STATEMENT

Plaintiffs seek to invalidate large swaths of New York's gun laws based on a misreading of Supreme Court precedent and a superficial and outcome-driven approach to American history. They urge this Court to disregard binding Second Circuit precedent and to treat their facial challenge as an applied challenge when it suits them. And, to top it off, they lack standing to challenge many of the provisions they ask this Court to declare unconstitutional, and have not made any affirmative showing of their own that undermines the significant historical record developed by the Superintendent and his experts. Superintendent James has met his burden and should be granted summary judgment against Plaintiffs on all claims.

## ARGUMENT

### I. PLAINTIFFS' INTERPRETATION OF THE SECOND AMENDMENT MISREADS SUPREME COURT AND SECOND CIRCUIT PRECEDENT

Plaintiffs devote much of their reply brief to advancing an interpretation of the law that would compel an ahistorical conclusion. They argue, in contravention of Supreme Court practice and binding Second Circuit precedent, that only "colonial or Founding Era evidence" matters, and that courts must strike down any modern law that does not have an equivalent from immediately around 1791. Pls.' Opp. & Reply at 9, Dkt. No. 147-1. They tell the Court to decide the constitutionality of laws passed by the People's elected representatives not on the basis of history, but on "historical silence." *Id.* at 10. And therefore, in all cases, Plaintiffs contend that "[t]he lack of a relevantly similar colonial or Founding Era analogue is dispositive." *Id.* at 9. But that is not the law.

"[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *United States v. Rahimi*, 602 U.S. 680, 691-92 (2024). Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692; *accord Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *7 (U.S. June 25, 2026). And in doing so, the Court must consider all "laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692. Historical analogues are one way to make this showing, but "[a] variety of sources, including scholarship, may aid this inquiry." *Wolford*, 2026 WL 1825723, at *6. When considering historical analogues, "[a] party defending against a Second Amendment clam may rely on a single analogue or a group of analogues," *id.* at *6, and the Court then considers whether the challenged regulation is "consistent with the principles that underpin our regulatory tradition." *Id.* at *7 (quoting *Rahimi*, 602 U.S. at 692). Put succinctly, "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" *Id.* at *6.

None of this is consistent with ruling on the basis of silence rather than actual history. Plaintiffs do not explain where they contend that the "colonial or Founding Era" ends and history may safely be ignored, Pls.' Opp. & Reply at 9, but the Supreme Court's practice indicates that there is no such arbitrary cutoff. Rather, all the Justices "ha[ve] repeatedly employed post-ratification history to determine the meaning of vague constitutional text."[1] *Rahimi*, 602 U.S. at

---

[1] Plaintiffs repeatedly quote from Justice Barrett's *Rahimi* concurrence, but the concurrence emphasized that "a challenged regulation need not be an updated model of a historical counterpart," that 21st-century regulations need not "follow late-18th century policy choices," and

2

728 (Kavanaugh, J., concurring); *see, e.g.*, Cross-Mot. at 12-13 (collecting examples of originalist justices looking to statutes and case law through the late 19th and early 20th centuries to elucidate constitutional meaning). *District of Columbia v. Heller*, the foundational case establishing the authoritative interpretation of the Second Amendment, conducted an analysis of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." 554 U.S. 570, 605 (2008). Other Supreme Court precedents consider laws from at least that spectrum of history. *See, e.g.*, *NYSRPA v. Bruen*, 597 U.S. 1, 64 (2022) (considering "Reconstruction-era state regulations and "late-19th-century cases"); *id.* at 30 (looking to "18th- and 19th-century 'sensitive places'"); *McDonald v. City of Chicago*, 561 U.S. 742, 776-77 (2010) (looking to "[e]vidence from the period immediately following the ratification of the Fourteenth Amendment" and multiple state provisions from 1889); *United States v. Hemani*, 146 S.Ct. 1677, 1688, 1690 & n.5 (2026) (considering large numbers of 19th century laws from as late as 1890). To be sure, "not all history is created equal," and "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). But nothing in the Supreme Court's holdings or practice indicates that history can be arbitrarily ignored, let alone based on Plaintiffs' restrictive "colonial or Founding Era" framework. Pls.' Opp. & Reply at 9-10.

Supreme Court practice contradicts Plaintiffs' methodological argument; Second Circuit precedent has "expressly rejected [their] view." *Christian v. James*, 176 F.4th 189, 205 (2d Cir. 2026). As the Circuit has repeatedly emphasized, "the absence of Founding-era law is not dispositive because 'it is not necessarily the case that, if no positive legislation from a particular

---

that we must not "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." 602 U.S. at 739–40. "Such assumptions are flawed, and originalism does not require them." *Id.*

time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms.'" *Id.* (quoting *Frey v. City of New York*, 157 F.4th 118, 130 (2d Cir. 2025)). "[T]he paucity of a similar historical regulation during the Founding era does not evince a lack of a historical tradition in 'this Nation's *whole* tradition,'" and therefore "[w]here there is no strong historical evidence from the Founding era, it is appropriate to look toward, and rely upon, later historical evidence." *Frey*, 157 F.4th at 130 (quoting *Antonyuk v. James*, 120 F.4th 941, 972 n.15 (2d Cir. 2024). Moreover, in the Second Circuit, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," *Antonyuk*, 120 F.4th at 972, and even "twentieth-century evidence" is "not weightless" so long as it is not "*inconsistent* with prior practices." *Id.* at 989 n.41 (emphasis in original). Plaintiffs ignore virtually all Second Circuit precedent in their methodology section, *see* Pls.' Opp. & Reply at 4-12, but the Circuit's holdings remain controlling, and correct.[2]

Plaintiffs also designate certain precedents as "outliers" or outside of arbitrary lines where those precedents do not support their view of history; they then ask the Court to ignore historical sources in a bid to manufacture the silence they view as dispositive. *See, e.g.*, Pls.' Opp. & Reply at 53-54 (dismissing "outliers" as "not sufficient to overcome the lack of colonial or Founding Era laws"). There is no basis for ignoring history in this manner: a party defending a Second Amendment case "may rely on a single analogue or a group of analogues," *Wolford*, 2026 WL 1825723, at *6, and the Supreme Court has said that we can "assume it settled" that locations are

---

[2] Even if there were any material in *Wolford* that cast doubt on Second Circuit jurisprudence—which there is not—the issue would be for the Circuit to determine. District courts within the Second Circuit must follow Circuit precedent, including on Second Amendment issues, "unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *United States v. Rivers*, No. 24-CR6154, 2025 WL 1006338, at *1 (W.D.N.Y. Apr. 4, 2025) (quoting *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)).

4

sensitive even with "relatively few 18th- and 19th-century" examples, so long as "we are also aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30. Conversely, where the Supreme Court has dismissed one or more laws as "outliers," it has done so only after elucidating a contrary common-law tradition—not based on silence alone. *See Bruen*, 597 U.S. at 55 (deriving "a consensus view that States could not altogether prohibit the public carry of 'arms'"); *Wolford*, 2026 WL 1825723, at *3, *7 (finding a contrary "standard common-law rule" grounded in history); *see Antonyuk*, 120 F.4th at 1021 n.83 (explaining that Supreme Court found an outlier only where "it went against the tradition of a majority of the Nation"). Accordingly, "depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 120 F.4th at 972.

Lastly, Plaintiffs argue that the Court must not consider "the lack of successful challenges to the mid-to-late-19th century laws" adduced by the Superintendent and his experts. Pls.' Opp. & Reply at 15. The Supreme Court says otherwise. While it is certainly probative "when judicial decisions explicitly acknowledge[d] [a] rule's legality,"[3] the constitutional acceptance of a historical tradition "may be tacit, as when a restriction on the keeping or carrying of arms was 'open, widespread, and unchallenged.'" *Wolford*, 2026 WL 1825723, at *6 (quoting *Bruen*, 597 U.S. at 36). And as both the Supreme Court and the Second Circuit have shown, the lack of any evidence that historical measures were viewed as unconstitutional is strong evidence that modern, analogous locations are indeed sensitive. *See Bruen*, 597 U.S. at 30 (courts can "assume it settled" that sensitive locations laws were constitutional where "we are also aware of no disputes regarding the lawfulness of such prohibitions."); *see, e.g., Antonyuk*, 120 F.4th at 1038 n. 112 (refusing to

---

[3] There are quite a few such decisions regarding the historical sensitive location laws discussed in this case, collected at Decl. of Patrick J. Charles at 15 n.33, Dkt. No. 142-5.

find that "'silence' of the historical record" indicates that "regulating firearms in theaters is unconstitutional" where plaintiffs had not adduced "any affirmative evidence that gun regulations in theaters were considered unlawful."). As shown below and in the Superintendent's moving brief, New York's sensitive places laws are solidly grounded in our Nation's tradition, and Plaintiffs have made no appreciable affirmative showing that anyone at any point in American history has viewed their predecessors as anything but constitutional.

## II. PLAINTIFFS CONCEDE THAT THIS IS A FACIAL CHALLENGE, AND AS *RAHIMI* AFFIRMED (AND *WOLFORD* DOES NOT CHANGE), THEY MUST MEET THE *SALERNO* TEST

Plaintiffs argue that the Court must ignore the governing *Salerno* test for facial constitutional challenges, despite the Supreme Court holding only two years ago that the test governs Second Amendment claims. *See Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and explaining that a facial challenge is "'the most difficult challenge to mount successfully' because it requires a [challenger] to 'establish that no set of circumstances exists under which the act would be valid.'"). In doing so, they invite the court to make the same "error[]" that led the Supreme Court to reverse the Fifth Circuit in *Rahimi* when "it did not correctly apply our precedents governing facial challenges." *Id.* at 701. And they invite the Court to make the same error as the district court in *Antonyuk*, which had the "view that *Bruen* 'create[d]' an 'exception' to the normal rules regarding facial and as-applied challenges," 120 F.4th at 986 (quoting *Antonyuk v. Hochul*, 693 F. Supp. 3d 232, 304-05 (N.D.N.Y. 2022)), only for the Circuit to emphasize, citing *Rahimi*, that "general principles of constitutional adjudication," including the facial challenge standard in specific, "apply in the context of Second Amendment litigation, as they do in cases involving other constitutional provisions." *Id.* at 983. Nothing in the *Wolford* decision in any way undermines these recent binding precedents.

**III.   PLAINTIFFS CONCEDE THEY HAVE NO STANDING TO CHALLENGE SEVERAL SENSITIVE PLACES**

Defendants' cross-motion for summary judgment argued that no Plaintiff had standing to challenge the CCIA's prohibition on carrying guns into libraries, zoos, or summer camps. Cross-Mot. at 20-21. Deposition testimony had revealed that no Plaintiff had any intention of visiting those locations while armed. *Id*. Plaintiffs have not contested this, and the undisputed evidence demonstrates that no Plaintiff has standing to challenge these provisions. *Id*. The Superintendent's cross-motion for summary judgment should be granted as to these three provisions, and Plaintiffs' motion for summary judgment denied. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

**IV.   PLAINTIFFS HAVE INTRODUCED NO EVIDENCE SUPPORTING STANDING TO CHALLENGE SEVERAL SENSITIVE PLACES**

Plaintiffs lack standing to challenge the prohibition on carrying firearms in places of worship, public transit, Times Square, playgrounds, and nursing homes, because no Plaintiff has "concrete plans" to visit any of these places while armed, and also because, for several of the places in question, they are privately owned and separately prohibit carriage of a firearm on their premises. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

**Places of Worship:** Mr. Francis is the only Plaintiff who challenges the prohibition on carrying firearms into a place of worship without authorization, but he has no plans or desire to bring a gun with him to his place of worship. Excerpts of Francis Dep., 152:10-153:25, Dkt. No. 142-29. Additionally, Plaintiff Francis has not asked to be designated a member of the security team, "[b]ecause as we've asked and answered previously, I'm not interested in carrying anywhere." *Id*. at 153:6-8. Plaintiffs contend that Mr. Francis is "not required to first engage in conduct that would subject him to criminal prosecution," Pls.' Opp. & Reply at 19, and while that is true, he must exhibit *some* intention to do what State law prohibits. *Cayuga Nation v. Tanner*, 824 F.3d 321, 332-33 (2d Cir. 2016). Plaintiffs quote a passage from Francis' testimony, in which

7

he says that he "want[s] to be able to" carry, Excerpts of Francis Dep. 57:4-59:19, but at no point in Francis' testimony did he describe any intention to carry his gun in public other than "'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be." *Lujan*, 504 U.S. at 564 (emphasis in original).

Plaintiffs separately argue that the requirement that someone be designated as "responsible for security at such place of worship" in order to carry a weapon "does not require that a person be appointed at all or receive approval from any member of the congregation," and that this requirement runs afoul of Mr. Francis' right "to carry firearms at [his] place[] of worship without seeking approval from other civilians to do so." Pls.' Opp. & Reply at 19-20. But they do not contest that Mr. Francis testified that "it would not be a burden to ask" his congregation's pastor to be a part of the church's security team, and that he has not done so because he does not want to bring a gun with him to church. Excerpts of Francis Dep., at 14-15.

**Public Transportation**: Plaintiffs argue that "Mr. Francis desires the freedom to carry a handgun on public transit, if he so chooses," Pls.' Opp. & Reply at 19, but in deposition testimony, Mr. Francis stated unequivocally that, if he were to prevail in this case, he would still not carry a gun on public transit. Excerpts of Francis Dep., at 11-12. That ends the inquiry, as Mr. Francis has no "personal stake in the outcome." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Plaintiffs argue that Superintendent James has "admitted that Mr. Stirnweis has standing to challenge" the prohibition on guns on public transit. Pls.' Opp. & Reply at 42. Not so: Superintendent James' opening brief noted that only one plaintiff, Mr. Stirnweis, had even an arguable claim to standing, but that the claim failed because it rested on his use of privately operated ferries. Cross-Mot. at 42-43. Plaintiffs contend that private ferry services are obviously public transit because they are "open to the public," citing vaguely to "the language of the statute."

Pls.' Opp. & Reply at 43. But that language is not found in N.Y. Penal Law § 265.01-e, which references "public transportation or public transit." Common usage weighs in favor of definition that turns on whether the system is operated and/or paid for by a public agency. *See, e.g.*, Merriam-Webster, "Public Transportation," https://www.merriam-webster.com/dictionary/public%20transportation ("a system of trains, buses, etc., that is paid for or run by the government"). Privately-operated ferry services on Long Island, such as the Cross-sound Ferry and the Bridgeport and Port Jefferson Ferry, do not accord with that definition. *See* Stirnweis Tr. 166:12-167:3. Mr. Stirnweis has not satisfied his burden of proving standing to challenge the public transportation provision.

**Airports**: Mr. Stirnweis would like to bring his firearm in his checked luggage in compliance with federal regulations, Excerpts of Stirnweis Dep. 188:7-17, Dkt. No. 142-32, which the CCIA allows, Deyo Decl. ¶ 3. Plaintiffs object that this is simply the "understanding" of the State Police and is an attempt by Superintendent James to moot this case through voluntary cessation of challenged conduct. Pls.' Opp. & Reply at 47-48. But as there is no evidence that the State Police have *ever* enforced the CCIA in the way that Plaintiffs intend, there is no challenged conduct to cease. Superintendent James introduced a declaration to support that argument, and Plaintiffs did not rebut that factual showing. *Lujan*, 504 U.S. at 561.

As to the "liminal areas of airports," Plaintiffs now allege that Mr. Stirnweis would like to carry a gun not just in the places listed in his declaration ("the airport's roadways, grounds, cell phone parking lot, and passenger drop off and pick up areas," Stirnweis Decl. ¶ 9(d), Dkt. No. 130-7), but now, for the first time, they assert that he wishes to carry in "baggage claim areas." Pls.' Opp. & Reply at 48. They have introduced no evidence in support of this assertion, and it is flatly contradicted by Mr. Stirnweis' declaration, which states that he does *not* want to enter the airport

terminal while carrying a firearm. Stirnweis Decl. ¶ 9(d). As for parking lots, roadways, and drop off areas, Plaintiffs make no substantive argument other than a general handwave at "[c]ommon sense and the canons of construction" to argue that "any facility used for or in connection with service in . . . airports," N.Y. Penal Law § 265.01-e(2)(n), must include parking lots and drop off areas. Pls.' Opp. & Reply at 47. Plaintiffs cite the Merriam Webster definition of "facility" ("something . . . that is built, installed, or established, to serve a particular purpose", Pls.' Opp. & Reply at 47)—that definition would cover the airport terminals, hangars, tarmac, and air traffic control tower, because they all serve the airport's purpose, namely air travel. But an adjacent parking lot is not serving the purpose of air travel and therefore is not an airport facility.

**Times Square**: Neither Mr. Stirnweis nor Mr. Porter has standing to challenge the prohibition on carrying guns in Times Square. Take Stirnweis first: Plaintiffs cite to vague assertions in his declaration, Stirnweis Decl. ¶ 9(e), and argue that he need not show that he intends to violate the CCIA. Pls.' Opp. & Reply at 41. But the statements in his declaration and deposition (when he spoke about past Times Square visits and had no concrete plans to return, Excerpts of Stirnweis Dep. at 15-16) do not satisfy Article III's requirement that a plaintiffs have a "concrete and particularized, actual or imminent invasion of a legally protected interest." *Lujan*, 504 U.S. at 555; *see also Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 445 (2d Cir. 2021).

Mr. Porter fares no better. The supposed "photographic evidence that he had traveled through the Times Square gun free zone," Pls.' Opp. & Reply at 40, is in fact a photograph taken *outside of* the Times Square gun free zone, looking in. But, more to the point, Mr. Porter could not point to any instance in which he had recently traveled to the Times Square gun free zone, Excerpts of Porter Dep. at 43-53, Dkt. No. 142-30, and when he was asked if, prior to the enactment of the CCIA, he had brought a gun with him when he had visited Times Square to attend the theater, he

10

testified that he had not done so. *Id*. at 56. Plaintiffs have not met their burden of establishing that, as to Times Square, there is a "real controversy with real impact on real persons." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring)).

**Playgrounds**: Plaintiffs argue that Mr. Porter may challenge this provision, because he visits parks that may contain playgrounds. Pls.' Opp. & Reply at 35. In support of this contention, they cite Mr. Porter's deposition, in which, in response to a direct question about whether he "visit[s] playgrounds presently," he responded: "Not presently, no." Excerpts of Porter Dep., at 7. Undaunted, Plaintiffs argue (without evidentiary support) that "[i]f Mr. Porter were to . . . walk through or around a playground" there is a "potential for him to" violate the CCIA. Pls.' Opp. & Reply at 35. Plaintiffs have only pointed to "fears that are imaginary or speculative." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (cleaned up). Conjecture and hypotheticals such as these do not establish Article III standing. *Lujan*, 504 U.S. at 560.

**Nursing Homes**: Plaintiffs argue that Mr. Porter has standing to challenge the prohibition on guns in nursing homes, even though the only nursing home he visits independently prohibits "all Associates, residents, or visitors" from possessing weapons, including firearms. Geller Decl. at 3, Dkt. No. 142-25. They quibble that maybe this policy is not enforced, or maybe the nursing home does not adequately advise visitors about the policy, or maybe in the absence of the CCIA, the nursing home might not prohibit weapons, but standing was their burden and they have introduced no evidence supporting these conjectures. Excerpts of Porter Dep. at 11-12. Separately, Plaintiffs argue that the fact that Mr. Porter did not carry his gun with him to the nursing home prior to the passage of the CCIA is not probative of his standing because "[o]ne does not waive one's constitutional rights by not exercising them continuously." Pls.' Opp. & Reply at 32. But

this misses the point: the fact that Mr. Porter did not previously carry his gun into nursing homes when it was not prohibited means that the law has not caused him to change his conduct in any way. There is no injury-in-fact. *CardX, LLC v. Schmidt*, 522 F. Supp. 3d 929, 938 (D. Kan. 2021); *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1251 (S.D. Cal. 2024), *reconsideration denied*, No. 23-CV-0945, 2025 WL 1012326 (S.D. Cal. Mar. 31, 2025).

## V.    PLAINTIFFS' REMAINING ARGUMENTS ON SENSITIVE PLACES FAIL

### A.    History supports a prohibition on guns in places of worship, and it is no burden to seek the permission of a worship to carry a weapon

Plaintiffs argue that colonial-era statutes requiring parishioners to carry guns to church (Dkt. Nos. 130-29, 130-30, 130-31, 130-32, 130-33, 130-34, 130-35) and two Founding-era statues requiring "white male inhabitant[s]" to carry guns to church (one of which was enacted "for the better security of this Province against the Insurrections and other wicked attempts of Negroes and other Slaves," Dkt. No. 130-36; *see also* Dkt. No. 130-37) demonstrate that the Second Amendment does not countenance prohibiting firearms in churches. Pls.' Opp. & Reply at 20-22. They argue that these colonial-era statutes and the two Founding-era statutes, which had the "goal of preserving slavery," *Goldstein v. Hochul*, 680 F.Supp.3d 370, 397 (S.D.N.Y. 2023), should be given more weight than the extensive history of 19th century laws restricting carrying guns in places of worship that, unlike the Plaintiffs' proffered analogues, do not "aim[] to perpetuate the subjugation of blacks." *Wolford*, 2026 WL 1825723 at *14. But as noted above, despite being given many opportunities to do so, the Supreme Court has not disclaimed the use of 19th century history and in fact has repeatedly turned to 19th and even 20th century sources. *See, e.g.*, *Heller*, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); *Vidal v. Elster*, 602 U.S. 286, 301-08 (2024) (considering cases from 1867 through 1928 in surveying the "history and tradition" of the

First Amendment's application to trademark law); *see also Antonyuk*, 120 F.4th at 972. The State's proffered analogues are "sufficiently similar" to the CCIA's prohibition on carrying guns into places of worship to establish that the "challenged regulation [is] 'consistent with the principles that underpin our regulatory tradition.'" *Wolford*, 2026 WL 1825723 at *7 (citation omitted).

Plaintiffs next dispute *Goldstein*'s reasoning, arguing that 19th-century statutes and court cases are too late and asserting (without evidence) that earlier laws "do not match the CCIA's animating principles." Pls.' Opp. & Reply at 21. But again, the 19th-century laws relied upon by the *Goldstein* court match both the how and the why of the CCIA, though Plaintiffs might wish it were not so. Plaintiffs also attack *Goldstein* for relying on Founding-era laws to establish a general principle that States can prohibit guns in sensitive places—but they do not dispute that these earlier statutes at a minimum establish the "how" of the CCIA (prohibiting guns in sensitive places).

Plaintiffs also argue that the antebellum and Reconstruction era analogues "directly contradict the colonial and Founding Era tradition of allowing and even requiring carry at places of worship." Pls.' Opp. & Reply at 22. *First*, taken together, they suggest that governments have long believed that they have the power to regulate carriage of weapons in places of worship, *see Goldstein*, 680 F.Supp. 3d at 397, and *second*, Plaintiffs cite no support for their contention that colonial-era laws and two racist Founding-era laws should somehow outweigh a long 19th century tradition of prohibiting guns in places of worship.

Finally, Plaintiffs' argument that the South Carolina and Georgia statutes that required white men to carry guns to church in order to suppress uprisings of enslaved people supports the principle that "the Founders looked to citizens peaceably carrying firearms to protect vulnerable populations" Pls.' Opp. & Reply at 23, should be disregarded for the reasons articulated in *Goldstein*, 680 F.Supp.3d at 396-97. These laws were enacted to enshrine "racial supremacy" and

to *target* a vulnerable population: enslaved persons in the pre-Civil War south. *Id.*

**B.      History supports the CCIA's prohibition on adults seeking to carry guns onto playgrounds**

Plaintiffs argue that "the colonial and Founding Era evidence produced by Plaintiffs shows that individuals were required to carry arms where vulnerable populations like children would be present for the protection of those populations." Pls.' Opp. & Reply at 35. Their support for this contention is the same collection of colonial statutes and Founding-era statutes that they relied upon for the places of worship provision. *Id*. Setting aside whether laws about carrying guns to churches are relevant to laws about carrying guns to playgrounds, Plaintiffs' analogues should be disregarded for the reasons discussed above.

Plaintiffs next argue that children can be found "virtually anywhere," *Id.* at 36, and therefore the analogy to statutes prohibiting gun in schools and other "crowded places and locations frequented by children" is inapt. Plaintiffs fail to acknowledge that playgrounds are *only* used by children (and their accompanying caregivers), like schools. The Second Circuit has held that there is a "well-established and representative" "tradition of regulating firearms in spaces frequented by children." *Antonyuk*, 120 F.4th at 1026 (citing *Bruen*, 597 U.S. at 30). Plaintiffs cannot dispute that playgrounds are "spaces frequented by children," or that the CCIA's prohibition on playgrounds is consistent with this tradition.[4]

Plaintiffs also argue that analogies to historical prohibitions on carrying guns at schools are inapposite because: (1) many of these rules were private and some did not apply the public at large; and (2) "[t]he state does not have *in loco parentis* authority over all individuals who visit all

---

[4] Plaintiffs argue that "*Heller* itself acknowledged that the idea that schools were 'sensitive places' was a presumption untested against actual historical evidence," Pls.' Opp. & Reply at 36, but the Supreme Court has repeated that holding four times, *see Wolford*, 2026 WL 1825723 at *5, and declared the matter "settled" in *Bruen*, emphasizing that "we are aware of no disputes regarding the lawfulness of such prohibitions."  597 U.S. at 30.

places where children might be present." Pls.' Opp. & Reply at 36. Taking the first argument, as Patrick Charles explained, firearms prohibitions at schools date back to the eighteenth century and were "commonplace" by the mid-19th century. Charles Decl. ¶ 22, Dkt. No. 142-5. Plaintiffs note that the earliest prohibitions were promulgated by private institutions, but this reflects that public education did not become widespread until the mid-19th century. *Id.* ¶ 23. As to the argument that schools, unlike playgrounds, exercise *in loco parentis* authority over children on their premises, Plaintiffs do not explain why this should change the Second Amendment analysis. Schools can prohibit possession of guns by children, teachers, and members of the public, *Heller*, 554 U.S. at 626, even though they do not have any *in loco parentis* authority over teachers or members of the public. *See also Bruen*, 597 U.S. at 40 (identifying schools as a location "where arms carrying c[an] be prohibited").

C.      **The prohibition on guns in parks is constitutional**

Plaintiffs acknowledge the Second Circuit's recent decision in *Christian v. James*, which rejected a substantially identical facial challenge[5] to the CCIA's prohibition on guns in public parks, based on a substantially identical historical showing from Dr. Terence Young, finding that New York had adduced a "mountain of regulations" that were "relevantly similar to the Public Parks Provision." 176 F.4th at 205. Plaintiffs ask this Court to overrule the Second Circuit, asserting that the Court of Appeals acted "based on an inaccurate factual record" and that Dr. Young somehow "implicitly acknowledged that many of the historical findings contained in his declaration were incorrect." Pls.' Opp. & Reply at 49-50. Both assertions are wrong.

---

[5] Plaintiffs gesture in the last paragraph of their parks argument toward challenging "National Parks and rural parks," Pls.' Opp. & Reply at 52, but the Court should not reach such a hypothetical as-applied challenge because Plaintiffs did not raise it in their moving brief and have not developed any National or rural park-specific argument. *See Christian*, 176 F.4th at 193, 204. If the Court were to reach the issue, the challenge would fail based on the longstanding tradition of regulating guns in rural parks described on pages 25–26 of the Superintendent's moving brief.

The supposed admission that undermines Young's testimony is the straightforward and uncontroversial acknowledgement that spaces like Bowling Green and Boston Common were at times "used for recreational and ornamental purposes" in early America. Pls.' Opp. & Reply at 50. No one has denied that these spaces were sometimes used for recreation,[6] and the *Christian* decision explicitly acknowledges as much. *See* 176 F.4th at 206 (noting that "Boston Common's long history show[s] a variety of uses, both practical and recreational," but pointing out that those uses included cattle grazing and public executions); Young Decl. ¶ 13, Dkt. 142-19 (commons were "multi-purpose utilitarian spaces"). The fact that some of these locations were at times used for recreation or had a garden does not turn them into "Founding Era parks," in Plaintiffs' words, Pls.' Opp. & Reply at 51, because they had a wide variety of uses incompatible with a park's purpose of peaceful recreation (such as Puritan meetinghouses, livestock pens, cemeteries, militia drills, taverns, and "pest houses" for smallpox victims), *see* Young Decl. ¶¶ 13-15, 17, and because parks resulted from a distinct social movement that only began "[i]n the immediate pre-Civil War years" and spread after the conflict. Young Decl. ¶¶ 23-26; *see Christian*, 176 F.4th at 206 ("the lack of similar regulations prior to 1858 is a 'natural consequence' of the fact that modern urban public parks in the mold of Olmstead's Central Park did not yet exist in significant numbers").

The Second Circuit did not only reject Plaintiffs' factual argument about parks, it rejected their methodological one as well. Plaintiffs here, like the plaintiffs in *Christian*, mainly contend

---

[6] Dr. Young's declaration specifically discusses certain of these spaces, including civic squares in Savannah, Georgia, that had "a small plantation of trees" as well as "railings, walks, and lawns," but also acknowledges that the area was used for "several utilitarian purposes" like militia drills, markets, and water pumps for firefighting. *See* Young Decl. ¶ 16, Dkt. No. 142-19. Likewise, Plaintiffs make much of the fact that one of the sources cited by Dr. Young indicates that one of Philadelphia's squares had a "pleasure garden" around a pumping station, but Dr. Young explains that these spaces were also used for horse racing, militia training, for the city gallows, for "a burial ground for strangers, or potter's field," for livestock grazing, and "as a place for selling hay, straw, and lime." *Id.* ¶ 17. None of this is new, and all of it was before the Second Circuit in *Christian*.

16

that "these regulations, which began to proliferate starting from 1858, came too late, and that post-Founding era history cannot alone establish the historical tradition of regulation required by *Bruen*." 176 F.4th at 205 (citation modified). That assertion runs contrary to the binding precedent of *Antonyuk*, under which "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." 120 F.4th at 972. The Second Circuit noted in *Christian* that it had "expressly rejected" that Founding-only viewpoint because later history can "provide persuasive evidence of the original meaning" and because "a regular course of practice" such as the dozens and dozens of park regulations presented here "may settle a constitutional debate at *any* point in our history." 176 F.4th at 205-06 (emphasis in the original) (quoting *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring)).

**D.      The State may prohibit guns in places selling alcohol for on-site consumption**

Plaintiffs contend that they should be allowed to carry guns in bars and restaurants selling alcohol because the historical analogues would only allow a prohibition on possessing firearms while intoxicated. Pls.' Opp. & Reply at 52. But to reach this conclusion, Plaintiffs argue that the Court should ignore the Founding Era and 19th Century analogues that plainly "burdened Second Amendment rights in a similar manner and for similar reasons," *Antonyuk*, 120 F.4th at 1031, by preventing sales of alcohol to armed persons and by regulating access to firearms at balls and similar events where alcohol is consumed. They urge this Court to ignore *Antonyuk* because they say, citing *Wolford*, that the statutes relied upon in that binding Second Circuit opinion were not "widespread or widely accepted." Pls.' Opp. & Reply at 53. This misstates the record before both the *Antonyuk* court and this Court.

Since the Founding era, legislatures have prohibited selling liquor to armed militiamen, out of a concern about the dangers of combining liquor and arms bearing.  Charles Decl. ¶¶ 37-38. These laws certainly had the same "why" as the CCIA, and their "how" is very close (prohibiting

17

bringing liquor to a place where people congregate with guns). Beginning at the turn of the 19th century, legislatures began prohibiting bringing guns to ballrooms. Rivas Decl. ¶ 21, Dkt. No. 142-2. As the 19th century progressed, state legislatures and local governments continued to enact laws prohibiting guns in venues where alcohol was served. Charles Decl. ¶¶ 39-40. Plaintiffs argue that the fact that the first ballroom prohibition was a "localized issue relating to fights at public balls," should lessen the import of this analogue. Pls.' Opp. & Reply at 53. If anything, it demonstrates that the "why" of these laws—preventing drunken fights from turning deadly—is the same as the CCIA's. *See Ziegenfuss v. Martin*, 824 F. Supp. 3d 540, 555 (N.D. Tex. 2026). Plaintiffs also argue that the 19th century analogues (the earliest of which fall in the Founding Era) should be disregarded because they "contrast with the lack of colonial or Founding Era prohibitions on carrying [firearms] in locations serving alcohol." Pls.' Opp. & Reply at 53. But "[r]easoning from historical silence is . . . risky." *Antonyuk*, 120 F.4th at 969. That is especially true here, where the historical record reveals that Founding Era and 19th century legislatures identified the same social problem that the CCIA seeks to address—the dangers of mixing firearms and alcohol—and tried different solutions, including the very same method used in the CCIA: prohibiting bringing firearms to places where alcohol is consumed.

**E.**     **Both the prohibition on bringing guns to performance, gaming and sport venues and the prohibition on bringing guns to permitted public events are supported by America's history of regulating guns in crowded spaces where people gather for entertainment**

**Sporting Venues**: Plaintiffs have dropped their challenges to performance and gaming venues, leaving only "the sporting venues ban." Pls.' Opp. & Reply at 32. As to that provision, Plaintiffs argue that Superintendent James has "misread[]" their challenge, because they merely "seek to carry at places used for informal, amateur, or youth sporting events."[7] *Id*. These places,

---

[7] Plaintiffs argue that they should be allowed to carry guns at these locations, because they do not

18

they say, "are much more like the racetracks and green spaces common at the Founding that professional stadiums." *Id*. at 33. But this is not an "as applied" challenge; it is a facial challenge, and the challenger must "establish that no set of circumstances under which the Act would be valid." *Salerno*, 481 U.S. at 745. Trying to narrow their challenge to places like "[a] local basketball court, soccer field, or baseball diamond," Pls.' Opp. & Reply at 33, does not lower the standard for a facial challenge. And sensibly so: if Plaintiffs have their way, the State could no longer prohibit carrying guns into "Madison Square Garden, Yankee Stadium, Highmark Stadium, or the USTA Billie Jean King National Tennis Center." *Id*. at 32.  Plaintiffs argue that Superintendent failed to point to "colonial or Founding Era law banning firearm carry at horse tracks or in other areas used for sports or games," that the Northampton statute and its American analogues are not "proper analogues," and that the 19th-century laws introduced by Plaintiffs are "too late and contradict the Founding Era tradition preferring the free exercise of the right to carry at these sporting venues." Pls.' Opp. & Reply at 33-34. But Plaintiffs do not acknowledge that prior to the 19th century there were "few public gathering spaces comparable to modern sports stadiums," and they ignore the extensive evidence of prohibitions on public carry in smaller venues where people gathered for entertainment, dating back to the colonial era. Cross-Mot. at 30-31. Likewise, they argue, without support, that this Court should ignore the extensive evidence in the record that, during the Reconstruction Era, it was commonplace for governments to prohibit carrying firearms into recreational and entertainment venues. *Cf*. Pls.' Opp. & Reply at 34 with Rivas Decl. ¶ 34.

---

have the "comprehensive screening at entrances and the presence of security guards" to be found at larger venues." Pls.' Opp. & Reply at 33. But Dr. Reeping's research and testimony makes plain that there is no evidence that prohibiting guns at these venues will increase the risk of violence and evidence to the contrary. Reeping Decl. ¶ 11, Dkt. No. 142-23.

**Public Events**: In support of their claim that they should be allowed to carry guns at public events (such as parades, fairs, and markets), Plaintiffs again argue that the only good history is from the colonial and Founding eras. Pls.' Opp. & Reply at 38-39. But even if that were so, there is a historical tradition of regulating guns in places where people gather that dates back to colonial America and extends through to today. Cross-Mot. at 29-36. Plaintiffs next argue that even the 19th century historical laws prohibiting guns at special events identified by Patrick Charles, "are not proper analogues" because they "merely prohibited firearms 'discharge' or 'use' at specified times of the year." Pls.' Opp. & Reply at 39. But this ignores the full range of analogues identified by Patrick Charles, who presented both discharge prohibitions and carry prohibitions, with the former more common at Fourth of July events, and the latter more common at fairs and markets. *See, e.g.,* Charles Ex. 83, 84, 85. Plaintiffs' final argument is that the fact that some localities allowed discharge of guns on holidays means that "no national historical tradition can be gleaned from these statutes because" of this contradiction. Pls.' Opp. & Reply at 39. But no case requires a single, uncomplicated historical tradition—this is not how history works, and it is not what the Supreme Court requires. Instead, as the Supreme Court explained in *Wolford*, even "a single analogue" can establish that a modern regulation "is consistent with the codified [Second Amendment] right." 2026 WL 1825723, at *6. And just as reasoning from historical silence is "risky," *Antonyuk*, 120 F.4th at 969, Plaintiffs' attempt to point to a few laws allowing gunfire on holidays proves only that local governments have long understood themselves as possessing the power to regulate firearm carry during public events. *See Goldstein*, 680 F.Supp.3d at 397.

**F.      The prohibition on guns in government administration buildings is constitutional**

Plaintiffs argue that "[t]he state cannot show that there is a historical tradition of banning firearms in *all* places where government functions occur." Pls.' Opp. & Reply at 23 (emphasis

added).[8] But that is not what Superintendent James is required to show—rather, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit," an analysis that does not require a "precise[] match." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). Dr. Rivas' declaration and testimony established that, since the colonial era, governments have understood that they may prohibit guns in "sites of government activity." Rivas Decl. ¶ 30.

Plaintiffs seek to limit the CCIA's prohibition on guns in government administration buildings to only *Bruen's* illustrative examples of places where guns may be prohibited—polling places, legislatures, and courts. Pls.' Opp. & Reply at 24. First, because this is a facial challenge, the fact that Plaintiffs concede that guns may be prohibited in some government administration buildings should resolve this issue entirely. *Rahimi*, 602 U.S. at 694. In any event, nothing in *Bruen* suggests that these examples were intended to narrow *Heller*'s discussion of "longstanding . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and in fact the Court noted that "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30 (emphasis in the original). Plaintiffs resort to suggesting that *Bruen* should have "reiterated *Heller*'s language in a binding holding," Pls.' Opp. & Reply at 24, but as *Bruen* did not overrule *Heller*, it is hard to see why the Supreme Court should be expected to note that a passage in *Heller* that lower courts have repeatedly relied upon is still good law.

Plaintiffs next contend that the proffered colonial and Founding era analogues are different

---

[8] Plaintiffs also argue that Superintendent James has "acknowledge[d] that no historical analogues, much less any from the colonial or Founding eras, prohibited weapons at all buildings where any kind of government business occurs." Pls.' Opp. & Reply at 24. But of course, "Legislatures past and present have not generally legislated to their constitutional limits." *Antonyuk*, 120 F.4th at 969.

from the CCIA's ban, but what they point to (namely, that three of the analogues had temporal limitations) are distinctions without a difference. Superintendent James need not produce "a 'dead ringer' or 'historical twin'" as an analogue in order to show (as he has here) that a modern law is consistent with this country's historical tradition of regulating firearms. *Wolford*, 2026 WL 1825723, at *6. Finally, Plaintiffs argue that the myriad 19th century historical analogues are "too late in time," but as discussed *supra*, this argument is at odds with the Supreme Court's practice on this issue and the Second Circuit's binding caselaw.

**G.     The prohibition on guns in health care facilities and nursing homes is constitutional**

Health care facilities and nursing homes are "locations where vulnerable populations congregate," and there is a long history of prohibitions on guns in such locations. *Antonyuk*, 120 F.4th at 1012. Plaintiffs argue that this Court should disregard *Antonyuk* and ignore *Kipke v. Moore*, 165 F.4th 194, 216 (4th Cir. 2026), both of which upheld prohibitions of firearms in health care settings, because *Wolford* undermines their holdings. In *Antonyuk*, the Court looked to precisely what *Wolford* says it must: "the relevantly similar feature of these analogues is the *how* and the *why*: firearm prohibition (how) in places frequented by and for the protection of vulnerable populations (why)." 120 F.4th at 1012 (emphasis in the original). To be sure, *Antonyuk* concluded that the "vulnerable population" protected by the analogues need not be the same as that protected by modern regulation, *id*., but that is not at odds with *Wolford*, which requires a "similar" rationale, not an identical one. 2026 WL 1825723, at *6. Similarly, the analysis in *Kipke* is on point and not at odds with *Wolford*, as it concluded that modern health care facilities are unlike hospitals at the time of the Founding, and that the prohibiting guns in health care facilities was supported by both the historical tradition of prohibiting guns in places where vulnerable people gather as well as by the "historical tradition of banning guns in places used for scientific

purposes." *Kipke*, 165 F.4th at 216.[9]

Plaintiffs also argue (again) that these provisions of the CCIA cannot be reconciled with the "historical principle" that "required" individuals to "carry firearms to protect vulnerable populations." Pls.' Opp. & Reply at 30. This argument relies upon the same Founding-era laws that required "white male inhabitant[s]" to carry arms so as to *target* vulnerable populations, namely enslaved persons. Dkt. No. 130-36, Dkt. No. 130-37. They do not support the Plaintiffs' arguments and should be disregarded. *See Wolford*, 2026 WL 1825723, at *14.

**H.      The prohibition on guns on public transit and in airports is constitutional**

Plaintiffs contend that Superintendent James has "underestimat[ed] . . . the Founders" and that "shared transportation already existed throughout America during the Founding," pointing to "the maritime intercontinental travel that brought pilgrims to Plymouth Rock."[10] Pls.' Opp. & Reply at 43-44. But the fact is that "[t]here were no mass transit systems at the time of the Founding," making "lack of historical laws that specifically regulated transit systems . . . a natural consequence." *Frey*, 157 F.4th at 136; *see also Schoenthal v. Raoul*, 150 F.4th 889, 919 (7th Cir. 2025), *cert. denied,* 224 L. Ed. 2d 380 (Apr. 6, 2026) ("[W]e emphasize that public transit did not exist until late in the 19th century"). What is evident is that as soon as there were systems of mass transit—privately operated railroads—the operators of those systems prohibited firearms or

---

[9] Plaintiffs argue that there were sites where health care was provided at the time of the Founding. Pls.' Opp. & Reply at 29. But health care settings at the time of the Founding were very unlike health care facilities today. *See, e.g.*, Dkt. No. 130-38 (noting at the time of the founding, "Physicians treated many patients in their homes" where "[t]he physician brought drugs for the patient, provided some nursing care, and observed changes in the patient's condition" and noting that almshouses were used, among other things, "as temporary shelters for the sick and needy."). And given that this is so, it is entirely appropriate to rely upon the extensive history of restricting firearms in places where vulnerable people congregate.

[10] Plaintiffs reference "shared transportation" and "shared transit," throughout this portion of the brief, presumably to sweep in modes of transportation such as the stagecoach. Pls.' Opp. & Reply at 44-45. But a stagecoach is simply not comparable to commuter rail and the subway, not least because the latter carry orders of magnitude more travelers than a stagecoach.

regulated their storage while on board, and their decisions had the force of law. Cross-Mot. at 45-46. Plaintiffs argue that these "were private regulations imposed by whim," and suggest that Dr. Rivas "admits" that the records of these private regulations "are too sparse to draw any kind of meaningful pattern." Pls.' Opp. & Reply at 44. As Dr. Rivas explained, while there are gaps in the records, "[e]xtant records for rail companies indicate that regulating the carriage of guns on board was not uncommon," and that this is consistent with 19th-century norms about not carrying guns in public. Rivas Decl. ¶¶ 44, 46. Finally, Plaintiffs suggest that the colonial and Founding era laws requiring travelers to carry arms in response to active warfare with Native peoples are better historical analogues, because contemporary Americans may encounter a "situation giving rise a self-defense need." Pls.' Opp. & Reply at 45. This analogy fails, not least because traveling on the Long Island Rail Road in the 21st century does not involve "wartime considerations." Rivas Dep. Excerpts 205:10-15, Dkt. No. 142-34.

As for airports, Plaintiffs say they merely want to carry in "unsecured liminal areas of airports like parking lots, drop off and pick up lanes, terminal entrances, and baggage claim areas." Pls.' Opp. & Reply at 48. This is a facial challenge, in which they seek to invalidate the prohibition on carrying in airports, full stop. *See* Second Am. Compl. ¶¶ 109, 152, Dkt. No. 63 (asserting facial claim and prayer for relief). Plaintiffs do not and could not argue that the prohibition on carrying guns into airports would be valid in no circumstances—and that is fatal to their challenge. *Rahimi*, 602 U.S. at 693. Even as to the "liminal spaces," Plaintiffs' arguments fall apart. They contend (without citation) that these areas "are no different from other kinds of unsecured transportation terminals for which there is no historical tradition of banning carry and where self-defense concerns persist." Pls.' Opp. & Reply at 48. And Plaintiffs argue that the analogues prohibiting carry in crowded and enclosed spaces are not applicable because these "liminal spaces" are not

24

crowded. *Id*. at 48-49. That assertion is at odds with the experience of anyone who has waited for a rideshare car, picked up luggage from a baggage claim, or navigated the entrance and ticketing halls of any airport in New York State.

## I.        Plaintiffs mistake Times Square for Manhattan

Plaintiffs argue that the Times Square gun-free zone "offends *Bruen's* mandate against declaring Manhattan a sensitive place." Pls.' Opp. & Reply at 40. At another point, Plaintiffs describe the Times Square prohibition as a "[b]road carry ban[] covering entire city limits" and as a "large portion of a city." *Id*. at 42. Manhattan comprises over 22 square miles of land,[11] and the Times Square gun free zone occupies a quarter of a square mile (roughly 1% of Manhattan by square mileage and a mere .08% of New York City's land area).[12] And while Plaintiffs argue that *Frey* misread *Bruen*, they misread *Frey*, which emphasized a tradition of prohibiting firearms not just in "quintessentially crowded places," but also in "public forums." 157 F.4th at 133 (quoting *Antonyuk*, 120 F.4th at 969). This historical tradition is also evident in testimony of Superintendent James' historical experts. *See* Cross-Mot. at 48-49.

## VI.    THE PRIVATE PROPERTY CHALLENGE IS MOOT

Plaintiffs failed to respond to Superintendent James' argument that the Second Circuit mooted Plaintiffs' challenge to Penal Law § 265.01-d (the "Private Property Provision") when it affirmed a permanent injunction that prohibits the law's enforcement.[13] "[T]here is no 'reasonable

---

[11] *2020 Census Gazetteer Files: New York County Subdivisions*, United States Census Bureau.

[12] Taking the zone in two segments: the first is from West 40th to West 48th Street (.4 miles) and from 8th to 9th Avenues (.2) miles – this segment has a total square mileage of .08. The second segment is from West 40th to West 53rd Street (.6 miles) and from 8th to 6th Avenues (.3 miles), for a square mileage of .18. Adding these two figures together, the square mileage of the Times Square Gun Free Zone is .26. New York City occupies a total land area of 300.45 square miles. *QuickFacts, New York City, New York*, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/PST045225.

[13] Of course, even though Plaintiffs have not responded to this argument, "[t]he Court must still 'determine whether the legal theory of the motion is sound.'" *Higbie v. James*, 795 F. Supp. 3d

expectation'" that an already enjoined defendant will take "'the same action again.'" *Giambalvo v. Suffolk County*, 155 F.4th 163, 179 (2d Cir. 2025) (citation omitted). Accordingly, in *Giambalvo*, the Second Circuit held that plaintiffs in a preliminary posture could not "evade mootness" after the Circuit affirmed "[another] district court's preliminary injunction on the merits." *Id*. And that reasoning applies even more forcefully here. The Second Circuit has affirmed a permanent injunction, not a preliminary one. *See Christian*, 176 F.4th at 206. Adding another injunction against the Private Property Provision would have no "real-world effect," and Plaintiffs' claim is moot. *Giambalvo*, 155 F.4th at 179 (citation omitted).

## VII. THE AUTOMOBILE STORAGE PROVISION FALLS OUTSIDE THE SECOND AMENDMENT'S TEXT AND IS SUPPORTED BY HISTORICAL GUN LAWS

As to New York's vehicle storage law, which simply requires anyone who "store[s] or otherwise leave[s]" a gun "out of such person's immediate possession or control inside a vehicle" to unload the gun and place it in a locked "safe storage depository out of sight from outside the vehicle," N.Y. Penal Law § 265.45(2), Plaintiffs do not dispute the Superintendent's argument that the law only applies when a person is *not* bearing arms,"[14] and therefore falls outside the Second Amendment's text.[15] Cross-Motion at 51-52. They argue that certain "ancillary" rights are protected, citing to *New York State Firearms Association v. James*, 157 F.4th 232 (2d Cir. 2025), but do not engage with that case's holding that "unenumerated 'ancillary' conduct . . . is 'only

---

307, 330 n.1 (N.D.N.Y. 2025) (citation omitted). But "[i]t is 'simply not [the Court's] job, at least in a counseled case[,]' to develop arguments on Plaintiff's behalf." *O'Brien v. City of Syracuse*, No. 5:22-CV-948, 2025 WL 1519411, at *27 (N.D.N.Y. May 27, 2025) (citation omitted) (second and third alterations in original).

[14] The fact that the Automobile Storage Law does not apply to weapons in "such person's immediate possession or control" negates Plaintiffs' attempt to conflate New York's law with the D.C. law discussed in *Heller*, which required "that firearms in the home be rendered and kept inoperable at all times" and "ma[de] it impossible for citizens to use them for the core lawful purpose of self-defense." 554 U.S. at 630.

[15] Plaintiffs contend, Pls. Opp. & Reply at 2, that "the state concedes" that all of the CCIA falls within the text of the Second Amendment. That is incorrect.

protected to the extent that it is necessary to the realization of the textually-specified right to keep and bear arms,'" and that "regulations on the means of [] transporting [] and storing firearms only implicate the text of the Second Amendment if they *meaningfully constrain* the right to possess and carry arms." *NYSFA*, 157 F.4th at 244 (quoting *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025)) (emphasis in the original). Because Plaintiffs have not made this showing at *Bruen*'s first, textual step, on which they bear the burden, *see United States v. Gomez*, 159 F.4th 172, 177-78 (2d Cir. 2025), the Court's analysis can and should stop there.

Even if the Court reaches *Bruen*'s second step, Plaintiffs do not dispute the accuracy of the many historical storage laws adduced by the Superintendent, nor do they dispute that these laws were widely accepted, nor do they provide any evidence that such laws were ever viewed as unconstitutional. *Cf. Wolford*, 2026 WL 1825723 at *6 (historical basis demonstrated where laws were "open, widespread, and unchallenged"). Plaintiffs do not dispute that several of these laws had the explicit purpose of preventing theft, *see* Cross-Mot. at 53-54, and that the other storage laws had that practical effect. Instead, they argue that the subset of laws that explicitly mention theft are "too few to create a national historical tradition," Pl. Opp. & Reply at 58—in effect, that there are "dead ringers," but not enough—and that the many additional examples should all be ignored. That is not how the Second Amendment test works: as *Rahimi* establishes, it is error to "read *Bruen* to require a 'historical twin' rather than a 'historical analogue.'" 602 U.S. at 701. Modern storage regulations, which like historical laws specify the manner in which weapons and ammunition may be kept in order both to protect public safety and to prevent theft, are entirely "consistent with the principles that underpin our regulatory tradition." *Wolford*, 2026 WL 1825723 at *7 (quoting *Rahimi*, 602 U.S. at 692, 698-99).

## VIII. PLAINTIFFS HAVE NOT MET THEIR BURDEN ON THE EQUAL PROTECTION AND VAGUENESS CLAIMS

On vagueness, Plaintiffs repeat—citing no authority but *Wolford*, which did not address vagueness—that the CCIA is vague because it is "comprehensive" and "broad" and "makes it effectively impossible for a person to determine where he can carry." Pls.' Opp. & Reply at 59-60. But this is contradicted by the testimony of Plaintiffs themselves, Cross-Mot. at 57-58, and in any event "comprehensiveness" does not make a statute vague. *See generally Thibodeau v. Portuondo*, 486 F.3d 61, 65-66 (2d Cir. 2007). Plaintiffs also suggest that "even the state itself fails to understand what the words of the CCIA mean." Pls. Opp. & Reply at 59. But the mere fact that a challenger can "conjure up hypothetical cases in which the meaning of these terms will be in nice question," does not render a statute unconstitutional: "because we are condemned to the use of words, we can never expect mathematic certainty from our language." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (internal quotation marks and citations omitted).

Plaintiffs' equal protection arguments also fail. In New York, peace officer training is much more intensive than the training required to obtain a handgun carry license. *Compare* N.Y. Crim. Proc. Law § 2.30 and 9 N.Y.C.R.R. §§ 6020.3, 6022.3 *with* N.Y. Penal Law § 400.00. And Plaintiffs, unlike retired police officers, do not have the experience of working years serving as law enforcement officers, which certainly bears on their ability to exercise good judgment and conduct themselves responsibly. Plaintiffs and retired law enforcement officers are not "in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

## IX. PLAINTIFFS' FACIAL CHALLENGE TO THE LICENSING LAW ALSO FAILS

As the Court previously held, *see NYSRPA v. James*, No. 1:22-CV-907 (MAD/PJE), 2025 WL 553423 (N.D.N.Y. Feb. 18, 2025) at *3-4, and as the Superintendent noted in his moving brief, Cross-mot. at 5 & 59 n.26, the licensing-based claims against the Superintendent were dismissed

more than a year ago. Plaintiffs attack the Superintendent for failing to oppose a claim that has already been dismissed, arguing that "[t]he state fails to support its licensing requirements," and that "[n]o defendant disputes Plaintiffs' arguments" against the licensing laws." Pls. Opp & Reply at 54, 56. The facial constitutionality and historical foundation of the CCIA's licensing requirements are a matter of binding precedent. Nonetheless, out of an abundance of caution and despite no licensing claim being stated against him, the Superintendent briefly addresses the facial constitutionality of these laws.[16]

Shall-issue licensing laws "are constitutionally sound because they 'are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" *Frey*, 157 F.4th at 140 (quoting *Bruen*, 597 U.S. at 38 n.9). The Supreme Court's *Bruen* decision emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of such laws. 597 U.S. at 38 n.9*; see also id.* at 80 (Kavanaugh, J., concurring) ("States including New York . . . may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements"). The historical basis for such laws is rock-solid: the Second Circuit traced the history of licensing laws providing cabined discretion in *Antonyuk*, explaining that "[c]ities from across the country . . . adopted similar discretionary permitting schemes," that these laws "appear to have existed without constitutional qualms or challenges," and that the historical record "suggests that these policies enjoyed broad popular support and were understood at the time to be consistent with the Second and Fourteenth Amendments." 120 F.4th at 990. Accordingly, the Second Circuit "ha[s] interpreted [*Bruen*],

---

[16] The Superintendent does not address any as-applied challenge, as he has no knowledge of or control over the application of the licensing laws to any Plaintiff here. *See James*, 2025 WL 553423 at *3 (Superintendent "is not involved in the licensing of civilian applicants like the Individual Plaintiffs"). Additionally, at least one Plaintiff, Wayne Francis, will have recently renewed his license, apparently without incident. Decl. of Wayne Francis ¶ 6, Dkt. No. 130-8.

along with the Court's reassurances in *Heller* and *McDonald* that there exists certain 'presumptively lawful regulatory measures,' to mean that shall-issue licensing regimes are 'presumptively constitutional.'" *Frey*, 157 F.4th at 140 (quoting *Heller*, 554 U.S. at 627 n.26, and *Giambalvo*, 155 F.4th at 180-81). Plaintiffs provide no grounds to undermine that presumption, and the provisions that they complain of (an in-person meeting requirement, character references, and the licensing officer's ability to ask questions that are "reasonably necessary and related to the review of the licensing application," Pl. Opp. & Reply at 56) are several of the same ones upheld in *Antonyuk*. *See* 120 F.4th at 999-1002.

## X. PLAINTIFFS HAVE NOT MADE THE NECESSARY SHOWING TO OBTAIN PERMANENT INJUNCTIVE RELIEF

In addition to failing to meet their burden on the merits, Plaintiffs have not shown their entitlement to injunctive relief. "An injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and Plaintiffs carry the burden to satisfy four factors: (1) "irreparable injury," (2) "inadequa[cy]" of "remedies available at law," (3) justification given "the balance of hardships," and (4) service to "the public interest," *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Yet Plaintiffs fail to address any of these requirements. *See* Dkt. Nos. 130-2, 147-1. That silence on dispositive "matter[s] of law" is not sufficient for summary judgment. Fed R. Civ. P. 56(a); *see, e.g.*, *Sulzer Mixpac AG v. DXM Co.*, No. 19 CIV. 9404, 2024 WL 3536366, at *6 (S.D.N.Y. July 25, 2024).

### <u>CONCLUSION</u>

For the reasons set forth above, and upon all prior proceedings, Superintendent James respectfully asks the Court to grant his motion for summary judgment, deny Plaintiffs' motion for summary judgment, dismiss this action in its entirety and with prejudice, and grant such other and further relief as the Court deems just and proper.

30

Dated: Albany, New York
      July 22, 2026

LETITIA JAMES
New York State Attorney General
<u>Attorney for the Superintendent</u>

By: _____

Molly Thomas-Jensen
Special Counsel
NDNY Bar Roll No. 705119
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-8679
<u>molly.thomas-jensen@ag.ny.gov</u>

Jennifer J. Corcoran
Assistant Attorney General
NDNY Bar Roll No. 508740
The Capitol
Albany, NY 12224
Tel: (518) 776-2581
<u>jennifer.corcoran@ag.ny.gov</u>

James M. Thompson
Special Counsel
NDNY Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-6556
<u>james.thompson@ag.ny.gov</u>

CC: All Counsel of Record
    (via ECF)